IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| VERONICA POLLARD, <u>et al.</u>, | ) |
| | ) |
|     Plaintiffs | ) |
| | ) |
|         v. | ) CA No. S-02-CV-764 |
| | ) Judge Quarles |
| THE UNITED STATES OF AMERICA | ) |
| | ) |
|     Defendant | ) |

**<u>PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES</u>**

This medical negligence action is brought by Veronica and Roosevelt Pollard against the United States of America and Raj Gupta, M.D., a civilian oncologist, and relates to medical treatment that was provided to Veronica Pollard for breast cancer in October-December, 1998, at the Fort Gordon, Eisenhower Army Medical Center (hereafter "Eisenhower"), in Augusta, Georgia.

**<u>FACTUAL BACKGROUND OF THE CASE</u>**

Mr. Pollard is a staff Sargent in the Army where he has served for nineteen years. He specializes in the installation and repair of micro electronic equipment. Mrs. Pollard retired from the Army as a staff Sargent in 1996, after serving 20 years. In 1998, Mr. and Mrs. Pollard and their two young sons, were living near Fort Gordon in Augusta, Georgia. During that year Mr. Pollard was on a "hardship" assignment in Kuwait, which meant that he was away from his family. The tour in Kuwait was scheduled to end in December, 1998. However, Mr. Pollard returned early to Fort Gordon in October, 1998, after Mrs. Pollard was diagnosed with breast cancer. Mr. Pollard's next assignment was to England, and was scheduled to begin in January,

1999. The family was to accompany him on this tour.  In December, 1998, Mrs. Pollard was medically cleared for the transfer to England by the physicians at Eisenhower, and the family moved from their home in Augusta, Geogia, in the last half of the month.  The Pollard's arrived in England in mid-January, 1999, and were there until June, 2000.  The Pollard's returned to the United States in June, 2000, after Mrs. Pollard breast cancer recurred.  Mr. Pollard is currently stationed with his family at Fort Meade, in Odenton, Maryland.

The allegations in this case relate to the medical care and treatment that Mrs. Pollard received at the Eisenhower Army Medical Center in October-December, 1998, after she was diagnosed with breast cancer.  In late September, 1998, while Sgt. Pollard was in Kuwait, Mrs. Pollard discovered a lump in her right breast on self-examination.  She was 43 years old at the time and pre-menopausal.  Mrs. Pollard had a strong family history of breast cancer that included her mother and an older sister, and she sought immediate consultation with one of the surgeons at Eisenhower.

On October 2, 1998, Mrs. Pollard underwent a fine needle aspiration of the lump in her breast.  The pathologic examination showed some "atypical cells," and an excisional biopsy of the tumor was performed on October 14, 1998. Pathologic report of the biopsy described a .5 cm tumor, with margins that were "extremely close" to the edge of excised tissue.  The report also described the tumor as "infiltrating carcinoma with medullary features."

On November 12, 1998, Dr. David Sees, a surgeon on staff at Eisenhower, performed a lumpectomy to remove a wider margin of tissue around where the tumor had been excised during the biopsy.  Dr. Sees also dissected and removed 17 axillary lymph nodes. Pathology studies on the new specimens were reported as showing no additional findings of cancer in

either the excised tissue or the lymph nodes. On November 17, 1998, Dr. Sees sent a referral form to Dr. Raj Gupta requesting an oncology consult for Mrs. Pollard to discuss the need for adjuvant chemotherapy and radiation treatment. The appointment was scheduled for December 1, 1998.

Dr. Gupta discovered at the time of the December 1, appointment that additional pathology studies which should have been done to determine certain prognostic features of cancer had never been ordered.[1] Dr. Gupta told Mrs. Pollard that the small size of her tumor and the fact that her lymph nodes were negative were good prognostic factors. Dr. Gupta also told Mrs. Pollard that he could not advise her regarding the need for adjuvant chemotherapy until he had the results of the studies. (Exhibit 2, Deposition of Raj Gupta, M.D., p. 46) Dr. Gupta requested the studies and scheduled Mrs. Pollard for a second appointment. The appointment was scheduled for December 15, 1998, which was a day or two before the Pollards were scheduled to leave Fort Gordon and begin the process of transferring to England.

