IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| VERONICA POLLARD, <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | CA No. S-02-CV-764 |
| | ) | Judge Quarles |
| THE UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFFS' OPPOSITION
TO DEFENDANT RAJ GUPTA, M.D.'S
MOTION FOR SUMMARY JUDGMENT**

This medical negligence action is brought by Veronica and Roosevelt Pollard against the United States of America and Raj Gupta, M.D., a civilian oncologist, and relates to medical treatment that was provided to Veronica Pollard for breast cancer in October-December, 1998, at the Fort Gordon, Eisenhower Army Medical Center (hereafter "Eisenhower"), in Augusta, Georgia.

**FACTUAL BACKGROUND**

Mr. Pollard is a staff Sargent in the Army where he has served for nineteen years. He specializes in the installation and repair of micro electronic equipment. Mrs. Pollard retired from the Army as a staff Sargent in 1996, after serving 20 years. In 1998, Mr. and Mrs. Pollard and their two young sons, were living near Fort Gordon in Augusta, Georgia. During that year Mr. Pollard was on a "hardship" assignment in Kuwait, which meant that he was away from his family. The tour in Kuwait was scheduled to end in December, 1998. However, Mr. Pollard returned early to Fort Gordon in October, 1998,

after Mrs. Pollard was diagnosed with breast cancer. Mr. Pollard's next assignment was to England, and was scheduled to begin in January, 1999. The family was to accompany him on this tour. In December, 1998, Mrs. Pollard was medically cleared for the transfer to England by the physicians at Eisenhower, and the family moved from their home in Augusta, Geogia, in the last half of the month. The Pollards arrived in England in mid-January, 1999, and were there until June, 2000. The Pollard's returned to the United States in June, 2000, after Mrs. Pollard breast cancer recurred. Mr. Pollard is currently stationed with his family at Fort Meade, in Odenton, Maryland.

       The allegations in this case relate to the medical care and treatment that Mrs. Pollard received at the Eisenhower Army Medical Center in October-December, 1998, after she was diagnosed with breast cancer. In late September, 1998, while Sgt. Pollard was in Kuwait, Mrs. Pollard discovered a lump in her right breast on self-examination. She was 43 years old at the time and pre-menopausal. Mrs. Pollard had a strong family history of breast cancer that included her mother and an older sister, and she sought immediate consultation with one of the surgeons at Eisenhower.

       On October 2, 1998, Mrs. Pollard underwent a fine needle aspiration of the lump in her breast. The pathologic examination showed some "atypical cells," and an excisional biopsy of the tumor was performed on October 14, 1998. Pathologic report of the biopsy described a .5 cm tumor, with margins that were "extremely close" to the edge of excised tissue. The report also described the tumor as "infiltrating carcinoma with medullary features."

       On November 12, 1998, Dr. David Sees, a surgeon on staff at Eisenhower, performed a lumpectomy to remove a wider margin of tissue around where the tumor had

been excised during the biopsy. Dr. Sees also dissected and removed 17 axillary lymph nodes. Pathology studies on the new specimens were reported as showing no additional findings of cancer in either the excised tissue or the lymph nodes. On November 17, 1998, Dr. Sees sent a referral form to Dr. Raj Gupta requesting an oncology consult for Mrs. Pollard to discuss the need for adjuvant chemotherapy and radiation treatment. The appointment was scheduled for December 1, 1998.

