Page 1

```
                 UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF MARYLAND



VERONICA POLLARD, et al.,

        Plaintiffs,

v.                                       CIVIL NO. S-02-764

UNITED STATES OF AMERICA,

        Defendant.
```

The Videotaped Oral Deposition of DAVID W. SEES, M.D., taken at the request of the Plaintiffs, pursuant to Federal Rules of Civil Procedure, on Tuesday, March 18, 2003, from 9:00 a.m. to 10:55 a.m., at 100 N. Stanton, Suite 1320, El Paso, Texas 79901.   (28653)

CERTIFIED  ___COPY___                COURT COST: $32.50

Prepared for:

_Klores_                             Reported by:
                                     John Eby, CSR/RDR/CRR

Page 50

1  you know how long it took for this outside place to get
2  back with their results?
3     A. I do not.
4     Q. Well, is it your sense that at a lot of
5  these -- at these tumor board meetings, that the
6  doctors were waiting for results of either DNA or tumor
7  markers?
8     A. We frequently had patients that we would
9  present at the tumor board and at that point, their
10 DNA/tumor markers were not back. And they would -- we
11 would subsequently get another report, and it was
12 usually within about a week or two, I guess.
13    Q. And how long was the tumor board usually --
14 did the tumor board usually meet after the diagnosis of
15 cancer was made?
16    A. Once the patient --
17    Q. In Mrs. Pollard's -- I'm sorry.
18    A. Because the patient had had definitive
19 surgery, as in Mrs. Pollard's case, the next tumor
20 board. And the tumor boards occurred on a weekly
21 basis, so it would have been the next tumor board,
22 which would have been the following week.
23    Q. Well, did you have any expectation as to when
24 the results of the tumor markers or the DNA studies
25 should come back in order to appropriately care for the

Page 51

1  patient?
2     A. Yeah. I don't recall when the specimen was
3  actually sent, so I do not -- I can't say that I can
4  recall when I would have expected it to come back. But
5  I would have expected the markers to have been back
6  within a week or two after the tumor board.
7     Q. Well, does that mean within two to three weeks
8  of the surgery?
9     A. Correct, of her definitive surgery.
10    Q. And was it the practice at Eisenhower that no
11 final decision was made concerning adjuvant therapy,
12 radiation, and the timing of each until the tumor
13 marker and DNA studies were returned to the doctors at
14 Eisenhower?
15    A. The radiation therapy was a given. The
16 decision for chemotherapy and that discussion was one
17 that was done by the oncology service, and I can't
18 answer to that. Although I'm sure they used the tumor
19 markers to influence what they did for their -- you
20 know, what they decided and what type of chemotherapy
21 to give.
22    Q. So I want to make sure we're on the same page.
23    A. She would have gotten radiation therapy
24 regardless of her tumor markers.
25    Q. Right.

Page 52

1     A. Okay.
2     Q. So if it took the people, wherever it was, 10
3  weeks to get back to you with respect to the tumor
4  markers, six weeks postop, if she was healed okay, she
5  would have started her radiation therapy in Georgia?
6     A. She could have started radiation therapy,
7  that's correct.
8     Q. And according to your -- from your
9  perspective, she should have started her radiation
10 therapy?
11    A. Yes.
12    Q. And that six to eight weeks would have started
13 from October 14?
14    A. No. That six to eight weeks would have
15 started from the time of her definitive surgery, which
16 was November 2.
17    Q. November 12, I think.
18    A. 12th.
19    Q. And why is that? Why does it start from
20 November 12 and not October 14?
21    A. For the -- well, because of the incisions that
22 we made, we had a couple of large incisions that needed
23 to heal up first.
24    Q. Because you know you're going to be operating
25 again?

Page 53

1     A. Oh. Correct, right. I misunderstood you.
2  Yes.
3     Q. So do you have any recollection of having any
4  conversations with Mrs. Pollard or anyone in her family
5  about chemotherapy?
6     A. Not specific recollections, no.
7     Q. Have you read her deposition?
8     A. I have not.
9     Q. Mrs. Pollard, she testified on page 29 of her
10 deposition that essentially, that you told her that you
11 would recommend chemotherapy and radiation, although
12 that was just, I guess, on the chemo, just your
13 opinion, that the oncologist had the final decision on
14 that.
15       Is that the type of conversation that you
16 would have with a patient like Mrs. Pollard?
17    A. My general conversation with breast cancer
18 patients was that we would do their surgery, depending
19 on what kind of surgery they had, if they had a
20 lumpectomy and axillary dissection, they would get
21 radiation, and that I would refer them to the
22 oncologists to discuss chemotherapy.
23       But if they were premenopausal, they
24 generally would require chemotherapy because of their
25 age, and those tumors tended to be more aggressive.

