0001
1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
2
      VERONICA POLLARD, et al. *
3                              *
                 Plaintiffs    *
4                              *      Civil Action
           v.                  *
5                              *      No. S-02-764
      UNITED STATES OF AMERICA *
6                              *
                 Defendant     *
7                    * * * * * * * * *
8
9
10             Pursuant to Notice, the deposition of
11    RAJ R. GUPTA, M.D. was taken on Friday, March 21st,
12    2003, commencing at 1:07 p.m., at the law offices
13    of Morgan, Shelsby, Carlo, Downs & Everton, 4 North
14    Park Drive, Suite 404, Hunt Valley, Maryland
15    21030-1876, before Sharon A. Beaty, Notary Public.
16
17
18
19
20
21
22    Reported by:  Sharon A. Beaty, CSR

                                                           0002
1   APPEARANCES:
2         ON BEHALF OF THE PLAINTIFFS:
3              BRUCE J. KLORES, ESQUIRE
               LESLEY ZORK, ESQUIRE
4              Bruce J. Klores & Associates, P.C.
               915 15th Street N.W., 3rd Floor
5              Washington, D.C. 20005
               Telephone:  202-628-8100
6              Fax:  202-628-1240
7
          ON BEHALF OF DEFENDANT
8                  UNITED STATES OF AMERICA:
9              LARRY D. ADAMS, ESQUIRE
               U.S. Department of Justice
10             United States Courthouse
               101 West Lombard Street
11             Baltimore, Maryland 21201-2692
               Telephone:  410-209-4801
12             Fax:  410-962-2310
13
        ON BEHALF OF DEFENDANT HUMANA MILITARY
14                 HEALTH CARE SYSTEMS, INC.:
15             CATHERINE A. HANRAHAN, ESQUIRE
               Wilson, Elser, Moskowitz,
16                 Edelman & Dicker, LLP
               The Colorado Building, Suite 500
17             1341 G Street N.W., 5th Floor
               Washington, D.C. 20005
18             Telephone:  202-626-7660
               Fax:  202-628-3606
19
20
21
22

```
                                                      0003
 1   APPEARANCES, continued:
 2        ON BEHALF OF THE DEPONENT:
 3             JOAN CERNIGLIA-LOWENSEN, ESQUIRE
               Morgan, Shelsby, Carlo, Downs & Everton
 4             4 North Park Drive, Suite 404
               Hunt Valley, Maryland 21030-1876
 5             Telephone:  410-584-2800
               Fax:  410-584-2020
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

```
                                                              0004
 1                        INDEX                    PAGE
 2   WITNESS:
 3       Raj R. Gupta, M.D.
 4   EXAMINATION:
 5       By Mr. Klores                              6
 6   EXHIBITS:  (Attached.)
 7     1 Shared Decision Making                    88
 8     2 Areas of Controversy in the               147
          Adjuvant Systemic Therapy of
 9        Endocrine - Nonresponsive Breast
          Cancer
10
       3 NIH Consensus Development                 147
11        Conference: Adjuvant Therapy for
          Breast Cancer
12
       4 Breast Cancer: Detection of Small         147
13        Tumors Creates New Controversies
14     5 Adjuvant Therapy for Breast Cancer:       147
          Practice Patterns of Community
15        Physicians
16     6 Adjuvant Therapy for All Patients         147
          With Breast Cancer
17
       7 Prognosis and Treatment of Patients       147
18        With Breast Tumors of One
          Centimeter or Less and Negative
19        Axillary Lymph Nodes
20     8 Determining Which Breast Cancer           147
          Patients Can Skip Chemo
21
       9 Preferred Chemotherapy Regimens for       147
22        Recurrent or Metastatic Breast
```

0005

1
    10 Invasive Breast Cancer                    147
2
    11 NCCN, Breast Cancer                       147
3
    12 Understanding the Utility of              147
4       Adjuvant Systemic Therapy for
        Primary Breast Cancer
5
    13 Computer Program to Assist in             147
6       Making Decisions About Adjuvant
        Therapy for Women With Early
7       Breast Cancer
8   14 ImPath Report                             147
9   15 Letter dated December 16, 1998 To        147
        Whom It May Concern
10
11
12
13
14
15
16
17
18
19
20
21
22

                                                      0006
```
 1              RAJ R. GUPTA, M.D.,
 2  called for examination, having been duly sworn to
 3  tell the truth, the whole truth and nothing but the
 4  truth, testified as follows:
 5              EXAMINATION BY MR. KLORES:
 6       Q    Please state your name and give us your
 7  business and residential address.
 8       A    Raj Gupta, home address is 746 Jones
 9  Creek Drive, Evans, Georgia 30809, and business
10  address is 8 West Oncology, Eisenhower Medical
11  Center, Fort Gordon, Georgia 30905.
12            (Ms. Zork enters the deposition.)
13            MR. KLORES:  Just off the record.
14            (Discussion held off the record.)
15       Q    Have you given a deposition before
16  today?
17       A    For a medical legal case?
18       Q    In any case.
19       A    For a personal divorce case, yes.
20       Q    In any other case at all?
21       A    No.
22       Q    Have you ever been a defendant in a
```

0007

```
 1   medical malpractice case?
 2        A    No.
 3        Q    And you've never testified as an expert
 4   witness in a medical malpractice case --
 5        A    No.
 6        Q    -- have you?
 7        A    No.
 8        Q    Okay.  So for purposes of today you
 9   should wait until I finish my question and then
10   answer it, because then if you don't I'll have to
11   ask it again so that there's -- when this is typed
12   up we want there to be a complete question and then
13   a response.
14        A    Yes.
15        Q    Okay?
16        A    (Nodding head indicating yes.)  Okay.
17        Q    And I'll try to follow that rule as
18   well.
19             Do you remember Mrs. Pollard at all?
20        A    No, I don't.
21        Q    You reviewed her medical records for
22   purposes of today's deposition, right?
```

0008

```
 1        A    Yes.
 2        Q    Do the records refresh any of your
 3   recollection about Mrs. Pollard?  In other words,
 4   are there things in the record that allow a
 5   lightbulb to go off in your head and think that
 6   yes, I do remember this?
 7        A    Not specifically, but reviewing the
 8   records I do know that she was about to go to
 9   England soon after I was evaluating her.
10        Q    Well, I guess what I'm trying to ask is
11   is your universe of knowledge about Mrs. Pollard
12   what is contained in the medical records only?
13        A    Yes.
14        Q    Okay.  And does that include any
15   conversations that you may have had with Mrs.
16   Pollard or any member of her family?
17        A    Yes.
18        Q    And any other health care provider?  In
19   other words, you wouldn't be able to talk about any
20   other conversations you've had with any doctors
21   about Mrs. Pollard other than what may be reflected
22   in those medical records?
```

0009

```
 1        A    That's correct.
 2        Q    Have you had a full opportunity to
 3   review Mrs. Pollard's medical records before
 4   today's deposition?
 5        A    Yes.
 6        Q    And are all of the records that you've
 7   reviewed for preparation of today's testimony here
 8   with you at your lawyer's office?
 9        A    Yes.
10        Q    And having reviewed all of the records
11   do you believe that there are, that there may be a
12   record that is not in any of the files that you
13   have before you?  In other words, does it appear to
14   you from your general knowledge of the way medicine
15   was practiced at Fort Gordon that a document should
16   exist that you have not seen?
17        A    No.
18        Q    On how many pages is the medical care
19   that you provided Mrs. Pollard reflected in the
20   medical records that you have with you?
21        A    About four pages.
22             MS. CERNIGLIA-LOWENSEN:  You can look at
```

0010

```
 1   any time.
 2        Q    You can.  Can you please at this time
 3   turn to those four pages and show them to me and
 4   identify what they are?
 5        A    The first two pages are a record of my
 6   consultation.
 7        Q    And what is the date of that?  December
 8   1st?
 9        A    December 1st, 1998.
10             MS. ZORK:  Doctor, if I may, does it
11   have a number on the bottom?  If you could refer to
12   it.
13             THE WITNESS:  Page number 5 and 6.
14             MR. KLORES:  It's a different number
15   than what we have; otherwise it would be the first
16   time in any case that everybody had the same
17   numbers.  We wouldn't want to start that trend.
18        A    And then there's a page 4, and this is
19   my follow-up visit note from December 15 I believe,
20   December 15, 1998.  And the other page is a letter
21   that I gave her when she went to England, a letter
22   December 16, 1998, page number 24.
```

0011

```
 1        Q    Right.
 2        A    And there is one more page.  And there's
 3   one more page that I wrote a consultation for her
 4   to see a physician in England or to see an
 5   oncologist in England, and that's page 23 dated
 6   December 15, 1998.
 7        Q    All right.  So if we go back, your first
 8   visit is reflected in two typewritten pages, right?
 9        A    Right.
10        Q    Your second visit is reflected in one
11   handwritten page?
12        A    Right.
13        Q    Then there's the letter that you wrote
14   to whom it may concern?
15        A    Right.
16        Q    Now, you mentioned that you, quote, gave
17   that letter to her, unquote.  Can you turn to that
18   letter?  Do you know, that letter dated December
19   16th to whom it may concern, who would have typed
20   that?
21        A    My secretary.
22        Q    And how do you know that you gave it to
```

0012

```
 1   her and, to Mrs. Pollard, or do you know that you
 2   actually gave it to Mrs. Pollard as opposed to
 3   giving it to someone else or mailing it?
 4        A    No, this is hand delivered.  Either
 5   myself or my secretary gave it to her.
 6        Q    And how do you know that?
 7        A    Because that's the normal routine.  If
 8   it wasn't done I would have heard about it from the
 9   patient that she did not get a letter.  Because
10   patient is the one who's requesting this letter.
11        Q    So you're saying that Mrs. Pollard asked
12   you for a letter that she could carry with her to
13   England concerning her medical care?
14        A    Right.
15        Q    And that, the letter on December 16th is
16   that letter that you gave her?
17        A    Right.
18        Q    And your testimony is that you gave that
19   to her prior to the time that you knew that she was
20   moving obviously out of the United States, right?
21        A    Right.
22        Q    Did you know when she was going to be
```

0013

```
 1   moving to England?
 2        A    My note says that she was leaving within
 3   two weeks of my visit, which was 15 December.
 4        Q    Okay.  Did you know where she was moving
 5   in England?
 6        A    I don't know.  She probably told me but
 7   I'm not sure where that place is.
 8        Q    Okay.  So when do you think you first
 9   found out that she was moving to England?  Would
10   that have been on your second visit on the 15th?
11        A    I don't know for sure.  It was probably
12   during my first visit.
13        Q    During the first visit?
14        A    Yes.
15        Q    You think that just because you would
16   have had that conversation that she was leaving?
17        A    Normally if somebody is moving to
18   England they would let me know if they were
19   leaving.
20        Q    So either on December 1st or December
21   15th, on either one of those dates you knew that
22   Mrs. Pollard was leaving the United States and
```

0014

```
 1  moving to England?
 2       A    Right.
 3       Q    And does your record reflect any more
 4  specifics about where she was going?
 5       A    No.
 6       Q    I mean did you know what the possible
 7  places that she could be going were?
 8       A    No.
 9       Q    Did you know anything about who would be
10  taking care of her in England?
11       A    No.
12       Q    Did you conduct any investigation as to
13  who would be taking care of her in England?
14       A    No.
15       Q    Did you know that she was going to be
16  moving to a facility or to a part of England that
17  had, that radiation therapy would be available to
18  her?
19       A    Not specifically.  From what I know
20  radiation therapy and medical care is available in
21  all parts of England.
22       Q    Well, you didn't know what city or town
```

0015

```
 1   in England she was moving to, right?
 2        A    Correct.
 3        Q    And you didn't know -- you had no
 4   specific knowledge as to whether radiation therapy
 5   would be available wherever she was leaving --
 6   wherever she was moving, I'm sorry?
 7        MS. CERNIGLIA-LOWENSEN:  Objection to
 8   the form.  You can answer.
 9        A    I thought it would be available, medical
10   care and radiation will be available where she was
11   moving.
12        Q    What specific investigations did you
13   undertake to determine where Mrs. Pollard would
14   receive her radiation therapy and where Mrs.
15   Pollard would receive the chemotherapy that you had
16   discussed?
17        A    I did not investigate that.
18        Q    Did you assume that Mrs. Pollard would
19   take the December 16th letter with her and just
20   bring it to a health care provider in England?
21        A    Yes, and along with my consultation note
22   or consultation request.
```

0016
```
 1          Q     Now, your note of December 16th, can you
 2    turn to that?
 3                MS. ZORK:  The letter or --
 4                MR. KLORES:  Yeah, the letter.
 5                MS. CERNIGLIA-LOWENSEN:  The letter?
 6                MR. KLORES:  The letter of December
 7    16th.
 8          Q     Do you make any reference in that letter
 9    as to when Mrs. Pollard should start to receive her
10    radiation therapy?
11          A     No, it's not in the letter.
12          Q     Okay.  Dr. David Sees, do you know him?
13          A     Yes.
14          Q     Okay.  He testified at his deposition a
15    few days ago.  Has anyone told you what he said,
16    the substance of what he said?
17          A     No.
18          Q     One of the things that he said at his
19    deposition was that it was the practice, at least
20    his practice, let's say that, it was at least his
21    practice in 1998 that women, premenopausal women
22    with breast cancer, that he recommended that they
```

0017

```
 1  have chemotherapy.  Was that as far as you know the
 2  practice at Dwight Eisenhower Hospital?
 3       A    Whether or not to use adjuvant
 4  chemotherapy is decided on an individual basis
 5  depending on the case.
 6       Q    Well, that wasn't what I was asking you.
 7  At Eisenhower Hospital were all women, were all
 8  premenopausal women with breast cancer, did they
 9  all get a recommendation for chemotherapy?
10       A    No.
11       Q    Irrespective of nodal status, in other
12  words, small primary tumor, no positive nodes,
13  simply the fact that they were premenopausal, did
14  you refer them to chemotherapy?
15       A    Not everybody.
16       Q    How many, what percentage?
17       A    What percentage what?
18       Q    Would you have referred in that
19  category, tumor less than one centimeter, just
20  these facts alone, tumor less than one centimeter,
21  no positive nodes, premenopausal?
22       A    That category will also include whether
```

0018

```
 1    their hormone receptors are negative or positive.
 2    If their hormone receptors are positive, then they
 3    would be recommended to take an anti-hormonal
 4    treatment such as tomaxifen.  If they are hormone
 5    receptor negative, then it has to be
 6    individualized, depending on other characteristics
 7    of the tumor as far as what their differentiation
 8    is, what -- if there is any blood vessel in reason,
 9    and then the decision would be made.
10         Q    All right.  So that's -- we'll get back
11    to the individual circumstances of the case, but
12    you do not believe that the practice amongst
13    physicians taking care of people with breast cancer
14    in 1998 was that all women, all premenopausal women
15    should have chemotherapy?
16         A    Not at all.
17         Q    Were those the types of discussions that
18    you would have at conferences called tumor boards?
19         A    Yes.
20         Q    And you're familiar with the tumor
21    board?
22         A    Yes.
```

0019

```
 1        Q     What is a tumor board?
 2        A     Tumor board is a conference where all
 3   the cancer experts meet and discuss all the new
 4   cases in the hospital, we have a new diagnosis of
 5   cancer.
 6        Q     Any type of cancer?
 7        A     Most all cancers, not skin cancer.
 8        Q     And how often does the tumor board meet?
 9        A     At least once a week.
10        Q     Once a week?  Are there other types of
11   meetings, formal meetings, that, to discuss cancer
12   patients, or is it just the tumor board?
13        A     Just the tumor board.
14        Q     And where would the meeting, where do
15   the tumor board meetings take place?
16        A     In a conference room, conference hall.
17        Q     At the hospital?
18        A     At the hospital.
19        Q     And what time of day were they?
20        A     It has been different times.  Right now
21   it's held every Monday at 3 p.m., and there's
22   another conference, and the chest tumor board at 2
```

0020

