1

1          IN THE UNITED STATES DISTRICT COURT

2                  DISTRICT OF MARYLAND

3

4      VERONICA POLLARD,        :

5      et al.,

6            Plaintiffs    : Civil Action

7         vs.              No. S-02-CV-764

8      UNITED STATES OF AMERICA,:

9      et al.,

10           Defendants    :

11              ------------------

12

13          Deposition of LEROY FLEMING SMITH, JR.,

14      M.D., was taken on Tuesday, June 10, 2003, at

15      5226 Dawes Avenue, Alexandria, Virginia,

16      commencing at 5:20 p.m. before Carol T. Lucic,

17      Notary Public.

18              ------------------

19

20

21    REPORTED BY:  Carol T. Lucic

2

1    APPEARANCES:

2        LESLEY S. ZORK, ESQUIRE

3            On behalf of the Plaintiffs

4        LARRY D. ADAMS, ESQUIRE

5            On behalf of the Defendant

6            United States of America

7        JOAN CERNIGLIA-LOWENSEN, ESQUIRE

8            On behalf of the Defendant

9            Raj Gupta, M.D.

10        (via telephone)

11        CATHERINE A. HANRAHAN, ESQUIRE

12            On behalf of the Defendant

13            Humana Military Healthcare

14            Systems, Inc.

15

16

17

18

3

1        I N D E X   O F   W I T N E S S E S

2    WITNESS                    PAGE

3    LEROY FLEMING SMITH, JR., M.D.

4    By Ms. Cerniglia-Lowensen        4, 108

5    By Ms. Hanrahan              90, 110

6    By Mr. Adams                 110

7

8        I N D E X   O F   E X H I B I T S

9    EXHIBIT                    PAGE

10    No. 1   Curriculum vitae         4

11    No. 2   Handwritten notes       27

12    No. 3   Handwritten notes       27

13

14

15

16

17

18

19

20

21          (Exhibits attached.)

4

1          (Whereupon curriculum vitae was marked as

2    Deposition Exhibit No. 1.)

3    Thereupon --

4          LEROY FLEMING SMITH, JR., M.D.,

5    a Witness, called for oral examination by

6    counsel for the Defendants, having declared and

7    affirmed under the penalties of perjury to tell

8    the truth, was examined and testified as

9    follows:

10         EXAMINATION BY MS. CERNIGLIA-LOWENSEN

11   Q.   Good afternoon, Dr. Smith.  My name is

12   Joan Cerniglia-Lowensen.  I'm here today

13   representing Dr. Raj Gupta in a matter that has

14   been brought against him by the Pollards, and

15   you have been identified as an expert witness in

16   this case.

17         Is that your understanding as to why

18    you're here, sir?

19    A.   Yes.

20    Q.   Dr. Smith, you previously gave your full

21    name.  Can you do that again on the record,

5

1    please.

2    A.   Yes.  It's LeRoy Fleming Smith, Jr.

3    Q.   Dr. Smith, you are a physician; correct?

4    A.   Yes.

5    Q.   What type of doctor are you, sir?

6    A.   I'm board certified in medical oncology,

7    hematology, and internal medicine.

8    Q.   Dr. Smith, have you had your deposition

9    taken before, sir?

10    A.   Yes.

11    Q.   Just to go over the ground rules for you,

12    if at any time I ask you a question that's

13    unclear, if you will make me aware of that, I

14    will be happy to rephrase the question.  Is that

15    agreeable, sir?

16    A.   Yes.

17    Q.   Since we're making a transcript here, it's

18    important that my questions and your responses

19    be verbal so the court reporter can take them

20    down.  Is that agreeable?

21    A.   Yes.

6

1    Q.   If at any time you need a break for any

2    reason, let us know, and we will be happy to

3    accommodate that.

4    A.   Yes.

5    Q.   On how many occasions have you been

6    deposed in the past, sir?

7    A.   The past how many years?

8    Q.   How long have you been doing expert

9    testimony?

10    A.   To a limited degree since about 1975.

11    Q.   Over that period of time has the frequency

12    of your expert testimony remained the same,

13    increased, or decreased?

14    A.   For the last 20 years it has remained

15    fairly much the same.

16    Q.   Can you estimate for me approximately how

17    many cases you review on a yearly basis?

18    A.   Approximately eight or nine per year.

19    Q.   How many times were you deposed in the

20    last calendar year?

21    A.   In the last calendar year from June of

7

1    2002 until June of 2003 I think approximately

2    three times.

3    Q.   Would you say that that's average for your

4    yearly forensic-type work?

5    A.   That's average.

6    Q.   How many times have you testified in trial

7    approximately, sir?

8    A.   All together?

9    Q.   Yes.

10    A.   Because so many of the cases that I'm

11    involved in never go to trial, I would say in

12    the last 30 years probably 15 times maybe.  I

13    don't really keep a real accurate record of

14    that.

15    Q.   Dr. Smith, which jurisdictions have you

16    agreed to serve as an expert in?

17    A.   Most of my testimony has involved the

18    metropolitan Washington area, that being

19    Maryland and Virginia.  Well, I have testified

20    on behalf of another physician at the Washington

21    Hospital Center in D.C. once, and I've also

8

1    testified in Norfolk and Richmond and on one

2    occasion actually in Arizona because my patient

3    had lived there when the infraction occurred,

4    and once I've testified in New York City for the

5    same reason, but most of it is just right around

6    here.

7    Q.   I wrote down D.C., Maryland, Virginia,

8    Arizona, and New York.  Can you think of any

9    other states or areas?

10    A.    Those are the only states I have been to

11    to testify.

12    Q.    Doctor, for your reviews -- and I'm

13    talking about the time that you agree to review

14    records -- can you estimate for me what

15    percentage are on behalf of the plaintiff and

16    what percentage are on behalf of the defendant?

17    A.    Roughly about 30% are for the defendant

18    and about 70% for the plaintiff, and before 1980

19    it was just the opposite.  It was 70% for the

20    defendant and 30% for the plaintiff.

21    Q.    Do you have any idea why it did that

9

1    flip-flop for you in the '80s?

2    A.    Well, I don't advertise that I do this,

3    and in fact, as I say, I don't do it that much

4    because my practice is too busy to allow me to

5    do that.  I think probably it's because of

6    certain attorneys that were attorneys involved

7    in the case had asked me to help them.

8    Everything I review is just on merit.  I don't

9    accept everything that I see either.

10    Q.   You estimated for me based upon review

11    currently about 70% of the reviews you do are on

12    behalf of the plaintiff?

13    A.   That's correct.

14    Q.   Is it approximately the same percentage or

15    a different percentage of those times you appear

16    at deposition are on behalf of the plaintiff?

17    A.   As far as depositions are concerned, I

18    would say that right now it would be probably

19    very similar.

20    Q.   "Similar" meaning?

21    A.   This last year we have had a couple in the

10

1    defense area that have been nonsuited, and so I

2    haven't had to -- I have had to give

3    depositions, but not go to trial.

4    Q.   So when you say "similar," it would be a

5    similar 70/30 percentage, 70 being plaintiff?

6    A.   Right.

7    Q.   What about trial; what would be the

8    percentage breakdown of the times that you have

9    testified in trial?

10   A.   Pretty much the same.

11   Q.   70/30?

12   A.   70/30.

13   Q.   Plaintiff/defendant?

14   A.   Right.

15   Q.   Doctor, I think you already answered this,

16   but just for the record you don't advertise your

17   services with any expert witness corporation?

18   A.   No.  I'm not associated with any type of

19   organization.  Mine is strictly word of mouth.

20   Q.   Have you testified or reviewed records on

21   behalf of Mr. Klores' firm in the past?

11

1    A.   I have.

2    Q.   Do you know approximately on how many

3    occasions?

4    A.    I would say probably maybe four or five

5    occasions.

6    Q.    How did you first become acquainted with

7    Mr. Klores' law firm?

8    A.    As I recall, I think Lesley called me

9    about the first case.  I'm not sure of how he

10    obtained my name.

11    Q.    Did you know Miss Zork prior to the time

12    she called you the first time?

13    A.    No, I did not.

14    Q.    What is your fee regarding review of

15    records, sir?

16    A.    Well, for the initial review of the

17    initial records, depending a lot on the volume

18    of records that I get -- occasionally I have to

19    vary this, but usually what I charge is $750 for

20    the initial review, and that includes discussing

21    the merit of the case with the referring

12

1    attorney.

2    Q.   When you say "initial review," that's not

3    hourly; that's for reviewing the records?

4    A.   That's a flat fee.

5    Q.   What is your fee related to deposition

6    time?

7    A.   Restate that, please.

8    Q.   I'm sorry.  What is your fee for

9    deposition?

10   A.   Oh, for deposition?

11   Q.   Yes, sir.

12   A.   My fee for deposition -- most of them last

13   about two hours – is a flat $1,000, and then if

14   they go over two hours, then it's $500 an hour.

15   Q.   What about your trial time; what do you

16   charge for that?

17   A.   If it's in the metropolitan Washington

18   area, then I charge $5,000.  If I have to leave

19   and go to another city and even spend the night,

20   it's $7,500.

21   Q.   So that $5,000, that's a per diem;

13

1    correct?  That's for one day?

2    A.   That's for one day.  That includes

3    everything.

4    Q.   Dr. Smith, you provided me with a current

5    copy of your curriculum vitae, which we have

6    marked as Exhibit 1.  Is that the most

7    up-to-date version of your CV?

8    A.   Yes, it is.

9    Q.   If you could just highlight for me

10   beginning with college your medical background,

11   sir.

12   A.   Yes.  Medical background?

13   Q.   Yes.

14   A.   Okay.  Well, I went to the Medical College

15   of Georgia, which is the medical school for the

16   University of Georgia in Augusta.  I interned at

17   Harrisburg Hospital in Pennsylvania, which is

18   one of the teaching hospitals for Hahnemann at

19   that time.  Now it's Hershey.  I was in San

20   Antonio, Texas, for three months at the School

21   of Aerospace Medicine, and then after serving in

14

1  the U.S. Air Force as a flight surgeon, then I

2  was at the Cleveland Clinic and did a three-year

3  residency in internal medicine.  During that

4  time I also spent about six months in the

5  hematology-oncology area, an additional six

6  months after the three years, and then I spent

7  six months on the active staff there and then

8  left and came here.

9  Q.   Dr. Smith, during the time that you were

10  in the military as a physician where were you

11  stationed, sir?

12  A.   I was stationed initially in San Antonio

13  in the TDY capacity, and then I was stationed at

14  Holloman Air Force Base, New Mexico.

15  Q.   What, if any, experience do you have, sir,

16  with the medical system in England?

17  A.   None other than having traveled there and

18  visited some of the hospitals.  The Cleveland

19  Clinic had a fairly close working relationship

20  with Hammersmith Hospital, in fact, in

21    particular in gastrointestinal diseases and

15

1    gastrointestinal cancers.  So we had frequent

2    visitors from England that would come over and

3    would participate in our conferences and that

4    sort of thing.  Of course, I've never practiced

5    there or anything like that.

6         MR. ADAMS:  Can we get a year on that?

7    Q.   Doctor, the first thing that you talked

8    about that I wrote down, you said you traveled

9    and visited some English hospitals.

10   A.   Yes.

11   Q.   Can you tell me what years you did that?

12   A.   Okay.  Around 1980 I was on a

13   people-to-people tour.  Eisenhower set up people

14   to people.  The Medical Society of Virginia had

15   a contingency that traveled not only to England,

16   but we traveled to the Eastern Block and to

17   Russia and visited all of the different

18   hospitals -- well, a lot of different hospitals.

19      Since that time I have not really been on

20      any hospital tours or anything.  The other

21      experience with English physicians has been at

16

1       our different conferences.  I usually attend the

2       San Antonio breast cancer conferences.  In fact,

3       this last December one of the keynote speakers

4       was a physician from England.  Then in the

5       Southwest Oncology Group when I was at the

6       Cleveland Clinic we had interaction with

7       physicians from the U.K. because they frequently

8       visited the Cleveland Clinic to see what we were

9       doing in all sorts of different areas.

