1

1      IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MARYLAND
2          CASE NO. WDQ-02-764

3

4   VERONICA POLLARD, et al.,

5         Plaintiffs,

6   vs.

7   RAJ R. GUPTA, M.D., et al.,

8         Defendants.
   _____/
9

10

11      DEPOSITION OF JAMES VINCENT FIORICA, M.D.

12
              Wednesday, August 27, 2003
13             2:35 p.m. - 4:14 p.m.

14
              H. Lee Moffitt Cancer
15             12902 Magnolia Drive
                Suite 3057L
16             Tampa, Florida 33612

17         _____

18

19

20
   REPORTED BY:
21
   Lori A. Clements, RPR-CP

22   Notary Public, State of Florida

23   Esquire Deposition Services - Tampa, Florida
     813-221-2535 (800-838-2814)
24   Job No. N557229

25

2

1  APPEARANCES:

2
    LESLEY S. ZORK, ESQUIRE
3    Bruce J. Klores & Associates
     915 Fifteenth Street, N.W.
4    Third Floor
     Washington, D.C. 20005
5    (202) 628-8100

6        Attorney for Plaintiffs

7
    JOAN CERNIGLIA-LOWENSEN, ESQUIRE
8    Morgan Shelsby Carlo Downs & Everton
     4 North Park Drive
9    Suite 404
     Hunt Valley, Maryland 21030
10   (410) 584-2800

11       Attorney for Defendant Raj R. Gupta, M.D.

12
    LARRY ADAMS, ESQUIRE (Via telephone)
13   Assistant United States Attorney
     United States Attorney's Office
14   6625 U.S. Courthouse
     101 West Lombard Street
15   Baltimore, Maryland 21201
     (410) 209-4801
16
         Attorney for Defendant United States
17

18   CATHERINE A. HANRAHAN, ESQUIRE (Via telephone)
     Wilson, Elser, Moskowitz, Edelman & Dicker LLP
19   1341 G Street, N.W.
     Fifth Floor
20   Washington, D.C. 20005
     (202) 626-7660
21

Attorney for Defendant Humana Military
22          Healthcare Services

23

24

25

3

1           INDEX

2                           PAGE

3  Examination by Ms. Cerniglia-Lowensen...............4

4  Examination by Mr. Adams..........................59

5  Examination by Ms. Hanrahan.......................60

6  Certificate of Oath...............................67

7  Certificate of Reporter...........................68

8  Signature Page/Errata Sheet.......................69

9  Witness Notification Letter.......................70

10

11                    EXHIBITS
12
   NO.  DESCRIPTION                          PAGE
13
   1   Curriculum vitae of James Vincent Fiorica,
14       M.D............................................7

15  2   Letter dated 12/23/02 from Patricia C. Karppi
        to James Fiorica, M.D........................18
16
   3   One page of handwritten notes.................20
17
   4   One page of handwritten notes.................21
18
   5   Statement for Services Rendered dated
19      7/23/03.......................................22

20  6   Letter dated 4/17/03 from Lesley S. Zork to
        James Fiorica, M.D. with attached Pollard Time
21      Line..........................................66

22

23

24

25

4

1        The deposition of JAMES VINCENT FIORICA,

2   M.D., was taken pursuant to notice by counsel for the

3   Defendant Raj R. Gupta, M.D., on the 27th of August,

4   2003, commencing at 2:35 p.m. at H. Lee Moffitt

5   Cancer, 12902 Magnolia Drive, Suite 3057L, Tampa,

6   Florida 33612.  Said deposition was reported by Lori

7   A. Clements, RPR-CP, Notary Public, State of Florida.

8        - - - - - - - - -

9   WHEREUPON:

10        JAMES VINCENT FIORICA, M.D.,

11   a witness, having been duly sworn to tell the truth,

12   the whole truth and nothing but the truth, was

13   examined and testified as follows:

14            EXAMINATION

15   BY MS. CERNIGLIA-LOWENSEN:

16   Q   Good afternoon, Doctor.  My name is Joan

17   Cerniglia-Lowensen, and I'm here today representing

18   Dr. Gupta.  You have been identified as an expert in

19   a case involving Veronica Pollard.

20        Is that your understanding as to why you're

21   here?

22    A    Correct.

23    Q    Can you please state your full name for the

24  record?

25    A    James Vincent Fiorica.

5

1     Q    Dr. Fiorica, have you had your deposition

2    taken in the past, sir?

3     A    Yes.

4     Q    Do you know about on how many occasions?

5     A    Probably 15 to 20.

6     Q    And in those 15 to 20 cases, were you

7    serving as an expert, as a treating or as a defendant

8    or a mixture of all the above?

9     A    Expert.

10     Q    The 15 or so times that you served -- that

11    you provided a deposition as an expert, can you give

12    me either numerically or as a percentage the number

13    of times that you've testified on behalf of the

14    patient as compared to the health care provider?

15     A    It's approximately 50-50.

16     Q    Do you advertise your services for review

17    of records and to act as an expert?

18     A    No.

19     Q    How do people come to learn of your

20    availability to do this, sir?

21     A    I'm not sure, actually.

22    Q    Doctor, if I can review for you just as an

23    overview the basic rules of a deposition, if at any

24    time I ask you a question that's unclear, if you'll

25    make me aware of that, I'll be happy to rephrase it.

6

1   Is that agreeable?

2       A    Okay.

3       Q    And also, for the purposes of the

4   transcript as well as the two attorneys that are by

5   phone, if you can keep your responses verbal, that

6   will make it easier.

7       A    Okay.

8       Q    And also many times if you answer yes or no

9   to a question, just that one word, when you're on the

10  phone that gets clipped off.  So if you can say yes,

11  I agree with that or no, I don't agree with that,

12  that will make it easier for them.

13      A    Yes, I understand.

14      Q    Thank you.  Doctor, you have provided me

15  with a copy of your deposition.  It has a date on the

16  corner --

17      A    That's my CV.

18      Q    I'm sorry.  Yes.  Your CV.  There's a date

19  on the corner December 2002.  Is that the most recent

20  version of your curriculum vitae?

21      A    I may have one more recent than that, but

22   that's the date it's dated.

23        Q    Are there any changes that are necessary to

24   make this a more up-to-date copy?

25        A    There may be a few additions on

7

1  publications or some of the in press may have been

2  published.  But as a general, it's nearly the same.

3      Q    Doctor, if I can have you continue to have

4  that in your hand, briefly take a look at your

5  publication section and if you could tell me if any

6  of the articles are germane to the issues that we're

7  going to talk about today regarding Ms. Pollard.  You

8  can do that just by circling them or whatever.

9      A    Let me review them.

10     Q    Sure.

11     A    Reference 41, reference 57, reference 65,

12  reference 73, reference 89, reference 93, reference

13  94, reference 95, reference 117, reference 118,

14  reference 119, reference 121, reference 125,

15  reference 126, reference 132; and in the

16  nonpeer-reviewed section, reference 2, reference 3,

17  reference 4, reference 5, reference 10, reference 12;

18  book chapters, reference 1, reference 2, reference 3,

19  reference 4, reference 6, reference 7, reference 8,

20  reference 11, reference 14, reference 16; under

21  abstracts, reference 12, reference 13, reference 28,

22   37, reference 46.  I believe that's all.

23      Q   Thank you.  Doctor, I have your CV in front

24   of you -- in front of me and we've marked it as

25   Exhibit 1.  Can you just briefly outline for me your

8

1  educational background beginning with medical school.

2      A   I went to medical school in Boston,

3  Massachusetts.  From then, I did my residency in

4  OB/GYN at the University of South Florida, did a GYN

5  oncology fellowship at the University of South

6  Florida, then went on to do a breast fellowship in

7  benign disease and malignant breast diseases.  I'm

8  currently on staff -- on full-time staff here at the

9  University of South Florida.

10     Q   And, Doctor, what's your current

11  position/title at the University of South Florida?

12     A   I'm professor of OB/GYN in the Department

13  of Interdisciplinary Oncology and I'm the program

14  leader of the Gynecologic Oncology Program.

15     Q   Now, H. Lee Moffitt Cancer Center, is that

16  a part of the University of South Florida?

17     A   Yes.  It's the cancer center on the USF

18  property.

19     Q   Doctor, on a daily or a weekly basis, can

20  you break down for me your job responsibilities, how

21  you spend your week?

22    A    My week is spent either seeing patients in

23    the clinic, performing surgery or instructing and

24    supervising either fellows in training or research

25    protocols.

9

1     Q   The patients that you see in the clinic,

2   are they your own patients?

3     A   Yes.  They are referred to me.

4     Q   About how many hours per week do you spend

5   in the clinic?

6     A   That's a tough one.  Typically on a typical

7   week, Monday mornings, Wednesday mornings, and

8   Thursday afternoons are my clinic days.

9     Q   Is that approximately 12 hours a week?

10     A   It's more than that.

11     Q   More than that.

12     A   Yes.

13     Q   Can you approximate it for me at all?

14     A   18 hours a week.

15     Q   Okay.

16     A   It's hard to approximate, because a lot of

17   add-on patients and overflow will go on other days,

18   whenever you can see them, so they don't have to

19   wait.

