0001

1  VERONICA POLLARD, et al.,   *   IN THE
2      Plaintiffs,        *   UNITED STATES
3  v.                *   DISTRICT COURT
4  UNITED STATES, et al.,    *   FOR THE
5      Defendants.      *   DISTRICT OF MARYLAND
6              *   CASE NO.: WDQ02CV764
7          *  *  *  *  *  *

8

9          Deposition of GERALD H. SOKOL, M.D.
10              Rockville, Maryland
11              Monday, July 14, 2003
12                 4:28 p.m.

13

14  Job No.:  10-19024
15  Pages 1 - 82
16  Reported by:  Randy T. Sandefer, RPR
17
18
19
20
21
22

0002

1           Deposition of GERALD H. SOKOL, M.D., held at

2    the offices of:

3

4           L.A.D. REPORTING COMPANY

5           1984 East Gude Drive

6           Suite 201

7           Rockville, Maryland  20850

8           (301) 762-8282

9

10           Pursuant to agreement, before Randy T.

11    Sandefer, Registered Professional Reporter and Notary

12    Public of the State of Maryland.

13

14

15

16

17

18

19

20

21

22

```
                               0003
 1                  A P P E A R A N C E S
 2
 3
 4      ON BEHALF OF PLAINTIFFS:
 5          LESLEY S. ZORK, ESQUIRE
 6          BRUCE J. KLORES & ASSOCIATES
 7          915 Fifteenth Street, Northwest
 8          Suite 300
 9          Washington, D.C.  20005
10           (202) 628-8100
11
12
13      ON BEHALF OF DEFENDANT UNITED STATES:
14          LARRY ADAMS, ESQUIRE
15          ASSISTANT UNITED STATES ATTORNEY
16          UNITED STATES ATTORNEY'S OFFICE
17          U.S. Courthouse
18          101 West Lombard Street
19          Baltimore, Maryland  21201
20           (410) 209-4801
21
22
```

0004

| | |
|---|---|
| 1 | ON BEHALF OF DEFENDANT HUMANA MILITARY HEALTHCARE |
| 2 | SERVICES, INC.: |
| 3 | CATHERINE A. HANRAHAN, ESQUIRE |
| 4 | WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP |
| 5 | 1341 G Street, Northwest |
| 6 | Fifth Floor |
| 7 | Washington, D.C.  20005 |
| 8 | (202) 626-7660 |
| 9 | |
| 10 | |
| 11 | ON BEHALF OF DEFENDANT RAJ R. GUPTA, M.D.: |
| 12 | JOAN CERNIGLIA-LOWENSEN, ESQUIRE |
| 13 | MORGAN SHELSBY CARLO DOWNS & EVERTON |
| 14 | 4 North Park Drive |
| 15 | Suite 404 |
| 16 | Hunt Valley, Maryland  21030 |
| 17 | (410) 584-2800 |
| 18 | (Via Telephone) |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

0005

1         C O N T E N T S
2
3    EXAMINATION OF GERALD H. SOKOL, M.D.          PAGE
4
5        By Mr. Adams                    6
6        By Ms. Cerniglia-Lowensen                41
7        By Ms. Hanrahan               63
8        By Ms. Zork                74
9        By Ms. Cerniglia-Lowensen                77
10
11
12
13
14           E X H I B I T S
15           (Attached to the Transcript)
16    SOKOL DEPOSITION EXHIBIT                  PAGE
17        1   Curriculum Vitae               6
18
19
20
21
22

0006

```
 1            P R O C E E D I N G S
 2            GERALD H. SOKOL, M.D.
 3      having been duly sworn, testified as follows:
 4     EXAMINATION BY COUNSEL FOR DEFENDANT UNITED STATES
 5   BY MR. ADAMS:
 6      Q   Good afternoon, Dr. -- is it Sokol?
 7      A   Yes, sir.
 8      Q   My name is Larry Adams.  I'm with the U.S.
 9   Attorney's Office in Baltimore.  We are representing the
10   United States in this action.
11          Also present at counsel table is Catherine
12   Hanrahan, who represents Humana --
13          MS. HANRAHAN:  Good afternoon.
14   BY MR. ADAMS:
15      Q   -- and on the speaker phone is Joan Cerniglia-
16   Lowensen, who represents Dr. Raj Gupta, and all three
17   defendants in the case.
18      A   Okay.
19      Q   Let's go through your background a little bit.
20          As I understand it from your CV -- and we will
21   mark this as an exhibit a little later -- you graduated
22   from Indiana University -- well, it says Indiana
```

0007

1  University and Temple University, 1965.  I am a little
2  bit confused by that.
3      A   I spent a year at Temple.
4      Q   But your degree was ultimately from Indiana
5  University?
6      A   Yes.
7      Q   With an A.B. In Chemistry?
8      A   Correct.
9      Q   And then you received your master's at Indiana
10  in pharmacology in 1968; is that correct?
11      A   Yes.  It was a combined program in medicine and
12  pharmacology.
13      Q   All right, sir.  So that resulted in your M.D.
14  from Indiana in 1970, correct?
15      A   Correct.
16      Q   And your internship was at Temple University in
17  Philadelphia from 1970 to 1971?
18      A   Affirmative.
19      Q   Well, I didn't think you would lapse into the
20  military jargon until we got a little further down the
21  line; but if you want to, that's fine.
22          And let me put the onus on you then:  Where did

0008

1  you spend your residency in internal medicine and what
2  years?
3      A    That was in the United States Public Health
4  Service hospital in Baltimore, in affiliation with
5  Hopkins and NCI and the University of Maryland.
6      Q    When you say NCI, you are talking about the
7  National Cancer Institute?
8      A    That's correct.
9      Q    Was that the -- what used to be the old
10  Merchant's Hospital up on Winding Park Road?
11      A    Yes.  And the NCI had two or three floors, plus
12  all of the research buildings.
13      Q    And you did another residency at Massachusetts
14  General Hospital; is that correct?
15      A    Correct.
16      Q    And what years were those?
17      A    Oh, that was -- that was about 1973 to 1977.
18      Q    According to this, '76?  1976?
19          MS. ZORK:  Do you mind if he looks at it?
20          MR. ADAMS:  Sure, absolutely.
21      A    That was 1973 to 1976.  This is an old CV, I
22  think.  But, yes, that's correct.  And I was also a

0009

1  fellow at that same period of time.

2  BY MR. ADAMS:

3    Q   Now, as I understand it, you have several board

4  certifications.  Would you give us what they are and the

5  years.

6    A   Internal medicine, I was board certified in

7  approximately '76; medical oncology, somewhere about that

8  time, about a year or so later; radiation oncology, I

9  think was '76; medical oncology might have been '77 or

10  '78; clinical pharmacology was about '92.

11        Within a year of that, the Board of Quality

12  Assurance and utilization review, roughly about '92 or

13  '93.  It probably says here.

14    Q   Feel free to look at your CV.

15    A   Yes.  Here we go.  (Indicating.)

16    Q   And as I understand it, your last board

17  certification was 1992 when it says American Board of

18  Quality Assurance?

19    A   That's correct.

20    Q   Now, currently, how are you employed?

21    A   Well, I'm busy in private practice, so that's

22  job number one.  I'm also associated with a company

0010

1  called Tampa Scientific Association.  That's a research
2  company that does consulting in clinical and animal
3  research.  I also do work at the Center for Drug
4  Evaluation as well.
5      Q   I see on your CV -- and help me to understand
6  this.  I see there are a number of employments that begin
7  in a certain year and go to the present.  For instance --
8  and this is employment, so this is why I'm puzzled.
9          It says 1979 to present, president, Tampa
10  Scientific Association.
11     A   Yes.
12     Q   Is that a paid position?
13     A   It is my company.
14     Q   So you are the sole proprietor of the company?
15     A   I am the owner, yes.
16     Q   Well, is it a partnership?  Is it a
17  corporation?  Is it a Subchapter S corporation?
18     A   It is a corporation.
19     Q   Is it a close corporation or --
20     A   What do you mean by "close"?
21     Q   Are there a limited number of owners?
22     A   Me.

0011

1    Q    Just you?

2    A    Yes.

3    Q    But it has been incorporated?

4    A    Yes.

5    Q    It says Tampa Scientific Association.  I wasn't

6    sure.  Usually, it would say "corporation" or some other

7    designation of that nature.

8         What is the work of the Tampa Scientific

9    Association of which you are the owner?

10   A    We do research.  We do research evaluations.

11   We do consulting.  We do animal investigation.

12   Q    Well, that's a pretty broad spectrum.  For

13   instance, in the past year what kind of projects has your

14   company undertaken?

15   A    I have been looking at radio-protectors.  I am

16   looking at radio-protectors in a mouse model.

17   Q    Radio-protectors?

18   A    Yes.

19   Q    Okay.  I'm not sure what that is.

20   A    Well, a radio-protector is a drug that is

21   designed to mitigate the adverse effects of radiation on

22   an organism.  We are looking at various combinations of

0012

1  drugs as potential radio-protectors, and we are doing it
2  in animal models.
3      Q    And the scientific research involved in that,
4  was that something that you contracted with a
5  pharmaceutical company to do?
6      A    We are doing it through university, actually.
7      Q    And the particular project that you just
8  mentioned, the radio-protectors, what university is your
9  contract with?
10      A    Uniform Services University.
11      Q    That's the one located in Bethesda?
12      A    That's correct.
13      Q    So did they make a presentation and you bid on
14  that work?
15      A    No.  Somebody called me and they said, would
16  you be interested in doing this as a research study, and
17  I said yes.  I said, this is roughly what it would cost
18  to do, so we did the study.
19      Q    I see.  Does Tampa Scientific Association have
20  any other projects that it is currently testing for?
21      A    Let's see.  That's the main project right now.
22  That's the main project right now.

