0001
1              IN THE UNITED STATES DISTRICT COURT
2                FOR THE DISTRICT OF MARYLAND
3
4    VERONICA POLLARD, et al.        *
5            Plaintiffs        *
6    v.                    *   Civil Action
7    UNITED STATES OF AMERICA        *   No. S-02-764
8            Defendant        *
9                *  *  *  *  *  *  *  *  *
10
11
12            Pursuant to Notice, the deposition of
13   JAMES J. STARK, M.D. was taken on Wednesday, September
14   10, 2003, commencing at 2:00 p.m., at the offices of
15   James J. Stark, M.D., 3640 High Street, Portsmouth,
16   Virginia  23704, before Shell Riddle, Notary Public.
17
18
19
20
21
22   Reported by:  Shell Riddle, RPR
0002
1    Appearances:
2
3        On behalf of the Plaintiffs:
4            LESLEY ZORK, ESQUIRE
5            Bruce J. Klores & Associates, P.C.
6            915 15th Street N.W., 3rd Floor
7            Washington, D.C.  20005
8            Telephone:  (202) 628-8100
9            Fax:  (202) 628-1240
10
11        On behalf of the Defendant United States of
12        America:
13            LARRY D. ADAMS, ESQUIRE
14            U.S. Department of Justice
15            United States Courthouse
16            101 West Lombard Street
17            Baltimore, Maryland  21201-2692
18            Telephone:  (410) 209-4801
19            Fax:  (410) 962-2310
20
21
22

0003
1   Appearances (Contd.):
2
3       On behalf of Humana Military Health Care
4       Systems, Inc.:
5           CATHERINE A. HANRAHAN, ESQUIRE
6           Wilson, Elser, Moskowitz, Edelman &
7           Dicker, LLP
8           The Colorado Building, Suite 500
9           1341 G Street N.W., 5th Floor
10          Washington, D.C.  20005
11          Telephone:  (202) 626-7660
12          Fax:  (202) 628-3606
13
14      On behalf of Raj Gupta, M.D.:
15          JOAN CERNIGLIA-LOWENSEN, ESQUIRE
16          Morgan, Shelsby, Carlo, Downs & Everton
17          4 North Park Drive, Suite 404
18          Hunt Valley, Maryland  21030-1876
19          Telephone:  (410) 584-2800
20          Fax:  (410) 584-2020
21
22
0004
1                   I N D E X
2                   WITNESS
3
4   ON BEHALF OF THE PLAINTIFFS:   Examination by:  Page
5   J. Stark, M.D.              Ms. Zork          5
6
7
8
9                   EXHIBITS
10  No.    Description                 Page
11  1      Notice                  5
12  2      Curriculum Vitae              5
13  3      Case List               38
14  4      Pathology Report              81
15  5      Handwritten notes             93
16
17
18
19
20
21
22

0005
1          (Documents were marked as Exhibits 1 and
2    2.)
3          JAMES J. STARK, M.D., called as a
4    witness, having been first duly sworn, was examined
5    and testified as follows:
6                    EXAMINATION
7    BY MS. ZORK:
8      Q.    Dr. Stark, good afternoon.  My name is
9    Lesley Zork.  We met briefly off the record.  Would
10   you please introduce yourself or identify yourself for
11   the record?
12     A.    I'm James J. Stark, M.D.  We are at my
13   office which is 3640 High Street, Portsmouth,
14   Virginia.
15     Q.    Is this your only business address?
16     A.    Yes.
17     Q.    What is your residential address?
18     A.    116 Settlers Landing Road in Suffolk,
19   Virginia.
20     Q.    How long have you had this as your
21   professional address?
22     A.    About a year and a half.
0006
1      Q.    What is it that you do here?
2      A.    Practice medical oncology.
3      Q.    Did you start your practice in this
4    location about a year and a half ago?
5      A.    Yes.
6      Q.    Can you describe your practice, please?
7      A.    I'm in the solo practice of medical
8    oncology.  I see patients almost entirely on referral
9    from other doctors.  I have a reporting relationship
10   with the CEO of the local hospital.  He pays me a
11   small stipend and I spend some time with him each week
12   going over the growth and development of the cancer
13   program at this facility.  I'm professor of medicine
14   at Eastern Virginia Medical School in Norfolk.  It's
15   an unpaid position.  I do a fair amount of teaching of
16   medical students, interns and residents there.  I do
17   some clinical research, and that's kind of how I spend
18   my day.
19     Q.    Your referrals, where do your referrals
20   for oncology patients come from?
21     A.    This metropolitan area pretty much, from
22   doctors all over the area.  Most of them concentrate

0007
1   in this hospital.
2       Q.    Are there other oncologists practicing
3   medical oncology in the same building?
4       A.    Yes.  Not in the same building but they
5   have privileges at this hospital.
6       Q.    How many medical oncologists have
7   privileges at this hospital?
8       A.    I think it's eight.
9       Q.    Is there a department of oncology?
10      A.    No.
11      Q.    What department do you come under within
12  the hospital?
13      A.    Internal medicine.
14      Q.    Who is the chairman of the internal
15  medicine department?
16      A.    I don't know.
17      Q.    What hospitals do you currently hold
18  privileges at?
19      A.    This hospital here which is called
20  Maryview Medical Center, Chesapeake General Hospital,
21  Obici Hospital which is in Suffolk.  There are two
22  hospitals in Norfolk run by the same company, Sentara
0008
1   Health System, one is called Norfolk General, the
2   other is called Leigh Hospital.  I think that's it.
3       Q.    Of these hospitals that you've listed,
4   where do you admit patients the most?
5       A.    I only admit patients to Maryview.  I see
6   patients in consultation occasionally at the other
7   hospitals, but I frankly try to limit the amount of
8   running around that I do.
9       Q.    Before you set up practice here a year
10  and a half ago, when was the last time that you had a
11  private oncology practice?
12      A.    Well, nine years before I -- for the nine
13  years before I started this practice, I worked for a
14  large national cancer care company called Cancer
15  Treatment Centers of America and I was their medical
16  director, but I practiced about two miles away from
17  here in Portsmouth, at a different office.
18      Q.    And what was that address?
19      A.    355 Crawford Street.
20      Q.    So at 355 Crawford Street did you have a
21  private practice where you saw and treated patients
22  for cancer?

0009
1      A.     Well, it looked like a private office.
2   In fact, it was owned by this national company but if
3   you walked in there you wouldn't know that.  It would
4   look like a private office.
5      Q.     What was the national company set up to
6   do?
7      A.     Practice oncology all over the country.
8   They had several different locations.  They owned the
9   practices and took a profit out of each of these
10  practices at the end of the year.
11     Q.     Who are the other -- did you work with
12  any other oncologists locally that were also working
13  for this national company?
14     A.     Yes.
15     Q.     Who were they?
16     A.     Lloyd Shabazz and Snehal Damle.  They
17  were the two oncologists who were there at the time I
18  left.
19     Q.     And did you work with those two
20  oncologists the entire nine years?
21     A.     No.
22     Q.     Were there other oncologists that came
0010
1   and went?
2      A.     There were.
3      Q.     And how many?
4      A.     Lots.  Do you want me to name them all?
5      Q.     No.  That's okay.  Not yet anyway.  This
6   company, did you see patients, did you consult with
7   patients, did you make decisions about their treatment
8   and did you administer their treatment?
9      A.     Yeah, all the things one would do in an
10  oncology practice.  It looked like an ordinary
11  oncology practice.  We just didn't own it.  That was
12  the only difference.
13     Q.     Is there any area of oncology that you
14  specialize in?
15     A.     Most of my publications have been in the
16  areas of cancer of the pancreas, melanoma, kidney
17  cancer.  Those don't represent a very large percentage
18  of what I do because they are not very common.
19  Probably the most common disease I see is lung cancer.
20  The second most common disease I see is breast cancer.
21  But in terms of my research interests, the first three
22  I mentioned.

0011
1       Q.    Have you published any peer-review
2   articles in the area of -- having anything to do with
3   cancer?
4       A.    Yeah.  My CV will reflect that.  I have
5   several pages of publications.
6       Q.    I understand that you have several pages
7   of publications.  What I'm trying to understand, are
8   those scientific journals and scientific peer-review
9   articles?
10      A.    Yes.  They all are.
11      Q.    Have you published any scientific
12  articles in the area of breast cancer?
13      A.    Yes.
14      Q.    Dr. Stark, how many depositions have you
15  given this year?
16      A.    I don't have a really accurate count.  I
17  would think probably between ten and 15.
18      Q.    How many cases have you reviewed this
19  year?
20      A.    Probably about 20 so far this year, new
21  cases, new files.
22      Q.    Of the ten to 15 depositions that you've
0012
1   given so far this year, how many of those depositions
2   were in cases where you were testifying as an expert
3   on behalf of a patient in a medical malpractice
4   lawsuit?
5       A.    I would estimate about a third.
6       Q.    Can you identify for me of those --
7   roughly three to five?
8       A.    Yeah.  Just a guess.  It's an estimate,
9   put it that way at this point.
10      Q.    Can you tell me the names of the
11  attorneys in any of those cases?
12      A.    Where I testified on behalf of a
13  plaintiff?
14      Q.    Yes.
15      A.    Yes.  Jerry Maloon from Columbus, Ohio.
16  Let me look at my calendar here.  I've only been
17  keeping this calendar lately but it will give me some
18  insight.  It's not helping me.  Sorry.  I'm just
19  trying to think back.  One other place I can look.
20  Excuse me.  I'm just having no luck remembering.  I
21  have a place I can look.  Andrew Greenwald.  Actually
22  that was a trial, that wasn't a deposition, in

0013
1    Montgomery County, Maryland.  A gentleman by the name
2    of Lamar Flatt who is a plaintiff's lawyer in I think
3    it's Columbia, South Carolina.  It was a lung cancer
4    case.  And a guy named Ron Manasco who is a
5    plaintiff's lawyer in I think Wilmington, North
6    Carolina or Rocky Mount, someplace like Eastern North
7    Carolina.  That was a breast cancer case.
8        Q.    The case that you had with Mr. Greenwald
9    in Montgomery County --
10       A.    That was a breast cancer case.
11       Q.    Did you testify on issues of standard of
12   care in that case?
13       A.    No, I did not.
14       Q.    Did you testify on causation?
15       A.    I believe so, yes.
16       Q.    And the case -- and we're talking about
17   this year?
18       A.    This year.
19       Q.    And the case with Mr. Maloon in Columbus,
20   Ohio, what kind of case was that?
21       A.    That was a coagulation case actually,
22   involving blood clotting.
0014
1        Q.    So that was a hematology case?
2        A.    Yes.
3        Q.    What are your fees?
4        A.    $400 an hour to review cases and $500 an
5    hour for depositions, $4,000 per day plus expenses for
6    trial testimony.
7        Q.    How much have you billed so far in this
8    case?
9        A.    Probably about $2,000 so far and I've
10   probably got another $1,000 to $1,500 in preparation
11   for today's deposition that I haven't added up yet.
12       Q.    And how much do you make a year on
13   average doing medical-legal work?
14       A.    Probably between -- probably around
15   $50,000 a year, something like that.
16       Q.    Do you keep track of that?
17       A.    I have to.  It's called income taxes.
18   Somebody keeps track of it.  My accountant mostly
19   keeps track of it.
20       Q.    And out of the $50,000 a year, is that so
21   far this year or does that reflect on average going
22   back the last five years?

0015
1      A.     That's probably the last couple of years
2  on average.
3      Q.     Has there been a time when you've been --
4  more of your income -- you've made more than that in a
5  year?
6      A.     It may have been.  I don't remember.  Not
7  recently.
8      Q.     When you say not recently, not in the
9  last two years?
10     A.     Two or three years, right.
11     Q.     Do you keep a list of the cases you
12  review?
13     A.     Just the depositions and trials.  That's
14  supposed to be for the Federal Court, this Federal
15  Court list which is at best an approximation,
16  periodically updated from memory.  It's not
17  encyclopedic.
18     Q.     May I have a copy of that list?
19     A.     Sure.
20     Q.     Is it something you can produce now?
21     A.     Yeah.  I could produce it now.  The thing
22  is what I haven't done is updated it for a while, like
0016
1  in a couple of months.
2      Q.     How far does it go back?
3      A.     Goes back to 1998.
4      Q.     Have you testified in Federal Court in
5  Baltimore?
6      A.     Yes.
7      Q.     How many times?
8      A.     Only one that I can remember.
9      Q.     When was that?
10     A.     That was the night that Rodney King was
11  acquitted.  I remember there were great fears of
12  rioting in Baltimore.  What was that, 1992, 1991,
13  something like that.  Was it he was acquitted or the
14  police were acquitted?  Somebody was acquitted.
15         MR. ADAMS:  The police were acquitted.
16         THE WITNESS:  The first trial before they
17  were indicted on racketeering or whatever other crime
18  they were indicted on.  It was the first trial.
19  BY MS. ZORK:
20     Q.     Have you testified in Baltimore City
21  court?
22     A.     I don't think so.  I have testified in

0017
1    some of the suburban courts around Baltimore.
2        Q.    Which courts?  I understand Montgomery
3    County.
4        A.    Right, north of Baltimore, northwest of
5    Baltimore.  If you told me the name of the place I
6    would remember it, but I can't quote it to you right
7    now.  Out in the country, beautiful suburbs.  I don't
8    know.
9            MR. ADAMS:  Towson or Belair?
10           MS. CERNIGLIA-LOWENSEN:  All of Baltimore
11   is beautiful.
12   BY MS. ZORK:
13       Q.    What other courts have you testified in
14   Maryland?
15       A.    I testified in Maryland -- I don't recall
16   otherwise testifying live in Maryland.  I have
17   testified in D.C. a few times, but I don't think -- I
18   can't remember any other physical appearances in
19   Maryland.
20       Q.    When was the last time you testified in
21   D.C.?
22       A.    It's been a couple of years.  I think
0018
1    probably I want to say year, year and a half ago.
2        Q.    What kind of case was that?
3        A.    It was a failure to diagnose Hodgkin's
4    disease.
5        Q.    Was that a plaintiff's case or defense
6    case as an expert?
7        A.    I was representing the plaintiff.
8        Q.    Who was the attorney that you worked with
9    in that case?
10       A.    Jerry Mitchell.
11       Q.    Did you testify regarding standard of
12   care in that case?
13       A.    I don't think so.
14       Q.    Was your testimony then on causation?
15       A.    Yes, as I recall.
16       Q.    Have you testified -- have you ever
17   testified on behalf of a plaintiff that another
18   physician breached the standard of care?
19       A.    Yes, on occasion.
20       Q.    What case comes to mind?
21       A.    It was a case in South Carolina.  The
22   deposition has been taken but there has been no trial

