**EXHIBIT NO. 2**

# IN THE MATTER OF:

*VERONICA POLLARD, et al.   v.*
*THE UNITED STATES OF AMERICA*

---

*KENNETH I. FINK, M.D.*
*November 24, 2003*

\*\*\*\*\*\*

\*\*\*\*\*\*\*

---

*BROWN REPORTING, INC.*
*ATLANTA AUGUSTA MACON ROME SAVANNAH*

*(706) 724-2778*

*Original File 1124FINK.TXT, 84 Pages*
*Min-U-Script® File ID: 1913638868*

**Word Index included with this Min-U-Script®**

KENNETH I. FINK, M.D.
November 24, 2003
Case 1:02-cv-00764-WDQ   Document 61-3   Filed 12/29/2003   Page 3 of 5
VERONICA POLLARD, et al. v.
THE UNITED STATES OF AMERICA

Page 11

[1] unless there were other circumstances that required
[2] us to see them.
[3] Q: And was that — was the reason for what
[4] you just said because of workloads?
[5] A: It could be from workload. Generally his
[6] clinic was pretty free to receive all patients of
[7] CHAMPUS eligible — CHAMPUS eligibility.
[8] Q: My question wasn't asked very well. I
[9] guess, the reason why — what was the reason why you
[10] and Dr. Coleman tried to stay away from CHAMPUS
[11] eligible patients?
[12] A: Again, yes, our clinics were a bit busier
[13] with the Medicare and the active duty age
[14] populations.
[15] Q: Okay. And can you tell me what would —
[16] what types of patients that would be seen at
[17] Eisenhower would be CHAMPUS eligible patients?
[18] A: Yeah. All oncology diagnoses could fit
[19] in, in the CHAMPUS eligible patient, and all the
[20] common cancers that we see here are seen — were seen
[21] by Dr. Gupta, including breast cancer, colon cancer,
[22] lung cancer, prostate cancer. Those would the most
[23] common.
[24] Q: I guess just to clarify. I understand
[25] active duty members were not CHAMPUS eligible?

Page 12

[1] A: That's correct.
[2] Q: And what types of individuals would be
[3] CHAMPUS eligible?
[4] A: I'm sorry. Now I understand. So,
[5] dependents of active duty, such as their spouses or
[6] their children or sometimes even their parents, and
[7] then retirees, people who have retired from active
[8] duty, who are under the age of 65.
[9] Q: Can you tell me — I know you may not be
[10] able to tell me precisely. Can you give me a rough
[11] idea of how many cancer patients are seen by the
[12] oncology department on an annual basis?
[13] A: Yeah. That would be a rough estimate is
[14] all I could give you.
[15] Q: Sure.
[16] A: On average we have about 300 new cancer
[17] cases per year at Eisenhower, based on our pathology
[18] data. Of those, we probably get referred about half
[19] or more of those cases, depending on whether they
[20] have a need for a medical oncologist. So, my guess
[21] would be an average about 150 new referrals per year.
[22] Q: In addition to that, then you also provide
[23] follow-up for ongoing services for patients that you
[24] have treated in the past?
[25] A: That's correct. So, we have — most of

Page 13

[1] our patients are patients already established and we
[2] see in follow-up.
[3] Q: New referrals, roughly, I understand these
[4] are — just trying to get a general idea. Roughly
[5] what percentage of those new referrals a year are
[6] breast cancer patients versus all other kinds of
[7] cancer?
[8] A: Breast cancer may make up about one-third
[9] or so of our new referrals. So between, I would say,
[10] 30 to 50 new breast cancers per year.
[11] Q: Now, can you explain to me what CHAMPUS
[12] is?
[13] A: Can I? Yeah, only in general terms.
[14] Q: Okay.
[15] A: The CHAMPUS program is a way to authorize
[16] care for civilians who are military beneficiaries,
[17] and the CHAMPUS system — in other words, we
[18] guarantee the medical care for patients, for people
[19] who are civilian. Some of that CHAMPUS medical care
[20] can be delivered either inside the medical treatment
[21] facility, such as at Eisenhower, through a CHAMPUS
[22] physician, or can also be — CHAMPUS care can be
[23] received outside of the military facility through a
[24] CHAMPUS contractor in a civilian setting.
[25] Q: Was there any difference in how oncology

