IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

VERONICA POLLARD, et al.,    )
    )
        Plaintiffs    )
    )
        v.    )    CA No. S-02-CV-764
    )    Judge Quarles
THE UNITED STATES OF    )
AMERICA    )
    )
        Defendant    )

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' OPPOSITION
TO DEFENDANT HUMANA MILITARY HEALTHCARE
SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT**

      This medical negligence action was brought by Veronica and Roosevelt Pollard against the United States of America, Humana Military Healthcare Services, Inc., Sterling Medical Corporation, and Raj Gupta, M.D., a civilian oncologist. The allegations relate to treatment that was provided to Veronica Pollard for breast cancer in October-December, 1998, at the Fort Gordon, Eisenhower Army Medical Center (hereafter "Eisenhower"), in Augusta, Georgia. Veronica Pollard died of metastatic breast cancer on December 29, 2003, during the pendency of defendant's Motion for Summary Judgment. Roosevelt Pollard, as surviving spouse and personal representative of Veronica Pollard's Estate, continues this action on behalf the wrongful death beneficiaries and his wife's Estate.

## I. FACTUAL BACKGROUND

      Veronica and Roosevelt Pollard were married in June of 1992. They met while in the Army, where they both specialized in installation and repair of micro electronic equipment. Mr. Pollard is still a staff Sargent in the Army where he has served for over nineteen years.

6

Mrs. Pollard retired from the Army as a staff Sargent in 1996, after 20 years of service.

In 1998, Mr. Pollard was on a "hardship" assignment in Kuwait, which meant that the family was not permitted to accompany him.  During the assignment Mrs. Pollard and their two young sons stayed behind in their home in Augusta, Georgia, near Fort Gordon.  The Kuwait assignment was scheduled to end in December, 1998.  Mr. Pollard's next assignment was a "permanent change of station" to Menwith Hill Station in England, and was scheduled to begin in January, 1999.  Because this was a permanent change of station the family was assigned to accompany him.  After Mrs. Pollard was diagnosed with breast cancer in October, 1998, Mr. Pollard to return Fort Gordon to be with his wife while she underwent treatment.

Mr. Pollard notified his sponsor in England from Fort Gordon about the change in his wife's health status.  He also spoke with a woman by the name of Helen, who was in the Tricare office at Menwith Hill Station in England in an effort to find out whether treatment would be available for his wife, and whether she should come over to England.  (Id., p. 21) Helen told Mr. Pollard that she would need to speak to Mr. Pollard's doctor.  Mr. Pollard passed this information on to Dr. Gupta.  On December 15, 1998, Dr. Gupta told Mr. and Mrs. Pollard that arrangements had been made in England for Mrs. Pollard's care.  Mr. Pollard submitted the forms for his wife to the doctors at Fort Gordon, and Mrs. Pollard was given medical clearance to go to England.  (Id. pp. 24-26).

After Mrs. Pollard was given medical clearance, the family moved from their home in Augusta, Georgia, in the last half of December, 1998.  They arrived at Menwith Hill Station in England in mid-January, 1999, and were there until June, 2000.  The Pollards returned to the United States in June, 2000, after Mrs. Pollard's breast cancer recurred.  In July, 2000, Mr.

7

Pollard received a compassionate reassignment to Fort Meade, in Odenton, while Mrs. Pollard underwent treatment for metastatic breast cancer at Walter Reed Army Hospital in Washington, D.C. Mrs. Pollard died from metastatic breast cancer on December 29, 2003. Mr. Pollard is still stationed at Fort Gordon where he lives with their two sons.

### THE MEDICAL CARE

The allegations in this case relate to the medical care and treatment that Mrs. Pollard received at the Eisenhower Army Medical Center in October-December, 1998, after she was diagnosed with breast cancer. The primary allegations are against Stephen Adams, M.D., who was a member of the medical corp in the pathology department at Eisenhower, and Raj Gupta, M.D., a civilian oncologist who was hired to provide oncology services at Eisenhower. The allegations against Dr. Adams relate to his under-reporting and misreporting of the size and pathologic characteristics of tumor that was removed from Mrs. Pollard's breast in October, 1998, and for a two-month delay in obtaining complete results regarding the tumor's prognostic features.

The allegations against Dr. Gupta relate to his failure to advise Mrs. Pollard that she needed chemotherapy and radiation treatment in December 1998, and his failure to provide or arrange for timely and appropriate chemotherapy and radiation treatment. As a result, Mrs. Pollard never received the required chemotherapy, and encountered a five-six month delay in radiation treatment. Because Mrs. Pollard never received the appropriate adjuvant treatment in December, 1998 following her surgery, Mrs. Pollard suffered local and systemic recurrence of her breast cancer in May 2000, and ultimately died from the disease in December, 2003.

### UNDISPUTED FACTS

8

In late September, 1998, while Sgt. Pollard was on assignment in Kuwait, Mrs. Pollard discovered a lump in her right breast on self-examination.  She was 43 years old at the time and was pre-menopausal.  Mrs. Pollard had a strong family history of breast cancer that included her mother and an older sister, and sought immediate consultation with one of the surgeons at Eisenhower.

On October 2, 1998, Mrs. Pollard underwent a fine needle aspiration of the lump in her breast.  The pathologic examination showed "atypical cells."  This was followed by an excisional biopsy of the tumor on October 14, 1998.  The pathologic report of the excisional biopsy written by Dr. Adams, described a .5 cm tumor, with margins that were "extremely close" to the edge of excised tissue.  The report also described the tumor as "infiltrating carcinoma with medullary features."

On November 12, 1998, Dr. David Sees, a staff surgeon at Eisenhower, performed a lumpectomy to remove a wider margin of tissue around where the tumor had been excised during the biopsy.  Dr. Sees also dissected and removed 17 axillary lymph nodes.  Pathology studies on the new specimens were reported as showing no additional findings of cancer in either the excised tissue or the lymph nodes.  On November 17, 1998, Dr. Sees sent a referral form to Dr. Raj Gupta requesting an oncology consult for Mrs. Pollard to discuss the need for adjuvant chemotherapy and radiation treatment.  The first appointment with Dr. Gupta was scheduled for December 1, 1998.

At the December 1 appointment, Dr. Gupta discovered that certain prognostic pathology studies which should have been done in October, 1998, had never been ordered.[2]  Dr.

---

[2]      Dr. Steven Adams examined the specimen from the October 14, 1998, excisional biopsy.  Dr. Adams conceded at his deposition that he was

9

Gupta told Mrs. Pollard that he could not advise her regarding the need for adjuvant

chemotherapy until he had the results of the additional pathologic studies. (Exhibit 4,

Deposition of Raj Gupta, M.D., p. 46) Dr. Gupta requested the studies and scheduled Mrs.

Pollard for a second appointment. Dr. Gupta told Mrs. Pollard that the small size of her tumor

and the fact that her lymph nodes were negative were good prognostic factors.

