1

1    VERONICA POLLARD, et al.,   *  IN THE

2           Plaintiffs,   *  UNITED STATES COURT

3        vs.           *  FOR THE DISTRICT

4    RAJ R. GUPTA, M.D., et al., *  OF MARYLAND

5           Defendants.   *  Case No. WDO-02-764

6           - - - - - - - -

7         The deposition of G. PETER PUSHKAS, M.D., was

8    taken on Monday, the 23rd day of June, 2003, commencing

9    at 10:30 a.m., at the Law Offices of Bruce J. Klores &

10    Associates, 915 Fifteenth Street, N.W., Washington,

11    D.C., before Mona Smith, CSR, RMR, Notary Public.

12    APPEARANCES:

13         LESLEY S. ZORK, ESQUIRE

14           On behalf of the Plaintiffs.

15         JOAN CERNIGLIA-LOWENSEN, ESQUIRE

16           On behalf of Dr. Gupta.

17         LARRY D. ADAMS, ESQUIRE

18           Assistant U.S. Attorney

19         CATHERINE A. HANRAHAN, ESQUIRE

20           On behalf of Humana Military Healthcare

21    Reported by:   Mona Smith, CSR, RMR

2

1                    I N D E X

2    WITNESS                          PAGE

3    G. PETER PUSHKAS, M.D.,

4    By Ms. Cerniglia-Lowensen                  3

5    By Mr. Adams                    49

6    By Ms. Hanrahan                 69

7    By Ms. Cerniglia-Lowensen            79

8

9        I N D E X   O F   E X H I B I T S

10    EXHIBITS                        PAGE

11    Number 1  Curriculum Vitae of Dr. Pushkas        3

12    Number 2  MEDICARE search              20

13    Number 3  MEDICARE search              20

14

15

16    EXHIBITS ATTACHED

17

18

19

20

21

3

1          G. PETER PUSHKAS, M.D.

2     the Deponent, called for oral examination by the

3     defendant, being first duly sworn to tell the truth, the

4     whole truth, and nothing but the truth, testified as

5     follows:

6     EXAMINATION BY CERNIGLIA-LOWENSEN:

7     Q     Good morning, Doctor.  My name is Joan

8     Cerniglia-Lowensen, and I'm here today representing

9     Dr. Gupta in a matter that has been filed against him

10     and some of the other defendants on behalf of Veronica

11     Pollard.

12          Is that your understanding as to why you're

13     here, sir?

14     A     Yes, it is.

15          (Curriculum vitae of Dr. Pushkas was marked

16               as Pushkas Deposition Exhibit Number 1.)

17     Q     Doctor, you previously provided to plaintiff's

18     counsel a copy of your curriculum vitae.  Can you look

19     at that and tell me whether that is the most current

20     copy of your CV?

21     A    There are only minor additions that need to be

4

1    made.

2     Q    And what's the nature of those additions?

3     A    Since this has been reviewed, I got back on

4    staff at the Washington Hospital Center, so I have

5    privileges at that hospital as well.  And on Page 2, the

6    professional achievements, many of these things have

7    been quite outdated and I have a number of new

8    committees that I am on and other positions that I have

9    taken.

10     Q    Doctor, do you have a more updated copy of

11    your CV in your office, sir?

12     A    No, I do not.

13     Q    If at any time you get that together, if you

14    could provide that to Ms. Zork and then she can forward

15    it on to us, that would be helpful.

16     A    I will make sure it will happen.

17     Q    Thank you, sir.  Doctor, you went to medical

18    school in Hungary; is that correct?

19     A    That is correct.

20     Q    Can you tell me what you did professionally

21    after your graduation from medical school at the

5

1    University of Budapest?

2       A    I was graduated in September of 1968.  I

3    started to work in an internal medicine internship while

4    in Hungary, and in the early summer of 1970, I left that

5    position and I left Hungary and immigrated to the United

6    States.  In the United States I needed to have my,

7    first, my diploma smuggled out of the country and then

8    have it accepted.  I had to take an equivalency test,

9    which is called the ECFMG.

10          And having accomplished all of that, I have

11   started an internship at the Washington VA Medical

12   Center on the George Washington University Service in

13   1972.  I started a residency in 1973.  And I started my

14   medical oncology fellowship at the National Cancer

15   Institute at the National Institutes of Health in 1974.

16   I have completed that fellowship in 1976 and went into

17   the private practice of medical oncology.  And I have

18   been in the private practice of medical oncology since

19   then.

20      Q    Doctor, your internship at the VA Hospital at

21   the George Washington University Service, was that a

6

1    rotating internship?

2        A    That is correct.

3        Q    And what about your residency, sir?

4        A    That was a straight medical residence.

5        Q    Are you board certified in any areas?

6        A    Yes, I am.

7        Q    Which areas, sir?

8        A    Internal medicine and medical oncology.

9        Q    When did you become board certified in

10    internal medicine?

11        A    It's been a long enough time that -- it was

12    1978 I became -- no, 1977 I became board certified in

13    internal medicine and in 1981 I became board certified

14    in medical oncology.

15        Q    The certification exam in internal medicine,

16    is that both written and oral?

17        A    It was all written.

18        Q    Did you pass on the first attempt, sir?

19        A    No, I didn't.  I never pass a test on the

20    first attempt.  I have a learning disability and I am

21    unable to do very well on a timed test.

                                7

1        Q    How many attempts did you require in internal

2    medicine?

3        A    Second.

4        Q    The examination for medical oncology, was that

5    oral and written or all written?

6        A    All written.

7        Q    How many attempts on that, sir?

8        A    The second.

9        Q    Doctor, in your area of medical oncology, do

10    you specialize, subspecialize with any types of patients

11    or do you see a gamut of cancer patients?

12        A    I do not specify -- I do not specialize in any

13    special field.  I am a general medical oncologist and I

14    see pretty much the same variety and the same percentage

15    of cancer patients as there are in the general

16    population.

17        Q    Could you estimate for me approximately what

18    percentage of the patients that you see have breast

19    cancer?

20        A    It's about 10 percent of all my patients have

21    breast cancer at any one time.

                                    8

1        Q    Doctor, have you authored any publications or

2    written any textbook chapters on the topic of oncology?

3     A    No, I have not.

4     Q    Do you have any academic appointments that you

5    currently hold?

6     A    No, I do not.

7     Q    Have you in the past, sir?

8     A    No, I have not.

9     Q    Doctor, have you had your deposition taken

10    before, sir?

11     A    Yes, I have.

12     Q    Just to go over the ground rules a little bit,

13    if at any time I ask you a question that's unclear, if

14    you'll make me aware of that, I'll be happy to rephrase

15    the question.  Is that agreeable?

16     A    Yes.

17     Q    And though I don't think we're going to be

18    very, very long today, if you need a break, please let

19    me know that.  Likewise, if you need to refer to any

20    records or any documents, please feel free to do so.

21     A    Thank you very much.

9

1     Q    How many times have you had your deposition

2    taken in the past, sir?

3     A    In my professional career in the past 20 years

4    that I have on occasion been given depositions, with

5    this one, it's probably up to two dozen or maybe 25.

6    Q    And, Doctor, of those 24, 25, what percentage

7    or what number has been on behalf of the plaintiff as

8    compared to the defendant?

9    A    Probably seven or eight were for the defendant

10    and the rest were plaintiff.

11    Q    Have you ever reviewed a case for Mr. Klores's

12    office in the past?

13    A    Yes, I have.

14    Q    Do you know approximately on how many

15    occasions?

16    A    Maybe five or six.

17    Q    Doctor, I presume some of the reviews that you

18    do will not blossom into a deposition; is that correct?

19    A    That is correct.

20    Q    Can you estimate for me in any manner that

21    you're capable of, whether it's over a 20-year period or

10

1    a yearly period, how often you do reviews on behalf of

2    attorneys?

3    A    Well, the yearly average lately has been five

4    to seven.

5      Q    And, sir, how many times have you testified at

6    trial?

7      A    In court?

8      Q    Yes, sir.

9      A    I probably have been in court either six or

10   seven times.

11     Q    And where have those court cases taken place

12   in terms of D.C., Maryland, Virginia?  What's the

13   jurisdiction?

14     A    Mostly D.C.  One time in Virginia.  One

15   time -- no, correction.  Twice in Washington State, and

16   in Suburban Maryland, which includes Prince George's

17   County and Baltimore, one of each.

18     Q    Anywhere else that you recall?

19     A    No.

20     Q    Doctor, what is your fee schedule regarding

21   review of records?

11

1      A    Reviewing records is $250 an hour, conferences

2    with lawyers is $300, and a trial deposition is $2000

3    per day plus travel expenses and food and lodging.  I

4    try to eat less when I'm away.

5      Q    When you say conferences, you're including

6    deposition for that?

7        A    That's correct.

8        Q    Doctor, do you know how Mr. Klores's office

9    came to learn of your availability to review records

10   initially?

11       A    I really do not know.

12       Q    Do you advertise your services with any of the

13   expert witness service lists?

