IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| VERONICA POLLARD, et al., | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| v. | ) CA No. S-02-CV-764 |
| | ) Judge Quarles |
| THE UNITED STATES OF AMERICA | ) |
| | ) |
| Defendant | ) |

**MEMORANDUM IN PLAINTIFFS' OPPOSITION TO DEFENDANT UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs through reference hereby adopt and incorporate the Memoranda in Support of Plaintiffs' Opposition to the Motions for Summary Judgement filed by Defendants, Raj Gupta, M.D., Sterling Medical Corporation and Humana Military Healthcare, Inc., in opposing the United States's Motion for Summary Judgment.

## I. UNDISPUTED FACTS

Raj Gupta, M.D. graduated from medical school in India. He came to the United States in 1981, and completed a residency in Internal Medicine in 1984. He completed a fellowship in Medical Oncology in 1986. From 1987-1989 Dr. Gupta was employed as a staff physician at a Veteran's Hospital in Montgomery, Alabama. (See Exhibit 1, Gupta CV) In 1990, Dr. Gupta was hired as an oncologist at Eisenhower Army Medical Center. He was hired through Sterling Medical Corporation, an Ohio based corporation that hired physicians, nurses and other support staff for military hospitals. (Exhibit 2, Gupta Deposition, p. 132)

In 1996, Humana Military Healthcare Inc., was awarded a contract by the United States Department of Defense to manage delivery of healthcare services in the entire Southeast region of the country to beneficiaries of the Civilian Health and Medical Program of the Uniformed

Services (CHAMPUS) pursuant to the TRICARE program. (See Defendant Humana's Motion for Summary Judgment, p. 4) Eisenhower Army Medical Center ("Eisenhower") was in that region. In 1996, Humana hired Sterling Medical Corporation as its a sub-contractor to provide oncology services at Eisenhower. Sterling, in turn, hired Dr. Gupta pursuant to the terms of its contract with Humana. While there may have been changes in contractors and sub-contractors between 1990 and 1998, Dr. Gupta's duties and responsibilities at Eisenhower remained essentially the same. The contracts that ultimately governed the terms of Dr. Gupta's employment at Eisenhower in 1998, are attached as exhibits to Defendant Humana Military Healthcare Services, Inc.'s Motion for Summary Judgment. (See Defendant Humana's Exhibits 8, 9, 10 and 11). Dr. Gupta testified at his deposition that he had "several employers, Sterling Medical Corporation, Humana Corporation, and government of the USA." (Exhibit 2, p. 133-34)

In December of 1998, Dr. Gupta was one of three oncologists in the department at Eisenhower. (Exhibit 3, Fink Deposition, p.7) The other two members were in the Army Medical Corp. Dr. Fink, was Chief of the department. The department was located on the 8th floor of the hospital. Id., p. 8. Both outpatients and inpatients were treated in this location. Id., p. 9. Dr. Gupta saw patients in the department at Eisenhower, exclusively. He had no other office or practice. Id., pp. 9-10.

As Chief of the oncology department Dr. Fink had the responsibility of supervising and overseeing the quality of the care that Dr. Gupta provided to patients in the department. Id., p. 19. Dr. Fink was also responsible for renewing Dr. Gupta's credentials. Id., p. 18. According to Dr. Fink, this involved,

> checking off that [Dr. Gupta] is still performing all the duties as

> we see fit for an oncologist. . . . They include things such as prescribing chemotherapy and seeing oncology patients. Those are included in his privileges. I then okay those, and say, yes, he is performing these duties properly. And then there is also a portion where I determine that he's using medications correctly and using all the aspects of his responsibilities as a staff physician correctly."

(Exhibit 3, p. 18)

Dr. Gupta was required to attend regular departmental meetings where patient care issues were discussed. Id., p. 46. Dr. Fink was also solely responsible for assigning which patients would see Dr. Gupta, and for assigning Dr. Gupta's work schedule. Id., p. 46-47. Dr. Fink also had the authority to institute disciplinary action against Dr. Gupta if warranted. Id., p. 54.

Humana's contract with Eisenhower to provide oncology services in is contained in Exhibit 11, of defendant Humana's Motion for Summary Judgment. Attachment C of this contract, entitled "Oncology Statement of Work" is a 12 page, single-spaced document that contains detailed requirements of the Eisenhower Army Medical Center that governed Dr. Gupta's employment at Eisenhower. The "Oncology Statement of Work" is attached as Exhibit 4.

