(Pages 1 to 4)

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

VERONICA POLLARD, et al.   *

    Plaintiffs   *

                *   Civil Action
   v.   *
                *   No. S-02-764

UNITED STATES OF AMERICA   *

    Defendant   *

        * * * * * * * * *

Pursuant to Notice, the deposition of RAJ R. GUPTA, M.D. was taken on Friday, March 21st, 2003, commencing at 1:07 p.m., at the law offices of Morgan, Shelsby, Carlo, Downs & Everton, 4 North Park Drive, Suite 404, Hunt Valley, Maryland 21030-1876, before Sharon A. Beaty, Notary Public.

Reported by: Sharon A. Beaty, CSR

## Page 2

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:
   BRUCE J. KLORES, ESQUIRE
   LESLEY ZORK, ESQUIRE
   Bruce J. Klores & Associates, P.C.
   915 15th Street N.W., 3rd Floor
   Washington, D.C. 20005
   Telephone: 202-628-8100
   Fax: 202-628-1240

ON BEHALF OF DEFENDANT
   UNITED STATES OF AMERICA:
   LARRY D. ADAMS, ESQUIRE
   U.S. Department of Justice
   United States Courthouse
   101 West Lombard Street
   Baltimore, Maryland 21201-2692
   Telephone: 410-209-4801
   Fax: 410-962-2310

ON BEHALF OF DEFENDANT HUMANA MILITARY
   HEALTH CARE SYSTEMS, INC.:
   CATHERINE A. HANRAHAN, ESQUIRE
   Wilson, Elser, Moskowitz,
     Edelman & Dicker, LLP
   The Colorado Building, Suite 500
   1341 G Street N.W., 5th Floor
   Washington, D.C. 20005
   Telephone: 202-626-7660
   Fax: 202-628-3606

## Page 3

APPEARANCES, continued:

ON BEHALF OF THE DEPONENT:
   JOAN CERNIGLIA-LOWENSEN, ESQUIRE
   Morgan, Shelsby, Carlo, Downs & Everton
   4 North Park Drive, Suite 404
   Hunt Valley, Maryland 21030-1876
   Telephone: 410-584-2800
   Fax: 410-584-2020

COPY

## Page 4

| INDEX | PAGE |
|---|---|
| WITNESS: | |
| Raj R. Gupta, M.D. | |
| EXAMINATION: | |
| By Mr. Klores | 6 |
| EXHIBITS: (Attached.) | |
| 1 Shared Decision Making | 88 |
| 2 Areas of Controversy in the Adjuvant Systemic Therapy of Endocrine - Nonresponsive Breast Cancer | 147 |
| 3 NIH Consensus Development Conference: Adjuvant Therapy for Breast Cancer | 147 |
| 4 Breast Cancer: Detection of Small Tumors Creates New Controversies | 147 |
| 5 Adjuvant Therapy for Breast Cancer: Practice Patterns of Community Physicians | 147 |
| 6 Adjuvant Therapy for All Patients With Breast Cancer | 147 |
| 7 Prognosis and Treatment of Patients With Breast Tumors of One Centimeter or Less and Negative Axillary Lymph Nodes | 147 |
| 8 Determining Which Breast Cancer Patients Can Skip Chemo | 147 |
| 9 Preferred Chemotherapy Regimens for Recurrent or Metastatic Breast | 147 |

**Page 129**

1  A   I asked her about this program and that
2  I'm a provider and whose obligation it is, whose
3  responsibility it is, and she said it's the
4  soldier's responsibility.
5      MS. ZORK: I'm sorry, it was what?
6      THE WITNESS: Soldier's responsibility
7  to enroll.
8  Q   Did you ask her whether the provider
9  could enroll a soldier?
10 A   No, I don't think so.
11 Q   Okay. Well, I guess the question is no
12 one has ever told you that you could not raise the
13 discussion with the patient, right? I mean you
14 understood, you understand that there was nothing
15 prohibiting you from raising the concept --
16     MR. ADAMS: Objection.
17 Q   -- of enrolling in this Exceptional
18 Family Program with a patient, right?
19     MR. ADAMS: Objection.
20     MS. CERNIGLIA-LOWENSEN: Objection.
21 A   That's not true. Some patients that I
22 have followed have enrolled in this program.

**Page 130**

1  Q   What I'm saying is did you understand
2  that you were prohibited from discussing this with
3  a patient?
4      MR. ADAMS: Objection.
5      MS. CERNIGLIA-LOWENSEN: Bringing it up
6  first?
7      MR. KLORES: Bringing it up.
8      MS. ZORK: Recommending.
9  A   I'm not prohibited against recommending
10 it.
11 Q   Okay.
12     When you talked to Mrs. Brown and Dr.
13 Fink, you know Dr. Fink knew about the case, right?
14 A   I found out he knew, yes.
15 Q   And then you talked -- did you tell
16 Mrs. Brown what case you were talking about?
17 A   No.
18 Q   Have you ever -- do you know whether or
19 not Mr. -- Mrs. Pollard or Sergeant Pollard ever
20 enrolled in this program?
21 A   I don't know.
22 Q   Have you ever seen any documents to