Most of the additional pathology results were available to Dr. Gupta on December 15, 1998. These studies showed that the tumor that was removed during the biopsy was estrogen and progesterone receptor negative, and had a high proliferation index. Both of these were poor prognostic indicators, and combined with Mrs. Pollard's age and family history, weighed

---

[1]   Steven Adams, M.D., who was a pathologist at Eisenhower, examined the specimen from the October 14, 1998, excisional biopsy. Dr. Adams reported that the tumor was .5 cm and was poorly differentiated. Dr. Adams conceded at his deposition that he was responsible for forwarding the specimen to an outside laboratory for studies to determine additional prognostic features of the cancer, including whether the tumor was estrogen and progesterone positive or negative and the proliferation rate of the cancer cells. This information should have been available by the end of October, 1998, before the lumpectomy.

strongly in favor chemotherapy. Dr. Gupta never advised Mrs. Pollard that chemotherapy was indicated when she returned to see him on December 15, 1998. Instead, on December 16, 1998, Dr. Gupta wrote a referral letter, "To Whom It May Concern," stating that Mrs. Pollard's adjuvant treatment was "somewhat debatable," but that he "favored recommending adjuvant chemotherapy" based on the fact that she was "pre-menopausal and that her receptors were negative." (Exhibit 16) This letter was sent to the military base in England where Mr. Pollard was to be stationed.

     Plaintiffs contend that the physicians at the Eisenhower Army Medical Center, failed to provide timely and appropriate chemotherapy and radiation treatment following the excisional biopsy on October, 14, 1998, and lumpectomy and lymph node dissection on November 12, 1998. Dr. Gupta and Dr. Sees both conceded in their depositions that Mrs. Pollard required chemotherapy to be administered within 4-6 weeks of surgery, followed by radiation treatment. (Exhibit 1, Deposition of David Sees, M.D., pp. 52-54; Exhibit 2, Deposition of Raj Gupta, M.D., pp. 29, 71) The purpose of adjuvant chemotherapy is to systemically eradicate any cancer cells that may have been released into the blood stream during surgery, before they have a chance to multiply and spread throughout the body, which is why the timing is considered important. (Exhibit 2, Deposition of Gupta, p. 69) Radiation treatment of the entire breast is given following lumpectomy to eradicate microscopic focal lesions that may have remained. The combination of lumpectomy with radiation treatment is generally considered as effective as radical mastectomy in treating breast cancer in women who have node negative small tumors.

     As the treating oncologist it was Dr. Gupta's duty to advise Mrs. Pollard that

chemotherapy and radiation treatment were indicated, and to administer the adjuvant treatment within the 3-6 weeks of surgery, even if it meant delaying her move England. At the very least, the standard of care required Dr. Gupta take steps to determine whether appropriate arrangements could be made for Mrs. Pollard to receive chemotherapy within this time frame once she got to England. Dr. Gupta did neither.

      Dr. Gupta testified at his deposition that when he saw Mrs. Pollard on December 15, 1998, he believed that chemotherapy was indicated and understood that treatment should begin as soon as the surgical site had healed, which is usually within 4-6 weeks, with radiation treatment to follow. (Exhibit 2, Deposition of Gupta, p. 29, 71) Dr. Gupta also agreed that the standard of care required radiation treatment within 3-6 weeks of surgery if chemotherapy was not indicated. Id. at p. 26. Dr. Gupta testified that when he saw Mrs. Pollard he understood that she was scheduled to be transferred with her husband to England and did not believe that he was responsible for her adjuvant care and treatment. Id. at p. 22-23. Instead of advising Mrs. Pollard of his recommendations as he would have any other patient, Dr. Gupta deferred the decision regarding chemotherapy and the timing of treatment to the doctors in England. By his own admission, Dr. Gupta deferred the care and treatment of Mrs. Pollard's breast cancer without knowing who would assume her care once she got to England or when treatment might begin, and without knowledge of the standards of oncology practice in England. Id. at pp. 15, 42-44.