Dr. Gupta discovered at the time of the December 1, appointment that additional pathology studies which should have been done to determine certain prognostic features of cancer had never been ordered.[1] Dr. Gupta told Mrs. Pollard that the small size of her tumor and the fact that her lymph nodes were negative were good prognostic factors. Dr. Gupta also told Mrs. Pollard that he could not advise her regarding the need for adjuvant chemotherapy until he had the results of the additional pathologic studies. (Exhibit 3, Deposition of Raj Gupta, M.D., p. 46) Dr. Gupta requested the studies and scheduled Mrs. Pollard for a second appointment. The appointment was scheduled for December 15, 1998, which was a day or two before the Pollards were scheduled to leave Fort Gordon and begin the process of transferring to England. Most of the additional pathology results were available to Dr. Gupta on December 15, 1998. These studies showed that the tumor that was removed during the biopsy was estrogen and

---

[1] Steven Adams, M.D., who was a pathologist at Eisenhower, examined the specimen from the October 14, 1998, excisional biopsy. Dr. Adams reported that the tumor was .5 cm and was poorly differentiated. Dr. Adams conceded at his deposition that he was responsible for forwarding the specimen to an outside laboratory for studies to determine additional prognostic features of the cancer, including whether the tumor was estrogen and progesterone positive or negative and the proliferation rate of the cancer cells. This information should have been available by the end of October, 1998, before the lumpectomy.

progesterone receptor negative, and had a high proliferation index. Both of these factors were poor prognostic indicators, and combined with Mrs. Pollard's age and family history, weighed strongly in favor chemotherapy.

Dr. Gupta never advised Mrs. Pollard that chemotherapy was indicated when she returned to see him on December 15, 1998. Instead, on December 16, 1998, Dr. Gupta wrote a referral letter, "To Whom It May Concern," stating that Mrs. Pollard's adjuvant treatment was "somewhat debatable," but that he "favored recommending adjuvant chemotherapy" based on the fact that she was "pre-menopausal and that her receptors were negative." (Exhibit 1) This letter was sent to the military base in England where Mr. Pollard was to be stationed.

Plaintiffs contend that the physicians at the Eisenhower Army Medical Center, failed to provide timely and appropriate chemotherapy and radiation treatment following the excisional biopsy on October, 14, 1998, and lumpectomy and lymph node dissection on November 12, 1998. Dr. Gupta and Dr. Sees both conceded in their depositions that Mrs. Pollard required chemotherapy to be administered within 4-6 weeks of surgery, followed by radiation treatment. (Exhibit 2, Sees Deposition, pp. 52-54; Exhibit 3, Gupta Deposition, pp. 29, 71) The purpose of adjuvant chemotherapy is to systemically eradicate any cancer cells that may have been released into the blood stream during surgery, before they have a chance to multiply and spread throughout the body, which is why the timing is considered important. (Exhibit 3, Gupta Deposition, p. 69) Radiation treatment of the entire breast is given following lumpectomy to eradicate microscopic focal lesions that may have remained.

As the treating oncologist it was Dr. Gupta's duty to advise Mrs. Pollard that chemotherapy and radiation treatment were indicated, and to administer the adjuvant treatment within the 3-6 weeks of surgery, even if it meant delaying her move England. At the very least, the standard of care required Dr. Gupta take steps to determine whether appropriate arrangements could be made for Mrs. Pollard to receive chemotherapy within this time frame once she got to England.   Dr. Gupta did neither.

Dr. Gupta testified at his deposition that when he saw Mrs. Pollard on December 15, 1998, he believed that chemotherapy was indicated and understood that treatment should begin as soon as the surgical site had healed, which is usually within 4-6 weeks, with radiation treatment to follow.  (Exhibit 3, Gupta Deposition, p. 29, 71)  Dr. Gupta also agreed that the standard of care required radiation treatment within 3-6 weeks of surgery if chemotherapy was not indicated.  Id. at p. 26.   Dr. Gupta testified that when he saw Mrs. Pollard he understood that she was scheduled to be transferred with her husband to England and did not believe that he was responsible for her adjuvant care and treatment.  Id. at p. 22-23.  Instead of advising Mrs. Pollard of his recommendations as he would have any of his other patients at Eisenhower, Dr. Gupta deferred the decision regarding chemotherapy and the timing of treatment to the doctors in England.  By his own admission, Dr. Gupta deferred the care and treatment of Mrs. Pollard's breast cancer without knowing who would assume her care once she got to England or when treatment might begin, and without knowledge of the standards of oncology practice in England. Id. at pp. 15, 42-44.