Page 54

1  And if they were postmenopausal, it would depend on
2  their tumor markers.
3     Q. So in your view, in order for you to say that,
4  then would you have to have concluded that as of
5  November 12, when the pathology came back from the
6  lumpectomy, that it was your opinion that Mrs. Pollard
7  should have chemotherapy, irrespective of the tumor
8  markers --
9          MS. CERNIGLIA-LOWENSEN: Objection.
10         MR. ADAMS: Objection.
11         MR. KLORES: I'm not finished yet.
12         MR. ADAMS: Okay.
13    Q. (BY MR. KLORES) Given the fact that
14  Mrs. Pollard was premenopausal and the poorly
15  differentiated carcinoma, it was your view that,
16  although you would defer to the oncologists, perhaps,
17  but it was your view that Mrs. Pollard should have
18  chemotherapy along with her radiation?
19         MR. ADAMS: Objection.
20         MS. CERNIGLIA-LOWENSEN: Objection. You
21  can answer.
22    A. Okay. In general, most premenopausal women
23  would get some type of chemotherapy. And so in my
24  view, Ms. Pollard should probably have received some
25  type of chemotherapy, correct. But the type and the

Page 55

1  dose and the timing is always best left to the
2  oncologist.
3     Q. Well, what she has said in her deposition, if
4  I've correctly stated that, is something that you would
5  have said to her, that --
6          MR. ADAMS: Objection.
7          MR. KLORES: I'm not finished yet.
8          MR. ADAMS: Okay.
9     Q. -- that radiation absolutely; chemotherapy, in
10  your opinion, you would recommend it; but as to the
11  specifics of the chemotherapy, you would leave that to
12  the oncologists. Is that right?
13         MR. ADAMS: Objection. You may answer if
14  you understand.
15         MS. CERNIGLIA-LOWENSEN: Objection.
16    A. I would have told her that in my view, she
17  probably would require some chemotherapy, but that
18  decision was between her and her oncologist.
19    Q. (BY MR. KLORES) Okay. And the indications in
20  your mind for the chemotherapy were separate and apart
21  from the results of the tumor markers. It was simply
22  the fact that she was premenopausal, right?
23    A. Yes, I guess so. Yes.
24    Q. Dr. Sees, there is an issue in this case
25  concerning whether Mrs. Pollard or the Pollard family

Page 56

1  should have been transferred over to England, you know,
2  late in 1998 prior to the commencement of -- or the
3  completion of either radiation therapy or chemotherapy.
4  Are you aware of that issue?
5     A. I am aware of the issue now, yes.
6     Q. Were you consulted by anyone, any doctor at
7  Eisenhower or any military doctor, concerning your
8  views as to whether the Pollards should have their
9  treatment first for the cancer before they were
10  transferred over to England?
11    A. I do not recall being asked about that, no.
12    Q. Do you know who -- are you aware of the -- are
13  you aware of the procedure in the military with someone
14  like Mrs. Pollard, who has been recently diagnosed with
15  cancer, and when the military wants to transfer them
16  overseas, are you aware of the procedures that attach
17  medically before that transfer can be effectuated?
18    A. I can't say that I am specifically, other than
19  something called an EFMP, which is exceptional -- I
20  think it's -- EFMP -- Exceptional Family Member
21  Program, which has to do with mostly children who have
22  problems that, for whatever reason, should not be away
23  from medical centers. But other people can be involved
24  in that program.
25    Q. I guess -- let me ask it to you in a little

Page 57

1  bit of a different context. From your understanding of
2  the way things worked in the military, if the military
3  wanted to transfer the Pollards to an outpost that did
4  not have radiation therapy available, and she hadn't
5  had her radiation, she wouldn't be sent, would she?
6          MR. ADAMS: Objection. But try to answer
7  that, if you can.
8          MS. CERNIGLIA-LOWENSEN: Same objection.
9     A. She might not be -- she could be allowed to
10  stay in the United States and receive that radiation
11  therapy. That would not necessarily preclude her
12  husband being deployed to whatever assignment he was to
13  go to.
14    Q. Okay. You're right.
15         I guess the better question is: Do you
16  know who was -- do you know whether or not a doctor at
17  Eisenhower had to give Mrs. Pollard medical clearance
18  to be able to move to England with her husband?
19    A. I do not know that.
20    Q. But you weren't asked to give medical
21  clearance?
22    A. Not that I recall, no.
23    Q. And you were not asked to make any
24  arrangements or to have any discussions with any of the
25  doctors in England to assure continuity of care?

5 (Pages 54 to 57)