```
 1   p.m. on Mondays.
 2         Q    You said chest tumor board?
 3         A    Yes.  And then there's a third urology
 4   tumor board which is less often, every other
 5   Tuesday or one Tuesday a month.
 6         Q    So the breast cancer would be discussed,
 7   for example, at the 3 o'clock meeting?
 8         A    Correct.
 9         Q    And at the tumor board for a breast
10   cancer patient, what type of specialists were
11   supposed to be present?
12         A    Surgeons would be there, medical
13   oncologists would be there, radiation oncologists
14   would be there, pathologists would be there,
15   radiologists would be there.
16         Q    Can you say that a little bit slower?
17   Surgeons, medical oncologists, radiation
18   oncologists.
19         A    Pathologists, a radiologist.  And
20   anybody else, all the physicians are invited to
21   attend.
22         Q    And when is that conference supposed to
```

0021

```
 1  be held in relation to a diagnosis?
 2        A    All the new, new diagnosis are discussed
 3  there, so it would be sometime soon after
 4  diagnosis.  More likely, most likely within a month
 5  of diagnosis.
 6        Q    Well, was there a rule as to when that
 7  conference should take place, or was there a
 8  practice?
 9        A    That's my understanding, most of them
10  would be discussed within about a month of
11  diagnosis.
12        Q    Was that the intended time?  In other
13  words, were you planning to have, to discuss cases
14  that were a month after diagnosis?
15        A    I don't know the specific requirements
16  or what the guidelines are, and not every case is
17  presented.  The cases that are more interesting are
18  presented for sure, and more common varieties,
19  sometimes they are, not every case is presented.
20        Q    Would Mrs. Pollard be a type of a case
21  that would be presented?
22        A    She would be.
```

0022

```
 1        Q     Why?
 2        A     Because her tumor is, or was somewhat
 3   unusual in the presentation.
 4        Q     Okay.  Well, you know the day that a
 5   pathologic diagnosis was made, right?  I think it
 6   was October 15th.
 7        A     Yes.
 8        Q     That's the biopsy date, right?
 9        A     Right.
10        Q     And so was it the practice at the
11   hospital that decisions concerning future
12   management were to be made at a tumor board?
13        A     Not exactly.  Tumor board is for general
14   discussion, because we don't, we are not evaluating
15   a patient there, we are evaluating a case just
16   based on what findings we have.  What the actual
17   treatment is is based when the physician sees the
18   patient.
19        Q     Which physician?
20        A     Depending on the case.
21        Q     In this case.
22        A     In this case, I mean there are different
```

0023

1    aspects to her treatment.  Her surgical part would
2    naturally be addressed by the surgeon, and then she
3    will be recommended to see an oncologist and then
4    oncologist will decide further treatment.
5         Q    In this case is it the oncologist's job
6    to decide whether Mrs. Pollard is to receive
7    radiation therapy?
8         A    This will be, recommendation will be
9    that of medical oncologist.  As far as treating
10   with radiation oncology, that would be a radiation
11   oncologist.
12        Q    What I'm asking is, the decision as to
13   whether Mrs. Pollard should even get radiation
14   therapy, is that your decision in this case or
15   someone else's, Dr. Sees' for example?
16        A    I think it's both of ours.  When the
17   patient presents and the decision is made to do a
18   lumpectomy, then a decision is being made at that
19   time that either she will have a lumpectomy and
20   radiation to the breast or she would have a
21   mastectomy.
22        Q    So you understood, you understood that

0024

```
 1   Mrs. Pollard, at least the first time that you saw
 2   her, that she had had a lumpectomy, which
 3   automatically means that she is going to have
 4   radiation therapy, right?
 5         A    Right.
 6         Q    Okay.  And so on -- and you knew that
 7   on, you knew that on December 16th, 1998, right?
 8         A    Right.
 9         Q    And you also knew on December 16th, 1998
10   that Mrs. Pollard had now gone two months from the
11   date that her cancer had been diagnosed and had not
12   had any radiation, right?
13         A    No.  This date is calculated from the,
14   from her cancer surgery, which was the date of her
15   lumpectomy, which would be November 12th, 1998.
16         Q    I understand that, but that's not what I
17   asked you.  Mrs. Pollard's cancer was diagnosed on
18   October 15th, 1998, right?
19         A    Correct.
20         Q    That's when she was told that she had
21   cancer?
22         A    I'm assuming so, I have not, you know,
```

0025

```
 1   that's the time --
 2         Q    That's when she should have been told,
 3   right?
 4         A    Right.
 5         Q    And then she would have elected her
 6   definitive treatment to be a lumpectomy with
 7   radiation, right?
 8             MS. HANRAHAN:  Objection to the form.
 9             MS. CERNIGLIA-LOWENSEN:  Do you
10   understand the question?
11         A    Can you repeat that?
12         Q    Yes.  After the biopsy she elected,
13   rather than to have a mastectomy she elected to
14   have a lumpectomy with radiation?
15         A    Looking at the medical records, yes.
16         Q    And as of December 16th she had had both
17   the excisional biopsy and the lumpectomy but she
18   had not started her radiation therapy, right?
19         A    Correct.
20         Q    And you knew that?
21         A    Yes.
22         Q    And did you know when Mrs. Pollard was
```

0026

```
 1    supposed to be arriving in England on December
 2    16th?
 3          A    Within about two weeks from that date.
 4          Q    And how did you know that?
 5          A    Because my note says that.
 6          Q    What does it say?
 7          A    My note says patient plans to move to
 8    England next week, we will give her pertinent
 9    records, and this is on December 15th.
10          Q    And when you say pertinent records,
11    which records would those be?
12          A    Those would be the pathology report,
13    would be my consultation note, would be the special
14    studies of her receptor studies, would be her
15    mammogram, mainly these.
16          Q    When in your view should the radiation
17    have started?
18          A    It depends from case to case.  Normally
19    if everything is going okay, meaning there is no
20    complication in healing, then it starts somewhere
21    about four to six weeks after the surgery when the
22    wound has all healed.  It also depends on whether
```

0027

```
 1    the patient is going to get adjuvant chemotherapy.
 2    If patient gets chemotherapy, then radiation is
 3    given normally after the chemotherapy is completed,
 4    which could be as late as six months after the
 5    surgery.
 6         Q    Well, let me ask it to you this way.
 7    Let's assume that Mrs. Pollard wasn't going
 8    anywhere.
 9         A    Okay.
10         Q    What would happen to her at Dwight
11    Eisenhower?  Your record indicates, should have
12    some indication of the condition of her breast
13    after the November operation, right?  Did you
14    actually see her on December 16th?
15              MS. HANRAHAN:  Objection to the form.
16    I'm not sure which question is pending.
17              MS. CERNIGLIA-LOWENSEN:  Yeah.
18         Q    Did you see her in the office on
19    December 16th?
20         A    December 15th, yes.
21         Q    Okay.  Was her wound healing well at
22    that time?
```

0028

```
 1          A     I do not recall that.  I do not have a
 2    note about her physical exam.
 3          Q     Well, let's assume that she was healing
 4    normally on, after the lumpectomy on November 12th.
 5    What would the plan have been had she stayed at
 6    Fort Gordon?
 7          A     The first, the first decision would be
 8    whether or not she was going to undergo adjuvant
 9    chemotherapy, and if she was going to undergo
10    chemotherapy, then radiation would be given after
11    the chemo is completed.
12          Q     Well, your record speaks to whether
13    chemotherapy was indicated, doesn't it?
14          A     My record makes a recommendation.
15          Q     Okay.  So your recommendation was that
16    there was, that chemotherapy should be started,
17    right?
18          A     Right.
19          Q     And take me from there.  She's in the
20    office with you on December 15th, she's not going
21    anywhere, you sit her down and you tell her this is
22    what I recommend that you have done.
```

0029

```
 1        A    Yeah, I would tell her that, you know,
 2   in general terms these are your risk of relapse and
 3   this is what chemotherapy can do for you, how much
 4   benefit it can provide, and these are the side
 5   effects of chemotherapy, and then I would have her
 6   involved in the treatment decision.
 7        Q    And assuming that she followed your
 8   recommendation, what would your recommendation be?
 9        A    My recommendation was for her to get
10   four cycles of chemotherapy.
11        Q    And how long does that take to
12   accomplish generally?
13        A    Chemo, one cycle is three weeks, so it's
14   about ten, twelve weeks.
15        Q    And was it your recommendation then that
16   the radiation not start until after the last
17   chemotherapy?
18        A    That would be normally my
19   recommendation.
20        Q    Okay.  Do you ever do them together?
21        A    No.
22        Q    Okay.  Now, you had -- the tumor that
```

0030

```
 1    was removed, the cancer that was removed on October
 2    15th, that cancer was sent to pathology, right?
 3          A    Correct.
 4          Q    And did you review the pathology report
 5    when it came back?
 6          A    Yes.
 7          Q    But not until December 1st?
 8          A    Correct.
 9          Q    Now, why is that?  Why is it that this
10    tumor was looked at by a pathologist on October
11    15th or thereabouts and that it was not looked at
12    by an oncologist until December?
13          A    The normal routine is that patient is
14    being seen by a surgeon at this time, surgeon does
15    the biopsy and the pathology report from the
16    pathologist goes back to the surgeon, then surgeon
17    decides what is the next step.
18          Q    Well, when, when should you have seen or
19    when should an oncologist have been consulted after
20    October 15th when the cancer was shown on
21    excisional biopsy?
22               MS. CERNIGLIA-LOWENSEN:  Objection to
```

                                                              0031
```
 1   the form.  You can answer.
 2         A    After the surgeon is finished with his
 3   care, with his treatment for the patient, then he
 4   normally consults a medical oncologist.
 5         Q    Yeah, well, that really wasn't what I
 6   was asking you.  The surgeon in this case knew on
 7   October 15th that Mrs., that Mrs. Pollard had
 8   breast cancer, right?
 9         A    Right.
10         Q    And the surgeon also knew that Mrs.
11   Pollard was going to need radiation therapy, right?
12         A    I don't know at what point he knew that.
13   He may not have known that on October 15th.
14         Q    Okay.  He knew, he knew that if she
15   took, that if she elected a lumpectomy that she was
16   going to need radiation?
17         A    Correct.
18         Q    But on October 15th the surgeon knew
19   that there was breast cancer?
20         A    Correct.
21         Q    And the surgeon knew that simply by
22   virtue of the fact that there was breast cancer
```

0032

```
 1   that a medical oncologist was going to be consulted
 2   on the case, right?
 3               MS. HANRAHAN:  Objection to form.
 4        A    Right.
 5        Q    And that it was going to be a medical
 6   oncologist within the group of medical oncologists
 7   at the hospital, right?
 8        A    Right.
 9        Q    Are you saying that it was, that it was
10   not the practice at the hospital for a medical
11   oncologist to be consulted at or around the time
12   that the pathology came back on October 15th?
13        A    That's correct.
14        Q    It was not the policy?
15        A    That's correct.
16        Q    And when would you -- when was, when
17   were the medical oncologists first consulted?
18   After the definitive surgery?
19        A    Most of the time, yes.
20        Q    So if Mrs. Pollard didn't have her
21   lumpectomy for eight weeks after the breast cancer
22   came back at Eisenhower, an oncologist wouldn't
```

0033

```
 1   have been consulted for eight weeks; is that the
 2   way it worked?
 3        A    Normally it wouldn't take that long of a
 4   time gap, and again, it will depend on the
 5   individual circumstances why it's taking eight
 6   weeks.
 7        Q    How long does it normally take?
 8        A    I could not answer that correctly, the
 9   surgeon could probably answer that better.
10        Q    There was no further cancer removed at
11   the lumpectomy, right?
12        A    They did not know that at the time, but
13   yes, you're right.
14        Q    Well, they knew it at the lumpectomy,
15   they knew it when they sent the tissue from the
16   lumpectomy to the pathologist, right?
17        A    We are talking about the surgery on
18   November 12th?
19        Q    November 12th, right.
20        A    Yes.
21        Q    Okay.  So as best as we can tell all of
22   the cancer in Mrs. Pollard's breast was in fact
```

0034

```
 1    removed at the excisional biopsy, right?
 2              MS. CERNIGLIA-LOWENSEN:  Objection to
 3    form.
 4         A    At the time of lumpectomy, yes.
 5         Q    No, at the time of the biopsy.  At the
 6    lumpectomy there was no other cancer found in the
 7    breast?
 8         A    That's correct, and they knew that after
 9    doing the lumpectomy.
10         Q    Right.  And so as of November 12th all
11    of the cancer had presumably been removed from Mrs.
12    Pollard's breast at the time of the excisional
13    biopsy, right?
14         A    Right.
15         Q    And when was the first time that you
16    were contacted?  Was that December 1st?
17         A    That's the date I saw her.  A
18    consultation was put in I think on November 17th.
19         Q    Now, do you know why the pathology
20    specimen on October 15th was not sent out for the
21    special studies, the DNA studies?
22         A    No, I do not.  It was probably an
```

0035

```
 1   oversight.
 2        Q    Well, what is the normal -- was it the
 3   normal practice at Dwight Eisenhower that this
 4   tumor that was removed on October 15th would be
 5   sent to, for receptor studies and DNA studies on or
 6   about December -- I'm sorry, October 15th?
 7        A    Yes.
 8        Q    Okay.  So what should have happened in
 9   this case with Mrs. Pollard is that Dr. Sees should
10   have removed the cancer on the biopsy on October
11   15th, right?
12        A    That was for diagnosis he did the
13   biopsy.
14        Q    Right, yeah.  What should have happened
15   is that the tumor that was removed on excisional
16   biopsy should be sent by Dr. Sees to the pathology
17   department at Eisenhower, right?
18        A    Right.
19        Q    And then the pathologist should have
20   sent a sample of that tissue out to the, for the
21   specialized studies at the laboratory in New York
22   that you were using to perform the estrogen and
```

0036

```
 1    other DNA studies, right?
 2         A    Right.
 3         Q    And that should have been done on or
 4    around October 15th, 2000 -- I'm sorry, 1998,
 5    right?
 6         A    Yes.
 7         Q    And how long did it normally take for
 8    that report to come back from the place in New York
 9    once the tissue was sent?
10         A    About a week or ten days.
11         Q    So what should have happened in this
12    case is that as of October 25th at the latest,
13    1998, the in-house pathology report should have
14    been completed and the extra studies done by the
15    lab in New York, the DNA studies and the ER
16    studies, should have been back at Eisenhower,
17    right?
18         A    Right.
19         Q    And those two studies, in other words,
20    the studies done by the pathologist in-house and
21    the studies done by the laboratory in New York,
22    those are the two studies that comprise all of the
```

0037

```
 1   information that you intend to get about a tumor in
 2   order to map out your treatment plan, right?
 3        A    No.  We have not completely staged the
 4   patient yet.
 5        Q    Well, you haven't staged the patient
 6   meaning that you haven't done the lymph node
 7   diagnosis?
 8        A    Right.  And we also haven't seen the
 9   actual tumor size yet, if there's any more tumor
10   left behind in the breast.
11        Q    So those two pieces of information would
12   have been completed as of November 12th?
13        A    Yes.
14        Q    So what should have happened in this
15   case is that, is that everything should have been
16   set for the oncologist as of around November 12th,
17   1998?
18        A    I would say probably a week from that
19   surgery.
20        Q    Okay.  Now, has anyone given you an
21   explanation as to why that tumor was not sent out
22   for the pathology to the laboratory in New York?
```

                                                    0038
```
 1        A    No.
 2        Q    Is that something that happened in your
 3   view more than once at Eisenhower?
 4        A    It has happened more than once.
 5        Q    And what was the -- did anybody ever try
 6   to find out why it happened?
 7             MS. CERNIGLIA-LOWENSEN:  Objection to
 8   form.  You can answer if you know.
 9        A    I'm not sure.
10        Q    Did you ever try to find out?
11        A    Yes, and I don't have the exact answer.
12        Q    Well, what did you do when you tried to
13   find out?
14        A    I was told it actually should have been
15   sent but it was not sent and we'll send it now.
16        Q    Did you try to find out in this case why
17   the sample hadn't been sent out on or around
18   October 15th?
19        A    I do not remember that.
20        Q    The commencement date for the
21   chemotherapy in your mind in this case would be
22   after the lumpectomy, right?
```

0039