10      Q.   When were you last associated with

11      England's physicians at the Cleveland Clinic?

12      A.   I left there in 1967, so not since '67.

13      Q.   So, Doctor, what familiarity do you have

14      with the standard of care in England, the

15      current standard of care?

16      A.   The familiarity that I have with it is

17    presentations that have been made at the

18    American Society of Clinical Oncology and the

19    American Society of Hematology and the San

20    Antonio breast cancer conferences by the English

21    physicians.  They're usually fairly active in

17

1    coming to those meetings.

2    Q.   Do you remember the name of any of the

3    physicians from England who made these

4    presentations?

5    A.   What I would probably have to do, I could

6    go back to one of my syllabuses and look, but I

7    don't remember right offhand.

8    Q.   If you could do that easily and provide

9    that to Miss Zork, I would appreciate that.

10    A.   Okay.

11    Q.   When were these conferences that you're

12    referring to?

13    A.   Well, the San Antonio breast cancer

14    conference is every December.  This year I think

15    it's going to be the 2nd through the 5th or

16    something like that.  It's always the first week

17    or two in December.  The ASCO, American Society

18    of Clinical Oncology, meets in May of each year.

19    Q.    Would you say based upon those conferences

20    that you've attended that you're familiar with

21    the standard of care in England?

18

1    A.    Well, I wouldn't say in any intricate

2    detail, but I do know from the articles that are

3    published and looking at ASCO -- in fact, I've

4    attended conferences where they've talked about

5    the treatment of breast cancer.  In particular,

6    the group from Montreal and then some of the

7    British physicians attend these meetings.  So,

8    in other words, I have a good feeling for what

9    they do in general, but certainly not every

10    little intricate detail of every little case,

11    but just kind of an overview.

12    Q.    Would you consider yourself an expert in

13    the standard of care for breast cancer in

14    England?

15        MS. ZORK:  Objection.  He's not going to

16    be testifying at trial about the standard of

17    care for breast cancer in England.

18    A.   Unless I lived over there I wouldn't be

19    able to do that.

20        MS. ZORK:  It's beyond the scope of his

21    designation.

19

1          MS. CERNIGLIA-LOWENSEN:  Let's have one

2     rule:  Objection and then he can answer.  You

3     can make your objection for the record, but if

4     he's talking and you're talking, we're going to

5     have a mess here.

6          MS. ZORK:  My objection is that he has not

7     been designated as an expert on the standard of

8     care in England.

9     Q.    Doctor, can I have your answer now, sir?

10    A.    I would say that, no, I would not be

11    considered an expert to make any type of

12    testimony concerning the standard of care in

13    England.

14    Q.    Dr. Smith, have you ever personally been

15    sued for medical malpractice?

16    A.    I was named in a suit about 25 years ago,

17    but was dropped very quickly.  It never went

18    anywhere with me.  There were about 15 doctors

19     named.  I happened to be unfortunate enough to

20     have consulted on the case, but never have I had

21     to have my insurance company pay anything or go

20

1    to trial or anything.

2    Q.    Was that suit here in the District area?

3    A.    It was in Virginia.  Actually it was one

4    of my friends, his wife.  I just happened to be

5    a consultant that saw him.  There were four or

6    five other doctors that were really taking care

7    of him when he was in the hospital, yes.

8    Q.    Dr. Smith, your curriculum vitae, Pages 3

9    and 4 contain publications that you either

10    authored or participated in in some way.

11    A.    Yes.

12    Q.    Are any of those articles germane to the

13    issues in this case?

14    A.    Let's see here.  No. 9 was a protocol that

15    we participated in in the treatment of advanced

16    breast cancer with two different Adriamycin

17    regimens, and that was in the Proceedings of

18    Clinical Oncology in March of '82.  Then No. 12

19     was where we reviewed a lot of our cases looking

20     at the pattern of local-regional failure in

21     patients with breast cancer treatment with

21

1    adjuvant chemotherapy, and that was published in

2    Journal of Clinical Oncology in 1985.  Since

3    1985 I haven't published anything because

4    basically I haven't had the time and we don't

5    have the resources to hire a full-time data

6    manager.

7    Q.   Doctor, where do you currently have

8    privileges to admit patients?

9    A.   I have privileges at all of the INOVA

10   hospitals.  Starting alphabetically, Alexandria,

11   Fairfax, Fair Oaks, and Mount Vernon.

12   Q.   Have you ever had your privileges to admit

13   to any hospital restricted in any manner?

14   A.   No.

15   Q.   Where are you licensed, sir?

16   A.   I'm licensed in the State of Virginia and

17   the State of Georgia.

18   Q.   Have you ever been licensed in any other

19    jurisdictions?

20    A.   Yes; Ohio.

21    Q.   And you're no longer licensed in Ohio for

22

1   what reason?

2   A.   I canceled that because I never plan to go

3   back and didn't want to pay the fees every year.

4   Q.   Has your license ever been restricted in

5   any manner, sir?

6   A.   No.

7   Q.   Dr. Smith, can you tell me a little bit

8   about your practice right now, sir?  I know

9   you're board certified in oncology, hematology,

10   and internal medicine.  Do you have a percentage

11   that you can break down those three areas for me

12   in terms of the patients you see or are all of

13   your patients one type?

14   A.   No.  In fact, I see a varied amount of

15   patients in both hematology and oncology.  In

16   oncology the ladies that schedule the patients

17   know that my special interest is in breast

18   cancer, and so that I would say probably 75% of

19     the cases I do consults on that.  I do limit

20     myself somewhat now in the breast cancer area.

21     Q.   So when you say you limit yourself, in

23

1    terms of oncology are you restricted to breast

2    cancer patients?

3    A.    No.  I'll limit myself as far as the

4    number of consults I'll do.  I'm currently

5    almost 68 years old.  I'm the senior partner in

6    this organization, and so therefore I have the

7    right or the privilege of making my own

8    decisions.  Basically, as I indicated, my

9    special interest is in breast cancer, so I see

10    more breast cancer than I do anything else.

11    Q.    Approximately how many hours per week do

12    you put into the practice of medicine, sir?

13    A.    Roughly 48 hours a week Monday through

14    Friday 12 hours a day – Monday through Thursday

15    12 hours a day.  I don't work Friday and I don't

16    work weekends.

17    Q.    It doesn't sound like a very good

18    retirement deal.

19     A.   I don't take any night call.  That's a

20     good deal.

21     Q.   Other than seeing patients in your medical

24

1    practice, are there any other professional

2    activities that you engage in?  And, of course,

3    reviewing cases occasionally.

4    A.    Yes.  I'm on the community cancer advisory

5    board for INOVA Health Systems, and we basically

6    serve as a consulting committee to assist INOVA

7    in their cancer program planning.  I'm the

8    physician representative from the INOVA

9    Healthcare Services Board.  There is one other

10    physician on that committee.  She's the director

11    of the cancer program at Fairfax.  Then I do

12    attend the tumor board at Alexandria every week

13    unless I'm away.  Let's see.  I do less now, but

14    I occasionally do some teaching at Fairfax to

15    the Georgetown students, but really I've

16    decreased that significantly in the past three

17    years.

18    Q.    Are you a member of the tumor board or are

19    you an attendee?

20    A.    Well, basically the tumor board is open to

21    anybody that wants to go.  The question really

25

1    should be are you a member of the cancer

2    committee at any of the hospitals.  Right now,

3    no.  For 18 years I was chairman of the cancer

4    committee at Fairfax Hospital, and obviously

5    they consult me, I mean INOVA does, because of

6    the fact that I have been here for this many

7    years, predating most of the people that are

8    actively running the organization now, and if

9    they want to know a little bit about what has

10   happened in the past, they usually call me.

11   Q.   When the last occasion, sir, that you were

12   the chairman of the cancer board?

13   A.   Let's see.  I'm trying to think now.  I

14   became chairman of the cancer committee at

15   Fairfax around 1970 and about 1990 is when I

16   ended my tour of duty.

17   Q.   Dr. Smith, when were you first contacted

18   concerning reviewing matters in this case?

19     A.   Let's see if I have a date written down

20     here.  February of 2002 is when I first received

21     records and started looking at the case.

26

1    Q.   Dr. Smith, have you taken any notes or

2    drafted any reports concerning your opinions in

3    this case?

4    A.   The only thing I have done is

5    chronologically I have just about three-quarters

6    of a page just with dates and stuff as to when

7    things happened.

8    Q.   Can I see those, sir?

9    A.   Yes.  This is just some information that I

10   have in my file on breast cancer in general,

11   yes.  If you want copies of that, I can give it

12   to you, too.

13   Q.   That would be great.

14       This is your handwriting, sir, correct?

15   A.   Yes, it is.  These are notes that I had in

16   my file primarily on medullary carcinoma and

17   atypical medullary.  You can have that, too.

18       MS. CERNIGLIA-LOWENSEN:  We can mark the

19    doctor's notes Exhibit 2 and the Pages 2 and 3

20    entitled general data on breast Ca from Harris

21    as 3.

27

1      THE WITNESS:  From Harris' textbook.

2          (Whereupon above-described documents were

3      marked Smith Exhibit Nos. 2 and 3.)

4      Q.   Dr. Smith, what have you reviewed to date

5      in preparation for your opinions, sir?

6      A.   What I did is I reviewed the documents you

7      have there, and the only thing else I looked at

8      was the -- I'm a member of the American Society

9      of Clinical Oncology, and each year we get an

10     educational booklet, and I looked at the 2002

11     booklet since Dr. Gupta had mentioned that in

12     his deposition.

13     Q.   So let me make sure I have this correct,

14     sir.  You reviewed medical records; is that

15     correct?

16     A.   Medical records.  I reviewed Dr. Gupta's

17     deposition -- do you need to know this now?

18     Q.   Yes, please.

19     A.    -- Dr. Sees' deposition, and the pathology

20     depositions.  I don't recall the gentlemen's

21     names, but one was Adams, I believe.   Anyway,

28

1    those two depositions.  I did not get to review

2    any of the others.  I had a copy, but didn't

3    have a chance to review the ones from Sergeant

4    Pollard or Mrs. Pollard because I received those

5    late and didn't have time to do that.  I ran out

6    of time.

7    Q.    You reviewed Dr. Adams.  Did you also

8    review Dr. Huang, the other pathologist?

9    A.    Yes, I did.

10    Q.    And you mentioned the 2002 booklet that

11    was referred to by Dr. Gupta.

12    A.    Just the one article.  I had read that

13    before, but I just reviewed it since he had made

14    that comment in there that there were some

15    discrepancies in what he said, yes.

16    Q.    Did you also review slides?  Is that my

17    understanding?

18    A.    No, I did not.  Basically with breast

19    cancer I'm constantly reading about it anyway,

20    so I don't really have to review too much when

21    it comes right down to that.

29

1    Q.   Dr. Smith, is there anything additional

2    regarding this case that you feel that you need

3    to review before finalizing your opinions?

4    A.   No.

5    Q.   I presume that you have some opinions

6    concerning Dr. Gupta; is that correct?

7    A.   Yes, I do.

8    Q.   Can you list for me first or can you tell

9    me whether you believe Dr. Gupta deviated from

10    accepted standards of care?

11    A.   Can I answer that yes or no?

12    Q.   Yes, please.

13    A.   I think he did.

14    Q.   Tell me in what way.

15    A.   I feel that, number one, one of the big

16    concerns in this case was the delay in getting

17    things going, and having been a physician in the

18    military, usually what happens is that if

19     somebody is diagnosed with a significant problem

20     that needs therapy and that person is scheduled

21     to be transferred to another facility or another

30

1     country or what have you, what we did in the

2     military was that we had those orders changed,

3     had the treatment given, and then once the

4     treatment was completed, then the military then

5     would go ahead if they wanted to transfer that

6     individual to another site.

7          What I think Dr. Gupta should have done

8     when he saw Mrs. Pollard since there had been

9     already a tremendous amount of delay in this

10    case from October until December, that he should

11    have had the commanding officer, whoever handles

12    the transfers on that particular base, to have

13    had Sergeant Pollard's orders changed, had her

14    stay in Augusta to have been treated at the

15    Eisenhower Medical Center as he had recommended

16    with chemotherapy and then to have had her

17    radiation, and then they could have dealt with

18    the issue of transfer.