20     Q   You told me you also do surgery.

21     A   Yes.

22    Q    What types of surgery fall under your

23    expertise?

24    A    Gynecology surgeries, primarily gynecologic

25    oncology surgery and breast cancer surgeries.

10

1      Q    Approximately how many hours per week do

2   you spend actually in the operating room?

3      A    Again, generally my -- I'll operate all day

4   on Tuesdays and half a day on Thursdays.

5      Q    And about how does that break down in terms

6   of hours on average?

7      A    Probably 15, 16 hours per week.

8      Q    Now, I also wrote down that you instruct

9   and supervise fellows.

10     A    Mmm-hmm.

11     Q    Approximately how many hours per week do

12   you spend doing that, sir?

13     A    Well, that's within the clinic and surgical

14   arena.

15     Q    That would encompass those hours?

16     A    Yes.  We have -- they are always on-site,

17   as you might say.

18     Q    So when you are in the clinic, you would

19   have fellows with you.  Likewise with the research

20   protocols?

21     A    They are usually involved in that as well.

22    Q    Do you have any administrative

23    responsibilities in your position?

24    A    Yes.  I'm the program leader.

25    Q    And as the program leader, about how many

11

1   hours a week do you spend in actual administrative

2   duties?

3       A   Probably 10 percent of my time is done --

4   is doing administrative work.  How many hours a week

5   is going to vary.  Maybe four hours a week.

6       Q   Now, I notice you've written a lot of

7   articles.  Do you also spend time doing that?

8       A   Yes.

9       Q   About how much if you had to average that

10  out a week?

11      A   That's hard.  That's usually nights and

12  weekends type thing, so that's going to vary.  Again,

13  that could be anywhere from four hours a week to one

14  12-hour session on a weekend.

15      Q   Doctor, approximately how many cases would

16  you estimate that you review on behalf of attorneys

17  on a yearly basis?

18      A   Well, I told you a total number of depos

19  were 15 to 20.  Probably -- there's not many more

20  than that that I've reviewed.  Probably total review

21  cases, maybe 30.

22    Q    Over how many years?

23    A    Over the last ten years.

24    Q    So would you say it's approximately three a

25    year or in the beginning was it one every three years

12

1  and then got more common near the end?

2    A    That's probably true.

3    Q    So in the last 12 months, can you estimate

4  for me?

5    A    In the last 12 months, maybe six.

6    Q    Now, you told me that of your depositions

7  they break down about 50-50 in terms of health care

8  providers to patient.  Your reviews, are they about

9  the same or is the percentage different?

10    A    It's about the same.

11    Q    Have you ever testified in court?

12    A    Yes.

13    Q    On how many occasions?

14    A    Two.

15    Q    Were those in courts down here in Florida

16  or were they somewhere else?

17    A    In Florida.

18    Q    Were they on behalf of defendant doctors or

19  patients or both?

20    A    One was a plaintiff and one was the

21  defendant.  One was a lower genital tract cancer and

22   that was a plaintiff case.  And the other was a

23   breast cancer and that was a defendant case.

24        Q    The breast cancer case, was that -- do you

25   know approximately what year that was?

13

1    A    Probably about three years ago.

2    Q    Do you remember the name of the attorney

3  that asked you to review that?

4    A    No.

5    Q    You said it was in Florida.  Which county,

6  if you remember?

7    A    Oh, I don't know what county it was.  I

8  think the town was Inverness.

9    Q    Doctor, what are your fees for review of

10  medical records?

11    A    $500 per hour.

12    Q    What about for deposition?

13    A    It's the same.

14    Q    And for trial?

15    A    It's the same, same thing.

16    Q    Have you ever reviewed a case for Ms. Zork

17  or anyone in her law firm in the past?

18    A    No.

19    Q    Do you know how they came to know of you as

20  a physician?

21    A    No, I don't, actually.  I don't recall

22   that.  I believe someone from her office may have

23   contacted me to see if I would be interested in

24   reviewing a case.

25      Q   Have you ever reviewed a case in Maryland

14

1    or the District of Columbia before?

2        A    I don't think so.

3        Q    Other than Florida, what other states do

4    you recall reviewing or testifying in?

5        A    I think most of them are Florida.  I may

6    have reviewed some out of state ones, but I don't

7    remember where they were.  But I think anything that

8    went beyond that, most of them were all Florida.

9        Q    So you don't recall ever going to another

10    state to testify in court?

11        A    One I did.  I take it back.  There was one

12    other one.  There was -- in Boston there was a case.

13    I don't remember the firm or the details now.  But

14    there was something in Boston.  I think that was the

15    only thing I went out of state for.

16        Q    Doctor, are you board certified?

17        A    Yes.

18        Q    In what area?

19        A    Obstetrics and gynecology and gynecologic

20    oncology.

21        Q    When did you become board certified in

22  OB/GYN?

23     A   I'm just looking on my CV.

24     Q   Sure.

25        MS. ZORK:  I don't see it.  I think it's

15

1    about '91.

2        THE WITNESS:  I was going to say I don't

3    see it here, but it is about '91.  OB/GYN in '91

4    and the following year in gynecologic oncology.

5    I guess it was 2000.  Well --

6        MS. ZORK:  You got recertified.

7        THE WITNESS:  Yeah.  So it was '91 or '92

8    or '90, '91.

9    BY MS. CERNIGLIA-LOWENSEN:

10    Q   What does the board in general OB/GYN

11    entail?

12    A   It entails a written and an oral

13    examination.

14    Q   Did you pass both parts on the first

15    attempt?

16    A   Yes.

17    Q   Same question as to the GYN oncology, are

18    there two parts to that?

19    A   Yes, an oral and a written.

20    Q   And did you pass those on the first

21    attempt?

22    A    Yes.

23    Q    Doctor, have you ever been sued for medical

24   malpractice?

25    A    No.

16

1    Q    Doctor, when were you first contacted

2    regarding this case?

3    A    It looks like my first correspondence

4    letter was April 17.  So someone probably called me

5    earlier that month and then followed up with a

6    correspondence.

7    Q    You're looking at a cover sheet from

8    Ms. Zork dated April 17th, 2003?

9    A    Yes.

10    Q    May I take a look at that document?

11    A    (Indicating.)

12    Q    And this cover sheet indicates that you

13    were sent the medical records of Ms. Pollard,

14    deposition transcripts from Dr. Gupta and Dr. Sees

15    and Dr. Adams, and the transcript of Ms. Pollard's

16    trial testimony that was videotaped --

17    A    Correct.

18    Q    -- and a time line entitled "Pollard Time

19    Line, Confidential, Attorney Work Product," dated

20    October 1998.

21    A    Correct.

22    Q    Doctor, what were you asked to do regarding

23    the materials that were sent to you at that point in

24    time?

25    A    I was asked to review the materials to see

17

1   if there was a breach in the standard.

2       Q    Doctor, did you review the time line also?

3       A    Yes, I reviewed the information that was

4   given to me.

5       Q    Did you rely on the time line at all in

6   developing your opinions?

7       A    Oh, no.

8       Q    Did you subsequently receive anything else

9   from Ms. Zork's office?

10      A    Yes.  I have some additional correspondence

11   that I can show you.

12      Q    Correspondence dated May 9th, 2003,

13   enclosing the deposition of Dr. Steven Adams; then

14   one dated May 12 enclosing a, underlined, complete

15   and correct copy of Dr. Adams' deposition.

16          MS. ZORK:  They sent it with every other

17   page.

18   BY MS. CERNIGLIA-LOWENSEN:

19      Q    So then you got the full version?

20      A    Correct.

21      Q    May 30th, 2003, a copy of Dr. Hwang's

22  deposition; June 10th, a copy of the trial testimony

23  of Veronica Pollard; the deposition transcript of

24  Roosevelt Pollard; and the deposition transcript of

25  Dr. Gupta and Dr. Sees.  Did you get two copies of

18

1    that?

2        A    I did.

3        Q    Correspondence dated July 23rd, 2003,

4    confirming the deposition today and setting up a

5    meeting for you and Ms. Zork at 1 o'clock.  Is that

6    correct?

7        A    Correct.

8        Q    Did you meet with Ms. Zork today at

9    1 o'clock?

10        A    Yes.

11        Q    And then earlier correspondence dated

12    December 23rd, 2002, from Patricia Karppi.

13        A    That would have been my initial

14    correspondence, then.

15        Q    And this outlines the case from

16    Ms. Karppi's standpoint.  Was this the first written

17    contact you had?

18        A    I believe so, because this is all the

19    information I have with me.

20            MS. CERNIGLIA-LOWENSEN:  I'd like to label

21    this 2, please.

22        (Exhibit Number 2 was marked for

23     identification.)

24   BY MS. CERNIGLIA-LOWENSEN:

25     Q   Doctor, I see some handwritten notes.  Are

19

1   those your handwritten notes?