0013

1    Q    Okay.  Now, you also indicate that from 1987 to
2  the present you are a research review officer for the
3  Center for Drug Evaluation and Research at the FDA
4  located here in Rockville; is that correct?
5    A    That's correct.
6    Q    I'm not sure if that's in the Parklawn Building
7  or the --
8    A    Part of it is.
9    Q    Part of it is, okay.  Are you -- I know that
10  FDA has both, employs both government employees that are
11  reviewers; and that it is my understanding that they also
12  contract out for other clinical trials, or to review
13  papers that have been presented by people asking for
14  approval for drugs or medical devices.
15        Could you clarify exactly what your role is,
16  vis-a-vis the FDA?
17    A    Yes.  They pay me to evaluate drugs; to do
18  consultations for new radiation oncology devices; for
19  looking at radiation therapy accoutrements such as
20  dosimeters, positioning devices.  And I evaluate them.
21    Q    But you are not a government employee?
22    A    Well, they pay me.

0014

1    Q    I understand that.  But it is --
2    A    It is a contract.  I have a contract.
3    Q    You have a contract in your name or in the name
4  of Tampa Scientific Association?
5    A    In my name.
6    Q    For Dr. Gerald Sokol?
7    A    Yes.
8    Q    But you are not a general service employee?
9  You are not a GS-13 or -14 or anything like that?
10    A    I have a ranking.
11    Q    You do have a ranking, okay.  And what is that
12  ranking?
13    A    GS-15.
14    Q    Oh, you are a GS-15.  Are you a full-time
15  employee?
16    A    Oh, no.
17    Q    Okay.  I am a little puzzled because normally a
18  GS-15 would be a full-time government employee.
19    A    But I am a little unusual because there weren't
20  any other quadruple board certified people who could
21  really address the issue of radiation drug interactions.
22  No other guy like that, so maybe they are giving me a

0015

1  little slack or something.
2     Q   I understand they might -- for purposes having
3  to do with your interaction with the Agency -- give you
4  an equivalency, but I take it that you have a contract
5  with FDA?
6     A   I do.
7     Q   For particular projects?
8     A   Yes.  And those are -- the projects are broad;
9  I'm available to review anything.  And I make myself --
10  sort of graciously, I think -- available anytime anybody
11  has a question, or --
12     Q   Well, let me -- I'm not sure if this term
13  applies, but --
14        MS. ZORK:  Let him finish his answer, and don't
15  talk over him, please.
16        MR. ADAMS:  I'm sorry.
17        MS. ZORK:  That's okay.  Go ahead.
18  BY MR. ADAMS:
19     Q   I'm familiar with NIH, that they have what they
20  call intramural and extramural research projects?
21     A   And I have a volunteer appointment at the NCI
22  as well.

0016
1     Q    Right.  But what I'm trying to get at with
2  regard to the FDA -- let me finish my question.
3     A   I'm sorry.
4     Q    -- is that I take it that your contract with
5  FDA is as a consultant with various specialties.  As you
6  said, you have the five board certifications, and that
7  probably is a prized credential, several prized
8  credentials by the FDA.  But you are not a full-time FDA
9  employee, correct?
10     A   I'm not a full-time FDA employee.
11     Q    And I believe you said that the area that they
12  consult with you in is radiation oncology?
13     A   Well, I'm board certified in clinical
14  pharmacology, and I'm board certified in medical oncology
15  and radiation oncology.  So I have a broad spectrum of
16  clinical, pharmaceutical, and clinical practice issues
17  that I opine on.
18     Q    Well, let me put it this way:  You --
19     A    You are not going to get a special project that
20  doesn't exist.  I have lots of questions and lots of
21  reviews that they ask me to look at and lots of products
22  and lots of drugs and lots of issues and lots of

0017

1  questions.  I'm sorry I can't give you any specifics,
2  plus I think a lot of them are proprietary anyway.
3      Q    Well, that's helpful.  I understand today that
4  you had work at the FDA; is that correct?
5      A    Yes.
6      Q    What section were you working with the FDA?
7      A    I was working with drugs.
8      Q    I understand that.  But my experience in
9  defending FDA, there are various sections -- divisions,
10  if you will -- in the Agency.  And --
11      A    Well, today I did two projects.  I was with
12  radiologic health, and I was with drug evaluation and
13  research.  So I was doing a couple of things today.
14      Q    And were you giving a talk in those two
15  divisions, or you were simply consulting informally with
16  reviewers and researchers at the FDA?
17      A    You know, I don't know what is formal or not
18  formal over there seeing as how all of these things
19  impact on possible decision-making processes.  So I'm not
20  prepared to say that anything is necessarily informal.
21          I'm reviewing protocol about an interesting
22  combination of drugs, and I'm reviewing an interesting

0018

1  dosimetric device that has some very interesting clinical
2  implications.
3      Q    And with regard to the protocol that you
4  mentioned, who were you meeting with specifically in FDA?
5      A    Somebody called Shupping.  Do you want their
6  name?
7      Q    Yes.
8      A    Shupping.  Ralph Shupping.
9      Q    How do you spell that, if you know?
10     A    S-H-U-P-P-I-N-G.
11     Q    And with regard to the dosimetric device, who
12  are you meeting with?
13     A    That's who.
14     Q    It was the one individual with regard to --
15  they are two different things --
16     A    Talking.
17     Q    Okay.  Anybody else that you met with at FDA
18  today?
19     A    No.  Independent work.
20     Q    Now, you also listed as a present employment
21  vice chief of radiation oncology at Tampa General
22  Hospital?

0019

1     A    Yes.  That's not the case anymore.

2     Q    That's no longer the case?

3     A    I'm no longer vice chief.  I am just a -- it
4  has been taken over by the Moffitt Cancer Center, and I
5  am a staff physician at the Moffitt Cancer Center.

6     Q    So you are fulfilling a similar role, it is
7  just with the Moffitt Cancer Center now; is that correct?

8     A    I am a regular guy there now.  I'm not a vice
9  anything.

10    Q    Okay.  Just a staff physician?

11    A    No vice.

12    Q    Okay.  So we can take out the "vice" and make it
13  just --

14    A    I can also get you a newer CV so you don't have
15  to -- (indicating).

16    Q    Okay.  And you also list director of radiation
17  oncology, Gulf Point Cancer Center at Hudson Park?

18    A    That name has changed, too.  What did that list
19  me as?

20    Q    Director.

21    A    Right.  I'm, sort of, really the president.

22    Q    You are the president.  And is that a company

0020

1  that you also own?
2      A   I am a part owner in it.
3      Q   Is it a corporation or is it a partnership?
4      A   You know, the little legal things sometimes
5  escapes me.  There is a partnership component, and I
6  guess there is also a corporate part of it as well.
7      Q   Is it still known as the Gulf Point Cancer
8  Center?
9      A   No.  Its name has changed to New Hope Cancer
10  Center.
11      Q   Was that a change in ownership also?
12      A   No.  One partner died.
13      Q   And the remaining partners chose to change the
14  name?
15      A   Yes.
16      Q   I see.  And what is your role at the -- what is
17  now known at the New Hope Cancer Center?
18      A   I am engaged in the practice of oncology.
19      Q   So I take it that you see patients there and
20  make recommendations about their radiation treatment?
21      A   Yes.  And their medical oncology treatment as
22  well.

0021

1    Q    And the other position that I see is medical
2  director, chief medical officer of MetSolutions, a
3  Bozel --
4    A    That company was bought out as well.  So that
5  company is now defunct or whatever; defunct or digested
6  or --
7    Q    I'm sorry.  What is it?
8    A    Defunct, digested, disassembled.
9    Q    Is there a new name?
10    A    No.  It has been --
11    Q    So cross it out altogether?
12    A    There is a new name.  I forget the name of the
13  company that bought it.  Yes, scratch it.
14    Q    And you are no longer associated with the
15  successor company?
16    A    No.
17    Q    Okay.  I see.  So we can scratch that.
18        Now, you also have -- well, with regard to
19  academic appointments, I see that you have listed through
20  the present time an assistant professorship at the
21  University of South Florida School of Medicine in Tampa.
22  Does that still pertain?