0019
1   yet, involving a medical oncologist who gave a lady
2   adriamycin.  It turns out that he knew she had had
3   previous adriamycin but never bothered to find out how
4   much and she developed a cardiomyopathy and died
5   because he didn't bother to find out how much
6   adriamycin she previously received and he gave her too
7   much.
8        Q.    Do you have a Web site?
9        A.    No, not at the moment.  I've had various
10  Web sites.  I don't think there is anything left.
11  I've gotten rid of them.  There may be one on the AMA
12  that AMA put up for me or that my national society put
13  up for me but I don't take care of those.  I don't do
14  anything with them.
15       Q.    Do you advertise at all?
16       A.    No.
17       Q.    Are you listed with any expert services?
18       A.    No, not that I'm aware of.  It would not
19  be with my permission.
20       Q.    Do you maintain a list of lawyers who
21  practice medical malpractice that you send -- that you
22  correspond with on a regular basis?
0020
1        A.    No.  Outside of the work that I do for
2   them, no.  I don't do any kind of newsletter or
3   anything like that if that's what you are referring
4   to.  I don't do any sort of blanket mailing to anybody
5   for any reason.
6        Q.    Have any of your opinions that you
7   intended to offer at trial, have they ever been
8   challenged on the ground that there was not an
9   adequate scientific basis to offer that opinion?
10            MS. CERNIGLIA-LOWENSEN:  Objection to the
11  form.  You can answer.
12            THE WITNESS:  No.
13  BY MS. ZORK:
14       Q.    So to your knowledge that issue has never
15  been raised with respect to any causation opinion that
16  you intended to offer?
17       A.    Never been raised successfully.
18       Q.    That's a different question.  My question
19  was has it ever been raised?
20       A.    I think the only issue I can recall, and
21  you probably already know this because I think it's
22  your firm, I developed some computer software looking

0021
1   at tumor growth and I got into it once with a lawyer
2   in D.C. about the validity of that, and I think the
3   validity of the methodology was challenged but
4   unsuccessfully.
5       Q.    Who was the lawyer that challenged the
6   validity of --
7       A.    It was the same case that Dr. Zurbuur
8   referred to involving Michael Hannan.  She couldn't
9   remember who the plaintiff was, but it may very well
10  have been somebody from your firm representing the
11  plaintiff and I can't remember the people's names but
12  it was the same case in D.C. Circuit Court.  I was on
13  the witness stand for two days.  I remember it vividly
14  and bitterly.  I've never been on the stand for two
15  days before or ever since.  Anyway, the plaintiff's
16  lawyer tried to show that the software had no basis
17  and we duked it out and I won.  That's really the only
18  time I can think of.
19      Q.    Have you testified in cases relying on
20  your computer software?
21      A.    Yes.
22      Q.    And in this case will any of your
0022
1   opinions be based upon -- will you be relying on the
2   computer software for any of your opinions in this
3   case?
4       A.    No.
5       Q.    In response to an earlier question you
6   were looking at a calendar to try to determine when
7   you had done a deposition I believe or who the lawyer
8   may have been.  Do you keep a separate calendar for
9   your medical-legal schedule?
10      A.    I have -- I've just started recently
11  using Microsoft Outlook to schedule all kinds of
12  personal meetings, not just legal things but meetings
13  with hospital administrators, doctors' appointments
14  that I personally may have, haircuts, stuff that
15  doesn't involve patient care.
16      Q.    How far back does that go?
17      A.    Not very far.  I can't remember.  A
18  couple of months probably.
19      Q.    Is it possible to print up your calendar
20  eliminating the haircuts and the -- just to show
21  the --
22      A.    It is physically possible.  I will

0023
1  respectfully decline to do that unless you get the
2  judge to compel me to.  I don't feel like doing that.
3      Q.    Okay.  That's fine.  Can you tell me how
4  many patients you see on a weekly basis here in this
5  office?
6      A.    I average on days that I'm fully engaged,
7  not doing this kind of thing, I will probably see
8  maybe 15 patients myself, another four or five
9  patients will come in for chemotherapy, I might see
10  another eight to ten patients in the hospital.  That
11  would be sort of an average day for me.
12      Q.    An average day, how many of those average
13  days do you have a week?
14      A.    Four or four and a half shall we say.  I
15  might spend half a day a week in some other activity,
16  whether it's a meeting.  Yesterday I went to a board
17  meeting for the local health systems administration.
18  They were debating certificate of need issue.  I do
19  these things for the hospital.  That plus the
20  depositions usually takes up about a half day a week.
21      Q.    The practice that you had before you
22  started this practice that we're in today, can you --
0024
1  was that a similar average?
2      A.    Yeah.  I would do things for that
3  company.  I would travel for that company.  I would
4  get on conference calls, meetings and that sort of
5  thing.  So it worked out about the same, about four
6  and a half days a week.
7      Q.    When you traveled for the company, what
8  would you do?
9      A.    I would be meeting with other doctor
10  groups typically.  They were always in the business of
11  acquiring practices or doing deals with insurance
12  companies to try to set up managed care networks.  I
13  was kind of their point man to do some of that kind of
14  work.
15      Q.    Are you affiliated at this point with any
16  managed care group?
17      A.    I am a provider for all the managed care
18  insurance companies in the area, but I don't do any
19  kind of advising or I'm not on any kind of contract
20  basis with any of the insurance companies to do any
21  peer review or utilization review or anything like
22  that.

0025
1     Q.     So the patients that you see, you bill
2   their insurance company and then you get paid?
3     A.     Yeah.
4     Q.     From their insurance company?
5     A.     Like any other doctor would, yes.
6     Q.     Well, there are lots of doctors that work
7   for companies that pay them their salaries.
8     A.     But ultimately the way that salary is
9   generated is through patient care, whether it's
10   somebody doing the billing for them.  Money always
11   goes into some pool.  In this case it's simpler
12   because I get to keep what's left over after I pay
13   everybody else.
14     Q.     How many staff members do you employ?
15     A.     I have one receptionist.  I usually have
16   two nurses.  One just quit.  I'm in the process of
17   hiring a second nurse.  I have a management company
18   that works for me based in Richmond, Virginia.  Their
19   business is to manage oncology practices and they have
20   a CEO.  I have a woman who handles my payables and
21   receivables and another woman that does my billing.  I
22   would consider them part-time employees.  I pay this
0026
1   management company a percentage of my net revenue --
2   excuse me -- a percentage of my gross revenue.
3   Through this management contract I have with this
4   company, they are not really my employees but they
5   work for me indirectly.  On site here typically I have
6   three employees.
7     Q.     That's the receptionist and two nurses?
8     A.     Right.
9     Q.     So here in this office, you administer --
10   do you administer chemotherapy to women who are
11   receiving adjuvant treatment for breast cancer?
12     A.     Yes.
13     Q.     In 1998 were you doing the same?
14     A.     For the other company, yes, I was.
15     Q.     In 1998 were you seeing women -- were
16   women being referred to you who had been diagnosed
17   with breast cancer and you would be the oncologist
18   making recommendations regarding the need for adjuvant
19   treatment?
20     A.     Yes, ma'am, absolutely.
21     Q.     Have you ever worked for the military as
22   a physician?

0027
1        A.     Not really.  I was on active duty with
2   the U.S. Public Health Service which is considered a
3   uniformed service.  It's not an armed service and that
4   was in the mid '70s in lieu of being drafted as a
5   doctor.  I worked in a civilian clinic in inner-city
6   Philadelphia for two years in a Model Cities Health
7   Center and I had a commission in the Public Health
8   Service, but I didn't do any -- it wasn't like a
9   military base or anything.  It was like an ordinary
10   hospital.  I was on loan to this hospital by the
11   Public Health Service.
12        Q.     In looking at your CV you've been
13   practicing in the Portsmouth, Norfolk area since the
14   1970s?
15        A.     Yes.
16        Q.     During that time have you treated as an
17   oncologist either active duty members of the military
18   or their dependents?
19        A.     I have treated dependents.  I've treated
20   retirees.  I don't believe I've treated anybody active
21   duty.
22        Q.     But you have had dependents referred to
0028
1   you for oncology?
2        A.     Yeah.  It depends on what the military
3   decides to do from month to month and year to year
4   with the dependents.  Sometimes they have enough room
5   for them at the Navy Hospital to treat them all here.
6   Sometimes they run out of room and they farm them out.
7   I have treated dependents from time to time, again, at
8   the discretion of the military.
9        Q.     Are you -- do you know the oncologists at
10   the Navy Hospital?
11        A.     That's pretty much a revolving door of
12   oncologists but from time to time I know who they are.
13   I'm not sure I know who they are right now.
14        Q.     Have you ever done any advising or
15   consulting in that department?
16        A.     I think I have given one or two talks
17   over there in the course of 25 years, invited
18   lectures.  One I can remember I gave on cancer of the
19   kidney maybe 10 or 15 years ago.  I think that was the
20   last time I did that.
21        Q.     Are you -- do you -- are you familiar
22   with the policies and procedures of how medical care

0029
1   is provided in the Navy or in the Naval Hospital or
2   any of the branches of the military to dependents?
3           MS. CERNIGLIA-LOWENSEN:  Objection to the
4   form.  You can answer.
5           THE WITNESS:  Not really.  Somebody shows
6   up on my doorstep with a stack of records, I'll take
7   care of them.  I'm not sure how I get paid frankly.  I
8   like to stay away from that.  I let my billing company
9   worry about that.  As far as the lines of referral,
10  the only thing I have to look at is the end product
11  which is the chart of the patient.  I don't understand
12  the workings of how military medicine works.
13  BY MS. ZORK:
14      Q.    As far as you know in this country are
15  the standards of care for the practice of oncology and
16  the treatment of breast cancer in the military any
17  different from the standards of care in Maryland or
18  nationally?
19          MS. CERNIGLIA-LOWENSEN:  Objection to
20  form.
21          THE WITNESS:  Difficult question to
22  answer.  I do know that the military has been heavily
0030
1   criticized in this area in the past for how slowly
2   they work up patients with cancer.  I think they
3   largely fixed that.  I think now cancer care in the
4   military is comparable to that in the civilian sector
5   to the extent I'm familiar with it.  And I'm not very
6   familiar with it.
7   BY MS. ZORK:
8       Q.    What is your -- where did you get your
9   understanding from that the military has been heavily
10  criticized or in what form have they been criticized
11  for how slowly they've been --
12      A.    The plaintiffs' Bar in Hampton Roads.
13      Q.    I'm sorry?
14      A.    The plaintiffs' Bar.  The big plaintiffs'
15  lawyers make a handsome living off of suing the Navy
16  Hospital.  They are friends of mine.
17      Q.    The plaintiffs' Bar here in --
18      A.    In Hampton Roads.
19      Q.    In Hampton Roads?
20      A.    Yes.
21      Q.    My question was a more general question
22  as to whether or not you -- are you aware if there's a

0031
1  different standard of care that applies in the
2  military to the management of oncology patients and --
3      A.    The short answer is I think there is no
4  difference.  Certainly in the last five or six years
5  there's been no difference.  I think it's the same.
6  It wasn't always the same, but I think it has been the
7  same and has been for the last five years, should be
8  the same.
9      Q.    Have you testified on behalf of a
10  plaintiff against any of the medical providers, the
11  oncologists, in the local Navy Hospital?
12      A.    No.
13      Q.    Have you been asked to?
14      A.    No.  I testified like 15 years ago -- I
15  didn't provide standard of care opinions, but I was a
16  plaintiff's expert in a case against a pathologist in
17  the Navy Hospital who read a breast biopsy as showing
18  no cancer when, in fact, there was cancer in the
19  breast biopsy.  That was a long time ago, at least 15
20  years ago.
21      Q.    Do you have and is it your policy not to
22  testify in cases in this -- against physicians who are
0032
1  being sued in this local area?
2      A.    It's not an absolute policy, but I think
3  I certainly try to use some discretion.  I certainly
4  wouldn't appear as a plaintiff's expert where I knew
5  the doctor personally or socially.  It would just be
6  unseemly to do that.  I don't have an absolute
7  prohibition in my own mind about doing it locally,
8  though.
9      Q.    Have you done any review of any
10  literature in preparation for this case?
11      A.    No.
12      Q.    Are there any studies or any literature
13  that you are relying on that support any of your
14  opinions in this case?
15      A.    I'm familiar with a lot of the breast
16  cancer literature.  I didn't feel like I needed to
17  look at it again for purposes of coming here today.
18  But I guess indirectly I'm going to rely on some
19  survival statistics in the published literature and I
20  will be quoting those to you if you ask me the right
21  questions.
22      Q.    Right now I'm asking you what studies you

0033
1  are going to be quoting to?
2       A.    Nothing particular.  It's something -- I
3  look at the universe of the published studies in the
4  last 15 years.  There is no one study that stands out
5  in my mind.
6       Q.    Just so I understand, when we get to the
7  point if I ask the right question where you are
8  testifying about survival statistics, will you be
9  referring to a specific study by a specific name in
10  support of whatever statistics you testify about?
11      A.    Probably not.
12      Q.    Why is that?
13      A.    Because I feel like I've assimilated all
14  this information and synthesized it in a form that I
15  can give it to you, but it's on the basis of reading
16  hundreds of studies.  I don't think there's any one
17  particular one I think has excess gravity over
18  another.
19      Q.    When were you first contacted about being
20  an expert in Ms. Pollard's case?
21      A.    Probably about six months ago.
22      Q.    Do you have any correspondence from --
0034
1  were you contacted by Ms. Cerniglia-Lowensen?
2       A.    Or someone in her office, I don't
3  remember.
4       Q.    Do you have the correspondence that you
5  have received from Ms. Cerniglia-Lowensen and other
6  members of her firm?
7       A.    I may have saved a few of the cover
8  letters that I got, but there was nothing substantive
9  in them.  It was just here are the records.
10      Q.    Do you have the correspondence with you?
11      A.    Anything that remains would be in this
12  office, in this room.
13      Q.    Can I see the correspondence?
14      A.    Sure you can.  Actually the back of Page
15  9 of my notes is some of that and I would like that
16  back.  If I could ask the court reporter to move, I've
17  got about six volumes of records here, and there may
18  be some correspondence intermixed with those records.
19  Actually looks like I threw out most of the
20  correspondence.  There is no correspondence left.  Let
21  me look in my other file.  Here's some correspondence,
22  again, just cover letters about stuff.  I tend to