Page 14

[1] was practiced within your department based on whether
[2] the patient was CHAMPUS versus whether they were
[3] active duty or Medicare?
[4] A: No, no difference at all.
[5] MR. ADAMS: Lesley, if I can clarify.
[6] I think CHAMPUS was the predecessor to what
[7] is now Tricare, if I understand how it's
[8] gone on.
[9] MS. ZORK: Let me ask the witness if
[10] he knows that.
[11] A: My understanding, again, some of the
[12] generals, that Tricare program is a part of CHAMPUS.
[13] CHAMPUS eligibility, you must be CHAMPUS eligible in
[14] order to be on Tricare. So, the CHAMPUS program
[15] still exists as a foundation, and then Tricare is the
[16] specifics by which we deliver CHAMPUS care.
[17] Q: (By Ms. Zork) Doctor, are you familiar
[18] with Humana military — Humana Military Health Care
[19] Services?
[20] A: Yes, I am familiar with it.
[21] Q: What is that?
[22] A: Humana, again, my general understanding,
[23] is it is a contractor for delivery of CHAMPUS care
[24] through Tricare, that they won the contract to
[25] deliver that care for the — on behalf of the

VERONICA POLLARD, et al., v.
THE UNITED STATES OF AMERICA
Case 1:02-cv-00764-WDQ   Document 61-3   Filed 12/29/2003   Page 4 of 5
KENNETH I. FINK, M.D.
November 24, 2003

Page 15

[1] military CHAMPUS beneficiary.
[2]  Q: And you understand what the — do you
[3] understand anything about the nature of the contract
[4] between Humana Military Health Care Services and the
[5] Department of Defense?
[6]  **MR. ADAMS:** Objection to the form.
[7] If you understand, you may answer.
[8]  Q: (By Ms. Zork) Let me rephrase it. Not to
[9] interrupt you if you were getting ready to answer. I
[10] guess, are you familiar with the terms of the
[11] contract between Humana Military Health Care Services
[12] and the Department of Defense?
[13]  A: No, I am not.
[14]  Q: Are you familiar with the terms of any
[15] contract between Humana Military Health Care Services
[16] and Fort Gordon for oncology services?
[17]  A: Only in the sense that they are — they
[18] did take on that contract to facilitate the hiring of
[19] an oncologist at our request.
[20]  Q: Were you involved in any of the
[21] negotiations of the contract between Humana Military
[22] and Fort Gordon?
[23]  A: No, I wasn't.
[24]  Q: Do you know what — are you familiar with
[25] Sterling Medical?

Page 16

[1]  A: Yes, I am.
[2]  Q: How are you familiar with Sterling
[3] Medical?
[4]  A: Again, as the subcontractor who has picked
[5] up the responsibility to hire the oncologists at
[6] Eisenhower.
[7]  Q: And how did you become familiar with
[8] Sterling Medical?
[9]  A: Sterling Medical has been a contractor at
[10] Eisenhower for some time. Their presence is pretty
[11] well known here. They have other contracts as well
[12] with some of the nursing personnel, for example.
[13]  Q: Have you ever had any dealings with anyone
[14] from Sterling Medical with respect to any services
[15] that they have provided?
[16]  A: No.
[17]  Q: Do you have any understanding — are you
[18] familiar — let me ask it this way. Are you familiar
[19] with any contracts between Sterling and Fort Gordon
[20] or Sterling and Humana?
[21]  A: Not in any specific terms. Only familiar
[22] with the fact that they — they carry out the
[23] contract for hiring of the oncologist.
[24]  Q: Does Sterling Medical have any medical
[25] personnel who Dr. Gupta consults with?

Page 17

[1]  A: No, not that I'm aware of.
[2]  Q: What is your understanding as to the
[3] nature of Sterling Medical? What type of a
[4] corporation is it?
[5]  A: My understanding, again, is not based on a
[6] knowledge that I have ever looked at. I just — I am
[7] aware that they are a contractor who can hire medical
[8] personnel and deliver the personnel to the site
[9] requested, as we did here at Eisenhower.
[10]  Q: Was Dr. Gupta already working in the
[11] oncology division at Eisenhower when you arrived?
[12]  A: Yes.
[13]  Q: So, did you have — did you have anything
[14] to — did you have anything to do with hiring Dr.
[15] Gupta or credentialing him?
[16]  A: I had nothing to do with hiring him.
[17] However, I do — I do his credentials in terms of
[18] reassessing his credentials when the credentials'
[19] committee sends me his packet, which occurs about
[20] every several years.
[21]  Q: What is your role in the credentialing of
[22] Dr. Gupta?
[23]  A: I renew his credentials packet by checking
[24] the privileges and checking off that he is still
[25] performing all the duties as we see fit for an

Page 18

[1] oncologist, and as he is also requesting, which he
[2] does have to re-request his privileges. Usually a
[3] repeat of all the same privileges. They include
[4] things such as prescribing chemotherapy and seeing
[5] oncology patients. Those are included in his
[6] privileges. I then okay those, and say, yes, he is
[7] performing these duties properly. And then there is
[8] also a portion where I determine that he's using
[9] medications correctly and using all the other aspects
[10] of his responsibilities as a staff physician
[11] correctly.
[12]  Q: So, are you, as the chief of the
[13] department, responsible for overseeing the quality of
[14] care that Dr. Gupta provides to patients at
[15] Eisenhower?
[16]  **MS. LOWENSEN:** This is Joan.
[17] Objection to the form.
[18]  **MR. ADAMS:** Yeah. I am going to
[19] object. That's something he could not
[20] testify about.
[21]  **MS. ZORK:** Hello?
[22]  **MR. ADAMS:** Yeah, Lesley, it is
[23] Larry. I am going to object and instruct
[24] the witness not to answer that question.
[25]  **MS. ZORK:** Why?