The second appointment with Dr. Gupta was scheduled for December 15, 1998, just a

day or two before the Pollards were scheduled to leave Fort Gordon. Most of the additional

pathology results were available to Dr. Gupta on December 15, 1998. These studies showed

that the tumor that was removed during the biopsy was estrogen and progesterone receptor

negative, and had a high proliferation index. These were poor prognostic indicators of a tumor

with a greater tendency to metastasize; and combined with Mrs. Pollard's age and family

history, weighed strongly in favor of chemotherapy.

Dr. Gupta conceded at his deposition that he never advised Mrs. Pollard that

chemotherapy was indicated when she came back to see him on December 15, 1998. However,

on December 16, 1998, Dr. Gupta wrote a referral letter, "To Whom It May Concern," stating

that Mrs. Pollard's adjuvant treatment was "somewhat debatable," but that he "favored

recommending adjuvant chemotherapy" based on the fact that she was "pre-menopausal and

that her receptors were negative." (Exhibit 3) Mr. and Mrs. Pollard never saw this letter.

---

responsible for forwarding the specimen to an outside laboratory for studies
to determine additional prognostic features of the cancer, including whether
the tumor was estrogen and progesterone positive or negative and the
proliferation rate of the cancer cells, and that this information should have
been available by the end of October, 1998, before the lumpectomy. Dr.
Adams could give no explanation for the delay.

Exhibit 1, R. Pollard Deposition, p. 26; Exhibit 2, V. Pollard Trial Deposition, p. 41)  Instead, the letter was forwarded to the military base in England where Mr. Pollard was to be stationed.

Plaintiffs' experts contend that the physicians at the Eisenhower Army Medical Center breached the standard of care by failing to provide timely and appropriate chemotherapy and radiation treatment following the excisional biopsy on October, 14, 1998, and lumpectomy and lymph node dissection on November 12, 1998.  The standard of care required that systemic chemotherapy begin 3-6 six weeks after the lumpectomy ─ at or about the time of Mrs. Pollard's second visit to Dr. Gupta ─ followed by radiation treatment of the affected breast. Both Dr. Gupta and the surgeon, Dr. Sees, conceded in their depositions that this is what the standard of care required for Mrs. Pollard.  (Exhibit 5, Sees Deposition, pp. 52-54; Exhibit 4, Gupta Deposition, pp. 29, 71)

As acknowledged by Dr. Gupta in his deposition, the purpose of adjuvant chemotherapy is to systemically eradicate any cancer cells that may have been released into the blood stream during surgery, before the cells have a chance to multiply and spread throughout the body, which is why the timing is considered important.  (Exhibit 4, Gupta Deposition, p. 69) Radiation treatment of the entire affected breast is given following lumpectomy to eradicate microscopic focal lesions that may have remained in the breast, in lieu of mastectomy.

As Mrs. Pollard's treating oncologist, it was Dr. Gupta's duty to advise Mrs. Pollard that chemotherapy and radiation treatment were indicated and to administer the adjuvant treatment within the 3-6 weeks of surgery, even if it meant delaying her move to England.  At the very least, the standard of care required Dr. Gupta take steps to determine whether appropriate arrangements could be made for Mrs. Pollard to receive chemotherapy within this time frame

11

once she got to England.   Dr. Gupta did neither.

Dr. Gupta testified at his deposition that when he saw Mrs. Pollard on December 15, 1998, he believed that chemotherapy was indicated and understood that treatment should begin as soon as the surgical site had healed, which is usually within 4-6 weeks, with radiation treatment to follow.  (Exhibit 4, Gupta Deposition, p. 29, 71)  Dr. Gupta also agreed that the standard of care required radiation treatment to begin within 3-6 weeks of a lumpectomy if chemotherapy was not indicated.  Id. at p. 26.

Dr. Gupta testified that when he saw Mrs. Pollard in December, 1998, he knew that she was about to be transferred to England with her husband on a new assignment, but that he did not believe that he was responsible for her adjuvant care and treatment.  Id. at p. 22-23.  Thus, instead of advising Mrs. Pollard of his recommendations as he should have and would have any of his other patients at Eisenhower, Dr. Gupta deferred the decision regarding chemotherapy and the timing of treatment to the doctors in England.  By his own admission, Dr. Gupta deferred the care and treatment of Mrs. Pollard's breast cancer without knowing who would assume her care once she got to England, when treatment might begin, and without knowing the knowledge of the availability of treatment or the standards of oncology practice in England. Id. at pp. 15, 42-44.

Mrs. Pollard left Augusta, Georgia in December, 1998, to travel with her family to England, with no sense of urgency, not knowing that she needed chemotherapy, and believing that her prognosis was good and that she had been medically cleared by Dr. Gupta and the other physicians at Eisenhower.  (Exhibit 2, V. Pollard Trial Deposition, pp. 29-36) If Dr. Gupta had advised Mrs. Pollard that he was recommending chemotherapy and had he discussed

12

with her the timing of treatment, Mrs. Pollard would have, and easily could have, delayed going to England until after treatment was completed.  (Id., pp. 38-39)

Dr. Gupta's failure to advise Mrs. Pollard regarding the need for chemotherapy and the importance of timing, ensured that any adjuvant treatment would be delayed well beyond the optimal time for preventing recurrence and metastatic spread of the disease.  As it turned out, the oncologist in England, Dr. David Dodwell, recommended against chemotherapy when he saw Mrs. Pollard in mid-February, and radiation treatment was delayed for six months.

When the Pollard's arrived in England in mid-January, 1999, Mrs. Pollard sought follow-up care immediately.  Her first appointment was with a general practitioner, on February 2, 1999.  The general practitioner referred Mrs. Pollard to the oncologist, Dr. David Dodwell.  Mrs. Pollard saw Dr. Dodwell on February 18, 1999, which by then was three month after the lumpectomy.  Dr. Dodwell did not advise chemotherapy at that point, but referred Mrs. Pollard for radiation treatment.  Radiation treatment did not begin until late April, 1999, which was almost six months after surgery.

At his deposition in England, Dr. Dodwell testified that the delay in radiation treatment in England was due to the fact that there was a long waiting list for radiation therapy.  (Exhibit 6, Dodwell Trial Deposition p. 42)  Dr. Dodwell, testified that one of the factors that weighed into his decision not to recommend chemotherapy to Mrs. Pollard was the fact that there had already been a three month delay in treatment by the time he saw her.  (Id., p. 34)  Dr. Dodwell testified, "As that time of delay between surgery and adjuvant chemotherapy increases, there is . . . more uncertainty whether the treatment would be effective." (Exhibit 6, p. 32) In addition, Dr. Dodwell testified that the threshold for providing chemotherapy to patients with tumors

13

similar to Mrs. Pollard was higher in England in 1998, than it was in the United States.  Dr.

Dodwell testified as follows:

> I think that there is no dispute that there has been and perhaps
> still remains a difference between UK and US practice in that
> there is a threshold of risk and the degree of benefit which is
> deemed necessary to make a recommendation for adjuvant
> chemotherapy and I think it is true to say that threshold is much
> lower in chemotherapy issues more widely in the US than in the
> UK and other European countries.