14       A    No, I do not.

15       Q    Have you ever been sued for malpractice, sir?

16       A    Yes, I have.

17       Q    On how many occasions?

18       A    Once so far.

19       Q    And when was that approximately?

20       A    1968.

21       Q    And that was in Hungary?

                              12

1        A    I'm sorry.  '86.

2        Q    And where were you then, sir?  Were you in

3    private practice?

4        A    I was in private practice.  It was an

5    occurrence from 1981.

6        Q    And that case is resolved, I assume?

7     A    Yes.

8     Q    How was it resolved, sir?

9     A    I was released from the case in the pretrial

10    deposition-taking stage.

11    Q    Was any settlement paid on your behalf or were

12    you dismissed?

13    A    I was dismissed.  There was no settlement made

14    on my behalf.

15    Q    What briefly were the allegations regarding

16    your care?

17    A    Failure to treat breast cancer.

18    Q    Was that suit here in the District, sir?

19    A    Yes, it was.

20    Q    Doctor, can you tell me what you have reviewed

21    in preparation for your deposition today?

13

1     A    Yes.  I have reviewed medical records from the

2     Dwight D. Eisenhower Hospital.  I have reviewed records

3     from England on Ms. Pollard from the Menwith Hill

4     Station in Harrogate.  I have reviewed Cookridge

5     Hospital's records.  I have reviewed outpatient records

6     from Lincoln Keith Air Force Base.  I have reviewed

7     hospitalization and clinic records of Walter Reed Army

8    Medical Center.  And I have reviewed the depositions

9    Ms. Veronica Pollard, Staff Sergeant Roosevelt Pollard,

10   Jr., and the depositions of Dr. Sees, Dr. Stephen Adams,

11   Dr. Moo oh Hwang, and Dr. Raj Gupta.

12        Q    And, Doctor, do you have the -- any

13   correspondence that you received from Ms. Zork or

14   Mr. Klores concerning this case?

15        A    I have brought all the correspondence with me

16   for your review.

17        Q    May I have it.  Thank you.

18        A    Mm-hmm.

19        Q    Doctor, I notice that the first correspondence

20   is dated April 29th, 2003, and it starts off, "Thank you

21   for agreeing to review medical records of Veronica

                              14

1    Pollard."  Do you believe that you received this shortly

2    after your first contact from Mr. Klores's office?

3         A    That's correct.

4         Q    Doctor, have you ever practiced medicine in

5    the United Kingdom?

6         A    I have taken a clinical clerkship in the

7    United Kingdom in London in the summer of 1965, but that

8    was the only extent of my having patient contacts in

9    England.

10      Q    And when you say clinical clerkship, what does

11   that mean?  What did you do that summer?

12      A    It was probably the equivalent of an

13   externship, which is, again, an intern who is not on

14   staff in the hospital.

15      Q    You had not graduated from medical school at

16   that point, correct?

17      A    That is correct.

18      Q    What type of patients did you care for at that

19   time?

20      A    General medical patients and some oncology

21   patients.

15

1    Q    Would you say that you have any familiarity

2    with the standard of care in England during the time

3    period around 1998?

4    A    I would not have any familiarity with that.

5    Q    So I think I know the answer to this, but just

6    for the record, you don't hold yourself as an expert

7    regarding standards of care in England in oncology in

8    1998; is that correct?

9    A    I do not, that is correct.

10    Q    Doctor, I presume that you have some opinions

11    regarding Dr. Gupta and that's part of the reason that

12    you're here today.  Can you list for me, first, what

13    opinions you have regarding how Dr. Gupta may have

14    deviated from accepted standards of care?  And then

15    we'll go back and talk a little more in depth about it.

16    Is that okay?

17    A    Right.  When Dr. Gupta had his contact with

18    Ms. Pollard in the first couple of weeks of December of

19    1998, it was his opinion and recommendation that he

20    documented that he recommended adjuvant chemotherapy for

21    Ms. Pollard in addition to the obvious radiation therapy

16

1    needed.  By not starting this treatment and not making

2    sure that this treatment will be started expeditiously,

3    Dr. Gupta has breached the standard of care.

4    Q    Do you agree that Ms. Pollard required the

5    chemotherapy and radiation therapy?

6    A    Yes, I do.

7    Q    When did the standard of care require the

8    treatments be initiated?

9    A    By early December 1998 Ms. Pollard was

10    approximately six weeks after the diagnosis of the

11    cancer and two weeks after the definitive surgical

12    procedure that was performed.  Assuming good wound

13    healing, and I do not see any record to the contrary to

14    that, the chemotherapy could have been started at that

15    time and should have been started within two weeks at

16    the most of the definitive surgery.

17        Q    When you talk about the definitive surgery,

18    are you talking about the lumpectomy?

19        A    I'm talking about the lumpectomy and axillary

20    node dissection.

21        Q    Doctor, could the chemotherapy be initiated

                                    17

1    prior to obtaining results from the receptor study?

2        A    Yes.

3        Q    And why is that?

4        A    Well, the receptor studies are clearly

5    indicated in determining whether the patient would be

6    given the benefit of hormonal manipulation after the

7    completion of the chemotherapy.  But the chemotherapy

8    decision does not depend on the hormone receptor

9    positively or negatively.

10       Q    What type of chemotherapy should have been

11    utilized on Ms. Pollard?

12     A     With the kind of tumor that she had, four

13     courses of adriamycin and cytoxan would have been

14     appropriate.

15     Q     Doctor, talking specifically about the tumor,

16     it's my understanding that Ms. Pollard had a T1 tumor;

17     is that correct?

18     A     Correct.

19     Q     In 1998 is it your opinion that the standard

20     of care required that all T1 tumors receive chemotherapy

21     or was there something specific about Ms. Pollard that

                                    18

1     you think made her a candidate for chemotherapy?

2     A     The answer of the two-part question, not all

3     T1 patients automatically require chemotherapy.  There

4     is a subset of patients with T1 tumors that should be

5     considered for the administration of chemotherapy, and

6     that includes younger age, it includes a more

7     undifferentiated tumor, it may include the patient's

8     race with regard to being African-American, and it also

9     depends somewhat on the hormone receptor positivity,

10     because if the tumor has several good prognostic factors

11     and one of them is hormone receptor positivity, one

12     could forego chemotherapy.

13      Q    But you told me earlier that you could

14    initiate the chemotherapy before you get the receptor

15    studies back?

16      A    If the other characteristics are unfavorable,

17    young patient, rapidly growing tumor, poorly

18    differentiated in the microscope, one would be inclined

19    to give chemotherapy.  And if the hormone receptors are

20    negative, then we know that yes, she really needs it.

21    If they're positive, not only does she need that, but

                                  19

1    she will need Tamoxifen afterwards.

2      Q    Now, you referred to race and I've never heard

3    that before.  Can you explain to me how the fact that

4    Ms. Pollard is African-American would fit into the

5    equation?

6      A    Yes.  There have been observations in growth,

7    that one abstract that I brought for this discussion

8    about describing the well-known fact that it turns out

9    that even though breast cancer as such is less common in

10    African-Americans than in Caucasians, once it is

11    discovered, it is usually a more aggressive and more

12    advanced and with a poorer outcome in general.

13      Q    And this was in "Cancer 2003"; is that

14    correct?

15        A    Correct.

16        Q    Do you know when the study that was done that

17    yielded this article?

18        A    This study was obviously done within a year or

19    so prior to its appearance, but these are pieces of

20    information that have been well-recognized in previous

21    NIH cancer surveillance data that have been collected

                                    20

1    for many years.

2        Q    So it's your testimony that oncologists in

3    general were aware of that hypothesis in 1998?

4        A    Yes, it is.

5        Q    Do you mind if I mark this?

6        A    Please do.

7            (MEDLINE search was marked as Pushkas

8             Deposition Exhibit Number 2.)

9        Q    Before I forget, Doctor, it looks like you

10    have another -- is that a copy of the same thing?

11        A    No.  It's a slightly different issue that may

12    come up at one point.

13            MS. CERNIGLIA-LOWENSEN:  Why don't we just

14    mark this too?

15          (MEDLINE search was marked as Pushkas Exhibit

16          Number 3.)

17      Q    Doctor, we were talking about the

18   chemotherapy.  Had chemotherapy been initiated in

19   January of 1999, do you have an opinion to a reasonable

20   degree of medical probability as to whether that would

21   have made a difference in Ms. Pollard's reoccurrence?

                              21

1      A    January 1st?  2nd?

2      Q    Well, let's start with the first week in

3   January.

4      A    The first week in January, that would have

5   been -- it was November 20th or so that she had her

6   surgery.  That would have been about on the outside edge

7   of where chemotherapy should have been started and would

8   have made a difference, yes.

9      Q    What about the second week in January?

10     A    The second week of January would have made it,

11   instead of six weeks or so, seven weeks.  Probably

12   between six and seven weeks.  It may not have -- eight

13   weeks begin to make it two months, and then it would

14   have --

15     Q    I'm sorry?

16     A    Eight weeks would have made it two months --

17    you're going to ask me about --

18     Q    Yes.

19     A    -- the next week?  And then it could

20    conceivably have made a difference.