It is clear from this "Statement of Work," that the Government exercised day-to-day control of Dr. Gupta's work in the oncology department. The government controlled the days, hours and location of Dr. Gupta's work, patient assignments, and how he was required to dress. The government directed and controlled significant aspects of patient care that Dr. Gupta

provided. Section C. 5. of the "Oncology Statement of Work" directed when Dr. Gupta was required to perform rounds on patients who were admitted to the hospital. Dr. Gupta was required to "request diagnostic tests as medically indicated;" "render a diagnosis for each patient;" "provide indicated treatment for each patient;" in complex or distress cases, provide medical care, summon the appropriate specialists when deemed necessary, and continue medical management as necessary;" "prescribe and dispense medications as indicated by the diagnosis and medical condition;" "use and be guided by the EAMC formulary and associated regulations/policies/procedures;" "provide immediate definitive medical care to reduce any emergency situation and enable the patient to continue care as an outpatient with follow-up care as required;" "follow DoD, US Army, and EAMC regulations and policies . . . when arranging for referrals and consults;" refer stable patients to specialty clinics at EAMC as required; "a decision and disposition shall be made and recorded on the appropriate form as to whether to send the patient home, to full duty, to quarters, or to refer the patient to a consultant;" "the patient shall be provided with complete and appropriate instructions on the form, and verbally, regarding medication, limitations, and follow-up plans;" "provide and document medical advice to patients by telephone as appropriate and in accordance with EAMC protocol;" "attend the type and estimated quantity of medical and administrative meetings as designated by the Chief." In addition, Dr. Gupta was required to obtain permission from the EAMC Commander before prescribing drugs not that were not on the list of drugs available in the hospital pharmacy. The EAMC Commander also had the right to impose prescribing limitations on certain drugs in the pharmacy and Dr. Gupta would be bound by that restriction.

## II. ANALYSIS

The Federal Tort Claims Act is a limited waiver of sovereign immunity that makes the United States liable for certain torts of federal employees acting within the scope of their employment. See United States v. Orleans, 425 U.S. at 813. It applies only to "officers or employees of any federal agency, members of the military or naval forces of the United States . . . . and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." 28 U.S.C. §2671. The FTCA's definition of "employee" does not extend to independent contractors or their employees. See 28 U..C. §2671; United States v. Orleans, 425 U.S. at 813-14; Logue v. United States, 412 U.S. 521, 527-28 (1973). "Because the United States is not liable for the acts or omissions of independent contractors, sovereign immunity has not been waived; and the doctrine therefore operates to bar suits against the United States" for the conduct of such independent contractors. Williams v. United States, 50 F.3d 299, 305 (4th Cir. 1995). The government maintains that Dr. Gupta was an employee of an independent contractor, Sterling Medical Corporation, not an employee of the Eisenhower Army Medical Center.

In distinguishing between an employee of the United States and an independent contractor, or an employee of an independent contractor, a critical factor is "the power of the Federal Government 'to control the detailed physical performance of the contractor.'" United States v. Orleans, 425 U.S. at 814, quoting Logue v. United States, 412 U.S. at 528. See Rodriguez v. Sarabyn, 129 F.3d at 764; Lilly v. Fieldstone, 876 F.2d 857, 859-60 (10th Cir. 1989). The question of control is by its nature fact-specific. In this case, it requires the Court to examine the nature and extent of Dr. Gupta's day-to-day supervision by government personnel. See United States v. Orleans, 425 U.S. at 815.

In considering whether the government controlled and supervised Dr. Gupta's day-to-day performance of his duties at Eisenhower, the Court must examine the realities of Dr. Gupta's position to discern whether the government controlled the result of Dr. Gupta's work and the manner and method in which he achieved that result. See United States v. Orleans, 425 U.S. at 814; Logue v. Unite States, 412 U.S. at 528; Rodriquez c. Sarabyn, 129 F.3d at 764' Lilly v. Fieldstone, 876 F.2d at 859-60. The deposition testimony of Dr. Gupta and Dr. Fink, and "Oncology Statement of Work"convincingly demonstrate that level of control over Dr. Gupta's work by U.S. Army medical personnel at Eisenhower, that he qualifies as a federal employee within the meaning of the FTCA, and the government should be held liable for his actions.

When considering whether the government has sufficient day-to-day control over an individual defendant the Court should look to both the terms of the contract, and whether there is actual supervision of the day-to-day work. See e.g., Wood v. Standard Products Company, Inc., 671 F.2d 825, 829 (4th Cir. 1982); Limo v. United States, 852 F.Supp. 50, 53 (D.D.C. 1994). Relying on Orleans and Logue, the court in Wood found that "the contract and its terms in fixing the relationship of the offending party are critical." Wood v. Standard Products Company, Inc., 671 F.2d at 829. See also Alexander v. United States, 605 F.2d 828, 833 (5th Cir.1979) (relying on explicitly terms of contract that assigned sole responsibility for safety of work site to contracting party, not to the United States, in finding party to be independent contractor.) The fact that a contract exists and even its language are "not dispositive." Brooks v. A.R. & S. Enterprises, Inc., 622 F.2d 8, 11 (1st Cir. 1980). The Court must still look to whether the United States "actually supervises the 'day-to-day operations' of the endeavor." Williams v. United States, 50 F.3d at 306. See Strangi v. United States, 211 F.2d, 305, 307 (5th