**Page 131**

1  suggest that they did enroll in the program?
2  A   I have not.
3  Q   But no one ever contacted you about them
4  and the program?
5  A   No.
6      MR. KLORES: Okay. Just give me a
7  minute.
8      (Pause in the proceedings.)
9  Q   Let me ask you a few questions about
10 Sterling. Have you ever heard of them?
11 A   Sterling Medical Corporation, yes.
12 Q   So where were you in 1989?
13 A   I was working in a Veterans Hospital in
14 Montgomery, Alabama.
15 Q   Were you an employee of the United
16 States at that point?
17 A   Yes.
18 Q   So you were a staff physician at the VA
19 Hospital?
20 A   Yes.
21 Q   Paid by the United States?
22 A   Yes.

**Page 132**

1  Q   And then you changed jobs in 1990,
2  right?
3  A   Correct.
4  Q   And what were you looking to do at that
5  point in time?
6  A   What was I looking to do? I was looking
7  forward to practicing oncology.
8  Q   I mean were you trying to move out of
9  Alabama? What was your career intention? Why did
10 you change?
11 A   I was not happy with my situation over
12 there, I was doing a lot of internal medicine and I
13 was spending a lot of hours doing night duty in the
14 hospital.
15 Q   So how did you find out about the
16 opening in Dwight Eisenhower?
17 A   Sterling contacted me.
18 Q   Sterling. And who is Sterling or what
19 is Sterling?
20 A   It's a medical corporation based in
21 Cincinnati and they hire physicians and nurses and
22 other support staff for the military hospitals.

**Page 133**

1  Q  Were they known to you before this time?
2  A  No.
3  Q  So who -- they called you or wrote to
4  you?
5  A  First contact was by call.
6  Q  And what did they say?
7  A  They said they have an opportunity for
8  oncology, for this practice, and if I would be
9  interested.
10  Q  And what was the practice, staff
11  hematologist/oncologist at Dwight Eisenhower?
12  A  Yes.
13  Q  And you signed a contract with Sterling?
14  A  Yes.
15  Q  Did you also sign any contracts with the
16  military or the United States government?
17  A  I applied for the hospital privileges
18  but I don't remember ever signing any contract.
19  Q  Okay. So who do you understand your
20  employer to be, if any, from 1990 onwards?
21  A  I have several employers, Sterling
22  Medical Corporation, Humana Corporation and

**Page 134**

1  government of USA.
2  Q  The government of the USA; that's what
3  you said, right?
4  A  Right.
5  Q  On your report of December 16th you
6  write that her ER and PR were negative, right?
7  A  Right.
8  Q  And what does that mean with respect to
9  the efficacy of chemotherapy?
10  A  That means those are the receptors,
11  estrogen and progesterone receptors that were
12  negative, it means that use of any anti-hormonal
13  treatment would not be effective. As in regards to
14  chemo, I don't think it means whether or not chemo
15  would be less or more effective.
16  Q  Well, it's, the fact that the ER and PR
17  are negative mean that she is less likely to
18  benefit from tamoxifen, which is another type of
19  adjuvant therapy, right?
20  A  Right.
21  Q  And the studies being negative would be
22  one additional reason to recommend chemotherapy,

**Page 135**

1  right?
2  A  Right.
3  Q  Your recommendation for tamoxifen then
4  was based upon what?
5  A  My recommendation for tamoxifen was
6  strictly for preventive use. She had a strong
7  family history of breast cancer and she was, she
8  was at a high risk of developing a new breast
9  cancer, and tamoxifen was to help prevent or lower
10  the risk of a new breast cancer.
11  Q  Was there any scientific support in 1998
12  that tamoxifen would increase survival in the
13  literature in a patient such as Mrs. Pollard?
14  A  There is scientific evidence back in
15  1998 that tamoxifen would be helpful in lowering
16  the development of new breast cancers.
17  Q  And when would the tamoxifen start?
18  After the chemotherapy was over?
19  A  Normally, yes.
20  Q  Have you brought any other documents
21  with you today in response to the notice of
22  deposition that you haven't already identified?

**Page 136**

1  (Documents tendered.)
2  Q  Just your medical, your board
3  certification in medical oncology and internal
4  medicine, your license to practice in Georgia. All
5  right. And that stack of records that you have,
6  and this article, the NIH consensus of January
7  31st, 2002?
8  MS. CERNIGLIA-LOWENSEN: What the doctor
9  has in front of him, these records, and you're
10  welcome to look through them, I mailed you all a
11  packet. That is the records that he sent to me
12  initially before I got the records from Larry. I
13  suspect most of them, if not all of them, are
14  copies of what you already have, but you're welcome
15  to look through them.
16  MR. KLORES: Okay. Thank you.
17  Q  Yeah, you know, that's a good point
18  here. You received a letter from somebody in
19  England, right? Do you remember that? In this
20  case, I don't mean in life.
21  A  I was wondering. No, I don't remember.
22  Q  Okay. So the form that you were talking