      Mrs. Pollard left Augusta, Georgia in December, 1998, to travel with her family to England, not knowing that she needed chemotherapy, with no understanding that there was any urgency, and believing that her prognosis was good and that she had been medically cleared by

5

Dr. Gupta and the other physicians at Eisenhower. (Exhibit 3, Deposition of Veronica Pollard, pp. 29-36) Had Mrs. Pollard been advised that chemotherapy was recommended and understood the importance of the timing, she would have, and easily could have delayed going to England until after treatment was completed. (Exhibit 3, Deposition of Veronica Pollard, pp. 38-39) Dr. Gupta's failure to advise Mrs. Pollard regarding the need for chemotherapy and the importance of timing, ensured that any adjuvant treatment would be delayed well beyond the optimal time for preventing recurrence and metastatic spread of the disease. As it turned out, the oncologist in England recommended against chemotherapy when he saw Mrs. Pollard in mid-February, and radiation treatment was delayed for six months. (Exhibit 4, Letter of Dr. David Dodwell)

When the Pollard's arrived in England in mid-January, 1999, Mrs. Pollard sought follow-up care immediately. Her first appointment was with a general practitioner, on February 2, 1999. The general practitioner referred Mrs. Pollard to the oncologist, Dr. David Dodwell. Mrs. Pollard saw Dr. Dodwell on February 18, 1999, which by then was three month after the lumpectomy. Dr. Dodwell did not advise chemotherapy at that point, but referred Mrs. Pollard for radiation treatment. Radiation treatment did not begin until late April, 1999, which was then six months after surgery.

In February, 2000, Mrs. Pollard developed pain in her right breast and chest area. A biopsy in May, 2000, revealed recurrent cancer in her right breast. Mrs. Pollard was transferred back to the United States for further treatment at Walter Reed Army Hospital. In June, 2000, at Walter Reed, Mrs. Pollard was diagnosed with metastatic cancer in her lymph nodes and lungs. Since June of 2000, Mrs. Pollard has undergone right mastectomy, removal

of portions of her lungs, bone marrow transplant, and at least seven trials of chemotherapy, but has been unable to eradicate the wide-spread metastatic disease.

Mrs. Pollard developed incurable metastatic cancer and now has no chance of survival because the defendants failed to provide chemotherapy and failed to provide radiation treatment at the appropriate time following the lumpectomy. Plaintiffs contend that Mrs. Pollard would more likely than not have survived if she had received the appropriate adjuvant treatment at the appropriate time.

**BACKGROUND OF THIS DISPUTE**

On February 5, 2003, plaintiffs' counsel received a letter from Ms. Cerniglia-Lowensen requesting that we have our client sign an enclosed Authorization allowing her to obtain information from Dr. Dodwell in England. (Exhibit 5) The proposed Authorization was sweeping and included the language, "I also authorize Joan Cerniglia-Lowensen to speak with Dr. Dodwell or other employees of The Leeds Teaching Hospital concerning my condition." Id.

Plaintiffs' counsel responded the same day with a revised Authorization, that we agreed to have our client sign if the changes were acceptable to defense counsel. The revised form omitted authorization for Ms. Cerniglia-Lowensen to speak with Dr. Dodwell, and included the following paragraph instead: "I do not authorize you to speak with anyone about me outside of my attorneys' presence. My attorneys are BRUCE J. KLORES and LESLEY S. ZORK of the law firm of BRUCE J. KLORES & ASSOCIATES, P.C. The attorneys from the firm of MORGAN SHELSBY DOWNS & EVERTON are not my attorneys. (Exhibit 6)