Mrs. Pollard left Augusta, Georgia in December, 1998, to travel with her family to England, not knowing that she needed chemotherapy, with no understanding that there

was any urgency, and believing that her prognosis was good and that she had been medically cleared by Dr. Gupta and the other physicians at Eisenhower. (Exhibit 4, Veronica Pollard Deposition, pp. 29-36) Had Mrs. Pollard been advised that chemotherapy was recommended and understood the importance of the timing, she would have, and easily could have delayed going to England until after treatment was completed. (Exhibit 4, Veronica Pollard Deposition, pp. 38-39) Dr. Gupta's failure to advise Mrs. Pollard regarding the need for chemotherapy and the importance of timing, ensured that any adjuvant treatment would be delayed well beyond the optimal time for preventing recurrence and metastatic spread of the disease. As it turned out, the oncologist in England, Dr. David Dodwell, recommended against chemotherapy when he saw Mrs. Pollard in mid-February, and radiation treatment was delayed for six months. (Exhibit 5, Letter of Dr. David Dodwell)

When the Pollard's arrived in England in mid-January, 1999, Mrs. Pollard sought follow-up care immediately. Her first appointment was with a general practitioner, on February 2, 1999. The general practitioner referred Mrs. Pollard to the oncologist, Dr. David Dodwell. Mrs. Pollard saw Dr. Dodwell on February 18, 1999, which by then was three month after the lumpectomy. Dr. Dodwell did not advise chemotherapy at that point, but referred Mrs. Pollard for radiation treatment. Radiation treatment did not begin until late April, 1999, which was almost six months after surgery. Dr. Dodwell testified at a recent deposition that the delay in radiation treatment in England was due to the fact that there was a long waiting list for radiation therapy. Dr. Dodwell also testified that the threshold for providing chemotherapy to patients with tumors similar to Mrs. Pollard was higher in England in 1998, than it was in the United States.

In February, 2000, Mrs. Pollard developed pain in her right breast and chest area. A biopsy in May, 2000, revealed recurrent cancer in her right chest wall. Mrs. Pollard was transferred back to the United States for further treatment at Walter Reed Army Hospital. In June, 2000, at Walter Reed, Mrs. Pollard was also diagnosed with metastatic cancer in her lymph nodes and lungs. Since June of 2000, Mrs. Pollard has undergone right mastectomy, removal of portions of her lungs, bone marrow transplant, and at least seven trials of chemotherapy. While treatments have prolonged Mrs. Pollards life, they has been unable to eradicate the wide-spread metastatic disease.

Mrs. Pollard developed incurable metastatic cancer and now has no chance of survival because the defendants failed to provide chemotherapy and failed to provide radiation treatment at the appropriate time following the lumpectomy. Plaintiffs contend that Mrs. Pollard would more likely than not have survived if she had received the appropriate adjuvant treatment at the appropriate time.

## SUMMARY OF EVIDENCE PERTAINING TO PROXIMATE CAUSE

Defendant Gupta argues that he is entitled to summary judgment on the purported basis that the undisputed evidence produced in discovery thus far has failed to establish the element of proximate cause. Dr. Gupta does not dispute that Mrs. Pollard should have received chemotherapy within four to six weeks of her lumpectomy that was performed on November 12, 1998, followed by radiation therapy. Nor does defendant dispute that Mrs. Pollard was never given adjuvant chemotherapy, and that there was a five-six month delay in radiation treatment. Finally, defendant does not dispute that Mrs. Pollard's cancer reoccurred and metastasized in June, 2000, and that she currently has no chance of survival.