```
 1        A    After she was healed from that surgery,
 2   yes.
 3        Q    I'm talking for the chemotherapy.
 4        A    Yes.
 5        Q    So you wanted the information from the
 6   nodal dissection to determine if there were
 7   positive or negative nodes and if there was any
 8   residual tumor, you wanted information from, you
 9   would want information from the lumpectomy before
10   you went ahead and decided on chemotherapy, right?
11        A    Right.
12        Q    And in this case, as I understand it
13   then, on or about November 17th, a week's -- or say
14   November 19th, after the lumpectomy, had you seen
15   the patient at that time you would have issued
16   these recommendations concerning the four cycles of
17   chemotherapy and the radiation therapy, right?
18        A    Starting after she was healed up, yes.
19        Q    Healed up in her breast before you start
20   the chemotherapy?
21        A    Yes.
22        Q    How long would that take?
```

```
                                                          0040
 1        A     If there are no infections, no
 2  complications, four to six weeks.
 3        Q     Which would have been around the time
 4  that she would have seen you on December 15th,
 5  assuming that she had healed well?
 6        A     Her six weeks would have been at the end
 7  of December.
 8        Q     Okay.  Well, four weeks is at the middle
 9  of December, her six weeks is at the end of
10  December, right?
11        A     Right.
12        Q     So at or around between December 15th
13  and December 30th, if you had Mrs. Pollard, what
14  should have happened is that the chemotherapy
15  should have started around then if she was staying
16  at Eisenhower, right?
17        A     Right.
18        Q     Was that option given to her by you?
19              MR. ADAMS:  Objection.
20              MS. CERNIGLIA-LOWENSEN:  Join in the
21  objection.  Do you understand the question?
22        A     Can you repeat that question, please?
```

0041

```
 1         Q    Did you tell Mrs. Pollard that she could
 2    stay and receive this therapy, the chemotherapy and
 3    the radiation therapy, at Fort Gordon?
 4              MR. ADAMS:  Same objection.
 5              MS. HANRAHAN:  Objection.  Lacks
 6    foundation.
 7         A    I do not remember that.  When I saw the
 8    patient I knew that she was going to England, she
 9    was moving to England.
10         Q    Did you have any conversation with her
11    about whether it would be better for her to stay
12    here and receive her chemotherapy and radiation or
13    go to England and get it there?
14         A    I don't remember such conversation.
15         Q    Okay, I want to be specific.  As I
16    understand you, it was your assumption that the
17    treatment plan that you had recommended, i.e.,
18    chemotherapy and radiation, would be available to
19    Mrs. Pollard in England, right?
20         A    Right.
21         Q    It was your assumption that -- and you
22    actually recommended to Mrs. Pollard that she take
```

0042

```
 1  chemotherapy followed by radiation, right?
 2       A    Correct.
 3       Q    Did she agree with you?
 4       A    I don't think a decision was made about
 5  that at that time because she was not going to be,
 6  she wasn't going to be treated by me, she was
 7  moving to England and her treatment was going to be
 8  carried out in England.
 9       Q    Well, did you know whether or not she
10  would have chemotherapy available to her in England
11  after you wrote that December 16th letter?
12            MR. ADAMS:  Objection.
13       A    I don't understand.
14            MS. CERNIGLIA-LOWENSEN:  Same objection.
15       A    Can you repeat that, please?
16       Q    We've talked about the fact that you're
17  sending her, or not that you're sending her, but
18  that she's leaving the United States to go to the
19  United Kingdom, right?
20       A    Right.
21       Q    In your professional opinion on December
22  16th, 1998, you believed that the best course for
```

```
                                                        0043
1    her to treat and fight her cancer was that she had
2    four cycles of chemotherapy followed by radiation
3    therapy, right?
4         A    Right.
5         Q    Did you know whether or not doctors in
6    England would agree with that plan?
7              MS. CERNIGLIA-LOWENSEN:  Objection.  You
8    can answer.
9              MS. HANRAHAN:  Same objection.
10        A    I don't know if another medical
11   oncologist in the United States would agree with
12   that or a medical oncologist in the United Kingdom
13   would agree with that.
14        Q    And did that matter to you?
15             MS. CERNIGLIA-LOWENSEN:  Objection to
16   form.
17        A    No, it did not.
18        Q    Did you make any effort to try to find
19   out what part of England she was moving to?
20             MR. ADAMS:  Objection.
21             MS. HANRAHAN:  Objection.  Asked and
22   answered.
```

0044

```
 1              MS. CERNIGLIA-LOWENSEN:  Same objection.
 2         A    No, I did not.
 3         Q    Did you make any effort, either you or
 4    someone on your staff or someone in the military,
 5    to try and find out who her doctor was going to be
 6    in England?
 7              MR. ADAMS:  Objection.
 8              MS. HANRAHAN:  Objection.  Lacks
 9    foundation.
10              MS. CERNIGLIA-LOWENSEN:  Objection.
11         A    I don't know about the military, I did
12    not.
13         Q    In order for -- well, let me ask it to
14    you this way.  You mentioned that you would have
15    sat down and discussed with Mrs. Pollard the risks
16    and benefits of chemotherapy, right?
17         A    Right.
18         Q    And as you go through this, that
19    determination in your mind, tell me the facts that
20    you were considering.  Let's start with the cancer
21    itself.
22              MS. CERNIGLIA-LOWENSEN:  I'm going to
```

0045

```
 1    object because I don't understand the question.
 2    Maybe the doctor does.
 3              MS. HANRAHAN:  I don't either.
 4              MS. CERNIGLIA-LOWENSEN:  Because you
 5    said facts and you talked about risks and benefits.
 6    I'm sorry, I just got lost, Bruce.  If you could
 7    ask it differently.
 8              MR. KLORES:  No problem.
 9        Q    You're faced with Mrs. Pollard, you have
10    the information -- just backing up a second, as I
11    understand it, you would not have been in a
12    position to make any recommendations concerning
13    chemotherapy, based upon your prior testimony, on
14    December 1st, right?
15              MR. ADAMS:  Objection.
16        A    I'm sorry, can you repeat that?
17        Q    You said earlier that you would not have
18    made a decision concerning whether to recommend
19    chemotherapy or not until you had these estrogen
20    and DNA studies back, right?
21        A    Right, I already had that -- no, I'm
22    sorry, I did not have that information at that
```

0046

```
 1   time.
 2          Q    So on December 1st you could not make
 3   any, you could not make, in your practice, you
 4   would not have made any recommendations concerning
 5   chemotherapy, right?
 6          A    Can I elaborate on that?
 7          Q    Sure.
 8          A    My note from December 1st outlines these
 9   different scenes if her receptors would be negative
10   or positive, and my note says if she was receptor
11   positive I would recommend adjuvant tamoxifen and
12   if she was receptor negative I would recommend
13   chemotherapy and I would also recommend radiation
14   to her breast.
15          Q    But that's my point, you could not have
16   made a recommendation as to which route she should
17   take until these studies came back to you, right?
18          A    Right.
19          Q    So if you had everything in front of you
20   on December 1st, you would have made the
21   recommendation on December 1st that we've already
22   talked about, four weeks of chemotherapy followed
```

0047

```
 1   by radiation, right?
 2         A    Right.
 3         Q    When you -- tell me how you would
 4   describe to her the type of breast cancer that she
 5   had.
 6         A    I would tell her --
 7         Q    Tell us slowly.
 8         A    I would tell her that her breast cancer
 9   is in an early stage, the tumor is very small, and
10   the smaller the tumor the more favorable it is, the
11   lower the risk of spreading or recurrence.  Her
12   lymph nodes were all negative and that's a good
13   prognostic indicator.  Most of the tumors of this
14   size, that is point five centimeter, are detected
15   by screening mammography and not, and not present
16   as a palpable tumor.  In her case it is somewhat
17   unusual in that regard.  We know that tumors that
18   are this small have a very good prognosis and many
19   times we do not recommend any adjuvant
20   chemotherapy.  Since there is something unusual
21   about her case I would explain to her that I favor
22   giving her chemotherapy.
```

0048

```
 1          Q    What were the unusual things?
 2          A    One was that the tumor was palpable and
 3     was very small, other thing was that her grade was
 4     not grade 1 or it was not a well-differentiated
 5     tumor.
 6          Q    Uh-huh.
 7          A    That's it.
 8          Q    You mentioned that the tumor was .5
 9     centimeters; is that right?
10          A    Correct.
11          Q    And you would have received that
12     information from Dr. Adams, the pathologist, that's
13     who you were relying upon?
14          A    Yes.
15          Q    So your understanding in December, on
16     December 1st is that the tumor was less than one
17     centimeter?
18          A    It was .5 centimeter, yes.
19          Q    Now, have you seen the records where the
20     tumor was looked at by the pathologists in England?
21          A    No.
22          Q    I assume if the tumor was greater than
```

0049

```
 1    one centimeter, that that would have been an
 2    indication by itself, or not, standing alone, for
 3    adjuvant chemotherapy?
 4               MS. CERNIGLIA-LOWENSEN:  Objection to
 5    form.
 6        Q    In other words, you said that one of
 7    the -- you said that the tumor was .5 centimeters
 8    and that's a good prognosticating sign, right?
 9        A    Right.
10        Q    And then we started talking about the
11    unusual characteristics of her tumor, of her cancer
12    which may lead you to say let's give her
13    chemotherapy, right?
14        A    Right.
15        Q    Is tumor size an indication for
16    chemotherapy by itself?
17        A    Yes.  Most tumors, most of the time
18    tumor more than one centimeter receives some
19    adjuvant treatment.
20        Q    Well, by some adjuvant treatment we're
21    talking about chemotherapy?
22        A    Most of the time, yes.
```

0050

```
 1        Q    So when you decided to offer
 2   chemotherapy, you were deciding to offer
 3   chemotherapy under the assumption that the tumor
 4   was in fact .5 centimeters?
 5        A    Correct.
 6        Q    You mentioned that the tumor was, that
 7   her cancer was in an early stage, right?
 8        A    Correct.
 9        Q    You didn't mention anything about family
10   history in your analysis.  Was her family history
11   of the fact that her sister had died of breast
12   cancer at a young age and that her mother was dying
13   of breast cancer a factor that you determined in
14   your analysis as to whether to offer her
15   chemotherapy?
16        A    No.
17        Q    And why is that?
18        A    When we are looking at the family
19   history we are looking at her increased risk of
20   developing the cancer.  She has already, she
21   already has a cancer, so family history is not
22   contributing any more to her diagnosis, and the
```

0051

```
 1   treatment that I would recommend her would be based
 2   on the type of tumor that she has.
 3        Q    Okay.  So the fact that her sister died
 4   at age 29 I believe it was, or 39, at a young age,
 5   that fact in and of itself doesn't give you any
 6   information that you consider to be reliable as to
 7   whether to offer chemotherapy to Mrs. Pollard?
 8        A    No.
 9        Q    Okay.  Any other factors?  Her age, does
10   her age have anything to do with whether to offer
11   chemotherapy or not?
12        A    Yes.  She's premenopausal and her age is
13   not a significant risk factor in itself in this
14   case.
15        Q    I'm asking it the other way.  Do you
16   tend to try to give chemotherapy to a younger woman
17   than you would to an older woman simply by virtue
18   of the age, everything else being equal?
19             MS. CERNIGLIA-LOWENSEN:  Objection to
20   the form.  You can answer.
21        A    Yes, in general, yes.
22        Q    Why?
```

0052

```
 1        A    Because then the patients normally have
 2   a longer life expectancy and we have to look at a
 3   longtime outlook, whereas if somebody is older, if
 4   somebody is older than 70 let's say, then we're not
 5   looking at 20- or 25-year prognosis, we're more
 6   looking at five or ten years.
 7        Q    What is the relevancy of whether or not
 8   a woman is pre- or postmenopausal with respect to
 9   the decision to give chemotherapy?
10        A    In general the breast cancer tends to be
11   more aggressive in premenopausal women.
12        Q    You mentioned one of the unusual
13   characteristics of her tumor is that it was only a
14   half a centimeter and yet it was physically
15   palpable or the type of a tumor that Mrs. Pollard
16   was or somebody else was able to actually feel;
17   that's what you meant by that, right?
18        A    Right.
19        Q    How does that factor into the analysis
20   of whether or not to offer chemotherapy?
21        A    That just makes it unusual because we do
22   not have that database that tells us about patients
```

0053

```
 1    whose tumors are palpable and are .5 centimeter in
 2    size.
 3          Q    Well, typically it's thought that a
 4    mammogram should be able to pick up a tumor of a
 5    half a centimeter but a physical exam would not,
 6    right?
 7          A    Right.
 8          Q    You normally don't expect anybody doing
 9    self breast examination or a woman on self breast
10    examination to be able to palpate a lump unless
11    it's a centimeter or more, right?
12          A    Generally, yes.
13          Q    What information do you glean as an
14    oncologist about the fact that a half a centimeter
15    lump is physically palpable?
16          MS. CERNIGLIA-LOWENSEN:  Objection to
17    form.  You can answer.
18          Q    As to why that relates to chemotherapy.
19    What about that fact alone tends to steer one in
20    the direction of chemotherapy?
21          A    It just muddles the picture because we
22    do not have that database.
```

0054

```
 1         Q    What database?
 2         A    Of women who have .5 centimeter size
 3  tumor and whose tumor is palpable.
 4         Q    Are you saying you don't have a
 5  database, you don't have a five-year statistical
 6  survival rate based upon those two figures?
 7         A    That's right, we don't.
 8         Q    Okay.  Now, you mentioned also that the
 9  tumor was, in your opinion, or in the pathologist's
10  opinion it was not well differentiated; it was I
11  think described as being poorly differentiated,
12  right?
13         A    Correct.
14         Q    And what does that mean?
15         A    It tells us that tumor is more
16  aggressive.
17         Q    Okay.  And by more aggressive, in a
18  layperson's terms does that mean that they tend to
19  grow faster?
20         A    They tend to grow faster, they have a
21  higher tendency to spread.
22         Q    And when you use the word spread in the
```

0055

```
 1   context of your answer, you're talking about
 2   spreading out of the breast, not a focal regrowth
 3   of breast cancer but spreading systemically through
 4   the circulatory system or through the lymph nodes,
 5   right?
 6         A    Correct.
 7         Q    And it's that type of spread that you
 8   are attempting to kill by chemotherapy, right?
 9         A    Correct.
10         Q    Now, in the clinical setting of this
11   case there would have been certain tests and
12   evaluations that would have been done on Mrs.
13   Pollard prior to her leaving the United States to
14   determine whether or not there was any spread
15   either locally or any other type of metastasis from
16   her breast cancer, right?
17         A    No, I think her workup was complete.
18         Q    That's what I'm saying, there would have
19   been a workup to stage her, right, to give her a
20   stage before she left?
21         A    Right.
22         Q    And that's -- and staging, by staging we
```

0056

```
 1   mean an evaluation or an inspection of other parts
 2   of her body to determine whether there was any
 3   evidence at all, either clinically or
 4   microscopically or radiologically, that there was
 5   either another growth of cancer in her breast or
 6   that there had been any seepage of cancer cells
 7   through her lymph nodes or her circulatory system,
 8   right?
 9           MS. HANRAHAN:  Objection to the form.
10       A    All of that workup does not include
11   doing more tests.  A staging workup for a case like
12   this would include taking a history and getting
13   blood chemistries, and if these were normal, then
14   this would be the extent of workup.
15       Q    Now, wasn't a bone scan done?
16           MS. CERNIGLIA-LOWENSEN:  Take a look.
17            (Pause in the proceedings.)
18       Q    I think it's on November 10th.
19           MS. CERNIGLIA-LOWENSEN:  What page
20   number?
21           MR. KLORES:  I'll find it.
22           MS. HANRAHAN:  Right before the surgery.
```

```
                                                       0057
 1              (Discussion held off the record.)
 2       Q    Okay.  Are you with me?
 3       A    Yes.
 4            MS. CERNIGLIA-LOWENSEN:  I don't see a
 5   D.  Oh, here we go.  Got it.
 6            MR. KLORES:  Was I right?  It was
 7   November 10th, right?
 8            MS. CERNIGLIA-LOWENSEN:  Yes.
 9       Q    So let's talk about what we know about
10   Veronica Pollard as of your last visit with her on
11   December 16th, okay?
12       A    Okay.
13       Q    We know that prior to her original
14   biopsy she had mammograms performed, she had a
15   mammogram done on both breasts, right?
16       A    Correct.
17       Q    We know that that mammogram was
18   negative, right?
19            MS. HANRAHAN:  Objection to the form.
20       A    Correct.
21       Q    We know that a wide excision was
22   performed on lumpectomy which showed no residual
```