19    Q.   I'm going to go into specific detail about

20    those issues, but are there any other general

21    broad areas of criticism regarding Dr. Gupta's

31

1     care?

2     A.   I agree with his recommendation that she

3     needed chemotherapy.  I agree with his

4     recommendation that she needed radiation

5     therapy.  The only thing I would have been

6     interested in doing based on her family history

7     is I would have been very interested in looking

8     at some of the genetic aspects of her family

9     situation.

10    Q.   Anything else in a broad sense?  Then

11    we'll parcel it down a little more.

12    A.   No.  I think those are the main things.

13    Q.   You talked about the initial delay in

14    getting things going.  That's what I wrote down.

15         What did the standard of care require in

16    terms of when intervention should have been

17    initiated after the lumpectomy that occurred,

18    how long after?

19     A.   The standard of care when you initiate

20     treatment?

21     Q.   Yes, sir.

32

1    A.    As soon as possible.  It takes roughly

2    about seven to ten days for a lumpectomy scar to

3    heal and the axillary sampling scar to heal.

4    Actually in some of our earlier protocols with

5    NSABP when I was a member of NSABP, we would

6    start chemotherapy within seven to ten days

7    after the surgery.  Most of our protocols that I

8    participated in and what we try to do here is

9    that we don't like to wait any longer than three

10    weeks from the time that the diagnosis is first

11    made.

12        Once an abnormality is found -- just to

13    give you an idea, this happened Monday -- a

14    patient came in with her mammograms and they

15    were read as being okay; repeat it in six

16    months.  She's having her biopsy tomorrow.

17    That's how soon we do it.  She's having a needle

18    biopsy, and then right away, within a week or

19    less we do the lumpectomy.

20         There is no question that early treatment

21    of breast cancer is essential because the longer

33

1    you wait, the greater the risk, and the reason

2    for that is that once you do a lumpectomy, then

3    what happens is if there are micrometastases,

4    those metastases might basically be sort of in

5    the resting phase or the GO phase initially, but

6    once the bulk of the tumor is removed, even

7    though this was a small tumor, then these cells

8    tend to reenter the cell cycle, and that is the

9    optimum time to kill them with chemotherapy.  So

10    delays in treatment can be detrimental as far as

11    survival.

12    Q.   Dr. Smith, does an oncologist require

13    certain test results, specifically I'm thinking

14    about hormone receptor results, before

15    determining which course of chemotherapy to

16    utilize?

17    A.   You like to have those and in our

18    hospitals we get them immediately.  In other

19     words, once the tissue is out, then in less than

20     a week we have the ER and PR.  The Her 2 Neu

21     takes about two weeks to get back, but that

34

1    doesn't determine whether or not you use

2    chemotherapy.

3        The only time that would make a difference

4    would be if you're dealing with somebody over

5    the age of 60 or in particular over the age of

6    65 who has a very small tumor and who has high

7    ER and PR receptors, that person may be a

8    candidate only for some sort of hormonal

9    manipulation, but in a younger person like this

10    particular person even before we had ER and PR

11    we would have treated her simply on the basis of

12    her age, if nothing else.

13        The only type of tumor where we would have

14    not treated her aggressively probably with

15    chemotherapy is if she had a tubular carcinoma

16    that was ER and PR positive, 90% or more, then

17    that individual could have been treated with

18    Tamoxifen, but that's the only exception to the

19     rule as far as I'm concerned.

20          Medullaries, colloids, strictly invasive

21     ductal cancers, lobular invasive cancers in

35

1    these young people, we treat them all.

2    Q.    So I take it from your response -- and

3    correct me if I'm wrong -- you do not agree that

4    Dr. Gupta should have waited until he got the

5    result of the receptor studies before

6    determining what type of chemotherapy to

7    utilize; is that correct?

8    A.    Yes.  In other words, I feel that that

9    would just add more to my decision process, but

10   I would have treated her even -- this happens.

11   This happened in a case where I was defending

12   the hospital where in Richmond they actually

13   lost the tissue so you couldn't get ER and PR,

14   and this was a young woman, and she got treated.

15   Q.    Doctor, what would the standard of care

16   require in terms of the type of adjuvant therapy

17   for Miss Pollard?

18   A.    That is sort of in a flux now.  Initially

19    the standard of care was CMF.

20    Q.    What is that?  I'm sorry.

21    A.    Cytoxan, Methotrexate, and 5 FU, and in

36

1    fact a lot of your older studies are based on

2    that form of therapy.

3        With the advent of the anthracyclines;

4    i.e., Adriamycin and Epirubicin, then we found

5    out that the addition of an anthracycline to the

6    regimen was superior to the CMF; in other words,

7    CAF versus CMF, and now we know that CEF, which

8    is the Epirubicin, which is also an

9    anthracycline is superior to CAF, and you don't

10    have the added problems of worrying about

11    cardiac toxicity.

12        The standard of care in 1998 when she was

13    treated basically based on the NSABP clinical

14    trials in this country was to use Adriamycin,

15    Cytoxan, or AC times four, which was

16    chemotherapy every three weeks for four cycles

17    or 12 weeks of treatment.

18    Q.   When you say chemotherapy every three

19    weeks for 12 weeks of treatment --

20    A.    Which is four cycles.

21    Q.    -- what does that entail when you say

37

1    every three weeks?

2    A.    They get Adriamycin and Cytoxan

3    intravenously every three weeks once a week.

4    That's every third week they get treatment.  So

5    it's 21 days in between each cycle, and a cycle

6    is one day of treatment.  This is what Dr. Gupta

7    recommended.

8    Q.    And you agree with that recommendation?

9    A.    Yes, I do.

10    Q.    Dr. Smith, do you know whether that

11    protocol would have been available to Miss

12    Pollard in England?

13    A.    In fact, in England even at that time they

14    were using CEF.  In fact, that drug was used in

15    England for at least 10 or 15 years before it

16    ever got approved in this country.  I don't know

17    why there was that big delay, but they finally

18    did approve it in this country.

19          The biggest drawback to using that drug in

20      this country now is an economic issue where one

21      dose in this country costs roughly about $2,000,

38

1    $2,500 depending on the situation.  In Canada I

2    know because I've talked to one doctor at one of

3    the meetings they get it for $900 for one dose.

4    Q.   Doctor, I think I know what your answer is

5    going to be, but I want to make sure this is

6    clear for the record.

7        Do you believe that what was being

8    utilized in England at that time, the CEF you

9    referred to, was as good, if not better, than

10   what was being used here in 1998?

11   A.   Well, the data wasn't in as far as the

12   comparative data, but it certainly was as good

13   and we know now it was better.

14   Q.   Dr. Smith, the tumor that Miss Pollard had

15   at the time of the needle biopsy and the

16   lumpectomy, what was the classification of that,

17   sir?

18   A.   Dr. Huang, was it?

19     Q.    Yes.

20     A.    I read his deposition and I looked at the

21     path. report, and what they did, he called it an

39

1    infiltrating or invasive cancer that had

2    medullary features.  It did not have all of the

3    medullary features that you see, but he did make

4    a statement in that report that it was not

5    typical medullary.  It would be classified,

6    which is an acceptable classification, as

7    atypical medullary.

8    Q.    So from that a tumor that has medullary

9    features is not the same as a medullary tumor;

10    correct?

11    A.    No.  Actually one of the biggest misnomers

12    in medicine today, but it's pretty much being

13    refuted now and people aren't paying much

14    attention to it because there are so many other

15    things to look as far as the biology of the

16    tumor as far as aggressiveness is the fact that

17    medullary tumor had a good prognosis.  In fact,

18    in several of the textbooks -- you can go back

19    and look -- I remember seeing this because we

20    see medullary carcinomas, too, that they are not

21    anywhere near as good as far as prognosis as

40

1    people thought they were initially.

2         The other thing is that one of the

3    problems you have with medullary is getting

4    uniformity of opinion from pathologists as to

5    whether it's a medullary or not, and that's one

6    of the problems because a tumor may be well

7    circumscribed, it may have lymphoplasmacytic

8    infiltration, it may not have calcifications,

9    and that's why it probably didn't show up on the

10    mammogram because they usually have pretty much

11    the same density as normal breast tissue and

12    they don't have calcifications, that these

13    things are inconsistent in a lot of cases that

14    sort of have what you might say is some of the

15    medullary characteristics.

16    Q.   So a medullary tumor is or is not the same

17    thing as a tumor with medullary features?

18    A.   No.  Actually there are basically two

19    classifications.  She would be classified as far

20    as I'm concerned as atypical medullary like Dr.

21    Huang said at the bottom of his report there,

41

1    that it was not a typical medullary.  There are

2    basically two different classifications.  One is

3    a guy whose name is Pedersen and the other one I

4    think is Redeli, as I remember.  I'm not a

5    pathologist, so this is from memory.  In fact, I

6    think it was in this thing that I had here, too.

7    They're different, so they create some confusion

8    as far as which classification you use, but we

9    actually depend more on -- except for tubular,

10    we depend more on the biology of the tumor.

11    Q.    And the classification of Miss Pollard's

12    tumor or the staging of Miss Pollard's tumor,

13    what would that be, sir?

14    A.    Well, it depends on whose size you go by,

15    but initially it was a T1-C, N0, M0.  I guess

16    the initial measurement was .5.  We measure our

17    tumors on the slide, and, as you probably know,

18    if you measure it, of course, in the breast,

19    you're going to get a larger measurement because

20    of the surrounding tissue.  When you take it out

21    and you try to measure it -- first of all, when

42

1    you take it there is some contraction, and when

2    you try to measure it in the tissue itself, then

3    it's sometimes difficult, and then when you put

4    it on the slide, it's spread out and then you

5    can take your measurements with a chronometer,

6    which is in the microscope, and that's what most

7    of our people do.

8    Q.    Certainly the tumor that Dr. Gupta thought

9    he was dealing with was a T1; correct?

10    A.    Yes; 5 centimeters.

11    Q.    And the nodes were all negative; is that

12    correct?

13    A.    The nodes were negative.

14    Q.    And there was no metastasis at that point

15    that we were aware of; correct?

16    A.    M0 as far as we know at that time.

17    Q.    Doctor, as an oncologist, are you aware of

18    with that staging what the survivability is for

19     five years with that type of tumor?

20     A.    First of all, we need to mention two --

21     well, actually three things.  This was available

43

1    apparently to Dr. Gupta at the time; I guess he

2    got it later, but one thing he did have was the

3    patient's age.  It's a uniform fact that young

4    women do less well irregardless of size, ER-PR,

5    or what have you.

6        So anyway she was a young woman with a

7    very strong family history apparently.  The

8    characteristics of her sister's cancer were ones

9    of being very aggressive.  The other very

10   disturbing thing about this lady is that she had

11   a proliferation rate -- the KI67 was 90%, which

12   means 90% of those cells were in evolution as

13   far as division when the tissue was evaluated.

14   There was an intermediate value for the S phase.

15   S phase in very, very small samples sometimes

16   can be somewhat unreliable, whereas the KI67 is

17   a stain, and they can actually with a molecular

18   microscope gauge it much better, and the fact

19      that she was ER and PR negative.

20          So basically we had size of tumor, ER-PR

21      negativity, KI67, and age to look at.  The

44

1    latter three were the ones that were, of course,

2    very disturbing as far as this lady was

3    concerned, and I'm sure this is what Dr. Gupta

4    was thinking as far as wanting to treat her,

5    which, as I said before, I agree with that. In

6    fact, in his little article that he was

7    referring to it even brings this out. Harris'

8    brings this out, too.

9        It's very difficult to find a study

10   stratified so that you can say that you have

11   adequate numbers of patients in a study -- to

12   find any study where the survival is better than

13   90%. It wasn't a meta analysis, but the

14   original study that was probably the largest

15   study -- they don't even mention it in this

16   article. This is from Belgium, by the way --

17   was Dr. Peter Paul Rosen's article from Memorial

18   Sloan-Kettering at least 20 years ago where he

19      went back into the archives at Memorial and

20      looked at almost a little bit over 800 cases of

21      women who had tumors less than 1 centimeter in

45

1     diameter.