2      A   Yes.

3      Q   May I see that, sir?

4      A   (Indicating.)

5      Q   Thank you.  On the first page, the first

6   reference I see is conference call July 20th, 2003,

7   with Bruce Klores.  Can you read that for me?

8      A   Standard is chemo/XRT.

9      Q   What does that mean, sir?

10      A    The question was would the standard of care

11   have been to receive radiation, chemotherapy at a

12   particular point and time in her care.

13      Q    Was that a question that was asked of you

14   or was that an opinion that you gave to Mr. Klores?

15      A    That's the opinion I gave to him.

16      Q    And then what is the next statement there,

17   sir?

18      A    It says, If timely, more likely than not

19   that would have improved her survival and outcome.

20      Q    Is that a question that you were asked by

21   Mr. Klores?

22     A   No.  That was a question I gave to him or

23   statement I made to him.

24     Q   And what does that say, the very last line?

25     A   I'm not sure.

20

1    Q    That's your handwriting.  Right?

2    A    Yes, it is my handwriting.  It's a

3  physician's handwriting.

4    Q    Can you read any of it?

5    A    It says something not chemo, not something

6  chemo.  I don't know what that means.  I think it

7  says not sure if she received chemo, is what I think

8  that says.

9        MS. CERNIGLIA-LOWENSEN:  Let's mark that 3,

10    please.

11        (Exhibit Number 3 was marked for

12    identification.)

13  BY MS. CERNIGLIA-LOWENSEN:

14    Q    This is your handwriting too.  Right?

15    A    Yes.

16    Q    Can you read that for me, please?

17    A    Yes.  These are notes from the -- that I

18  just jotted down for chronology of Dr. Gupta.  It

19  basically says, Depos, Raj Gupta, MD, medical

20  oncology.  Lumpectomy, November 12th, 1998; moved to

21  England; November 12th recommended chemo times 4

22  cycles.

23        There are some recurrence rate numbers that

24  he mentioned in the deposition:  8 year recurrence

25  rate, no chemo 4 percent, with chemo 3 percent.  And

21

1  there were some references -- ASCO references that he

2  made during the deposition, and that's just those

3  references that were made during the deposition.

4          It talks about one of the references JCO

5  and it looks like prognostic factors.  I think it's

6  saying age, health, receptors, grade, size, nodes, 95

7  percent survival, 3 percent die of cancer, 2 percent

8  die of other causes.  And then it just has a couple

9  other references that he mentioned in the depo.

10     Q    So are these just notes that you took while

11  you were reading the deposition of Dr. Gupta?

12     A    Yes.

13         MS. CERNIGLIA-LOWENSEN:  We'll mark that,

14     please.

15         (Exhibit Number 4 was marked for

16     identification.)

17  BY MS. CERNIGLIA-LOWENSEN:

18     Q    Statements for services rendered, is this

19  your bill to Ms. Zork's office?

20     A    Yes, it is.

21     Q    And this is dated July 23rd, 2003, and then

22   there's an indication that it was mailed August 19th,

23   2003.  Have you sent or totaled any other bills?

24      A   No.

25      Q   It indicates less a retainer of a thousand

22

1  dollars.  Is that the retainer that you charge?

2     A    Correct.

3        (Exhibit Number 5 was marked for

4     identification.)

5  BY MS. CERNIGLIA-LOWENSEN:

6     Q    The only other thing that I see in your

7  file are some E-mails back and forth with you and

8  Ms. Zork basically trying to arrange a time that you

9  can talk.  Is that right?

10     A    Yes.

11     Q    Other than what I have seen here and what

12  we've talked about in terms of the documents that

13  were sent to you, have you reviewed anything else in

14  preparation for your opinion?

15     A    The medical record chart that was given to

16  me.

17     Q    Those -- I'm reading upside down.  Those

18  include the medical records from the Dwight

19  Eisenhower Army Medical Center, the Menwith Hill

20  Station, Cookridge Hospital, Laken Heath RAF, and the

21  Walter Reed Medical Center.

22    A    And I think these are all part of the same.

23    Q    And I have a second binder and it's Dwight

24  D. Eisenhower Bates-stamped medical records.  Are

25  these a duplicate of what you already have in there

23

1  but just numbered?

2    A    It looks like there's some additional

3  information.  It's in the chronology that you read.

4        MS. ZORK:  Can I just interrupt for a

5  second?

6        MS. CERNIGLIA-LOWENSEN:  Sure.

7        MS. ZORK:  With the mute on, if they say

8  anything to us will we hear them?

9        MS. CERNIGLIA-LOWENSEN:  No.  They have to

10  turn the mute off.

11        MS. ZORK:  So if they want to object, they

12  will push the mute button and --

13        MS. CERNIGLIA-LOWENSEN:  Yes.

14        THE WITNESS:  Here are the depositions that

15  you mentioned.  These are all the depositions

16  that I have.  I believe you mentioned all of

17  them.

18        MS. ZORK:  Sorry about the multiple copies.

19  BY MS. CERNIGLIA-LOWENSEN:

20    Q    Doctor, everything that I've looked at --

21  is there anything additional that you have reviewed

22   that we have not mentioned so far today?

23     A   That's all.

24     Q   Have you reviewed any films, any scans?

25     A   No, I don't believe so.

24

1    Q    What about slides?

2    A    No.

3    Q    Doctor, as a GYN oncologist, when you

4    provide care to a patient, would things like ordering

5    the chemotherapy -- would that be within your

6    purview?

7    A    Yes.

8    Q    Now, what about the radiation oncology?

9    Would that be something that you order?

10    A    I would refer to a radiation oncologist.

11    Q    And you then rely on that doctor to

12    determine whether it's appropriate and what type to

13    use?

14    A    Well, I'd make recommendations that a

15    patient receive it and ask the radiation oncologist

16    to deliver it in the safest way possible.

17    Q    And you also do surgery.  Is that correct?

18    A    Correct.

19    Q    Doctor, I presume that since you're here

20    today you have some opinions concerning the care that

21    was provided to Ms. Pollard.  So I'd like to direct

22  you to the care provided by Dr. Gupta.

23         Can you tell me whether you have any

24  opinions regarding whether or not Dr. Gupta adhered

25  to accepted standards of care?

25

1    A   Yes, I have an opinion.

2    Q   And what is that opinion?

3    A   My opinion is that Dr. Gupta fell below the

4   standard of care by not administering chemotherapy

5   and coordinating radiation therapy on this patient

6   within a timely manner.

7    Q   Doctor, when I asked you that opinion, you

8   referred to the confidential attorney work product

9   time line.

10    A   Yes, because I thought your next question

11   was going to be when should that have occurred.

12    Q   And we'll get there.  It probably won't be

13   my next one, but we're definitely going there.

14       Doctor, have you reviewed the

15   recommendations, the letter drafted by Dr. Gupta for

16   use once Ms. Pollard arrived in England?

17    A   Which letter are you referring to?

18    Q   I believe that it is entitled "To whom it

19   may concern."

20       MS. ZORK:  He has it.

21       THE WITNESS:  Is this the letter you're

22    referring to?

23  BY MS. CERNIGLIA-LOWENSEN:

24    Q   Yes, sir.  You have reviewed that?

25    A   Yes.

26

1    Q    Do you agree with the recommendations made

2    by Dr. Gupta in that letter dated December 16th,

3    1998?

4    A    In the letter Dr. Gupta says "to whom it

5    may concern" and he summarizes her medical history in

6    the first paragraph.  And then Dr. Gupta says,

7    "Mrs. Pollard's adjuvant therapy is somewhat

8    debatable, the size of the tumor is very small and

9    has medullary features which are favorable prognostic

10    factors.  The fact that she's premenopausal and

11    receptors were negative make me favor adjuvant

12    chemotherapy with Adriamycin and Cytoxan for 4

13    cycles.  I also recommend radiation therapy to her

14    right breast.  In addition, I recommend the use of

15    tamoxifen to prevent breast cancer in high risk

16    patients."

17        I would not have given her the tamoxifen.

18    But yes, she should have had chemotherapy and

19    radiation based on her findings and prognostic

20    factors.

21    Q    Would it have been a deviation in the

22  standard of care for a physician to order tamoxifen

23  with a patient such as Ms. Pollard?

24      A   No.

25      Q   Doctor, you indicated that the standard of

27

1   care would have required that chemotherapy and

2   radiation therapy be utilized with a patient such as

3   Ms. Pollard.  Is that correct?

4       A    Correct.

5       Q    Do you agree with the type of drugs that

6   Dr. Gupta refers to in his correspondence?

7       A    Yes, I do.

8       Q    So administering that in 1998 would have

9   adhered to the standard of care?

10      A    Yes.

11      Q    Doctor, do you know anything about the

12   health care system in England?

13      A    No.

14      Q    Do you know whether in 1998 and early 1999

15   chemotherapy would have been available for

16   Ms. Pollard in England?

17      A    They administer chemotherapy in England.

18      Q    Doctor, Dr. Gupta refers to the tumor as

19   being small in size.  Is that your understanding?

20      A    My understanding is the tumor on one

21   description was .5 centimeters.  The tumor on another

22   description was 11 millimeters.