0022

1    A    It changed.  It did change.  The Moffitt Cancer
2  Center became affiliated with the university, so now I
3  think I am an instructor at the Moffitt.  I don't know
4  what academic rank that is at this time.  But the
5  affiliation is with the cancer center, not with the
6  university now.
7    Q    And how about the assistant professorship with
8  the Uniform Services --
9    A    I still have an appointment.
10    Q    Do you teach at the Bethesda school frequently?
11    A    Yes.  And I do research frequently.
12    Q    Well, maybe I should rephrase the question:  Is
13  it primarily a teaching position or primarily a research
14  position?
15    A    Both.
16    Q    So when you are teaching there, how often do
17  you give classes or seminars or clinical --
18    A    I'm usually there every month, and at least --
19  oh, several hours every month in one capacity or another.
20  Of course, the research because a lot of the work is
21  off-site.  We didn't have any animal facilities there, so
22  the work that we are doing for research I am actually

0023

1  doing down near our practice in Tampa, near the
2  university down there.
3      Q    The research project that you are doing in
4  conjunction with the Uniform Services University, what is
5  that research project?
6      A    Well, part of it is the animal work, and
7  another part of it is studying carbonic anhydrase
8  activities in various compounds with respect to adverse
9  side effects and potential oncologic activities.
10     Q    And that research is being funded by --
11     A    There is no funding.  We are sending stuff off
12 to Sweden or Argonne National Laboratory.  We are just
13 doing it as a collaborative project.  We write away to a
14 drug company and get some drug samples.  So there is
15 really no funding, per se.  It is works of God.
16     Q    Okay.  Now, I take it that you testify a fair
17 amount as an expert in litigation; is that correct?
18     A    Yes.
19     Q    And what are your hourly charges?
20     A    Actually, it is really simple.  I charge $750
21 to $1,000 to review a case, and then that's pretty much
22 it.  If I have to prepare -- as I did today for a

0024

1   deposition or something -- it is up $200 an hour.

2       Q    And if you have to go to trial?

3       A    I try not to --

4       Q    Right.  So do we.

5       A    -- but if I have to, it would depend on how far

6   it is and what else I have to do and what my priorities

7   are at the time.  But somehow it always seems to come out

8   roughly to $200 an hour.

9       Q    For trial testimony as well?

10      A    After all of the time and effort and

11  preparation, that's what it seems to come out to,

12  strangely enough.

13      Q    Have you -- we are taking this deposition --

14      A    I didn't say I charge $200.  I said it seems to

15  come out to $200.

16      Q    No.  I understand.  It comes out to 200.

17  That's an hour --

18      A    I wasn't trying to obfuscate the answer at all.

19  I would be happy to tell you, but the truth is it does

20  vary a little bit depending on distance and time.

21      Q    Well, can you tell us what the average is that

22  you get when you go to trial?

0025

1   A  I don't know what the average is.  But if you
2  ask me the average, it comes out to about $200 an hour.
3   Q  Well, I mean the total you might receive if you
4  went to trial.
5   A  Well, if it is an enormous case and it is
6  complicated, I might spend ten hours reviewing the data,
7  and four or six hours in deposition, and four or five
8  hours traveling.  So it could add up to $4,000.  I don't
9  know that I have ever charged more than that, but that
10  would sort of be the max.
11   Q  Have you previously been employed by the firm
12  that Ms. Zork is with, Klores & Associates, the firm that
13  Ms. Zork is with?
14     MS. ZORK:  Objection to "employed."
15   A  I don't believe that I have ever had the honor
16  before.
17  BY MR. ADAMS:
18   Q  So this is the first time with Klores &
19  Associates?
20   A  Is that right?  I don't believe we have ever
21  met.
22     MS. ZORK:  We have never net.  I can't speak

0026

1 for other colleagues in my office. I don't know.

2 BY MR. ADAMS:

3     Q    But as far as you remember --

4     A    I don't remember any other.

5     Q    And, of course, this is July 14 we are having

6 this deposition. How many other cases have you been

7 involved with as an expert witness this year, 2003, the

8 first half of 2003?

9     A    I get one or two cases a month, maybe, to look

10 at.

11     Q    And when you complete your tax returns -- say,

12 in the past five years -- what has been the average that

13 you have earned from your testimony as an expert witness,

14 say, on a yearly average going back the past five years?

15     A    I would have to go back and look. I don't know

16 the answer to that question.

17     Q    Well, I believe you said that --

18     A    Do you want a hard number?

19     Q    What I want really is, sort of, a ballpark

20 number. I know you may not have it at your fingertips.

21     A    I really don't know. I really can't tell you

22 at this time.

0027

1    Q    Would you say it was $20,000 or less?
2    A    I really don't want to be inaccurate, so --
3    Q    I'm not asking for a hard number.
4    A    No, but I think it is more than that.
5    Q    $25,000 or less?
6    A    I better not get pinned down because I just
7  don't remember.
8    Q    So it is less than $50,000 then?
9    A    You could probably assume that.  But again, I
10  would just be guessing, and I don't want to guess.
11    Q    And what percentage of your income is derived
12  from testimony as an expert witness?
13    A    Oh, I'm sure it is less than 10 percent.
14  Certainly, less than 15 percent just to be super-safe.
15    Q    Now, in preparation for today's testimony, I
16  take it that you reviewed certain materials?
17    A    Yes, sir.
18    Q    Could you tell us what you reviewed?
19    A    Yes.  I have it right here.  (Indicating.)
20    Q    Go ahead and name those items for the benefit
21  of the court reporter.
22    A    The IC medical records from the Eisenhower

0028

1 Medical Center. The Menwith Hill Station; those are
2 medical records from England. The Cookridge Hospital
3 from Yorkshire Regional Center for Cancer Treatment in
4 England. The Lincolnheath RAF outpatient medical
5 records. The Walter Reed medical records.
6        A lot of these are redundant. These look to be
7 medical records from Eisenhower Medical Center, pretty
8 much in their entirety here. And there was a time line
9 provided by counsel. It says: Confidential attorney
10  work product.
11     Q    All right.
12        MS. ZORK: Just medical records. No big deal.
13     A    And I skimmed over the deposition of Dr. Sees;
14  the deposition of -- skimmed over the deposition of Mrs.
15  Pollard. There are two depositions of Dr. Sees, I guess.
16  I don't know how I did that.
17  BY MR. ADAMS:
18     Q    The deposition of Dr. Sees --
19        MS. ZORK: There was only one deposition. It
20  must have been my office's mistake.
21  BY MR. ADAMS:
22     Q    Right. But to make the record clear, the one

0029
1  deposition of Dr. Sees, the deposition of Mrs. Pollard.
2  Any other depositions?
3     A   No.
4     Q   Were there any medical reports or treatises or
5  anything else that you checked in preparation of your --
6     A   No.  I read about cancer all the time.
7     Q   Any Internet searches that you made in
8  preparation --
9     A   I'm always on the Internet looking at new stuff
10  on breast cancer.
11    Q   But nothing specifically with regard to this
12  case?
13    A   No.
14    Q   Let me turn back to your CV for a second.  Are
15  there any items in your publications that are pertinent
16  to your testimony today with regard to Mrs. Pollard?
17    A   Oh, I did a -- we did a report on breast cancer
18  radiotherapy and presented it at a national meeting.  I
19  did a study on hormonal treatment for breast cancer.
20    Q   Would you take a look at your CV.  Is there a
21  particular item that you are referring to?
22    A   Let's see here.  I do believe it is -- here we

0030

1  go.  There was an article on Danazol, abstract number 6
2  on this.
3      Q    Let me catch up with you.  Are you talking
4  number 6 about research interests and projects?
5      A    Abstracts.
6      Q    Abstracts.  Okay.  I'm not sure that I have
7  that.  Let me take a look at what you are referring to.
8      A    It is abstract number 6 there.  And there is
9  another abstract there on technique of irradiating breast
10  cancer.
11      Q    Where it says --
12      A    Horseshoe blocks.
13      Q    Are we talking University of South Florida
14  grand rounds, new approaches to breast cancer?
15      A    No.  Those are just little talks that I gave.
16      Q    Okay.  You are talking peer reviewed
17  publications?
18      A    These are abstracts, so these aren't peer
19  reviewed publications.  They are peer reviewed to
20  present, but they are not peer reviewed journal articles.
21      Q    You talk about number 6, Paladine, Ayres,
22  Price, Drapkin, Sokol, Kritz, et cetera, et cetera.

0031

1  Danazol inhibiter LH and FSH in the treatment of
2  recurrent metastatic breast carcinoma?
3      A   Yes.
4      Q   Any others?
5      A   That horseshoe block thing on radiotherapy
6  technique that is somewhere buried in there.
7          Let's see.  Here it is.  Horseshoe blocks for
8  isocentric tangential breast radiotherapy.
9      Q   What item is that?
10     A   That's number 12.
11     Q   Any others?
12     A   I just started a book on combined modality and
13  treatment that had issues of combined modality and
14  treatment for breast cancer in it.  But otherwise, not a
15  lot of breast stuff.
16     Q   But otherwise --
17     A   Not a lot of breast articles.
18     Q   Is there anything else that you brought with
19  you today that you reviewed or prepared in order to give
20  this testimony?
21     A   No.
22     Q   Did you author a report or a letter of any kind

0032

1  with respect --
2      A   No.
3      Q   You did not?
4      A   No.
5      Q   But I take it you did have -- without revealing
6   the content, you had conversation with counsel?
7      A   Yes.
8      Q   Okay.  Based on your review of the medical
9   records, do you have an opinion to a reasonable degree of
10  medical certainty as to the treatment of Mrs. Pollard?
11     A   Well, I reviewed her records so I have some
12  familiarity with her treatment.  I didn't memorize two
13  stacks, but I have some familiarity.
14     Q   So in trying to cut to your opinions here, what
15  opinions are you going to proffer today?
16     A   Well, I haven't been asked to address the
17  standard of care except for just one thing.  I mean,
18  obviously, doctors are responsible for the continuity of
19  the care, and they are responsible to see that patients
20  get the right treatment at the right time and the right
21  place.  And that's -- I know that is complicated, and I'm
22  not here to talk about the wrongdoings of any individual.

0033

1    Q    So what is your medical opinion?

2    A    About what?

3    Q    About the care rendered to Mrs. Pollard.

4    A    Well, you want to know a standard of care

5    opinion when I'm not here to give you one?