0035
1  throw out most of those cover letters, but those are
2  the only ones I have left.
3      Q.    Why do you throw out the cover letters?
4      A.    So I don't have to produce them.  Just
5  saves time.  Especially if there is nothing
6  substantive on them.
7      Q.    Why didn't you throw these out?
8      A.    I don't know, too lazy, whatever.
9      Q.    I've had marked as Exhibit 1 notice of
10 deposition for your deposition, Dr. Stark.  Have you
11 seen this notice?
12     A.    I don't think so actually.  I may have.
13     Q.    Did Ms. Cerniglia-Lowensen notify you
14 prior to today of items that had been requested?
15     A.    She may have sent me this, but we didn't
16 discuss anything in here.
17     Q.    So you don't -- do you know if you've
18 looked at this notice of deposition?
19     A.    I don't remember.  I may have.
20     Q.    Do you have with you here today all of
21 the materials that you have reviewed in preparation
22 for your opinions and --
0036
1      A.    I have everything I've ever reviewed in
2  this case here in this room.
3      Q.    Can you show me what you have?
4      A.    The bottom right-hand corner of that
5  lower shelf, I have five or six volumes of medical
6  records.
7      Q.    Shall I just go over and look?
8      A.    If you want to, feel free.  Plus some
9  depositions.  I have not read all the depositions that
10 were sent to me but most of them.  I can tell you
11 which ones I've read and have not read.  Plus I've got
12 more stuff up here, more depositions.
13     Q.    Do you need to refer to any of these
14 volumes?
15     A.    I hope not.  It's all distilled in my
16 notes.
17     Q.    Here's another letter.
18     A.    Letter of correspondence.
19     Q.    Okay.  I have the deposition of
20 Dr. Gupta, did you review that?
21     A.    Yeah.  Do you want me to tell you which
22 ones I reviewed?

0037
1    Q.    Okay.
2       A.    I haven't reviewed them all.  Dr. Lee
3    Smith; Dr. Zurbuur, I think it's Z-u-r-b-u-u-r or
4    something like that; Dr. Pushkas; Dr. Sokol.  I
5    glanced at the deposition of Sergeant Pollard.  I did
6    not review it from cover to cover and there are some
7    other depositions that I did not read including
8    Dr. McTighe.
9       Q.    You have not read Dr. McTighe?
10      A.    No, Dr. Steven Adams I have not read.
11   That may be the only ones.  I think those -- to my
12   knowledge those are the only ones I haven't read.
13      Q.    There was one name that I missed because
14   I was writing something down.  You read Dr. Smith,
15   Dr. Zurbuur, and then I missed.
16      A.    Pushkas, Sokol.
17      Q.    Okay.  You did not read Dr. Fiorica?
18      A.    No.
19      Q.    Was that provided to you?
20      A.    I don't think so.  It may have been but I
21   don't recall.  The name doesn't ring a bell.
22      Q.    Dr. Stark, right before the deposition
0038
1    you handed me a CV that I believe is your most
2    up-to-date CV?
3       A.    Yes.
4       Q.    And we've had it marked as Exhibit Number
5    2.  Just can you verify that that is your most up to
6    date?
7       A.    Let me make sure all the pages are here.
8    I've got to reformat this because it looks like the
9    bottom Page 9 is mostly blank so I'll need to redo the
10   spacing on it, but otherwise it's fine.  It goes on
11   about 12 and a half pages.
12      Q.    And then you've also provided a listing
13   of cases going back to 1998?
14      A.    Correct.
15         MS. ZORK:  It's two pages and I'll have
16   this marked as Exhibit Number 3.
17         (The document was marked as Exhibit 3.)
18   BY MS. ZORK:
19      Q.    Just looking over the list quickly,
20   the -- strike that.  It looks like it's
21   self-explanatory.  Looking at Exhibit Number 3 can you
22   give me an estimate of what percentage of cases that

0039
1  you've testified in have been cases involving breast
2  cancer?
3      A.    Probably half of them.
4      Q.    And the other half?
5      A.    Variety of other cancers, occasionally
6  hematology case, one or two product liability cases
7  thrown in there.
8      Q.    Doctor, in 1998 we've already established
9  that you were treating women with adjuvant treatment
10  for breast cancer; is that correct?
11      A.    Yes.
12      Q.    In 1998 were you prescribing adjuvant
13  treatment to women who were premenopausal and had node
14  negative breast cancer under one centimeter in size,
15  the tumor under a centimeter in size?
16          MS. CERNIGLIA-LOWENSEN:  Objection to
17  form.
18          THE WITNESS:  There is no simple answer
19  to that.  I'll answer the best I can.  What I would do
20  is sit down with the woman and go over her risk of
21  recurrence with or without chemotherapy, gave it my
22  best shot, probably the same kind of analysis I'm
0040
1  going to give you this afternoon, risk/benefit ratio,
2  risk of treatment versus risk of no treatment, and I
3  would ask the patient to make her own decision as to
4  whether she thought that such treatment was something
5  she wanted to do.  I wasn't dogmatic.  I wasn't
6  particularly directional even in terms of what I would
7  tell people what to do.  Probably 90 percent of the
8  time, maybe 95 percent of the time, a woman would opt
9  for treatment and then I would prescribe that
10  treatment, but I would first give her my best faith
11  estimate of what her chances of dying were with or
12  without this treatment and let her make her own
13  decision.
14  BY MS. ZORK:
15      Q.    Okay.  And in response -- my question,
16  and just to make sure that your answer was responsive
17  to my question, okay, I just want to clarify.  I'm
18  talking about in the context, not about women in
19  general who have breast cancer.  I'm talking very
20  specifically in the context of women who are
21  premenopausal, who have been diagnosed with breast
22  cancer, who have a tumor that is less than a

0041
1  centimeter and who are node negative.  Were there
2  women who fit that category that you sat down and had
3  the discussion with about chemotherapy?
4      A.    Yes.
5      Q.    And did you do that with all women who
6  were premenopausal who had node negative breast --
7  tumors in their breast that were less than a
8  centimeter?
9      A.    Every one.  I do it with every breast
10  cancer patient.  Every cancer patient I see, I give
11  them risks and benefits and ask them to make a
12  decision, often help them make a decision.  They ask
13  me what I would do if I were sitting in their shoes.
14  It's always a give and take.  There is no dogma
15  involved.
16      Q.    Exactly.  But when they ask -- the
17  patient, who has never had breast cancer before, asks
18  the oncologist, who treats women on a regular basis,
19  what their recommendation is in probably every case;
20  isn't that correct?
21          MS. CERNIGLIA-LOWENSEN:  Objection to
22  form.
0042
1          THE WITNESS:  Some people don't ask me
2  what I would do.  Some people make their own minds up.
3  It really does vary.
4  BY MS. ZORK:
5      Q.    Do you make recommendations in favor or
6  against the chemotherapy in the context of the
7  scenario that I provided in the initial question?
8      A.    Actually I think if I just -- if somebody
9  like you just presented to me turned around and asked
10  me what would I do do, then I would say it's pretty
11  much a flip of the coin.  It's how you feel about
12  this.  Can you wake up tomorrow morning doing nothing
13  and feel good about yourself, because the chances of
14  your being materially benefited from this treatment
15  are materially small, and that's what I tell people.
16  The amazing thing to me is almost all women elect to
17  be treated.  It continues to be a surprise to me.
18      Q.    Why does that surprise you?
19      A.    Because the treatment is tough and --
20  these days a lot of people believe in things like
21  healthy living, nutrition, exercise, megadose
22  vitamins, meditation to try to improve their health,

0043
1   and chemotherapy doesn't fit into the life-style of
2   many women.  They don't like the idea of putting
3   poisons into their bodies, and I would think under
4   those circumstances, when a lot of people feel that
5   way, more people would turn down this kind of
6   treatment than actually do.
7       Q.   As an oncologist discussing this
8   treatment option with the patient, you must believe
9   that it would be of some benefit, otherwise you would
10  not discuss it.
11      A.   Right.
12      Q.   In light of the fact that there are these
13  sides effects and they are going to be putting poison
14  into their body; is that correct?
15          MS. CERNIGLIA-LOWENSEN:  Objection to the
16  form.  Go ahead.
17          THE WITNESS:  First of all, it's very
18  clear to me that the standard of care mandates that
19  discussion.  I would be negligent if I didn't have
20  that discussion with the patient given the environment
21  that we live in the United States in the years 1998 to
22  2003, for argument sake, if I didn't have a discussion
0044
1   about adjuvant chemotherapy, regardless of how I feel
2   about it.  So I have that discussion.  I do believe
3   that for some women the magnitude of benefit is
4   between one and two percent and people take on a
5   hundred percent chance of side effects for one or two
6   percent benefit and it surprises me that they do that,
7   but those are the numbers I believe in node negative
8   breast cancer in some subsets of women.  People will
9   put themselves out for one or two percent more chance
10  of living.
11  BY MS. ZORK:
12      Q.   In the context of a tumor that is less
13  than a centimeter and node negative and premenopausal
14  I believe you testified that if asked by the patient
15  what your recommendation would be, under those
16  circumstances you would say, tell the patient if you
17  ask me it's a flip of the coin?
18      A.   Right.
19      Q.   Is that correct?
20      A.   Yes.
21      Q.   Would that be the same advice that you
22  would give to a patient who had a tumor that was

0045
1   greater than one centimeter, all other things being
2   the same?
3       A.    Let me clarify something.  You didn't ask
4   me things about like receptor assay and flow cytometry
5   and those things.
6       Q.    I understand and I will get to that.
7       A.    Greater than a centimeter I will say the
8   evidence begins to mount up that it's a more useful
9   thing to do.  The chances of dying increase somewhat.
10  The therapy is manageable and now you are talking
11  about maybe a five to ten percent benefit.  To me
12  that's a more reasonable discussion to have.  We do a
13  lot of things in medicine for five or ten percent.  We
14  don't do that many things for one or two percent.
15  It's just how things have evolved.  Does one thing
16  make more sense than another, is it five times as
17  beneficial to give somebody a ten percent versus a two
18  percent chance of living, those are not easily
19  answered questions but I am more comfortable in
20  pushing something where I think there is a ten percent
21  difference in outcome.
22      Q.    When we are talking about, you said that
0046
1   the standard of care would mandate that you have these
2   discussions, are we talking about the standard of care
3   in 1998?
4       A.    Yes.
5       Q.    Now, going back to what you touched on,
6   in a patient who has node negative tumor that's less
7   than a centimeter in size, does the degree to which
8   you would recommend the cancer depend upon other
9   prognostic indicators associated with the tumor?
10      A.    Yes.
11      Q.    So the poorer the prognosticating
12  features of that tumor, am I correct, the stronger
13  your recommendation would be if the patient says to
14  you, Doctor, what do you recommend?
15      A.    Within reason.  If you look at tumors
16  less than a centimeter with negative nodes, you can't
17  find bad enough biochemical markers to make it even 40
18  percent likely that such a woman would die.  You can't
19  invent markers that would make it that bad.  You might
20  get up to, with the world's worst markers, 25 to 30
21  percent chance of death with a tumor less than a
22  centimeter and negative nodes.  So, again, you are

0047
1   talking about degrees of gray.  But if the markers are
2   really awful, I'll tend to push a little bit more
3   strongly for adjuvant treatment.
4       Q.    How would you characterize the markers in
5   Ms. Pollard's tumor in 1998?
6       A.    They were mixed.  She had negative
7   receptor assays.  Her HER-2 oncogene overexpression
8   was zero, that's good; she had a Ki-67 that was high,
9   that was bad; she had a DNA of 1.0, that's good; and
10  an S-phase of 6.6, and that's intermediate.  So she
11  was kind of right in between good and bad.  She was
12  some of each.
13      Q.    So if you were to grade Ms. Pollard's
14  tumor using the Elston score, how would you grade her
15  tumor?
16      A.    I would have to look up this Elston
17  score.  I don't remember exactly how to do that.
18      Q.    The fact it was a poorly differentiated
19  tumor, that's a bad prognosticating --
20      A.    The degree of differentiation actually is
21  pretty far down the list compared to these other
22  things.  Most important, nodes; second, size; third,
0048
1   everything else.  And then within everything else ER,
2   PR, and HER-2 are thought to be at the top of the
3   list.  Degree of differentiation, somewhere down the
4   list.  Vascular invasion, somewhere down the list.
5   Ki-67, pretty far down the list.
6       Q.    Is that -- can you refer me to some
7   literature that talks about Ki-67 being down the list,
8   HER-2 being up the list, those kinds of things?
9       A.    I think if you looked in the current
10  issue of DiVita you would find that to be so.  I
11  haven't done that but I would suspect you would find
12  that to be so.
13      Q.    What is it the Ki-67 is measuring?
14      A.    It's a measure of proliferation, the
15  percentage of cells undergoing cell division.  It's
16  different from the S-phase but it kind of looks at the
17  same thing.
18      Q.    So a Ki-67 shows that Ms. Pollard's tumor
19  had a high proliferation index?
20      A.    Yes, although the S-phase was only
21  moderate which is also supposed to look at the same
22  thing.  That's why these studies are imprecise.  They