Page 19

[1] **MR. ADAMS:** Because the quality
[2] assurance is something that regulation
[3] precludes him from testifying about.
[4] **MS. ZORK:** I am not asking him to
[5] give me any specifics. I am asking if he
[6] is the one responsible for overseeing the
[7] quality of care. It goes directly to the
[8] issue of control. I am not asking for any
[9] specifics about his — any quality
[10] assurance reviews.
[11] **MR. ADAMS:** I'll let him answer that
[12] question.
[13] **A:** Yes. I oversee the quality of the care
[14] that he delivers, and I reflect that in my
[15] credentials review.
[16] **Q:** (By Ms. Zork) Is there anyone outside of
[17] your department, either at Sterling or at Humana,
[18] that oversees the quality of Dr. Gupta's care at
[19] Eisenhower?
[20] **MS. HANRAHAN:** Objection, foundation.
[21] This is Cathy Hanrahan.
[22] **MR. ADAMS:** If you understand, you
[23] can answer.
[24] **A:** I understand. I don't believe so. I am
[25] not aware of anyone else overseeing the quality of

Page 20

[1] his medical care.
[2] **Q:** (By Ms. Zork) I have become aware during
[3] this case at Eisenhower there is a tumor board that
[4] convenes on a regular basis to discuss oncology
[5] patients, and that that was in existence in 1998. Am
[6] I correct about that?
[7] **A:** Yes, you are.
[8] **Q:** How long has there been a tumor board in
[9] operation at Eisenhower for that purpose?
[10] **A:** Our tumor board goes back well into the
[11] '70s or '80s. I don't know the exact year.
[12] **Q:** In October of 1998, you were the chief of
[13] oncology at that time; is that correct?
[14] **A:** Yes.
[15] **Q:** Can you describe for me who — how the
[16] tumor board operated in 1998?
[17] **A:** Yeah. The tumor board was, I will say it,
[18] as a surgically based tumor conference. The surgeons
[19] would — usually are the ones who perform surgery,
[20] and when they discover a cancer, they submit that
[21] patient to the tumor board to review at a conference,
[22] usually after — obviously after the cancer diagnosis
[23] has been made. Sometimes before the treatment has
[24] actually started, and sometimes after the treatment
[25] has started. The cases come to the tumor board's

Page 21

[1] attention for review by all of us who take care of
[2] patients. It is actually a requirement to have a
[3] tumor board at our hospital in order to take care of
[4] patients. And generally the conference meets and
[5] goes over the case, and some recommendations are made
[6] from various consultants that attend the meeting.
[7] The recommendations from the tumor board are given
[8] serious consideration and weight by the actual
[9] treating physician.
[10] **Q:** Is there any method of follow-up on a
[11] patient that's put in the tumor board by the tumor
[12] board?
[13] **A:** Yeah. The tumor registry does follow up
[14] and indicates, as do all tumor registries, what
[15] treatment decisions were made, and then continues to
[16] follow that patient for life.
[17] **Q:** What is the method for continuing to
[18] follow patients for life?
[19] **A:** Yeah. The patient, through the tumor
[20] registry, a minimum of once a year, a mail-out is
[21] sent to the patients or the patient's family to ask
[22] the status, whether the patient still has cancer, if
[23] that cancer is active or inactive and whether the
[24] patient is alive or not and died from that cancer or
[25] not. Once that patient has succumbed, has passed

Page 22

[1] away, then the patient is no longer followed in the
[2] registry.
[3] **Q:** So, is Veronica Pollard in the tumor
[4] registry that is operated by the tumor board at
[5] Eisenhower?
[6] **A:** Yes.
[7] **Q:** And how is that data maintained? Is it in
[8] a computer? Anyway, do you understand what I am
[9] asking?
[10] **A:** Yes, I do. Yes, we do have a computer
[11] program that maintains, maintains all of our tumor
[12] registry patients. It's a military based computer
[13] program shared by all military cancer institutions.
[14] **Q:** Who puts the information into the data —
[15] into the registry?
[16] **A:** Our tumor registrar is her title.
[17] **Q:** Have you accessed the information on
[18] Veronica Pollard prior to today's deposition?
[19] **A:** No, not from the tumor registry.
[20] **Q:** Okay. Based upon that answer, I am going
[21] to ask you, can you tell me what records you have and
[22] documents you have reviewed that relate to Veronica
[23] Pollard for your anticipated testimony in today's
[24] deposition?
[25] **MR. ADAMS:** For today's deposition he