(Exhibit 7, Dodwell Discovery Deposition, p. 30)

In February, 2000, Mrs. Pollard developed pain in her right breast and chest area.  A

biopsy in May, 2000, revealed a recurrence of the cancer in her right chest wall.  Mrs. Pollard

was medivac'd back to the United States for further treatment at Walter Reed Army Hospital.

In June, 2000, at Walter Reed, Mrs. Pollard was diagnosed with metastatic cancer in her lymph

nodes and lungs.  From June of 2000, until she died on December 29, 2003, Mrs. Pollard

underwent right mastectomy, bone marrow transplant, surgery to remove of portions of her

lungs where the cancer had spread, and multiple trials of chemotherapy.  While grueling

treatments may have prolonged Mrs. Pollard's life, they could not eradicate the metastatic

disease that took hold during the period when treatment was delayed.

Mrs. Pollard developed incurable metastatic cancer because the defendants failed to

provide chemotherapy and failed to provide radiation treatment at the appropriate time

following the lumpectomy.  Plaintiffs' experts contend that Mrs. Pollard would more likely

than not have survived if she had received the appropriate adjuvant chemotherapy and radiation

treatment at the appropriate time.

## II.     <u>AGENCY</u>

14

It is undisputed that in 1996, Humana was awarded a contract with the United States Department of Defense to manage delivery of healthcare services in the Southeast Region of United States to beneficiaries of the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS) pursuant to the TRICARE Program, and that Eisenhower Army Medical Center ("Eisenhower") was within that region.  (Defendant's Motion, p. 4).  Under what is titled a "Resource Sharing Program," Humana contracted with the government to supply civilian medical personnel to facilities such Fort Gordon where there were shortages of active military health care personnel to provide the services.  Id.

The Resource Sharing Program Requirements are set forth in a three page document at Defendant's Exhibit 8.  Under these terms, Humana was required to submit a detailed proposal for identifying "Resource Sharing" opportunities at a particular Military treatment facility where a need was identified.  The plan had to include, among other things, a detailed cost analysis, and proposed procedures for monitoring the performance and workload of medical personnel who were hired to staff military treatment facilities pursuant to this Agreement. Under the Resource Sharing Program, medical personnel who were placed in military treatment facilities had to be "supervised and controlled by [Humana] the purpose of directing the terms and conditions of employment." Id. Under this Agreement, Humana was also "**solely liable for negligent acts or omissions of the contractor's agents**,"and was required to "ensure that providers maintain full professional liability coverage."  Id.

Pursuant to the Resource Sharing Program Requirements that are outlined in Defendant's Exhibit 8, Humana entered into a contract with Eisenhower Army Medical Center to provide Oncology Services in July, 1996.  It is undisputed that this contract was in effect in

15

1998, when Dr. Gupta treated Mrs. Pollard for breast cancer at Fort Gordon's Eisenhower Army Medical Center.  The terms of this contract are set forth in Defendant's Exhibit 11, entitled "HMHS/Military Treatment Facility Resource Sharing Agreement" (hereafter "Humana/Eisenhower Agreement").

The contract between Humana and Eisenhower included the same conditions and provisions as outlined in the Resource Sharing contract with the DoD but went into even greater detailed.  The contract required Humana to supply licensed medical personnel who were properly credentials to meet the privileging requirements at the Eisenhower Army Medical Center.  Humana would bear the financial risk, and was responsible for ensuring that "Shared Resources" were cost effective. Humana was responsible for monitoring the performance of "Resource Sharing" personnel to ensure compliance with the terms and conditions of any Resource Sharing provider agreements.  (Id., ¶ 2)  Humana was required to bear the costs of providing the "Shared Resources," (Id., ¶ and 3) was required to keep strict records and report on the performance and workload of personnel performing services at Eisenhower under the agreement.  (Id., ¶¶ 6,7)  As in the original Resource Sharing agreement between Humana and DoD, under Humana's contract with Eisenhower, Humana was "**solely liable for negligent acts or omissions of the contractor's agents**".  (Id., ¶ 5.2).

In fulfillment of its contract with Eisenhower, Humana sub-contracted with Sterling Medical in December, 1996, to provide the needed oncology services at Eisenhower. (Defendant's Exhibit 10, "Agreement Between Humana Military Healthcare Services and Sterling Medical (Oncology)") (Hereafter "Humana/Sterling Agreement)  In turn, Sterling Medical Corporation hired Dr. Gupta to provide those services under the terms of the

16

agreement between Humana and Sterling.  (Defendant's Exhibit 9, "Tricare Resource Sharing

Services Dwight D. Eisenhower Army Medical Center Ft. Gordon, Georgia Oncology

Agreement - Fee For Service") (Hereafter "Gupta/Sterling Agreement")

There is no provision in the Resources Sharing Agreements between Humana and the

DoD or Humana and Eisenhower that would allow Humana to assigned it duties and

responsibilities under the contract. The contract between Humana and Sterling specifically

states that, "None of the provisions of this contract are intended to create nor shall they be

construed to create any relationship between corporation [Sterling] and MTF [Eisenhower]."

(Defendant's Exhibit 10, ¶ 1.2.  It is clear from this language that Humana's obligations

pursuant to its contract with Eisenhower were not assigned to Sterling as sub-contractor.

### ARGUMENT

**A.    Humana is Liable for the Negligent Acts or Omissions of Raj Gupta, M.D. Under the Express Term of the Resource Sharing Agreement Between Humana and Eisenhower Army Medical Center.**

Under Georgia law an employer is liable for the acts of a contractor "if the wrongful act

is the violation of a duty imposed by express contract upon the employer."  O.C.G.A §. 51-2-

5(3) (2002).  Under the terms of the Resource Sharing Agreements between Humana and the

government, Humana was responsible for hiring, firing and supervising medical personnel who

were hired pursuant the Resource Sharing Agreements.  Moreover, under the express terms of

those Agreements Humana was also "solely liable for the negligent acts or omissions" of its

agents.  There can be no dispute that Dr. Gupta, was Humana's agent for purposes of Humana's

contract to provide oncology services at Eisenhower.  Nor can there be any question that Mrs.

Pollard, was an intended beneficiary of that contract.  Accordingly, plaintiffs' are entitled to

17

judgment on this issue as a matter of law, and defendant Humana's Motion for Summary

Judgment should be denied.

> 2.  Humana Had Sufficient Control Over Dr. Gupta To Establish An
>     Employer/Employee Relationship Under Georgia Law.

Under Georgia law, the determination of agency rests on "whether the contract gives, or

the employer assumes, the right to control the time and manner of executing the work, as

distinguished from the right merely to require results in conformity to the contract."

Greenbaum v. Brooks, 139 S.E.2d 432, 434 (Ga.App. 1964) (citing Massee & Felton Lumber

Co. v. Macon Cooperage Co., 162 S.E. 396 (Ga.App. 1932)).  The determining factor is the

right to control and not the actual extent to which control is exercised.  Where there is any

evidence tending to establish agency, the question should be submitted to a jury.  Warnock v.