21     Q    In the eight weeks -- I just want to make sure

22

1    that's clear for the record.  We're now talking about

2    the third week in January; is that right?  You moved on

3    one?

4     A    Right.

5     Q    And that would have been eight weeks after the

6    lumpectomy, correct?

7     A    Which would have been November 20th, I think.

8     Q    Okay.  And eight weeks after the surgery, if

9    chemotherapy had been initiated, would that, to a

10    reasonable degree of medical probability, have prevented

11    the reoccurrence?

12     A    It would have had less chances of preventing

13    the reoccurrence, and the reason why I cannot be more

14    specific about that is that we aim to start chemotherapy

15    within a reasonable period of time of surgery.  We're

16    waiting for healing to happen, but then we proceed.  And

17    typically most of the studies, the research protocols

18    that we have duly acquired that we start the treatment

19    within 30 days that has been translated into the general

20    medical practice, so we do not dilly dally for months

21    and months to start adjuvant therapy.

23

1     Q    So, can you say to 51 percent probability had

2     the chemotherapy been started eight weeks after the

3     definitive surgery or approximately the third week in

4     January, whether that would have prevented the

5     reoccurrence?

6     A    Whether it would have prevented it more likely

7     than not?

8     Q    Yes.

9     A    It may not have been able to prevent the

10    reoccurrence at that time.

11    Q    And I don't mean to be difficult or

12    argumentative, but in the law, may's and maybe's,

13    there's significance to the language in a very different

14    sense than in medicine.  So what I want to find out is,

15    to a reasonable degree of medical probability, can you

16    say that chemotherapy would have or would not have made

17    a difference eight weeks out?  And if you don't have an

18    opinion, if you can't say, you can tell me that too.

19         MS. ZORK:  I'm just going to object because

20    that's a slightly different question than the earlier

21    question, but your question now is would it have made a

                                24

1    difference?

2         MS. CERNIGLIA-LOWENSEN:  Mm-hmm.

3         THE WITNESS:  It would have been less likely

4    than not to be able to prevent the reoccurrence.  It

5    would be less likely to prevent the reoccurrence.

6    Q    Okay.  Would it have been less likely to an

7    amount of below 51 percent?

8    A    Yes.  I think that's what I'm answering to.

9    We were getting out of the window of opportunity.

10    Q    What do you base that upon?

11    A    I mentioned already that unfortunately what we

12    have is -- we don't usually do this, we don't really

13    wait that long to start the treatment, and we are

14    starting treatment typically within a month because of

15    our understanding that perioperatively there could be a

16    spread of the cancer because of the discovery of the

17    cancer, the physical manipulation, the biopsies, the

18    cutting into the tumor and all that, which could bring

19    about a spread of the cancer right around the time the

20    surgery is done.  And if those circulating cancer cells

21    are allowed to become comfortable, settled down, and

                                25

1    start drawing, that will affect the effectiveness of

2    chemotherapy adversely.

3        Q    Are you aware of any studies that elaborate on

4    the issue of timing, other than sort of the sooner the

5    better and let's get it started within a month?

6        A    I don't think that a study like this could be

7    performed in this country, anymore than deciding not to

8    treat somebody to see whether it's worse than treating

9    somebody.  It's difficult to get studies like this

10    through an institutional review board that takes the

11    patient's welfare as the foremost consideration.

12        Q    Doctor, you referred to the two agents, the

13    chemotherapy agents, the adriamycin and the cytoxan, and

14    that was the standard of care in 1998, correct?

15        A    That was, you know, it's not absolute, there

16    are other combinations available.  The most commonly

17    used, more likely than not used, agents at that time

18    would have been adriamycin and cytoxan.

19        Q    Are there any side effects with the use of

20    adriamycin and cytoxan?

21        A    Sure.

                              26

1        Q    Can you highlight some of the side effects for

2    me?

3        A    Sure.  First of all, adriamycin has a

4    bothersome side effect of causing heart muscle toxicity.

5    We usually evaluate the heart muscle activity in our

6    patients prior to the administration of adriamycin and

7    there's a lifetime limited dose that we can give of

8    adriamycin.  All chemotherapeutic agents typically gives

9    upset stomach, vomiting, they cause hair loss, they can

10    suppress the bone marrow and the result in increased

11    incidence of bleeding, infection, and fatigue,

12    bothersome mouth sores can develop.  Cytoxan

13    specifically can irritate the bladder and people can

14    have hemorrhagic cystitis.  And chemotherapeutic drugs

15    in general can cause infertility, which may or may not

16    be a problem for somebody at age 44.  These are the

17    major ones and there are probably a hundred minor ones

18    as well.

19        Q    Is there a certain fatality rate with the use

20    of adriamycin and cytoxan?

21      A     In the actual setting, giving four courses of

27

1      adriamycin and cytoxan, the fatality rates are probably

2      one in ten thousand, if that much.  It's not an issue.

3      Q     Doctor, in a patient that you deal with who is

4      a T1, who has characteristics similar to Ms. Pollard,

5      and when I say that, I'm talking about her age, her

6      race, characteristics of the tumor, do you sit down and

7      discuss with them the option of chemotherapy versus just

8      radiation?

9      A     Let's go back a little bit.  If the treatment

10     of breast cancer in any woman is less than a mastectomy,

11     a total removal of the breast, radiation treatment is

12     mandatory.  Now, this is a free country and patients can

13     decide whether they do or they don't whatever they are

14     told, but in reality, that is an undertreatment.  It is

15     an untreatment of breast cancer if radiation therapy is

16     not given.  So it's not so much an option for the

17     patient.  The option for the patient was to go either

18     for a mastectomy and be done when you get discharged

19     from the hospital or have a minor surgery, have

20     remainder of the breasts, but go for five or six weeks

21     of daily radiation treatment.  That is the only option.

28

1          In Ms. Pollard's case, radiation therapy was

2     not optional.  It is a little bit similar when we're

3     talking about chemotherapy.  There are situations where

4     it's mandatory to take chemotherapy.  Five centimeter

5     tumor, 15 positive lymph nodes, hormone receptor

6     negative, come on, you don't have to take it, but then

7     you're going to die.  It's still up to the patient to

8     decide, but one has to explain it fairly forcefully.

9          There are situations where it is an option for

10    the physician, that is, it's somewhat of a debate

11    whether we can add an additional 10 percent or 15

12    percent, whatever percent to survival by giving

13    chemotherapy, and then it may be an option for the

14    doctor to recommend.  And there are options for the

15    patient then to decide whether to take it or not.  So it

16    depends on the situation.

17    Q    You characterized chemotherapy as in some

18    instances being mandatory when you have someone that has

19    a very large tumor and positive lymph nodes.  With

20    Ms. Pollard, if you were presenting that to her as her

21    oncologist, would you consider chemotherapy to be

29

1    mandatory or would you present it as an option?  A

2    recommendation?  How would you classify it?

3        A    I personally, facing a patient like

4    Ms. Pollard, even without the benefit of hindsight that

5    I have of course in her case, I would have strongly

6    advised her that in my opinion chemotherapy was needed

7    and it was in her best interest.

8            She's a young woman with a rapidly developing

9    cancer, coming from a family where her mother had breast

10    cancer, where her young sister died of breast cancer.

11    She could see what devastation breast cancer can do.

12    She needed the chemotherapy.

13        Q    Doctor, with a T1, negative node, no

14    metastasis tumor the size of Ms. Pollard's, what would

15    the incidence of obtaining a five-year survival be with

16    chemotherapy?

17        A    Well, let's look at it without chemotherapy

18    first.

19        Q    That's fine.

20        A    Without chemotherapy, stage one breast cancer,

21    that is cancer of the breast without lymph node

                                30

1    involvement, the five-year survival is roughly 80

2    percent, and this means 20 percent recurrence rate in

3    that five years.  In ten years, the numbers change a

4    little bit.  Proper adjuvant therapy typically changes

5    the survival statics by 30 percent.  So instead of a 20

6    percent recurrence rate, it would be seven points less,

7    so it would be 13.  See, we're talking T1, but you have

8    to realize there's T1 (A), (B), and (C), depending on

9    the size of the tumor.  If it had been a 10 percent

10    chance of recurrence, that would go down 7 percent again

11    from that.  So 7 percent of 10 would be 7, so it would

12    go down only to maybe, whatever that is, about 9 percent

13    would do well.

14        Q    I'm sorry.  I got lost.

15        A    I'm sorry.  Not 7 percent.  30 percent.  You

16    take 30 percent out of ten, that's three, so now it's

17    seven women who will have recurrence rather than ten if

18    you give the adjuvant chemotherapy to women who have a

19    10 percent chance of recurrence.

20        Q    Okay.  Math is not my forte.  I'm going to

21    back you up just so I'm sure I get it.

                                31

1        A    And I confused you with the numbers.  I

2    apologize.

3     Q    You told me with a stage one tumor, that --

4     with chemotherapy?  Or without chemotherapy?  Without

5     chemotherapy, the survival rate is 80 percent, the

6     five-year survival rate?