Cir. 1954) (in distinguishing between government employee and independent contractor, no single factor – including the terms of the written contract – control, but rather the distinction "lies largely in the degree of control or right of control retained by the employer over the details of he work as it is being performed. . ."); Berkman v. United States, 957 F.2d 108, 113-14 (4th Cir. 1992)(where a contract exists, the court still "must consider whether the government exercises day-to-day control over the performance of the work under the contract.").

**Control and Supervision of Dr. Gupta**

The contract that governed Dr. Gupta's employment in the oncology department at Eisenhower and the testimony of Dr. Fink, plainly demonstrate that the United States had sufficient control of Dr. Gupta in the day-to-day performance of his duties to hold the government liable under the FTCA. Dr. Fink testified that he supervised and oversaw the quality of the care that Dr. Gupta provided to patients in the department to ensure that Dr. Gupta performed "all aspects of his responsibilities as a physician correctly." (Exhibit 3, p. 18-19) This included determining whether Dr. Gupta was using medications correctly, prescribing chemotherapy, and seeing oncology patients. Id. Dr. Fink also had the authority to institute disciplinary action against Dr. Gupta, id., p. 54, dictated Dr. Gupta's work schedule, and made patient assignments. As set forth above, the manner and method that Dr. Gupta was required to adhere to in providing patient care, was dictated in excruciating detail in "The Oncology Work Statement." (Exhibit 4). It is clear from the dictates of this contract that Dr. Gupta did not operate wholly independently in providing oncology services to the patients whom he saw at Eisenhower. It is also clear that Dr. Gupta was supervised on the administrative substantive and technical aspects of his work, and that supervision of his work was not limited to quality

control aimed simply at assuring compliance with goals, standards or contractual obligations.

In this case, it undisputed that Dr. Gupta was acting within the scope of his employment when the alleged negligence occurred. Accordingly, for the above reasons the Court should find that Dr. Gupta was an employee of the United States.[1]

**III. THE UNITED STATES IS NOT ENTITLED TO SUMMARY <u>JUDGMENT BASED STEPHEN ADAMS, M.D.'S NEGLIGENCE</u>**

The United States is not entitled to Summary Judgment regardless of whether Dr. Gupta was an independent contractor. Liability in this case is shared by Stephen Adams, M.D., the pathologist at Eisenhower who under-reported and misread the pathology specimens, and delayed obtaining important pathologic studies for over two months.

Dr. Adams erroneously reported that the tumor that was removed from Mrs. Pollard's breast on October 14, 1998, was .5 cm in size, when in fact it was 1.1 cm in greatest dimension. This difference in size had important significance in determining the appropriate adjuvant treatment. Dr. Adams's reporting of the characteristics of the tumor was also confusing and misleading, and gave the mis-impression that the tumor had more favorable prognostic features than in reality it had. This too had serious implications in determining the appropriate adjuvant treatment. Finally, the two-month delay in obtaining pathologic studies contributed significantly to the failure to provide Mrs. Pollard with timely and appropriate adjuvant

---

[1] On January 26, 2004, plaintiffs filed a Motion to Compel the United States of America to produce a witness, pursuant to Fed. Civ. Pro. Rule 30(b)(6), to testify on the matters that were set forth in plaintiffs' Notice of Deposition, relating to the terms of contracts that were in effect in 1998, on issues related to, among other things, provision of health care services to members of the military and their families, and control of healthcare. Plaintiffs respectfully request the right to supplement this Opposition with any additional relevant information that may be obtained.

treatment of her breast cancer before she went to England.

The United States does not dispute that Dr. Adams was an employee of the Amy Medical Corp, acting within the scope of his employment during that time. Nor does the United States challenge the fact that plaintiffs have established a *prima facie* case against Dr. Adams for negligence.

**IV. CONCLUSION**

For the above reasons, plaintiffs respectfully request that Defendant, United States of America's Motion for Summary Judgment be denied.

Respectfully submitted,

BRUCE J. KLORES & ASSOCIATES, P.C.

By:______________________
Lesley S. Zork
Bruce J. Klores
915 15th Street, NW
Washington, D.C. 20005
(202) 628-8100
Co-counsel for Plaintiffs

and

LAW OFFICES OF PETER MASCIOLA

______________________
Peter R. Masciola
601 Pennsylvania Avenue, N. W. #900
Washington, D.C. 20004
202-628-5680
Co-counsel for Plaintiffs