We heard nothing until April 3, 2003, when Ms. Cerniglia-Lowensen sent a letter

requesting our client's written consent to schedule the deposition of Dr. Dodwell in England. (Exhibit 7) We promptly sent our proposed Authorization to Mrs. Pollard for her signature, and Mrs. Pollard signed and returned it on April 16, 2003. (Exhibit 9) On April 22, 2003, Ms. Cerniglia-Lowensen sent a second letter stating that she approved of the revised Authorization that we had previously sent to her, and requested that we forward it to our client to be signed so that she could schedule the deposition of Dr. Dodwell "as soon as possible." She stated that Dr. Dodwell would not agree to schedule the deposition without our client's signed consent. (Exhibit 8). The signed Authorization was forwarded to Ms. Cerniglia-Lowensen that same day.

Ms. Cerniglia-Lowensen contacted our office several times during the Summer as she was attempting schedule Dr. Dodwell's deposition, and we cooperated with her efforts at every turn. When Ms. Cerniglia-Lowensen was unable to schedule Dr. Dodwell's deposition until October 6, 2003, plaintiffs' counsel even consented to defense counsel's Motion to extend the discovery deadline to allow Dr. Dodwell's deposition to go forward. Our willingness to cooperate ended on September 5, 2003, when we learned that Ms. Cerniglia-Lowensen had flagrantly violated the terms of the Authorization to which both side had agreed, by engaging in *ex parte* communications with Dr. Dodwell.

On September 5, 2003, at 9:00 a.m., plaintiffs' counsel spoke to Dr. Dodwell in England by telephone. Dr. Dodwell informed plaintiffs counsel that he had no independent recollection of Mrs. Pollard, and that he was relying solely on his medical records regarding her care and treatment. During the course of the conversation Dr. Dodwell also disclosed that he had spoken to Ms. Cerniglia-Lowensen at length several nights earlier, and that he had

8

received several letters and numerous emails from Ms. Cerniglia-Lowensen. Dr. Dodwell described three letters in his file from Ms. Cerniglia-Lowensen, including a letter dated June 9, 2003, which Dr. Dodwell read to us in its entirety. The letter began by imploring Dr. Dodwell for his help in this case. The letter said that Dr. Gupta was being blamed for Mrs. Pollard's decision to go to England, and that plaintiffs' counsel were making wild accusations about Dr. Dodwell's care of Mrs. Pollard and the health care in England in general. The letter ended with an offer to pay Dr. Dodwell if he would be willing to help Dr. Gupta in defending him against these unfair allegations. (Exhibit 10, Affidavit of Counsel)

In our conversation with Dr. Dodwell plaintiffs' counsel expressed to him our shock and concern that he had engaged in ongoing *ex parte* conversation with Ms. Cerniglia-Lowensen in light of the express terms of the Authorization that Mrs. Pollard signed. We asked Dr. Dodwell to have no further *ex parte* communications with Ms. Cerniglia-Lowensen until the issue could be resolved, and told Dr. Dodwell that we would not contact him *ex parte* either. We suggested that he have his attorney contact us and that all future communications be conducted "attorney to attorney." Dr. Dodwell agreed to this.

As soon as our call with Dr. Dodwell ended, he emailed Ms. Cerniglia-Lowensen (*ex parte*) and informed her about his conversation with our office. Within minutes Ms. Cerniglia-Lowensen called our office wanting to discuss the issue, which we declined to do so at that time. Plaintiffs' counsel then sent Dr. Dodwell an email stating our position in writing, and forwarded the email to Ms. Cerniglia-Lowensen. (See Defendant's Motion for Sanctions, Exhibit J) Before either side could take any considered action to resolve the issue, Ms Cerniglia-Lowensen rushed to Court with unfounded accusations that plaintiffs' counsel had

9

engaged in witness intimidation.  In doing so, Ms Cerniglia-Lowensen underscored the fact that she had consciously and intentionally disregarded Mrs. Pollard's confidentiality rights as well as the terms of our agreement, by her *ex parte* communications with Dr. Dodwell.