Defendant argues that he is entitled to judgment as a matter of law because plaintiffs have failed to produce evidence that any negligence by Dr. Gupta in failing to administer chemotherapy and coordinate radiation therapy for Mrs. Pollard in a timely manner, made a difference in Mrs. Pollard's chances of survival or caused any other damages. In support of this argument defendant refers selectively to portions of deposition testimony of plaintiff's experts, while misconstruing or ignoring the experts' clearly stated opinions on causation. When viewed in their entirety the depositions of plaintiffs' experts clearly establish with reasonable medical probability that Mrs. Pollard would have survived had adjuvant chemotherapy and radiation therapy been initiated in December, 1998, as the standard of care required. Accordingly defendant Gupta's motion for summary judgment should be denied.

During the course of discovery plaintiffs produced evidence on the issue of proximate cause through four experts who are highly qualified in the treatment of breast cancer, and whose expertise defendant has not challenged. The experts include, L. F. Smith, M.D., who is Board Certified in internal medicine and oncology and hematology (see Exhibit 6, CV of L.F. Smith, M.D.); James V. Fiorica, M.D., who is Board Certified in obstetrics and gynecology and gynecologic oncology (see Exhibit 7, CV of James V. Fiorica, M.D.); Peter Pushkas, M.D., who is Board Certified in internal medicine and oncology and hematology (see Exhibit 8, CV of Peter Pushkas, M.D.); and Gerald H. Sokol, M.D. who is Board Certified in internal medicine, medical oncology, radiation oncology and clinical pharmacology(see Exhibit 9, CV of Gerald H. Sokol, M.D.).

As outlined below, each of these experts testified with reasonable medical probability that the Mrs. Pollard would have survived had she received adjuvant

chemotherapy and timely radiation treatment as the standard of care required. The testimony of plaintiffs' experts, collectively and individually, satisfies plaintiffs' burden of presenting expert testimony upon which a jury could reasonably find that there was proximate cause.

### L.F. SMITH, M.D.

Dr. Smith testified that in light of the prognostic features of Mrs. Pollard's tumor, and Mrs. Pollard's age and family history of breast cancer, the standard of care required adjuvant chemotherapy and radiation treatment beginning as soon as possible after the definitive surgery. In Mrs. Pollard's case the definitive surgery was lumpectomy and lymph node dissection that took place on November 12, 1998. Dr. Smith testified that some of the protocols for adjuvant chemotherapy start the treatment within seven to ten days of surgery. (Exhibit 10, Smith Deposition, p.32) He testified, "we don't like to wait any longer that three weeks form the time that the diagnosis is first made." Id.

When asked specifically, "Dr. Smith, is it your opinion to reasonable degree of medical probability that Miss Pollard would have fallen into that percentage that would have survived with the chemotherapy?" he replied, "Yes, it's my opinion." (Id. pp. 54-55) Dr. Smith testified,

"I base that opinion on a number of different things. Number one, as I indicated before, that obviously her tumor burden was small metastatically speaking at the time of her diagnosis. She had no sign anywhere of cancer that they could find. Her tumor burden was small. The time to cure patients with micrometastases is when the tumor burden is small and the cells are active. We also know that ER and PR negative cells respond much better to chemotherapy that ER and PR high positive cells." (Id. pp. 55-56)

Dr. Smith also testified that radiation therapy given in a timely manner, by itself, would have prevented Mrs. Pollard's recurrence of cancer. Dr. Smith testified that with timely radiation therapy the likelihood of recurrence would have been 3 to 5 percent, and that Mrs. Pollard's chances of recurrence increased by seven to tenfold to 35% based on the delay in radiation treatment. (Id. pp. 77, 79)

### JAMES V. FIORICA, M.D.

Dr. Fiorica testified that Dr. Gupta fell below the standard of care by not administering chemotherapy and coordinating radiation therapy on Mrs. Pollard within a timely manner. (Exhibit 11, Fiorica Deposition, p. 25) Dr. Fiorica explained that the chemotherapy is given in the adjuvant setting to decrease "her local and distant recurrence rate and improve her survival rate." (Id. p. 30) Dr. Fiorica testified that the standard of care required Dr. Gupta to initiate chemotherapy and radiation therapy "once the patient is healed from the surgical perspective," (id. p. 31), and that this generally occurred "four to six weeks after the surgery." Id. p.32) According to Dr. Fiorica, Mrs. Pollard should have received adjuvant treatment anywhere from the middle to the end of December, 1998.
(Id. at p. 33) In response to questions by Gupta's counsel, Dr. Fiorica plainly testified that Mrs. Pollard's cancer would not have reoccurred has this treatment been initiated. Id. at 34.