```
                                                      0058
 1   tumors surrounding, which are basically clear
 2   margins, so that there was no tumor that was left
 3   that had not been excised by Dr. Sees, right?
 4               MR. ADAMS:  Objection.
 5               MS. HANRAHAN:  Objection to the form.
 6               MS. CERNIGLIA-LOWENSEN:  Same objection.
 7       A    Can you repeat that, please?
 8       Q    We know that there was no tumor left in
 9   the area of the tumor that Dr. Sees excised, right?
10               MS. CERNIGLIA-LOWENSEN:  Objection.
11               MR. ADAMS:  Objection.
12               MS. HANRAHAN:  Same objection.
13       A    There was no residual tumor at the time
14   of lumpectomy.
15       Q    Okay.  And we know that there was no
16   evidence that any of the lymph nodes were, had
17   cancer in them?
18       A    Right.
19       Q    We know that there was a negative bone
20   scan, right?
21               MS. HANRAHAN:  Objection to the form.
22               MR. ADAMS:  Objection.
```

0059

```
 1        A     Correct.
 2        Q     And what was the purpose of the bone
 3   scan on November 10?
 4              MS. HANRAHAN:  Objection.  Lacks
 5   foundation.
 6              MR. KLORES:  Okay.
 7        Q     Do you know why a bone scan was ordered?
 8        A     No, I do not.
 9        Q     Do you know what a bone scan is?
10        A     Yes.
11        Q     What is it?
12        A     As the name implies, it's a scan with a
13   radionucleotide agent to look at the skeletal
14   system and it shows up problems in the bones, which
15   could be different problems, could be an infection,
16   could be traumalike fracture, could be arthritis,
17   could be spread of cancer.
18        Q     Well, in the clinical setting of this
19   case, knowing what you know about Mrs. Pollard and
20   the practice at Dwight Eisenhower, the reason for
21   the bone scan would have been to see if there was
22   cancer, right?
```

```
                                                        0060
 1              MR. ADAMS:  Objection.
 2              MS. HANRAHAN:  Objection to the form.
 3              MS. CERNIGLIA-LOWENSEN:  Objection.
 4      A    I can presume that, I do not know for
 5   sure.
 6      Q    You don't know?  Is that your testimony,
 7   that having gone through this case in the fashion
 8   that we have that you don't know what the
 9   indication for the bone scan was?
10              MS. CERNIGLIA-LOWENSEN:  Objection.
11              MS. HANRAHAN:  Objection to form.
12      Q    Well, what were they looking for based
13   upon the impression?
14              MS. CERNIGLIA-LOWENSEN:  Objection.
15      Q    Cancer in the bone, right?
16              MS. CERNIGLIA-LOWENSEN:  Objection.
17      A    Can you repeat that question?
18      Q    Under the impression it says that there
19   is no evidence of metastatic disease in the bone,
20   right?
21      A    Right.
22      Q    So can you at least assume from that
```

0061

```
 1    that the reason for the bone scan was to see
 2    whether or not there was any cancer in the bone?
 3              MS. HANRAHAN:  Objection to the form.
 4              MS. CERNIGLIA-LOWENSEN:  Objection.
 5         A    That would be likely.
 6         Q    Okay.  Do you consider -- do you know
 7    who ordered it?  Look at the --
 8         A    It says here Dr. James Frizzi from
 9    general surgery.
10         Q    Was it the practice at Dwight Eisenhower
11    to order a bone scan on women with breast cancer
12    before their definitive treatment?
13              MR. ADAMS:  Objection.
14         Q    In other words, she hadn't had her
15    lumpectomy yet, right?
16              MS. HANRAHAN:  As of the date of the
17    bone scan?
18              MR. KLORES:  As of the date of the bone
19    scan.
20         A    Right.
21         Q    Was it the practice at Dwight Eisenhower
22    to order bone scans on women with breast cancer
```

0062
```
 1   that had not had their definitive therapy?
 2            MS. CERNIGLIA-LOWENSEN:  Objection.  You
 3   can answer.
 4       A    It depends on the surgeon.  If the
 5   surgeon wants to get a bone scan, then I don't
 6   think he needs to wait until after the lumpectomy.
 7       Q    So you know from the bone scan that
 8   there's no evidence of cancer in Mrs. Pollard's
 9   bones, right?
10       A    Right.
11       Q    In order for her to be staged before she
12   goes away -- and your records I think do indicate
13   that she was staged as an NoMo, right?
14       A    Right.
15       Q    And the Mo would have to indicate that
16   there was no evidence of any distant metastasis,
17   right?
18       A    Right.
19       Q    And how do we know that?  How did you
20   know that?
21       A    Based on her blood work and her
22   symptomatology, her history.
```

0063

```
 1          Q    And when you talk about her blood work,
 2   what blood work are you speaking about particularly
 3   that showed you that there was no evidence of any
 4   metastatic disease?
 5          A    We look at her alkaline phosphatase and
 6   her serum calcium level.
 7          Q    And can you turn to those?  Tell me what
 8   the date is of the test.
 9               MR. KLORES:  I have some lab results
10   from October 7th in the chart that, Larry, those
11   are on page 61, 62 and 63.
12               Are you looking at the October 7th lab
13   results?
14               MS. CERNIGLIA-LOWENSEN:  Yes.
15          Q    Now, tell me what studies are at all
16   relevant to you as an oncologist to determine
17   whether there is any type of evidence of metastatic
18   disease from these three pages of lab results,
19   Doctor.
20          A    The ones that I mentioned are not on
21   these pages.
22          Q    Okay.
```

0064

```
 1              (Pause in the proceedings.)
 2              MS. CERNIGLIA-LOWENSEN:  Here we go.  I
 3  find some more.
 4              (Discussion held off the record.)
 5              MS. CERNIGLIA-LOWENSEN:  I've got a
 6  handwritten 13 down here.
 7              MR. KLORES:  Yeah, I don't think I've
 8  ever seen that, but I don't know, I could have.
 9              MS. HANRAHAN:  I got it all from these
10  folks, it's all Bates stamped.  I don't know who
11  did it, but I got it and I got the impression it
12  came from Larry to them Bates stamped, but I don't
13  know.  So I thought three of --
14              MR. ADAMS:  He's referring to the DDE
15  61, 62, 63.
16              MR. KLORES:  In any event --
17              MS. CERNIGLIA-LOWENSEN:  But they're
18  additional that we have here.  And I don't know
19  where I got them.
20              MR. KLORES:  Well, I've never seen
21  those.
22              MS. CERNIGLIA-LOWENSEN:  We'll make
```

```
                                                0065
 1    copies for you.
 2             MR. KLORES:  Okay.
 3        Q    So you're looking at some lab results
 4    now in front of you.  Can you tell us -- they're
 5    pages what?  13, 14, all right.  And what date are
 6    those drawn?
 7        A    November 9th, '98.
 8        Q    And at whose request?
 9        A    Dr. Sandra Goins.
10        Q    Do you know who that is?
11        A    No.
12             MS. ZORK:  Greens?  I'm sorry, what's
13    the name?
14             MS. CERNIGLIA-LOWENSEN:  Goins,
15    G-O-I-N-S.
16        Q    And what are the tests that you consider
17    to be relevant to determine whether or not there
18    was any spread of cancer?
19        A    Alkaline phosphatase, which was normal;
20    calcium level, which was normal.
21        Q    Uh-huh.
22        A    These are the two main ones.
```

0066

```
 1          Q    Any others?
 2          A    And CBC in case she's anemic, that needs
 3   to be addressed.
 4          Q    What does the alkaline phosphatase tell
 5   you in regard to cancer?
 6          A    It's an enzyme that's made in the bones
 7   and the liver and if there is a bone turnover, if
 8   for example there is cancer in the bones, alkaline
 9   phosphatase may be elevated.
10          Q    And does the same hold true if there's
11   cancer in the liver, that you would expect to see
12   an elevation?
13          A    Yes.
14          Q    At what stage of liver cancer would you
15   expect to start seeing an elevation of the alkaline
16   phosphatase?
17          A    There is not a hundred percent
18   correlation.  Sometimes there can be cancer in the
19   liver and alkaline phosphatase may be totally
20   normal.
21          Q    But this is an enzyme that is produced
22   when there is, when there can be cancer in the bone
```

0067

```
 1   or in the liver, right?
 2        A    Right.
 3        Q    And Mrs. Pollard's in November was
 4   normal?
 5        A    Correct.
 6        Q    And then you looked at the calcium, and
 7   what medically, what medical information do you
 8   glean from the calcium?
 9        A    Calcium can be released from the bones
10   in case there is spread of tumor in the bones, so
11   you can see an elevated calcium, but again, calcium
12   may be normal and somebody may have tumor spread to
13   the bones.
14        Q    So as far as you can tell on November
15   12th, or November 17th, all of the tests that were
16   available and performed, and that would be the
17   mammogram, the bone scan, the blood work and the
18   clinical examination as well as the laboratory
19   studies of the, and the pathology studies on the
20   lymph nodes, indicated that there had been no
21   systemic, that there was no systemic cancer, right?
22        A    Right.
```

0068

```
 1          Q    Now let me ask you a question about
 2   chemotherapy.  In Mrs. Pollard's case would she
 3   receive the same benefit from chemotherapy if it
 4   had started on January 1, 1999 or January 1, 2000?
 5              MS. CERNIGLIA-LOWENSEN:  Objection to
 6   the form.
 7              MS. HANRAHAN:  Objection to the form.
 8          A    Can you repeat that, please?
 9          Q    Sure.  You've talked about initiating
10   chemotherapy in the clinical setting of this case.
11   If you had seen her in the middle of November you
12   would have started chemotherapy sometime after her,
13   she had healed from her lumpectomy, right?
14          A    Right.
15          Q    And we talked about that being sometime
16   between the middle and the end of December, right?
17          A    Correct.
18          Q    Let's just use January 1st, 1999 as the
19   commencement date for her four cycles of
20   chemotherapy, right?
21          A    Okay.
22          Q    If that chemotherapy that you intended
```

0069

```
 1   or that you recommended she undertake did not start
 2   until January 1st, 2000, in your view would it have
 3   the same effectiveness?
 4              MS. HANRAHAN:  Objection to the form.
 5              MS. CERNIGLIA-LOWENSEN:  Objection.
 6       A    No, it would not.
 7       Q    Why is that?
 8       A    When we use chemotherapy we are trying
 9   to kill off the cancer cells, and most of the
10   cancer cells have been removed at the time of
11   surgery.  At this time we do not know if the
12   patient has any cancer cells left behind in the
13   body or not, and the purpose of chemo is to kill
14   off those cancer cells if there are any.  If you
15   wait another year, of course you're letting these
16   cancers multiply, and if you treat a year later the
17   outcome or the result will not be the same, it will
18   be worse.
19       Q    Well, is there a -- now, that is on the
20   assumption, right, that there is still cancer?
21       A    Right, only if there are cancer cells.
22       Q    Correct.  I mean if everything is gone
```

0070

```
 1   on January 1st, 1999 --
 2            MS. CERNIGLIA-LOWENSEN:  Everything
 3   being all the cancer cells.
 4        Q    If there's no cancer, if there's not a
 5   single cancer cell left in Mrs. Pollard on January
 6   1st, 1999, whether or not you start chemotherapy
 7   then or a year later presumably wouldn't matter,
 8   right?
 9        A    If I knew she does not have cancer cell
10   in her body I would not recommend we do
11   chemotherapy.
12        Q    Understood.  But tell me about the
13   relationship between -- on the assumption, on the
14   assumption that she did have cancer cells in her
15   body on December -- on January 1st, 1999, tell me
16   about the efficacy of chemotherapy the longer you
17   wait to start it.
18            MR. ADAMS:  Objection.
19            MS. HANRAHAN:  Objection.
20            MS. CERNIGLIA-LOWENSEN:  Objection.
21        A    In general you do not want to wait too
22   much longer after the patient has healed up.
```

0071

```
 1   Sometimes we have to wait if there is an infection
 2   or there's a delayed wound healing.
 3        Q    When do you normally want to start it,
 4   four to six weeks, right?
 5        A    Right.
 6             MR. ADAMS:  Objection.
 7        Q    And what's the reason for that?  Do the
 8   studies show that the sooner you start the
 9   chemotherapy the more effective it is?
10             MS. CERNIGLIA-LOWENSEN:  Objection to
11   the form.
12             MR. ADAMS:  Objection.
13        A    There are no definitive studies to that
14   effect.
15        Q    Is that your opinion to a reasonable
16   degree of medical probability as a board certified
17   oncologist, that the earlier you commence
18   chemotherapy the better the outcome?
19             MS. CERNIGLIA-LOWENSEN:  Objection.
20             MS. HANRAHAN:  Objection to the form.
21        A    There are no studies that will, that
22   tell us whether you start the chemo at four weeks,
```

0072

```
 1    if that's better than six weeks and that's better
 2    than eight weeks and that's better than ten weeks.
 3         Q    Well, that's because no one waits,
 4    right?
 5              MS. CERNIGLIA-LOWENSEN:  Objection to
 6    form.
 7              MR. ADAMS:  Objection.  Let him finish
 8    his answer.
 9              MR. KLORES:  Well, are you his lawyer?
10              MR. ADAMS:  Well, I'd like to have a
11    clear record.
12              MR. KLORES:  You may be, but, you know.
13    Okay, good.
14         A    So there are no such studies.
15         Q    Well, why aren't there any such studies?
16              MS. HANRAHAN:  Objection.  Lack of
17    foundation.
18              MS. CERNIGLIA-LOWENSEN:  Objection.
19         Q    No, I mean am I right?  You're never
20    going to as an oncologist in a patient like Mrs.
21    Pollard say we are going to wait, you're healed, we
22    could start your chemotherapy today but we're going
```

0073

```
 1    to wait six months?
 2              MS. CERNIGLIA-LOWENSEN:  Objection.
 3         A    We do not like to do that.
 4         Q    Okay.  And the reason you don't like to
 5    do that is because, notwithstanding whether there
 6    is a study, it is your opinion as a board certified
 7    oncologist, and it is the opinion of probably all
 8    of the board certified oncologists that you're
 9    familiar with, that the sooner you commence
10    chemotherapy, if you've decided to use it as an
11    adjuvant therapy, the better the outcome, right?
12              MR. ADAMS:  Objection.
13              MS. HANRAHAN:  Objection to the form.
14         A    Again, it has limitations.  Sooner
15    means, you know, the patient has to be healed up,
16    so it's not sooner meaning next day after surgery.
17         Q    I understand that.  Do you understand
18    what I'm asking?
19              MS. CERNIGLIA-LOWENSEN:  I don't think
20    he does.  Could you ask it again?
21         A    Could you ask it --
22         Q    You're board certified in the field of
```

0074

```
 1   medical oncology, right?
 2        A    Right.
 3        Q    Is it your opinion to a reasonable
 4   degree of medical probability that the sooner that
 5   you commence chemotherapy, if you are going to use
 6   it, the better it is for the patient?
 7             MS. HANRAHAN:  Objection to the form,
 8   it's vague, ambiguous and overbroad.
 9             MR. ADAMS:  Objection.
10        A    I think that that has a very, a lot of
11   limitations.  Again, sooner doesn't mean the day
12   after surgery.
13        Q    Okay.  Well, I asked you -- let's talk
14   about the clinical setting in this case.  There
15   would have been no reason for Mrs. Pollard in your
16   mind to wait past say January 1st, 1999 for
17   chemotherapy assuming she was fully healed, right?
18        A    There was because she was moving to
19   England.
20        Q    No.  If she was staying in the United
21   States and she was your patient, you would have
22   started her on chemotherapy around January 1st,
```

0075
```
 1   1999, right?
 2        A    Right.
 3        Q    You would not have told her that she
 4   could start her chemotherapy on January 1st, 2000,
 5   right?
 6        A    No.  Right.  Yeah.
 7        Q    And if she asked you can I start this a
 8   year later you would tell her that it was your
 9   opinion as an expert in cancer that the sooner she
10   starts her chemotherapy, that if she starts it on
11   January 1st, 1999, that she will have the best
12   possible outcome from it, right?
13             MS. CERNIGLIA-LOWENSEN:  Objection to
14   form.
15             MR. ADAMS:  Objection.
16             MS. HANRAHAN:  Objection to form.
17        A    Within limitations.
18        Q    Within whatever limitations there were
19   for the chemotherapy, right?
20        A    And as far as time frame is concerned,
21   there is no cutoff that you can say okay, after six
22   weeks chemotherapy will lose its benefit.
```