2        At that time probably most of them didn't

3     have ER and PR.  He didn't stratify for age.  He

4     didn't stratify for any of those things.  The

5     ten-year survivorship in that group of patients

6     was 90%.  Some of them had chemotherapy; some

7     didn't have chemotherapy.  Most of them had

8     mastectomies.  They didn't have lumpectomies.

9     They weren't doing them at that time.  So anyway

10     that is basically a hodgepodge of patients as

11     far as biological behavior, but all less than 1

12     centimeter.

13        The other much larger analysis was made by

14     about 1998.  This was a meta analysis of at

15     least 15 to 20 reports of small cohorts of

16     patients that had tumors that were less than 1

17     centimeter, and this is with patients that have

18     ten-year survivorship.  If you look at the

19     ten-year survivorship of women under the age of

20     50, and this is not stratified for ER or PR

21     either, under the age of 50 that have tumors

46

1    that are less than 1 centimeter that have no

2    chemotherapy at all, then the survivorship in

3    that group of patients is 58% at ten years.

4    That's overall survival.

5        If you look at the same group of sort of

6    matched patients who have had polychemotherapy,

7    that may be CMF, CAF, or what have you, then

8    you're looking at 68.3% ten-year survivorship,

9    overall survival, with a net difference of

10   10.3%.

11       So that's a salvage of at least one

12   patient out of ten.  Unfortunately, as I say,

13   I'm not aware of any study of any size where

14   they actually looked at stratification for age,

15   ER and PR, proliferation indexes.  It just isn't

16   there.  That's as close as you're going to get

17   to looking at a fairly large cohort of patients.

18   Q.   I'm sorry, Doctor.  I wrote down the 1998

19    meta analysis.  Did you give me an author for

20    that study?

21    A.    I can probably give you the bibliography

47

1    of it.

2    Q.    That would be wonderful.

3    A.    Can I do that later?

4    Q.    Yes, absolutely.

5    A.    I'm trying to think now.  I think Peto did

6    it, the guy from England, the big statistician.

7    I know he did the meta analysis for Tamoxifen.

8    I'm pretty sure it was Peto, but I'll make a

9    note to look that up.  That would be the 1998

10    meta analysis.

11        What is happening so often in breast

12    cancer, like, for instance, in hormone

13    replacement therapy and Tamoxifen therapy,

14    they're doing meta analysis now really to try to

15    pick up really very small differences in

16    outcome.

17    Q.    Dr. Smith, you reviewed Dr. Gupta's

18    deposition, and you know that the numbers that

19    he quoted for T1, node negative, metastasis

20    negative was 93% without chemo and 94% with

21    chemo.

48

1    A.    Let me tell you where he messed up here.

2    I was a member of NSABP during this time.

3        (Discussion off the record.)

4    A.    Anyway, Column 1, Page 145 in the 2002

5    educational booklet from ASCO.  What they did is

6    they looked at -- the survey period was 1976 to

7    1993.  These are NSABP trials, the National

8    Surgical Adjuvant Breast Project.  Now it's

9    called the National Surgical Adjuvant Breast and

10    Bowel Project.

11        Median followup was eight years.  Number

12    of patients, they had 235 patients that were ER

13    negative.  They had 1,024 patients who were ER

14    positive.  74% of all of those patients had

15    adjuvant chemotherapy.  The outcome, 92%

16    survival, 4% death rate from breast cancer which

17    was breast cancer related.  They included ER-PR

18    positive and ER-PR negative.  It's a combination

19     of all of those patients, and it was not just

20     the ER negative patients.

21          So that's where his figures are wrong.

49

1    This is a total of all the patients, not just

2    the ER negative patients.  That's why I left

3    this out because I knew that wasn't right.

4    Q.   The 1998 meta analysis case study that

5    dealt with the T1 tumors, tumors of less than 1

6    cm., did they differentiate ER negatives from ER

7    positives?

8    A.   No.  I told you that ahead of time when I

9    say that.  In other words, that's the problem

10    with all of these studies is that from the

11    standpoint of making a decision about treatment

12    it really does matter in older patients, but in

13    women under the age of 50 the standard of care

14    really is to treat those patients unless, as I

15    indicated, they have -- of course, most of your

16    tubular carcinomas are going to be ER and PR

17    positive anyway, so you're not going to have to

18    merely make that decision, and most of your

19      atypical medullaries are ER and PR negative,

20      which is another issue, in other words, that you

21      see.  Medullary and atypical medullaries are

50

1    usually ER and PR negative.

2    Q.   Dr. Smith, based upon your review of the

3    case do you have an opinion to a reasonable

4    degree of medical probability whether the

5    adjuvant therapy in this case would have made a

6    difference in Miss Pollard's survival?

7    A.   Well, I just gave you the figures on what

8    we have available, so we know that in situations

9    where you include all tumor sizes in patients

10   under the age of 50 without stratification for

11   anything that you get a 68.3% ten-year

12   survivorship.  Basically this was with

13   polychemotherapy that was -- most of these cases

14   were CMF cases because the 1998 meta analysis,

15   this went way back.  They started looking at

16   patients diagnosed to get the ten-year

17   survivorship in '88 and before '88, some of

18   those patients.  Some were more than ten years,

19    but the mean was ten years.

20         So, in other words, my feeling is that in

21    this particular patient situation the worst

51

1     scenario would have been that this patient would

2     have had about a 68.3% chance of survivorship.

3     She had a very small tumor compared to a lot of

4     these women in that meta analysis.  Also the

5     fact that the chemotherapy would have been

6     better, too, that certainly if you look at those

7     figures and try to figure that as best you can,

8     you're probably talking about a 12% increase

9     over and above the 68%, so roughly an 80% chance

10    of being alive in ten years.  I'm saying overall

11    survival.

12    Q.    How did we get from the 68.3 to the 80?  I

13    got lost there.

14    A.    Because the 68.3%, they took all comers

15    sizewise.  That's how I got that figure.

16    Q.    That 80% that you gave me, somewhere in

17    the literature is there a cite for that that I

18    can go look and say that is what Dr. Smith

19     meant?

20     A.   No.  I told you that before.  The big

21     problem is that it hasn't been stratified to

52

1    that degree, but if you look at what the basic

2    survival was like -- this is overall survival

3    that we're talking about now -- if you have

4    those kind of figures, which included patients

5    that were ER and PR negative, who had large

6    tumors, who are going to be below that figure,

7    and you've included some that were going to be

8    above that figure, certainly by size alone she

9    had some benefit there.

10        The big things that were against this lady

11   were the proliferation index, the fact that she

12   was young, and the fact that she was ER and PR

13   negative.  Those are the big things.

14   Q.    Doctor, maybe I wrote this down

15   incorrectly, and you clear this up for me.  When

16   we were talking about the meta analysis where

17   you gave me the number of the 68.3 with

18   polychemotherapy, I wrote down tumors less than

19     1 cm.; is that correct?

20     A.     Yes.  Wait a minute.  No.  I'm sorry.  Let

21     me just double check my figure here.

53

1    Q.   Please do.

2    A.   Let me see if I've got something on it

3    here.  No.  They were all comers sizewise.  I

4    kept saying that, all comers.  I didn't say less

5    than 1.5 or less than 1 centimeter.

6        MS. ZORK:  And he said that she would get

7    benefit from --

8    A.   What I said was that you had patients with

9    tumors any size in that group.  I mean they

10   could have been -- in fact, back in the old days

11   before they did mammography, even DCIS tumors

12   that we saw were always palpable.

13   Q.   So the 80% number, that was your

14   extrapolation.

15   A.   From the 68.3%, right.  This is overall

16   survival I'm talking about.  We know that

17   chemotherapy does two things.  One, it decreases

18   recurrence rate; and, two, it extends the time

19    from diagnosis to recurrence.  In other words,

20    see, I've got patients with breast cancer who

21    have recurred ten years ago who are alive

54

1    because of all the treatments we have available.

2    Q.    Doctor, if I can draw your attention back

3    to that 80% chance of survival number, I just

4    want to make sure this is clear to me and clear

5    to the record.  There is not a study that gives

6    that number.  That's your extrapolation.  It

7    could be 75%, 70%, or some number in between; is

8    that correct?

9    A.    We know it would be more than 68.3%

10    because they took all sizes, but I told you as

11    far as giving you a study -- this is one of the

12    things they pointed out in the particular

13    article Dr. Gupta referred to and also in

14    Harris' is that the problem with these small

15    tumors is that we don't have large studies where

16    there has been stratification because now as far

17    as looking at proliferation indexes and S phases

18    and P 53 mutations and Her 2 Neu and Chaderin 1

19     and all of these things that we're beginning to

20     look at now, they weren't even available.

21     Q.    Dr. Smith, is it your opinion to a

55

1    reasonable degree of medical probability that

2    Miss Pollard would have fallen into that

3    percentage that would have survived with the

4    chemotherapy?

5    A.   Yes, it's my opinion.

6    Q.   What do you base that opinion on?

7    A.   I base that opinion on a number of

8    different things.  Number one, as I indicated

9    before, that obviously her tumor burden was

10   small metastatically speaking at the time of her

11   diagnosis.  She had no sign anywhere of cancer

12   that they could find.  Her tumor burden was

13   small.  The time to cure patients with

14   micrometastases is when the tumor burden is

15   small and the cells are active.  We also know

16   that ER and PR negative cells respond much

17   better to chemotherapy than ER and PR high

18   positive cells.

19       To give you an example, right now I just

20       saw a lady in the hospital who is currently in

21       the hospital, 32 years old with a Stage IV

56

1    breast cancer at presentation, had a

2    proliferation index of about 90 to 95 percent.

3    She's ER and PR negative, Her 2 Neu negative,

4    and we're waiting on the P 53 to come back.  The

5    mass in her neck was the size of an orange.

6    Remember, she's ER and PR negative.  The mass in

7    her breast was only about the size of a walnut.

8    One cycle of chemotherapy, and today when I saw

9    her, the mass in her left neck has gone from the

10    size of an orange to the size of a peanut.

11    That's how fast they can shrink.

12        You don't usually see that fast shrinkage

13    like that in patients who have ER and PR

14    positivity because a lot of those cells tend to

15    be in the so-called resting phase.  With cycle

16    specific chemotherapy drugs you do not kill

17    those GO cells, and those are the ones that stay

18    in the resting phase, and when a patient has a

19    recurrence 18 years after their mastectomy,

20    somehow and for some reason they come out of

21    that phase and then proliferate.

57

1       It's a well-known fact that there is no

2    five, ten, 15, 20.  The all-time record I have

3    is a 50-year recurrence after mastectomy in a

4    woman who was 91 years old.  She was actually

5    diagnosed in 1950 with pleural effusion.  50

6    years later she had ER and PR positive tumor

7    cells in the fluid.  She responded to Tamoxifen.

8    She died at 94 of old age.  She just sort of

9    quit living.

10   Q.    Dr. Smith, you talked about tumor burden.

11   What do you mean by that?  That's a term I'm not

12   familiar with.

13   A.    Tumor burden refers to the number of cells

14   present.  One cubic centimeter of tumor contains

15   one billion cells.  So, in other words, if a

16   person has metastases in their bone, in their

17   liver, in their lungs, but their liver hasn't

18   stopped working, they're still breathing, and

19    their bones are hurting, but they're riddled,

20    why does the patient die then?  They die because

21    of tumor burden.  In other words, it's almost

58

1     like critical mass.  I look at it like a

2     critical mass with a nuclear explosion.  You get

3     to a certain point where the body can no longer

4     tolerate any more cells.  This is why they die,

5     from tumor burden.

6     Q.    All patients that have a .5 cm. breast

7     tumor, would they have the same tumor burden?

8     A.    No.  When I say in the breast, they

9     probably do if it's exactly .5 and measured with

10    an anatomic calculator or whatever you have, but

11    we don't know what is happening out there in the

12    periphery somewhere.  If this patient has ER-PR,

13    high ER-PR, and is like 60 years old, then the

14    chances of having a large tumor burden probably

15    is in that range that Dr. Gupta was talking

16    about.  Maybe 4 or 5 percent of them will;

17    however, that doesn't mean they won't recur 10

18    or 15 years later, though.