23       Q    What would the classification be for a

24   tumor that is .5 cms?

25       A    Classification?

28

1     Q    Would it be a T1?

2     A    Yes.

3     Q    What about the one that is 11 millimeters?

4     A    It would be a T1.

5     Q    In terms of the care required by standard

6   of care, does it matter whether the tumor was a .5 cm

7   as compared to an 11 millimeters?

8     A    In this particular case, 11 millimeters, no

9   question her prognosis would change.  She would

10   definitely get the chemotherapy.  5 -- 5 millimeters

11   would depend on other prognostic factors to sway you

12   one way or the other as to chemotherapy.

13     Q    Doctor, when you as a GYN oncologist have a

14   patient who is similar to Ms. Pollard and you do a

15   lumpectomy and you send away the slides or pieces of

16   the tumor to be read by a pathologist, is that

17   something you personally as a doctor get involved in?

18   And by that, I mean, do you go to the lab and look at

19   it and measure it yourself?

20     A    Sometimes I go to the lab and look at it.

21   I don't measure it.  No.

22     Q     So do you rely on the expertise of the

23     pathologist to tell you how large the tumor is?

24     A     Absolutely.  For the fine tuning of the

25     final pathology report, they're responsible for that.

29

1    Q    So, in this instance, was it within

2    standard of care for Dr. Gupta to rely on the reading

3    of the pathologist when the pathologist determined

4    that the tumor was a .5 cm?

5    A    Absolutely.

6    Q    Now, you indicated that if the tumor that

7    Dr. Gupta was faced with was 5 millimeters that you

8    looked at other prognosticators to determine whether

9    or not chemotherapy was required by standard of care.

10   Is that correct?

11   A    Correct.

12   Q    What other prognosticators should Dr. Gupta

13   had looked at in making determinations for

14   Ms. Pollard?

15   A    Well, in this particular case, it was a

16   poorly differentiated neoplasm.  It had a K167 of 90

17   percent, which is a poor prognostic indicator, and it

18   had an S-phase of 6 percent, which is intermediate.

19   Q    So, based upon those prognosticators, do

20   you agree with Dr. Gupta's recommendation in December

21   of 1998 that chemotherapy would have been appropriate

22  for Ms. Pollard?

23      MS. ZORK:  I'm going to object.  You're

24  talking about the letter, you're referring to

25  this --

30

1        MS. CERNIGLIA-LOWENSEN:  Correct.

2        THE WITNESS:  The letter on December 16th,

3    yes, it is -- I agree that chemotherapy should

4    have been administered.

5  BY MS. CERNIGLIA-LOWENSEN:

6      Q    What is the goal of chemotherapy in a

7  patient such as Ms. Pollard?

8      A    The goal of chemotherapy is given in the

9  adjuvant setting to decrease her local recurrence

10  rate and decrease the survival rate -- or to improve

11  her survival rate.  Let me rephrase that.  Decrease

12  her local and distant recurrence rate and improve her

13  survival rate.

14      Q    Does chemotherapy have a role in preventing

15  local recurrence?

16      A    The radiation is the primary treatment for

17  local recurrence control, although I'm sure that the

18  chemotherapy would have some benefit as well, because

19  we use it in the neoadjuvant setting to decrease

20  local disease.

21      Q    Are you aware of any studies that indicate

22  the effect of chemotherapy on local recurrence?

23      A    Again, you could use the neoadjuvant data

24  similar to what she had when she recurred.  There's

25  neoadjuvant data that would show that you'd use it in

31

1    stage 3 locally advanced breast cancers to decrease

2    the size of the tumor prior to surgery and that's

3    exactly what she had when she had her recurrence.

4    And that was very appropriate.

5        Q    What about in T1 tumors, are you aware of

6    any data indicating whether chemotherapy has an

7    effect on local recurrence in those types of tumors?

8        A    I'd have to review the literature on that.

9        Q    Doctor, from your notes, I know that you

10   have an opinion regarding causation, specifically

11   whether it would have made a difference regarding

12   this case.  But let me ask you first, what did the

13   standard of care require for -- strike that.

14          When did the standard of care require

15   Dr. Gupta to initiate radiation therapy and/or

16   chemotherapy?

17       A    If patients are to receive both

18   chemotherapy and radiation, the chemotherapy is

19   administered first, followed by the radiation, in

20   that sequence.  The standard is to initiate

21   chemotherapy once the patient's healed from the

22   surgical perspective so it would be safe to

23   administer the chemotherapy.  So if --

24      Q   How long -- I'm sorry.

25      A   If the patient is not to receive

32

1  chemotherapy, then the radiation is administered once

2  the patient's healed from the surgery.

3    Q   A patient that is without postop

4  complications, how long does it take them on average

5  before you can initiate further treatment?

6    A   Chemotherapy, generally four to six weeks

7  after the surgery.

8    Q   And when we talk about the surgery in

9  Ms. Pollard's case, we're talking about the

10  lumpectomy of November 12th, '98.  Would that be the

11  four to six weeks after that?

12    A   She had her lumpectomy on October 14th,

13  '98.

14    MS. ZORK:  Actually, she had excisional

15  biopsy -- I called it a lumpectomy.  That's my

16  fault.  She had a resection --

17    THE WITNESS:  I'm sorry.

18  BY MS. CERNIGLIA-LOWENSEN:

19    Q   You're looking at the time line.  Correct?

20    A   Right.  The November 12th data is when she

21  had her primary breast cancer diagnosis.  So that's

22  where your time clock would have started as far as

23  healing before -- that is her most recent surgery as

24  far as healing and initiating chemotherapy.  So that

25  would be the four to six weeks.

33

1    Q    So four to six weeks from then, we're

2    looking at anywhere from December 12th, '98, through

3    about the 26th, December 26th, '98, around that time

4    period?

5    A    Correct.

6    Q    Do you have any information, any knowledge

7    regarding Ms. Pollard's social situation at that

8    point in time, what her plans were regarding where

9    she was going to live?

10    A    During the records it indicated she was

11    going to move to England.  It was unclear as to how

12    long she was supposed to stay in England.

13    Q    Do you know when Ms. Pollard planned to

14    make that ultimate move to England?

15    A    At the beginning of the year.

16    Q    Doctor, do you have an opinion to a

17    reasonable degree of medical probability as to

18    whether Ms. Pollard would have had an adverse effect

19    had radiation and chemotherapy begun on January 2nd,

20    1999?

21    A    Yes.

22    Q    What is that opinion?

23    A    Had chemotherapy and radiation begun on

24    January 2nd, more likely than not she would have had

25    improved survival and lower recurrence rate.

34

1    Q    When you say improved survival, is there

2    any way to put a percentage on the improvement?

3    A    The survival with adjuvant chemotherapy is

4    approximately 30 percent improvement in survival.

5    Q    So on January the 2nd, 1998, had

6    Ms. Pollard been initiated with chemotherapy and then

7    followed by radiation therapy, do you have an opinion

8    as to whether more likely than not she would have

9    reoccurred?

10    A    Yes.  More likely than not she would not

11    have reoccurred.

12    Q    What about February 2nd, 1999?  Same

13    question as to do you have an opinion whether more

14    likely than not she would have reoccurred on

15    February 2nd, 1999, had the care that you believe

16    standard of care required been administered at that

17    point in time?

18    A    Now you're talking a two and a half month

19    delay, but still more likely than not that would have

20    affected her outcome.

21    Q    So it's more likely than not that she would

22   have been cancer free?

23        A    Correct.

24        Q    Same question as to March 2nd, 1999?

25        A    March 2nd, now you're delayed.  She may

35

1   have had microscopic disease at that point in time.

2       Q    Is it more likely than not that she would

3   have had microscopic disease had treatment been

4   delayed until March 2nd, 1999?

5       A    That's a difficult question to answer.  The

6   cancer recurred somewhere in that subsequent time

7   frame.  But when it was microscopically detectable is

8   more difficult.

9       Q    So it's impossible to say had the treatment

10   begun on March 2nd, 1999, the treatment that you

11   believe standard of care required, whether or not

12   Ms. Pollard would have reoccurred?

13       A    Given that hypothetical situation, correct.

14       Q    At what point can you say to a reasonable

15   degree of medical probability the treatment that you

16   believe standard of care required would not have

17   prevented a reoccurrence?

18       A    If given within the first six weeks to two

19   months, as we mentioned earlier -- as I mentioned

20   earlier, more likely than not it would have altered

21   the outcome.

22    Q    At what point would intervention have been

23    fruitless to prevent this reoccurrence?  At what

24    point in time can you sort of point at the time line

25    and say beyond this date we couldn't have affected

36

1    the outcome?

2        A    Depends on if you could predict where she's

3    going to recur and it depends on whether you're going

4    to talk about radiation or chemotherapy.  In this

5    particular patient scenario, she had a local

6    recurrence that was microscopic in the chest --

7            MR. ADAMS:  I'm sorry.  Is there an answer?

8            THE WITNESS:  The phone is making static.

9            (Discussion off the record.)