6    Q    No.  You said you were not going to give one.

7        MS. ZORK:  Let me just clarify one thing.  I

8    will be asking him as a general proposition:  What is the

9    standard of care for the timing of treatment from

10   diagnosis, chemotherapy, radiation therapy as a general

11   practice.  I haven't asked him to render opinions with

12   regard to who was at fault or -- hello?

13       MS. CERNIGLIA-LOWENSEN:  I'm sorry.  I didn't

14   hear what Lesley just said.

15       MS. ZORK:  I said I had discussions with Dr.

16   Sokol, and I intend to ask him questions in a general

17   sense about the timing of treatment, the standard of care

18   for the timing of treatment of breast cancer surgery,

19   chemotherapy, and radiation therapy.

20       I have not asked him to criticize or give

21   standard of care opinions with respect to who did what in

22   this case as a factual matter, and to render opinions

0034

1  about was it Dr. Sees' responsibility or was it Dr.
2  Gupta's responsibility or was it Dr. Adams'
3  responsibility; but, specifically, in a general sense,
4  what is the standard of care for the timing of treatment.
5          So that, we did talk about that.  And we are
6  going to be talking about radiation treatment and its
7  relationship to Mrs. Pollard's recurrence of breast
8  cancer, or the timeliness of the radiation treatment in
9  this case and its relationship to her recurrence and
10  metastasis of breast cancer.  So that's it.
11  BY MR. ADAMS:
12     Q    Did you understand what counsel just said?
13     A    I would have abbreviated it, but I think I
14  understand.
15     Q    Now, it is up to you to render your medical
16  opinion about the timing of care.  Can you do that?
17     A    Yes.  The treatment of breast cancer involves a
18  combination of surgery, chemotherapy, possibly hormonal
19  treatment, and radiation therapy.  And it is up to the
20  doctors, of course, to sort out the appropriate order and
21  timeliness of when these are given.
22          Mrs. Pollard chose a lumpectomy and radiation

0035

1  therapy as her treatment.  She had the options for
2  receiving chemotherapy and/or hormonal therapy depending
3  on the results of her surgical and pathological
4  evaluation.  When a patient chooses radiation therapy and
5  does not receive medical oncology treatment -- that is
6  drugs, chemotherapy management given -- we like to begin
7  radiation therapy as soon as possible for obvious reasons
8  because any cancer cells that are left behind will
9  continue to grow.
10      Q    Let me stop you right there.  What does the
11  "soon as possible" mean in your scenario?
12      A    As soon as healing has allowed treatment to
13  progress.  And by far the great majority of time, four
14  weeks is quite acceptable and the usual time for
15  initiation of postoperative radiation therapy.
16          The longer the delay, the longer the cancer has
17  a chance to grow and spread, and the less effective that
18  application of that therapeutic modality -- i.e.,
19  radiation therapy -- is.
20          And as I understand it, Mrs. Pollard's
21  radiation therapy wasn't initiated for a period of five
22  months, which would be not optimal treatment, obviously.

0036

1    Q    What is your understanding as to why Mrs.
2  Pollard did not undergo radiation therapy sooner?
3    A    I don't have an understanding of it.  And I
4  understand it is complicated, and I understand it is
5  controversial, and I understand that there are issues of
6  fact that I have not been asked to address.
7    Q    So you have no opinion about those issues of
8  facts; is that correct?
9    A    No, sir, I don't.  Other than just the general
10  standard of care, the treatment should be initiated as
11  soon as possible.
12    Q    To what degree is it the responsibility of the
13  patient to demand or ask for the radiation treatment that
14  you have been speaking about?
15         MS. ZORK:  Objection.  Go ahead.
16    A    If you are asking as a general question, the
17  responsibility of the patient is to conscientiously
18  follow the recommendations of her physician.
19  BY MR. ADAMS:
20    Q    Have you spoken with either Mrs. Pollard or her
21  husband?
22    A    No, sir.

0037

1    Q    Do you have any factual understanding of what
2  Mrs. Pollard's or her husband's obligations were with
3  respect to his military assignments during the time
4  period in question, which would be roughly November-
5  December of 1998?
6    A    No.  I haven't been involved in the
7  administrative issues of his military life.
8    Q    Now, with respect to the fact that she did not
9  receive radiation therapy within the window that you have
10  described, what were the medical/scientific consequences
11  based on your reading of the records?
12        MS. ZORK:  Objection to the form.  Go ahead.
13    A    Medical and scientific consequences are kind of
14  a broad, undefined question.  I could certainly tell you
15  the medical consequences, and I could base those medical
16  consequences on my understanding of the science, if
17  that's what you mean.
18        The medical consequences are, of course, that
19  if your cancer cells are left behind in the field which
20  was to be irradiated, the likelihood is that the cancer
21  would grow back.  In this case, as you know, the cancer
22  did grow back with devastating consequences.

0038

1       If there is a tragic aspect, the tragic aspect
2  is that radiotherapy given with the appropriately timed
3  treatment program will result in control of disease and
4  likely contribution to cure 80 to 90 percent of the time.
5  BY MR. ADAMS:
6    Q   You are right to point out that I asked the
7  question in a broad way, and you answered it in a broad
8  way also.  But is your understanding based on the review
9  of any studies that have been done that relate to the
10  increased morbidity or mortality that results in a delay
11  of receiving radiation similar to Mrs. Pollard's
12  situation?
13    A   Of course.  By all of my training and
14  experience and literature review --
15    Q   No.  I understand --
16        MS. ZORK:  Objection.  Let him finish his
17  answer.  Okay?
18        THE WITNESS:  All of my training and experience
19  and practice and reading and education impact on that
20  answer.  Of course, there is data to corroborate that.
21  BY MR. ADAMS:
22    Q   Right.  I understand that answer.  What I'm

0039

1  asking for:  Are there any particular studies that you
2  referred to or that you reviewed in preparation for your
3  testimony today?
4      A    I have not reviewed any because I deal with the
5  issue just literally every week.  So the issue is so well
6  addressed in standard textbooks of radiation oncology and
7  standard textbooks of medical oncology that they really
8  are not argued about.  These are givens.
9      Q    Based on your testimony that you just gave, are
10  there any particular textbooks or studies that you have
11  in mind?
12      A    I don't have any particular textbooks because
13  they all reach the same conclusions and basically
14  describe many of the same studies.  So I can cite you the
15  standard textbooks of radiation oncology or medical
16  oncology that corroborate the need and the consequences
17  of not filling that need for, finally, radiation therapy.
18      Q    Is there a particular textbook that you refer
19  to more than others?
20      A    No, sir.
21      Q    With regard to directing or giving radiation
22  therapy after surgery, after the wounds have healed, you

0040

1  indicated, as I understand your testimony, that the
2  normal course would be four weeks, perhaps a little bit
3  longer depending on the kinds of wounds that are healing.
4          Is that correct?
5      A   Well, when you say the "normal course,"
6  radiation therapy given preferably within four weeks, on
7  or about four weeks status, post-surgery.  And we
8  typically wait for wounds to heal before initiating
9  radiation therapy.
10          However, having said that, that is not a
11  mandatory circumstance.  In many occasions in which
12  people are at risk for tumor recurrence, we begin
13  radiation therapy regardless of whether the wound heals
14  or not because we do have experience that wounds continue
15  to heal even though the site has been irradiated.
16          So depending on the severity and the need for
17  the institution of radiation therapy, there are occasions
18  where they damn the torpedoes -- if you don't mind me
19  using a military term.
20      Q   Is there anything in this record, Mrs.
21  Pollard's record, of radiation given before four weeks of
22  the surgery?

0041

```
 1     A    No.  I don't see any lead that that needed to
 2  be given before four weeks.  Surgeons have a compromise
 3  as well.  And as I understand it, their comfort level was
 4  somewhat within that range.
 5         MR. ADAMS:  I don't have any further questions
 6  right now.  Joan, did you want to go next?
 7         MS. CERNIGLIA-LOWENSEN:  I do.  Is that okay,
 8  Catherine?
 9         MS. HANRAHAN:  Sure.  Go ahead.
10         EXAMINATION ON BEHALF OF DEFENDANT GUPTA
11  BY MS. CERNIGLIA-LOWENSEN:
12     Q    Doctor, can you hear me okay?
13         MS. ZORK:  Barely.  Joan, if you could talk up
14  just a little bit or get closer to the phone?
15         MS. CERNIGLIA-LOWENSEN:  I actually have the
16  speaker right next to my mouth, so let me try a little
17  louder.  Is that any better?
18         MR. ADAMS:  Yes.  That's good.
19  BY MS. CERNIGLIA-LOWENSEN:
20     Q    Doctor, did you review the deposition of Dr.
21  Gupta?
22     A    No, ma'am.
```

0042

1    Q    Was it sent to you, sir?

2    A    It might have been.  I was told that it was,
3  but I couldn't find it.  So I didn't review it possibly
4  because I couldn't find it.  But I didn't see it.

5    Q    Okay.  Thank you.  I just want to make sure.  I
6  think that I understand this, but I want to make sure
7  that it is clear for me.  You are not going to come into
8  court and say that Dr. Raj Gupta deviated from accepted
9  standard of care; is that right?

10    A    That's correct.

11    Q    Okay.  Now, you testified or you will testify
12  that timing is important for radiation with a patient
13  with breast cancer; is that correct?