0049
1  are measuring comparable biological properties but
2  they are getting different answers.  That's a mystery.
3  Nobody knows why that should be so.  It's a function
4  of the way the test is done.
5      Q.    So when you look at this cancer,
6  Dr. Stark, you don't view this as a cancer with poor
7  prognostic indicators?
8      A.    It's got a couple of poor prognostic
9  indicators, but if I look at lymph node status, size
10  and then everything else, I think this is still a
11  relatively favorable cancer.
12      Q.    I'm asking you just to look at the tumor,
13  not the --
14      A.    Not size, not nodes?
15      Q.    Not size, not nodes.  Just looking at the
16  tumor itself, when you look at the characteristics of
17  the tumor itself, the characteristics -- these are
18  characteristics of a tumor with poor prognosticating
19  features?
20      A.    I don't agree with that.  I think it's
21  about 50/50.  I think the HER-2 being zero is a good
22  feature, the DNA being one is a good feature, the
0050
1  S-phase being 6.6 is average, and the other two were
2  bad.  So it's like a 2.5 out of five.
3      Q.    So you disagree with Dr. Gupta.
4  Dr. Gupta thought these were bad prognosticating
5  indicators in his deposition.  You would disagree with
6  that?
7      A.    I don't think they are that bad.  I think
8  they are so-so.  It's shades of gray, though, really
9  what we're talking about.
10      Q.    When you say it's shades of gray, we're
11  talking about the information that you are going to
12  base a recommendation on adjuvant treatment to a woman
13  who is trying to make a decision.
14      A.    The problem is there are hundreds of
15  articles written on every one of these things and you
16  can pick and choose what you believe, and some
17  articles emphasize the hormone receptors more than
18  anything else.  Some articles emphasize the HER-2/neu
19  oncogene overexpression.  And if you do a Medline
20  search or cancer lit search on breast cancer, you will
21  find these days about a hundred thousand articles have
22  been written on breast cancer in the last 20 or 30

0051
1  years.  You can pretty much choose anything you want
2  to rely on.  So it's very hard to distill that and
3  give people meaningful information.  That's why
4  Dr. Gupta and I can look at the same numbers and draw
5  slightly different conclusions because we are all
6  children of our experience in a sense.  It's what you
7  read, what you believe and how you are influenced.  It
8  is a very complicated matter, though, to come up with
9  a firm recommendation.  There is no dogma in this.
10      Q.    Yet you do it every day.
11      A.    I do it every day as best I can.  Yes,
12  ma'am.  Good faith every day.
13      Q.    In Dr. Gupta's consultation report he
14  identified ER, PR status, the receptor status, as an
15  important prognostic indicator that would tip the
16  scales in favor of chemotherapy.  And out of all those
17  indicators that you selected with respect to the tumor
18  itself, he identified that as the indicator that would
19  tip the scales.  Do you agree with that in terms of
20  what is generally accepted or was generally accepted
21  in 1998 in the clinical setting of this case?
22      A.    Not sure how to view the term "tip the
0052
1  scales."
2      Q.    Have you read his report?
3      A.    I've read his deposition.
4      Q.    Have you read --
5      A.    I've read what he authored in terms of
6  what's in the medical record.  I don't disagree with
7  your characterization of what he said.  All I'm saying
8  is it may have tipped the scales for him.  All of us
9  have a different way of looking at this.  I think
10  that's one of a number of pieces of information.
11          I think you are looking at a lady --
12  might as well get to it now because we're going to get
13  to it eventually.  If this lady walked into my office
14  in 1998 I would have said to her, Ms. Pollard, I think
15  you have between an 80 and 90 percent chance of being
16  cured with lumpectomy and radiation alone.  Anything
17  else you do is icing on that cake.  I cold throw the
18  kitchen sink at you and turn an 80 percent into about
19  an 85 percent or 90 percent into about a 93 percent.
20  That's what I can do for you.  Whether it's 80 or 90
21  depends on how important you think the ER and PR are
22  versus the HER-2, and that's when you get into the

0053
1  hundred thousand articles that have been written.  You
2  make up the decision, Ms. Pollard, how important is it
3  to you to feel rotten for four or five months for a
4  few points.
5           If it tipped the scales for Dr. Gupta and
6  he sold this to this lady on that basis, that's his
7  privilege.  That's what makes the horse races.  There
8  are 20,000 of us who practice medical oncology in this
9  country and no two of us agree on anything or
10  certainly not down the line on everything.  Change
11  that.  No two of us agree on everything.  We all agree
12  on something.  Very, very tough field.
13      Q.    Let me go back to -- pick up from what
14  you were just talking about.  In this -- in the
15  clinical setting of this case, Ms. Pollard was
16  referred to the oncologist, Dr. Gupta, by the surgeon
17  after he had performed the lumpectomy and gotten the
18  results of the lumpectomy that demonstrated that there
19  was no further tumor identified and that the nodes
20  were negative?
21      A.    Correct.
22      Q.    And just so we make sure that we are all
0054
1  on the same page, that definitive surgery took place
2  on November 12 and Ms. Pollard was in Dr. Gupta's
3  office on December the 1st.  Would that be in your
4  practice a reasonable amount of time between the
5  surgery, the definitive surgery, and the referral to
6  the oncologist?
7      A.    Yes.  That's fine.
8      Q.    In your practice and in 1998 if there was
9  going to be adjuvant treatment initiated on a patient
10  such as Ms. Pollard, am I correct that the optimal
11  time for beginning the treatment is as soon as the
12  surgery has healed?
13      A.    The term "optimal" is a difficult word.
14  I think it's the conventional period of time.  Again,
15  because you are probably going to get into this, I
16  might as well --
17      Q.    Let me ask the questions.  I'll ask the
18  questions.
19      A.    That's fine.  It's conventional.  Put it
20  that way.
21      Q.    So the conventional -- and conventionally
22  if there is going to be adjuvant chemotherapy

0055
1  administered on a patient who has undergone a
2  lumpectomy, that conventionally would begin at about
3  anywhere from three to six weeks after the surgery?
4      A.    Yes.
5      Q.    What is the conventional -- first of all,
6  all of the chemotherapy trials, there is no
7  chemotherapy trials that begin treatment months down
8  the line?
9      A.    Correct.
10      Q.    All of the trials begin treatment within
11  three to six weeks of surgery under the protocols?
12      A.    As far as I know, that's correct.
13      Q.    The conventional treatment -- that
14  convention, what is the conventional wisdom behind
15  beginning treatment within three to six weeks of
16  surgery?
17      A.    The conventional wisdom is that the
18  surgery itself probably stimulates the metastases to
19  begin to synthesize DNA and start to grow and that it
20  would be optimal to begin chemotherapy at a time when
21  the metastases were the most vulnerable to being
22  killed, the microscopic metastases most vulnerable to
0056
1  being killed by chemotherapy.  There is no scientific
2  basis for this but that is the convention.
3      Q.    So when you have the initial conversation
4  with your patient when they have -- after they have
5  been referred to you by the surgeon, when you are
6  having the discussions about the pros and cons of
7  chemotherapy, that is one of the elements that is
8  included in your discussions with the patient; isn't
9  that correct?
10      A.    Yeah.  I tell them if they are going to
11  do it they might as well get on with it.  That's what
12  I say.
13      Q.    And you explained to them why based upon
14  the conventional wisdom?
15      A.    If they ask.  Patients, their friends all
16  had it right away so they don't even bother asking.
17  But if they ask, that's what I would tell them.  It
18  doesn't usually come up.  People assume they are going
19  to start chemotherapy right away.  That's what I'm
20  saying.
21      Q.    And if you sit down with the patient and
22  you have that conversation where you say these are

0057
1  what the benefits are and the patient says, Well, you
2  know, for that small amount of benefit I think I'm
3  going to take my chances.  I'm not going to undergo
4  the chemotherapy.  With that patient you, the
5  oncologist, do you discuss with that patient then the
6  need to begin radiation treatment right away in light
7  of the fact they have just had a lumpectomy?
8      A.    Yes.  I would say, If you are not going
9  to do the chemo, let's go ahead and start the
10  radiation, yes.
11      Q.    And the conventional practice, now and in
12  1998, is that if you are going to have radiation
13  treatment -- first of all, everyone who gets a
14  lumpectomy, the standard of care is that they also
15  receive radiation treatment of the entire breast?
16      A.    Yes.
17      Q.    And that's treatment of the entire breast
18  in lieu of having to have a mastectomy?
19      A.    Correct.
20      Q.    And if there is not going to be
21  chemotherapy started, then the conventional practice
22  is to give radiation treatment within three to six
0058
1  weeks of surgery?
2      A.    Yes.
3      Q.    And as the oncologist consulting with the
4  patient at that initial consultation where you are
5  having this discussion, you give that -- if the
6  decision is made not to give chemotherapy, you tell
7  the patient that we need to get you signed up for
8  radiation treatment right away?
9          MS. CERNIGLIA-LOWENSEN:  Objection to the
10  form.
11          THE WITNESS:  Yes.
12  BY MS. ZORK:
13      Q.    And that's the standard of care?
14      A.    Yes.
15      Q.    Do you see anywhere in the medical
16  records or in Dr. Gupta's deposition that Dr. Gupta
17  had that conversation with Ms. Pollard at any time?
18      A.    I don't recall.
19      Q.    Should he have had that conversation with
20  Ms. Pollard on December 1st when he saw Ms. Pollard
21  two and a half weeks after her surgery?
22          MS. CERNIGLIA-LOWENSEN:  Objection to the

0059
1  form.
2         THE WITNESS:  Well, there were certain
3  extenuating circumstances.  I can't recall whether
4  Dr. Gupta knew when she was getting ready to go to
5  England or not on that very first visit.  But if he
6  did know that, then he would have had a different
7  discussion, saying, We need to get this set up so as
8  soon as you get there you start your treatment,
9  something like that.
10  BY MS. ZORK:
11     Q.    He should have had the conversation with
12  Ms. Pollard outlining what the standard procedure
13  would be if she chose chemotherapy and what the
14  standard procedure would be in terms of timing and
15  what's involved if she chose not to have the
16  chemotherapy?
17     A.    Certainly within some reasonable period
18  of time, you expect him to have that discussion.  It
19  might not necessarily be at the first visit, but along
20  the way you have that discussion.
21     Q.    By December 15 when Dr. Gupta saw
22  Ms. Pollard again in his office, at that point it had
0060
1  now been four weeks since the surgery.
2     A.    Right.
3     Q.    Under conventional practices if
4  Ms. Pollard was going to receive chemotherapy, she
5  should have been being prepared to start her
6  chemotherapy shortly after that appointment, is that
7  correct, within days or --
8     A.    Within days or a few weeks, yes, sure.
9     Q.    Days or --
10     A.    A couple of weeks.  If she were in the
11  process of moving to England, you might have to have a
12  little bit of delay to get her over there.  Would not
13  be unreasonable to do that.
14     Q.    But you would have that discussion with
15  the patient herself, correct?
16     A.    Sure.
17     Q.    You would say, You need to get this
18  started now or sometime in the next two weeks?
19         MS. CERNIGLIA-LOWENSEN:  Objection to
20  form.
21         THE WITNESS:  Soon.  I'm not sure I can
22  put -- there are extenuating circumstances and in the

0061
1   absence of data that are hard core about this issue, I
2   would encourage the patient but I wouldn't be too
3   dogmatic about it.
4   BY MS. ZORK:
5       Q.    But you would give the patient that
6   information?
7       A.    Sure.
8       Q.    And that information being that, You need
9   to get treatment started, normally we get this
10  treatment started within three to six weeks of
11  surgery?
12      A.    I would say something like, It would be
13  advisable for you to get going as soon as you can.
14      Q.    And if the patient says, What do you
15  mean, Doctor, as soon as I can?
16      A.    As soon as you can.  If you are moving to
17  England, when are you moving?  The problem with
18  radiation is you can't start at one place and finish
19  at another place.  The machines are different.  It's
20  very difficult to do that.  The calibrations are
21  different.  The dosimetry is different.  Radiation
22  oncologists frown on this.  As a practical matter if
0062
1   she is going to England she needs to get there, get
2   stuff unpacked and start radiation.  If it were an
3   extra month, it probably wouldn't make any difference,
4   but in some reasonably timely way, consistent with the
5   practicalities of the situation, she ought to get
6   going on this treatment.
7       Q.    And the point of my question is that
8   precisely what you have just said should be conveyed
9   to the patient?
10      A.    At some point, right.  I can't say
11  whether it was the first visit or second visit.  At
12  some point the essence of that should be conveyed to
13  the patient.
14      Q.    Did you see anything in the records or in
15  Dr. Gupta's deposition where that information was --
16  that information in terms of the timing of the
17  treatment was conveyed to Ms. Pollard by Dr. Gupta?
18           MS. CERNIGLIA-LOWENSEN:  Objection to
19  form.
20           THE WITNESS:  I don't recall whether he
21  specifically gave her periods of time.  I just don't
22  recall.