Elliott, 101 S.E.2d 591 (1957).  Edwards-Warren Tire Co. v. Cole, Sanford & Whitemire, 373

S.E.2d 83 (Ga.App. 1988) (questions regarding the existence of agency and the extent of the

agent's authority are generally for the trier of fact).  There is no one determinative factor that

decides the issue of whether an employee is an independent contractor or an agent of the

employer. The courts look at a number of factors to determine the extent of control.

In Harris v. City of Chattanooga, 507 F. Supp. 365 (N.D. Ga. 1980), the Federal District

Court examined nearly fifty decision of the Georgia appellate courts in an effort to distill the

essence of the employer-independent contractor controversy.  Harris was a wrongful death

action that arose out of the death of the plaintiff's husband who was electrocuted while

dismantling scaffolding at a construction project.  The issue turned on whether sub-contractor

who hired the decedent had a master-servant relationship with the original contractor.  If a

master-servant relationship existed between the sub-contractor and the original contractor the

decedent's wrongful death claim would be barred under the Worker's Compensation Act.  If the

subcontractor was an "independent contractor," then recovery was not foreclosed.  Id: at 367.

18

The Court, in <u>Harris</u>,  identified the following "control" factors that are relevant for consideration in this case:

> (i)  The right of the employer to make additional plans and specifications; to impose his will in lieu of contractual provisions; and to direct the work step-by-step;
> (ii)  Contracts to perform a service rather than to accomplish a task;
> (iii)  The employer's right to control the employee's time;
> (iv)  The employer's right to inspect the employee's work;
> (v)  Right to terminate the contract or to fire an employee;
> (vi)  Nature or skill of employee's work;
> (vii)  Method of payment; and
> (viii)  Other aspects of the contract.

Following the an exhaustive review of the Georgia case law from which these factors were gleaned the Court concluded that,

> The cases are not tiles in a well-reasoned mosaic.  Often, the result seems to evidence a reliance on some unarticulated factor. If a method can be discerned from this brief odyssey through the cases, it escapes this Court.  The protean concept of control is not capable of simple explanation.  Perhaps it belongs within that genre of phenomena of which the Court must say "I can't define it, but I know it when I see it."

<u>Harris</u>, 507 F.Supp. at 373.  Finding that there was evidence in both directions on the issue of control the Court denied defendant's Motion for Summary Judgment.  <u>Id.</u>

In <u>Lee v. Satilla Health Services, Inc.</u>, 470 S.E.2d 461 (Ga.App. 1996), the Georgia Court of Appeals applied the factors that were identified in <u>Harris</u>, and held that summary judgment was improper where the evidence was not conclusive as to whether the physician was an employee or an independent contractor.  470 S.E.2d at 463.  <u>Lee</u> was a medical malpractice case in which the plaintiff alleged negligent treatment by a doctor in a hospital emergency room.  The hospital contended that the doctor was an independent contractor and the hospital was not liable for his actions.

In analyzing the factors in <u>Harris</u>, the Court, in <u>Lee</u>, found that on some factors there was evidence that indicated that the doctor was an employee of the hospital, and that on other

factors the evidence indicated that the doctor was an independent contractor. The Court held that, "given that the foregoing evidence does not conclusively establish whether Dr. Tanner was an employee of an independent contractor, summary judgment on this basis was not appropriate." Id. Applying these factors to this case, as the Court did in Lee, there are clearly genuine issues of material fact as to whether Dr. Gupta was an independent contractor, or an agent or employee of Humana, and summary judgment should likewise be denied.

   (i)    **The right of the employer to make additional plans and specifications; to impose its will in lieu of contractual provisions; and to direct the work step-by-step.**

When Dr. Gupta was asked who his employer was at his deposition he testified, "I have several employers, Sterling Medical Corporation, Humana Corporation and government [sic] of USA. (Exhibit 4, Gupta Deposition, p.133-134) This testimony by Dr. Gupta is borne out by the contracts between Humana and DoD, Humana and Sterling, and Sterling and Dr. Gupta. The contracts that Humana signed with the government to supply medical personnel at Military Treatment Facilities, and at Eisenhower in particular, imposed duties on Humana to oversee and supervise virtually every aspect of the care that was provided by the medical personnel.

Under the Resource Sharing Program Requirements, Humana was required to supply medical personnel to military treatment facilities where needed, and was required to supervise and control all such personnel in "for the purposes directing the terms and conditions of employment." (Defendant's Exhibit 8).

Under the Humana/Eisenhower Agreement, Humana was responsible for "monitoring the performance of Resource Sharing Personnel to ensure compliance with the terms of the Resource Sharing provider agreements." (Defendant's Exhibit 11) The performance requirements were spelled out in Attachment C of the Humana/Eisenhower Agreement, called "Oncology Statement of Work." This 12 page single spaced document contains detailed performance requirements for any physician providing services under the Agreement, including

20

what the oncologist is required to wear to work, his hours and days of duty, where he should park his car, when and where he should eat his lunch, how he should conduct himself, the timing and frequency of inpatient rounds, and the timing and frequency for writing notes on inpatients.  Id.

The Humana/Sterling contract also required Dr. Gupta to follow "policies, rules, procedures, and criteria for participation as a provider" as established by Humana and the Military Treatment Facility "including, but not limited to, fee schedules, referral rules, credentialing procedures, and utilization management procedures."  (Defendant's Exhibit 10, p. 6).  Dr. Gupta was also required to maintain records and provide Humana with the information that Humana needed to comply with the terms of the Humana/DoD contract.  (Id., p. 5)  Under Humana's contract with Sterling, Humana retained the right to review Dr. Gupta's performance and to determine whether Dr. Gupta was "under-utilizing health care facilities or services."(Id., p. 3)  Under this provision, Humana retained the right to demand replacement of Dr. Gupta, "if after thirty (30) days HMHS establishes that the problem has not been rectified."  Id.

All of these factors show that Humana retained and exercised significant control over Dr. Gupta's day to day work and are evidence of an employer/employee relationship under Georgia law.

**(ii) Contract to perform a service rather than to accomplish a task.**

Dr. Gupta was hired by Humana's subcontractor Sterling, to provide oncology services at specified time and location at Eisenhower.  He was not under contract to perform a specific task.  In Lee, the Court found that the doctor's obligation to provide twenty-four hour a day coverage in the hospital emergency room, was a contract "to provide service" and indicated that he an employee of the hospital.  470 S.E.2d at 462.  Under Harris and Lee, the fact that Dr. Gupta was hired to perform a service is evidence of employee-employer relationship.

**(iii) Employer's right to control employee's time.**

21

By virtue of Humana's contract to provide oncology services at Eisenhower, Humana controlled the hours when Dr. Gupta worked.  The hours that an oncologist were required to work were spelled out in Attachment C, of the Humana/Eisenhower Agreement.  (Defendant's Exhibit 11, Attachment C)  In keeping with Humana's contractual obligations to provide oncology services at Eisenhower, Dr. Gupta was required to provide services "on a five day per week basis, with services provided eight (8) hours per day.  Hours of service are 7:30 AM to 4:30 PM, Monday through Friday, with no regularly scheduled service on ten (10) Federal holidays and any base holiday where the Department is closed for operation.  Services will be provided for 49 weeks per Calendar Year with no service scheduled during three (3) weeks per Calendar Year."  (Defendant's Exhibit 9, ¶ 1).