7     A    Right.

8     Q    With the chemotherapy, how does that improve?

9     A    That improves to 87.

10    Q    Thank you.  87 percent?

11    A    Right.

12    Q    Okay.  And that is for all T1 N0, no

13    metastasis, correct?

14    A    That's correct.

15    Q    And you said there was T1(A), T1(B), and

16    T1(C)?

17    A    Correct.

18    Q    How would you classify Ms. Pollard based upon

19    the pathology report that Dr. Gupta had available to

20    him?

21    A    That pathology report described the primary

32

1     tumor as a 5-millimeter lesion, which would have made it

2     at T1(A) or if it was -- yeah, T1(A).

3     Q    Are there studies that indicate percentages

4    for T1(A)?

5       A    There are studies.  You are looking at

6    subsets, then it goes a little bit more complicated, but

7    that's why I brought up the issue that an early T1, as

8    it were, probably has a better five-year survival than a

9    late T1, being a continuum of course.

10      Q    Specific question as to a T1(A) similar to

11   Ms. Pollard's, without chemotherapy, what is the

12   five-year survival rate for patients with a T1(A)?

13      A    In my opinion, it would be around ten percent.

14   10 percent recurrence rate and 90 percent survival.

15      Q    Thank you.  And with chemotherapy, how would

16   that affect the number?

17      A    With adjuvant therapy, that would go up to 93.

18      Q    Doctor, do you have any other opinions

19   regarding deviations in standard of care?  What I wrote

20   down, you told me that Dr. Gupta had an obligation to

21   make sure that treatment was begun in an expeditious

33

1    manner.  Any other criticisms?

2       A    Well, if that includes the fact that he would

3    have made arrangements for the treatment to be given,

4    since he has not to my knowledge, that's part of the

5   criticism that I have.

6       Q    Okay.  Tell me what type of arrangements

7   standard of care required Dr. Gupta to make.

8       A    Dr. Gupta was at that time the physician of

9   record, the oncologist of record.  He has made the

10   assessment that Ms. Pollard needed adjuvant

11   chemotherapy, and that since there was adequate wound

12   healing and the workup, with the exception of the

13   hormone receptor studies, was complete, he could have

14   and should have proceeded with the first dose of

15   chemotherapy within the time frame that we talked about,

16   basically by the first week of January.

17       Q    Was Ms. Pollard still in Georgia the first

18   week in January?

19       A    I do not recall the exact departure date and

20   I'm not sure that I have seen that in the records

21   either.

34

1       Q    Okay.  Do you believe that the standard of

2   care placed upon Dr. Gupta any burden to make sure that

3   she stayed in Georgia?

4       A    Well, if he could make arrangements for the

5   chemotherapy given that is not site specific, it

6    wouldn't have to be in Georgia, it would have made it

7    more appropriate, then he would have known that it was

8    done rather than going halfway around the world to a

9    different country and try to look for a doctor to pick

10    up the ball there.

11    Q    But certainly it could have been done in

12    another country?

13    A    Sure.

14    Q    Doctor, do you have any information as to who

15    approved the Pollard family moving to England in terms

16    of medical clearance?

17    A    I have not seen that medical clearance as such

18    in the medical records, so I do not know.

19    MS. ZORK:  We haven't been told.

20    Q    Doctor, you as a medical oncologist, do you

21    have the expertise to personally look at a tumor slide

35

1    and to stage it or make any determination based upon

2    looking at slides?

3    A    No, I do not.

4    Q    You rely upon the pathologist to do that?

5    A    That's correct.

6    Q    And that's certainly within the standard of

7     care to do so, correct?

8          A    It certainly wouldn't be within the standard

9     of care if I would trust myself with a pathology

10     reading.

11          Q    I understand.  Doctor, you referred a few

12     times to Ms. Pollard's wound healing.  I presume that

13     before chemotherapy and radiation is initiated, the

14     surgical wound has to be healed, correct?

15          A    To a certain point, that's correct, yes.

16          Q    That's my question.  To what point?  How does

17     the doctor determine that healing is good enough?

18          A    I actually have an easy job on that because

19     that's not my expertise either.  And what typically

20     happens is patients come to me referred by the surgeon

21     after the surgical procedure and the discussion always

36

1     centers the fact that I will be very happy to start the

2     chemotherapy as soon as this surgeon tells the patient

3     that it is okay for Pushkas to give you the first dose,

4     and that's typically, again, within two to three weeks

5     of the time of the surgery.

6          Q    Are there instances where that needs to be

7     delayed?

8      A     Yes.  There could be infections, there could

9    be dehiscences of the wound, simply poor healing, there

10    could be bleeding, there could be -- and often there are

11    fluid pockets, fluid collections that develop that the

12    surgeon has to repeatedly drain.  These aren't the usual

13    events.

14      Q     Are you aware of any studies or any support in

15    the literature in terms of what the optimal timing is

16    post-surgery for the initiation for any type adjuvant

17    therapy?

18      A     Other than previously discussed that the

19    studies and protocols typically call for starting it

20    within 30 days from the time of the surgery.

21      Q     What would be a good resource for me to look

                                    37

1    at to sort of give me that guideline?  Is there a

2    particular textbook?  Or a particular article?

3      A     I really don't think that you would find hard

4    and fast guidelines written on it.  Where I can be of

5    help is to get you a number of treatment protocols that

6    all specify the period of time within which this

7    treatment should be started.

8      Q     If you would do that, that would be helpful.

9      A     I'll be happy to.

10      Q     Doctor, in your MEDLINE search, the one that

11   we have identified as Exhibit 3, "Prognostic Comparison

12   of Three Classifications for Medullary Carcinoma of the

13   Breast," when did you do this MEDLINE search, sir?

14      A     Yesterday.

15      Q     And what was the reason for your looking at

16   this particular article?

17      A     I couldn't help but notice that the pathology

18   report describes Ms. Pollard's cancer as showing

19   medullary features.  And I have seen two pathology

20   readings on those pieces of tissue and I have noticed

21   some discussion as well in the deposition of Dr. Adams

                                        38

1   and Dr. Moo oh Hwang that Ms. Pollard's pathology was

2   consistent with a typical medullary carcinoma.

3          Now, medullary carcinoma is an unusual

4   pathological finding.  We only see maybe 3 to 5 percent

5   of all breast cancers as being medullary carcinoma.  And

6   medullary carcinoma has the unusual characteristic that

7   it looks very aggressive under the microscope.  It also

8   shows a significant infiltration by tumor infiltrating

9   leukocytes.  Again, that's what my pathologist friends

10    tell me.  And despite the aggressive appearance,

11    classical, typical, medullary carcinoma is actually a

12    better prognostic feature than atypical medullary

13    carcinoma.

14          Since both of these pathologies have been

15    describing Ms. Pollard's tumor as being an atypical

16    medullary carcinoma, for my own interest I looked to see

17    if there was any difference.  And what I have found in

18    many articles, and I just didn't want to overburden my

19    floppy disk actually to save all of those, it appears

20    that atypical medullary carcinoma actually is not a good

21    thing to have.  It has the same kind of prognostic

                                39

1    significance as a nonmedullary carcinoma.  In other

2    words, it didn't work in Ms. Pollard's favor that she

3    had features of medullary carcinoma on pathology.

4    That's the reason why I did it.

5      Q    Just so that I'm sure that I got that right in

6    my layman's language, a tumor that -- do you agree that

7    Ms. Pollard's tumor had medullary features?

8      A    I have to accept it as an article of faith

9    from the two pathologists that have reported on the

10    tissue.

11     Q     But a tumor with medullary features is not the

12     same as a medullary tumor?

13     A     That is correct.

14     Q     And in this instance, the medullary features

15     led the pathologist to conclude and you to rely on the

16     fact that she had an atypical medullary carcinoma?

17     A     That's correct.  That's why the pathologist's

18     remarks in his report that this is a -- I forgot the

19     word he used, either high-grade or aggressive histology.

20     Or he may say undifferentiated.  I'll look afterward.

21     Q     Does that have any significance in the

                                    40

1     treatment?

2     A     Yes, it does.  If she had atypical medullary

3     carcinoma, then that would have supported a decision of

4     withholding chemotherapy, together with the other

5     findings, of course, but that would have been in favor

6     then to be less aggressive in our approach.

7     Q     Doctor, do you have an opinion as to whether

8     the physicians in England deviated from accepted

9     standards of care by not initiating chemotherapy when

10     Ms. Pollard got there?

11          MS. ZORK:  I'm going to object because he's

12    already testified that he was not aware of the standard

13    of care in England in '98.

14        Q    Do you have an opinion?

15        A    Not knowing the standard of care, all I can

16    say is that this lady needed chemotherapy and it should

17    have been given.

18        Q    I'm going to ask you hypothetically if a

19    patient found her way to your office for whatever

20    reason, eight weeks, ten weeks, twelve weeks, fourteen

21    weeks after her definitive surgery and presented with

                            41

1    the same characteristics of Ms. Pollard, would the

2    standard of care for you in your office here in Maryland

3    require you to initiate chemotherapy at that point in

4    time?