The June 9, 2003 letter that was to disclosed to plaintiffs' counsel by Dr. Dodwell disclosed was not attached to defendant's Motion for Sanctions.  This past week, Ms. Cerniglia-Lowensen represented to counsel that <u>all</u> of the correspondence between herself and Dr. Dodwell were attached to the Motion that was filed with the Court, and denied that there was any additional correspondence.  (Exhibits 11 and 12)

On September 11, 2003, plaintiffs' counsel wrote to defense counsel in an effort to resolve this issue before we were forced to air the entire course of events before the Court.  We stated our position, that in light of defense counsel's *ex parte* efforts to taint the witness, that we could no longer consent to his deposition.  (Exhibit 13)  Defense counsel replied that she was "not prepared to postpone or cancel the deposition of Dr. Dodwell."  (Exhibit 14)

**<u>ARGUMENT</u>**

**A.    Defense Counsel's *Ex Parte* Communications With Dr. David Dodwell Were In Flagrant Violation Of Mrs. Pollard's Privacy Right Under HIPAA**

As of April 14, 2003, all hospital, doctors, insurance companies and other health care providers are required by federal law to comply with the Health Insurance Portability and Accountability Act (HIPAA).  As of this deadline, pursuant to HIPAA, 45 CFR § 164 512(e), disclosure of health information of an individual in the context of judicial proceedings is only permitted under the following circumstances: 1) by individual consent; 2) by court order limited to those records "expressly authorized;"or 3) by subpoena or discovery request.  Under this third provision the party requesting the information is required to show "satisfactory

assurance" that "reasonable efforts" have been made to ensure that individual whose records are at issue has been given notice of the request and adequate time to object. 45 CFR § 164 512(e) applies to both federal and state courts. See 45 CFR §§ 160.202-205 (2002) (where state law regarding the disclosure of personal health information is more lenient that federal law, state law will be preempted). Penalties to health care providers for violations of this provision are severe and can range from civil fines of up $25, 000 for disclosures that are made by mistake, 42 CFR § 1320d-5(a)(1), to criminal penalties of up to$50,000 and 1 year in prison for intentionally disclosing patient health information, and $100,000 and five years in prison for intentionally disclosing patient health information under false pretenses. 42 CFR §§ 1320d-6(b)(1),(2)64 512(e).

The April 14, 2003 deadline for compliance with HIPAA coincided with the date, April 16, 2003, when Mrs. Pollard gave her written consent for defense counsel to obtain her medical records from Dr. Dodwell in England. (Exhibit 9) The limit of this consent was abundantly clear — counsel was expressly not authorized to speak with Dr. Dodwell outside of the presence of plaintiff's counsel. Under HIPAA, defense counsel was forbidden from going beyond the express terms of the authorization without first giving notice to plaintiffs and obtaining an Order from the Court. 45 CFR § 164.512(e).

**B.     Defense Counsel's *Ex Parte* Communications With Dr. Dodwell Were A Deliberate Violation Of Mrs. Pollard's Doctor Patient Privilege in England**

In addition to violating the requirements of HIPAA, defense counsel also violated Mrs. Pollard's doctor-patient privilege in England by exceeding the terms of Mrs. Pollard's consent. Dr. Dodwell informed Ms. Cernigilia-Lowensen by letter on January 28, 2003, "I do require Mrs. Pollard's consent in writing before I am able to disclose any information concerning her."