> Q. So on January the 2nd 1998 (sic), had Mrs. Pollard been initiated with chemotherapy and then followed by radiation therapy, do you have an opinion as to whether more likely than not she would have reoccurred?"
>
> A. Yes. More likely than not she would not have reoccurred.

Q. What about February 2nd, 1999? Same question as to do you have an opinion whether more likely than not she would have reoccurred on February 2nd, 1999, had the care that you believe standard of care required been administered at that point in time?

A. Now your talking a two and a half month delay, but still more likely than not that would have affected her outcome.

Q. So it's more likely than not that she would have been cancer free?

A. Correct.

Dr. Fiorica testified, "In the first two months [following definitive surgery], more likely than not there was no microscopic disease. So treatment at that point in time would have clearly been to the patient's advantage." (Id. at p. 38)

**PETER PUSHKAS, M.D.**

Dr. Pushkas testified that "Assuming good wound healing" standard of care required Dr. Gupta to begin chemotherapy by early December, 1998. (Exhibit 16, Pushkas Deposition, p. 16)

When asked whether chemotherapy initiated by January 2, 1999, would have made a difference in the reoccurrence of Mrs. Pollard's cancer, Dr. Pushkas testified, "that would have been the outside edge of where chemotherapy should have been started and would have made a difference, yes." (Id. at pp. 20-21) Dr. Pushkas testified that an eight week delay in chemotherapy would have resulted in a less than 51 percent likelihood of preventing the reoccurrence of Mrs. Pollard's cancer. (Id. at p. 23)

Dr. Pushkas testified that radiation therapy was mandatory in Mrs. Pollard's case, in light of the fact that she had elected to have a lumpectomy rather than mastectomy to

remove the cancer from her breast. (Id. at pp. 27, 42) Dr. Pushkas testified that for patients not receiving chemotherapy, radiation therapy usually begins within a month of surgery. (Id. at p. 47) For such patients, Dr. Pushkas testified, the likelihood of recurrence is less than 1 percent per year. (Id. at p. 48)

### GERALD H. SOKOL, M.D.

Dr. Sokol testified regarding the standard of care for the timing of radiation treatment following lumpectomy, and the adverse effect that the five-six month delay in Mrs. Pollard's radiation therapy had on her survival. Dr. Sokol testified that radiation therapy should have begun "as soon as possible for obvious reasons because any cancer cells that are left behind will continue to grow." (Exhibit 13, Sokol Deposition p. 35) When asked to be more specific regarding when radiation treatment should begin, Dr. Sokol testified, "As soon as healing has allowed treatment to progress. And by far the great majority of time four weeks is quite acceptable and the usual time for initiation of postoperative radiation therapy." Id. He explained, "The longer the delay, the longer the cancer has a chance to grow and spread and the less effective . . . radiation therapy is." Id.