```
 1        Q    Okay.  Does the efficacy of chemo, does
 2   its effectiveness lessen --
 3             MS. CERNIGLIA-LOWENSEN:  Objection.
 4        Q    -- when the cancer cells are greater?
 5        A    Yes.
 6             MS. HANRAHAN:  Greater in number?
 7             MR. KLORES:  Greater in number.
 8        A    Yes.
 9        Q    What is that concept referred to by
10   medical oncologists?
11        A    I'm not sure what you're referring to.
12        Q    Is it your view that chemotherapy, that
13   the effectiveness of chemotherapy is increased when
14   there are less cancer cells than when there are
15   more cancer cells?
16        A    Yes.
17        Q    Is there literature that supports that
18   concept in the field of oncology?
19        A    Yes.
20        Q    What literature would you refer to?
21        A    There is a lot of literature on that in
22   breast cancer, there's the whole concept of giving
```

0077

```
 1   adjuvant chemotherapy.
 2        Q    Now, so let's go back to this -- let me
 3   ask you this:  Would chemotherapy help prevent a
 4   focal recurrence, in other words, the birth of a
 5   new tumor in the breast?
 6        A    If the cancer, if there are no cancer
 7   cells, then no.
 8        Q    But if there are.
 9        A    Well, then the birth has already taken
10   place.
11        Q    No, what I'm asking is, you know that
12   Mrs. Pollard developed other primary tumors in her
13   breast later on, right?
14        A    No, I thought she developed recurrent
15   breast cancer.
16        Q    That's what I'm saying.
17        A    Not a brand new breast cancer.
18             MS. CERNIGLIA-LOWENSEN:  I think you two
19   are saying two entirely different things and not
20   communicating.  Maybe If you could explain a little
21   more to the doctor.
22        Q    There was cancer again found, there were
```

0078

```
 1    cancerous tumors found in Mrs. Pollard's breast at
 2    a later point in time, right?
 3         A    I thought that was in the chest wall,
 4    not in the breast.
 5         Q    Is it the types -- but they were solid
 6    tumors, right?
 7         A    Right.
 8         Q    Those types of tumors, would
 9    chemotherapy, if initiated in 1999, have tended to
10    be effective against preventing cancer growth which
11    would cause that type of recurrent tumor?
12         A    In a minority of cases, yes.
13         Q    No, I'm just saying, so you have
14    chemotherapy and then you have radiation as well,
15    right?
16         A    Right.
17         Q    Okay.  Now, when we get back to this
18    list of things that are, that would have led you to
19    give chemotherapy, what about this fact that there
20    was this medullary component to the tumor as
21    described by the pathologist?
22         A    The medullary features are actually
```

0079

```
 1    better prognostic features, so if her tumor was
 2    totally medullary type I would not have recommended
 3    chemotherapy.
 4         Q    But -- and then again I would assume
 5    then that if there was, that if the pathologist
 6    read the cancer as having no medullary component,
 7    that would have given you further reason to
 8    recommend chemotherapy, right?
 9         A    Not in this particular case.
10         Q    Why not?
11         A    Because she already had poorly
12    differentiated tumor.
13         Q    No, but I -- I think we're fine.
14              Now, in -- you've participated in a lot
15    of studies, as I read your CV, sort of research
16    projects, right?
17         A    Right.
18         Q    And when people in breast cancer write
19    about five-year survival rates or ten-year survival
20    rates, are there factors that -- what are the
21    factors that are generally relied upon to reach
22    those conclusions?
```

```
 1              MS. HANRAHAN:  Objection to the form.
 2              MR. ADAMS:  Objection.
 3         A    Can you repeat that?
 4         Q    Yes.  You're familiar with the
 5    literature that oncologists and breast cancer
 6    specialists write concerning five-year and ten-year
 7    survival rates for breast cancer patients, right?
 8         A    Correct.
 9         Q    In that literature what are the general
10    factors that are utilized to determine the groups
11    of people who will go five years and ten years?
12              MS. CERNIGLIA-LOWENSEN:  Objection.
13         A    If I understand you right, the
14    literature, when you say what are the five-year
15    results, that's an observation, that's a reflection
16    how many patients are alive at five years.
17         Q    Right.
18         A    And what's your question?
19         Q    There are certain types of -- there are
20    certain pieces of information that oncologists
21    write about as to those patients who are likely to
22    survive five years and those patients who are not
```

0081
```
 1    likely to survive five years, right?
 2         A    Right.
 3         Q    What are those criteria?
 4         A    Those are the prognostic criteria.
 5    Those are the lymph node involvement or not, size
 6    of the tumor, the age of the patient.
 7         Q    Uh-huh.
 8         A    Special studies, estrogen receptor,
 9    progesterone receptor.
10         Q    Right.
11         A    And whether or not the cancer cells have
12    gone into a blood vessel, and the grade of the
13    patient, grade of the tumor.
14         Q    You had mentioned that the tumor board
15    would meet to discuss unusual cases, right?
16              MS. HANRAHAN:  Objection to the form.
17         Q    I'm sorry, you're right.  That Mrs.
18    Pollard's case would have been discussed at a tumor
19    board because it was an unusual case, right?
20         A    In my opinion it was unusual, yes.
21         Q    An unusual case?
22         A    Yes.
```

0082

```
 1        Q    The studies that you have talked about
 2   concerning five-year survival, ten-year survival,
 3   or that I've talked about, do they take into
 4   consideration factors such as palpability of a 5,
 5   of a .5-centimeter tumor?
 6        A    They would if there was, there were
 7   enough cases that were palpable.
 8        Q    I guess what I'm trying to ask you is
 9   are there studies that you believe would, could,
10   that could reasonably give you information or give
11   you reasonable information given all of the factors
12   that we've talked about about Mrs. Pollard
13   concerning her where she would fit with a five- and
14   ten-year survival rate as of December 1st, 1998?
15             MS. CERNIGLIA-LOWENSEN:  Objection.
16        A    Yes.
17        Q    Okay.  And what, what studies would you
18   be referring to if you were to try to answer that
19   question?
20        A    I would be looking up the literature and
21   finding out all the good studies.
22        Q    Okay.  Do you have any more specific
```

0083

```
 1    information?  I mean can you tell me what you would
 2    typically go to?  Would you go to the National
 3    Cancer Institute, would you go to their website,
 4    would you look at the Devita textbook, what would
 5    you do?
 6         A    Normally the National Cancer Institute
 7    website and the Medline, which reviews all the
 8    literature published.
 9         Q    When you had the conversation with Mrs.
10    Pollard then, what would you tell her the benefits
11    of chemotherapy would be?
12         A    My best estimation would be that she
13    would have about 4 percent risk of recurrence
14    within the next eight years.
15         Q    Without chemotherapy?
16         A    Without chemotherapy, and with
17    chemotherapy her rate of recurrence would be about
18    3 percent.
19              MS. HANRAHAN:  What was the first
20    number, I'm sorry?
21              MS. CERNIGLIA-LOWENSEN:  4 percent.
22              MS. HANRAHAN:  Okay, thank you.
```

0084

```
 1        Q    So is it your view then that in December
 2   of 1998 Mrs. Pollard without chemotherapy had a 96
 3   percent eight-year survival rate?
 4        A    Correct.
 5        Q    And that the chemotherapy would just
 6   give her one more point to a 97 percent?
 7        A    Correct.
 8        Q    And what literature would you use to
 9   support that, the National Cancer Institute
10   literature?
11        A    I can show you the specific literature.
12        Q    Okay.  Why don't you tell me what book
13   you're referring to if you wouldn't mind?
14             MS. CERNIGLIA-LOWENSEN:  American
15   Society of Clinical Oncology, 2002 educational
16   book, 38th annual meeting.
17             THE WITNESS:  And in this article --
18             MR. KLORES:  Give me -- if you wouldn't
19   mind, Joan, just reading it?
20             MS. CERNIGLIA-LOWENSEN:  Areas of
21   Controversy in the Adjuvant Systemic Therapy of
22   Endocrine - Nonresponsive Breast Cancer, authored
```

0085

```
 1    by Martine Piccart, P-I-C-C-A-R-T, M.D., et al.
 2              MR. KLORES:  Page number?
 3              MS. CERNIGLIA-LOWENSEN:  144, and it
 4    goes on for a bit.  Starts on 144.
 5         A    And in this article they have reviewed
 6    all the available published literature.  There are
 7    about five different studies which talk about
 8    tumors that are less than one centimeter in size
 9    and are node negative.  In the first study by
10    Fisher there's 4 percent of death, 4 percent death,
11    which is breast-cancer-related death.  In the study
12    by Rosner there is 98 percent recurrence rate
13    survival if the tumor is less than .5 centimeter
14    and 94 percent if the tumor is between .6 and one
15    centimeter.
16         Q    Does it say what happens if it's more
17    than one centimeter?
18         A    This article is addressing the tumors
19    that are less than one centimeter, one and less
20    than one.
21         Q    Okay.  I assume that if everything else
22    was the same but the tumor was a centimeter or more
```

0086

```
 1  the survival statistics would be lower, not higher,
 2  right?
 3        A    Right.
 4        Q    Go ahead.
 5             MS. CERNIGLIA-LOWENSEN:  Do you want a
 6  copy of this?
 7             MR. KLORES:  Yes, at some point, please.
 8             MS. ZORK:  Do you have a year?
 9             MR. KLORES:  2002.  The article itself,
10  2002.
11             THE WITNESS:  Just one moment.
12        Q    You may as well tell us everything you
13  have because I'm going to ask you anyway, if that's
14  the literature that you brought with you.
15             MS. HANRAHAN:  What's the question?
16             MR. KLORES:  The literature that support
17  his conclusions of 96 versus 97 percent.
18             MS. HANRAHAN:  Okay.
19        A    Now, this article is, headline is
20  Computer Program to Assist in Making Decisions
21  about Adjuvant Therapy for Women With Early Breast
22  Cancer.
```

0087

```
 1        Q    I'm just going to read it again.  It's
 2   Computer Program to Assist in Making Key Decisions
 3   About Adjuvant Therapy for Women With Early Breast
 4   Cancer by Ravdin, R-A-V-D-I-N, et al., Journal of
 5   Clinical Oncology, volume 19, number 4, page 980 to
 6   991, and you've put a sticky on page 984 and then
 7   again on page 989 and underlined in yellow.  What
 8   else do you have?
 9        A    And if you entered this patient's
10   characteristics into this computer program, this
11   shows her outcome or likely outcome with or without
12   chemotherapy.
13             MR. KLORES:  All right.  Let's mark this
14   if we can as plaintiffs' Exhibit Number 1.
15        Q    This would be an analysis that you
16   performed on Mrs. Pollard based upon your
17   understanding as to her presentation using a
18   computer program?
19        A    Right.
20        Q    The computer program in the Ravdin
21   article that we just talked about?
22        A    Right.
```

0088

```
 1        Q     You have that program?
 2        A     It's a, I think it's an Internet-based
 3   program, you can access it from the computer.
 4        Q     Okay.  Thanks.
 5              (Exhibit 1 marked.)
 6        Q     Let me just ask you a question here.  On
 7   this Exhibit Number 1 you're -- what information
 8   are you plugging in concerning the patient?
 9        A     Plugging in her age, 43.
10        Q     Right.
11        A     General health good, estrogen receptor
12   status negative, histologic grade 3, tumor size
13   less than .5 centimeter, node in wall zero.
14        Q     And those are the pieces of information
15   and then you're simply asking what's the benefit of
16   chemotherapy in this patient statistically, right?
17        A     Right.
18        Q     And what answer did you get?
19        A     This is for no additional therapy, 95
20   out of hundred women are alive in ten years, three
21   out of a hundred women die of cancer, two out of a
22   hundred women die of further causes.  For decide to
```

0089

1   use hormonal therapy, less than one out of a
2   hundred are alive because of therapy; in other
3   words, there is no benefit of hormonal therapy in
4   this case because she is receptor negative.  If
5   there is chemotherapy, then one out of a hundred
6   women are alive because of therapy.
7           Q     And where does radiation fall into this
8   at all?  Are these studies all assuming that these,
9   that every woman with a .5-centimeter tumor with
10  negative lymph nodes that has had a lumpectomy has
11  had radiation?
12          A     Yes.
13          Q     And what would be your opinion if Mrs.
14  Pollard did not have radiation, would that lower
15  her statistical prognosis?
16          A     No.  The role of radiation is local
17  control.  If she does not or if she did not get
18  radiation to the breast, her chances of getting the
19  tumor recurrence in the breast would be higher, but
20  as far as distance spread or her death from breast
21  cancer, that would not be affected.
22          Q     Okay.  Do you have any other articles

0090

```
 1   that you brought with you?
 2        A    And there is another article.
 3        Q    And it's called Understanding the
 4   Utility of Adjuvant Systemic Therapy for Primary
 5   Breast Cancer by Loprinzi, L-O-P-R-I-N-Z-I, et al.,
 6   from the Journal of Clinical Oncology, volume 19,
 7   number 4, February 2001, page 972, and you've got a
 8   sticky and highlighting on the chart, Table 8.
 9        A    And that's basically validating that
10   computer program.
11        Q    Okay.  And then you brought some other
12   pieces of information?
13        A    That's all for now.
14        Q    Okay.  Well, what is it?  I'm going to
15   ask you --
16             MS. CERNIGLIA-LOWENSEN:  You can't hide
17   it now.  Nope, can't hide it now.
18             MR. KLORES:  I'm going to make you open
19   your briefcase and dump it out on the table.
20             MS. HANRAHAN:  Is the question what
21   other literature --
22        Q    What else do you have in your briefcase?
```

0091

```
 1            MS. CERNIGLIA-LOWENSEN:  Let's start
 2    with what I have in my hand, okay?  National
 3    Comprehensive Cancer Network, Breast Cancer, volume
 4    2.2000.  Do you want to tell him what this is?
 5        A    These are guidelines by NCCN, which is
 6    National Comprehensive Cancer Network, and these
 7    are guidelines on how to treat breast cancer.
 8        Q    Okay.  And let's take this, if you
 9    wouldn't mind, over here.
10            MS. CERNIGLIA-LOWENSEN:  All this.  Is
11    this all together?
12            THE WITNESS:  Yes.
13        Q    And then you have another one from
14    Practice Guidelines in Oncology.  These are the
15    same?
16        A    Yeah, these are part of that.
17        Q    We'll just make them all exhibits then.
18            MS. CERNIGLIA-LOWENSEN:  Adjuvant
19    Therapy for Breast Cancer, Practice Patterns of
20    Community Physicians, Linda Harlan, et al., what's
21    that?
22        A    This is a review of the medical practice
```

0092
```
 1   as to what is the practice by those in the
 2   community in regards to breast cancer of, you know,
 3   different subgroups, different size.
 4        Q    Okay.  And that's from the Journal of
 5   Clinical Oncology, volume 20, number 7, 2002, page
 6   1809.
 7             MS. CERNIGLIA-LOWENSEN:  Tell him what
 8   that is.
 9        A    This is an article by Dr. Morrow about
10   which patients can skip chemotherapy.
11        Q    Okay.
12             (Document tendered.)
13        Q    Let me ask you a question.  A tumor that
14   is one centimeter or more, does that, leaving
15   everything else the same, does that change the
16   stage?
17        A    No.  All tumors up to two centimeters
18   are stage 1 or --
19        Q    T1?
20        A    T1.
21        Q    What else?
22             MS. CERNIGLIA-LOWENSEN:  Tell him what
```

0093