19     Q.   How do we know then that Miss Pollard's

20     tumor burden was small?

21     A.   Because it couldn't be detected.  They

59

1    didn't do a PET scan on her because I guess they

2    didn't have the availability down there in '98,

3    but we have been doing PET scans around here for

4    quite a few years.  The smallest breast cancer

5    I've ever picked up with a PET scan measured .4

6    centimeters in diameter, and it was done on a

7    lady with lung cancer.  We found this in the

8    breast, took it out, and it was breast cancer.

9    That's the smallest one I've ever seen picked up

10   by PET.  PET would not pick up micrometastases.

11   Q.   Dr. Smith, you reviewed the

12   recommendations in the letter of Dr. Gupta that

13   Miss Pollard took along to England; is that

14   correct?

15   A.   Yes.

16       MS. ZORK:  Objection to the form of the

17   question.

18   A.   Wait.  I'm sorry.  Was it his consultation

19   that she took along?

20   Q.   Correct.

21   A.   That I had, yes.

60

1      MS. ZORK:  I'm not sure that the record is

2   clear as to whether she took that along with

3   her.  In fact, I think there is a dispute about

4   that.

5   Q.   In any event, you reviewed the

6   consultation note; correct?

7   A.   Yes, I did.

8   Q.   And you agreed with the recommendations

9   contained therein?

10  A.   Yes.

11  Q.   Do you have an opinion as to whether Dr.

12  Dodwell in England deviated from accepted

13  standards of care?

14     MS. ZORK:  Objection.  We're not going to

15  be asking him those questions.

16  A.   Well, here is the thing.  The one thing I

17  do know about the English, and it's unfortunate

18  is that anything they do has economic ties to

19    it.  I think I told Lesley this.  I've actually

20    seen in writing that a European in an article

21    indicated that in a patient that has a small

61

1    tumor, even though there is a benefit, that

2    economically it's not cost effective to treat

3    that patient.

4        I guess it all boils down to the issue of

5    how much is a life worth.  If it's mine, I would

6    give everything I have to be able to live.  I

7    think that's the wrong way.  In this country we

8    don't make decisions like that.  The insurance

9    companies try to make you not use Epirubicin and

10   use Adriamycin, but Medicare, the Federal

11   Government allows you to do that.  Some of the

12   for-profit insurance companies try to alter your

13   care, but we don't let them do it.  In England,

14   unfortunately, they don't have the power really

15   to make those decisions because of the

16   socialized program and the pressure they're

17   under because of the tremendous cost.

18   Q.   So is it your belief that Dr. Dodwell made

19     the decision to not utilize chemotherapy based

20     upon this economic analysis?

21     A.    I can't really say what he was thinking.

62

1      MS. ZORK:  I'm going to object.  You asked

2   him earlier if he knew what the standard of care

3   was in England, and he said no, so I'm not sure

4   what these standard of care questions relate to.

5   Did Dr. Dodwell violate the standard of care as

6   we know it in the United States?  What is your

7   question because we have already established --

8      MS. CERNIGLIA-LOWENSEN:  If the doctor

9   doesn't understand my question, he will tell me

10   that.

11   Q.   Doctor, did you understand my question?

12   A.   Repeat it.

13      (Whereupon the court reporter read the

14   pending question.)

15   A.   Specify whose accepted standards of care.

16   Q.   I will be happy to.  Let's parcel it out.

17   First off, pursuant to American standards of

18   care in 1998.

19    A.    Yes, he did.

20    Q.    In what way?

21    A.    By not treating her.

63

1    Q.   By not treating her with --

2    A.   Chemotherapy.

3    Q.   Thank you.

4    A.   And also by waiting so darn long to get

5    the radiation started.  We usually wait a couple

6    of weeks after chemotherapy is finished and then

7    we start the radiation.  He didn't give her

8    chemotherapy, and it still was six months before

9    they started radiation.

10    Q.   After a lumpectomy has occurred is there

11    an amount of time that you have to wait before

12    initiating radiation?

13    A.   If the patient is not getting

14    chemotherapy, you wait -- it's just like the

15    same thing, in other words.  You do wait and

16    make sure the incision has healed.  Within two

17    weeks most incisions are healed.  You may have

18    to delay if somebody gets a wound infection, but

19     then you go ahead and treat.

20         If you're seeing somebody who has a high

21     risk of having micrometastatic disease, then our

64

1    radiation oncologists will be the first ones to

2    agree with us that chemotherapy up front is

3    first.  We know even that can also delay or

4    prevent some degree of local recurrence.  We

5    also know that if you don't give radiation

6    therapy in a timely fashion, that the difference

7    between radiation and no radiation is almost --

8    in other words, that a delay like that almost

9    puts you in the same category you would have if

10    you don't give prophylactic radiation, and in

11    that situation in the data in this country it

12    runs about a 35% recurrence rate in the

13    nonirradiated breast and chest wall.

14        This particular patient did have a

15    recurrence in the parasternal region, which

16    would have been included in the radiation field.

17    Q.   If I can back that up a little bit, what

18    you're telling me is that after a lumpectomy if

19     the breast is not radiated, there is a 35%

20     risk --

21     A.   Failure rate in different series you will

65

1    look at, but one of the series I'm familiar with

2    is the one at Alexandria Hospital.  Dr. Grayson

3    is renowned.  She has got a tremendous

4    reputation.  Actually she has a national

5    reputation.  She was at the NCI and everything.

6    In her study they have now about a 5% failure

7    rate with radiation.  Fairfax is very similar,

8    by the way, Dr. Pierce there.

9    Q.    When we say 5% failure rate with

10    radiation, that means a recurrence in that area

11    of the breast?

12    A.    A local failure rate; in other words, even

13    in the breast or the surrounding chest wall.

14    Q.    Miss Pollard's cancer when it was

15    diagnosed, the recurrence, was that a local

16    failure rate?

17    A.    She had two things happen.  She had a

18    local failure rate, which was a parasternal

19    metastasis, and she also had DCIS in the

20    nontreated breast.  That's why I say that in

21    retrospect genetically and even before that to

66

1    look at this family from the genetic standpoint

2    -- I don't know whether Mrs. Pollard has

3    children or not, whether she has any girls in

4    her family, but it would impact on them.

5    Q.    Doctor, the local failure that Miss

6    Pollard had, would the chemotherapy -- I'm

7    talking separate from the radiation -- would the

8    chemotherapy have prevented that recurrence?

9    A.    We know that in patients who have had

10   total mastectomies, whether they be radicals,

11   modified radicals, or just removing the entire

12   breast and axillary node sampling that with

13   chemotherapy versus no chemotherapy the local

14   recurrence rate is reduced, but not as much as

15   it would be with radiation.

16   Q.    What about with lumpectomy; do we know in

17   that instance?

18   A.    With lumpectomy they all get radiation

19     anyway.

20     Q.   Do you know of any studies that indicate

21     lumpectomy with or without chemotherapy minus

67

1    radiation, just the chemotherapy?

2    A.   No, not in lumpectomy, no, because

3    everybody gets radiation.  In fact, I can tell

4    you right now the only person that I have not

5    irradiated in the last five years after

6    lumpectomy was a 90-year-old lady because she

7    had heart disease and she was dead within three

8    years.

9    Q.   What about the DCIS in the nontreated

10   breast; what effect would chemotherapy have had

11   on the recurrence in the nontreated breast?

12   A.   Well, first of all, let's just look at the

13   DCIS.  Number one, the standard of care for

14   treatment of DCIS -- number one, you take the

15   little tumor out, good margins, 1 centimeter if

16   you can.  Then you do ER and PR on that -- the

17   NSABP has shown that is necessary -- radiation

18   therapy, and they're ER and PR positive, then

19    Tamoxifen.

20        Are you asking me that having had

21    Adriamycin, Cytoxan, having had high-dose

68

1       chemotherapy, and stem cell rescue I guess is

2       what she had at Walter Reed, and whatever else

3       she has had in the way of chemotherapy and she

4       still developed the DCIS?

5       Q.    Yes.

6       A.    Well, obviously it didn't prevent it.

7       Q.    When did she develop the DCIS?

8       A.    I think I might have that written down

9       here somewhere.  Let's see.  I guess she began

10      having pain in her chest in April of 2000 while

11      in England, and on 3/24 she had a lump in her

12      right breast.  She had a diagnosis I guess of

13      costochondritis.  Finally on May 22 she had

14      biopsies.  She had DCIS in the right breast and

15      metastatic Ca of the parasternal area, and then

16      she was air vac'd to Walter Reed.  Later on she

17      developed right supraclavicular, lung, and what

18      have you.

19    Q.    Do you have an opinion to a reasonable

20    degree of medical probability as to whether

21    chemotherapy would have prevented the breast

69

1    cancer in the opposite breast?

2    A.    Well, I've already answered that.

3    Q.    If you would humor me again --

4    A.    She had chemotherapy during that whole

5    time and she still developed it.  It's a

6    noninvasive breast cancer, so that if you

7    develop a cancer of some sort in your other

8    breast while you're on chemotherapy, then

9    obviously it didn't prevent it.

10        MS. ZORK:  I think there is some confusion

11    here.  The DCIS was diagnosed in her right

12    breast when she got to Walter Reed.

13        MS. CERNIGLIA-LOWENSEN:  That's what the

14    doctor is clearing me up with.

15        MS. ZORK:  Before she had chemotherapy.

16        MS. CERNIGLIA-LOWENSEN:  That's not what

17    the doctor said.

18        THE WITNESS:  I said I don't know.  You

19    notice I answered that with a question.  I don't

20    have the dates on when she had high-dose

21    chemotherapy.  In fact, even in the records that

70

1    I have I don't believe I had anything from

2    Walter Reed, and I don't know when she had

3    high-dose chemotherapy and stem cell rescue.  I

4    don't know.  I assume that would have been after

5    she was diagnosed because when she left England,

6    she already had this lesion I guess on the chest

7    wall, and she didn't have any chemotherapy in

8    England; right?

9        Q.   You've reviewed the records from England?

10       A.   No.

11       Q.   You have not.

12       A.    In other words, I saw some notes, but I

13   saw nothing about chemotherapy from England, so

14   I assume she didn't have any.  Is that the

15   proper assumption?  The records I saw were very

16   skimpy from England, but there was nothing in

17   there about chemo.

18           MS. ZORK:  That's it.

19    A.   She didn't have chemotherapy.  When she

20    got there, she developed a DCIS between the time

21    that she had the radiation, but no chemotherapy,

71

1     so the chemotherapy was not a factor in

2     developing the DCIS in the right breast.

3     Q.    So what you said before, you were

4     incorrect when you said she had the chemo and

5     then got the DCIS?

6     A.    In other words, I didn't know about the

7     dates.  I thought the DCIS was made after she

8     had started chemo at Walter Reed, but it wasn't;

9     it was before.  So, in other words, she had not

10    had any type of chemotherapy in England, and the

11    DCIS developed during that time she was over

12    there.

13    Q.    Dr. Smith, you referred a few times to

14    Miss Pollard's genetics in terms of the fact

15    that her sister had breast cancer.

16        Is it your belief that Miss Pollard's

17    breast cancer was in any way similar to that of

18    her sister's or does it matter?

19     A.    There is no data on that.  All I can say

20     is that sometimes – well, for instance, in

21     identical twins it can vary.  I mean I have an

72

1    identical twin right now who is on chemo

2    prophylaxis with Tamoxifen whose sister who

3    genetically is pretty identical has had breast

4    cancer and the other one doesn't have it.

5        So, in other words, you can't really

6    quantify that, but sometimes you get clues about

7    certain things.  In other words, this is why I

8    say genetic workup.  Basically her sister

9    developed it at a young age.  She developed it

10   at a young age.  Her mother apparently never --

11   she lived to be old I guess with it.  This is

12   the kind of case where now what we like to do

13   thinking about their offspring is to be sure

14   they don't have one of the cancer syndromes.

15   Q.   When you talk about genetics and family

16   risks for cancer like breast cancer, are they

17   similar cancers that you're concerned about?  Do

18   you know what I mean?