10            MS. CERNIGLIA-LOWENSEN:  Why don't we get

11        the court reporter to read it back.

12            (Reporter read as requested Page 35, Line

13        21, through Page 36, Line 5.)

14        A    -- that was microscopic in the breast and

15    chest wall.  In her case, chemotherapy and/or

16    radiation would have decreased that risk or

17    eliminated it.

18    BY MS. CERNIGLIA-LOWENSEN:

19        Q    So is there a point in time that you can

20    point to looking at the medical records or the time

21    line that you've been provided where you say on X

22  date chemotherapy and/or radiation would not have

23  prevented Ms. Pollard's recurrence?

24      A   Well, that's different from the question

25  you asked me before.  The question you asked me

37

1  before related to would it have been helpful.  Now

2  you're asking me would it have prevented a

3  recurrence.

4     Q   That's really what I'm interested in,

5  whether it would have prevented.

6     A   The first part of it, would it have been

7  helpful at any point in time, yes.  Would it have

8  prevented it, the second question, you want to

9  prevent it before it's microscopic.  So obviously

10  within four to six weeks after treatment is the

11  ideal, because the odds of having microscopic disease

12  would be very unlikely.

13      I would say within two months the odds of

14  having microscopic disease would have been very

15  unlikely.  After that, it's impossible to know when

16  her microscopic disease developed.

17     Q   Just so I'm clear, what you're saying is

18  it's really impossible to know exactly when

19  Ms. Pollard's microscopic disease developed;

20  therefore it's impossible to say what the last

21  opportunity would have been to prevent this

22   recurrence with chemotherapy and radiation?

23        MS. ZORK:  That's not what he said.  He

24   said two months --

25        THE WITNESS:  That's --

38

1        MS. CERNIGLIA-LOWENSEN:  He can clear me

2    up.

3        THE WITNESS:  That's not necessarily true.

4    In the first two months, more likely than not

5    there was no microscopic disease.  So treatment

6    at that point in time would have clearly been to

7    the patient's advantage.

8  BY MS. CERNIGLIA-LOWENSEN:

9    Q   Okay.

10   A   After the two months in time, then there's

11  no way to tell from two months until her subsequent

12  recurrence when that would have occurred

13  microscopically or been detectable.

14   Q   Now, when we're saying two months, are we

15  talking two months after the four to six weeks for

16  recovery or are we including that time frame?

17   A   Two months from the time of surgery.

18   Q   Two months from the time of surgery?

19       MS. ZORK:  He's going based upon your time

20   line, which went on January 1, February 1,

21   March 1.

22        MS. CERNIGLIA-LOWENSEN:  He can clear me

23    up.  I'm really not trying to confuse him.  I'm

24    just trying to understand.

25  BY MS. CERNIGLIA-LOWENSEN:

39

1     Q    Doctor, you told me two months.  I'm lost

2  in the numbers.  So if you can clear me up.

3     A    The standard of care is to administer

4  adjuvant therapy within two months of the primary

5  surgery.  In this case, it was November 12th, 1998,

6  was the patient's primary surgery.  The standard of

7  care would be initiate treatment within that

8  two-month period once the patient is healed from her

9  surgery.

10    Q    Okay.  And beyond that two-month period,

11  you can't say at what point -- any particular patient

12  or any group of patients at which point chemo and

13  radiation will no longer prevent their disease?

14       MS. ZORK:  I'm going to object.  It's been

15    asked and answered.

16       THE WITNESS:  You're asking a -- I mean,

17    what if the patient never recurs?

18  BY MS. CERNIGLIA-LOWENSEN:

19    Q    Mmm-hmm.

20    A    Well, then how do you know when it's going

21  to recur?  I don't know how to answer that question:

22  If it never recurs microscopically, when would you

23  give chemotherapy?

24       In this particular case, she recurred very

25  early in her disease state, so chemotherapy would

40

1  have been to her advantage.

2    Q   So in Ms. Pollard's case, is there any way

3  to look at the records and say on X date had chemo

4  been given, to a reasonable degree of medical

5  probability, it would not have been effective?

6    A   That's correct.  There is no date that you

7  can say it's not effective.  However, you can do the

8  reverse and say if given within the first two months

9  it clearly would have been effective.

10    Q   Doctor, we talked about Ms. Pollard as

11  being a T1.  Correct?

12    A   Correct.

13    Q   Do you classify T1 tumors further?  Do you

14  say T1-A, T1-B?

15    A   Yes.  You can T1-A, B, and C, depending

16  whether it's 5 millimeters, 1 centimeter or less than

17  2 centimeters.

18    Q   Now, Dr. Gupta was working with what he

19  believed to be a T1-A.  Is that correct?

20    A   Yes.

21    Q   Doctor, what is the incidence of

22   reoccurrence in patients that have T-1A tumors, sort

23   of all comers?

24      A   All comers, not poorly differentiated like

25   her?

41

1    Q    Correct.

2    A    The recurrence rate would be in the range

3  of 8 to 10 percent.

4    Q    How long a period of time?

5    A    Five years.

6    Q    Is that generally what we talk about when

7  we talk about breast cancer, five-year survival rate?

8    A    Yes.

9    Q    Now, what is the rate of recurrence, if

10  this data exists, for patients who are T1-As who have

11  chemotherapy?

12    A    It would be a 30 percent improvement.  So

13  your question was --

14    Q    What would the recurrence rate be?

15    A    A recurrence rate would be in the range of

16  6 percent, 5 to 6 percent.

17    Q    And, again, that's five-year survival rate.

18  Correct?

19    A    Correct.

20    Q    Doctor, are there any risk factors

21  associated with the administration of chemotherapy?

22    A    Yes.

23    Q    What are they in a general sense?

24    A    They are chemotherapy specific.

25    Q    So it's specific for each medication?

42

1    A   Yes.

2    Q   What about the medications that were

3  suggested in Dr. Gupta's correspondence dated

4  December 16th, 1998?

5    A   The concerns, of course, are infection,

6  decrease in white blood cell count, making one more

7  prone to infection; side effects of cardiac toxicity

8  from long term Adriamycin; hair loss; risk of

9  bleeding.

10    Q   A mortality rate associated with those

11  medications?

12    A   I'm sure.

13    Q   Doctor, in the time that you have been

14  ordering chemotherapy and radiation for patients with

15  breast cancer, have you had a personal experience

16  where you've talked to patients regarding the

17  improvement that they can expect with chemotherapy in

18  terms of percentages?  Is that something you do?

19    A   Yes.  Generally the number is a 30 percent

20  improvement from what the recurrence rate would be is

21  what you can expect out of chemotherapy.

22    Q    Have you had occasion where patients have

23    refused chemotherapy?

24    A    Yes.

25    Q    Doctor, I know you indicated that you

43

1  reviewed the deposition of Dr. Gupta.  Did you

2  disagree with any of the statements made by Dr. Gupta

3  in his deposition?

4       MS. ZORK:  I'm going to object.

5       THE WITNESS:  Can you be more specific?

6  BY MS. CERNIGLIA-LOWENSEN:

7    Q   Well, was there anything in the deposition

8  that you read that you looked at and thought, that's

9  not right, percentages are wrong, his recommendations

10  are wrong?

11    A   I'd be happy to answer a specific question

12  if you pose one.

13    Q   Did you review the part of the deposition

14  of Dr. Gupta where he talked about incidence of

15  reoccurrence with or without chemo?

16    A   Maybe you can show me what you're asking.

17       (Discussion off the record.)

18  BY MS. CERNIGLIA-LOWENSEN:

19    Q   I'm going to let you take a look at -- I

20  believe that it starts on about 82 where the doctor

21  is referring to some literature and it goes through

22   to about 85.  So if you want to take a look at that.

23       A    On Page 82 it says, I'd be happy to look up

24   the literature and the findings and finding out all

25   the good studies, and then he talks about how he goes

44

1    to the National Cancer Institute web site.

2        And it says when he had conversations with

3    Mrs. Pollard, what would you tell her as far as the

4    benefits of chemotherapy.  And he said my best

5    estimate would be a 4 percent risk of recurrence

6    within eight years without chemotherapy, without

7    chemotherapy, and a risk of recurrence would be about

8    3 percent.  So from that point of view, December

9    1998, Pollard without chemotherapy had a 96 percent

10   8-year survival rate.  Correct?  With chemotherapy,

11   it would be one more point, 97 percent.  And it says

12   what literature would you use?  Can you be specific?

13       MS. ZORK:  What's your question?  I'm

14   sorry.

15       MR. CERNIGLIA-LOWENSEN:  I'm coming back to

16   it.

17   BY MS. CERNIGLIA-LOWENSEN:

18       Q    Do you agree with those numbers as

19   presented by Dr. Gupta in terms of the reoccurrence

20   rate with or without chemotherapy?

21       A    They are a little optimistic on the 96

22  percent versus 97 percent.  I would say they are more

23  in the range of 92 percent to 94 percent or 92

24  percent to 95 percent.

25      Q   So when you're saying the 92 percent, that

45

1    would be 92 percent -- strike that.