14    A    That's correct.

15    Q    And for the patient like Mrs. Pollard -- and it
16  is my understanding that her tumor was a T1, a node
17  negative with no metastasis.  Is that your understanding,
18  sir?

19    A    That's my understanding.

20    Q    What is the window of time you are operating in
21  with a patient such as Mrs. Pollard?  And from that what
22  I mean is when is radiation too late to prevent the

0043

1  metastasis and the recurrence?
2      A    When is radiation what?
3      Q    Too late, sir.
4      A    Well, it is too late when the cancer spreads,
5  and that varies from person to person and tumor to tumor.
6  And there is no threshold.  There is no watershed day
7  when the deed is done.  So far as we can tell, it is a
8  statistical phenomenon, and the longer you wait the worse
9  the chances are of the cancer coming back.
10     Q    When you say that it varies from patient to
11  patient, can you give me any range?  What is the quickest
12  that you would expect that you might see recurrence in a
13  patient?
14        MS. ZORK:  Objection.  Is this in any patient,
15  or are you talking about with most patients, or what?
16  BY MS. CERNIGLIA-LOWENSEN:
17     Q    In a patient with breast cancer, T1 M0 N0, what
18  is the quickest that you could expect to see a
19  recurrence?
20     A    Well, obviously, it depends on how the patient
21  is treated.
22     Q    I want you to assume hypothetically that for

0044

1  whatever reason radiation is delayed.  What is the
2  quickest when you would expect to see a recurrence?
3      A    Well, that involves so many astounding
4  variables that I find it a difficult question to answer
5  in a meaningful way because it depends on the size of the
6  cancer, the location of the cancer.  It depends on some
7  possibly histological characteristics.
8          It depends on how well the surgeon did his job,
9  what kind of margins the surgeon got, growth rates of the
10  cancer, impact on that.  All sorts of hereditary issues,
11  all sorts of citicoline issues.  It is a very complicated
12  issue.
13          If you want that answer -- if you want that
14  question answered phenomenologically, I mean,
15  theoretically, cancer can come back in days if it is not
16  treated appropriately.  And some cancers, depending on
17  how they are treated, could take months or years.  I have
18  seen a spectrum of days to many, many years.
19      Q    Is there a way to predict to a reasonable
20  degree of medical probability as to exactly when Mrs.
21  Pollard's cancer reoccurred, even in hindsight looking at
22  this?

0045

1    A    Well, yes.  I could tell you it reoccurred when
2  she developed chest pain in England.  And I can give you
3  the dates if you would like.  We certainly know it
4  occurred then because we have biopsy and palpable proof
5  of its presence.  So we know it recurred then.
6          And if you are asking me when it recurred
7  subsequent to that, the likelihood is it was growing
8  subsequent to the time of surgery because it likely never
9  completely disappeared; considering the fact, of course,
10  that she didn't get treated.
11    Q    So it is your belief, your testimony, your
12  understanding that this cancer reoccurred right after the
13  time of surgery, and then grew up to the point when it
14  was diagnosed in England.  Is that correct?
15    A    Well, hang on a second.  Let's make sure we are
16  using the right definitions.
17          This cancer in one aspect may have never
18  disappeared, obviously.  There were cancer cells there at
19  the time of surgery.  There were cancer cells there after
20  surgery.  These cancer cells likely grew during radiation
21  therapy.
22          The growth of the cancer was delayed, no doubt,

0046

1  by that radiation therapy. Those cancer cells continued
2  to grow, the ones that survived, and then presented
3  themselves as an apparent recurrence.
4        So when you say "recurrence," I don't mean to
5  be mincing words, but you have to be careful about
6  whether you really mean a persistence versus a
7  recurrence.
8     Q    Which do you believe was the case here?
9     A    Obviously, there was a persistence because she
10  had a cancer, and, as I said, it grew and it came back.
11     Q    Now, Doctor, I presume that there are instances
12  where patients get what you would define as prompt
13  radiation therapy, and their cancer still persists and
14  reoccurs. Is that correct?
15     A    Patients get -- did you say some
16  sub-radiotherapy.
17     Q    No. I said they get what you deem to be the
18  appropriate amount and the appropriate timing for
19  radiation therapy --
20     A    Yes.
21     Q    -- yet their cancer still persists and still
22  reoccurs. Is that right?

0047

1      A    Yes.  And in patients such as Mrs. Pollard,
2   that happens less than 10 percent of the time.
3      Q    What --
4      A    So 90 percent of the patients enjoy a local
5   regional recurrence-free existence within plus or minus 5
6   percent.
7      Q    When you say "patients such as Mrs. Pollard,"
8   what are you defining as being her characteristics that
9   put her in that 10 percent?
10     A    Ma'am, I used your definition.  It was a T1 N0
11  M0 cancer.
12     Q    Well, it wasn't really my definition.  It was a
13  definition by the pathologist; is that correct?
14     A    It was the one that was relayed to us both and
15  conveyed by you and agreed upon by me.
16     Q    Thank you.
17     A    And, as you know, there were questions about
18  the size, as you know, in different locations.
19     Q    You haven't reviewed the slides, so you don't
20  know really which of the sizing is correct.  Is that
21  true?
22     A    I relied on pathological determinations for my

0048

1  opinion and giving a broad spectrum, a possible barred
2  spectrum of pathological interpretation.
3      Q    For purposes of your opinion, is it germane as
4  to whether it was a T1 of a .5 centimeters or a T1 of 1
5  centimeter?  Does that make a difference to your opinion?
6      A    Well, like I said, I answered the question
7  within broad boundaries so that they would still be very
8  likely to be within a reasonable degree of medical
9  certainty.  So the answer is sure, it makes a difference
10  if a tumor is a half of a centimeter or 1 centimeter.
11          But even within those boundaries, the
12  likelihood is 90 percent, plus or minus a little bit,
13  that the tumor was controlled by appropriate and timely
14  radiation therapy after surgery.
15      Q    Dr. Sokol, is there a way to predict whether a
16  particular patient will fall into the 90 percent that
17  will have a -- be cured for a period of time or whether
18  they will fall into that 10 percent?
19      A    Well, we certainly make attempts at doing that.
20  Quite honestly, we are not very good about it.  When it
21  happens, we are often surprised about the nature of the
22  patient that constitutes 10 percent because we don't have

0049

1  great predictors.
2         There are articles in the literature that
3  specifically address prognostic factors for recurrence.
4  And those -- I can give you those factors, if you are
5  interested, that might be associated with a higher
6  incidence of what we refer to as local regional
7  recurrence, such as tumor size, such as the presence of
8  in citu disease, the amount of in citu disease, the
9  nature of the margins.
10         Some studies have been done addressing the risk
11  factors of estrogen receptor positivity or negativity.
12  But the truth of the matter is that having read all of
13  that data at one time or another and digested it, the
14  truth is we are really bad about picking those 10
15  percent.
16     Q    Is heredity an issue at all?
17     A    I'm sorry?
18     Q    Is heredity an issue at all, Doctor?
19     A    An issue in recurrence or an issue in the
20  presence?   With what end point in mind?
21     Q    I'm sorry.  I didn't hear your answer.
22     A    I don't know with what perspective you want me

0050

1   to address heredity.

2      Q   Yes.  Heredity as for recurrence.

3      A   It is not typically considered a risk factor

4   for recurrence.

5      Q   So, Doctor, it is my understanding – and tell

6   me if I'm correct or not -- that your opinion, you have

7   an opinion to a reasonable degree of medical probability

8   as to whether prompt radiation therapy, as you define

9   "prompt," would have made a difference in Mrs. Pollard?

10     A   Well, I believe it would just on a statistical

11  basis.  Patients that are timely treated roughly about 90

12  percent of the time have control of their disease in

13  their chest wall and breast.  I would have to say that --

14  and patients that don't have it develop recurrences with

15  much, much higher frequency.

16     Q   Other than for a statistical -- based upon

17  statistics, is there anything in particular about Mrs.

18  Pollard or her presentation where you can say that it is

19  more likely than not that she would have fallen into the

20  90 percent?

21     A   Well, yes.  She would have fallen into the

22  likely 90 percent of local control because she had a

0051

1  small tumor and she had no lymph nodes.  Both of those
2  are good prognosticators for local control of disease
3  given appropriate therapy.
4     Q   Do you know of any studies similar that we
5  talked about with the 90 percent or 10 percent that deal
6  with local reoccurrence for persistent disease, that you
7  were telling me about, that deal only with T1 tumors
8  where the patient is node negative?
9     A   There are some papers that I have read in days
10  of yesteryear that address that issue.  I don't have them
11  on my fingertips, but probably sitting down at Medline I
12  could resurrect them.
13     Q   Would you know approximately what the
14  percentages are with those patients that are T1 and node
15  negative?
16     A   The percentages of what?
17     Q   Reoccurrence.
18       MS. ZORK:  With or without radiation therapy?
19  BY MS. CERNIGLIA-LOWENSEN:
20     Q   With radiation therapy.
21     A   Yes.  It is quite low.  It is on the order of
22  roughly 10 percent, plus or minus perhaps 5 percent.