0063
1  BY MS. ZORK:
2      Q.    When Dr. Gupta saw Ms. Pollard in
3  December -- on December 1st and December 15th of 1998,
4  at that point in time was there any evidence of
5  metastatic disease?
6      A.    No.
7      Q.    Can you explain to me what the – first
8  of all, explain to me when -- how -- let me start all
9  over again.  In Dr. Gupta's letter that he wrote To
10  Whom It May Concern, he wrote a paragraph saying that
11  he would tend to favor the use of adriamycin and
12  cytoxan, four cycles in the event the breast -- the
13  tumor turned out to be ER, PR negative.  Do you recall
14  that?
15      A.    Yes.
16      Q.    Is that treatment -- was that standard
17  treatment for this type of breast cancer in 1998?
18      A.    One of a possible number of treatments.
19  It wasn't the only treatment.
20      Q.    I understand.
21      A.    It would have been standard, yes.
22  Nothing extraordinary about it, put it that way.
0064
1      Q.    So tell me just as a practical -- in a
2  practical sense, how would it work when an oncologist
3  prescribes or recommends and the patient goes along
4  with the recommendation and signs up for four cycles
5  of chemotherapy, adriamycin and cytoxan, how is that
6  handled as a practical matter?
7      A.    Practical matter, you get the patient in
8  the same room with the nurse.  The nurse looks at the
9  lady's veins.  Does the patient need a venous access
10  device depending how good their veins are.  That's
11  part of the workup, to see if they need such a device.
12  You also schedule them, at least in this country, for
13  what's called a MUGA scan to look at myocardial
14  function to be sure there is no risk of developing
15  cardiomyopathy.  You pick a date, give the patient
16  some literature, give them a little pep talk about
17  what to expect, tell them to go out and buy a wig and
18  just give them a time slot as to when to start.
19      Q.    So when they come in to start, tell me
20  what the course is.
21      A.    You come in, you get hooked up to an IV.
22  You get some premedication to keep you from throwing

0065
1   up. You get these two drugs. It takes a couple of
2   hours. The IV is pulled out and you go home.
3       Q.    And when do you come back?
4       A.    It's given every three weeks. Typically
5   most oncologists would see the patient halfway through
6   that three-week period. When the blood counts fall
7   they tend to do so about 10 days after treatment.
8   It's good to document how low they got to to know how
9   safe it is to go on with the next treatment, to know
10  if you need to give growth factors to keep them from
11  going down the next time. These are things you
12  determine midcourse. Generally most oncologists would
13  treat the patient on day one, see them on day 10, and
14  treat them again on day 22, three weeks after the
15  first treatment. They might or might not wait with
16  the patient on day 22. The nurse might handle it all.
17  That's typically how it's done.
18      Q.    So then if there were four cycles, it
19  would be four treatments, each of them three weeks
20  apart?
21      A.    Yes.
22      Q.    And if you were going to -- is it the
0066
1   standard of care in 1998 or the standard practice in
2   1998 if the patient was -- had undergone a lumpectomy
3   and were going to receive chemotherapy for them to
4   have the chemotherapy first followed by the radiation?
5       A.    Most people were doing it that way on the
6   basis of rather flimsy evidence, but I think that's
7   become the way it's done. It's hard to do it
8   together.
9       Q.    What is the thinking behind doing the
10  chemotherapy before you do the radiation treatment?
11      A.    A very limited number of studies,
12  probably the most famous one published by the Joint
13  Center for Radiation Therapy at Harvard showing a
14  slightly improved outcome if you give the chemo first
15  as opposed to the radiation first.
16      Q.    What is the principle behind that?
17      A.    The principle, again, it's with limited
18  science behind it, is that the more important thing to
19  eradicate is microscopic distant metastases. That's
20  what kills people. And the local control you achieve
21  with the radiation to the breast is less important.
22  So it's okay to delay that a little bit. Underlying

0067
1  all this is everybody knows that it's very difficult
2  to give the radiation and the chemo at the same time.
3  The toxicity is too high.
4      Q.    In a patient clinical circumstances of
5  Ms. Pollard, 43 years old, premenopausal woman, if the
6  woman is electing or you are having the discussion
7  about chemotherapy, what do you or what does the
8  standard of care require you to discuss in terms of
9  side effects and possibly complications from the
10  treatment?
11      A.    It requires you to tell the patient that
12  she is going to lose her hair completely, lose her
13  eyebrows and eyelashes, lose her pubic hair.  You have
14  to tell them that it's a period of several days each
15  cycle when they are at extreme risk for infection,
16  that you monitor for that but if they get a fever
17  during that time they need to call you right away.
18  You tell them there is a small chance they will suffer
19  heart damage from the adriamycin but if they have a
20  normal MUGA scan at the beginning of the treatment the
21  chances of that are very, very small.
22          You tell them that they may be
0068
1  permanently sterile from this treatment.  That, of
2  course, depends on the age of the patient.  You tell
3  them not to get pregnant while they are taking the
4  treatment, that it's not effective birth control.
5  Even though they may become sterile, they may not.
6  There are certain drugs you shouldn't take with other
7  drugs.  For example, if instead of getting CA you get
8  CMF, the M in CMF is methotrexate, and you shouldn't
9  take that with any other organic acids like aspirin or
10  certain antibiotics.  Certain drug interactions you
11  need to educate the patient about under certain
12  circumstances.
13          Generally you tell them not to go out in
14  the sun because many of these drugs are
15  photosynthesizers and you sunburn badly.  You tell
16  them there is a slight risk they will bleed from these
17  treatments.  You may have some bleeding in the urinary
18  tract from the cytoxan.  They may have burning on
19  urination.  They should tell you about that.  You tell
20  them there is a slight increased risk of second
21  malignancy from these drugs, but it's very slight.  I
22  think that's about it.

0069
1      Q.     Do you have literature that you give to
2   the patients so that they can review all of the
3   information that you've discussed with them?
4      A.     Yeah.  I make it available to them.  I
5   don't thrust it upon them partially because this is a
6   practice that is in sort of a lower middle class
7   neighborhood and some people are overwhelmed by the
8   information and they don't want to read about it.  I
9   certainly offer it to them and the conversation that I
10   had with you is something I mention to people at a
11   minimum.  I think that's the minimum amount of
12   information people need to know.
13      Q.     In reviewing Ms. Pollard's records, did
14   you identify or are you aware of any medical problems
15   that she had that would have made chemotherapy
16   especially risky for her or that would have made you
17   recommend against chemotherapy?
18      A.     No.
19      Q.     In Dr. Gupta's consultation he made
20   reference to the fact, as though it were significant,
21   that Ms. Pollard's lesion in 1998 was a palpable
22   lesion but that was not seen on mammogram.  Are you
0070
1   aware of any clinical significance in terms of
2   prognosis on patients who have small tumors less than
3   a centimeter that are palpable but not detected
4   radiographically?
5      A.     Only thing I can think of in that regard
6   is, and I'm not sure really what he meant, but if you
7   have annual mammograms and you develop a palpable
8   breast cancer between mammographic events that's
9   thought to be a bad thing because it means the cancer
10   is rapidly growing.  If your mammogram is negative at
11   the time you develop the cancer, then those rules
12   don't really matter because you have a false negative
13   mammogram if you will.  So I'm not really sure what he
14   meant by that.
15      Q.     Do you have an opinion as to whether or
16   not Ms. Pollard's tumor was a fast-growing tumor?
17      A.     I don't think there is any evidence in
18   the literature -- in the record, direct evidence that
19   really goes to that issue.  She developed metastatic
20   disease rather quickly so I guess that's sort of
21   indirect evidence that she had an aggressive cancer.
22   I guess in that sense that is strong but indirect

0071
1  evidence that she had a fast-growing cancer because
2  her metastases developed so quickly.
3      Q.    Is that an opinion that you would hold
4  with reasonable medical certainty?
5      A.    Yes.
6      Q.    Is it outside the standard of care in
7  1998 for a patient following lumpectomy to have a
8  delay in radiation treatment of six months?
9          MS. CERNIGLIA-LOWENSEN:  Objection to the
10  form.
11          THE WITNESS:  Yes.  In this country.  All
12  I can speak of is this country.  That's the only place
13  I'm familiar.
14  BY MS. ZORK:
15      Q.    Now, the thinking or the reasoning behind
16  giving radiation treatment within three to six weeks
17  of surgery following a lumpectomy, it is based upon
18  the same principle as the reason why you would give
19  chemotherapy; is that correct?
20      A.    Not exactly.  The chemotherapy has to do
21  with the recruitment of cells into cell division by
22  removing the bulk primary tumor.  With radiation it's
0072
1  just a question of trying to sterilize any microscopic
2  disease remaining in the breast before it has a chance
3  to grow back.  It's not exactly the same thing, but
4  it's comparable.
5      Q.    It's comparable in the sense that you
6  want to provide the treatment before the cancer has
7  had a chance to grow and develop?
8      A.    Yes.  That's fine.  I would agree with
9  that.
10      Q.    And radiation is considered more
11  effective the smaller the tumor mass or bulk is?
12      A.    Yes.
13      Q.    Now, what is your understanding or
14  opinion as to when Ms. Pollard developed cancer in her
15  breast again?
16      A.    You mean when she developed more trouble
17  medically with her cancer?
18      Q.    Yes.
19      A.    She had a couple of things happen to her.
20  In I think it was April of 2000 she developed a mass
21  in the original breast.  She developed in addition --
22  which turned out to be ductal carcinoma in situ.  She

0073
1   also developed a fixed mass at the edge of the breast
2   at what's called the costochondral junction, really
3   right at the edge of the sternum. Those are really
4   different events. In addition, she had shortly
5   thereafter the development of a lung nodule and a
6   supraclavicular lymph node as well within a few weeks
7   of this original tender, fixed mass at the
8   costochondral junction.
9       Q.   So do we agree that the lump in the
10  breast that was ductal carcinoma in situ, that was a
11  different process than what was going on in her breast
12  with respect to the original tumor?
13      A.   Yes.
14      Q.   And the ductal carcinoma in situ has --
15  is that a type of cancer that has very good prognostic
16  features or indicators?
17      A.   It's not even really cancer. It's kind
18  of precancer. It is associated with a hundred percent
19  cure rate if it's removed typically.
20      Q.   Do you have an opinion as to whether or
21  not the ductal carcinoma in situ would have been with
22  within the radiation field?
0074
1       A.   Yes, it would have been.
2       Q.   Do you have an opinion as to whether
3   radiation treatment given within three to six weeks of
4   the lumpectomy would have eradicated that tumor?
5       A.   I believe it would have or prevented it
6   from becoming clinically evident. Yes, eradicated
7   probably.
8       Q.   Do you have an opinion as to whether the
9   tumor that developed or the cancer that developed on
10  the edge of the breast near the sternum, whether that
11  was a recurrence of cancer or whether or not it was
12  metastatic cancer?
13      A.   It's probably metastatic cancer to an
14  internal mammary lymph node. Those classically grow
15  to the point where they grow between the ribs and you
16  can feel them as a lump adjacent to the sternum.
17      Q.   And then the cancer or the tumor that was
18  identified, the cancer in the lung and the clavicular
19  nodule, those were metastatic?
20      A.   Also, yes.
21      Q.   Also. So that your opinion is to a
22  reasonable degree of medical probability the -- is

0075
1  that the cancer on the edge of the breast was a
2  metastasis of the original tumor?
3      A.    Yes.
4      Q.    Would radiation treatment three to six
5  weeks after the lumpectomy have eradicated the cells
6  in the breast that led to that metastasis?
7      A.    No.
8      Q.    And that's your opinion with reasonable
9  medical certainty?
10     A.    Yes, ma'am.
11     Q.    And what's the basis of that opinion?
12     A.    These cells adjacent to the sternum
13  originated in an internal mammary node.  The great
14  likelihood is those cancer cells were present in that
15  node at the time of her original lumpectomy.  The
16  internal mammary chain is not routinely irradiated in
17  patients who have small primaries with negative
18  axillary nodes.  So that internal mammary chain would
19  not have been in the radiation field in all likelihood
20  had she undergone the radiation that we spoke about
21  earlier this afternoon.  Same can be said for the
22  supraclavicular node, it would not routinely be in the
0076
1  radiation field and that node was probably already
2  involved at the time of her lumpectomy in 1998.  So
3  its natural history would not have been impacted upon
4  if she had breast radiation at the time of her
5  diagnosis or shortly thereafter.
6      Q.    So you believe with a reasonable degree
7  of medical probability that the cancer had
8  metastasized to the clavicular node already in 1998?
9      A.    Yes.
10     Q.    What's the basis for that opinion?
11     A.    Well, she never regrew her tumor mass in
12  the site of her original lumpectomy, at least I don't
13  think she did, not in any reasonable period of time
14  anyway.  And, therefore, in order for cancer cells to
15  appear in those nodes they had to get there somehow,
16  and the origin of those cancer cells having been the
17  primary tumor, that tumor was amputated if you will or
18  removed at the time of lumpectomy.  So the cells would
19  already have had to have migrated to those nodes prior
20  to the lumpectomy in order for them to show up two
21  years later because there was nothing left at the site
22  of the original lumpectomy.  If there were something

0077
1   left at the site of the original lumpectomy, it would
2   have grown back.  So the lumpectomy was complete.  The
3   lumpectomy removed the cancer, so in order for those
4   cells to show up, and the same goes for the lung
5   nodule, in order for them to show up anywhere else
6   they already would have to be there at the time of the
7   lumpectomy.
8       Q.    What would prevent the -- how can you say
9   with reasonable medical probability that the nodule in
10  the lung and the clavicle metastasized from the
11  original tumor and not from the tumor that was near
12  the sternum?
13      A.    Generally speaking, because they all
14  appeared within the same period of time it's much more
15  reasonable and more likely to conclude that all three
16  sites were seeded at the same time.  If the --
17  furthermore, there is still in 2003 a question about
18  whether a parasternal mass or an internal mammary node
19  is even capable of metastasizing elsewhere.  Everyone
20  agrees that a primary breast cancer can metastasize
21  everywhere but it's not clear whether a nodule
22  metastasis can metastasize anywhere.  That's been
0078
1   debated for 30 years.  It's more likely than not that
2   the original primary gave off all these metastasis
3   rather than the metastasis in turn generating more
4   metastases.
5       Q.    I believe you said you've read
6   Dr. Sokol's deposition?
7       A.    Yes.
8       Q.    Dr. Sokol testified I believe in his
9   deposition that in his opinion the tumor in the
10  sternum was a recurrence of the breast cancer.
11      A.    Well --
12      Q.    Do you -- explain to me why you disagree
13  with Dr. Sokol.
14      A.    It may be semantics.  I think it's
15  metastasis from the original primary.  To me
16  recurrence means in breast recurrence.  Recurrence
17  means failure to extirpate completely with the
18  surgery.  Then you get a recurrence in the same site.
19  To me that is recurrence.  Anything else to me is
20  metastasis.  I think this thing in the parasternal
21  region was metastasis.
22      Q.    Explain to me what the literature means

0079
1  when they talk about lumpectomy and radiation and
2  recurrence as compared to lumpectomy with no
3  radiation.
4      A.    Generally what they mean by recurrence,
5  there is another tumor developing at the same site as
6  the original tumor, the reason for that being one of
7  two things, either the original excision left
8  microscopic cancer cells behind or there was
9  multifocal cancer in the breast originally that went
10  unrecognized at the time of the original lumpectomy.
11  It can be either one.  Sometimes it's difficult to
12  dissect out which of those two things is happening.
13      Q.    Can you say with reasonable medical
14  certainty that Ms. Pollard did not have multifocal
15  cancer in her breast in 1998?
16      A.    I can answer this way:  She did have a
17  second tumor in her breast which was DCIS.  That was
18  the thing that was the second lump that was found in
19  2000.  So that is some indicator of multifocality, but
20  to my knowledge she never had another invasive cancer
21  anywhere else in her breast tissue.
22      Q.    Well, not that you could detect
0080
1  clinically.
2      A.    Or that's ever been detected clinically
3  since.
4      Q.    So you don't consider the cancer that was
5  on the edge of the breast breast cancer?
6      A.    No.  It's metastatic breast cancer.  It's
7  not in the breast.  It's in the lymph node, in the
8  parasternal lymph node which is in the internal
9  mammary node that grew up between the ribs.  It is not
10  in breast tissue.  If you were to excise that and look
11  at the surrounding tissue, I don't think there would
12  be normal breast tissue there.
13      Q.    Can you pull the pathology report that
14  you are relying on for that opinion?
15      A.    If you tell me what volume it's in, I can
16  try to find it.  It looks like it might be in Volume
17  Number 2.  They were both biopsy 5-16-00.  Lakenheath,
18  RAF, is that where it was done?
19          MS. CERNIGLIA-LOWENSEN:  I think so.
20          THE WITNESS:  That would be H-3 probably.
21          MS. ZORK:  I'm going to have that marked
22  as the next exhibit, please.