In Lee, the hospital required the doctor to provide coverage twenty-four hours a day, but did not dictate his personal schedule.  The Court found that this was an indication that the doctor was an independent contractor.  470 S.E.2d at 463.   In contrast to Lee, Dr. Gupta's contract dictated the days, hours and weeks when Dr. Gupta was required to work, which is an additional  factor indicating that Dr. Gupta was an employee of Humana.

**(iv) Employer's right to inspect employee's work.**

Humana, by its contractual obligations with the DoD and Eisenhower, was required to monitor and report on Dr. Gupta's performance and workload, and to take steps to ensure that his performance and workload met the requirements of the Resource Sharing Agreement. Humana retained the right to determine if Dr. Gupta was under-utilizing health care facilities or services in the Humana/Sterling Agreement. (Defendant's Exhibit 10) Humana also retained the right require access to patient medical records, and to inspect and copy any records kept by Dr. Gupta. Id.   Humana's right to inspect Dr. Gupta's work indicates that he was an employee.

**(v) Right to terminate the contract or to fire an employee.**

In its contract with Sterling, Humana retained the authority to terminate the contract

and to fire Dr. Gupta.  "The right to terminate the contract, or to fire employees of the employee indicates the existence of a master/servant relationship."  <u>Harris</u> 507 F. Supp. at 372.

Humana had the right to terminate the contract immediately for cause, including for non-compliance with Humana's policies and procedures, over-utilization or under-utilization of health care services or facilities, or for professional incompetence.  (Defendant's Exhibit 10, p. 6)  Humana also held the right under the contract to fire a physician at anytime in the event Humana's director of Medical Services determines that a physician's conduct may lead to injury of patients.  <u>Id.</u>

The fact that Humana retained the right to fire Dr. Gupta points to employer-employee relationship.

### (vi) The nature or skill of employee's work.

The more skilled the employee the more likely he is to be an independent contractor. <u>Lee</u> 220 S.E.2d at 462.  Although this factor favors Dr. Gupta being an independent contractor, it is only one factor out of many and is not dispositive.  In <u>Lee</u>, where this factor favored the physician, the court still found a genuine issue of material fact and denied summary judgment. 470 S.E.2d 461.

### (vii) Method of Payment.

Under the terms of Dr. Gupta's contract with Sterling, he was paid an annual salary of $220,000 a year.  (Defendant's Exhibit 9, "Exhibit A") The money to pay Dr. Gupta's salary came from Humana, pursuant Humana's contract with the government.  (Defendant's Exhibit 10, Attachment A).

While Dr. Gupta may have been on salary, he was also required to meet mandatory workload requirements set by Humana in order to justify his the salary.  Dr. Gupta was required to provide 980 outpatient visits, outpatient consults and inpatient consults a year; 250 admissions a year; 200 discharges a year, and 700 chemotherapy units a year.  (Defendant's

23

Exhibit 9, "Exhibit A")  Under Dr. Gupta's contract with Sterling, "Both parties acknowledge[d] that the attainment of workload targets is essential for the service to continue on a cost-justified basis."  Id.

In Lee, the doctor was paid a salary instead of by the hour, which the Court said favored a finding that he was an independent contractor.  However, there was no indication that the doctor's salary in Lee, was tied to the number of patients he saw in the Emergency Room.  A salary that is tied to workload is more analogous to "piecework" which evidences a master-servant relationship.  See Harris, 507 F. Supp. at 372.

In this case, as in Harris and Lee, the evidence does not conclusively establish whether Dr. Gupta was an employee or an independent contractor, and therefore, summary judgment should be denied.

### III.    PROXIMATE CAUSE

Defendant argues that Humana is entitled to summary judgment on the purported basis that plaintiffs' experts failed to prove that any negligence by Dr. Gupta in failing to administer chemotherapy and coordinate radiation therapy for Mrs. Pollard in a timely manner, was the proximate cause of plaintiffs' injuries.  This same argument was raised by Dr. Gupta in his motion for summary judgement.  As in the case of  Dr. Gupta, Humana attempts to supports this argument by misconstruing and referring selectively to the deposition testimony of plaintiffs' experts, and by ignoring and omitting the experts' clearly stated opinions that the defendants' failure to properly treat Mrs. Pollard's breast cancer in 1998, more likely than not caused the cancer to recur and metastasize in 2000.  Plaintiffs' experts depositions, viewed in their entirety, clearly establish with reasonable medical probability that Mrs. Pollard would have survived had adjuvant chemotherapy and radiation therapy been initiated in December, 1998, as the standard of care required.  Accordingly defendant Humana's motion for summary judgment should be denied.

24

Plaintiffs established proximate cause through the opinions of four highly credentialed and highly qualified experts in the treatment of breast cancer.  The experts include, L. F. Smith, M.D., a Board Certified practicing oncologist in Alexandria Virginia for over 25 years (see Exhibit 8, CV of L.F. Smith, M.D.); James V. Fiorica, M.D., Board Certified in obstetrics and gynecology and gynecologic oncology.  Dr. Fiorica is the Chief of Gynecologic Oncology at the H. Lee Moffitt Cancer Center and Research Institute in Tampa, Florida, and is a Professor of  Interdisciplinary Oncology Program at the University of South Florida College of Medicine ( see Exhibit 9, CV of James V. Fiorica, M.D.); Peter Pushkas, M.D., a Board Certified oncologist in Bethesda, Maryland who has been treating women with breast cancer for over 20 years (see Exhibit 10, CV of Peter Pushkas, M.D.); and Gerald H. Sokol, M.D. who is Board Certified in internal medicine, medical oncology, radiation oncology and clinical pharmacology. Dr. Sokol is the Director of Oncology at New Hope Cancer Center, and is involved in numerous scientific research projects related to cancer treatments. (see Exhibit 11, CV of Gerald H. Sokol, M.D.)  Each one of these experts testified with reasonable medical probability that Mrs. Pollard would have survived breast cancer had she received timely adjuvant chemotherapy and radiation treatment, as the standard of care required.  The testimony of these experts, collectively and individually, more than satisfies plaintiffs' burden of presenting expert testimony upon which a jury could reasonably find that there was proximate cause.

### L.F. Smith, M.D.

Dr. Smith testified that in light of the prognostic features of Mrs. Pollard's tumor, and Mrs. Pollard's age and family history of breast cancer, the standard of care required adjuvant chemotherapy and radiation treatment beginning as soon as possible after the definitive surgery.  In Mrs. Pollard's case the definitive surgery was the lumpectomy and lymph node dissection that took place on November 12, 1998.  Dr. Smith testified that some of the

25

protocols for adjuvant chemotherapy start the treatment within seven to ten days of surgery. (Exhibit 12, Smith Deposition, p.32) He testified, "we don't like to wait any longer that three weeks form the time that the diagnosis is first made." Id.