5        A    It would have required a fairly involved

6    discussion with the patient pointing out that our window

7    of opportunity may have passed, but with the possible

8    dire circumstances that could develop if we make the

9    wrong choice and not give her the chemotherapy, it would

10    be still my recommendation to give it.  But I would

11    document the fact that this is not an ideal situation.

12    See, almost anything is better than dying from breast

13    cancer.

14        Q    And according to your testimony, there really

15    are not studies to indicate how statistically

16    chemotherapy would work on someone at that point in

17    time?

18        A    I'm not aware of any studies where that is

19    proven and I have done the search.

20        Q    Doctor, what is the purpose of radiation

21    therapy?  How does that prevent a recurrence?

                                    42

1        A    As we talked about earlier, if the surgical

2    procedure is anything less but the total mastectomy, we

3    still have viable breast tissue on the side where the

4    original cancer has developed, and the possibility of

5    intransit metastasis, that is cells that have broken off

6    from the bulk of the tumor and are on their way to the

7    lymph nodes, makes it imperative that we deliver a

8    certain amount of cell killing radiation to the

9    remainder of the breast tissue.  And if there are also

10    lymph nodes involved at the time of the surgery, then

11    that radiation typically includes the drainage area, the

12    lymphatic drainage area, that is the armpit.

13        Q    What does chemotherapy then add to the

14     situation?  What does it do that radiation wouldn't?

15          A     Radiation therapy is a local modality.  It

16     only works where it's given.  The outline field, the

17     radiation field, even half an inch outside of the

18     radiation field, the radiation will not have a cell

19     killing effect.  Chemotherapy, on the other hand, gets

20     into the blood circulation, permeates every cell, if you

21     will, in the human body and, therefore, it will search

                                   43

1     out and hopefully destroy any cancer cell that might

2     have gotten into the circulation.

3          Now, you have to realize that whole approach

4     with adjuvant chemotherapy or hormonal manipulation is

5     based on the fact that in the history of doing breast

6     cancer surgeries, we would perform the local surgery and

7     remove the breast and tell the patient, the surgeons

8     always do, that they got it all, only to lose a patient

9     five years or ten years later with breast cancer

10     starting in the liver, lung, brain, or the bone.

11          Now, the only way that those cells have gotten

12     there was prior to the surgery because those are breast

13     cancer cells.  And if that is true, then it is possible

14     that no matter how early the breast cancer may have

15    been, cells have broken off and landed elsewhere and not

16    in the lymph glands.  And that's the reason why we

17    started to give adjuvant chemotherapy or hormonal

18    therapy.

19       Q    Now, Ms. Pollard's reoccurrence was where,

20    sir?

21       A    Ms. Pollard had -- I don't know whether the

                                    44

1    time, how you like to know it, but in the early part of

2    2000, she fell at work, she injured her ribs, she

3    developed a lump in the sternum, the breast plate area,

4    which was painful and that was swollen and for a while

5    she was told it's going to go away because it's an

6    inflammation.  It turned out to be cancer on biopsy that

7    was done sometime in April.

8          In April of 2000, she had a CT scan done which

9    showed an eight millimeter lesion in the right upper

10    lobe of the lung that was presumed but not proven to be

11    metastatic cancer.  Then she got Medivac'd to the United

12    States.  And Walter Reed, either in late April or early

13    May, they have performed a supraclavicular lymph node

14    biopsy and there was cancer as well.  So if we take this

15    time frame all together, then she recurred regionally

16    and distantly as well.

17        Q    Would the regional occurrence have happened

18    first and that led to the metastasis or did the

19    metastasis begin at the time of the initial lesion or is

20    there any way to know?

21        A    There's really not a very good way to know.

45

1    One can surmise that since the lesion in the peristernal

2    area was larger than the supraclavicular node, that the

3    supraclavicular node was not there.  Also, none of the

4    doctors in England described the supraclavicular node as

5    being there.  The lung lesion was only eight

6    millimeters, extremely small, but it was there already

7    when the supraclavicular node wasn't.  So I'm at a loss

8    to say which it developed at.

9        Q    So you don't have an opinion to a reasonable

10    degree of medical probability as to which developed

11    first; is that correct?

12        A    Judging from the size of these lesions, the

13    peristernal lesions appears to have been first.

14        Q    Okay.  Thank you.  Would the peristernal

15    region have been an area that would have been reached

16    with radiation therapy?

17     A    I am not aware of her particular radiation

18     field, but in general, radiation fields do include that

19     edge of the sternum.  Whether it was right outside or

20     inside, it's impossible for me to tell without looking

21     at your radiation reports, and the radiation therapist

46

1     would be the one to answer that question in all honesty.

2     Q    Now, I want you to presume for a moment that a

3     patient with characteristics, hypothetically, like

4     Ms. Pollard had radiation alone and the radiation field

5     included that peristernal area, would that in your

6     opinion, to a reasonable degree of medical probability,

7     have prevented the recurrence in January of 2000 in that

8     area?

9          MS. ZORK:  If the timing of --

10          MS. CERNIGLIA-LOWENSEN:  If the timing is as

11     the doctor prescribed.

12          MS. ZORK:  She did have radiation in April.

13          MS. CERNIGLIA-LOWENSEN:  When the doctor

14     believes standard of care required radiation to be

15     initiated.

16          MS. HANRAHAN:  When was that?  I don't think

17     we got to that.

18      MS. ZORK:  I'm sorry.

19      MS. CERNIGLIA-LOWENSEN:  Let's back off that.

20      Q    Doctor, when did the standard of care require

21   that radiation therapy be initiated for Ms. Pollard?

                                    47

1      A    Well, two scenarios.  If she did not, for some

2   reason, get -- if a patient does not get recommendation

3   of additional chemotherapy, then radiation therapy is

4   typically started within a month, and radiotherapists

5   like to finish all their radiation within six months

6   from the time of the surgery.

7           If she had -- if a patient gets the

8   recommendation of chemotherapy, for certain reasons in

9   this country, we proceed with the chemotherapy first,

10   typically in a 12 to 18 week period, and then it is

11   followed by radiation treatment.

12      Q    With those two scenarios, if you have a

13   patient who is not going to receive chemotherapy and the

14   radiation therapy is initiated and that peristernal area

15   is included in the field -- you got all of my pieces

16   there?

17      A    Right.

18      Q    -- what is the incidence of recurrence in that

19    peristernal area under those circumstances?

20        A    Well, in breast and regional recurrences are

21    typically less than 1 percent per year.  And those

48

1    numbers are readily available because we know it from

2    all of the patients who have undergone lumpectomies

3    followed by radiation treatment.

4        Q    When you say 1 percent per year, does that

5    mean 1 percent year one, 2 percent year two, 3 percent

6    year three?

7        A    Every year there's 1 percent total, it's often

8    in ten years you've already had close to 10 percent

9    chance that it could occur.

10        Q    Thank you.  Doctor, do you have any other

11    criticisms of Dr. Gupta in the care that he provided

12    other than what we've talked about?

13        A    I can't think of any.

14        Q    Doctor, when I was asking you about five-year

15    survival rate with T1(A) tumors, you told me that with

16    chemotherapy 93 percent survive up to five years; is

17    that correct?

18        A    Correct.

19        Q    Does that number become smaller with time just

20    like the number with the radiation?

21      A    Correct.  Breast cancer unlike many cancers

                                49

1    that we can talk about, do not seem to have a

2    well-defined cut of time.  Lung cancer, stomach cancer,

3    colon cancer, five years typically equals cure.  With

4    breast cancer, the literature has information about

5    recurrence as many as 40 years after the initial

6    procedure.  The good news is the patient lived 40 years,

7    the bad news is it did recur.

8      Q    And for those 7 percent of women that succumb

9    even with all the proper treatment that we've talked

10    about today and timely treatment, is there any

11    prognosticator to indicate who falls in that 7 percent

12    or is it luck?

13      A    It is luck or the lack of it.

14          MS. CERNIGLIA-LOWENSEN:  Doctor, I don't think

15    I have any other questions right now, sir.  Thank you.

16          MR. ADAMS:  Why don't we take a five-minute

17    break and then we'll start?

18          (Recess taken.)

19    EXAMINATION BY MR. ADAMS:

20      Q    Doctor, my name is Larry Adams and I represent

21    the United States in this matter, so I have a few

50

1    questions.  I don't think I will be as long as

2    Ms. Cerniglia-Lowensen.

3        You mentioned earlier that one of the reasons

4    that you needed to take the boards twice was because of

5    a learning disability, but you didn't spell that out.

6    What is the learning disability?

7      A    I have an attention deficit disorder and I'm a

8    very slow reader.

9      Q    Is that also true in Hungarian as well as

10    English?

11      A    Sure.

12      Q    You also indicated that you had no expertise

13    in the standard of care required, or medical care

14    conditions in the United Kingdom; is that correct?  Did

15    I understand that correctly?

16      A    That is correct.

17      Q    In the process of your professional reading,

18    do you ever look at English British publications with

19    regard to medical care in your specialty?

20      A    All the time.

21      Q    Okay.  So is the level of research and

51

1   clinical studies in the U.K. comparable to what happens

2   in the United States?

3       A     They are comparable, they are equally good,

4   and sometimes surprisingly different.