See <u>Defendant's Motion for Sanctions</u>, Exhibit B.  Again, on February 11, 2003, Dr. Dodwell wrote Ms. Cernigilia-Lowensen the following: "I am quite happy to go ahead, providing I have Ms. Pollard's written consent, and I hope that you will be able to provide this." <u>Defendant's Motion for Sanctions</u>, Exhibit F.  Ms. Cernigilia-Lowensen clearly understood that the doctor patient privilege existed in England.  In her April 3, 2003, letter to plaintiffs' counsel Ms. Cerniglia-Lowensen stated, "I am in the process of attempting to schedule the deposition of Ms. Pollard's treating physician in England, Dr. David Dodwell.  Dr. Dodwell requests the written consent of Ms. Pollard prior to scheduling his deposition.  Will you provide this consent?"  <u>Id.</u>, Exhibit G.  Having obtained Mrs. Pollard's consent and having agreed to its terms, Ms. Cerniglia-Lowensen had no authority to go beyond those express terms.

**C.      Defense Counsel's *Ex Parte* Communications With Dr. David Dodwell Were A Violation Of The Maryland Code of Professional Conduct**

In deliberately seeking information from Dr. Dodwell beyond the terms of plaintiff's authorization defense counsel also a violated Maryland's Rules of Professional Conduct.   Rule 4.4(b) provides the following:

> In communicating with third persons, a lawyer representing a client in a matter shall not seek information relating the matter that the lawyer knows or reasonably should know is protected from disclosure by statute or by an established evidentiary privilege, unless the protection has been waived.

In the past this Court has taken seriously deliberate violations by counsel of the confidentiality rights of litigants through *ex parte* contact with third parties.  See <u>Camden v. State of Maryland</u>, 910 F. Supp. 1115 (D. Md. 1996) (witness prevented from testifying and counsel disqualified from case for engaging in ex parte communications with former employee); <u>Zachair, Ltd. v. Driggs</u>, 965 F. Supp.741 (D. Md. 1997), aff'd <u>Zachair, Ltd. v.</u>

12

Drigg, 141 F. 3d 1162 (4th Cir. 1998) (disqualification and suppression of wrongfully obtained evidence only appropriate remedy for breach of confidentiality, since counsel could never "erase" the disclosure of confidential information from his mind)

Counsel's conduct in this matter violated not only Mrs. Pollard's statutory rights in this country and in England, and the ethical code of conduct in Maryland, it also undermines the civil discovery process that favors the informal resolution of discovery disputes where possible. Without the ability to trust that opposing counsel will abide by the terms of an informal resolution of a discovery dispute, every dispute will require litigation and a Court Order dictating the conduct of the parties. Such flagrant violation of the clear terms of a discovery agreement that has been worked out informally between parties should be viewed as seriously as a violation of court order and should carry the same penalties.

## CONCLUSION

It is clear from at least two of Ms. Cerniglia-Lowensen's letters to Dr. Dodwell that she was not merely seeking discovery in seeking to schedule Dr. Dodwell's deposition. It is clear that she intended to prejudice Dr. Dodwell against the plaintiffs and shape his testimony by telling Dr. Dodwell that plaintiffs were critical of his care. On March 25, 2003, Ms. Cerniglia-Lowensen wrote, "You are not a Defendant in this case. Your care has, however, been called into question by the Plaintiff." (Defendant's Motion for Sanctions, Exhibit E)  Again, on June 9, 2003, Ms. Cerniglia-Lowensen directly implored Dr. Dodwell for his help in defending her client, and told him that plaintiffs' were making "wild accusations" about his care and the care in England. (Exhibit 10)

Putting aside privacy concerns, it is questionable whether it would have been proper for

13

Ms. Cerniglia-Lowensen to have attempted to influence the witness in this way even if the statements were true. However, Ms. Cerniglia-Lowensen had no basis in truth for telling Dr. Dodwell that plaintiffs were making "wild accusations" about his care. In fact, Ms. Cerniglia-Lowensen understood completely that the criticism of the care by plaintiffs' experts in this case is limited to the care that was provided to Mrs. Pollard at Eisenhower. Ms. Cerniglia-Lowensen questioned plaintiffs' oncology experts about the standard of care in England. Each expert testified that they are not familiar with the standard of care in England. Plaintiffs' counsel also objected to the line of questions and stated on the record that plaintiffs' experts would not be testifying at trial about the care in England. (See Exhibit 15, Excerpts of the Depositions of Plaintiffs' Experts, Smith, Pushkas, and Fiorica). These statements to Dr. Dodwell were misleading, and designed to be inflammatory.