Dr. Sokol testified that with timely radiation therapy Mrs. Pollard had a 90% chance that her cancer would be cured (Id. at pp. 37-38) When asked, "is there anything particular about Mrs. Pollard or her presentation where you can say that it is more likely than not that she would have fallen into the 90%?" Dr. Sokol replied "Well yes. She would have fallen into the 90% of local control because she had a small tumor and she had no lymph nodes. Both of those are good prognosticators for local control of disease given appropriate therapy." (Id. pp. 50-51)

Plaintiffs' primary allegations of negligence against Dr. Gupta's are that he failed to provide chemotherapy within appropriate window of time to prevent systemic spread of cancer following surgery, and that he failed to coordinate timely radiation treatment to prevent the local and regional reoccurrence of the cancer in light of the fact that Mrs. Pollard had undergone a lumpectomy.  In moving for judgment, defendant Gupta simply ignores the testimony of all four of plaintiffs' experts, that in Mrs. Pollard's case, timely adjuvant therapy, (i.e. chemotherapy and radiation therapy), more likely than not would have prevented the regional reoccurrence of cancer that Mrs. Pollard experienced in June,2000, as well as their testimony that had Mrs. Pollard received appropriate and timely adjuvant treatment she, more likely than not, would have survived.

### STANDARD FOR GRANTING SUMMARY JUDGMENT

Under Fed. Rule of Civ. Proc. 56(c), defendant Gupta is only entitled to summary judgment if there is no genuine issue of material fact and he is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Dungan v. AlbemarleCounty School Board, 293 F.3d 716, 720 (4th Circuit 2002).  The party moving for summary judgment has the burden of clearly showing that there are no triable issues of fact.  See Bishop v. Wood, 426 U.S. 341, 348 n.11 (1976); Ashton v. Okosun, 266 F. Supp. 2d 399, 402 (D.Md. 2003).  All disputed facts are resolved in favor of the non-moving party.  Id.  The Court must draw all justifiable inferences in favor of the non-moving party, including questions of credibility and the weight to be accorded to particular evidence.  Ashton, 266 F. Supp. at 402.

### LAW OF PROXIMATE CAUSE

Under Georgia law, "proximate cause is always determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy and precedent." Atlanta Obstetrics and Gynecology Group, Inc. v. Coleman, 260 Ga. 569, 569-70, 398 S.E.2d 16, 17 (Ga. 1990).   Whether proximate cause exists in a particular case is considered a mixed question of law and fact.  "Ordinarily both questions are to be determined by a jury upon appropriate instructions from the judge."  Id. at 570, 398 S.E.2d at 17-18.  The issue of proximate cause will be determined by the court as a matter of law only in "plain and undisputed cases."  Id.  See also Zwiren v. Thompson 276 Ga. 498, 578 S.E. 2d 862 (Ga. 2003).    Proximate cause under Georgia law is defined as "'that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred.'"  Zwiren, 578 S.E.2d at 865 (quoting T.J. Morris Co. V. Dykes, 197 Ga.App. 392, 395-396(4), 398 S.E.2d 403 (1990)).

The plaintiff must use expert testimony to establish proximate cause in a medical malpractice action, "because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the average layperson."  Zwiren, 578 S.E.2d at 865 (other citations omitted). "Using the specialized knowledge and training in his field, the expert's role is to present to the jury a realistic assessment of the likelihood that the defendant's alleged negligence caused the plaintiff's injury."  Id.  As an evidentiary threshold the expert's opinion regarding causation must be based on the determination that "'there was a reasonable probability that the negligence caused the injury.'"  Zwiren, 578 S.E.2d at 865 (quoting Pilzer v. Jones, 242 Ga. App. 198(1), 201, 529 S.E.2d 205 (2000)).

The deposition testimony of plaintiffs' experts, individually and collectively, clearly establish that this is not a case in which the evidence on proximate cause is "plain and undisputed." Atlanta Obstetrics and Gynecology Group, at 570, 398 S.E.2d at 17-18. Accordingly defendant's motion for summary judgment must be denied. In this case plaintiffs have identified qualified experts who testified with reasonable medical probability at deposition, that defendant Gupta's failure provide appropriate and timely adjuvant chemotherapy and radiation therapy to Mrs. Pollard in December, 1998, resulted in the reoccurrence and metastasis of her cancer in 2000, and that Mrs. Pollard would have survived had this treatment been given.