```
 1   that is.
 2        A    This is an article about prognosis and
 3   treatment of patients with breast tumors of one
 4   centimeter or less and negative ancillary nodes.
 5                (Document tendered.)
 6        A    And there's an accompanying editorial
 7   named Adjuvant Therapy For All Patients With Breast
 8   Cancer.
 9                (Document tendered.)
10        Q    You know, this paper says that, by
11   Lippman, that a patient with a 95 percent chance of
12   disease-free survival after surgery alone will have
13   her absolute odds of survival increase by no more
14   than one or two percent from adjuvant chemotherapy.
15   You agree with that I guess?
16        A    Yes.
17        Q    It goes on to say is this worth the risk
18   of nausea, hair loss, infection and bleeding and
19   perhaps even lethal toxic effects.  In Mrs.
20   Pollard's case you would have said it was worth
21   that?
22            A    I would have discussed those with the
```

```
 1   patient and would get the input from the patient.
 2         Q    No, but your recommendation would have
 3   been -- you would have told her you could have, you
 4   will get nauseous, your hair may fall out, you will
 5   feel terrible, terribly sick, you may have
 6   infection and bleeding and there may even be toxic
 7   effects from the chemotherapy, but notwithstanding
 8   all of that, if you ask my advice, Mrs. Pollard, I
 9   think you should do it, right?
10         A    But I need your input as well.
11         Q    Well, that's not my --
12         A    That's what I would tell the patient.
13         Q    She could say yes or no, right?
14         A    Right.
15         Q    But if she asked you what do you think I
16   should do, Doctor, what's your recommendation, you
17   would have told her take the chemotherapy; is that
18   right?
19              MR. ADAMS:  Objection.
20              MS. CERNIGLIA-LOWENSEN:  Objection.
21              MR. KLORES:  I'm sorry, have we not
22   established that today?
```

0095

```
 1          MS. CERNIGLIA-LOWENSEN:  No, I mean he
 2  can answer you, Bruce, there's no need to get
 3  testy.
 4          MR. KLORES:  No, I mean what's the round
 5  of objections?  Your recommendation to her --
 6          MS. CERNIGLIA-LOWENSEN:  You're making
 7  it a yes or no and there may be a gradation,
 8  there's a lot of grade there.  He doesn't have to
 9  say yes or no to the question, he can explain
10  himself.
11      Q    If Mrs. Pollard said Doctor, what is
12  your recommendation, should I have the chemotherapy
13  or not --
14      A    I would explain to the patient that
15  these are the side effects of chemotherapy, these
16  are the benefits of chemotherapy, and how does she
17  feel about undergoing chemotherapy, is she willing
18  to tolerate the side affects.
19      Q    But Dr. Gupta, there would be plenty of
20  patients that you would write in your record I
21  would not recommend chemotherapy for, right?
22      A    Right.
```

0096

```
 1        Q    In Mrs. Pollard's case you wrote in your
 2   record that you do recommend chemotherapy, right?
 3        A    Correct.
 4        Q    Okay.  And that is still your opinion
 5   today, right?
 6             MR. ADAMS:  Objection.
 7             MS. CERNIGLIA-LOWENSEN:  Same objection.
 8             MS. HANRAHAN:  Objection.
 9        A    Let me explain that.  This patient was a
10   little different than a typical patient who comes
11   into my office.  This patient was about to go to
12   England in one week, so this patient as far as I'm
13   concerned was seeking my opinion, I was not going
14   to be her treating physician.  So her treating
15   physician was, or would be in England and he would
16   make the final decision about this patient.
17        Q    Okay.  But your best medical opinion in
18   December of 1999, I'm sorry, December of '98, was
19   that chemotherapy was recommended?
20             MS. CERNIGLIA-LOWENSEN:  Objection.  You
21   can answer.
22        A    It was recommended with qualifications
```

0097

1   as to how small the benefit would be.
2        Q    Okay.  So let's talk a little bit about
3   the -- you're saying that out of 100 patients in
4   Mrs. Pollard's condition, without chemotherapy 96
5   of them would live eight years, right?
6        A    Right.
7        Q    And 97 of them with chemotherapy would
8   live eight years, right?
9        A    Right.
10       Q    What distinguishes survival in the
11  literature?
12       A    Between this 96 and 97?
13       Q    Correct.
14       A    We don't know.
15       Q    What do you believe distinguishes
16  survival?
17            MR. ADAMS:  Objection.
18            MS. CERNIGLIA-LOWENSEN:  Same objection.
19       A    I do not know.
20       Q    Well, let's get back to the issues that
21  we talked about earlier.  And I'm talking now in
22  the clinical setting of the case where the question

                                                              0098
     1    is now we're talking about two women and you're
     2    going to institute chemotherapy, some of those
     3    women will benefit from chemotherapy, right?
     4         A    Right.
     5         Q    And some will go on to die anyway,
     6    right?
     7         A    Right.
     8         Q    And the people who will benefit from the
     9    chemotherapy, let me ask you a few questions about
    10    those from your knowledge as a, as -- you're board
    11    certified in oncology, right?
    12         A    Right.
    13         Q    The prognosticating signs that we talked
    14    about prior to chemotherapy, you mentioned the
    15    things that make cancer have a better prognosis.
    16    Do you believe that smaller tumor size carries a
    17    better prognosis; in other words, that chemotherapy
    18    is more effective depending upon tumor size?
    19         MS. HANRAHAN:  I'm assuming we're just
    20    doing generalities this time?
    21         MR. KLORES:  Correct.
    22         MS. HANRAHAN:  Okay.

0099

```
 1          A     No, I did not say that.
 2          Q     I'm not asking if you said it, I'm
 3     asking if you agree with it.  Do the studies show
 4     that tumor size alone, that smaller tumors tend to
 5     respond better to chemotherapy than larger tumors?
 6          A     Can you be more specific?  Is this
 7     metastatic disease setting, is this adjuvant
 8     setting?
 9          Q     In an adjuvant setting where the primary
10     tumor at time of diagnosis is smaller than a
11     primary tumor -- is a T3 going to be more difficult
12     to treat with chemotherapy than a T1, simply the
13     number itself?
14          A     Okay.  If the T3 tumor, I'm assuming T3
15     tumor and the T1 tumors both have been resected and
16     we're talking about adjuvant treatment?
17          Q     Yes.
18          A     The risk of T3 tumor having a relapse
19     would be much higher and the benefit of
20     chemotherapy is proportional, so higher the risk of
21     relapse, higher would be the benefit, smaller the
22     tumor, lower will be the risk of relapse and
```

0100

1    consequently lower will be the benefit.

2         Q    Does a larger tumor in and of itself,
3    are those tumors associated more so with invasion
4    of the lymph nodes?

5         A    In general, yes.

6         Q    In your opinion is there any
7    relationship between the efficacy of chemotherapy
8    and whether or not a cancer is well, poorly or
9    moderately differentiated?

10        A    The risk of recurrence is lower if the
11   tumor is well differentiated and the risk of
12   recurrence is higher if it is poorly
13   differentiated.

14        Q    Meaning that a patient who has a well-
15   differentiated tumor as compared to a patient with
16   a poorly-differentiated tumor, the well-
17   differentiated tumor is less likely to spread even
18   without chemotherapy, right?

19        A    Everything else being equal, yes.

20        Q    The age factor itself, is it -- the
21   woman's age, are there studies which show that
22   younger women tend to reoccur or tend to have

0101

```
 1    reoccurrences, simply age itself as a factor?
 2         A    There are some studies that would
 3    indicate that if the woman is less than 35 years
 4    old then she has a worse prognosis if everything
 5    else is the same about that tumor.
 6                   (Brief recess.)
 7         Q    Just going back on the record.  The
 8    other, I don't want to touch these things unless
 9    your lawyer lets me, but the --
10              MS. CERNIGLIA-LOWENSEN:  Tell him what
11    this is.
12         A    This is an interview with Dr. Bernard
13    Fisher about breast cancer, Detection of Small
14    Tumors Creates New Controversies.
15         Q    In order for you to recommend
16    chemotherapy in the clinical setting of this case
17    you would have to believe that it would supply some
18    benefit, right?
19         A    Very minimal benefit, yes.
20         Q    Mrs. Pollard had a 100 percent risk of
21    relapse, ultimately we know that, right?
22              MR. ADAMS:  Objection.
```

0102

```
 1              MS. CERNIGLIA-LOWENSEN:  Objection.
 2              MS. HANRAHAN:  Objection to the form.
 3         A    I did not know it when I saw her.
 4         Q    I understand that.  But you know that
 5    she developed cancer later, right?
 6         A    Right.
 7         Q    So out of the patients that we're
 8    talking about, she was one that did develop cancer;
 9    she's in the smaller group of those who would go on
10    to develop cancer using the criteria that we've
11    discussed, right?
12         A    In retrospect, yes.
13         Q    Yes, in retrospect.  When you -- you
14    mentioned that you thought that she was going to be
15    going to England, but in December you were her
16    doctor, weren't you?
17         A    I was a consultant, yes.
18         Q    Well, you weren't -- Dr. Sees testified
19    that after he was finished with his surgery he
20    turns the patient over to the oncologist and the
21    oncologist becomes the primary doctor.  Is that
22    true?
```

0103

```
 1              MR. ADAMS:  Objection.
 2              MS. CERNIGLIA-LOWENSEN:  Same objection.
 3         A    No, I'm a consultant.
 4         Q    So who in, in December who was Mrs.
 5    Pollard's primary doctor, who was the one in
 6    charge?
 7         A    The primary care of the patient is the
 8    primary care provider.
 9         Q    Who was that?
10         A    I would have to look that up, who the
11    primary care provider was.
12         Q    Well, there was a, there was a surgeon,
13    there was an oncologist, there was a radiologist
14    involved and there was a pathologist involved in
15    the cancer treatment, right?
16         A    Yes.
17         Q    Who was the primary doctor in charge of
18    managing Mrs. Pollard's cancer at Eisenhower?
19              MS. HANRAHAN:  Is there a point in time?
20              MS. CERNIGLIA-LOWENSEN:  Yeah, December
21    of --
22         Q    December of 1998.
```

0104

```
 1        A    After I saw her I would be, yes.
 2        Q    Okay, so after December 1st?
 3        A    Yes.
 4        Q    So when you saw her on December 15th you
 5   were the doctor that was primarily in charge of
 6   managing her cancer until she went overseas, right?
 7        A    Correct.
 8        Q    If you felt that Mrs. Pollard was too
 9   sick to go overseas, what would you have done?
10        A    I would have advised her not to go.
11        Q    And -- well, does she have to obtain
12   medical clearance in the military before she goes
13   overseas with her husband?
14             MR. ADAMS:  Objection.
15        A    To the best of my knowledge, no.
16        Q    Is there any military clearance process
17   that you were asked to participate in before she
18   went overseas?
19        A    There is a program, it's called
20   Exceptional Family Member Program, and it is up to
21   the, as far as I know this program, it's up to the
22   soldier or the beneficiary to enroll into this
```

0105

1    program, and then if certain circumstances come up
2    where a patient's care can be compromised in a
3    place where he's being transferred, then he would
4    not be transferred there.
5        Q    Your testimony earlier about the tumor
6    board, so this would be a meeting that took place
7    about once a week, right?
8        A    Right.
9        Q    And a discussion would be had by these
10   various experts concerning unusual cases, right?
11       A    Well, most of the cancer cases.
12       Q    Okay.  And what was the purpose of this
13   meeting?
14       A    It has a few purpose.  One is how to
15   establish treatment pattern, how to provide the
16   treatment that's necessary, another is how to
17   provide education to other physicians.  It's also a
18   requirement I think to have accreditation.
19       Q    To have what?
20       A    To have accreditation.
21       Q    Okay.  And your role in that would be
22   the medical oncologist, right?

0106

```
 1         A    I'm not a member of the tumor board
 2    committee.  There's a tumor board committee and at
 3    least one doctor from each specialty is a member of
 4    this committee.
 5         Q    Have you ever been on the tumor board
 6    committee?
 7              MS. CERNIGLIA-LOWENSEN:  At that
 8    particular institution?
 9              MR. KLORES:  Yes.
10         A    Yes.
11         Q    When?
12         A    I don't know for sure what time frame.
13    I think for a six- to nine-month period in 2001.
14         Q    All right.  So you don't believe that
15    you were on the tumor board committee in December
16    of 1998, in October, November, December of 1998,
17    right?
18         A    That's correct.
19         Q    But there would always be a medical
20    oncologist on that committee, right?
21         A    Yes.
22         Q    And who were the medical oncologists at
```

```
                                                    0107
1    Eisenhower in 19, in the fall of 1998?
2         A    One is Dr. Ken Fink.
3         Q    Fink, right.
4         A    I'm not sure who the other one was in
5    that time period.
6         Q    Okay.  Now, Dr. Fink is in the Medical
7    Corps, he's a military doctor?
8         A    Yes.
9         Q    Employed by the United States?
10        A    Yes.
11        Q    And how many oncologists were there at
12   Eisenhower in 1998?
13        A    Three.
14        Q    Do you remember the third person?
15        A    I'm not sure.  It's -- I can give you
16   two names, it's one of those two names.
17        Q    Okay, give me those two names.
18        A    One is Dr. Willardson.
19        Q    Willardson?
20        A    Yes.  And another one would be Dr.
21   Terry, Theresa Coleman.
22        Q    Theresa Coleman?
```

```
                                                    0108
    1        A    Yes.  Dr. Willardson was there before
    2   Dr. Coleman and I don't know exactly when that took
    3   place.
    4        Q    Okay.  There's typically three, right?
    5        A    Right.
    6        Q    There's you, there's Dr. Fink and then
    7   there's a third?
    8        A    Right.
    9        Q    And the third was either Willardson or
   10   Coleman?
   11        A    Right.
   12        Q    Were Willardson and Coleman both
   13   military?
   14        A    Yes, they were at that time.
   15        Q    So you were the only civilian?
   16        A    Right.
   17        Q    So if there was a tumor board for Mrs.
   18   Pollard and there -- then that tumor board would
   19   have, the medical oncologist on that tumor board
   20   would have been a military doctor?
   21        A    Or me, one of three of us.
   22        Q    Yeah, but you said you didn't sit on it
```

0109

```
 1   in 1998.
 2        A    I'm not a member of the committee, but
 3   one of the medical oncologists would normally be on
 4   the tumor board.
 5        Q    Okay.  When there is a tumor board is
 6   there a writing, does somebody write something down
 7   as to what happens?
 8        A    Yes.
 9        Q    And have you seen that type of a writing
10   in this case?
11        A    No.
12        Q    What type of a form or forms are used?
13   What type of document is created?
14        A    There's a staging document and then
15   there's a brief recommendation document.
16             MS. ZORK:  A brief recommendation what?
17             MR. KLORES:  Document.
18             MS. CERNIGLIA-LOWENSEN:  Document.
19             MS. ZORK:  Oh, document, okay.
20        Q    And who signs that?
21        A    The chairperson of the committee.
22        Q    And who is the chairperson of the
```

```
                                                      0110
 1   committee?
 2               MS. CERNIGLIA-LOWENSEN:  When?
 3               MR. KLORES:  October, November, December
 4   1998.
 5         A    Probably it was Dr. James North.
 6         Q    Spell that.  North?
 7         A    North.
 8         Q    What type of a doctor is Dr. North?
 9         A    He's a surgeon.
10         Q    Is he a military doctor?
11         A    Yes.
12         Q    So he's not a civilian?
13         A    Correct.
14         Q    How large is the medical staff at
15   Eisenhower, how large was it in 1998?
16         A    I don't know the exact number of staff.
17         Q    Your office was in, is it a physicians'
18   building or were you in a hospital?
19         A    Hospital.
20         Q    What floor and what room?
21         A    Eighth floor, room 818.
22         Q    And how long have you been at
```

0111