19    A.   I can give you an example of where they

20    are similar.

21    Q.   Please.

73

1    A.    There is a cancer syndrome, and I happen

2    to have a family right now that we've identified

3    who have aggressive breast cancer.  They have

4    something called the Li-Fraumeni syndrome, which

5    is very rare.  I mean like you find this in

6    maybe 2% of all breast cancers.  They have a

7    mutation of the P 53 gene, which controls

8    programmed cell death or apoptosis.  That's one

9    type.

10        We also know that in 10% of all breast

11    cancers you will find that they are BRCA 1 or

12    BRCA 2 positive, and in Sephardic Jews they tend

13    to be very aggressive cancers.

14    Q.    In this instance we don't really know

15    anything about the genetic component here;

16    correct?

17    A.    No.  The only reason I made the comment is

18    that even now it might be worthwhile to look at

19    that.  Does she have girls in her family?

20        MS. ZORK:  She has a daughter, an adult

21    daughter.

74

1    A.    She has a daughter.  Well, to me I would

2    want to see a genetic counselor and get that

3    study done.

4    Q.    Hypothetically if Miss Pollard and her

5    sister were genetically predisposed for this

6    type of cancer, would the cancer be similar in

7    nature?

8    A.    It's not going to be identical.  It could

9    be similar from the standpoint of the histology

10    might be similar.  In other words, the lobular

11    could be, but as far as the behavior, no.  It

12    could vary a lot.

13    Q.    When you say "behavior," you mean what?

14    A.    The ability to metastasize and that sort

15    of thing, just like I mentioned the identical

16    twins where one has it and one doesn't.  So I

17    mean it is of interest, but it has no bearing I

18    think on the clinical outcome of the case.

19     Q.    Dr. Smith, before when you were telling me

20     about chemotherapy and radiation, do you

21     complete those cycles of chemotherapy before

75

1    initiating radiation?

2    A.    Most of the time we do.  Dr. Gupta I think

3    admits in his note to give the chemotherapy

4    first and the radiation second.  There are very

5    few cases where we don't do that.

6    Q.    Why is it done in that manner?

7    A.    Because people don't die of local

8    recurrence; they die of systemic spread, and

9    even though we do know that in certain

10    situations with node positive patients that

11    there is a slight difference in survivorship by

12    giving adjuvant breast irradiation after total

13    mastectomy.

14    Q.    When Miss Pollard had her recurrence, was

15    it a local recurrence at that point or was it

16    distant metastasis?

17    A.    Well, I told you before that the

18    parasternal border lesion was metastatic and the

19     DCIS, of course, was a new tumor.

20     Q.   The parasternal border area that we are

21     talking about, is that an area where radiation

76

1   would have prevented that growth?

2   A.   Yes.  In other words, radiation actually

3   -- if you look at most patients that had

4   radiation, you know, they put tattoo marks, and

5   basically that would have been included.  So

6   that, in other words, the chances of having

7   recurrence in that region would have been

8   reduced significantly.

9   Q.   Do you have an opinion then to a

10   reasonable degree of medical probability as to

11   if radiation would have been given to that area

12   in what you deem to be an appropriate time

13   period, whether that tumor would have been

14   prevented?

15   A.   Are you talking about the metastatic

16   tumor?

17   Q.   Yes.

18   A.   Yes.  I do have a opinion, yes.

19    Q.   What is that?

20    A.   That without radiation the chances of it

21    occurring would be about 30 to 35 percent --

77

1    that's the local recurrence rate -- and with it

2    it would have been 3 to 5 percent.

3    Q.   Dr. Smith, the tumor that was in the

4    opposite breast, is there any way for us to sort

5    of extrapolate back as to approximately when

6    that began?

7        MS. ZORK:  I'm going to object because I

8    don't know of a tumor in the opposite breast,

9    and if there is some specific record that you're

10    referring to --

11        MS. CERNIGLIA-LOWENSEN:  Dr. Smith

12    mentioned it.

13        THE WITNESS:  I mentioned the right

14    breast.

15    Q.   Fine.  The right breast.

16    A.   The right breast.

17        MS. ZORK:  I don't know if we're trying to

18    trick people here.

19    MS. CERNIGLIA-LOWENSEN:  No, not at all.

20    THE WITNESS:  This was a new tumor.

21    MS. CERNIGLIA-LOWENSEN:  Lesley, if you

78

1     have an objection, I'm going to ask the doctor

2     to leave the room.  I think you're trying to

3     coach him.

4          MS. ZORK:  No, I'm not.  Let's have the

5     doctor leave the room then if we need to clear

6     something up.  I think we have cleared it up.

7          MS. CERNIGLIA-LOWENSEN:  That's fine, but

8     in the future if you have an objection, if you

9     say objection and ask the doctor to leave, I

10     would appreciate that.

11          MS. ZORK:  Fine.

12     Q.   Sorry, Doctor.  You were talking about the

13     right breast and the tumor.

14     A.   Which was a new tumor.

15     Q.   Is there any way to extrapolate when that

16     would have occurred or begun?

17     A.   Well, first of all, it was noninvasive

18     cancer, so extrapolation wouldn't make any

19    difference because the tumor itself -- the

20    survivorship with DCIS if it's truly DCIS is

21    about 100%.  So it would have no impact on her

79

1    outcome.

2    Q.    Do you have an opinion to a reasonable

3    degree of medical probability as to whether

4    radiation alone would have prevented the

5    formation of that new tumor in her right breast?

6    A.    I've already given you the figures on

7    that.

8    Q.    What would that be?

9    A.    35% versus 3 to 5 percent.  That's local

10    recurrence on a new tumor in the breast.

11    Q.    And that's the same as the one you gave me

12    for the parasternal border?

13    A.    Exactly, because that's chest wall.

14    Q.    Doctor, initially when you listed for me

15    your opinions, you talked about and I wrote look

16    at genetics, and I think I've explored that with

17    you, but I don't know whether I've missed

18    something or not.

19      Is there something else specifically to

20    the genetics with Miss Pollard that had it been

21    explored in a more thorough manner, you believe

80

1    it may have made a difference in the outcome

2    here?

3    A.    No.  I listed that as an issue that would

4    be of interest to any oncologist.  I mean when

5    you see a situation like this, you always think

6    in terms of what about her daughter, that sort

7    of thing, just being concerned about offspring

8    to try to avoid something like this in that

9    individual.

10    Q.    So you're more concerned about the

11    potential impact on future offspring and family

12    members of Miss Pollard?

13    A.    In generations, right.

14    Q.    So you're not saying that a look at

15    genetics by Dr. Gupta would have made a

16    difference to Miss Pollard?

17    A.    No, because I mean everything that was

18    reasonably available she had done.

19     Q.    What do you mean?  I'm sorry.

20     A.    Well, she had the ER-PR, proliferation

21     index, Her 2 Neu was negative, and S phase and

81

1    all of that stuff.

2    Q.    Dr. Smith, do you have any other opinions

3    concerning standard of care as it relates to Dr.

4    Gupta?

5    A.    I think we've covered most of it as far as

6    I can think right now.

7        MS. CERNIGLIA-LOWENSEN:  I'm going to pass

8    you along to Mr. Adams.

9        MR. ADAMS:  Let's take a break.  Let's let

10    Joan and I talk for a second and then we'll

11    resume.

12        (Whereupon a brief break was taken, after

13    which the following was heard:

14        MS. CERNIGLIA-LOWENSEN:  Just a couple of

15    quick ones, and then I will be finished and I'll

16    pass you on to Mr. Adams and Miss Hanrahan.

17        EXAMINATION BY MS. CERNIGLIA-LOWENSEN:

18    Q.    Are there any side effects to

19    chemotherapeutic agents?

20    A.   Side effects?

21    Q.   Yes, sir.

82

1    A.   Yes, but fortunately now -- the main side

2    effect used to be nausea and vomiting, and now

3    with the advent of steroids, dexamethazone,

4    Lorazepam, which is a tranquilizer, but a very

5    good antiemetic, and some of the newer classes

6    of antiemetics such as Zofran and Kytril we've

7    just about got that totally wiped out.  Hair

8    loss, which occurs about two weeks after you

9    start chemotherapy, is totally reversible.  If

10   the patients get anemic, we now have

11   erythropoietin in the form of Procrit and

12   Epoetin to correct the anemia.  If they have

13   problems with white counts, we now have Neupogen

14   or the long-acting granulocytic colony

15   stimulating factor, which you give one shot and

16   it will last a week.  So you can prevent

17   neutropenic sepsis, and the death rate from

18   chemotherapy now is we haven't had anybody die

19     in years from chemotherapy.  Granted, it's no

20     picnic.

21     Q.   Is there currently a reported death rate

83

1    associated with chemotherapy?

2    A.   Very minimal.

3    Q.   Do you have any idea, estimate?

4    A.   Probably less than 1% with this type of

5    chemotherapy anyway.  Then, of course, the

6    biggest thing most people complain about is

7    fatigue.

8    Q.   You said presently.  Was that true in 1998

9    also?

10    A.   Yes, sure.

11        MS. CERNIGLIA-LOWENSEN:  I don't have any

12    other questions, Doctor.

13        MR. ADAMS:  I have no questions.

14    A.   I do have one other thing.  You asked me a

15    question just before you left, and I got to

16    thinking about it after you left.

17        I think really that one thing I would be

18    critical of Dr. Gupta would be that I think he

19     should have really stressed how important her

20     treatment was and how important it was for her

21     to stay there and get started, not knowing what

84

1   was going to happen in England.

2   Q.   Are you assuming, Doctor, by that

3   statement or that criticism, if I may, that Dr.

4   Gupta did not stress to Miss Pollard that her

5   further treatment was important?

6   A.   Well, it didn't come out to me anyway in

7   his deposition that he did that, and that's what

8   I'm going by.

9   Q.   So you're basing that criticism upon your

10  review of the deposition of Dr. Gupta?

11  A.   Yes.  As I said, I didn't have a chance

12  because I just got these yesterday.  Mrs.

13  Pollards' deposition and Sergeant Pollard's

14  deposition, I didn't have a chance to review

15  those.

16  Q.   When you say stress to a patient, what

17  does the standard of care require a doctor to do

18  to stress that to a patient?  I mean what are

19     the words?  What are the actions?

20     A.    The words are this:  What your chances of

21     relapse would be, what your chances of

85

1    alteration and survival would be, and what

2    benefit that chemotherapy would have bestowed

3    upon you and the side effects and the risk

4    factors associated with chemotherapy, and also

5    the issue of the radiation, how important that

6    was, too.

7    Q.    Did you think of anything else while we

8    took our little break?

9    A.    No.  Just the last point was the issue of

10    how important the timing of treatment was.  In

11    other words, this lady had an inordinate delay

12    in even reaching Dr. Gupta from October until

13    December and that the delay was already there,

14    and we know that patients that are treated in a

15    timely fashion, and that's why the protocols are

16    designed that way when they do them, it does

17    have a difference in outcome.

18    Q.    Doctor, since you brought timing up, I

19    want you to assume hypothetically that Dr. Gupta

20    would have begun treatment had Miss Pollard

21    stayed here in the United States sometime in

86

1    December or January.

2        Do you have an opinion to a reasonable

3    degree of medical probability what her chances

4    of survival would have been in that event?

5    A.   Well, as I say, there is no data that you

6    can go to that will give you that information,

7    but we do know that based on Dr. Skipper's work,

8    as I mentioned before, about what happens to

9    tumors when you remove the primary site, which

10   is usually the largest volume of tumor, that's

11   when they start to move, and that's the ideal

12   time to kill them.

13       We also know that the reason they start

14   protocols is because it can have an impact on

15   outcome and delay, and that as far as starting

16   her in December when he saw her, we know that

17   the figures could have been slightly different

18   than what I've already quoted to you.  It

19    wouldn't have been too far off; you certainly

20    would have lost maybe a few percentage points or

21    something, but I think the data pretty well

87

1    stands as far as what I said before.

2    Q.   When you say you might have lost some

3    percentage points, were you saying because of

4    the delay from October to December?  Is that

5    what you're saying?