2         Eight percent risk of recurrence without

3    chemotherapy?

4      A    Right.  That's what I said initially.  My

5    five-year recurrence rate is 8 to 10 percent for a

6    T1-A lesion, 5 millimeter lesion.  With chemotherapy,

7    you would improve it.  Basically the recurrence rate

8    would be about 5 to 6 percent.

9      Q    So you vary by a few percentage with

10   Dr. Gupta's numbers?

11     A    Correct.

12     Q    Doctor, during the time that you have been

13   a GYN oncologist, have you had occasion where

14   patients have moved to another location so you've

15   turned care over to another doctor?

16     A    Yes.

17     Q    And during that time, did you remain active

18   in the patient's care after they moved or did you

19   give that care over to another physician?

20     A    Living in Florida, we have a lot of

21   seasonal patients and typically we'll either receive

22   them or we'll send them and they will spend four to

23   six months here and the rest of that time up north or

24   vice versa.  We may do the surgery and recommend they

25   have chemotherapy or vice versa.  They may have the

46

1    surgery elsewhere and recommend that we do the

2    chemotherapy.  So yes, we do that.

3        Q    Do you -- if you send a patient back up

4    north for their chemotherapy after you've done the

5    surgery, do you then receive reports from the doctors

6    up north?

7        A    Yes.  Generally we do.

8        Q    Have you had occasions where people have

9    relocated, gone back up north, and you've not

10    remained active in their care?

11        A    Sure.  People move.

12        Q    Doctor, we talked in a general sense about

13    what standards of care requires of Dr. Gupta, and my

14    understanding is that you believe that standards of

15    care required that the chemotherapy be initiated

16    within four to six weeks or within two months of the

17    surgery.  Is that correct?

18        A    Correct.

19        Q    In light of the fact that Ms. Pollard was

20    planning to relocate in England --

21            MS. ZORK:  Let me object to the planning to

22    relocate.  Her husband is a soldier in the Army.

23    I mean --

24         MS. CERNIGLIA-LOWENSEN:  She was moving.

25    She wasn't in the Army.

47

1        MS. ZORK:  Okay.  She's married to a

2      soldier.  All right.  So let's go.

3    BY MS. CERNIGLIA-LOWENSEN:

4       Q    Doctor, what did standards of care require

5    Dr. Gupta to do in light of that fact?

6       A    Standard of care would have been that he

7    recommend chemotherapy and/or radiation; if she were

8    to be in that area, to actually administer the

9    chemotherapy or give the chemotherapy; if she is to

10   be relocating, either short term or long term, that

11   she make it clear that the patient -- that he's

12   recommending chemotherapy to that patient and/or

13   radiation.

14       If you have a doctor, the ideal way to do

15   it would be to communicate with that doctor or that

16   center, leave the patient a name and a phone number

17   to make contact to initiate chemotherapy as soon as

18   she arrives.  We generally will send the patient a

19   copy of her records when she leaves our office as

20   well.

21       Q    What's your understanding as to what, if

22  any, contact Dr. Gupta had with the health care

23  provider system in England?

24      A   He's in the military.  Is that correct?

25  From what I understand, he's a military physician.

48

1     Q   Dr. Gupta is not a military physician.  He

2   was providing care to military patients.  And --

3         MS. ZORK:  At a military hospital.

4         THE WITNESS:  At the military hospital.

5   BY MS. CERNIGLIA-LOWENSEN:

6     Q   Correct.  But he is not a member of the

7   armed forces.

8     A   So your question is, should the standard be

9   different for military or not military?

10    Q   No.

11    A   I'm trying to figure that out.

12    Q   Not at all.

13        MS. CERNIGLIA-LOWENSEN:  Can you read the

14    question back?

15        (Court reporter read Page 47, Lines 21

16    through 23.)

17        THE WITNESS:  I don't know if he had

18    contact with doctors in England.

19  BY MS. CERNIGLIA-LOWENSEN:

20    Q   Did you review the deposition of Sergeant

21    Pollard?

22     A     Yes.

23     Q     Do you recall during the deposition of

24   Dr. Pollard -- excuse me -- of Sergeant Pollard him

25   discussing a conversation that was relayed to him

49

1   regarding a woman by the name of Helen in England?

2   And if you don't recall, that's fine.

3       A    If you could just show that, I'd be happy

4   to look it over.

5          MS. ZORK:  I'm sorry.  Can you identify

6      what page you're referring to?

7          MS. CERNIGLIA-LOWENSEN:  Sure.

8   BY MS. CERNIGLIA-LOWENSEN:

9       Q    This is Page 19 of Sergeant Pollard's

10  deposition, which the doctor previously reviewed.

11      A    It says -- on line 9 it says, Question:

12  And were you present when Dr. Gupta examined your

13  wife and talked to your wife?  He said, He never

14  examined her when I was there.

15         And the question says, Were you present

16  when he spoke to your wife?  And the answer is, The

17  the appointment I went to was for him to talk to

18  Helen, to the Tricare administrator from England.  It

19  says, Do you know Helen's last name, sir?  He says, I

20  don't recall.

21      Q    I think it goes on a little bit more.

22    A   He says, Tell me about -- what your

23  understanding of the purpose of the conversation.  He

24  had to get with Helen so they could arrange that

25  my -- the care my wife would need once we went to

50

1   England or if there was care available for her in

2   England.  It says, How did you come about that?  Do

3   you know how Dr. Gupta made the contact with Helen

4   from Tricare?  Tell me about that, sir.  I called my

5   sponsor in England and told him about my situation,

6   how things had changed.  He gave me the phone number

7   to the health care facility.

8          (Difficulty with speaker phone.)

9          (Discussion off the record.)

10  BY MS. CERNIGLIA-LOWENSEN:

11      Q   I'm sorry, Doctor.

12      A   I'm on Page 20.  What I was reading is

13  Pages 19 and 20 of the deposition.  And the answer

14  was I called my sponsor in England and told him about

15  my situation, how things have changed.  He gave me

16  the phone number to the health care facility in

17  England.  I called there and spoke to Helen.  She was

18  a Tricare coordinator for the Menwith Hill Station.

19  I told her what my situation was and she said she

20  would have to speak to the doctor and find out if

21  they had the capability to take my doctor -- to take

22  care of my wife there.  Sergeant -- and that is a

23  military number assigned to you to help you with the

24  transition of the country.  And does that occur --

25  and does that occur any time and is a permanent

51

1    change in station?  90 percent of the time it does.

2      Q    So from reading that excerpt, is it your

3    understanding that Dr. Gupta had contact with someone

4    in the health care system in England?

5      A    I can't tell.  It sounds like he has the

6    name of a person.  What I can't tell is whether

7    anything further went on with that.  That's what I'm

8    having a hard time seeing.  In other words, I don't

9    see anything in the medical record chart saying that

10   he spoke to someone in England or that someone from

11   the staff did so.  I don't know the answer to that.

12     Q    I'm going to ask you to look at Page 22,

13   Line 6.  There's an additional question about

14   Dr. Gupta speaking with Helen.

15     A    It says, Did Dr. Gupta speak with Helen in

16   your presence?  He spoke to her in his office.  Where

17   was -- were you and your wife there in the office

18   when he had the conversation?  We were in the

19   reception area.

20          Again, it's not in the chart.  That's all I

21   have is from the deposition.

22    Q    Okay.  So from the deposition do you glean

23    that at least it's Sergeant Pollard's impression that

24    a conversation occurred between Helen in England and

25    Dr. Gupta?

52

1    MS. ZORK:  I'm going to object.  I mean --

2    THE WITNESS:  I mean, sure, there's an

3    impression here.  Again, I don't know who Helen

4    is, if she's a physician or a nonphysician.  But

5    there's a contact that implies that there was

6    some communication from someone from one office

7    to the other.

8  BY MS. CERNIGLIA-LOWENSEN:

9    Q    Doctor, in your experience as a physician,

10  have you ever had occasion to provide care to

11  military people or their dependents?

12    A    I'm sure I have.

13    Q    And do you have any personal experience

14  with a patient such as Ms. Pollard relocating to a

15  foreign country and how to make arrangements for that

16  when it is a military person or their dependent?

17    A    I don't recall ever doing a military

18  person.  I'm sure I've had patients go to Europe and

19  be treated.  I just -- but I don't recall a military

20  situation.  Usually they don't get transferred, if I

21  remember right.  They are treated at the military

22  base.

23    Q    If it's a military person you mean they

24  wouldn't be transferred?

25    A    Usually my dealings over here, for example,

53

1  with MacDill Air Force Base over here, they will

2  usually refer them to one of the regional centers for

3  treatment.  That's usually what happens.  But the

4  military system, as I said, I don't have experience

5  in the military system.

6      Q    And from your experience of them referring

7  an individual to one of the more regional centers, is

8  that for dependents also?

9      A    I don't know.

10     Q    Doctor, do you have any other opinions

11  regarding what the standard of care required of

12  Dr. Gupta that he failed to do other than what we've

13  talked about?