0052

1    Q    So the numbers are the same basically that you
2 had told me previously?
3    A    Yes.  She is a lady that typically we would
4 anticipate would have good local control of her disease
5 given appropriate and timely treatment.
6    Q    Dr. Sokol, do you have any opinions regarding
7 the role of chemotherapy in this case?
8    A    Yes.  I have opinions.
9    Q    What are those, sir?
10    A    Well, I would have preferred that she had had
11 chemotherapy, and to some extent -- not necessarily a
12 great extent, but to a little extent chemotherapy would
13 have helped to control local disease, but was certainly
14 not the most important factor in the control of her local
15 disease.  That was radiation therapy.
16        And that is a value judgment.  That is a
17 decision that not everybody would agree with.  That's my
18 own personal opinion.  And, as you know, it is a
19 controversial opinion because doctors at that time
20 legitimately had differences of opinion.
21    Q    What do you mean when you say it was a value
22 judgment?

0053

1    A   I'm just saying some doctors thought it was
2    okay, and some doctors didn't think it was necessary
3    based on the small size of her tumor.
4    Q   Doctor, you reviewed the medical records.  Did
5    you review the records of Dr. Gupta in this case?
6    A   I believe I did.
7    Q   And you saw -- correct me if I'm wrong -- the
8    letter that he wrote to the physicians in England?
9    A   To whom it may concern?
10    Q   Yes, sir.
11    A   Yes, ma'am.
12    Q   And do you have any problems with the protocol
13    set forth in those letters or recommended by Dr. Gupta?
14    A   Well, you know, I'm not here to talk about the
15    standard of care.  I'm not here to criticize Dr. Gupta.
16    I hate to have you drag stuff out of me.
17    Q   Well, if you have any opinions in that area
18    that you think you might be inclined to espouse at trial,
19    I want to hear them.  If not, I don't need to hear them.
20    MS. ZORK:  I am not going to ask him -- I mean,
21    I already put on the record that I'm going to be asking
22    about timing issues:  if you are going to do

0054

1  chemotherapy, when do you do it; if you are going to do
2  radiation therapy, when do you do it.
3      He has already testified that he would do
4  chemotherapy in this case, but I'm not going to be asking
5  him about standard of care of Dr. Gupta or Dr. Sees or
6  Dr. Adams.
7  BY MS. CERNIGLIA-LOWENSEN:
8      Q   Dr. Sokol, when would you initiate chemotherapy
9  in Mrs. Pollard?
10     A   Well, if I had the opportunity to see her and
11  talk to her, and we both agreed that it was in a
12  reasonable adjuvant to her general whole treatment
13  program, I would have started chemotherapy within four
14  weeks roughly; maybe a little bit earlier or maybe a
15  little bit later.  And I would have given her
16  chemotherapy for several months, and then instituted the
17  radiation therapy.
18     Q   So the chemotherapy would occur after the
19  radiation therapy?
20     A   No.  I indicated that chemotherapy typically
21  occurs before radiation therapy, but I don't know that is
22  a critical issue.  It is debated and studied, and we have

0055

1  sort of come to a general consensus of how we do it.  But
2  the timing doesn't seem to be extremely important.
3      Q   Dr. Sokol, does chemotherapy prevent local
4  reoccurrence?
5      A   As I said before, it contributes slightly.  But
6  in no way does it contribute anywhere near as impactfully
7  as radiation therapy.  And we would never, never not give
8  radiotherapy based on the fact that a patient had
9  previously received chemotherapy instead.
10     Q   So to prevent local recurrence, we are talking
11  basically radiation is what does the major job for that;
12  is that right?
13     A   Yes, ma'am.
14     Q   When Mrs. Pollard reoccurred, does she have a
15  local recurrence?
16     A   Yes, she did.  We would refer to it as a local
17  regional recurrence.
18     Q   What does that mean?  Is there a difference?
19     A   Well, there is a difference because a local
20  recurrence generally refers to a recurrence in the
21  breast.  And a local regional recurrence typically refers
22  to the presence of tumor in the surrounding draining

0056

1  lymph nodes such as the supraclavicular fossa or the
2  peristernal lymph nodes.
3      Q    And when you are talking about local regional
4  reoccurrence like you just explained to me with the lymph
5  nodes, what is the best means of preventing that?  Would
6  it be radiation therapy?  Would it be chemotherapy?
7      A    Well, for a local regional problem, you can't
8  beat the efficacy of radiation therapy.
9      Q    Doctor, you told me that chemotherapy should
10  have been initiated about four weeks, and you said give
11  or take.
12     A    Well, I didn't say "should."
13     Q    Okay.
14     A    I think we discussed the fact that it was
15  controversial, and that I personally would have done it;
16  but I am not criticizing any of the doctors that elected
17  not to give it.
18     Q    Okay.  With that caveat, if chemotherapy was to
19  be given -- and it was determined that that was the
20  appropriate modality to begin with -- you said four
21  weeks, give or take?
22     A    Yes.

0057

1    Q   What do you mean by "give or take"?  What is
2  the time span that we are talking about?
3    A   We like to begin as radiation therapy --
4  similar to radiation therapy, we like to begin
5  chemotherapy as soon as we can.
6       As you know, these days some chemotherapy is
7  actually given even before the surgery.  And some
8  chemotherapy these days are given during surgery in some
9  protocols, and some chemotherapy is given relatively
10  rapidly thereafter.  But in this country with our
11  standard regimens, typically we give it within three to
12  five weeks.
13    Q   Doctor, you talked about discussing with the
14  patient chemotherapy and the benefits of chemotherapy.
15  Are there downsides to chemotherapy that you feel that
16  you would need to discuss with the patient?
17    A   Oh, absolutely.
18    Q   What kind of things are they, sir?
19    A   Well, chemotherapy has significant toxicity,
20  both acute as well as chronic.  It is cytotoxic.  It
21  causes low blood counts.  It increases susceptibility to
22  infection.  It causes nausea, vomiting, fatigue, hair

0058

1  loss.
2      The Adriamycin, a drug that one of the doctors
3  suggested using, has potential cardio-toxicity.  There is
4  a small incidence of secondary cancers associated with
5  the delivery of chemotherapy.  So there are a lot of
6  potential toxicities.
7   Q   And you discuss all of those downsides with the
8  patient before determining what the appropriate regimen
9  is for that patient?
10   A   Yes.  That would be an important part of the
11  informed consent process.
12   Q   Dr. Sokol, when Mr. Adams was asking you about
13  your present activity and you listed those, can you
14  define for me percentages in terms of how much time you
15  spend doing all of these various positions that you hold?
16   A   Sure.  Within the -- oh, I would say within 60
17  or 70 hours that I find myself working these days, I
18  would say about 40 of it is taking care of patients, and
19  20 or 30 of it is doing research or teaching or writing
20  papers or evaluating drugs or new devices and things of
21  that nature.
22      Sometimes these things are obviously redundant

0059
1  and sometimes they overlap.  For instance, we use our own
2  patients to do some of our research studies.  So some of
3  the research time actually involves taking care of our
4  own patients.
5      Q    Dr. Sokol, your patients that you see, your own
6  patients, approximately how many of the patients that you
7  see on a percentage basis annually have breast cancer?
8      A    A good chunk of them.  I would say 20 to 25
9  percent of the patients that I see probably have breast
10  cancer.  That's just a rough estimate.
11      Q    Doctor, do you have any opinions as to the
12  efficacy of chemotherapy in patients like Mrs. Pollard
13  with a T1 node negative tumor?
14      A    Well, as we discussed, chemotherapy has some
15  efficacy in maintaining the local control of cancer.  It
16  is certainly not as good as the combination or with
17  radiation therapy alone, but it does have some efficacy.
18      Q    Do you have any idea what the percentage is?
19      A    Oh --
20          MS. ZORK:  You mean in a patient who has had a
21  lumpectomy, who has only had chemotherapy, and not
22  radiation treatment?

0060

 1  BY MS. CERNIGLIA-LOWENSEN:
 2     Q    Doctor, does that fit in your hypothetical?
 3  I'm asking --
 4         MS. ZORK:  I'm not asking what your
 5  hypothetical is for purposes of asking him to opine about
 6  the effectiveness --
 7         MS. CERNIGLIA-LOWENSEN:  I appreciate that,
 8  Lesley, but I think what you need to do -- your
 9  obligation is objection.  And if the doctor needs
10  clarification, he can certainly ask.
11         THE WITNESS:  I'm asking.
12         MS. CERNIGLIA-LOWENSEN:  Okay.  And in the
13  future, Counsel, if you would just object, I would
14  appreciate you limiting your speaking objections.
15         MS. ZORK:  When I have a question about it,
16  then I will object.  And if I want to make a point to
17  you, then I will ask Dr. Sokol to leave the room.
18         MS. CERNIGLIA-LOWENSEN:  That's fine.  We can
19  ask the doctor to leave, and we could have a discussion
20  on the record.  That would be fine.
21  BY MS. CERNIGLIA-LOWENSEN:
22     Q    Dr. Sokol, assume that a patient such as Mrs.