0081
1          (The document was marked as Exhibit 4.)
2          THE WITNESS:  Chest wall, incisional,
3  poorly differentiated adenocarcinoma.  See comment.
4  It doesn't say here.  Biopsy report, and this is
5  S00-1861, RAF Lakenheath, United Kingdom.  Doesn't
6  talk about what is surrounding Specimen B, which is
7  the -- they are calling it chest wall.  I'm saying
8  it's internal mammary node that grew up into the chest
9  wall.
10  BY MS. ZORK:
11      Q.    What do you base your opinion on that it
12  was an internal mammary node that grew up into the
13  chest wall?
14      A.    It's classic for that.  I've seen it 20
15  or 30 times and it's written about that when you have
16  a parasternal mass it's always an internal mammary
17  node that grows outward and into the area between the
18  ribs.
19      Q.    So your opinion is not based upon any
20  pathologic report but based upon in your experience
21  it's always -- cancer that reoccurs in that location
22  is always from a parasternal node?
0082
1      A.    Internal mammary node, yes.  That is
2  correct.
3      Q.    Where can I read about that?
4      A.    I don't know.  I've been doing this for
5  26 years and that's always been the case.  That's all
6  I can tell you.  Anybody that knows anything about
7  breast cancer won't disagree with me.  I'll tell you
8  that also.  Suit yourself.
9      Q.    Now, do you have an opinion whether
10  adjuvant chemotherapy, if adjuvant chemotherapy had
11  been given three to six weeks after the lumpectomy
12  whether that would have prevented the, as you've
13  described, metastasis of the cancer in the chest wall,
14  the lung and the clavicular node?
15      A.    I do have an opinion.
16      Q.    What is your opinion?
17      A.    More likely than not chemotherapy would
18  not have prevented those things from happening.
19      Q.    What is the basis for that opinion?
20      A.    If you look at survival statistics of
21  women who do and do not get chemotherapy, chemotherapy
22  reduces the likelihood of death by at most a third,

0083
1  which means that two-thirds of the women who are
2  destined to die of this disease do so anyway in spite
3  of getting chemotherapy and only about one-third of
4  women who are destined to die will be saved.  That's
5  based on scores of published clinical trials looking
6  at Stage I breast cancer.  The magnitude of benefit is
7  roughly at best a one-third reduction in death among
8  those people who are destined to die, which means
9  two-thirds will die which means it's more likely than
10  not that she would have died.
11      Q.    Do you have an opinion as to whether or
12  not Ms. Pollard will survive her breast cancer at this
13  point?
14      A.    I think she will die.
15      Q.    So you would agree that under your
16  statistics that you are relying on there is a 33
17  percent chance that Ms. Pollard would have survived if
18  she had received appropriate -- if she had received
19  chemotherapy three to six weeks after the lumpectomy?
20      A.    Yes.
21      Q.    And at this point she has a zero chance
22  of surviving?
0084
1      A.    Correct.
2      Q.    If Ms. Pollard had received chemotherapy
3  three to six weeks after the lumpectomy, would it have
4  any impact on her -- would it have extended her life
5  more likely than not beyond what her current life
6  expectancy is?
7      A.    Probably not.
8          MS. CERNIGLIA-LOWENSEN:  Objection.
9  BY MS. ZORK:
10      Q.    What is the basis for that opinion?
11      A.    She ultimately received the same kind of
12  treatment that she would have received in late '98 and
13  early '99, and that block of treatment probably bought
14  her about the same block of time when she got it as
15  the same block of time she would have bought her had
16  she got it earlier.
17      Q.    If Ms. Pollard had received chemotherapy
18  three to six weeks after the lumpectomy in 1998, would
19  it have affected -- would it have affected her
20  disease-free survival?
21      A.    It might have.
22      Q.    More likely than not?

0085
1      A.    I don't know.  Possibly.  I don't know.
2   I don't know either way.
3      Q.    And why don't you -- why can't you say
4   either way with respect to would it have extended her
5   period of disease-free survival?
6      A.    Well, there is only probably a 50/50
7   chance that therapy would have even killed any cancer
8   cells.  This therapy is not great and there's a
9   possibility that her -- that she would have had
10  essentially no benefit from this treatment.  Let me
11  look here.
12     Q.    Would you agree that she has benefited
13  from the treatment -- that the treatment that she has
14  received, the chemotherapy that she received, has
15  extended her life?
16     A.    It probably has, but she had an
17  autologous bone marrow transplant which is way
18  stronger than anything she would have ever had in late
19  '98 and '99, and that's much more likely to be of
20  benefit to her than the conventional therapy she would
21  have had.
22     Q.    It's your opinion that the bone marrow
0086
1   transplant is way more effective in treating breast
2   cancer than chemotherapy would have been if given
3   three to six weeks after the lumpectomy?
4      A.    In terms of duration of remission, I
5   think so, yeah.
6      Q.    Correct me if I'm -- it's my
7   understanding that bone marrow transplant has been
8   discontinued as a treatment for metastatic breast
9   cancer and is no longer being used.
10     A.    That is a hot button subject.  That has
11  as much to do with politics as anything else.  The
12  studies that were published a couple of years ago and
13  presented together at my national society meeting were
14  all seriously flawed in their design and execution.
15  Yet they have convinced the insurance industry to stop
16  paying for this procedure.  As a result, this
17  procedure has died on the vine because nobody gets
18  paid for it anymore.  It's very difficult to get
19  reimbursement for it after those studies were
20  published.  So effectively it has shut down the
21  transplant business in this country.
22         Most of us who were serious scholars of

0087
1   this area feel we believe the question has never
2   really adequately been asked and answered, the role of
3   transplant in women with high risk breast cancer.
4   What is clear is that many women will have prolonged
5   remissions after high dose therapy.  It may not be
6   curative.  The question that no one can answer is
7   whether it's worth the pain that's inflicted that goes
8   with the high dose chemo to get an extra year of
9   unmaintained remission versus being on chemo all the
10  time.  But if you are getting ten times the amount of
11  chemo than you ordinarily would have gotten, which is
12  what you generally get from the transplant doses, the
13  remissions tend to last longer and have a higher
14  percentage of patients going into remission.  The
15  problem is it's hard to translate that into cure.
16  That's what shut the industry down is this is often
17  not curative.
18       Q.    When Ms. Pollard was given chemotherapy
19  in June of 2002 when she got to Walter Reed, was the
20  chemotherapy -- was her tumor responsive to the
21  chemotherapy?
22           MR. ADAMS:  You meant 2000, right?
0088
1  BY MS. ZORK:
2      Q.    2000.  I'm sorry.
3      A.    To be honest with you, I didn't really
4  focus on that because the cat was sort of out of the
5  bag.  I don't remember.
6      Q.    Well, I'm going back to the point that
7  you were making when -- we got off on this tangent
8  when I was asking you whether or not Ms. Pollard would
9  have enjoyed a period of -- a longer period of
10  disease-free survival, and you said there was a 50/50
11  chance that her breast cancer wouldn't even have
12  responded to the chemotherapy.  So my question is in
13  looking at how she responded when she did receive
14  chemotherapy, can you – does that inform you?
15      A.    It would.  If I remembered it would.  Let
16  me say this, if she responded to conventional
17  chemotherapy in June or July of 2000, and she had a
18  meaningful anti-tumor response, then I think the
19  answer would be yes to your original question.  It
20  would be likely that her disease-free interval would
21  be longer with chemo than without chemo.  You are
22  right.  Probably buried in this record there is a way

0089
1   to answer this question.  I couldn't answer it off the
2   top of my head, did she respond to the conventional
3   chemo in June or July of 2000.
4        Q.    I want to get back to the studies that
5   you rely on for your opinion that Ms. Pollard's
6   prognosis for survival would have been increased by a
7   third.
8        A.    Right.
9        Q.    What factors – first of all, what
10   study -- can you identify for me what studies you rely
11   on?
12        A.    Not off the top of my head.  There are
13   lots of studies that have been published, NSABP
14   trials, other cooperative group trials that look at
15   the impact of adjuvant chemotherapy in Stage I breast
16   cancer.  They all show about a one-third reduction in
17   mortality at best among a group of patients that have
18   a very good prognosis to begin with.
19        Q.    So the patients that are being identified
20   in these big cooperative studies, the Stage I
21   patients, how are they broken down in terms of the
22   prognosis?
0090
1        A.    Well, it depends how the study design
2   goes.  Typically what you do is you randomize patients
3   between treatment or no treatment or Treatment A
4   versus Treatment B.  Some studies will stratify
5   patients by tumor size or things like that.  It
6   depends on how the study is designed.
7        Q.    Are the studies designed so that you have
8   a control group of patients who have a tumor of .5
9   centimeters, who are ER, PR negative, who have a high
10   proliferation index, who have poorly differentiated
11   breast cancer, and those patients singled out and some
12   are given chemo and some aren't?
13        A.    What you are talking about is stratifying
14   patients.
15        Q.    Yes.
16        A.    In other words, a well-designed, large
17   enough study will try to stratify patients with their
18   major prognostic variables so the treatment group and
19   the control group are comparable.  Sometimes that's
20   done only in retrospect.  If you have a thousand
21   patients in each group, by statistics alone the groups
22   are going to wind up being comparable.  When you have

0091
1  that many patients, eventually the comparability sort
2  of sorts out on its own.  It depends on who is
3  designing the study and how careful they want to be
4  and how many different things they are looking at.
5      Q.   My question is are you relying on a study
6  for your opinion that the benefit would be limited to
7  a 33 percent increase in survival?  The studies that
8  you are relying on, have they stratified the factors
9  as I just described?
10      A.   I don't remember.
11      Q.   Am I correct that the poorer the
12  prognostic indicators with respect to the breast
13  cancer are, the greater benefits you see with
14  chemotherapy?
15      A.   Yes.
16      Q.   Percentagewise?
17      A.   Yes.
18      Q.   And just so that I make sure I
19  understand, assuming that Ms. Pollard's tumor was
20  responsive to chemotherapy, the type of breast cancer
21  that she had, if chemotherapy had been administered
22  three to six weeks after the surgery, that
0092
1  chemotherapy would have gotten to the cancer cells
2  wherever they were located?
3          MS. CERNIGLIA-LOWENSEN:  Objection to
4  form.
5          THE WITNESS:  Yes.
6  BY MS. ZORK:
7      Q.   Are you familiar with the standard of
8  care in the U.K. for the treatment of breast cancer in
9  1998?
10      A.   No.
11      Q.   Have you gotten any information from
12  Ms. Cerniglia-Lowensen regarding the standard of care
13  in the U.K. according to any of the doctors that
14  treated Ms. Pollard when she got to England?
15      A.   The only thing I've looked at is what's
16  in the medical record.  I have not looked at any other
17  documents or anything else referable to health care.
18      Q.   My question is has Ms. Cerniglia-Lowensen
19  provided you any information verbally in your
20  discussions with her?
21      A.   No, not at all.
22      Q.   Just so that I understand, do any of your

0093
1  opinions that you have expressed today with respect to
2  causation, do you rely on any literature regarding
3  doubling times?
4       A.    No, I do not.
5            MS. ZORK:  I'm going to look over your
6  notes, Doctor.  Do we have an extra copy we could
7  identify?
8            (A document was marked as Exhibit 5.)
9  BY MS. ZORK:
10      Q.    Doctor, I'm just looking over your notes.
11  I guess it's the third page where you are taking notes
12  of the Lakenheath records, under, it says biopsy, can
13  you read what that says?
14      A.    "Biopsies CA in situ breast.  Invasive
15  cancer chest wall."  Then I have as brackets, "No
16  reference of lymphoid tissue," closed brackets.  Then
17  asterisk, "Now with left sternal border lump."
18      Q.    What is the significance of no mention of
19  lymphoid tissue?
20      A.    If there had been mention of lymphoid
21  tissue, it would be further evidence that this lump on
22  the chest wall was part of lymph node tissue.  What
0094
1  usually happens with the internal mammary business
2  that we talked about is the original lymph node is a
3  couple of inches below the skin and when the tumor
4  grows up between the ribs and presents as a bump that
5  gets biopsied, you are just basically biopsying pure
6  tumor but the lymph node has been left behind.  It's
7  not surprising there is no lymphoid tissue.  If there
8  had been lymphoid tissue, it would have been further
9  evidence that this was arising out of a lymph node but
10  the fact there wasn't any lymphoid tissue didn't
11  really bother me very much.
12      Q.    When they operated again at Walter Reed,
13  what did the pathology reports show?
14      A.    They did a fine needle aspiration of the
15  supraclavicular lymph node on the right side and that
16  was positive.  Is that what you were talking about?
17      Q.    No.  I'm talking about when she
18  eventually had surgery on her breast at Walter Reed.
19      A.    Do you remember when that was?  She
20  underwent completion mastectomy in 9-00 and that was
21  in Volume I.  It was a little out of order.  Path
22  showed microscopic focus residual cancer, confined to