When asked specifically, "Dr. Smith, is it your opinion to reasonable degree of medical probability that Miss Pollard would have fallen into that percentage that would have survived with the chemotherapy?" he replied, "Yes, it's my opinion." (Id. pp. 54-55) Dr. Smith based his opinion that Mrs. Pollard would have survived had she received appropriate chemotherapy treatment on the following sound reasoning:

> I base that opinion on a number of different things. Number one, as I indicated before, that obviously her tumor burden was small metastatically speaking at the time of her diagnosis. She had no sign anywhere of cancer that they could find. Her tumor burden was small. The time to cure patients with micrometastases is when the tumor burden is small and the cells are active. We also know than ER and PR negative cells respond much better to chemotherapy that ER and PR high positive cells.

(Id. pp. 55-56)

Dr. Smith also testified that radiation therapy given in a timely manner, by itself, would have prevented Mrs. Pollard's recurrence of cancer. Dr. Smith testified that with timely radiation therapy the likelihood of recurrence would have been 3 to 5 percent, and that Mrs. Pollard's chances of recurrence increased by seven to tenfold to 35% based on the delay in radiation treatment. (Id. pp. 77, 79)

**James V. Fiorica, M.D.**

Dr. Fiorica testified that Dr. Gupta breached the standard of care by failing to administer chemotherapy and by failing to coordinate radiation therapy in a timely manner. (Exhibit 13, Fiorica Deposition, p. 25) Dr. Fiorica explained that chemotherapy and radiation treatment were indicated to decrease Mrs. Pollard's "local and distant recurrence rate and improve her survival rate." (Id. p. 30) Dr. Fiorica testified that the standard of care required Dr. Gupta to initiate chemotherapy and radiation therapy "once Mrs. Pollard was "healed from the surgical perspective," (id. p. 31), and that this generally occurred "four to six weeks after the surgery." Id. p.32)

Dr. Fiorica, testified that Mrs. Pollard's adjuvant treatment should have begun in the last two weeks of December, 1998. (Id. at p. 33) Dr. Fiorica testified that Mrs. Pollard's cancer would not have reoccurred and she would have been "cancer free" if this treatment had been initiated. Id. at 34.

Q.    So on January the 2nd 1998 (sic), had Mrs. Pollard been initiated with chemotherapy and then followed by radiation therapy, do you have an opinion as to whether more likely than not she would have reoccurred?"

A.    Yes. More likely than not she would not have reoccurred.

R.    What about February 2nd, 1999? Same question as to do you have an opinion

whether more likely than not she would have reoccurred on February 2nd, 1999, had the care that you believe standard of care required been administered at that point in time?

A    Now your talking a two and a half month delay, but still more likely than not that would have affected her outcome.

Q.    **So it's more likely than not that she would have been cancer free?**

**A.**    **Correct.** Dr. Fiorica provided the following basis for this opinion, "In the first two months [following definitive surgery], more likely than not there was no microscopic disease. So treatment at that point in time would have clearly been to the patient's advantage." (Id. at p. 38) When pressed by defense counsel to identify the last date when chemotherapy would have been effective Dr. Fiorica testified, "There is no date that you can say, it's not effective. However, you can do the reverse and say if given within the first two months it clearly would have been effective." (Id., p. 40.)

**Peter Pushkas, M.D.**

Dr. Pushkas testified that "assuming good wound healing" the standard of care required Dr. Gupta to begin chemotherapy by early December, 1998. (Exhibit 14, Pushkas Deposition, p. 16)

When asked whether chemotherapy initiated by January 2, 1999, would have made a difference in the reoccurrence of Mrs. Pollard's cancer, Dr. Pushkas testified, "that would have been the outside edge of where chemotherapy should have been started and would have made a difference, yes." (Id. at pp. 20-21) Dr. Pushkas also testified that an eight week delay in chemotherapy would have resulted in a less than 51 percent likelihood of preventing the reoccurrence of Mrs. Pollard's cancer. (Id. at p. 23)

Dr. Pushkas testified that radiation therapy was mandatory in Mrs. Pollard's case, in light of the fact that she had elected to have a lumpectomy rather than mastectomy to remove the cancer from her breast. (Id. at pp. 27, 42) Dr. Pushkas testified that patients undergoing lumpectomy who do not receive chemotherapy, should begin radiation therapy within a month

27

of surgery.  (Id. at p. 47)  Dr.  Pushkas testified that for patients such as Mrs. Pollard who receive timely and appropriate radiation treatment following lumpectomy, the likelihood of recurrence is less than 1 percent per year.  (Id. at p. 48)

**Gerald H. Sokol, M.D.**

Dr. Sokol testified regarding the standard of care for the timing of radiation treatment following lumpectomy, and the adverse effect that the five-six month delay in Mrs. Pollard's radiation therapy had on her survival.  Dr. Sokol testified that radiation therapy should have begun "as soon as possible for obvious reasons because any cancer cells that are left behind will continue to grow."  (Exhibit 15, Sokol Deposition p. 35)  When asked to be more specific regarding when radiation treatment should begin, Dr. Sokol testified,  "As soon as healing has allowed treatment to progress.  And by far the great majority of time four weeks is quite acceptable and the usual time for initiation of postoperative radiation therapy."  Id.  Dr. Sokol explained, "The longer the delay, the longer the cancer has a chance to grow and spread and the less effective . . . radiation therapy is."  Id.

Dr. Sokol testified that in his opinion Mrs. Pollard suffered a "local regional recurrence of her cancer," (Id., p. 55)  and that radiation of the breast would have been the most effective treatment for preventing the local regional recurrence.  (Id., p. 56)  Dr. Sokol testified that Mrs. Pollard's likelihood of recurrence quadrupled — from 10% to 40% — as a result of the delay in radiation treatment.  (Id., p. 66).

Dr. Sokol testified that with timely radiation therapy Mrs. Pollard had a 90% chance that her cancer would be cured.  (Id. at pp. 37-38)  When asked, "is there anything particular about Mrs. Pollard or her presentation where you can say that it is more likely than not that she would have fallen into the 90%?" Dr. Sokol replied "Well yes.  **She would have fallen into the 90% of local control because she had a small tumor and she had no lymph nodes.  Both of those are good prognosticators for local control of disease given appropriate therapy**." (Id.

28

pp. 50-51)

Plaintiffs' primary allegation of negligence against Dr. Gupta are that he failed to

provide chemotherapy within the appropriate window of time to prevent systemic spread of

cancer following surgery, and that he failed to coordinate timely radiation treatment to prevent

the local and regional reoccurrence of the cancer in light of the fact that Mrs. Pollard had

undergone a lumpectomy.  In moving for judgment, defendant Gupta simply ignores the

testimony of all four of plaintiffs' experts, that in Mrs. Pollard's case, timely adjuvant therapy,

(i.e. chemotherapy and radiation therapy), more likely than not would have prevented the

regional reoccurrence of cancer that Mrs. Pollard experienced in June, 2000, as well as their

testimony that had Mrs. Pollard received appropriate and timely adjuvant treatment she, more

likely than not, would have survived.