5       Q     But that's true in all of Europe, isn't it?

6       A     That is correct.

7       Q     Do you have any familiarity with the military

8   system of medical care or the military in general in

9   this country?

10      A     I do not have familiarity with the military.

11  I am not aware that the military is practicing poorer

12  medicine than elsewhere.

13      Q     Okay.  Let me kind of refine that question.  I

14  take it that you don't have any particular experience

15  with military patients or patients who may be the

16  dependents of active duty military personnel in your

17  current practice?

18      A     That is correct.

19      Q     With regard to your testimony, concerning your

20  fees as an expert and your experience as an expert in

21  these kinds of cases, I believe Ms. Cerniglia-Lowensen

52

1     asked you about your hourly rate and number of cases.

2     What I would like to know is approximately in the past

3     three years what percentage of your income is derived

4     from expert testimony?

5     A     About 5 percent.  5 to 7 percent.

6     Q     And the remainder of your income, how would

7     you divide it between your private practice and other

8     concerns?

9     A     Private practice and what?

10     Q     If you have other specialties or concerns.

11          MS. ZORK:  Other sources of income?

12          MR. ADAMS:  Yeah.

13          THE WITNESS:  My or the family's income?

14     Q     No.  Your income.

15     A     I get a small stipend being the chairman of

16     the Department of Medicine at Suburban Hospital, which

17     is $18,000 a year, apart from that, all of my income is

18     derived from my private practice.  And my investments.

19     That was a joke.

20     Q     I don't know.  It could be very significant.

21     But I take it that it's -- that is a very small portion

53

1     of your income; is that correct?

2      A      I really don't have any investment income.

3      Q      Doctor, I would believe you if you said so.

4   Okay.  Now, have you met Ms. Pollard?

5      A      No, I have not.

6      Q      Did you see the videotape that we took of her

7   testimony last summer?

8      A      No, I did not.

9      Q      And you haven't spoken with her over the

10   telephone or anything of that nature?

11      A      I had no contact whatsoever with Ms. Pollard.

12      Q      I assume the same holds true for Sergeant

13   Pollard, her husband?

14      A      That is correct.

15      Q      So is it fair to say that you don't know what

16   the circumstances were with regard to Sergeant Pollard

17   and Ms. Pollard about their physical location in Georgia

18   in the fall of 1998?

19      A      Other than what I have gleaned from their

20   deposition that he was at that time still in Kuwait on

21   an assignment and Ms. Pollard was back over in Georgia.

54

1      Q      So you're not familiar with any orders

2   Sergeant Pollard had to be transferred to the United

3    Kingdom during the time period that she discovered the

4    lump in her breast?

5        A    Not any more than what I have seen described

6    in the depositions.

7        Q    And I take it you have no knowledge about what

8    arrangements they had made as far as housing in Georgia

9    or elsewhere during this same time period, October

10    through January, 1998 and 1999?

11        A    That is correct, other than what's referred to

12    as living in the hotel and this kind of stuff.

13        Q    Okay.  Now, in the course of doing your

14    research for the preparation of this deposition, did you

15    go back and look at any of the protocols for standard of

16    care that obtained in the latter part of 1998?

17        A    I did not.

18        Q    Is it fair to say that over the course of the

19    past almost five years now, that your specialty, the

20    protocols and procedures, have changed as medical

21    knowledge advances?

55

1        MS. ZORK:  Objection to the form of the

2    question.

3        THE WITNESS:  Well, we have constant

4    refinements of minor tweaking in our approaches, but the

5    basic approach has not significantly changed.  What held

6    true by and large in 1998 still holds true in 2003.

7    Q    Well, I know I'm going to mispronounce this,

8    but the adriamycin and cytoxan that you spoke about

9    previously, to what extent were they readily available

10   back in the latter part of 1998 as far as treatment?

11   A    That was one of the standard treatments.  It

12   wasn't investigational.  It was quite readily available

13   at that time.

14   Q    And do you have any knowledge as to when those

15   chemotherapy procedures came into effect, approximately

16   in what year?  Have they been out there for five years?

17   Ten years or longer?

18   A    We had adriamycin for the past 20 years or so.

19   Cytoxan is one of the grand daddies of chemotherapy, and

20   that has been around as a chemotherapeutic since the

21   late '50s, 1960.  Using cytoxan in the treatment of

56

1    breast cancer has become widely accepted in 1972, '73

2    when the so-called Cooper regimen was first used,

3    including five chemotherapeutic agents, one of them

4    being cytoxan.  In the early '70's everybody used CMF,

5    cytoxan, methotrexate and 5FU.  And then adriamycin came

6    in the early '80s.  It became the most active single

7    agent for the treatment of breast cancer, and pretty

8    soon it got incorporated with a regimen that was called

9    CEF, and it turned out that we didn't need the F, so we

10    were left with the AC.

11        Q    And could you give me sort of a brief history

12    of Tamoxifen and the usage of that particular

13    medication?

14        A    Tamoxifen came available in 1979, 1980, as an

15    antiestrogenic compound.  It's been around so long, as a

16    matter of fact, that it finally got a patent last year

17    and it is now available in a generic form.  It's a very

18    useful agent and we know probably more about Tamoxifen

19    than any other agent in the chemotherapy, hormonal

20    therapy.

21        Q    Now, in the preparation for your testimony,

                              57

1    you read the letter that Dr. Gupta wrote with regard to

2    his session with Ms. Pollard.  Do you recall that?

3        A    Would that be the "To whom it may concern"

4    letter?

5        Q    Yes.

6     A    Yes.

7     Q    Now, I believe that letter indicates that he

8  did recommend that she undergo chemotherapy.  Do you

9  recall that?

10     A    Yes, I do.

11     Q    And as I understand it, that is the

12  recommendation you would have made to this patient had

13  she been your patient, correct?

14     A    That is correct.

15     Q    Now, does the patient have the right to refuse

16  to undergo chemotherapy?

17     A    Sure.  I mentioned earlier and I think that I

18  feel strongly that this is a free country.

19     Q    And if the -- if a patient in circumstances

20  similar to Ms. Pollard's decides not to undergo

21  chemotherapy, what would your practice be in advising

                          58

1  that patient?

2          MS. ZORK:  I'm going to object to

3  circumstances like Ms. Pollard.  I'm not sure which ones

4  you're referring to.

5          MR. ADAMS:  All right.  Let me make it a

6  hypothetical.

7     Q     In a situation where you would have a T1 and

8   N0 MO type tumor, hypothetically, six weeks, four weeks

9   after surgery, lumpectomy, the patient comes to you and

10   you advise her undergo a course of chemotherapy prior to

11   radiation and that patient decides not to undergo the

12   chemotherapy, what advice, if any, would you give to

13   that patient?

14     A     Well, I actually would give my advice during

15   the discussion and I would try to explain what my

16   reasons are to give the chemotherapy.  I would obviously

17   point out to the patient that it is ultimately her

18   decision to take it, because it's easy for me to give

19   it, but it's tough for her to take it.  I would also

20   make sure that I have documented the possibilities that

21   would occur should she decide not to take the

59

1   chemotherapy.

2         And since my involvement, my treating

3   involvement with a malpractice suit included a private

4   discussion between the patient and myself and that came

5   back and almost bit me, I make sure that there is

6   documentation and there are witnesses to the discussion.

7   I need to point that out to the patient not just what

8      would happen if she would take the chemotherapy, but

9      what could potentially happen if she did not take the

10     chemotherapy.

11          If with all that, she decides not to do it,

12     that's her decision.

13     Q     Have you ever had patients in a situation like

14     we're discussing who have decided not to take the

15     chemotherapy because they fear the nausea, the fatigue,

16     the hair loss, all of the stereotypes that are out in

17     the public domain about course of chemotherapy?

18     A     I have patients like that, yes.

19          MS. ZORK:  I'm sorry, what was the question?

20          THE WITNESS:  Have I had patients like that.

21          MS. ZORK:  Have you had patient like that?

                              60

1      Have you had patients that refused to take chemotherapy?

2           THE WITNESS:  Despite all my silver tongue

3      devil behavior.

4           MS. ZORK:  I missed the question.  I was

5      waiting for the question part.

6      Q     So this refusal by the patient who was a good

7      candidate for chemotherapy is not unusual; is that

8      correct?

9    A    It is extremely unusual.  It is a very rare

10    occurrence.  In 99 out of 100 cases, I am able to

11    achieve a compromise with my patients, pointing out that

12    they do not necessarily have to finish the course of

13    treatment, and why don't we start -- why don't they try

14    the first dose.  If they get sick, if they tell me that

15    they would rather die than continue with it, that's the

16    worse thing that could happen, they will die anyway,

17    then it's okay to stop.  And with that, I'm usually

18    successful in 99 percent of the patients to push through

19    with the treatment.

20    Q    Well, that's a testament to your bedside

21    mannerism.

61

1    A    Thank you very much.

2        MS. ZORK:  It's a testament to a young woman's

3    will to live.

4    Q    But you do find patients who are concerned,

5    reluctant to undergo a course of chemotherapy; isn't

6    that correct?