In addition to the letters and emails, defense counsel has sent Dr. Dodwell several volumes of Mrs. Pollard's medical records regarding her care in the United States, and agreed to pay Dr. Dodwell for his time spent reviewing the records. These records played no role in Dr. Dodwell's treatment of Mrs. Pollard. One can only assume that defense counsel intended to blind side plaintiffs' at Dr. Dodwell's deposition by engaging him as an expert outside of his role as Mrs. Pollard's treating doctor, and outside of defendant's expert designation.

The prejudice to plaintiffs cannot be cured at this point short of precluding defendant from deposing Dr. Dodwell. The misleading and inflammatory letters preceded defense counsel's lengthy *ex parte* conversation with Dr. Dodwell on September 2 or 3, 2003. There is every reason to think that Ms. Cerniglia-Lowensen continued in this vain when she spoke to Dr. Dodwell directly. The prejudice to plaintiffs, coupled with the seriousness of counsel's

misconduct warrants serious censure as well as remedial action. Accordingly, plaintiffs request that the Court impose the following: 1) defendants be precluded from deposing Dr. Dodwell and from calling him as a live witness at trial; 2) Defendant Gupta be required to pay plaintiffs' cost associated with opposing Defendant's Motion for Sanctions and Plaintiffs' Cross Motion for Sanctions; 3) counsel for defendant Gupta be compelled to provide all correspondence between herself and Dr. Dodwell, and all other letters, bills, emails, attorney notes and memos that relate to counsel's communications with Dr. Dodwell, to plaintiffs' counsel; and 4) whatever further relief the Court deems just and proper.

Precluding defendants from deposing Dr. Dodwell will result in no real prejudice to defendants. Dr. Dodwell has told plaintiff's counsel that he has no independent recollection of Mrs. Pollard, and, therefore, is relying solely on his records. Thus, his testimony as a treating doctor would add little outside what is already contained in Mrs. Pollard's records.

Plaintiffs' cooperated fully in defense counsel's efforts to obtain Mrs. Pollards records from Dr. Dodwell and to schedule deposition. Plaintiffs had every reason to assume that defense counsel and Dr. Dodwell would abide by the terms of plaintiff's consent. Plaintiffs' counsel have now had to spend many hours sidetracked by this issue that came about because of defense counsel's deliberate disregard of plaintiffs statutory rights and privileges. Accordingly, plaintiffs should be awarded all associated costs with preparing this Opposition and Cross-Motion.

Finally, it is clear from plaintiffs' counsels' conversation with Dr. Dodwell that defense counsel has not provided the Court or counsel all of correspondence between herself and Dr. Dodwell. Plaintiffs are entitled to know the full extent of defense counsel's *ex parte*

communications with Dodwell. Defense counsel waived any "work-product' privilege by placing some of her correspondence and communications with Dr. Dodwell before the Court. Counsel cannot now hide behind the privilege to keep from disclosing her memos and letters that would shed full light on her communications with Dr. Dodwell.

WHEREFORE, for these reasons and any others that may appear to the Court, plaintiffs respectfully request that defendant's Motion for Sanctions be denied, and that plaintiffs' Cross Motion for Sanctions be granted.

Respectfully submitted,

BRUCE J. KLORES & ASSOCIATES, P.C.

By:_____
   Lesley S. Zork- #013454
   Bruce J. Klores- #03320
   915 15th Street, NW
   Washington, D.C. 20005
   (202) 628-8100
Co-counsel for Plaintiffs

and

LAW OFFICES OF PETER MASCIOLA

_____
   Peter R. Masciola - #12958
   601 Pennsylvania Avenue, N. W. #900
   Washington, D.C. 20004
   202-628-5680
Co-counsel for Plaintiffs