Defendant misconstrues the significance to this case of the studies cited by plaintiffs' experts regarding the survival statistics for patients with node negative tumors less than 1 centimeter in size, and the benefits of chemotherapy in improving survival. The studies may demonstrate prospectively that 90 percent of patients with tumors of this size will be cured by surgery alone and that an additional 3 percent will survive if chemotherapy is given. However, in hindsight we know that Mrs. Pollard was not among those 90 percent of patients who were destined to survive regardless of chemotherapy. We now know that Mrs. Pollard is in the category of the 10 percent of patients who stood to benefit from chemotherapy.

Plaintiffs experts testified with reasonable medical probability that Mrs. Pollard was among the patients in this much smaller group who would have survived had she been given chemotherapy as the standard of care required. Their opinions were based on the clinical factors that were present when Mrs. Pollard's cancer was diagnosed, as well as her proven response to chemotherapy when her cancer reoccurred. Dr. Smith testified

that Mrs. Pollard fell into the percentage that would have survived based on the fact that Mrs. Pollard's tumor burden was very small at the time of diagnosis, that she had no sign of metastatic cancer anywhere, and that ER and PR negative cells respond much better to chemotherapy that ER and PR high positive cells." (Exhibit 10, pp. 55-56). Dr. Sokol that had Mrs. Pollard received timely radiation treatment, she would have fallen into the 90 percent of patients who avoid reoccurrence because she had a small tumor and negative lymph nodes. (Exhibit 13, pp. 50-51)

Moreover, the studies do not account for cases involving a five-six month delay in radiation therapy following lumpectomy, as occurred in Mrs. Pollard's case. Plaintiffs' experts all opined that Mrs. Pollard's cancer more likely than not reoccurred in 2000 as result of the delay in radiation treatment in the absence of chemotherapy.

One of defendant's own experts, James J. Stark, M.D., supports the opinions expressed by plaintiffs' experts regarding Mrs. Pollard's prognosis and proximate cause. Dr. Stark, who is also Board Certified in internal medicine and oncology and hematology, testified during his deposition that based on statistics alone Mrs. Pollard would have had a 33 percent chance of survival if she had received chemotherapy three to six weeks after the lumpectomy, (Exhibit 14, Stark Deposition, p. 34), and that at this point she has a zero chance of surviving. Id. Dr. Stark also testified that if Mrs. Pollard had a meaningful anti-tumor response to conventional chemotherapy in June or July of 2000, when her cancer reoccurred, "it would be more likely that her disease free interval would be longer with chemo than without chemo." Id. at p. 88. Dr. Stark agreed that the poorer the prognostic indicators are of a particular breast cancer, the greater the benefit you see with chemotherapy. Id. at p. 91. In response to the following question: "And just so that

I make sure I understand, assuming that Ms. Pollard's tumor was responsive to chemotherapy, the type of breast cancer that she had, if chemotherapy had been administered three to six weeks after surgery, that chemotherapy would have gotten to the cancer cells wherever they were located." Dr. Stark responded "Yes." Id. at pp. 91-92.

At the time of his deposition Dr. Stark could not recall whether Mrs. Pollard's tumor did in fact respond to chemotherapy after her cancer reoccurred in June, 2000. However, the medical records from August of 2000 state that "clinically, patient has responded to chemo." (Exhibit 15) Dr. Stark agreed that Mrs. Pollard fit in to the 10 percent of patients who stood to benefit from chemotherapy. (Exhibit 14, at p. 123) Dr. Stark also agreed that it is "reasonable for an oncologist who treats women on a regular basis to look at those statistics and to look at how they are stratified and to come to reasonable conclusions with respect to prognosis of an individual patient." Id.