```
 1  Eisenhower?
 2        A    I joined September of 1990.
 3        Q    Have there ever been other civilians in
 4  the department of hematology oncology?
 5        A    Before me, yes.
 6        Q    Along with you.
 7        A    No.
 8        Q    So from 1990 have you been the only
 9  civilian in that office?
10        A    Right.
11        Q    Okay.  And so has Dr. Fink always been
12  there from 1990 onwards?
13        A    No.  Again, I don't know exactly when he
14  came to Eisenhower, probably '93 or '94.
15        Q    Well, would Mrs. Pollard know that you
16  were a civilian?
17        A    Yes.
18        Q    How?
19        A    Whenever, whenever I'm about to see a
20  patient in consultation and the patient is
21  contacted either by phone by my secretary and the
22  patient shows up on the visit, my secretary has a
```

0112

```
 1   form for Tricare that the patient needs to fill out
 2   that has that information and she explains to them
 3   what is the purpose of this form.
 4        Q    What does she say?
 5        A    She'll tell them that this is needed to
 6   file for the insurance with Tricare.
 7        Q    No, but I guess I'm saying does your
 8   secretary tell the patients that Dr. Gupta is not a
 9   military doctor?
10        A    Yes.
11        Q    And that he is a civilian doctor?
12        A    At that time a Tricare provider.
13        Q    Well, that's not what I asked you.  Do
14   they specifically say that you are a civilian
15   doctor and not a military doctor?
16        A    I don't know.
17        Q    Have you seen that form in this record?
18        A    I don't remember.
19        Q    Now, and do you wear -- are you the only
20   doctor there that wears civilian clothes in the
21   unit or do the other oncologists wear civilian
22   clothes?  What do you wear, what do you guys wear?
```

0113

```
 1        A    Normally I'm the only one in civilian
 2   clothing.
 3        Q    Do you wear a pair of pants and a white
 4   jacket when you go to work and a tie; is that the
 5   way you see your patients?
 6        A    I see my patients with a lab coat and
 7   shirt and tie.
 8        Q    And what do the military doctors wear
 9   when they see patients?
10        A    They're in their military uniforms.
11        Q    And they don't wear lab coats?
12        A    No.  Sometimes they do.
13        Q    Okay.  And in, at Eisenhower in order
14   for -- when you started in 1990 did you have to
15   apply for privileges?
16        A    Yes.
17        Q    Have you been a member of the medical
18   staff since 1990?
19        A    Yes.
20        Q    Are you obliged to follow the rules and
21   regulations of the medical staff?
22        A    Yes.
```

0114

```
 1          Q    Have you ever held any committees in the
 2  medical staff, on the medical staff, any committee
 3  appointments?
 4          A    I mentioned the one, that I think I was
 5  a member of the committee for tumor board for a
 6  period of time when Dr. Fink was not there in the
 7  hospital.
 8          Q    Okay.
 9          A    I may have been a member of another
10  committee for a short time.
11          Q    Do your privileges, are your privileges
12  intermittently reviewed by the medical staff at
13  Eisenhower?
14          A    Yes.
15          Q    And is that, are those privilege
16  determinations made by members in the military?
17          A    Yes.
18          Q    Has the chairman of the department of
19  hematology and oncology as long as you've been
20  there always been a member of the military?
21          A    Yes.
22          Q    Does the chairman of the department have
```

0115

```
 1    any supervisory power over you as a physician?
 2             MS. CERNIGLIA-LOWENSEN:  Objection to
 3    the form.  You may answer.
 4         A    He is my supervisor.
 5         Q    In what context?
 6         A    In my work.
 7         Q    Okay.  Have you ever been asked to
 8    participate in or approve anyone in this
 9    exceptional family application?
10         A    Yes.
11         Q    And what happened -- so can you do that
12    or does -- can you be the one who approves or
13    disapproves or does it have to be a military
14    person?
15         A    I do not approve or disapprove.  It's a
16    program that's available to the army personnel and
17    their families and they can enroll in this and I
18    can facilitate their enrollment in this, but as far
19    as transferring authority, I do not have that.
20         Q    Okay.  So let me just understand.  In a
21    case like this, if Mrs. Pollard wanted to stay in
22    the United States with her husband, right, and her
```

0116

```
 1    husband applied -- so her husband, who's about
 2    ready to be shipped over to the United Kingdom, if
 3    he wanted to not be transferred for his wife's
 4    medical reasons, he would have to fill out certain
 5    forms and those forms would be ultimately sent to
 6    the, to you for some type of filling out?
 7              MR. ADAMS:  Objection.
 8         A    Yes, I would be filling out part of that
 9    form.
10         Q    Okay.  So in this case if Mrs. Pollard
11    made a request to stay in the United States and to
12    have her husband stay with her for the next four
13    months so she could complete her chemotherapy and
14    radiation here at Eisenhower, would you have acted
15    favorably upon that?
16              MS. HANRAHAN:  Objection to the form to
17    the extent it says Mrs. Pollard requests the stay.
18              MR. KLORES:  Objection to the form.
19              MR. ADAMS:  Objection.
20         Q    No, what I'm saying is if the family, if
21    it was known to you that the family wanted to stay
22    here, that Mrs. Pollard wanted to stay at
```

0117

```
 1    Eisenhower and have her chemotherapy and radiation
 2    at Eisenhower and Mr. Pollard or Sergeant Pollard
 3    filled out an application to delay his transfer
 4    until, so he can be with his wife there in Georgia
 5    until all the chemotherapy and radiation was done,
 6    in your view would that have been a reasonable
 7    request that you would have supported?
 8              MR. ADAMS:  Objection.
 9              MS. CERNIGLIA-LOWENSEN:  Objection.
10        A    I do not think that her moving to
11    England hampered her treatment.
12        Q    Okay.  You don't think that her moving
13    to England hampered her treatment.  Your treatment
14    was chemotherapy and radiation, right?
15        A    Right.
16        Q    Okay.  Getting back to this, to the
17    question of your employment status, the department
18    chair, Dr. Fink --
19        A    He's the chair of oncology, division
20    chair.
21        Q    Did you ever discuss this matter with
22    him?
```

0118

```
 1            MR. ADAMS:  This matter?
 2            MR. KLORES:  This case.
 3            MS. CERNIGLIA-LOWENSEN:  The legal case
 4   or the medical issues?
 5            MR. KLORES:  Well, let's start with the
 6   medical case first.
 7       A    No.
 8       Q    Did you ever discuss this case with any
 9   other doctors at Eisenhower ever that you can
10   recollect, ever?
11       A    No.
12       Q    Even since the lawsuit's been filed?
13       A    I discussed briefly with Dr. Fink just
14   two days ago and that was in regards to this
15   Exceptional Family Member Program, to know the
16   details on this program.
17       Q    What -- how did that conversation
18   unfold?  Why did you have that conversation is a
19   better question.
20       A    Because I'm not totally sure about this
21   program, what my obligation is or what my authority
22   and responsibility is.
```

0119

```
 1        Q    Okay.  Well, what did you say -- where
 2   did the conversation take place?
 3        A    In the oncology clinic area, in his
 4   office.
 5        Q    Did you talk about Mrs. Pollard or did
 6   you talk about --
 7        A    Well, when I started this then he said
 8   that he knows about this case.
 9        Q    What did you say to him?
10        A    I went to ask about the Exceptional
11   Family Member Program, that I needed the details.
12        Q    Okay, but -- so what did you say, give
13   me the details of the Exceptional Family Member
14   Program?
15        A    Right.
16        Q    And what did he say to you?
17        A    I asked him whose responsibility and
18   obligation it was to enroll in the program, is it
19   the provider's obligation or is this the
20   beneficiary's obligation and responsibility.  He
21   wasn't totally sure about that.
22        Q    Well, what did he say?
```

0120

```
 1          A     He gave me information about this
 2    program and when I asked him about who has to
 3    enroll a patient he thought it was the
 4    beneficiary's obligation and responsibility but
 5    that I could enroll them in the program as well.
 6          Q     And when he said -- when you said he
 7    gave you information, did he give you something in
 8    writing, did he show you something?
 9          A     No.
10          Q     The fact that you had this conversation
11    with Dr. Fink a few days ago indicates to me at
12    least that in 1998 you didn't know anything about
13    the program.
14               MR. ADAMS:  Objection.
15               MS. HANRAHAN:  Objection to the form.
16          Q     Is that right?
17          A     That's not right.
18          Q     Well, you wanted to find out two days
19    ago whose responsibility it was to get into the
20    program, the beneficiary or the provider, right?
21               MS. HANRAHAN:  Objection to the form.
22               MS. CERNIGLIA-LOWENSEN:  Same objection.
```

```
 1        A    Yes, I wanted to know whose primary
 2   obligation it is.
 3        Q    Okay.  What else did you talk about with
 4   Dr. Fink?  You said he knew this case.  I mean how
 5   did this case come up?
 6        A    I asked him that what if a patient's
 7   husband is going to England and the patient has
 8   breast cancer and, you know, what are my
 9   obligations and what is my primary obligation about
10   this transfer, are there any obligations in this
11   regard, and that's what he told me and then he
12   said --
13        Q    Wait, wait.  What's what he told me?
14        A    What I just said, that, you know --
15        Q    That you could, that you could make the
16   application or that the patient could make the
17   application?
18             MR. ADAMS:  Objection.
19             MS. CERNIGLIA-LOWENSEN:  Same objection.
20        A    Right.
21        Q    Okay.  And then what?
22        A    And then he said I know about this case
```

0122

```
 1    that you're referring to.  He said that he was
 2    asked to review this case and he didn't see
 3    anything that was done that was wrong.
 4         Q    From whose perspective, from your
 5    perspective?
 6         A    From physicians' treatment perspective.
 7         Q    Now, were you ever, were you interviewed
 8    by anybody representing the United States
 9    government in preparation of this case, of your
10    defense in this case?
11         A    I don't know if that was an interview,
12    Mr. Adams informed me that the government was sued
13    by them saying that I may be involved in this case.
14         Q    When you -- when did you have that
15    conversation with Mr. Adams?
16         A    It's been several months, I don't know
17    exact date.
18         Q    Well, was it sometime after July of
19    2002?
20         A    What I can say is it was before I was
21    named as a party in this case.
22         Q    Okay.  Well, it was before you were
```

0123

```
 1    named as a party?
 2         A    Right.
 3         Q    At that point in time -- was that the
 4    first conversation you had with anybody about this
 5    legal case?
 6         A    Yes.
 7         Q    Okay, so -- and what did Mr. Adams ask
 8    you?
 9         A    He informed me that I should not discuss
10    this case with anybody and that it's possible --
11         Q    Wait a second.  Did he inform you that
12    you should not discuss this case with anybody but
13    that you could discuss the case with him?
14         A    I don't know about that specific
15    statement.
16         Q    Well, did you discuss the medical issues
17    with him?
18         A    I do not remember everything I
19    discussed, but yes.
20         Q    Did you discuss the issues with him --
21    was it your understanding that in this conversation
22    that Mr. Adams was acting as your attorney?
```

0124

```
 1        A    No, no, he was representing I think
 2  Eisenhower and the government.
 3        Q    I'm sorry?
 4        A    He was representing Eisenhower Hospital
 5  and the government of USA.
 6        Q    Okay.  And did you discuss -- so you did
 7  not think that Mr. Adams was speaking to you in any
 8  type of a privileged conversation?
 9             MS. CERNIGLIA-LOWENSEN:  Objection.  Do
10  you know what that means?
11        Q    A lawyer-client privilege.
12             MR. ADAMS:  Objection.
13        Q    Do you know what that means?
14        A    No.
15        Q    Well, when he identified himself as an
16  attorney for the United States, did you believe
17  that he was assisting in your defense?
18        A    I'm not sure but I thought to some
19  degree, yes.
20        Q    Okay.  And did he do anything to
21  dissuade you from that view?
22        A    No, I don't think this ever, this topic
```

0125

```
 1   ever really came up.
 2         Q    Did you discuss with Mr. Adams at all
 3   the care and treatment that you provided to
 4   Mrs. Pollard?
 5         A    Yes, we discussed.
 6         Q    Okay.  Did you send him -- did he send
 7   you any correspondence?
 8         A    No.
 9         Q    Did you send him any correspondence or
10   records?
11         A    No.
12         Q    What did he, what questions did he ask
13   you?
14              MR. ADAMS:  Objection.
15         A    I do not remember all the questions he
16   asked me.
17         Q    Did you take any notes based upon your
18   conversation?
19         A    No.
20         Q    Did you write anything down afterwards?
21         A    No.
22         Q    What was the purpose of the call?
```

0126

```
 1        A    Which call?
 2        Q    Mr. Adams calling you.  What did he tell
 3   you the purpose of the call was?
 4             MR. ADAMS:  Objection.
 5        A    I don't think it was a phone call, he
 6   was there in person.
 7        Q    Okay, he came to, he came to Fort
 8   Gordon?
 9        A    Yes.
10        Q    Did you meet with him privately?
11        A    We met in the hospital.
12        Q    That wasn't what I asked you.
13        A    What does privately mean?
14        Q    Two people, you and him.
15        A    No, there was another person and I do
16   not remember that name offhand.  It's a French name
17   I believe.
18        Q    Was it a lawyer person?
19        A    Somebody from the JAG office from the
20   hospital, from Eisenhower.
21        Q    So you had a meeting with Mr. Adams and
22   a lawyer employed by the United States, another
```

0127

```
 1   lawyer employed by the United States, a JAG
 2   officer?
 3         A    I don't think she's a lawyer.
 4         Q    An investigator?  A military employee.
 5         A    Yes.
 6         Q    Okay?
 7         A    Yes.
 8         Q    And the three of you had a meeting and
 9   you discussed the medical care that was provided,
10   amongst other things?
11         A    Yes.
12              MR. ADAMS:  Objection.
13         Q    Did the topic come up during this
14   meeting as to whether you were an independent
15   contractor or a government employee?
16         A    Yes.
17         Q    And what was said about that?
18         A    I was informed that I'm an independent
19   contractor and that this information will be
20   provided to the other party and that there's a
21   chance that I could be named in this lawsuit.
22         Q    Did you have a discussion with Mr. Adams
```

0128

```
 1    in the presence of any other doctors?
 2         A    No.
 3         Q    So the only -- you only had one meeting
 4    with him?
 5         A    As far as I remember.
 6         Q    And it was just the three of you, the
 7    three people you've just --
 8         A    Yes.
 9         Q    Now, have you done any further
10    investigation into this Exceptional Family Program
11    since your discussion with Dr. Fink?
12              MS. HANRAHAN:  Objection to the form.
13         A    Yes, I called that office where the
14    Exceptional Family Member Program is and I talked
15    to the lady who answered the phone.
16         Q    Who is that?
17         A    Mrs. Brown.
18         Q    Is that an office on the base?
19         A    Yes.
20         Q    When did you call her?
21         A    Yesterday morning.
22         Q    And what did you ask Mrs. Brown?
```

0129

```
 1        A    I asked her about this program and that
 2   I'm a provider and whose obligation it is, whose
 3   responsibility it is, and she said it's the
 4   soldier's responsibility.
 5             MS. ZORK:  I'm sorry, it was what?
 6             THE WITNESS:  Soldier's responsibility
 7   to enroll.
 8        Q    Did you ask her whether the provider
 9   could enroll a soldier?
10        A    No, I don't think so.
11        Q    Okay.  Well, I guess the question is no
12   one has ever told you that you could not raise the
13   discussion with the patient, right?  I mean you
14   understood, you understand that there was nothing
15   prohibiting you from raising the concept --
16             MR. ADAMS:  Objection.
17        Q    -- of enrolling in this Exceptional
18   Family Program with a patient, right?
19             MR. ADAMS:  Objection.
20             MS. CERNIGLIA-LOWENSEN:  Objection.
21        A    That's not true.  Some patients that I
22   have followed have enrolled in this program.
```

0130

```
 1        Q    What I'm saying is did you understand
 2   that you were prohibited from discussing this with
 3   a patient?
 4              MR. ADAMS:  Objection.
 5              MS. CERNIGLIA-LOWENSEN:  Bringing it up
 6   first?
 7              MR. KLORES:  Bringing it up.
 8              MS. ZORK:  Recommending.
 9        A    I'm not prohibited against recommending
10   it.
11        Q    Okay.
12             When you talked to Mrs. Brown and Dr.
13   Fink, you know Dr. Fink knew about the case, right?
14        A    I found out he knew, yes.
15        Q    And then you talked -- did you tell
16   Mrs. Brown what case you were talking about?
17        A    No.
18        Q    Have you ever -- do you know whether or
19   not Mr. -- Mrs. Pollard or Sergeant Pollard ever
20   enrolled in this program?
21        A    I don't know.
22        Q    Have you ever seen any documents to
```