6    A.   Yes.

7    Q.   But you can't quantify that?

8    A.   I can't give you an article and say go

9    read this article because nobody has ever really

10    studied that and quantified it.  All I know is

11    that when you read textbooks about the treatment

12    of cancer in general, you do sacrifice something

13    by delay in treatment especially in breast

14    cancer.  In pancreatic cancer and renal cancer

15    and gastric cancer and lung cancer it probably

16    doesn't make any difference because they die

17    anyway.

18    Q.   Reviewing this case and everything you

19     have reviewed thus far, is there a point in time

20     that you can point to and say on X date

21     intervention with chemotherapy and radiation

88

1    would no longer have to a reasonable degree of

2    medical probability prevented Miss Pollard's

3    recurrence?

4    A.    Is there a point in time?

5    Q.    Yes, sir.

6    A.    Well, the way the British -- well, we know

7    what happened.  The delay in radiation therapy

8    did not prevent her from getting this chest wall

9    recurrence, so we know the answer to that.  She

10    never had chemotherapy at all, so we don't know

11    the answer to that, and I don't think anybody

12    could tell you to a reasonable degree of medical

13    certainty at one particular point in time.

14        We do know that by the time she left

15    England it wouldn't have made any difference.

16    Certainly six months I think probably would not

17    have made any difference at all.  In fact, I do

18    occasionally see patients where the delay has

19     been six months.  Fortunately, those patients,

20     most of them have been ER and PR positive, so we

21     put them on Tamoxifen.  Occasionally patients

89

1   will refuse chemotherapy and then change their

2   mind, too.

3   Q.   So you said that you know that six months

4   -- we know at that point the intervention, the

5   radiation, did not prevent it; correct?

6   A.   Right.  We know that.

7   Q.   Do we know at four months whether it would

8   have prevented it?

9   A.   I don't think you really know.  I mean I

10   think that there is a reasonable chance it would

11   not have at four months, certainly more than

12   50%, but I can't back that up with any hard

13   data.  We do know one thing, and that is when

14   they're on chemotherapy prior to radiation and

15   there is a 12-week delay, there is no difference

16   in outcome as far as radiating patients with

17   lumpectomies.

18       MS. CERNIGLIA-LOWENSEN:  I don't have any

19    other questions, Dr. Smith.  Thank you.

20         MR. ADAMS:  No questions.

21

90

1          EXAMINATION BY MS. HANRAHAN:

2    Q.    Doctor, this is Catherine Hanrahan.  Can

3    you hear me?

4    A.    Yes, I can.

5    Q.    I just have a few questions.  On the

6    break, as Lesley indicated, I represent Humana

7    Military Healthcare Systems, Inc.

8         You have identified your opinions here

9    this afternoon.  Do you hold any opinions to a

10    reasonable degree of medical probability which

11    you have not identified?

12    A.    I think we've covered about everything.

13    Q.    The opinion, the general characterization

14    that I heard you say with respect to Dr. Gupta

15    concerned the generalization where you testified

16    that Dr. Gupta deviated from accepted standards

17    of care because there was a delay in care.  Is

18    that a correct characterization of your general

19    statement?

20    A.   Well, there were two phases of the delay.

21    One phase was getting the patient to Dr. Gupta.

91

1     In other words, you went from October when she

2     felt the lump until December when she was seen

3     by him, and I guess from what I gather from

4     that, what that infers is he was not contacted

5     in a timely fashion to see her.  Secondly, that

6     he sent her to England where he didn't really

7     know what was going to happen, and we know what

8     happened when she went over there.  They didn't

9     really do anything in a timely fashion.  They

10    didn't give chemotherapy, and radiation was

11    quite late in getting started.

12        Being an ex-military man myself, I know

13    what the military usually does in that

14    situation.  They would not send somebody to a

15    foreign country with a disease where they need

16    treatment.  They would have kept them here and

17    treated them on site or at Walter Reed or

18    Bethesda depending on the branch of service.

19          So I think that was basically -- I think

20      that he contributed to the delay by sending her

21      over there without any therapy, without any idea

92

1    that they were going to follow his

2    recommendations.

3    Q.   Let me ask you about the window of time

4    that concerns Dr. Gupta's interaction with Mrs.

5    Pollard as compared to any issues associated

6    with Mrs. Pollard first seeing Dr. Gupta.

7        Let me back up.  Do you have an opinion

8    within a reasonable degree of medical

9    probability that Dr. Gupta had a duty to address

10   Sergeant Pollard's orders and have them changed

11   by the United States military?

12   A.   I think he had a duty to see that she

13   stayed in this country to be treated here.

14   Q.   What do you base that statement on that

15   Dr. Gupta had a duty to make certain Mrs.

16   Pollard stayed in the United States?

17   A.   When I was in the Air Force, this was

18   basically a standard of care as far as we

19    physicians.  I had at least two cases where

20    patients were scheduled to be shipped out to

21    South Vietnam, and I insisted that this

93

1    particular person could not go because there was

2    a situation that required therapy.  The patient

3    had a hernia, and I wasn't about to send him to

4    South Vietnam with a hernia.

5        I think that Dr. Gupta's responsibility --

6    even though he wasn't on active duty; he was

7    serving as a military representative -- was to

8    make it clear to Sergeant Pollard's superiors

9    that his orders should be changed since it

10    wasn't a critical thing that he be transferred

11    to England until her therapy would be completed.

12    It would have only taken about three months --

13    no; it would have taken about five months to

14    complete all of her therapy.

15    Q.    So your basis to say that the standard of

16    care of a treating physician attending to

17    military dependents dictates that those

18    physicians have a duty to make certain a patient

19    such as Mrs. Pollard stays within the United

20    States is based on your experience back when you

21    were active duty?

94

1    A.   Well, it's also based on the fact that I

2    know, having dealt with military people in this

3    area, that patients are not sent — in fact,

4    they're even brought back like they did her,

5    which it was very obvious she needed special

6    care, that the military prefers to treat those

7    patients in their facilities rather than sending

8    them to England or any other country and have

9    them treated in the nonmilitary environment.

10   Q.   I understand preferences.  What I'm really

11   dealing with here, Doctor, is duties and

12   standard of care and whether or not there is a

13   dictated duty imposed on physicians in your

14   opinion to dictate that patients who are

15   receiving care as dependents of the military

16   system, those physicians must dictate they stay

17   in the United States if care is required.

18       MS. ZORK:  Objection.  He has asked and

19    answered that now three times.

20    A.   He was required to notify Sergeant

21    Pollard's superior officer that his wife had

95

1    cancer and needed therapy, and I know that

2    superior officer would have made sure that she

3    stayed there.  I know that for a fact.

4    Q.    That's the next conclusion that you've

5    rendered is that in your opinion you know for

6    certainty that Sergeant Pollard's superior

7    officer would have then changed Sergeant

8    Pollard's orders?

9    A.    I know that unequivocally.

10    Q.    What do you base that knowledge on?

11    A.    Well, I can tell you this:  All you have

12    to do is call the commanding officer at Walter

13    Reed Army Hospital and ask him what is done in

14    that situation, and you will find out for

15    yourself.

16    Q.    That's not my question, though, Doctor.

17    I'm asking you what do you base your knowledge

18    on.

19    A.   Because I have had a lady who

20    unfortunately is dead now.  Her husband was

21    scheduled -- he was in the Army and he worked in

96

1    embassies.  They were scheduled to go to Saudi

2    Arabia.  She had active breast cancer.  I wrote

3    a letter.  He took it to his commanding officer,

4    and he changed the orders.  She stayed.  In

5    fact, he stayed here until she succumbed to her

6    illness.

7    Q.    When was that?

8    A.    That was within the last three years.  Her

9    name was Edna Mason.

10   Q.    So your knowledge that Sergeant Pollard's

11   superior officer would have changed his orders

12   is based upon your experience with that patient?

13   A.    No.  It's based on the fact that I've

14   dealt with the military on and off in this area

15   all of my life that I have been here, and if you

16   have any doubts about that, then why don't you

17   contact the people I've asked you to contact.

18   You can even call the Surgeon General if you

19    want to, and he will tell you the same thing.

20    This is standard operating procedure in the

21    military.

97

1    Q.   Do you have any understanding as to

2    whether an active duty personnel's orders would

3    be changed depending upon a dependent's health

4    care status, whether it depends on what country

5    that person is to be transferred to?

6    A.   It doesn't make any difference.

7    Q.   Why is that?

8    A.   Because the standard of care in a lot of

9    European countries is not the same as it is in

10   the U.S.  It's a socialized system in most

11   countries and it's not the same.  I can tell you

12   this:  If Sergeant Pollard was the only person

13   qualified to do a job, then he would have gone

14   over and his wife would have stayed here.

15   Q.   Well, isn't that an option that they have

16   no matter what?

17   A.   To have the husband leave and the wife

18   stay?

19    Q.    Yes.  Isn't that an option no matter what?

20    A.    Yes, it would be an option.

21    Q.    In this case are you aware of that option

98

1    not being available to the Pollards?

2    A.   I'm aware of the fact that I don't think

3    Mrs. Pollard understood what a serious situation

4    this was with her.  She should have because of

5    her sister, who was apparently dying or at least

6    had metastatic disease, that that would

7    certainly be an option, but most of the time

8    when a person is basically not a critically

9    essential person to perform a job, then it's

10   very easy to get your orders changed.

11   Q.   I understand what you said there, Doctor,

12   but my question is this:  Do you have any

13   knowledge or understanding that indicated that

14   Mrs. Pollard regardless of Sergeant Pollard's

15   orders did not have the option to stay within

16   the United States?

17       MS. ZORK:  Objection.  He just answered

18   the question.

19    A.   How many times do you want me to tell you?

20    I mean I told you what I've said and I've said

21    it three times now.

99

1       What I'm saying is that usually what

2     happens -- in fact, when Sergeant Mason asked me

3     to write this letter, he said, Dr. Smith, all

4     you have to do is write me a letter stating my

5     wife has active breast cancer and needs

6     treatment here, and then my orders can be

7     changed and they will leave me here with my

8     wife, which is what most husbands would want to

9     do if your wife has cancer and is going to go

10     through chemotherapy because, in other words, so

11     many of them have children to be concerned about

12     or at least to drive them back and forth to the

13     office, especially since military people usually

14     are not in the same town where the families are

15     located.

16     Q.    So in the instance that you have had your

17     personal experience with in the last three years

18     you actually were approached by the active

19     military personnel asking for you to take a

20     step?

21     A.   I did not know he had orders to be

100

1    transferred.  When I found out that, I was more

2    than happy to do that.

3    Q.    At his request?

4    A.    Well, I mean he told me he was being

5    transferred and in the same breath said could

6    you write a letter, and I said yes.

7    Q.    And it's your understanding that the

8    location outside the States has no bearing on

9    the action of the military on whether or not the

10    individual's orders would be changed?

11        MS. ZORK:  Objection; asked and answered.

12        MS. HANRAHAN:  Lesley, I've heard like a

13    long answer to very simple questions, so I want

14    to make certain I've heard the response.

15    A.    Well, the response was that I'm not aware

16    of whether or not a location would make any

17    difference.

18    Q.    Okay, which is a little different than I

19     think I've heard, but I appreciate your answer.

20     A.   It's not any different than what you've

21     heard.  It's exactly what I said before, that as

101

1   far as I know it would not make any difference

2   whether she was going to Moscow or to Bangladesh

3   or to London, England, or to what have you.

4   That would not make any difference as far as I

5   know.

6   Q.   Are you aware of any steps that were taken

7   with respect to Mrs. Pollard's medical situation

8   and diagnosis with respect to interaction with

9   individuals in England with those in the United

10   States before Mrs. Pollard went to England?

11   A.   All I know is that she was given I guess

12   -- I know there is controversy about that.  I'm

13   assuming that she received copies of her records

14   at least.  As I understand, when you're

15   transferred like that, your military record goes

16   with you, so does the dependent's record.  At

17   least that's what we did.  In fact, I see

18   patients now that bring their military record

19     with them when they're being seen at Walter

20     Reed.  They're retired military and decide to

21     come and see me.  They bring their records with

102

1   them.  So I would assume that Sergeant Pollard

2   took his record and any of the kids' records and

3   her record with him.