14     A    No.

15     Q    Doctor, when Ms. Pollard reoccurred, was it

16  a reoccurrence of the original tumor or was it a new

17  cancer?

18     A    The odds of it being a new cancer would be

19  very unlikely within that time frame.

20     Q    Did she receive subsequent radiation after

21  her reoccurrence?

22    A    Yes.  She received chemotherapy and

23  radiation.

24    Q    Did the tumor respond -- the recurrence,

25  did that respond to the radiation treatment?

54

1     A    Yes, she responded to the treatment.

2     Q    In what way?  How can we say that she

3    responded?  What occurred?

4     A    The tumor shrunk and she was taken to

5    surgery -- that allowed her to be taken to surgery to

6    have it removed.

7     Q    And which tumor are we talking about when

8    we say that it shrunk and then was removed?  Is it

9    more than one tumor, one tumor?

10     A    Let me look at the pathology report.

11     Q    Sure.

12     A    We are talking about the right upper

13    breast, chest wall area.  On the pathology report

14    from the actual mastectomy -- let me give you a date

15    here -- it looks like it's September 27, 2000 -- they

16    talk about residual cancer.  But it's unclear as to

17    whether that's in the chest wall, the breast -- but

18    it's part of the tissue within the breast that was

19    removed.  Clinical history on that report says new

20    chest wall cancer, but the gross description talks

21    about a right breast.

22    Q    Now, with the chest wall cancer,

23    anatomically would the radiation therapy have

24    prevented a recurrence in that spot?

25    A    Is your question after it recurred or

55

1  before it recurred?

2    Q   Before it recurred, had it been given as

3  you prescribed within two months?

4    A   At the appropriate time, yes.  Yes, that

5  would have prevented that.  Absolutely.

6    Q   Is that considered a local recurrence when

7  it's in the chest wall?

8    A   Yes.

9    Q   Doctor, did you review the letter of

10  Dr. Dodwell from England -- and that's the doctor in

11  Harrogate – dated February 19th, 1999, post

12  treatment, where he says that he would not advise

13  chemotherapy or tamoxifen for Ms. Pollard?

14    A   I don't have that in front of me, but I do

15  recall him mentioning that.

16    Q   Was that a deviation in accepted standards

17  of care in February of 1999 for Dr. Dodwell to not

18  recommend chemo or tamoxifen?

19    A   Tamoxifen would not have been a deviation

20  from the standard of care.  I think we started the

21  deposition mentioning that.  The chemotherapy depends

22   on the prognostic factors on this particular case.

23   Now, the difference with Dr. Dodwell, when they did

24   the rereview, the tumor now on the rereview measured

25   11 millimeters.

56

1        MR. ADAMS:  Could you speak up a little

2    please?

3      A    The difference is the tumor upon rereview

4    was found to measure 11 millimeters.  The standard of

5    care actually would have been to give chemotherapy at

6    that point.  Had the tumor been 5 millimeters, it

7    would have depended on the prognostic factors.  And,

8    again, given the prognostic factors in her case, yes,

9    chemotherapy would have been appropriate in this

10    premenopausal patient.

11   BY MS. CERNIGLIA-LOWENSEN:

12      Q    Just so I'm sure I understand -- I think I

13    got it now -- if it were indeed 11 millimeters, it

14    doesn't matter about the prognosticators, the

15    standard of care would have required chemotherapy.

16    Correct?

17      A    Correct.

18      Q    If it's 5 millimeters, you have to look at

19    the other prognosticators?

20      A    Correct.

21      Q    But in any event, in Ms. Pollard's

22   situation, even at 5 millimeters, it's your opinion

23   that the standard of care because of her

24   prognosticators would have required chemotherapy?

25       A   Correct.

57

1     Q   So you don't agree with the letter written

2   by Dr. Dodwell on February 19th, 1999, for two

3   reasons.  One being he believed he was dealing with

4   an 11 millimeter tumor --

5        MS. ZORK:  Objection.  Just so we -- the

6        pathology studies weren't done until April

7        measuring that.  But it turns out in April --

8        THE WITNESS:  So had he known that it was

9        11 millimeters, the standard would have been to

10       give chemotherapy, unquestionable standard.  In

11       this particular case, if he didn't have that 11

12       millimeter information in front of him, if he

13       didn't have his own independent review prior to

14       that letter, it would have been based on the

15       prognostic factors.

16   BY MS. CERNIGLIA-LOWENSEN:

17      Q   So the standard of care required it for

18   Ms. Pollard regardless?

19      A   Correct.

20      Q   Got it.

21          Doctor, what is your understanding as to

22   when Dr. Dodwell first saw Ms. Pollard for medical

23   care?

24        MS. ZORK:  He's relying on my time line.

25        THE WITNESS:  Better than my handwritten

58

1    notes that we couldn't read earlier.  Let me find

2    that initial letter or the deposition maybe.  Let

3    me find that.

4        MS. ZORK:  Dodwell hasn't been deposed.  I

5    can help you find his initial in the records.

6        MS. CERNIGLIA-LOWENSEN:  It appears to me

7    that she first went into the Harrogate outpatient

8    department on February 3rd, 1999.

9        MS. ZORK:  That's what -- that's what

10   the -- there was a letter from Dr. Corrin to

11   Dr. Dodwell on February 3rd.  She was seen by

12   Dr. Dodwell, according to my review of the

13   records, on February 18 of 1999.  Is that what

14   you have?

15       MS. CERNIGLIA-LOWENSEN:  Yes.

16       THE WITNESS:  So what's the question?

17   BY MS. CERNIGLIA-LOWENSEN:

18     Q    What's your understanding as to who

19   Dr. Corrin is or do you know?

20     A    I don't know who Dr. Corrin is here in this

21   scenario.

22    Q   Doctor, do you know when Mrs. Pollard

23   arrived in England?

24    A   No.

25    Q   Do you have any information as to why her

59

1   first contact with a health care provider in England

2   was on February 3rd, 1999?

3       A   I don't know the health care system in

4   England.  I don't know whether she was scheduled and

5   not -- at that date or whether she missed any

6   appointments.

7       Q   Doctor, is there any way to determine which

8   patients even with chemotherapy and radiation given

9   within that six -- four- to six-week period of time

10   after their surgery will reoccur?

11      A   That boils down to all sizes and prognostic

12   factors being equal.  No.

13      Q   Yes.

14      A   I mean, you have prognostic factors for the

15   reason of prognostic factors tell you who is more

16   likely to recur than not.  But all prognostic factors

17   being equal, no.

18          MS. CERNIGLIA-LOWENSEN:  I don't have any

19   other questions right now, Doctor.  Thank you

20   very much.

21          Larry?

22          EXAMINATION

23  BY MR. ADAMS:

24      Q   Doctor, as you may have figured out, I

25  represent the United States.  So far the questions

60

1   have focused on Dr. Gupta.  He's an oncologist.

2   You're an oncologist.  Do you have any opinions with

3   respect to any of the other medical care providers in

4   the United States at Eisenhower Medical Center?

5       A    No, I don't.

6           MR. ADAMS:  I don't have any other

7   questions then.

8           Catherine?

9               EXAMINATION

10  BY MS. HANRAHAN:

11      Q    Doctor, can you hear me?

12      A    Go ahead.

13      Q    I represent --

14          THE COURT REPORTER:  I'm sorry.  We're

15  going to have to turn you up a little bit.

16          MS. ZORK:  Can you get real close to the

17  speaker?

18          MS. HANRAHAN:  I'm holding the phone in my

19  hand.

20          MS. ZORK:  Okay.  So then just keep your

21  voice up.  I'm sorry.

22  BY MS. HANRAHAN:

23      Q    Doctor, I represent Humana Military Health

24  Care Services.  I assume you have no other opinions

25  with respect to any aspects of the health care other

61

1  than those that you've rendered here this afternoon?

2      A   That's correct.

3      Q   Let me ask you just a few follow-up

4  questions with respect to your testimony concerning

5  Dr. Gupta.  You were asked earlier about survival

6  data, five-year survival data on T1 stage tumor.  Do

7  you recall that testimony?

8      A   Yes.

9      Q   With respect to Mrs. Pollard, given what

10  you know about the pathology of her tumor and

11  assuming that the size falls within T-1A, would her

12  survival statistics be those which you've already

13  identified with respect to all comers?

14      A   Yes.

15      Q   And that would be both with or without

16  adjuvant therapy?

17      A   I listed them separately.

18      Q   Correct.  But those separate statistics

19  would be applicable to Mrs. Pollard?

20      A   Correct.

21      Q   Okay.  I think I also heard you testify

22  about the standards of care respect to adjuvant

23  therapy.  If I understood you correctly, you

24  testified that given Mrs. Pollard's, well, hormone

25  study results that she was a patient where

62

1  chemotherapy would be part of the protocol to be

2  within standards of care.  Is that correct?

3      A   I believe what I said is the chemotherapy

4  would show a better response than tamoxifen.  I

5  personally, with an ER negative tumor, she would

6  benefit more from chemotherapy as opposed to

7  tamoxifen, if you're referring to the beginning of

8  the deposition.