0061

1  Pollard presented with a T1 node negative cancer, and she
2  says to you:  Doctor, if I take chemotherapy with
3  radiation therapy, what percentage improvement will that
4  give me from a prognostic standpoint?
5        What would you tell her?
6      A    Well, I would tell her the following:  that it
7  depends on the kind of chemotherapy; that it is not not
8  recommended alone; that it would have some efficacy in
9  decreasing the potential for local regional recurrence,
10  but I couldn't give her exact percentages.  Because it is
11  not something -- obviously, withholding treatment is not
12  something that we try to do prospectively when it has
13  been proven to be efficacious.  I don't know that I can
14  give her very good specifics.
15      Q    But, Doctor, I'm not suggesting that you have
16  studies regarding withholding treatment.  I presume that
17  there is a percentage of patients who have T1 N0 tumors
18  who opt to have chemo with their radiation, and then some
19  don't for whatever reason.  Either they determine it on
20  their own or certain physicians might recommend one
21  course over another.
22        Are you aware of any studies that looks at

0062

1   these two groups and determines the rate of recurrence in
2   these patients?
3       A   When you say "these patients," to specify, you
4   are specifically talking about patients that got
5   chemotherapy but not radiotherapy?
6       Q   No, sir.  Both.  Chemotherapy and radiation as
7   compared to radiation.
8       A   Okay.  Well, yes.  In patients like this,
9   chemotherapy adds perhaps -- and these are estimates --
10  perhaps, maybe, 5 percent to local control; maybe.
11          If local control is 90 percent, plus or minus 5
12  percent, you will get a small additional local control
13  with chemotherapy of 2 to 5 percent maybe with this kind
14  of patient with a small T1 tumor.  In other words, not
15  enormously impactful in terms of local control.
16      Q   Doctor, do you have any other categories of
17  opinions that I have not discussed with you?
18      A   Well, I think I said what I came here to say,
19  what I have been asked to come here to say.
20          Unless you have any other opinions, that's
21  really, I think, the opinions that we were going to
22  express today.

0063

1    Q   One more thing I wanted to ask you:  Do you
2  have any opinions as to whether Tamoxifen would have been
3  appropriate or necessary for Mrs. Pollard?
4    A   Well, the studies have suggested that in an
5  estrogen receptive negative tumor, Tamoxifen is not
6  helpful.  So the decision not to utilize it, I think, is
7  reasonable.
8        Again, I saw other opinions in the record,
9  based on their training and experience, that might have
10  cited different recommendations; but I would not have
11  used it, and I see no role for it in Mrs. Pollard.
12        MS. CERNIGLIA-LOWENSEN:  I don't have any other
13  questions, Dr. Sokol.  Thank you.
14        MS. HANRAHAN:  Good afternoon, Doctor.  I think
15  I only have a few questions.
16        THE WITNESS:  Okay.
17        EXAMINATION ON BEHALF OF DEFENDANT
18        HUMANA MILITARY HEALTHCARE SERVICES, INC.
19  BY MS. HANRAHAN:
20    Q   As I introduced myself earlier, my name is
21  Catherine Hanrahan.  I represent Humana Military
22  Healthcare Services, Inc.

0064

1      A few moments ago you were asked about what you
2  characterized to be prompt radiation therapy, which I
3  think you said in your opinion would have altered the
4  outcome given the statistics of the type of tumor Mrs.
5  Pollard had -- which has been identified as a T1 N0 M0;
6  is that right?
7    A  Yes.
8    Q  The question that I heard asked of you -- or
9  let me rephrase my question:  Are you familiar with any
10  studies done in the late 1990s or published in the late
11  1990s that address the frequency of recurrence in
12  patients who are T1 N0 M0 who have lumpectomies but
13  choose no further treatment?
14    A  Including radiation therapy?
15    Q  That's correct.  No further treatment.  Are
16  there such studies?
17    A  There are.  Well, I don't know that -- there
18  are studies published whose data is published.  A lot of
19  those studies have been done earlier when we were
20  developing.  So many of the studies were done in the
21  '70s, '80s; many more studies than what has been done in
22  the 1990s.  But, yes, there are studies published, sure.

0065

1    Q   With respect to those studies, what do you
2  understand to have been the conclusion with respect to
3  the number of patients who reoccur who chose no further
4  therapy?
5    A   Well, the number that recur far surpasses the
6  numbers that recur with radiation therapy, obviously.
7  But not all of them recur, obviously, if that's what you
8  are shooting for.
9    Q   I understand that.  But I guess what I'm asking
10  you is:  Similar to your 90 percent characteristic, what
11  do you understand to have been the conclusion of those
12  studies with respect to the percentage of patients who
13  reoccur who chose no further therapy but surgery?
14    A   So you are asking me as part of a global
15  T1 apart from the receptor --
16    Q   I am, absolutely.
17    A   The numbers vary in those studies, obviously.
18  And the consistent frequently recurring number is about
19  40 percent that will recur.  Not all of them will recur
20  obviously.
21    Q   So in the context that you are familiar with in
22  legal/medical expert standards, when asked whether Mrs.

0066
1  Pollard would have reoccurred had she chosen no further
2  therapy, isn't it correct that within a reasonable degree
3  of medical probability the answer would have been she
4  most likely would not have --
5        MS. ZORK:  Objection.
6  BY MS. HANRAHAN:
7      Q   -- given those studies?
8        MS. ZORK:  Because it is four times greater
9  than ten.
10     A   It depends.  If you are saying are these or are
11  these patients more likely than not on a statistical
12  basis, no, you can't argue with the statistics.
13  BY MS. HANRAHAN:
14     Q   Right.
15     A   But you are right.  The 10 versus 40 percent --
16  as a risk we wouldn't accept it.
17     Q   I'm not suggesting to take the risk.  But the
18  conclusion of those studies basically was 60 percent of
19  patients who choose no further therapy would not recur
20  with a T1 N0 M0, correct?
21     A   Insofar as those studies have been done and not
22  a very long follow-up; but, yes, within the framework and

0067

1  the limitations of those studies, that would be correct.

2      Q    Now, this is why I have asked these questions,

3  because you have rendered the opinion that Mrs. Pollard,

4  had she received prompt radiation therapy, would most

5  likely not have reoccurred?

6      A    That's correct.

7      Q    What is the premise of that opinion?

8      A    The premise of the opinion is that when

9  patients get timely radiation therapy, only 10 percent of

10  them recur.

11      Q    But we know that 10 percent do reoccur?

12      A    Yes.

13      Q    And what, other than the general population of

14  statistics, have you relied upon to say Mrs. Pollard,

15  having gotten radiation therapy about five months after

16  surgery, would not have been one of those 10 percent?

17      A    Well, nobody can say that she wouldn't have

18  been one of those 10 percent, but the odds are against

19  it.

20      Q    Now, I think you also rendered the opinion --

21  and correct me if I heard it incorrectly -- because she

22  did not receive what you identified as prompt radiation

0068

1  therapy --
2        MS. ZORK:  Objection.  He said appropriate
3  radiation therapy.  He didn't say -- you keep saying
4  "prompt."
5        MS. HANRAHAN:  That's what I thought the doctor
6  said.  I'm pretty confident he said "prompt."  I'm using
7  his word.
8  BY MS. HANRAHAN:
9     Q   Doctor --
10    A   I don't have any problem.  Go ahead.
11    Q   -- I just was using the word I thought you
12  used.  But here is my question:  If I understood you
13  correctly, it is your opinion that because she didn't
14  receive prompt and/or appropriate radiation therapy, the
15  cancer -- which was surgically treated in November -- was
16  never alleviated.  Is that right?
17    A   Yes.  The cancer that was surgerized (sic) did
18  not expurgate all of the tumor.
19    Q   Based upon your experience, if that statement
20  is true, what signs or symptoms would you generally
21  expect to see in a patient whose cancer was not
22  alleviated because of surgery?

0069

1     A   At what point in time?

2     Q   Well, let's start with the first six months.

3     A   Possibly nothing.

4     Q   Is there anything that you are familiar with,

5  based upon experience or studies, that have done an

6  analysis of what types of signs or symptoms one will

7  experience after surgery with no further treatment in

8  that window that would be diagnostic of potential --

9     A   It is a very broad question.  And it just plain

10  and simply depends on how fast the cancer grows back.

11  Obviously, roughly a year later she had severe pain

12  because her chest wall was invaded, and she had a lump.

13    Q   You say a year later.  Wasn't it, in fact,

14  almost a year and a half later?

15    A   Yes.

16    Q   And it is not that the cancer is "growing

17  back"; in your opinion it was never gone?

18    A   No.  No.  It was never gone, and it continued

19  to grow back to a sizable tumor.  It is just like pruning

20  a tree.  You can prune a tree, but it will grow back.

21    Q   Do you have any understanding as to the

22  rapidity of the tumor cells that Mrs. Pollard's tumor

0070

1  was, whether it was a fast growing cancer given what we
2  obviously know with respect to the size of the nodule and
3  what was discovered and the pathology that was done?  Any
4  opinion in that regard?
5      A    No.  I can tell you relatively that it was
6  faster rather than slower considering some of the tumor
7  markers that she had.  And there was a sizable amount of
8  tumor that grew back in a year and a half as well.  So
9  that would tend to be, kind of, an aggressive
10  recurrence --
11     Q    And that's what I'm trying to understand here.
12     A    -- recurrence of visible tumor, obviously.
13     Q    If, in fact, the tumor cells were always there
14  and you had a fast growing cancer, given your experience,
15  would you have anticipated seeing any signs or symptoms
16  prior to almost 18 months after surgery when the
17  radiation regimen was instituted five months after
18  surgery?
19     A    Well, I think this comports with the
20  anticipated clinical picture, because during that five
21  months it is likely that cancer cells grew back, and they
22  might not have been palpable or even visible and may not

0071

1 have caused any clinical symptoms whatsoever.
2         When those cells are irradiated, they are
3 pruned down again, and the cell numbers very decreased
4 significantly.  And then cells have to go back again to
5 compensate for that loss, that cell loss secondary to
6 radiation therapy.
7         That time period is pretty reasonable.  I think
8 that's well within the boundaries of expectation.  But as
9 you know, there is no way to absolutely quantitate the
10  time costs and the growth curves.
11     Q    Would you have anticipated, in hindsight -- if
12 you looked at her laboratory data, in hindsight, would
13 you anticipate being able to identify a certain lab value
14 which would have been suggestive of cancer cells growing?
15     A    I didn't see anything in the laboratory values
16 that would have tipped anybody off, other than somewhat
17 late when she developed local chest wall discomfort.
18     Q    What role, if any, then -- well, I guess you
19 have, kind of, explained it.  Let me just ask the
20 question though:  What role do you think the radiation
21 regimen, that she did undergo approximately five months
22 after the lumpectomy, had in her case?