0095
1  lymphovascular space, margins negative.  They did find
2  a tiny focus of cancer in the breast at the time she
3  had the mastectomy.
4      Q.     Where was that located?
5      A.     Not sure I can tell from this path report
6  whether it was in the site of the original primary or
7  not.  It might have been at a separate focus.  I don't
8  think I could tell.
9      Q.     What are you referring to when you are --
10  right now.  You say you can't tell from the path
11  report.
12     A.     From my notes.  I'm looking at Page 1 of
13  my notes.
14     Q.     Under where it says Volume I, Walter
15  Reed --
16     A.     Yes.
17     Q.     Can you just read to me what you notes
18  say?
19     A.     It says, "Path, microscopic focus of
20  residual cancer confined to lymphovascular space.
21  Margins negative."
22     Q.     Where it says "sternal pain/mass" and
0096
1  then you have a little asterisk and a key with a
2  question mark, what does that mean?
3      A.     I thought that was a very important part
4  of this case, the fact that she developed a
5  parasternal mass so soon after her lumpectomy in '98
6  meant that she already had metastatic disease in her
7  internal mammary nodes.  This is the first time --
8  this is like the first hour I've got this five-volume
9  file in front of me and I'm trying to make some sense
10  of it, and I thought that was probably going to turn
11  out to be an important finding.
12     Q.     So what does "key" mean?
13     A.     That it would be important in my
14  understanding of this case, trying to put it together.
15  I wanted to be sure I didn't forget that that thing
16  had occurred.  Again, I'm dropped down in the middle
17  of this saga trying to understand what's going on.
18     Q.     Now, Dr. Sees testified in his
19  deposition, which I see that you've reviewed, that the
20  standard of care -- he believed in 1998 that the
21  standard of care would be to recommend chemotherapy to
22  Ms. Pollard by virtue of the fact that she was

0097
1  premenopausal.  Do you agree or disagree with that?
2      A.    I think I disagree with that for the size
3  tumor that she had.
4      Q.    Now, do you know Dr. Lee Smith?
5      A.    By name only.  I don't think I've ever
6  met him.
7      Q.    Do you know Dr. James Fiorica?
8      A.    No.
9      Q.    Are you familiar with the Moffitt Cancer
10  Center in Tampa?
11      A.    Yes.
12      Q.    Is that a reputable cancer treatment
13  center?
14      A.    Very.
15      Q.    Do you have any criticism of any of the
16  other health care providers in this case that have
17  been identified?
18          MS. CERNIGLIA-LOWENSEN:  Objection to
19  form.
20          THE WITNESS:  When you say other, I don't
21  have any criticism of any of the health care providers
22  in this case.
0098
1  BY MS. ZORK:
2      Q.    That's fine.  Do you -- are you critical
3  at all of the failure to -- the delay in sending the
4  pathology specimen for receptor studies?
5      A.    No.
6      Q.    Do you think it's within the standard of
7  care to delay two months in sending a tumor for
8  receptor studies?
9          MS. CERNIGLIA-LOWENSEN:  Objection to
10  form.
11          MR. ADAMS:  Objection to form.
12          THE WITNESS:  I'm not a pathologist.  I
13  don't do the sending.  Certainly not normal, not
14  average.  You would have to ask a pathologist.
15  BY MS. ZORK:
16      Q.    Did you read the pathology report of the
17  pathologist in England who looked at the same specimen
18  that Dr. Adams looked at?
19      A.    Yes.
20      Q.    And do you see that the pathologist in
21  England measured the tumor on the slide and measured
22  it as 11 millimeters in size?

0099
1       A.    Yes.  I saw that.
2       Q.    How are tumors measured with respect
3   to -- how do you size tumors?  How do you determine
4   what the size of a tumor is for purposes of prognosis
5   and treatment?
6       A.    Well, as a clinician I do it clinically
7   either by palpation or by appearance on x-ray.  How a
8   pathologist does it is a high art.  There's all kinds
9   of issues involved.  Just simply dropping a tissue in
10  formalin can change the size.  Just the way a breast
11  comes off the operating table it can shrink, it can
12  change, it can be distorted.  That's a very
13  specialized area that I don't really work in every
14  day.  I mean --
15      Q.    That wasn't my question.  Not that I'm
16  trying to interrupt you.  My question was as an
17  oncologist, when you are looking at size of a tumor
18  for the -- for determining prognosis and treatment,
19  what measurement are you looking at?
20      A.    I'm looking at what the pathologist
21  generates for us.  He will say usually "Conclusion,
22  1.0 by .8 by .7 cm infiltrating ductal carcinoma."
0100
1   It's right there in the report.  That's what I look
2   at, the path report.
3       Q.    In Ms. Pollard's case if you have a path
4   report, all other things being the same, that
5   describes the tumor as a 1.1 centimeter, would you
6   have a different conversation with her with respect to
7   your recommendations for chemotherapy than you would
8   have if you have a path report that describes a tumor
9   of .5 centimeters?
10      A.    I would have had a slightly different
11  conversation with her.
12      Q.    Would your recommendation have been
13  slightly more favor of chemotherapy, tipping the scale
14  in favor of chemotherapy in your recommendation?
15      A.    I might not use the term "tipping the
16  scale," but it certainly would have opened -- I would
17  have been more inclined to encourage her to take the
18  chemotherapy.  I would have quoted her different
19  statistics than the ones I would have quoted her for a
20  .5 cm tumor and the spread between treatment and no
21  treatment would be slightly wider in terms of
22  percentages.  Instead of being three percent, it might

0101
1  have been five percent or six percent or seven
2  percent. I might have quoted her a slightly different
3  range of possibilities. Still not talking about huge
4  differences, but they would have been a little bit
5  bigger.
6      Q.    Once a patient -- these questions really
7  go to kind of who is the captain of the ship. A
8  patient goes to a surgeon and the surgeon identifies
9  breast cancer and does surgery. The pathology report
10  done. The patient is referred to an oncologist. Who
11  becomes the captain of the ship at that point?
12     A.    The patient. The patient is always the
13  captain of the ship in terms of deciding what they
14  want.
15     Q.    Deciding what they want. Who is the
16  captain of the ship in terms of making recommendations
17  and referrals and having discussions with the patient
18  and administering treatment once the patient gets to
19  the oncologist?
20     A.    You've asked several different questions.
21  I think as a practical matter in the United States,
22  which is what I'm familiar with, it's a joint
0102
1  decision. In other words, the surgeon, the radiation
2  oncologist and the medical oncologist get together and
3  try to present to the patient a unified front on what
4  they think ought to be done. If patients hear
5  different things from different health care providers
6  they get very confused and upset. You try to present
7  a unified theory of how the case should be handled.
8  Once the chemotherapy begins, the medical oncologist
9  takes over and it's symptom management and it's an
10  all-consuming business. Once the chemo is finished
11  and the radiation starts, then the radiation
12  oncologist will take over and do the symptom
13  management for the radiation.
14     Q.    Who is responsible for handing, in terms
15  of physicians, for handing over the patient from the
16  oncologist to the radiologist?
17     A.    The medical oncologist would be at that
18  point. He would make the phone call at the end of the
19  chemo and say we're done, your turn.
20     Q.    And you would provide that information to
21  the patient?
22     A.    Sure.

0103
1      Q.     The expert designation on you is actually
2  pretty sparse.  Have you seen it?
3      A.     Don't remember.
4      Q.     It says that you are going to be
5  testifying that Dr. Gupta adhered to all accepted
6  standards of care.
7      A.     Yes.
8      Q.     Have we covered your opinions in that
9  regard?
10      A.     I'm not sure we covered them explicitly.
11  We haven't gotten into a great deal of detail.  You
12  asked me selected questions.  I think my global
13  conclusion would be that given the circumstances that
14  he was presented, I think he did just fine.  I don't
15  think he violated the standard of care of the
16  reasonably prudent oncologist.
17      Q.     Tell me what it is that you see -- what
18  were the circumstances and what did Dr. Gupta do that
19  conformed with the standard of care in 1998 in the
20  clinical setting of this case.
21      A.     Presented with a lady of newly diagnosed
22  Stage I breast cancer who was getting ready to move to
0104
1  England.  He provides her with all the documentation
2  needed to get that treatment in England.  He makes
3  some reasonable effort to contact the military people
4  in England as I recall.  I think Sergeant Pollard
5  testified, in fact, that Dr. Gupta called somebody
6  named Helen in England who was involved in health care
7  for military people in England, provided a cover
8  letter, did all the things he could reasonably do to
9  get this lady treated in England under the auspices of
10  the United States Government for whom Sergeant Pollard
11  still worked while he was stationed in England.  I
12  think that is all he is required to do.
13      Q.     He was required -- was he required to
14  have a discussion along the lines that you described
15  earlier with Ms. Pollard with respect to
16  recommendation for chemotherapy, side effects, timing?
17      A.     Well, I think everybody has to have some
18  kind of discussion.  I try to be pretty encyclopedic
19  when I talk to patients.  I don't know that it's
20  mandated everywhere that you have to cover 20 bullet
21  points when you talk to people, but you have to have
22  some kind of discussion what they are going to

0105
1   encounter, what their options are, that kind of thing.
2   Some kind of discussion has to take place and I think
3   it did from what I can gather.  He certainly provided
4   her with documentation she needed to go forward to get
5   the treatment when she moved.
6       Q.    Tell me what evidence you see in the
7   record that Dr. Gupta discussed chemotherapy and the
8   fact that he was recommending chemotherapy.
9       A.    Well, he did say if her ER was negative
10  she ought to get chemo.
11      Q.    My question is what evidence do you have
12  that Dr. Gupta discussed any of this with Ms. Pollard?
13      A.    Only what's in the record.  I think the
14  record is terse.  I don't know of any details
15  regarding in the record as to what he said to her.  I
16  don't think it's spelled out in the record what he
17  said to her.
18      Q.    Was there anything in your deposition --
19  in the deposition of Dr. Gupta that eliminated any of
20  the discussions with Ms. Pollard regarding
21  recommending chemotherapy?
22      A.    I don't recall that it came up as to what
0106
1   he said to her about chemo at their visits.  I don't
2   have any notes to the effect that reflect any of his
3   recollections about what transpired at those visits.
4       Q.    Why don't we turn to your notes of
5   Dr. Gupta.
6       A.    Page 5 of my notes.
7       Q.    Can you go over those line by line?
8       A.    "Deposition of Dr. Gupta was held
9   3-21-03.  First consult, 12-1-98.  Follow-up, 12-15.
10  Letter to take to England, 12-16.  Referral to British
11  oncologist, 12-15."  These are the documents he
12  created.  "Question, do all female premenopausal women
13  with breast cancer get recommendations for chemo at
14  Eisenhower.  Answer, no.  If ER, PR negative, tumors
15  less than one centimeter, nodes negative, decision
16  regarding chemo is individualized.  There is a tumor
17  board at Eisenhower.  Not everyone is discussed.  He
18  would have recommended four cycles of chemo had she
19  stayed.  Six weeks from lumpectomy to medical
20  oncologist is the usual pace at Eisenhower.  10-15
21  biopsy, no DNA."  Brackets, that's my thoughts,
22  "Eventually was obtained" -- I say, "Was obtained.

0107
1  Assumed fait accompli.  Moving to England.  Doesn't
2  recall advising her to stay in U.S.
3          "Bad features, palpable, not grade 1,
4  family history not a factor, age not a factor," and I
5  put, "I agree.  He tends to treat younger women
6  because of longer life expectancy.  Negative bone scan
7  at workup.  Risk of recurrence, four percent without
8  chemo, three percent with chemo."  Then he quotes the
9  ASCP, which is my national society educational
10  booklet.  "Discussion regarding ability to stay in
11  U.S."  I guess that was you were asking him some
12  questions about that.  That's what my notes say about
13  Dr. Gupta.
14      Q.    Going back to your note which talks about
15  the "Assumed fait accompli.  Moving to England," would
16  that assumption, fait accompli, moving to England,
17  would that affect the standard of care with respect to
18  his discussions with Ms. Pollard regarding adjuvant
19  treatment of her breast cancer?
20      A.    I'm not sure how to answer that.  I guess
21  in theory he could leave some of that discussion to
22  the doctors who pick up her care there.
0108
1      Q.    Would that be the standard of care, to
2  have an incomplete discussion with Ms. Pollard with
3  respect to his thoughts and his recommendation
4  regarding chemotherapy and simply leave that up to
5  another doctor somewhere to pick up and discuss with
6  her?
7      A.    I think it would be okay to do that.
8      Q.    You do?
9      A.    I do.
10      Q.    Okay.  Would you need to at the very
11  least tell that patient to make sure you get to the
12  doctor within the optimal window for treatment because
13  if that doctor thinks that treatment is indicated you
14  will need to begin it within three to six weeks of
15  your surgery?
16      A.    Again, it's a question there's a certain
17  amount of practicality involved in this.  It depends
18  how fast she is getting over there and how fast she
19  can get unpacked and find her way around and that sort
20  of thing.  Some discussion like that should occur, the
21  sooner the better, something like that.
22      Q.    And the patient says, The sooner the

0109
1  better, would three months be okay, what would the
2  answer to that question be?
3      A.    I would say no one knows.  We all do it
4  within three to six weeks.  Does an extra six weeks
5  count, no one knows.  Intuitively it might be bad for
6  you, but no one knows.
7      Q.    If under your scenario it's within the
8  standard of care to, as the oncologist, to assume it's
9  a fait accompli and simply leave the decision up to
10  another oncologist, does the standard of care require
11  that you, the oncologist, have identified for the
12  patient someone whom they can see within the period of
13  time that would be optimal?
14      A.    Not necessarily.  This lady is still
15  under the umbrella of the United States Government.
16  It's their responsibility to find her someone.  I
17  don't think he needs to independently find that
18  person.  There may be a roster of doctors that the
19  government uses in England.  He would have no
20  knowledge who they are.  I don't think he's got to
21  identify that person himself.
22      Q.    Does he need to say to the patient,
0110
1  Ms. Pollard, you needed to go to the United States
2  Government and have them identify for you an
3  oncologist in England?
4      A.    He ought to say something like that.
5      Q.    And that you ought to be able to hook up
6  with that oncologist, because I'm going to leave the
7  whole recommendation of chemotherapy up to him or her
8  but you -- but you need to hook up with that person --
9  be able to hook up with that person within six weeks?
10      A.    I think that would be a reasonable thing
11  to say.  Yeah.
12      Q.    And do you see anywhere in the records
13  that Dr. Gupta did that?
14      A.    Not in the medical record, no.  I don't
15  think it's in there.
16      Q.    Is there anything in any of the
17  depositions that Dr. Gupta did that?
18      A.    I'm not sure he was ever asked whether he
19  did that.
20      Q.    You didn't read in Dr. Gupta's deposition
21  where he was asked, Did you ever speak with anyone in
22  England, and he answered no?