## ARGUMENT

### A.    Standard For Granting Summary Judgment

Under Fed. Rule of Civ. Proc. 56(c), defendant Humana is only entitled to summary

judgment if there is no genuine issue of material fact and he is entitled to judgment as a matter

29

of law.   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Dungan v. AlbemarleCounty

School Board, 293 F.3d 716, 720 (4th Circuit 2002).   The party moving for summary judgment

has the burden of clearly showing that there are no triable issues of fact.   See Bishop v. Wood,

426 U.S. 341, 348 n.11 (1976); Ashton v. Okosun, 266 F. Supp. 2d 399, 402 (D.Md. 2003).   All

disputed facts are resolved in favor of the non-moving party.   Id.   The Court must draw all

justifiable inferences in favor of the non-moving party, including questions of credibility and

the weight to be accorded to particular evidence.   Ashton, 266 F. Supp. at 402.

Under Georgia law, "proximate cause is always determined on the facts of each case

upon mixed considerations of logic, common sense, justice, policy and precedent."   Atlanta

Obstetrics and Gynecology Group, Inc. v. Coleman, 260 Ga. 569, 569-70, 398 S.E.2d 16, 17

(Ga. 1990).    Whether proximate cause exists in a particular case is considered a mixed

question of law and fact.   "Ordinarily both questions are to be determined by a jury upon

appropriate instructions from the judge."   Id. at 570, 398 S.E.2d at 17-18.   The issue of

proximate cause will be determined by the court as a matter of law only in "plain and

undisputed cases."   Id.   See also Zwiren v. Thompson 276 Ga. 498, 578 S.E. 2d 862 (Ga. 2003).

Proximate cause is defined as "'that which, in the natural and continuous sequence, unbroken

by other causes, produces an event, and without which the event would not have occurred.'"

Zwiren, 578 S.E.2d at 865 (quoting T.J. Morris Co. V. Dykes, 197 Ga.App. 392, 395-396(4),

398 S.E.2d 403 (1990)).

The plaintiff must establish proximate cause in a medical malpractice action by the use

expert testimony, "because the question of whether the alleged professional negligence caused

the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the

average layperson."  Zwiren, 578 S.E.2d at 865 (other citations omitted).   "Using the

specialized knowledge and training in his field, the expert's role is to present to the jury a

realistic assessment of the likelihood that the defendant's alleged negligence caused the

30

plaintiff's injury." <u>Id.</u>  As an evidentiary threshold the expert's opinion regarding causation

must be based on the determination that "'there was a reasonable probability that the negligence

caused the injury.'"  <u>Zwiren</u>, 578 S.E.2d at 865 (quoting <u>Pilzer v. Jones</u>, 242 Ga. App. 198(1),

201, 529 S.E.2d 205 (2000)).

     1.     Plaintiffs Experts Established With Reasonable Medical Certainty That Mrs.
             Pollard Would Have Survived With Timely Chemotherapy and Radiation
             Therapy.

It is clear from the deposition testimony of plaintiffs' experts, individually and

collectively, that this is not a case in which the evidence on proximate cause is "plain and

undisputed," <u>Atlanta Obstetrics and Gynecology Group,</u> at 570, 398 S.E.2d at 17-18, and that

defendant's motion for summary judgment should be denied.  Plaintiffs' experts testified with

reasonable medical probability that Dr. Gupta's failure provide appropriate and timely adjuvant

chemotherapy and radiation therapy to Mrs. Pollard in December, 1998, resulted in the

reoccurrence and metastasis of her cancer in 2000, and that Mrs. Pollard would, more likely

than not, have been "cancer free" and would have survived had this treatment been given.  (See

above summary of expert testimony)

Defendant misconstrues the significance of the survival statistics for patients with node

negative tumors less than 1 centimeter, and the benefits of chemotherapy in improving

survival.  Some studies suggest <u>prospectively</u> that 90 percent of patients with tumors of less

than one centimeter will be cured by surgery alone, and that an additional 3 percent will

survive if chemotherapy is given.  However, the studies do not take into account the tumor

characteristics or other prognostic factors for the 10 percent of patients who fail, or of those

patients who are likely to benefit from chemotherapy.  While it was not known at the of

diagnosis, in <u>hindsight</u> we know that Mrs. Pollard fell into the category of the 10 percent of

patients who were destined to fail with surgery alone. We also know with certainty  that Mrs.

Pollard was one of the 10 percent who stood to benefit from chemotherapy and radiation.

31

Plaintiffs experts testified with reasonable medical probability that Mrs. Pollard was among this smaller group who would have survived had she been given chemotherapy and radiation treatment as the standard of care required.  Their opinions were based on a number of sound clinical and scientific factors, including the clinical factors that were present when Mrs. Pollard's cancer was diagnosed, as well as her proven response to chemotherapy when her cancer reoccurred.  Dr. Smith testified that Mrs. Pollard fell into the percentage that would have survived based on the fact that Mrs. Pollard's tumor burden was very small at the time of diagnosis, that she had no sign of metastatic cancer anywhere, and that ER and PR negative cells respond much better to chemotherapy that ER and PR high positive cells." (Exhibit 12, pp. 55-56).  Dr. Sokol testified that had Mrs. Pollard received timely radiation treatment, she would have fallen into the 90 percent of patients who avoid reoccurrence because she had a small tumor and negative lymph nodes.  (Exhibit 15, pp. 50-51)

The studies that defendant cites regarding the efficacy of chemotherapy do not account for cases involving a five-six month delay in radiation therapy following lumpectomy, as occurred in Mrs. Pollard's case.  Plaintiffs' experts all opined that Mrs. Pollard's cancer more likely than not reoccurred in May, 2000, as result of the delay in radiation treatment in the absence of chemotherapy.

Defendant's expert, James J. Stark, M.D., largely agreed with the opinions expressed by plaintiffs' experts regarding Mrs. Pollard's prognosis and proximate cause.  Referring to the same studies, Dr. Stark, testified that based on statistics alone Mrs. Pollard would have had a 33 percent chance of survival if she had received chemotherapy three to six weeks after the lumpectomy,  (Exhibit 16, Stark Deposition, p. 34), and having received no chemotherapy her chances of survival were reduced to zero.  Id.

Dr. Stark also conceded that if Mrs. Pollard had a meaningful anti-tumor response to conventional chemotherapy in June or July of 2000, when her cancer reoccurred, "it would be

32

more likely that her disease free interval would be longer with chemo than without chemo." Id. at p. 88. Dr. Stark agreed that the poorer the prognostic indicators are of a particular breast cancer, the greater the statistical benefit you see with chemotherapy. Id. at p. 91. When asked "And just so that I make sure I understand, assuming that Ms. Pollard's tumor was responsive to chemotherapy, the type of breast cancer that she had, if chemotherapy had been administered three to six weeks after surgery, that chemotherapy would have gotten to the cancer cells wherever they were located." Dr. Stark responded "Yes." Id. at pp. 91-92.