7    A    Absolutely.  That's correct.

8    Q    I take it from the way you couched your

9    answers that it sometimes takes a good deal of

10    persuading to get the patient to understand that it

11    really is in her long-term best interest to undergo the

12    course of chemotherapy; is that correct?

13        A    That's correct.

14        Q    Have you ever had a situation where a patient

15    came to you basically three to four weeks after a

16    lumpectomy and indicated to you that they were not going

17    to be in the area or under your medical care immediately

18    after the last visit with you?

19        A    Yes, I have.

20            MS. ZORK:  Objection.

21        Q    And in those circumstances, what was your

62

1    action in order to follow the patient or to advise the

2    patient after she left your care?

3        A    What I typically discuss with my patients is

4    that my recommendations that I'm giving are the best

5    recommendations that I can give under the circumstances.

6    They are not site specific and they are not person

7    specific.  I would like to turn off the issue of my

8    monetary gain by giving the chemotherapy.  When I

9    discuss these things with my patients, I tell them, not

10     in so many words necessarily, but I tell them that it

11    really doesn't matter where they get the treatment or

12    who is giving them the treatment, this is what they

13    should be getting, and we'll take it from there.  I'm

14    willing to give them information about it.  I'm offering

15    to them to send the records to anybody that they would

16    want to go to, or I tell them to have their doctor call

17    me so I can discuss it with them.

18       Q    Do you ever have patients that basically deny

19    the consequences that would flow from their diagnosis of

20    cancer and, therefore, don't undertake any kind of

21    treatment within the time frames that you suggested are

                              63

1    appropriate?

2        MS. ZORK:  Objection.

3        THE WITNESS:  In my 26 years, I'm sure that I

4    have people like that, yes, that's correct.  When I came

5    to this country, I learned the proverb that you can take

6    a horse to the well, but you can't make him drink.

7        Q    Let me ask a follow-up on that.  Are you

8    saying that -- are you contrasting that with your

9    experience in Hungary when you were a medical student?

10       A    Yes.  It is partly because of the elapsed time

11    of 30 years since graduating from medical school and

12    partly because of the cultural differences.  In Europe,

13   the doctor is god and what he says is really cast in

14   stone.  There is much more give and take, much more

15   discussion, much more arguments, if you will, are going

16   on in this country in the day-to-day medical care.

17        Q     So it's fair to say that the American patient

18   exercises a lot more independent judgment as to what he

19   or she wants to do with regard to their care; is that a

20   fair statement?

21        MS. ZORK:  Objection.

                                    64

1        Q     You may answer the question.

2        A     Yes.  And especially with the Internet

3   available; everybody seems to know how to treat cancer.

4        MS. HANRAHAN:  That's only been true in the

5   last five years.

6        Q     As I indicated earlier, I represent the United

7   States and basically the Army Healthcare System, in

8   particularly as it pertains to the treatment in Georgia.

9   Is there any criticism that you would voice of the care

10   rendered that fell below the standard of care based on

11   your designation as an expert in internal medicine and

12   oncology?

13        A     Well, I clearly cannot express an opinion on

14    the standard of care of the surgical aspects provided by

15    Dr. Sees because I have no knowledge. I do have a

16    criticism as to the timeliness and the sequence of the

17    referral of Ms. Pollard for an oncology evaluation. I

18    also cannot express an opinion about the medical

19    knowledge of Dr. Adams, the pathologist, but I can

20    express a criticism about not performing the necessary

21    variations on the breast tissue. Specifically not

65

1    sending the hormone receptor studies in a timely manner.

2    Q    Well, is it fair -- I understand that you

3    think it should have been sent in a more timely manner,

4    but you're not saying you know who may have been

5    responsible for the delay, are you?

6    A    That's correct. All I know is that in reading

7    Dr. Adams' deposition he said he was the responsible

8    that should have sent it out. Who actually put it in

9    the mail obviously would not have been Dr. Adams.

10    Q    Well, would it be fair to say that in hospital

11    settings and even in private practice, sometimes things

12    don't get done as quickly as they should be?

13    A    That is fair to say.

14    Q    You made a remark, and I want to make sure I

15    understood this, I know it was a generalization, but you

16    indicated that breast cancer in contrast to other

17    cancers in which you're familiar is less well-defined as

18    far as the survival time; is that correct?

19    A    In the sense that there is a tail, tailing off

20    effect.  There are late recurrences in breast cancer

21    much more commonly than in many of the other cancers.

66

1    Q    Okay.  And is that unique to breast cancer?

2    A    It is unique to breast cancer that it does

3    have a definite chance of recurrence even as much as 40

4    years after the original diagnosis.  With lung cancer,

5    five years is cured.  It's very unlikely that there

6    would be a recurrence.  The same for colon, the same for

7    stomach.  But breast, like prostate, has this unique

8    characteristic of being able to recur 15, 20, or 25

9    years later.

10    Q    So you're saying the prostate cancer, also

11    like breast cancer, has this characteristic, in laymen's

12    terms, a certain unpredictability?

13        MS. ZORK:  Objection.  That's not what he

14    said.

15    Q    It may be an inappropriate way of saying it.

16    How would you characterize that characteristic that it

17    may reoccur as long as 40 years after the first

18    occurrence?

19        A    It does not have a clearcut of time where

20    nonrecurrence equals cure.

21        Q    Do you have any understanding as to why that

                                    67

1    is at a biological level?

2        A    No, I do not.

3        Q    Dr. Pushkas, based on your reading of all the

4    medical records including the records at Walter Reed, do

5    you have any opinion as to the life expectancy that

6    Ms. Pollard has now?

7        A    Well, I needed to ask whether she was still

8    alive, because I wouldn't have been surprised if she

9    wasn't.  Clearly she will die of metastatic breast

10    cancer sometime very soon.  Depending on what kind of

11    treatment she is getting, and I haven't seen the latest

12    records, she may have a couple of months.  I would be

13    very pleasantly surprised but shocked if she lived more

14    than another six to nine months knowing what I know

15    about her.

16        Q    Okay.  Are there any other opinions with

17     regard to standard of care that you wish to opine on at

18     this time?

19          MS. ZORK:  I mean, he's going to testify

20     consistent with the designation with respect to standard

21     of care, and I think he has covered them in the broad

                                   68

1     sense.  You haven't asked him the specifics about -- he

2     said broadly timing, timeliness of the referral, timing

3     of the -- you know, if you want to be more specific

4     about that.  We will ask him more specifically about

5     when should the timing be and all of that at trial.  So

6     I just want to make it clear.  You've asked him and he's

7     given you his broad opinions.

8          MR. ADAMS:  Right.  I understand that.  And I

9     think I understand that, but what I want to make sure,

10     is there anything else that he feels compelled to say

11     with regard to his opinion at this time, anything that

12     he thinks has been overlooked that is truly significant

13     to his opinion about the breach in the standard of care.

14     Q     And you may answer the question if you

15     understand it.

16          MS. ZORK:  I'm just going to object.  I'm

17     going to ask him a lot of questions at trial, set the

18    foundation and all that.  So what he thinks is important

19    may not be the same as what I'm going to ask him about

20    at trial.

21         MR. ADAMS:  I understand that.

                                69

1    Q    Do you understand the question?

2    A    From the medical point of view, I have

3    expressed my gross-based opinions.

4         MR. ADAMS:  I just wanted to make sure.

5    EXAMINATION BY MS. HANRAHAN:

6    Q    Good afternoon.  My name is Cathy Hanrahan.  I

7    represent the defendant Humana Military Healthcare

8    Systems, Inc.

9         As I understand what you've said here today,

10    you're not rendering any independent opinions with

11    respect to Humana; is that accurate?

12    A    That is correct.

13    Q    Let me just ask you a little bit here about

14    the timeliness and sequence of referral, the opinions

15    which you're going to render.  Specifically what is it

16    that is your opinion with respect to that issue?

17    A    Dr. Sees was aware as early as October 14th

18    that this comparatively young lady had an aggressive

19   breast cancer that required an oncology evaluation,

20   oncology refer, that has not even materialized until

21   sometime early December, which was an unnecessary delay,

                            70

1   really.  That referral being made earlier, of course,

2   the oncologist would have started to look for the

3   hormone receptor studies.  They would have been

4   available earlier.  He would have been able to give his

5   recommendations.  Treatment could have been started and

6   then it would have been simply been picked up in England

7   when Ms. Pollard went there.

8      Q   You, in response to an earlier question,

9   indicated that your number of cases in which you've

10   rendered testimony totals 24 to 25.  What I would like

11   to do is ask you the window of time, maybe do it for

12   about last five years on average, what do you think the

13   number of times have been that you testified either in

14   deposition or in court?

15      A   The past two years I have appeared in court

16   once.  And this is shaping up as a horrible year.  This

17   is already my fifth deposition.  Last year I may have

18   had three.

19      Q   So this year, five, the year 2002 you think

20    maybe three, so that would be almost a third of the

21    total number that you recall giving over the span of

71

1    your experience in rendering testimony.

2        Do you know when you began to render testimony

3    in the capacity as an expert addressing standard of care

4    issues?