Defendant argues that plaintiffs' experts' testimony on proximate cause demonstrates, at most, a "loss of a chance," that defendant argues is not compensable under Georgia law. Defendant relies on Dowling v. Lopez, 211 Ga. App. 578, 580, 440 S.E.2d 205, 208 (Ga. App. 1994). However, defendant's reliance on Dowling is misplaced in this case. Dowling held in the context of a wrongful death action, that the loss of a chance of extended survival was not recoverable under the Georgia wrongful death statute. The Court, in Dowling, recognized a "fundamental distinction between the statutorily prescribed wrongful death claims and claims associated with loss of chance of survival," id., a fundamental distinction that applies in this case since there is no wrongful death action at this time.

Another important distinction is that in Dowling, the only claim was that decedent's life could have been prolonged (rather than saved) had it not been for defendant's alleged malpractice." Id.  In this case, defendant's expert Dr. Stark, testified that Mrs. Pollard would have had a 33 percent chance of survival had she been given appropriate adjuvant chemotherapy, and that now her chances of survival are zero.  This loss of chance of survival is, in fact, compensable under Georgia law.  See Richmond County Hospital Authority v. Dickerson, et al., 182 Ga. App. 601, 356 S.E.2d 548 (1987)

In Richmond, the Court held that proximate cause is not eliminated by merely establishing by expert opinion that patient had less than a fifty percent chance of survival had the negligence not occurred.  The negligence in Richmond related to the failure of the defendants to perform surgery on the decedent who seen in the emergency room for an aneurysm. The expert testimony was that the chances of survival with surgery were less that fifty percent, however, the evidence also established that the decedent's death was not inevitable.  The Court held that "the record does not establish that the actions or inactons of the hospital staff were not a proximate or contributing cause of [the decedent's] death.  Thus the movant hospital did not on this records, carry its burden of proof on summary judgment." Id. at 603, 550.  Likewise, defendant has failed to carry his burden of proof for summary judgment based on the testimony of his own expert.

THE UNDISPUTED EVIDENCE IS THAT MRS. POLLARD WOULD HAVE DELAYED MOVING TO ENGLAND HAD DR GUPTA ADVISED MRS. POLLARD OF HER NEED FOR ANDJUVANT CHEMOTHERAPY AND RADIATION TREATMENT AND INFORMED HER OF THE RECOMMENDED TIMING ADJUVANT TREAMENT

Mrs. Pollard left Augusta, Georgia in December, 1998, to travel with her family to England, not knowing that she needed chemotherapy, with no understanding that there

was any urgency, and believing that her prognosis was good and that she had been medically cleared by Dr. Gupta and the other physicians at Eisenhower. (Exhibit 4, Veronica Pollard Deposition, pp. 29-36) Had Mrs. Pollard been advised that chemotherapy was recommended and had she been informed that treatment should begin as soon as her surgery had healed, she would have, and easily could have delayed going to England until after treatment was completed. (Exhibit 4, Veronica Pollard Deposition, pp. 38-39)

Dr. Gupta's failure to advise Mrs. Pollard regarding the need for chemotherapy and the importance of timing, ensured that any adjuvant treatment would be delayed well beyond the optimal time for preventing recurrence and metastatic spread of the disease. As it turned out, the oncologist in England, Dr. David Dodwell, recommended against chemotherapy when he saw Mrs. Pollard in mid-February, and radiation treatment was delayed for six months.

WHEREFORE, for these reasons, and any others that may appear to the Court, plaintiffs' respectfully request that defendant Raj Gupta, M.D.'s Motion for Summary Judgment be denied.

Respectfully submitted,

BRUCE J. KLORES & ASSOCIATES, P.C.


By:_____
Lesley S. Zork- #013454
Bruce J. Klores- #03320
915 15th Street, NW
Washington, D.C. 20005
(202) 628-8100
Co-counsel for Plaintiffs

and

                        LAW OFFICES OF PETER MASCIOLA

                        _____
                        Peter R. Masciola - #12958
                        601 Pennsylvania Avenue, N. W. #900
                        Washington, D.C. 20004
                        (202) 628-5680
                      Co-counsel for Plaintiffs

1606\opp.mtn.sj.memo