```
                                                   0131
 1    suggest that they did enroll in the program?
 2         A    I have not.
 3         Q    But no one ever contacted you about them
 4    and the program?
 5         A    No.
 6              MR. KLORES:  Okay.  Just give me a
 7    minute.
 8              (Pause in the proceedings.)
 9         Q    Let me ask you a few questions about
10    Sterling.  Have you ever heard of them?
11         A    Sterling Medical Corporation, yes.
12         Q    So where were you in 1989?
13         A    I was working in a Veterans Hospital in
14    Montgomery, Alabama.
15         Q    Were you an employee of the United
16    States at that point?
17         A    Yes.
18         Q    So you were a staff physician at the VA
19    Hospital?
20         A    Yes.
21         Q    Paid by the United States?
22         A    Yes.
```

0132

```
 1          Q     And then you changed jobs in 1990,
 2   right?
 3          A     Correct.
 4          Q     And what were you looking to do at that
 5   point in time?
 6          A     What was I looking to do?  I was looking
 7   forward to practicing oncology.
 8          Q     I mean were you trying to move out of
 9   Alabama?  What was your career intention?  Why did
10   you change?
11          A     I was not happy with my situation over
12   there, I was doing a lot of internal medicine and I
13   was spending a lot of hours doing night duty in the
14   hospital.
15          Q     So how did you find out about the
16   opening in Dwight Eisenhower?
17          A     Sterling contacted me.
18          Q     Sterling.  And who is Sterling or what
19   is Sterling?
20          A     It's a medical corporation based in
21   Cincinnati and they hire physicians and nurses and
22   other support staff for the military hospitals.
```

0133

```
 1        Q    Were they known to you before this time?
 2        A    No.
 3        Q    So who -- they called you or wrote to
 4   you?
 5        A    First contact was by call.
 6        Q    And what did they say?
 7        A    They said they have an opportunity for
 8   oncology, for this practice, and if I would be
 9   interested.
10        Q    And what was the practice, staff
11   hematologist/oncologist at Dwight Eisenhower?
12        A    Yes.
13        Q    And you signed a contract with Sterling?
14        A    Yes.
15        Q    Did you also sign any contracts with the
16   military or the United States government?
17        A    I applied for the hospital privileges
18   but I don't remember ever signing any contract.
19        Q    Okay.  So who do you understand your
20   employer to be, if any, from 1990 onwards?
21        A    I have several employers, Sterling
22   Medical Corporation, Humana Corporation and
```

0134

```
 1   government of USA.
 2        Q    The government of the USA; that's what
 3   you said, right?
 4        A    Right.
 5        Q    On your report of December 16th you
 6   write that her ER and PR were negative, right?
 7        A    Right.
 8        Q    And what does that mean with respect to
 9   the efficacy of chemotherapy?
10        A    That means those are the receptors,
11   estrogen and progesterone receptors that were
12   negative, it means that use of any anti-hormonal
13   treatment would not be effective.  As in regards to
14   chemo, I don't think it means whether or not chemo
15   would be less or more effective.
16        Q    Well, it's, the fact that the ER and PR
17   are negative mean that she is less likely to
18   benefit from tamoxifen, which is another type of
19   adjuvant therapy, right?
20        A    Right.
21        Q    And the studies being negative would be
22   one additional reason to recommend chemotherapy,
```

0135

```
 1  right?
 2        A    Right.
 3        Q    Your recommendation for tamoxifen then
 4  was based upon what?
 5        A    My recommendation for tamoxifen was
 6  strictly for preventive use.  She had a strong
 7  family history of breast cancer and she was, she
 8  was at a high risk of developing a new breast
 9  cancer, and tamoxifen was to help prevent or lower
10  the risk of a new breast cancer.
11        Q    Was there any scientific support in 1998
12  that tamoxifen would increase survival in the
13  literature in a patient such as Mrs. Pollard?
14        A    There is scientific evidence back in
15  1998 that tamoxifen would be helpful in lowering
16  the development of new breast cancers.
17        Q    And when would the tamoxifen start?
18  After the chemotherapy was over?
19        A    Normally, yes.
20        Q    Have you brought any other documents
21  with you today in response to the notice of
22  deposition that you haven't already identified?
```

0136

```
 1                  (Documents tendered.)
 2        Q    Just your medical, your board
 3   certification in medical oncology and internal
 4   medicine, your license to practice in Georgia.  All
 5   right.  And that stack of records that you have,
 6   and this article, the NIH consensus of January
 7   31st, 2002?
 8             MS. CERNIGLIA-LOWENSEN:  What the doctor
 9   has in front of him, these records, and you're
10   welcome to look through them, I mailed you all a
11   packet.  That is the records that he sent to me
12   initially before I got the records from Larry.  I
13   suspect most of them, if not all of them, are
14   copies of what you already have, but you're welcome
15   to look through them.
16             MR. KLORES:  Okay.  Thank you.
17        Q    Yeah, you know, that's a good point
18   here.  You received a letter from somebody in
19   England, right?  Do you remember that?  In this
20   case, I don't mean in life.
21        A    I was wondering.  No, I don't remember.
22        Q    Okay.  So the form that you were talking
```

0137

```
 1    about earlier that you have your secretary have the
 2    patient sign, is that this form right here, the
 3    CHAMPUS form?
 4         A    Yes.
 5         Q    Okay.
 6              MR. ADAMS:  For the record, Tricare
 7    succeeded where CHAMPUS was.
 8         Q    Okay.  But this is the form you're
 9    talking about that you said was one piece of
10    information that would tend to suggest that the
11    patient knew that you were not military, right?
12         A    Correct.
13         Q    And that's -- okay.  That's the
14    beneficiary signature form, page 8 in this package.
15    The, your bill, that's this bill here.  I haven't
16    seen this, I'm sorry.  This is the Fort Gordon
17    oncology inpatient/outpatient Sterling Medical,
18    right?  What is this?
19              MS. CERNIGLIA-LOWENSEN:  Can you see?
20         A    That's a super bill.
21         Q    That's a what?
22         A    Super, it's called super bill.
```

0138

```
 1              MR. ADAMS:  Super?
 2              THE WITNESS:  (Nodding head indicating
 3  yes.)
 4              MS. CERNIGLIA-LOWENSEN:  Super bill.
 5       Q    Okay.  I'll put these back the best --
 6  the way that they were here, but.
 7              So you have a bill dated December 1st,
 8  1998 for a moderate slash comprehensive office
 9  visit?
10       A    Consultation, yes.
11       Q    Yeah, consultation, right.  Okay.
12              So on December 7th there was a, it looks
13  like a chest X-ray, is that what this is, spine
14  X-ray?
15       A    Lumbar spine X-ray.
16       Q    And why was there a lumbar spine X-ray?
17       A    This is done 7 December 1996.
18       Q    Oh, it's in '96?
19       A    (Nodding head indicating yes.)
20       Q    I'm sorry, I thought it said '98.
21              So these documents that I'm looking at
22  now, when were -- where did you get these?
```

0139

```
 1        A    This is a copy I got from this JAG
 2  office at Eisenhower.
 3        Q    Okay.  And this document here that I'm
 4  showing you that you've tabbed, page 15, it's the
 5  ImPath report, do you see this?
 6        A    Right.
 7        Q    Do you see it has a fax transmittal on
 8  top of it that bears the date of December 15th?
 9        A    Yes.
10        Q    What does that indicate to you?
11             MS. CERNIGLIA-LOWENSEN:  What does what
12  indicate, the fax?
13             MR. KLORES:  The fax date at the top,
14  right.
15        Q    Is that the date it was faxed to you or
16  is that the date it was faxed by you or what?
17        A    That says from ImPath, New York.  It was
18  faxed from ImPath from New York and I don't see to
19  whom it was faxed.
20        Q    But the date on the top of that, and
21  we'll make that an exhibit, indicates that that
22  ImPath report was faxed on December 15th, right?
```

0140

```
 1          A     That's the date it has.  I'm not sure if
 2     that's the correct date.
 3          Q     All right.
 4                I'm sorry, some of these things I've
 5     never seen and so I'm going to take a few minutes
 6     and go through them with you if I can.
 7                Do you remember being contacted or
 8     receiving a letter from a doctor in England, a
 9     copy?
10          A     No, I do not.
11          Q     Who's the JAG officer that gave you
12     these records?
13          A     It's the same lady I was mentioning
14     before.
15          Q     Okay.  Do you remember her name?  No?
16          A     No.
17          Q     Have you talked to her about your
18     defense in this case?
19          A     No, we just had that one meeting that I
20     mentioned before.
21          Q     But when did you get the records from
22     her?
```

0141

```
 1        A     After I was named in the lawsuit.
 2        Q     What did you do?
 3        A     I went to her and I asked her for these
 4   records.
 5        Q     And she gave them to you?
 6        A     She gave me a few days later after she
 7   made copies.
 8        Q     Did you maintain any record in the
 9   office file on Mrs. Pollard?
10        A     Normally we have a duplicate of her --
11   her note is done in a duplicate.  The original one
12   goes in the medical records and the copy stays in
13   our clinic as a clinic file.
14        Q     Have you looked for those records?
15        A     Those records were taken by the JAG
16   officer for this case.
17        Q     Okay.
18        A     But I believe I have a copy of those.
19        Q     With you today?
20        A     It's part of --
21        Q     In here?  Okay.
22              Which portion of these records would be
```

0142

```
 1   the ones that you would maintain in your office?
 2        A    Can I see?
 3        Q    Yeah.
 4                  (Documents tendered.)
 5                  MS. CERNIGLIA-LOWENSEN:  He needs those
 6   too.
 7                  (Documents tendered.)
 8        A    This would probably be my copy.
 9        Q    This is your office record?
10                  MS. CERNIGLIA-LOWENSEN:  Can you
11   identify those for the record, please?
12                  MR. KLORES:  Yeah, it's a letter of
13   December 16th, his letter of December 16th, '98;
14   his consult sheet request of December 15th; his
15   handwritten note of the consult on, I think it's
16   the 15th, did we establish that, or the 16th?
17                  MS. CERNIGLIA-LOWENSEN:  No, the 15th.
18                  MS. ZORK:  The 15th.
19                  MR. KLORES:  So another copy of that;
20   his two-page consult; page 7, which is, seems to be
21   his, the request to him for the consult by
22   Dr. Sees; his CHAMPUS form; his bill; the bone
```

0143

```
 1    scan.  There you go.  The bilateral mammograms and
 2    the lumbar spine X-ray.  And I'll just put these in
 3    a clip and have these marked as an exhibit itself.
 4    Thank you.  Okay.
 5         Q    So other than Dr., the doctor that
 6    you've talked about, Dr. Fink, you haven't talked
 7    to any other doctors about this case back at
 8    Eisenhower?
 9         A    No.
10         Q    In those women that, that -- the women
11    that do respond to chemotherapy in that small group
12    that we were talking about earlier --
13         A    Which group is that?
14         Q    We talked about there being a 96 percent
15    eight-year survival which goes up in your view to
16    97 percent.
17         A    Okay.
18         Q    The women that do benefit from
19    chemotherapy in that subgroup, do they go on to
20    have the same eight-year survival statistic as the
21    women who are in the zero to 96 percent?
22         A    I didn't understand your question.
```

0144

```
 1        Q    Okay.  There's a -- you said that 96
 2   percent of women who have tumors less than five
 3   centimeters, no negative, basically just
 4   paraphrasing, have a 96 percent survival rate,
 5   eight-year survival rate, right?
 6             MS. HANRAHAN:  Let me just object.  I
 7   thought it was T1.  You keep going to less than
 8   five, but I think it was T1.
 9        Q    T1, no nodes positive, they have a 96
10   percent survival, eight-year survival rate, right?
11        A    With that size, .5-centimeter size, 96
12   percent survival.
13             MS. HANRAHAN:  That's what he said.
14             MR. KLORES:  That's what I asked.
15             MS. HANRAHAN:  Sorry.
16        Q    And the women who do benefit from
17   chemotherapy, those that do in the small subgroup,
18   when we talk about them benefiting from it, do they
19   have the same eight-year survival rate?  Is that
20   how you describe their benefit?
21        A    Let me just make the statement perfectly
22   clear.  Patients with these characteristics, let's
```

0145

```
 1    say a 43-year-old woman with .5-centimeter cancer
 2    of the breast with nodes negative, with ER and PR
 3    negative, would have a 96 percent survival without
 4    any adjuvant chemotherapy already or tamoxifen.  If
 5    this woman is receptor negative and I give her
 6    adjuvant chemotherapy, then 97 percent of this
 7    group would be survival.
 8        Q    Eight-year survival?
 9        A    Yes.
10        Q    Same.  Okay.  That's all I was asking.
11    Okay.
12            (Pause in the proceedings.)
13            MR. KLORES:  Joan, do you expect to
14    offer Dr. Gupta on, as a, on either standard of
15    care of either himself or any other physician?
16            MS. CERNIGLIA-LOWENSEN:  He may offer
17    opinions concerning his own care, obviously as he
18    has here today, but not concerning Dr. Sees or
19    Dr. Adams or any other doctor in the world other
20    than his own standard of care.
21            MR. KLORES:  And do you expect to offer
22    him on questions of what Mrs. Pollard's prognosis
```

0146

```
 1  would have been had she had chemotherapy and
 2  radiation?
 3              MS. CERNIGLIA-LOWENSEN:  None other than
 4  what he's testified to today, specifically the
 5  percentages of survivability, but specifically to
 6  Ms. Pollard, no.  Does that make sense?
 7              MR. KLORES:  Yeah.  So in other words
 8  you're not going to ask him at trial if Mrs.
 9  Pollard, if Mrs. Pollard had chemotherapy and
10  radiation at the times and in the amounts that he
11  had recommended or had been recommended do you hold
12  an opinion to a reasonable degree of medical
13  probability what effect that would have had on Mrs.
14  Pollard?
15              MS. CERNIGLIA-LOWENSEN:  That's correct.
16              MR. KLORES:  Okay.  Fine.  Then I don't
17  think I have any other questions.
18              MS. CERNIGLIA-LOWENSEN:  Larry?
19              MR. ADAMS:  No.
20              MS. CERNIGLIA-LOWENSEN:  Catherine?
21              MS. HANRAHAN:  No questions.
22              MS. CERNIGLIA-LOWENSEN:  None for us.
```

0147

```
 1   And we will read, please.
 2          (Deposition concluded at 4:10 p.m.)
 3            (Exhibits 2 through 15 marked.)
 4                   *******
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

0148

```
 1              CERTIFICATE OF DEPONENT
 2
 3
 4
 5
 6
 7          I hereby certify that I have read and
 8   examined the aforegoing transcript, and the same is
 9   a true and accurate record of the testimony given
10   by me.
11          Any additions or corrections that I feel
12   are necessary, I will attach on a separate piece of
13   paper to the original transcript.
14
15          _____
                 Raj R. Gupta, M.D.
16
17
18
19
20
21
22
```

0149

```
 1  STATE OF MARYLAND, COUNTY OF CARROLL:
 2       I, Sharon A. Beaty, a Notary Public in and
 3  for the State of Maryland, County of Carroll, do
 4  hereby certify the within named RAJ R. GUPTA, M.D.
 5  personally appeared before me at the time and place
 6  herein set out and, after having been duly sworn by
 7  me according to law, was interrogated by counsel.
 8       I further certify that the examination was
 9  recorded stenographically by me and then
10  transcribed from my stenographic notes to the
11  within typewritten matter in a true and accurate
12  manner.  I further certify that the stipulations
13  contained herein were entered into by counsel in my
14  presence.  I further certify that I am not of
15  counsel to any of the parties, nor an employee of
16  counsel, nor related to any of the parties, nor in
17  any way interested in the outcome of this action.
18       AS WITNESS my hand and notarial seal this
    28th day of March, 2003, at Baltimore, Maryland.
19
20       _____
         Sharon A. Beaty, Notary Public
21
22
```