4   Q.   That's all the knowledge you would have

5   about any interaction between --

6   A.   As far as I know Dr. Gupta did not call

7   anybody in England.  I don't think he even knew

8   which hospital she would be going to.  I don't

9   think he had any idea which clinic she might

10  have been seen in or why.

11  Q.   Would any information with respect to any

12  interaction had between coordinating care in

13  England and communication with Dr. Gupta have

14  any bearing on the opinions you've rendered?

15      MS. ZORK:  It depends on the information.

16  A.   I guess it would depend on what

17  information was given to him.

18      MS. CERNIGLIA-LOWENSEN:  Once again for

19    the record, Miss Zork just made a comment that

20    was repeated by Dr. Smith, and I want to render

21    my objection to that.

103

1          MS. ZORK:  Can I just interpose something

2     here?  Cathy, if you're asking him about

3     documents and records that have not been

4     produced in discovery, I'm going to object and

5     I'm not going to let him answer questions if

6     you're referring to records about communications

7     with people in England that you have not turned

8     over to me so that I could provide to my expert.

9     So I'm going to instruct him not to answer any

10     questions based upon hypothetical records that

11     might have additional information in it that

12     have not been provided.

13          MS. HANRAHAN:  Lesley, I have no records

14     at all, so it's not based on anything such as

15     that.  I'm not certain an instruction not to

16     answer is an appropriate objection, but I'm not

17     basing the question on any records.

18          MS. ZORK:  I can't instruct him not to

19      answer, but I can also certainly end the

20      deposition with respect to those questions.

21          MS. HANRAHAN:  I'm not basing them on any

104

1    records.  I'm just asking if he has any

2    knowledge of any interaction.  It's not based on

3    any records at all.

4         MS. ZORK:  Other than the deposition of

5    Dr. Gupta, which he testified about.

6         MS. HANRAHAN:  Well, he didn't testify

7    about any knowledge of interaction, which is why

8    I asked the question, but we can move on.

9    Q.   Doctor, when is it that you were last

10   active duty with the military?

11   A.   I was discharged in 1963.  I was in the

12   Reserves from 1963 until 1970.

13   Q.   In your position you were never based in

14   Georgia at the location where the Pollards were

15   located at the time of the diagnosis in this

16   case?

17   A.   No, but I spent four years in medical

18   school there in Augusta.

19    Q.    At this point you don't have any knowledge

20    from any of the review of the materials that

21    you've done as to the type of services that

105

1    Sergeant Pollard was being transferred to

2    England to perform?

3    A.   No, I do not.

4    Q.   Are you familiar at all with anything that

5    you have reviewed as to what Sergeant Pollard's

6    expertise or military experience was?

7    A.   I think if you were listening earlier on,

8    you probably heard me say that I received four

9    depositions yesterday, and I didn't have a

10   chance to look at the depositions of Sergeant

11   Pollard or Mrs. Pollard.

12   Q.   Yes, I did hear that, Doctor.

13   A.   So I don't have any information about that

14   at all, no.

15   Q.   I know you have also spoken with Miss

16   Zork, so I'm not certain whether you have any

17   information in that regard, but you do not at

18   this time.

19   A.   I don't understand what you're saying.

20   What does it have to do with what we're talking

21   about by bringing Mrs. Zork into the situation

106

1    here?

2    Q.   Because when I asked you whether you had

3    any knowledge of any of that information, I

4    wasn't just limiting it to your opportunity to

5    review the deposition testimony.  It obviously

6    could have included any communications you had

7    with Miss Zork.

8    A.   No, she did not tell me what Sergeant

9    Pollard did.  I have no earthly idea.

10   Q.   I appreciate that, but that's why I asked

11   the question in the manner that I did.

12   A.   Okay.

13   Q.   Based upon the materials that you have

14   reviewed do you have any knowledge or

15   understanding as to why Mrs. Pollard first saw

16   Dr. Gupta in December versus at an earlier point

17   in time?

18   A.   I think when I was asked that question

19     previously, I made the comment that apparently

20     Dr. Gupta was not aware of her existence I would

21     assume.

107

1    Q.   I understand that part.  What I'm asking

2    you is whether you have any understanding as to

3    why Dr. Gupta was not aware of her existence

4    before the December consult.

5    A.   Well, nobody I guess told him that she was

6    a patient that he would be seeing.

7    Q.   You discussed in depth the studies that

8    you referred to in response to survival data,

9    and I don't want to go into all of that again

10   with you, but I was a little confused about

11   certain numbers, and I just want to make certain

12   that I understood what you said.  I apologize if

13   I didn't hear the number exactly correctly, but

14   I believe that you quoted both five- and

15   ten-year survivability percentages.

16   A.   I gave you ten years.

17   Q.   Okay.  I thought I had also heard

18   something in a five-year study about 58%.

19   A.   No.  That was ten years.

20   Q.   Okay.  But there was also a 68%.

21   A.   That was ten years.

108

1    Q.    They were both ten-year studies?

2    A.    What it was, it was a ten-year study

3    comparing no chemotherapy with chemotherapy.

4    Q.    And that was the difference between the 58

5    and 68?

6    A.    68.3 versus 58, yes.

7    Q.    I'm sorry.  I thought I heard a

8    distinction of five and ten years.

9    A.    No.

10        MS. HANRAHAN:  Those are all the questions

11   I have.

12        MS. CERNIGLIA-LOWENSEN:  Just one thing in

13   follow up.

14        EXAMINATION BY MS. CERNIGLIA-LOWENSEN:

15   Q.    Doctor, did a physician clear Miss Pollard

16   to go to England?

17   A.    I don't know.  I didn't see any record of

18   anything.

19     MS. CERNIGLIA-LOWENSEN:  That's all I

20     have.  Thank you, sir.

21     MS. ZORK:  I just want to make sure that
                                    109

1     everybody understands including Mr. Adams that

2     Dr. Smith is going to be offering opinions in

3     all the areas that have been identified in his

4     designation.

5     MR. ADAMS:  But he said he had given all

6     of his opinions.

7     MS. ZORK:  With respect to Dr. Gupta.  So

8     I don't know --

9     MR. ADAMS:  Then I misunderstood.

10     MS. ZORK:  The question that Miss

11     Cerniglia-Lowensen asked him was what his

12     opinions were with respect to Dr. Gupta, and

13     that's where he started and that's where she

14     wrapped it up with him.  He has alluded in

15     response to some of Miss Hanrahan's questions to

16     his opinions with respect to the initial delay

17    in getting to Dr. Gupta.  We will be asking him

18    about that as designated in plaintiff's

19    designation of experts.

20        MS. HANRAHAN:  This is Cathy.  I did hear

21    that distinction and I appreciate that.  I

110

1    understand that.  Maybe I'll just ask the global

2    question.  I think he has responded to that.

3        EXAMINATION BY MS. HANRAHAN:

4    Q.   With respect to Humana Military Systems,

5    Inc., Doctor, you're not rendering any

6    independent opinions about Humana; correct?

7    A.   I've never heard of Humana.  I've heard of

8    Humana Healthcare, but...

9        MS. HANRAHAN:  I understand, Lesley, what

10    you're saying.  That's why I focused my

11    questions where I did.

12        MS. ZORK:  Okay.

13        MS. HANRAHAN:  So really, Larry, it's your

14    call.

15          EXAMINATION BY MR. ADAMS:

16     Q.   Dr. Smith, since we have had that

17     clarification from plaintiff's counsel, what

18     opinions do you have with respect to the other

19     healthcare providers that were employed by the

20     military -- well, let me rephrase that -- that

21     were active duty and that were not independent

                        111

1     contractors?  Do you have any opinions with

2     respect to, for instance, the pathologists, Dr.

3     Adams and Dr. Huang?

4          MS. ZORK:  I'll object to the form of the

5     question.

6     Q.   You may answer.

7     A.   Yes.  As far as the interpretation of the

8     slides, I have no problems with that because he

9     specified at the bottom of that report that it

10     was atypical.  It wasn't typical medullary, and

11     to most oncologists that wouldn't make any

12     difference anyway.  It depends on the other

13    things.

14       I think the fact that they didn't send the

15    tissue out for what I would call the biological

16    or the flow-type studies that would be done; in

17    other words, ER, the PR, the KI67, the assays,

18    the Her 2 Neu, they were negligent in not

19    sending those out when they should have, which

20    was at the time the tissue was handled,

21    resected, and whatever they had to do with it.

112

1    That should have been sent out right away.  So I

2    do criticize them for that.  That was it.

3    Q.   Let me stop you right there.  I understand

4    you think that the delay was negligent.  How

5    long would you characterize that delay?

6    A.   Well, it should be sent out -- in other

7    words, the standard of care is for it to go out

8    immediately, and they usually send them to Mpath

9    or one of the referring installations for that.

10      All of our pathologists -- of course, when I was

11    in medical school in Augusta, they didn't do

12    that, but I do know that knowing some

13    oncologists in the Augusta area -- I guess Dr.

14    Nixon is in Charleston now, but that's what they

15    do at the medical college I know.  I mean in

16    the American College of Pathology you don't

17    delay it for a month or two to decide to send

18    that out.

19    Q.    What effect did that have on this

20    particular case to the best of your

21    understanding?

113

1    A.    Well, as it turns out, my opinion is that

2    the surgeon usually is the one that contacts the

3    oncologist and the radiation therapist, and so

4    in reality I mean since she didn't see Dr. Gupta

5    until December, if he was going to plan to give

6    chemotherapy, that would have been another

7    three-week delay.  In other words, I guess he's

8    the one who discovered it wasn't sent out.  It

9    would have delayed it another three weeks, so it

10   would have added to the delay that they didn't

11   send it out, but, as I say, there was already a

12   delay by the time he found out about the case

13   and saw her.

14   Q.   If I understand your testimony then, you

15   have a criticism of Dr. Sees, the surgeon, in

16   not making contact with Dr. Gupta, the

17   oncologist, on a timely basis?

18   A.   I can tell you that I would say almost all

19   of the cases that are referred to me, breast

20   cases, I'm called by the surgeon of record that

21   does the surgery.

114

1    Q.   Do you have an electronic system for

2    notifying particular specialists about the

3    result?  Do you understand my question?

4    A.   I think I do.  In other words, if the

5    surgeon doesn't -- once they call us, which what

6    they do is they usually call you right after

7    they get the path. report back, and if the data

8    is not readily available, and I assume you mean

9    electronically, we are on line with the INOVA

10   Heath Systems computer so we can just go on the

11   computer and get the data we need.

12       Now, of course, with HCFA there are some

13   problems.

14   Q.   Well, this predates HCFA, so that's not an

15   issue in this case; correct?

16   A.   It wouldn't have been then.  We are on

17   line and we can get the data.

18   Q.   So what you're saying is as a result of

19   that there was approximately a three- to

20   four-week delay in getting the information that

21   Mpath eventually gave to Dr. Gupta into his

                                        115

1    hands?

2    A.   In other words, the ER and the PR, you can

3    get that in less than a week.  The Her 2 Neu

4    takes longer, and the KI67, if they do it in

5    house, you can get that quickly, too.  The S

6    phase takes longer because that's done in a flow

7    cytometer is what they do, but the Her 2 Neu,

8    and if you have to do FISH, which is the

9    fluorescent in situ hybridization technique for

10    patients that are two plus or three plus -- we

11    confirm it with FISH.  That takes a little

12    longer.  That's something that doesn't enter

13    into the adjuvant therapy program anyway.

14    That's for later on.

15        MR. ADAMS:  I don't have anything further.

16        (Whereupon at 7:30 p.m. the deposition was

17    concluded.)

18

19

20

21

                                116

1        CERTIFICATE FOR READING AND SIGNING

2

3        I hereby certify that I have read and

4    examined the within transcript and the same is a

5    true and accurate record of the testimony given

6    by me.

7            Any additions or corrections that I

8    feel are necessary I have listed on the separate

9    ERRATA SHEET enclosed, indicating the page and

10    line number of each correction.

11

12

13

14

15

16

17

18    ----------         ----------------------

19    DATE          LEROY FLEMING SMITH, JR., M.D.

20

21