9      Q   Well, I was actually kind of coming in at

10  the end here where you were asked about the letter

11  from Dr. Dodwell where he obviously identified his

12  preference with respect to tamoxifen.  If I

13  understood you correctly, I thought that when a

14  patient has a 5 millimeter tumor, in order to get a

15  treatment plan that you would advocate, I thought you

16  said you would look at the prognostic factors.

17      A   Correct.  Correct.

18      Q   Why is it that you would wait for the

19  hormone study to identify the appropriate treatment

20  plan for a patient who has a tumor of 5 millimeters?

21      A   Oh.  If she needed chemotherapy and

22    tamoxifen.  Some patients get both.  If she were ER

23    positive, in addition to the chemotherapy, she could

24    also benefit from tamoxifen after she's completed her

25    chemo and radiation.  But that didn't pertain to this

63

1   particular patient.

2     Q   And what with respect to Mrs. Pollard's --

3   let me rephrase it.

4        What with respect to Mrs. Pollard's hormone

5   studies in your opinion dictated that chemotherapy

6   would be the appropriate regimen?

7     A   Chemotherapy would have been the

8   appropriate regimen because she's a premenopausal

9   patient with a tumor that's 5 millimeters that's

10   poorly differentiated, with the adverse prognostic

11   factors we mentioned earlier.

12     Q   Okay.  What I'd like you to do is assume

13   for me the following facts:  That Helen, the woman

14   who was referred to by Sergeant Pollard, is the

15   military personnel who coordinates the or -- let me

16   rephrase it -- is the military personnel who assists

17   the relocation of family members with a military

18   individual being transferred.

19     A   Okay.

20     Q   I'd like you to also assume that Helen in

21   that capacity had a conversation with Dr. Gupta and

22  it was indicated that Mrs. Pollard was an individual

23  who was relocating to England and would require

24  follow-up treatment upon her arrival in England where

25  she would either see an oncologist and potentially a

64

1   radiation oncologist.

2      A   Okay.

3      Q   Assuming he did that, coupled with the fact

4   that he wrote his letter dated December 16th, and

5   provided Mrs. Pollard her complete medical chart

6   knowing she was leaving Georgia, what further duty

7   did Dr. Gupta have to comply with the standard of

8   care?

9      A   Well, if he communicated with someone --

10  the appropriate person in the health care system, if

11  Helen was the appropriate person to make that

12  appointment, and expressed the need that she's ready

13  to begin chemotherapy now, basically she's healed

14  from the surgery, and radiation, he would have

15  fulfilled those obligations.

16      I just don't know what he communicated with

17  Helen, as did she need a follow-up appointment or did

18  she need chemotherapy and in what time frame.

19      Q   Now, you have his letter where he does

20  specifically identify what the treatment is that the

21  woman needed.  Correct?

22          MS. ZORK:  Objection.  He says it's

23     somewhat debatable.

24          THE WITNESS:  I see his letter, and I do

25     agree she needed chemo.  What I don't know is the

65

1    dialogue that went on and if Helen is the

2    appropriate person.  But in your hypothetical

3    question, you're correct.  In your hypothetical

4    question, if Helen was the appropriate person to

5    streamline the oncology appointment and to

6    initiate the chemotherapy in London and he

7    expressed that to her, that she was ready to

8    begin chemotherapy and needed radiation, since

9    her surgery was on such and such date, that would

10    be appropriate.  I just don't know when that

11     occurred or if that occurred.

12  BY MS. HANRAHAN:

13     Q    All right.  So if that in fact happened

14  between Dr. Gupta and this Helen, then Dr. Gupta

15  would have fulfilled his obligations in accordance

16  with your opinion to meet the standard of care?

17     A    Yes.  I think the referring doctor,

18  Dr. Gupta, his obligation is to see that the care is

19  carried out.  I mean, he obviously can't give the

20  chemotherapy in London or England or wherever she was

21  going -- wherever she was going to be.  But he can

22  make sure the -- of the urgency.

23        MS. HANRAHAN:  That's all I have, Doctor.

24        MS. CERNIGLIA-LOWENSEN:  Nothing further.

25        Anything else, Larry?

66

1        MR. ADAMS:  No.

2        MS. CERNIGLIA-LOWENSEN:  Lesley?

3        MS. ZORK:  No questions.

4        THE COURT REPORTER:  Read or waive?

5        THE WITNESS:  I'd like to read.

6        THE COURT REPORTER:  Are you ordering this?

7        MS. CERNIGLIA-LOWENSEN:  Yes.

8        THE COURT REPORTER:  Mr. Adams?

9        MR. ADAMS:  I'll take the same thing that

10   Joan is receiving.

11        THE COURT REPORTER:  Ms. Hanrahan?

12        MS. HANRAHAN:  I need four per page, one

13   side only.

14        THE COURT REPORTER:  We'll still send you a

15   full size.

16        MS. ZORK:  Mini, full and ascii.

17        (Discussion off the record.)

18        MS. CERNIGLIA-LOWENSEN:  Doctor, we got off

19   the record, but I wanted to attach the

20   correspondence dated April 17th, 2003, with the

21   attached time line and that will be Exhibit 6.

22          (Exhibit Number 6 was marked for

23     identification.)

24          (At 4:14 p.m., no further questions were

25     propounded to the witness.)

67

1           CERTIFICATE OF OATH

2

3

4   STATE OF FLORIDA        )

5   COUNTY OF HILLSBOROUGH )

6

7

8

9       I, the undersigned authority, certify that JAMES

10   VINCENT FIORICA, M.D. personally appeared before me

11   and was duly sworn on the 27th of August, 2003.

12

13

14       WITNESS my hand and official seal this 8th of

15   September, 2003.

16

17

18

19       _____

            LORI A. CLEMENTS, RPR-CP
20           Notary Public - State of Florida
            My Commission No. CC727560
21           Expires:  March 24, 2006

22

23

24

25

68

1          CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA          )

4    COUNTY OF HILLSBOROUGH )

5

6        I, Lori A. Clements, RPR-CP, certify that I was

7    authorized to and did stenographically report the

8    deposition of JAMES VINCENT FIORICA, M.D.; that a

9    review of the transcript was requested; and that the

10   foregoing pages, numbered 1 through 66, are a true

11   and complete record of my stenographic notes taken

12   during said deposition.

13       I further certify that I am not a relative,

14   employee, attorney or counsel of any of the parties,

15   nor am I a relative or employee of any

16   of the parties' attorneys or counsel connected with

17   the action, nor am I financially interested in the

18   action.

19          Dated this 8th of September, 2003.

20

21

22

23    _____
      LORI A. CLEMENTS, RPR-CP
      Notary Public - State of Florida
24    My Commission No. CC727560
      Expires:  March 24, 2006

25

69

1         SIGNATURE PAGE/ERRATA SHEET

2   WITNESS:  JAMES VINCENT FIORICA, M.D., 8/27/03
    CASE REFERENCE:  Pollard vs. Gupta, et al.
3
        After you have read your transcript, please note
4   any errors in transcription on this page.  Do not
    mark on the transcript itself.
5       Please sign and date this sheet as indicated
    below.  If additional lines are required for
6   corrections, attach additional sheets.  If there are
    no corrections, please indicate "None."
7   _____
    Page/Line    Error or Amendment/Reason for Change
8   _____
    _____
9   _____
    _____
10  _____
    _____
11  _____
    _____
12  _____
    _____
13  _____
    _____
14  _____
    _____
15  _____
    _____
16  _____
    _____
17  _____
    _____
18  _____
    _____
19  _____
        I have read my transcript and subscribe to its
20  accuracy, to include the corrections or amendments
    noted above or hereto attached.
21

22                 _____
                   JAMES VINCENT FIORICA, M.D.     Date

23                 _____

24                 (Witness)

25

70

1        ESQUIRE DEPOSITION SERVICES
         Suite 1080, Bank of America Plaza
2          101 East Kennedy Boulevard
            Tampa, Florida 33602
3             (813) 221-2535

4                September 8, 2003

5   James Vincent Fiorica, M.D.
    H. Lee Moffitt Cancer Center
6   12902 Magnolia Drive, Suite 3057L
    Tampa, Florida 33612
7
    Re: Pollard vs. Gupta, M.D.
8
    Dear Dr. Fiorica,
9
        Enclosed is a courtesy copy of the transcript of
10  your deposition taken on August 27, 2003, in the
    above-styled case.
11
        Please read the transcript and note any
12  corrections on the errata sheet provided.  You should
    sign the errata sheet before a witness.
13
        Please return the signature page/errata sheet
14  within a reasonable period of time to Esquire
    Deposition Services at the address listed above for
15   inclusion with the original transcript.

16      Please contact our office if you have any
    questions or if we may be of further assistance.
17   Thank you for your prompt and careful attention to
    this matter.
18

19                Sincerely,

20

21

Lori A. Clements, RPR-CP

22

23

cc:  Joan Cerniglia-Lowensen, Esq.; Lesley S. Zork,
    Esq.; Larry Adams, Esq.; Catherine A. Hanrahan,
24    Esq.

25