0072

1     A    It probably bought her some time in terms of
2    preventing local discomfort.
3     Q    I was a little confused with respect to your
4    testimony about what role, if any, would the chemotherapy
5    have played in Mrs. Pollard's case had she had a
6    chemotherapy and radiation regimen following the
7    lumpectomy.  And if I understood you correctly, the data
8    that you quoted suggested a 90 percent cure rate, for
9    lack of a better term --
10     A    Well --
11     Q    Have they changed the term?
12     A    Well, maybe I should let you finish.  I'm
13    sorry.
14     Q    I'm going to use "cure rate" for that 90-10
15    when it comes to recurrence, a 90 percent cure rate.
16          And with chemotherapy on board, that cure rate
17    could have potentially increased to 92 to 95 percent; is
18    that correct?
19     A    That's basically correct.  But when I was
20    talking about the 90 percent, I was really talking, sort
21    of, about local control.
22     Q    I thought I heard you say that.

0073

1    A   Right.  And I wasn't necessarily talking about

2  a cure rate, although the cure rate is not necessarily

3  far from the local control rate.

4       If you understood that, it wasn't necessarily

5  totally wrong.  But the cure rates are probably a little

6  bit less, obviously.  There are a lot of women who enjoy

7  local control but still disseminate the disease someplace

8  else.  So the cure rates are probably more like 80 to 85

9  percent.  The local control rates would be more like 90

10  to 95 percent.

11    Q   And what you have identified as the recurrence

12  or the cancer was diagnosed about 18 months after the

13  lumpectomy.  Having reviewed the records that you did in

14  this case, if I understood your testimony, that would be

15  within the radiation field?

16    A  Yes.

17    Q   And, in your opinion, radiation would have then

18  alleviated that reoccurrence at that point in time?

19    A   Yes.  Hopefully, at any point in time.

20  Hopefully, it would have been good for the duration.

21    (Pause.)

22    Q   The radiation regimen which she underwent, did

0074

1  you review what that was?

2      A    There weren't very many details about the

3  radiation therapy.  It was very sparse notation, really.

4      Q    So you are not rendering an opinion at all on

5  the type of radiation regimen?

6      A    No.  Or the quality; I don't have those

7  details.

8      Q    Were there any areas of testimony that you were

9  asked to address that you felt you didn't either have the

10  expertise or the information necessary to render opinions

11  in this case?

12     A    No.  I gave you the opinion, and I felt pretty

13  comfortable about the opinion that I was asked to render.

14  I wasn't asked to opine about anything else.

15           MS. HANRAHAN:  Those are all of the questions

16  that I have.

17           MR. ADAMS:  I have nothing further.  Joan?

18           MS. CERNIGLIA-LOWENSEN:  I have nothing

19  further.

20           EXAMINATION ON BEHALF OF PLAINTIFFS

21  BY MS. ZORK:

22     Q    I have a couple of questions.

0075

1          Can you explain why it is that radiation
2    therapy accompanies -- why that has come to be a standard
3    of care that if you have a lumpectomy, you must also
4    treat with radiation and you must do it within -- and you
5    must do it promptly in order for it to be effective?
6        A    Well, for two or three reasons.  Number one, at
7    the time of surgery, it is very common for cells to
8    exfoliate from the cancer.  Adhesion is one of the
9    problems with cancer.  So cells fall off the cancer, and,
10    during the manipulation process of surgery, cells land in
11    the tumor bed.  Then they have potential to grow again.
12          The second reason is that sometimes cancers
13    aren't just solitary in the breast.  Sometimes they are
14    multi-focal, and radiation therapy can sterilize those
15    tiny little cancers.  So that's another reason why we
16    treat it.
17          Sometimes cancer spreads through the breast
18    through lymphatic channels, and those will enter
19    interconnections, and they can sometimes take cells
20    distant of the breast from the tumor bed, and radiation
21    therapy to the entire breast would alleviate that
22    potential sort of spread.

0076
1        And then radiation therapy, too, usually
2    accompanies draining lymph nodes, such as the internal
3    mammary nodes or the axillary nodes, and it prevents the
4    spread of cancer; or if they have spread, hopefully, the
5    sterilization of cancer at that site as well.
6        Q    In response to Ms. Hanrahan's questions, she
7    identified that with radiation therapy there is
8    approximately -- give or take 5 percent -- about a 10
9    percent reoccurrence of breast cancer.
10        Does reoccurrence by definition mean that there
11    were cancer cells that persisted in the breast?
12        MS. HANRAHAN:  Objection to the form.
13        A    Well, yes.  If the cancer occurs in the breast,
14    the likelihood is that it was there in the first place.
15    BY MS. ZORK:
16        Q    Then my question is:  How many times more
17    likely is a patient to have recurrence of breast cancer
18    following a lumpectomy if they do not undergo radiation
19    treatment based upon the statistics that we know about?
20        A    Well, at least if you are asking me about that
21    40 percent number versus 10 percent number, well, it is
22    four times more likely to have treatment, to have control

0077

1  of disease when treatment is appropriately and timely
2  given than when no treatment is given.
3         MS. ZORK:  Those are all of the questions that
4  I have.
5         MS. HANRAHAN:  No questions.
6         MR. ADAMS:  No questions.  Joan?
7     FURTHER EXAMINATION ON BEHALF OF DEFENDANT GUPTA
8  BY MS. CERNIGLIA-LOWENSEN:
9     Q    Just one, Doctor.  Based upon the questions
10  that Ms. Zork just asked about local reoccurrence, why is
11  it then that some patients who have prompt radiation
12  therapy to the breast still have a reoccurrence?
13    A    Well, that's the Nobel Prize question, and we
14  are trying to answer that by looking at any number of
15  biological questions.  So if you want me to hypothesize
16  on the reasons, I would be happy to give you the --
17         MS. ZORK:  Only if it is within reasonable
18  medical certainty.
19         THE WITNESS:  Well, these are not with
20  reasonable medical certainty.  These are laboratory clues
21  to answering your question.  And radio-resistance is one
22  of them, genetics, local factors, blood flow, issues of

0078

1  hypoxia, indirect meds; there are all sorts of reasons
2  why it may not work.
3  BY MS. CERNIGLIA-LOWENSEN:
4      Q   Are you aware of any studies that address any
5  of those issues?
6      A   Yes.  Of course.
7      Q   Where might I find those, sir?
8      A   Well, look in the standard textbooks of radio-
9  biology and look under the chapters, and there are
10  hundreds -- maybe thousands -- of articles that deal with
11  reasons for radio-resistance.  They have to do with
12  subtle molecular genetics, tumor transduction issues,
13  cellular transduction issues in tumors.
14          Issues of hypoxia, issues of blood flow, issues
15  of nutrition, issues of timing, issues of fractionation,
16  issues of dose.  I mean, you can go on and on and on.
17          MS. CERNIGLIA-LOWENSEN:  I don't have any other
18  questions.  Thank you, sir.
19          MR. ADAMS:  Joan, do want to tell the court
20  reporter what you want?
21          MS. CERNIGLIA-LOWENSEN:  Yes.  I would like a
22  full; a condensed, quarter to a page, one side; and an

0079

1  ASCii disk.
2          MR. ADAMS:  I will take the same as Joan is
3  getting.
4          MS. HANRAHAN:  I just need a mini, four per
5  page, one side only.
6          MS. CERNIGLIA-LOWENSEN:  I'm going to hang up,
7  if that's okay.
8          (Signature having not been waived, the
9  deposition of Gerald H. Sokol, M.D. was concluded at 5:49
10  p.m.)
11              ACKNOWLEDGMENT OF DEPONENT
12          I, GERALD H. SOKOL, M.D., do hereby acknowledge
13  that I have read and examined the foregoing testimony,
14  and the same is a true, correct, and complete
15  transcription of the testimony given by me, and any
16  corrections appear on the attached Errata sheet signed by
17  me.
18
19  _____    _____
20      (DATE)                (SIGNATURE)
21
22

0080

```
 1      CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
 2          I, RANDY T. SANDEFER, Registered Professional
 3  Reporter, the officer before whom the foregoing
 4  proceedings were taken, do hereby certify that the
 5  foregoing transcript is a true and correct record of the
 6  proceedings; that said proceedings were taken by me
 7  stenographically and thereafter reduced to typewriting
 8  under my supervision; and that I am neither counsel for,
 9  related to, nor employed by any of the parties to this
10   case and have no interest, financial or otherwise, in its
11   outcome.
12          IN WITNESS WHEREOF, I have hereunto set my hand
13   and affixed my notarial seal this 22nd day of July 2003.
14   My commission expires:
15   November 1, 2005
16
17
18
19
20   _____
21   Notary Public in and for
22   the State of Maryland
```