0111
1      A.    If you say so.  I don't remember.
2      Q.    Did you read where Dr. Gupta says he has
3   no idea where Ms. Pollard was going in England or what
4   medical care was available in England when she arrived
5   there?
6      A.    Well, he may have said that, but Sergeant
7   Pollard says he called somebody in England so he knew
8   something about this if indeed he did call --
9      Q.    My first question is did you read in
10  Dr. --
11     A.    No.
12            MS. CERNIGLIA-LOWENSEN:  And I think he
13  has a right to expound upon his answer.  He is not
14  restricted to yes or no, and he is trying to help you
15  out.
16            MS. ZORK:  He can expound upon his
17  answer, but he needs to answer the question.
18            MS. CERNIGLIA-LOWENSEN:  Which he did.
19            THE WITNESS:  I read Dr. Gupta's
20  deposition several months ago.  All I've got are my
21  notes.  We can go back and look at it line by line,
22  but presumably you know it better than I do.  I'm
0112
1   taking it at face value.  If you want to represent to
2   me that he said something as long as other counsel
3   doesn't object.
4   BY MS. ZORK:
5      Q.    I represent to you that Dr. Gupta said he
6   never spoke to anyone in England, he had no
7   understanding of who would be seeing Ms. Pollard in
8   England or what medical care was available in England
9   when she got there.  Is it your opinion that under
10  those circumstances based upon the records you have
11  Dr. Gupta complied with the standard of care?
12            MR. ADAMS:  Objection.
13            MS. CERNIGLIA-LOWENSEN:  Objection.
14            THE WITNESS:  I think he did.  It's the
15  United States of America's responsibility to find her
16  an oncologist, not Dr. Gupta's responsibility.  If the
17  United States Government can't find her an oncologist,
18  they ought to ship her back.  It's out of his hands.
19  He is working for the government.  She's -- her
20  husband is working for the government.  It's the
21  government's responsibility to find her an oncologist,
22  not his.

0113
1  BY MS. ZORK:
2      Q.    Do you think that -- looking at the
3  records you see that Ms. Pollard was not seen by an
4  oncologist in England until February 18?
5      A.    Yes.
6      Q.    At that point, February 18, given the
7  delay -- given that we were now three months after
8  surgery, in the United States what would your
9  discussion with respect to chemotherapy have been?
10     A.    If you want to do it, let's get on with
11  it.
12     Q.    The fact that it was three months, you
13  are now three months out, would that factor into your
14  recommendation if you are assuming that this is a .5
15  millimeter -- .5 centimeter tumor, node negative, all
16  other things being the same?
17     A.    No.
18     Q.    Why is that?
19     A.    Well, first of all, there are no critical
20  data that look at the impact of how long you wait
21  versus outcome.  The study will never get done in the
22  United States because everybody would be afraid to do
0114
1  it.  Secondly, three months is not horribly long.
2  And, thirdly, I can't think of any creative way to
3  change the discussion.
4      Q.    Would your discussion include that
5  chemotherapy, given the delay, may be less effective
6  in treating systemic disease at three months than it
7  would have been if we had given it at three to six
8  weeks?
9      A.    Probably not.  If it had been a year
10  later, I probably would have said that.  What point
11  would I say that, three months, six months, eight
12  months, a year, I don't know.  But I think three
13  months is too short for me to throw that in, but it is
14  a -- it's a gray zone.
15     Q.    Do you have any opinion -- do you have an
16  opinion as to whether or not if chemotherapy had been
17  initiated in February of 1999 whether that would have
18  had any impact on the outcome for Ms. Pollard?
19     A.    I think the numbers are probably roughly
20  the same.  In the absence of data, my estimate is it
21  would be roughly, again, a one-third reduction in
22  mortality.  At some point that one-third reduction in

0115
1   mortality starts to go down the longer you wait.  No
2   one knows how long that is.  It's never been
3   demonstrated how soon you have to give chemotherapy.
4   There are animal models that suggest you should give
5   it right away, but there is no human experience that
6   is comparable.
7       Q.    And there is no human experience that is
8   comparable because people don't wait?
9       A.    Nobody in this country would ever do a
10  trial like that.  There is no reason to do a trial
11  like that.  You wouldn't learn anything useful.
12  Nobody is ever going to wait.  There is no reason to
13  ever wait.  If there were compelling reasons to wait,
14  then there would be a good reason to do the trial.
15      Q.    Have we covered now all of your opinions
16  with respect to the standard of care?
17      A.    I think so.  Yes, we have.
18      Q.    Have we covered all of your opinions that
19  you have on causation, and do you understand what I
20  mean by causation?
21      A.    I go.  I think not completely.
22      Q.    Why don't you --
0116
1       A.    I would say this was an unfortunate young
2   woman who, if you will, drew the short straw of life.
3   She had a good prognosis breast cancer and got
4   slaughtered by it and I don't think that was anybody's
5   fault.
6       Q.    Okay.  Do you have any more -- how does
7   that go to causation?
8       A.    I think that there is a certain
9   randomness about cancer that fails a rational
10  explanation.  Why should this woman with her set of
11  circumstances do so spectacularly badly, and the
12  answer is no one knows.  I don't think it's the fault
13  of any of the health care providers that she did this
14  badly.  I think it's just random bad news, bad luck.
15      Q.    So you don't have any other specific
16  opinions with respect to causation?
17      A.    I thought that was an opinion, but
18  whatever.  No additional opinions beyond that.
19      Q.    Have you asked to see any other data or
20  records in this case?
21      A.    No.
22      Q.    Do your opinions with respect to

0117
1  causation, do reasonable experts disagree on that?
2          MS. CERNIGLIA-LOWENSEN:  Objection to
3  form.
4          MR. ADAMS:  Objection.
5          THE WITNESS:  I can't speak for
6  reasonable experts.  The experts you hired have come
7  to a somewhat different conclusion from me.  I think
8  Dr. Smith enjoys a good reputation.  I don't know
9  after reading his deposition exactly why he came to
10  the conclusion he did.  I think his own data don't
11  support his conclusion.  I think Dr. Pushkas' data
12  don't support his conclusion.
13 BY MS. ZORK:
14     Q.    Can you be specific about which data you
15  are referring to that does not support Dr. Pushkas' --
16  of course, you haven't given us any data that you are
17  relying on.
18     A.    I read his deposition.
19     Q.    I don't know what data you are relying on
20  for your opinions because you haven't gone on record.
21          MS. CERNIGLIA-LOWENSEN:  Objection to the
22  commentary.
0118
1          THE WITNESS:  Dr. Pushkas said he thought
2  her survival would have been improved from 90 to 93
3  percent with chemotherapy.  He said that in his
4  deposition.  That being the case, you can't get to
5  more likely than not she would have survived.  Those
6  two statements are incompatible.  To go from 90 to 93
7  percent it means to me less likely she would have
8  survived, because you got three chances out of ten
9  versus seven chances out of ten that she would have
10  been benefited.  Seven chances out of ten she wouldn't
11  have been benefited if you go from 90 to 93 percent.
12  Therefore, his opinion is not supported by his own
13  data.
14          Dr. Smith initially says 58 to 68 percent
15  improvement with chemo and then he changes that to 68
16  to 80 but doesn't give you a comparable number for the
17  58.  What does the 58 go to if the 68 goes to 80?  If
18  you just use the 58 to 68 you are talking about ten
19  chances in 42 that she has a better outcome.  That's
20  not more likely than not.  That's less likely than
21  not.  So his own data don't support his conclusions.
22          So I'm saying, I think reasonable people

0119
1  can disagree, but I don't think they disagree with me.
2  They just come to the wrong conclusion.  Their data
3  are the same as mine.
4  BY MS. ZORK:
5      Q.    And you haven't read Dr. Fiorica's
6  deposition?
7      A.    No, I have not.
8      Q.    Dr. Fiorica comes to a different
9  conclusion from you as well.
10     A.    Okay.
11     Q.    When answering the question, you threw in
12 "these people that you have hired."  What did you mean
13 by that?
14     A.    These are your experts.
15     Q.    These doctors that you have hired, how
16 does that impact their opinions, the fact that I have
17 hired them?
18     A.    You would have to ask them.  All I'm
19 saying is if they had --
20     Q.    I'm asking you because they didn't talk
21 about me hiring them.  You did.  I want to understand
22 how that factors in to your answer.
0120
1      A.    Well, put it this way:  If they had given
2  you opinions that weren't helpful to your case, I
3  don't think you would have listed them as experts.
4  I'm not a lawyer, but my strong suspicion is if
5  somebody says, I have an opinion that is going to be
6  counterproductive to you, you would have said, Thank
7  you, I'll see you around.  So you have hired these
8  people because they give opinions that you think are
9  helpful to your case.  I'm not naive.  That's what
10 lawyers do.  I'm not -- this is not earthshaking news
11 to anybody in this room.  That's what I meant by you
12 have hired.  You have hired people that you predict
13 will give opinions that will help you win with the
14 jury.  I'm not being critical of anybody.  It's just a
15 fact.  If I told Ms. Cerniglia-Lowensen that I thought
16 this lady would have been cured with chemo, she would
17 have said, Have a nice day.  I'm saying I gave my
18 opinion.  It was something that was consonant with
19 what would be helpful to her case and I signed on as
20 an expert.  It's entirely possible I would have given
21 her an opinion that wouldn't have been helpful to her
22 and we wouldn't be having this discussion today.

0121
1      Q.    Obviously.  When you look at the
2    combination of chemotherapy and radiation treatment,
3    both of which Dr. Sees and Dr. Gupta believe
4    Ms. Pollard should have received, do you see no
5    benefit to Ms. Pollard if she had received both of
6    those treatments as they intended her to?
7      A.    I think I've answered that question
8    already.
9      Q.    So you don't see there would be any
10   benefit to Ms. Pollard if she had radiation treatment
11   ultimately?
12     A.    I think if she had radiation she would
13   not have developed the DCIS.  That's the only evidence
14   that she failed locally.  She might still fail
15   locally.  She's had a mastectomy, so she is not going
16   to fail locally anymore probably.  I think the chemo,
17   there is a possibility it would have helped, not a
18   probability.  We often do things in oncology on the
19   possibility they will help people.  Every day that
20   dawns, I give people X, Y and Z therapy on the
21   possibility it would help them.  If I had to use
22   probability as the standard to treat patients, this
0122
1    office would be empty.
2      Q.    Would you consider 33 percent chance of
3    survival a substantial possibility of success?
4           MS. CERNIGLIA-LOWENSEN:  Objection to
5    form.
6           THE WITNESS:  I don't know what you mean
7    by substantial.
8    BY MS. ZORK:
9      Q.    You don't?
10     A.    That's a legal term.  In some states it's
11   a legal term.  I would say that's enough reason to
12   treat somebody.  It isn't just the percentage, though,
13   I think.  You have to look at the totality of the
14   situation.  If we used Dr. Pushkas' number, 90 to 93
15   percent, what you are saying is 90 percent of the
16   patients who get chemo don't need it.  Three percent
17   are helped and seven percent receive no or almost no
18   benefit from it.  So 97 out of a hundred patients are
19   not benefited.  Only three percent are benefited, not
20   33 percent.
21     Q.    When we talk -- Ms. Pollard doesn't -- on
22   the day that her cancer was diagnosed and treated, we

0123
1  know that she did not fit into the 90 percent.
2      A.    Correct.  We didn't know it at the time.
3      Q.    No, you didn't know it at the time, but
4  we know it now that she did not fit into the 90
5  percent.
6      A.    Right.
7      Q.    So we are looking at people -- when we
8  are looking at Ms. Pollard's prognosis, we are looking
9  at the people that fit into that last ten percent.
10     A.    The ten percent, sure.  Right.
11     Q.    And the studies that you rely on that get
12  you to 33 percent, you can't tell me whether they take
13  into account -- whether or not they are stratified for
14  prognostic features, can you?
15     A.    I don't remember.  There is always an
16  attempt to stratify either prospectively or
17  retrospectively.  You always do a subset analysis to
18  be sure the two groups are comparable.
19     Q.    And it is reasonable, is it not, as an
20  oncologist who treats women on a regular basis to look
21  at those statistics and to look at how they are
22  stratified and come to reasonable conclusions as with
0124
1  respect to prognosis of an individual patient?
2      A.    Sure.
3            MS. ZORK:  If we've covered all of your
4  opinions on causation and standard of care, then I
5  have no further questions.
6            MR. ADAMS:  I have no questions.
7            MS. CERNIGLIA-LOWENSEN:  Catherine, any
8  questions?
9            MS. HANRAHAN:  I don't have any
10  questions.
11            MS. CERNIGLIA-LOWENSEN:  Doctor, would
12  you like to read or waive?
13            THE WITNESS:  I would like to waive.
14            (The deposition was concluded at 4:40
15  p.m.)
16
17
18
19
20
21
22

0125
1  COMMONWEALTH OF VIRGINIA AT LARGE, to wit:
2      I, Shell Riddle, Registered Professional
3  Reporter, a Notary Public for the Commonwealth of
4  Virginia at Large, of qualification in the Circuit
5  Court of the City of Virginia Beach, Virginia, and
6  whose commission expires August 31, 2004, do hereby
7  certify that the within deponent, JAMES J. STARK,
8  M.D., appeared before me at Portsmouth, Virginia, as
9  hereinbefore set forth; and after being first duly
10  sworn by me, was thereupon examined upon his oath by
11  counsel; that his examination was recorded in
12  Stenotype by me and reduced to typescript under my
13  direction; and that the foregoing transcript
14  constitutes a true, accurate, and complete transcript.
15      I further certify that I am not related to nor
16  otherwise associated with any party or counsel to this
17  proceeding, nor otherwise interested in the event
18  thereof.
19      Given under my hand and notarial seal at Norfolk,
20  Virginia, this _____ day of _____, 2003.
21      _____
22              Shell Riddle, Notary Public