At the time of his deposition Dr. Stark could not recall whether Mrs. Pollard's tumor did in fact respond to chemotherapy after her cancer reoccurred in June, 2000. However, the medical records from August of 2000 show that Mrs. Pollard's cancer responded to chemo." (Exhibit 17) Dr. Stark agreed that Mrs. Pollard fell within the 10 percent of patients who stood to benefit from chemotherapy, rather than the 90% who would have survived anyway. (Exhibit 16, at p. 123) Dr. Stark also agreed that it is "reasonable for an oncologist who treats women on a regular basis to look at those statistics and to look at how they are stratified and to come to reasonable conclusions with respect to prognosis of an individual patient." Id.

    **C.**    **Under Georgia Law Proximate Cause Is Not Eliminated By Expert Opinion That The Patient's Chances of Survival Were Less Than Fifty Percent Absent The Negligence.**

Defendant argues that plaintiffs' experts' testimony on proximate cause demonstrates, at most, a "loss of a chance," that defendant argues is not compensable under Georgia law. Defendant relies on Dowling v. Lopez, 211 Ga. App. 578, 580, 440 S.E.2d 205, 208 (Ga. App. 1994). This argument fails for the reasons set forth above. However, defendant's reliance on Dowling is also misplaced. In Dowling, there was no expert testimony that the decedent had any chance of survival. The expert testimony only established that with appropriate treatment the decedent's life could have been prolonged, rather than saved. Id. The Court held that "there can be no recovery in a wrongful death action based on medical negligence where is no

showing to any reasonable degree of medical certainty that the patient's death could have been avoided." Id. In this case, defendant Gupta's own expert, Dr. Stark, testified to a reasonable degree of medical certainty that Mrs. Pollard would have had a <u>33 percent chance of survival</u> had she been given appropriate adjuvant chemotherapy, and that that chance was reduced to zero. A 33% chance of survival is a substantial loss that is compensable under Georgia law. See <u>Richmond County Hospital Authority v. Dickerson, et al.</u>, 182 Ga. App. 601, 356 S.E.2d 548 (1987)

In <u>Richmond</u>, the Court held that proximate cause is not eliminated by merely establishing by expert opinion that the patient had less than a fifty percent chance of survival had the negligence not occurred. The negligence in <u>Richmond</u> related to the failure of the defendants to perform surgery on the decedent who was seen in the emergency room for an aneurysm. The expert testimony was that the chances of survival with surgery were less then fifty percent, however, the evidence also established that the decedent's death was not inevitable. The Court held that "the record does not establish that the actions or inactions of the hospital staff were not a proximate or contributing cause of [the decedent's] death. Thus, the movant hospital did not on this records, carry its burden of proof on summary judgment." Id. at 603, 550. Likewise, defendant has failed to carry his burden of proof for summary judgment based on the testimony of his own expert.

**D.    It Undisputed That Mrs. Pollard Would Have Delayed Moving to England If Chemotherapy Had Been Recommended**

Mrs. Pollard left Fort Gordon in December, 1998, to accompany her husband on his assignment to England, believing that her prognosis was good and she had been medically cleared by Dr. Gupta and the other physicians at Eisenhower. She was given no sense of urgency, and no one had advised her that she needed chemotherapy. (Exhibit 2, V. Pollard Trial Deposition, pp. 29-36) Dr. Gupta does not dispute the fact that he never advised Mrs.

34

Pollard that he was recommending chemotherapy, or that he never told her the risks and benefits of chemotherapy or informed her about the timing of chemotherapy or radiation treatment following a lumpectomy. (Exhibit 4, Gupta Deposition, p. 41-42) It is also undisputed that if Dr. Gupta had discussed this with Mrs. Pollard, she would have stayed at Fort Gordon for treatment, and would have delayed going to England until after the treatment was completed. (Exhibit 2, pp. 38-39) The overwhelming testimony from Dr. Gupta, Dr. Sees, and from plaintiffs' and defendants experts alike, is that the standard care required Dr. Gupta to give Mrs. Pollard this advice and information when she went to see him for an oncology consult in December, 1998.

In addition, Dr. Gupta admits in his deposition that he did nothing to determine whether chemotherapy or radiation treatment would be available to Mrs. Pollard when she arrived in England. (Exhibit 4, pp. 14-15) Dr. Gupta admits that he made no effort to find out what part of England the Pollards were moving to, (p. 43), or who her doctor would be when she arrived. He also admits that he did nothing to find out whether or not doctors in England would agree with his recommendation for chemotherapy. (Id.) In circumstances like this where the Mr. Pollard and his family were being reassigned to a military facility outside of the United States, plaintiffs' expert testified that the standard of care required Dr. Gupta to make reasonable efforts to determine whether appropriate medical treatment by US standards, would be available. By admittedly doing nothing, Dr. Gupta breached this standard.

As it turned out the standards for treatment of breast cancer differed significantly in England in 1998; and there were long waiting lists for the treatment that was available. Dr. Dodwell, the oncologist who saw Mrs. Pollard in England, testified that the threshold for giving chemotherapy to breast cancer patients is much higher in England than it is in the United States. (Exhibit 7, Dodwell Discovery Deposition, p. 30) He also testified that there was waiting list for radiation treatment in the region of England because supply exceeded the

35

demand.  (Exhibit 6, Dodwell Trial Deposition, p.42)  As a result, Dr. Dodwell, recommended against chemotherapy when he saw Mrs. Pollard in mid-February, and radiation treatment was delayed for six months.

Dr. Gupta would have known, as a matter of fact, that Mrs. Pollard would not receive the necessary or timely adjuvant treatment for her breast cancer if he had made reasonable efforts to contact Dr. Dodwell in December, 1998, before the Pollard's left Fort Gordon for their assignment to England, when Mrs. Pollard was, without question, under his care.

The facts also demonstrate that the doctors in England sent their consult reports to Dr. Gupta and kept him informed of Mrs. Pollard's treatment in England.  (See Exhibit 18)  Dr. Gupta was made aware that the oncologist, Dr. Dodwell, had advised against giving chemotherapy, and that there was delay in radiation treatment because of its unavailability under the British healthcare system.

WHEREFORE, for these reasons, and any others that may appear to the Court, plaintiffs' respectfully request that defendant Raj Gupta, M.D.'s Motion for Summary Judgment be denied.

Respectfully submitted,

BRUCE J. KLORES & ASSOCIATES, P.C.

By:_____/S/_____
　　Lesley S. Zork- #013454
　　Bruce J. Klores- #03320
　　915 15th Street, NW
　　Washington, D.C. 20005
　　(202) 628-8100
Co-counsel for Plaintiffs

and

36

LAW OFFICES OF PETER MASCIOLA


_____/S/_____
Peter R. Masciola - #12958
601 Pennsylvania Avenue, N. W. #900
Washington, D.C. 20004
(202) 628-5680
Co-counsel for Plaintiffs

37