5    A    About 20 years ago.

6    Q    So if you did about a third of all your

7    testimony in the last 15 months or so, can you tell me

8    how much testimony was in the last five years?

9    A    It would be, in a typical year, over the past

10    20, it was as many as three and as few as none.  These

11    cases, for some reason, I might get a pile of records

12    and nothing happens for three years and then there is a

13    deposition tomorrow.

14    Q    When you reviewed all the material you

15    identified earlier, did you make any notes or any

16    summaries on a computer or anything like that?

17    A    I did not.  I do not keep records.

18    Q    Did you author any type of document, whether

19    in a computer or letter or any correspondence of any

20    nature to Mr. Klores or Ms. Zork with respect to your

21    services in this case?

72

1    A    I did not take a pen and put any marks on any

2    piece of paper concerning this case to this moment.

3    Q    Have you done any billings?

4    A    No, I have not.

5    Q    The MEDLINE search that you did yesterday,

6    what is -- you did two separate searches?  Is that fair

7    to say?  Or was it one search?

8    A    I spent most of my yesterday going through

9    these papers.  I got on the computer several times.  I

10    went on MEDLINE several times.  I looked at several

11    articles.  It's --

12    Q    Tell me what you recall being the searches?

13    What is it you put in to search?

14    A    There are search engines that are available to

15    physicians and this one is called "Doctors' Net Access,"

16    which allows me to get on MEDLINE search.  I can put in

17    certain key words and ask for the computer to look for

18    those and then give me the abstracts of the articles

19    that match that description.  Sometimes it comes back

20    and says that we didn't find anything or sometimes it

21    comes back with literally 30,000 responses if I put in

73

1    something as broad as breast cancer.  So you refine your

2    search.  You go again.  You look at the abstracts if you

3    like them.  Some of those are available free.  So you

4    click on it and then you get the whole thing.  Some of

5    those require money, in which case you move on.

6        Q     Did you look at either of the articles that

7    you presented here today, the abstracts that you

8    presented here today?

9        A     I wouldn't have been able to.  It was Sunday

10    when I found these and then I came here this morning.

11        Q     So you haven't looked at the articles at this

12    time, just the abstracts?

13        A     That is correct.

14        Q     I'm a little confused about the race issue.

15    Is it your opinion that there have been peer-reviewed

16    articles addressing studies which have concluded that

17    race, because of tumor findings, result in different

18    cure or survival rates in breast cancer?

19        A     Well, as we talked about earlier, the

20    statistics that are available in many different cancers,

21    including breast cancer, that as a group,

74

1   African-Americans are discovered with far less of the

2   disease and they have poorer outcomes.

3       Q    Yes, but that's not because of the tumor

4   characteristic; isn't that correct?

5       A    That's correct.

6       Q    That's why I narrowed my question to tumor

7   characteristics having a conclusion that race plays a

8   role in survival or recurrence.

9       A    Correct.  And that's why this article is just

10  meaning the hypothesis that there may be tumor

11  characteristics that explain the observation.

12      Q    But even as of 2003 you're not aware of any

13  study that's been able to actually answer that question

14  as it pertains to tumor characteristics and race?

15      A    Right.  And I don't think that had Ms. Pollard

16  been white, that would have made a major decision

17  whether to give chemotherapy or not.  We're speaking of

18  small pieces of a large puzzle.

19      Q    That's what confused me when you put race into

20  the picture when you were discussing that early on.

21          If you assume the following with respect to

75

1   Dr. Gupta's care in this case, that when he first saw

2    Ms. Pollard, he deemed it prudent to obtain the hormone

3    receptor studies before providing her his completed

4    opinion as to his therapy regimen, and then on that

5    date, December 15th I think it is, communicated to her,

6    so now we're about three weeks, three and a half weeks

7    postsurgical treatment for the breast cancer, which I

8    think was lumpectomy November 20th --

9         MS. ZORK:  November 12th.

10    Q    I'm sorry.  November 12th.

11    A    Around a month.

12    Q    Right around a month.  -- and he says to her

13    on that day that he recommends that she receive

14    chemotherapy, he describes the appropriate chemotherapy

15    protocol, which would then be followed with radiation

16    therapy, and he recommends that that be instituted, and

17    he is also aware she leaves the country, or to his

18    understanding, leaves the state of Georgia the next day,

19    but he communicates what is necessary and needs to be

20    done and has a conversation with personnel who are

21    arranging healthcare providers for her to consult in

76

1    England, has he breached the standard of care?

2         MS. ZORK:  This is a hypothetical?

3      MS. HANRAHAN:  Yes.

4      THE WITNESS:  If he had made reliable

5    arrangements that this will be in fact performed – this

6    is not so, if a recommendation, you go out there, you

7    find a doctor or whatever -- if he has made arrangements

8    aligned without any doubt, then he would not have

9    breached the standard of care.

10    Q    Let me address the arrangements.  We're

11    dealing now with the United States military system and

12    not a private physician who can contact another

13    physician.  If in fact he has spoken with the person in

14    charge of coordinating healthcare for United States

15    dependents or military personnel overseas and

16    understands that coordination is occurring and they are

17    obtaining oncology care for her upon arrival in a

18    foreign land and he understands that to have been in

19    place, do you have an opinion whether he has conformed

20    with the standard of care?

21    A    If these all have been arranged and they are

77

1    followed up, then he would have complied with the

2    standard of care.  It would have made it significantly

3    simpler to start the treatment or perhaps have her stay

4    in this country, of course.  But barring that, if the

5    proper arrangements are made.

6    Q    He can communicate when his opinion is the

7    appropriate regimen for her care and advise the system

8    within which he is working that that is the appropriate

9    regimen.  But are you rendering an opinion that he

10   breaches the standard of care if an independent source

11   says no, I disagree, and this is what I'm going to

12   recommend to you Ms. Pollard, choose what you prefer?

13   A    Well, it is -- it happens surprisingly often

14   that different doctors give different opinions in the

15   same situation.  What it usually causes is a discussion

16   between the two different doctors to basically work out

17   their differences, perhaps explaining to each other why

18   did they make this opposing recommendations.  And

19   ideally, they also communicate it to the patient in a

20   clear manner, so the patient can say, wait a minute,

21   something is wrong here, how come the two of you are

78

1    giving me different opinions. So it does require some

2    kind of communication rather than just saying that we do

3    things differently in this country, you ain't getting

4    it.

5     Q     But if there is a communication and yet the

6     one person who has a difference in opinion is going to

7     hold that opinion, which I'm sure you encounter in

8     oncology frequently, you're not necessarily going to

9     change somebody else's oncology opinion, do you breach

10     the standard of care when that subsequent healthcare

11     provider becomes the treating physician and chooses and

12     the patient accepts a treatment regimen that is

13     different from what you recommended?

14          MS. ZORK:  I'm going to object to the form of

15     the question.

16     Q     You may answer.

17          MS. ZORK:  And I think he has already answered

18     that question in his previous answer.

19          THE WITNESS:  It really depends on how

20     strongly the doctor feels about the situation.

21     Dr. Gupta made a proper recommendation, somebody else

79

1     5000 miles away overrides his recommendation, thus he

2     shrugs his shoulder and say I don't care, that's not

3     right.

4     Q     So in your experience when you've had patients

5     who have left your care where you haven't had the

6    opportunity to initiate it, they've gone to California,

7    in your opinion it is your duty in order to comply with

8    the standard of care to follow-up with whoever they

9    choose to consult with to make certain that that

10    oncologist has followed your recommendation?

11        A    We communicated why he isn't, maybe I was

12    wrong, but we should communicate.

13        Q    But that's your duty?

14        A    If I find out about it and my patient is

15    following a recommendation that's not correct by my

16    opinion, it is my duty.

17            MS. HANRAHAN:  That's all I have.

18            MS. CERNIGLIA-LOWENSEN:  Just a couple in

19    follow-up.

20    EXAMINATION BY MS. CERNIGLIA-LOWENSEN:

21        Q    When did Dr. Gupta find out that the

                                80

1    recommendations were not being followed in England, if

2    you know?

3        A    I do not know.

4        Q    Doctor, I notice on your MEDLINE search that

5    you have -- at the bottom it says "A: Pollard 1, files."

6    You saved these on floppy disks?

7     A    Yes.

8     Q    Are there any other MEDLINE articles that you

9    saved on those floppy disks?

10     A    I have other MEDLINE articles on the floppy

11    disks, that's correct.

12     Q    Are they in relationship to the Pollard case?

13     A    One of them may be.

14     Q    I would ask that anything that is on that disk

15    that is part of this case, if you can provide that to

16    Ms. Zork and she can forward it to us.

17     A    I'll be happy to.

18        MS. CERNIGLIA-LOWENSEN:  Thank you.  Nothing

19    else.

20        MR. ADAMS:  I have nothing else.

21        MS. ZORK:  No questions.


                            81

1        THE WITNESS:  Thank you.

2        MS. ZORK:  I think read.  Do you want to read?

3        THE WITNESS:  I love reading.

4

5        (These proceedings concluded at 12:30 p.m.)