1

```
 1            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2

 3
     VERONICA POLLARD, et al.,    )
 4                                )
                    Plaintiffs,   )
 5                                )CIVIL ACTION
          vs.                     )
 6                                )FILE NO. S-02-CV-764
     THE UNITED STATES OF         )
 7   AMERICA,                     )
                                  )
 8                  Defendant.    )

 9

10

11                    DEPOSITION OF

12            KENNETH I. FINK, M.D.

13

14                  November 24, 2003

15                     10:20 a.m.

16

17     Dwight David Eisenhower Army Medical Center

18          11th Floor, 300 Hospital Road

19               Augusta, Georgia

20
          Regina W. Hollis , CCR B-2306, RPR
21

22

23

24

25
```

2

```
 1                    APPEARANCES OF COUNSEL

 2

 3    On behalf of the Plaintiffs:

 4        LESLEY S. ZORK, Esq.
          Bruce J. Klores & Associates
 5        Suite 300
          915 15th Street, N.W.
 6        Washington, District of Columbia  20005

 7    On behalf of the Defendant, The United States of
      America:
 8
          LARRY D. ADAMS, Esq.
 9        Assistant United States Courthouse
          6625 United States Courthouse
10        101 West Lombard Street
          Baltimore, Maryland  21201
11
      On behalf of the Defendant, Raj R. Gupta, M.D. and
12    Sterling Medical Corporation:

13        JOAN CERNIGLIA-LOWENSEN, Esq.
          Morgan, Shelsby, Carlo, Downs & Everton
14        4 North Park Drive
          Suite 404
15        Hunt Valley, Maryland  21030-1876

16    On behalf of the Defendant, Humana Military Health
      System:
17
          CATHERINE A. HANRAHAN, Esq.
18        Wilson, Elser, Mokowitz, Edelman & Dicker
          1341 G. Street, N.W., Fifth Floor
19        Washington, District of Columbia 20005-3105

20

21

22

23

24

25
```

3

```
 1              (Reporter disclosure made pursuant to
 2         Article 8.B. of the Rules and Regulations
 3         of the Board of Court Reporting of the
 4         Judicial Council of Georgia.)
 5                   KENNETH I. FINK, M.D.,
 6    having been first duly sworn, was examined and
 7    testified as follows:
 8                   DIRECT EXAMINATION
 9    BY MS. ZORK:
10         Q.    Good morning, Dr. Fink.  This is Lesley
11    Zork.
12         A.    Good morning.
13         Q.    Would you please state your full name for
14    the record?
15         A.    Kenneth I. Fink.
16         Q.    And please tell us your residential and
17    special addresses.
18         A.    Residence, 4213 Riverside Drive, Evans,
19    Georgia 30809.  Professional, DDEAMC, Fort Gordon,
20    Georgia 30905.
21         Q.    Dr. Fink, have you had your deposition
22    taken before?
23         A.    No.
24         Q.    Have you ever testified as a witness in a
25    trial?
```

4

1          A.    No.

2          Q.    I am sure Mr. Adams has gone over some of

3     the procedural aspects of a deposition, but I'll just

4     quickly go over that again.  I am going to be asking

5     you some questions, and if at any time you don't

6     understand my question, please stop me and ask me to

7     repeat it or just let me know that you don't

8     understand the question, and I will try to rephrase

9     it.  And I just want to make sure that you understand

10    me and I understand -- you understand my question,

11    and I understand your answer.

12          We will also need to speak one at a time.

13    Even if you can anticipate what my question is going

14    to be, let me complete it so the court reporter can

15    get it down.  Do you understand that?

16          A.    Yes.

17          Q.    Okay.  What is your position at

18    Eisenhower?

19          A.    My position is Chief of

20    Hematology/Oncology.

21          Q.    How long have you had that position?

22          A.    I have been the chief for six years.

23          Q.    So, is that starting in 1997 you became

24    Chief of Hematology and Oncology?

25          A.    That's correct.

1      Q.    How long have you worked at Eisenhower?

2      A.    For nine years.  I arrived in July of '94.

3      Q.    What was your position when you arrived?

4      A.    I was a staff hematology/oncology doctor.

5      Q.    Are you a member of the military?

6      A.    Yes, I am.

7      Q.    Can you tell me what your current rank is?

8      A.    I am a Colonel O6.

9      Q.    Can you just give me -- first of all, do

10     you have a curriculum vitae?

11     A.    I do.

12     Q.    Do you have that with you?

13     A.    I don't.

14     Q.    Can you produce that and give a copy of

15     that to Mr. Adams so that he can distribute it to the

16     rest of us?

17     A.    Yes, I can.

18     Q.    Why don't you give me just a brief summary

19     of your educational background and training starting

20     with college and going through your medical training.

21     A.    I went to college at Brandeis University.

22     I graduated in '79.  I went to Eastern Virginia

23     Medical School in Norfolk.  I graduated in '82.  I

24     did an internship at Walter Reed and completed in

25     '83.  I did a residency in internal medicine at

6

1    Letterman Army Medical Center, San Francisco,

2    completed in '86.  And I completed a fellowship --

3    I'm sorry.  Completed the residency I guess in '86,

4    and then I did a fellowship from '89 to '92, a

5    combined program between Letterman and UCSF in San

6    Francisco, combined hematology/oncology.  And that

7    was the end of my training.

8        Q.    Are you board certified in any

9    subspecialties of medicine?

10        A.    Yes.  Oncology and hematology.

11        Q.    Are you board certified in internal

12    medicine?

13        A.    Yes.

14        Q.    When were you board certified in internal

15    medicine, and when were you board certified in

16    hematology and oncology?

17        A.    Internal medicine '86, oncology '93,

18    hematology '94.

19        Q.    So, your training in oncology and

20    hematology, that was all in San Francisco?

21        A.    Yes.

22        Q.    Where did you work when you completed your

23    fellowship in '92?

24        A.    After I completed my fellowship in '92, I

25    had a position in the Army as a oncologist at Fort

1    Ord from '92 to '94.

2        Q.    That's Fort what?

3        A.    Fort Ord, Monterey, California.

4              MR. ADAMS:  O-R-D is Ord, Lesley.

5        Q.    (By Ms. Zork) And then from there you went

6    to Fort Gordon?

7        A.    Correct.

8        Q.    Currently at Eisenhower, how many

9    oncologists are there in the department?

10       A.    We have three oncologists in our

11   department.

12       Q.    And in 1998, how many oncologists were

13   there?

14       A.    Also three.

15       Q.    Have there been three oncologists in the

16   department throughout the time that you have

17   practiced at Eisenhower?

18       A.    No.  At times we have had as many as four,

19   and that position tends to rotate in and out.

20       Q.    And what determines whether or not there

21   is a fourth oncologist?

22       A.    We have something called the TDA. It is

23   how many slots are available at any given time, and

24   initially when I got here there were four positions.

25   We don't always fill all positions.  The workload

8

1    began to become a little bit less over the years that

2    I have been here.  So, now our positions are down to

3    three TDA slots.

4        Q.    In your department, is there anyone who is

5    in the department that specializes in one type of --

6    treatment of one type cancer or another?

7        A.    No.  We all treat equally between all the

8    different aspects of medical oncology.

9        Q.    Who are currently the members of the

10    department of oncology?

11        A.    Right now, myself, Dr. Raj Gupta and Dr.

12    Jeremy Perkins.

13        Q.    And who was in the department in 1998?

14        A.    As best I recall, it was Dr. Teresa

15    Coleman.

16        Q.    That would be you and Dr. Gupta and Dr.

17    Coleman?

18        A.    Correct.

19        Q.    Have you and Dr. Gupta been working

20    together in the department of hematology and oncology

21    since you began working at Eisenhower?

22        A.    Yes, we have.

23        Q.    Where is the department of oncology

24    located?

25        A.    The 8th floor of Eisenhower, ward 8 west.

```
 1          Q.     Are outpatient services or patients seen
 2     on an outpatient basis on the 8th floor as well?
 3          A.     Yes.
 4          Q.     And do you administer chemotherapy?
 5          A.     Yes.  We have a devoted chemotherapy room
 6     where we administer chemotherapy.
 7          Q.     Is that on the 8th floor as well?
 8          A.     Yes, it is part of our clinic.
 9          Q.     Did that hold -- was that the same
10     situation in 1998?
11          A.     Yes, it was.
12          Q.     Are radio therapy -- are radiation therapy
13     services also available at Eisenhower?
14          A.     No, they are not.
15          Q.     Patients, oncology patients requiring
16     radiation treatment, where do those patients obtain
17     treatment?
18          A.     We send our patients to an area in
19     Augusta, Georgia, called Georgia Radiation Center.
20     And we have an agreement with the -- with the group
21     out there for our patients to receive radiation.
22          Q.     Does Dr. Gupta see patients on -- strike
23     that.  I'm sorry.  Does Dr. Gupta see oncology
24     patients on the 8th floor as well?
25          A.     Yes, he does.
```

          1        Q.    To your knowledge, does Dr. Gupta have an

          2     office in any other location where he sees patients?

          3        A.    No, I am not aware of any other office

          4     that he has.

          5        Q.    In 1998, how were oncology patients

          6     assigned if there was -- if a referral was requested

          7     for a patient, such as Mrs. Pollard, who had surgery

          8     and been diagnosed with cancer, how would a patient

          9     such as Mrs. Pollard be assigned to an oncologist?

         10        A.    In 1998, whenever a patient, such as Mrs.

         11     Pollard, was referred, we preferentially had that

         12     patient see Dr. Gupta.  He is under a CHAMPUS

         13     contract which allows him to see patients who are

         14     CHAMPUS eligible.  So, we have all CHAMPUS eligible

         15     patients first come to see him.

         16        Q.    Why was that practiced?

         17        A.    His contract did not allow him to see any

         18     patients who were either on active duty or were of

         19     Medicare age.  And since many and most cancers are

         20     actually seen in the older population, myself and Dr.

         21     Coleman, at the time, were seeing most of the

         22     Medicare age patients.  Again, his contract did not

         23     allow him to see the Medicare patients.  Thus we had

         24     him see all the CHAMPUS eligible patients that he

         25     could.  We would try not to see the CHAMPUS patients,

1    unless there were other circumstances that required

2    us to see them.

3        Q.    And was that -- was the reason for what

4    you just said because of workloads?

5        A.    It could be from workload.  Generally his

6    clinic was pretty free to receive all patients of

7    CHAMPUS eligible -- CHAMPUS eligibility.

8        Q.    My question wasn't asked very well.  I

9    guess, the reason why -- what was the reason why you

10   and Dr. Coleman tried to stay away from CHAMPUS

11   eligible patients?

12       A.    Again, yes, our clinics were a bit busier

13   with the Medicare and the active duty age

14   populations.

15       Q.    Okay.  And can you tell me what would --

16   what types of patients that would be seen at

17   Eisenhower would be CHAMPUS eligible patients?

18       A.    Yeah.  All oncology diagnoses could fit

19   in, in the CHAMPUS eligible patient, and all the

20   common cancers that we see here are seen -- were seen

21   by Dr. Gupta, including breast cancer, colon cancer,

22   lung cancer, prostate cancer.  Those would the most

23   common.

24       Q.    I guess just to clarify.  I understand

25   active duty members were not CHAMPUS eligible?

1      A.    That's correct.

2      Q.    And what types of individuals would be

3  CHAMPUS eligible?

4      A.    I'm sorry.  Now I understand.  So,

5  dependents of active duty, such as their spouses or

6  their children or sometimes even their parents, and

7  then retirees, people who have retired from active

8  duty, who are under the age of 65.

9      Q.    Can you tell me -- I know you may not be

10  able to tell me precisely.  Can you give me a rough

11  idea of how many cancer patients are seen by the

12  oncology department on an annual basis?

13      A.    Yeah.  That would be a rough estimate is

14  all I could give you.

15      Q.    Sure.

16      A.    On average we have about 300 new cancer

17  cases per year at Eisenhower, based on our pathology

18  data.  Of those, we probably get referred about half

19  or more of those cases, depending on whether they

20  have a need for a medical oncologist.  So, my guess

21  would be an average about 150 new referrals per year.

22      Q.    In addition to that, then you also provide

23  follow-up for ongoing services for patients that you

24  have treated in the past?

25      A.    That's correct.  So, we have -- most of

1    our patients are patients already established and we

2    see in follow-up.

3        Q.    New referrals, roughly, I understand these

4    are -- just trying to get a general idea.  Roughly

5    what percentage of those new referrals a year are

6    breast cancer patients versus all other kinds of

7    cancer?

8        A.    Breast cancer may make up about one-third

9    or so of our new referrals.  So between, I would say,

10   30 to 50 new breast cancers per year.

11       Q.    Now, can you explain to me what CHAMPUS

12   is?

13       A.    Can I?  Yeah, only in general terms.

14       Q.    Okay.

15       A.    The CHAMPUS program is a way to authorize

16   care for civilians who are military beneficiaries,

17   and the CHAMPUS system -- in other words, we

18   guarantee the medical care for patients, for people

19   who are civilian.  Some of that CHAMPUS medical care

20   can be delivered either inside the medical treatment

21   facility, such as at Eisenhower, through a CHAMPUS

22   physician, or can also be -- CHAMPUS care can be

23   received outside of the military facility through a

24   CHAMPUS contractor in a civilian setting.

25       Q.    Was there any difference in how oncology

14

1    was practiced within your department based on whether

2    the patient was CHAMPUS versus whether they were

3    active duty or Medicare?

4        A.    No, no difference at all.

5            MR. ADAMS:  Lesley, if I can clarify.

6        I think CHAMPUS was the predecessor to what

7        is now Tricare, if I understand how it's

8        gone on.

9            MS. ZORK:  Let me ask the witness if

10       he knows that.

11       A.    My understanding, again, some of the

12   generals, that Tricare program is a part of CHAMPUS.

13   CHAMPUS eligibility, you must be CHAMPUS eligible in

14   order to be on Tricare.  So, the CHAMPUS program

15   still exists as a foundation, and then Tricare is the

16   specifics by which we deliver CHAMPUS care.

17       Q.    (By Ms. Zork)  Doctor, are you familiar

18   with Humana military -- Humana Military Health Care

19   Services?

20       A.    Yes, I am familiar with it.

21       Q.    What is that?

22       A.    Humana, again, my general understanding,

23   is it is a contractor for delivery of CHAMPUS care

24   through Tricare, that they won the contract to

25   deliver that care for the -- on behalf of the

15

1    military CHAMPUS beneficiary.

2        Q.    And you understand what the -- do you

3    understand anything about the nature of the contract

4    between Humana Military Health Care Services and the

5    Department of Defense?

6             MR. ADAMS:  Objection to the form.

7        If you understand, you may answer.

8        Q.    (By Ms. Zork)  Let me rephrase it.  Not to

9    interrupt you if you were getting ready to answer.  I

10   guess, are you familiar with the terms of the

11   contract between Humana Military Health Care Services

12   and the Department of Defense?

13       A.    No, I am not.

14       Q.    Are you familiar with the terms of any

15   contract between Humana Military Health Care Services

16   and Fort Gordon for oncology services?

17       A.    Only in the sense that they are -- they

18   did take on that contract to facilitate the hiring of

19   an oncologist at our request.

20       Q.    Were you involved in any of the

21   negotiations of the contract between Humana Military

22   and Fort Gordon?

23       A.    No, I wasn't.

24       Q.    Do you know what -- are you familiar with

25   Sterling Medical?

1          A.    Yes, I am.

2          Q.    How are you familiar with Sterling

3    Medical?

4          A.    Again, as the subcontractor who has picked

5    up the responsibility to hire the oncologists at

6    Eisenhower.

7          Q.    And how did you become familiar with

8    Sterling Medical?

9          A.    Sterling Medical has been a contractor at

10   Eisenhower for some time.  Their presence is pretty

11   well known here.  They have other contracts as well

12   with some of the nursing personnel, for example.

13         Q.    Have you ever had any dealings with anyone

14   from Sterling Medical with respect to any services

15   that they have provided?

16         A.    No.

17         Q.    Do you have any understanding -- are you

18   familiar -- let me ask it this way.  Are you familiar

19   with any contracts between Sterling and Fort Gordon

20   or Sterling and Humana?

21         A.    Not in any specific terms.  Only familiar

22   with the fact that they -- they carry out the

23   contract for hiring of the oncologist.

24         Q.    Does Sterling Medical have any medical

25   personnel who Dr. Gupta consults with?

1      A.    No, not that I'm aware of.

2      Q.    What is your understanding as to the

3   nature of Sterling Medical?  What type of a

4   corporation is it?

5      A.    My understanding, again, is not based on a

6   knowledge that I have ever looked at.  I just -- I am

7   aware that they are a contractor who can hire medical

8   personnel and deliver the personnel to the site

9   requested, as we did here at Eisenhower.

10     Q.    Was Dr. Gupta already working in the

11  oncology division at Eisenhower when you arrived?

12     A.    Yes.

13     Q.    So, did you have -- did you have anything

14  to -- did you have anything to do with hiring Dr.

15  Gupta or credentialing him?

16     A.    I had nothing to do with hiring him.

17  However, I do -- I do his credentials in terms of

18  reassessing his credentials when the credentials'

19  committee sends me his packet, which occurs about

20  every several years.

21     Q.    What is your role in the credentialing of

22  Dr. Gupta?

23     A.    I renew his credentials packet by checking

24  the privileges and checking off that he is still

25  performing all the duties as we see fit for an

```
 1    oncologist, and as he is also requesting, which he
 2    does have to re-request his privileges.  Usually a
 3    repeat of all the same privileges.  They include
 4    things such as prescribing chemotherapy and seeing
 5    oncology patients.  Those are included in his
 6    privileges.  I then okay those, and say, yes, he is
 7    performing these duties properly.  And then there is
 8    also a portion where I determine that he's using
 9    medications correctly and using all the other aspects
10    of his responsibilities as a staff physician
11    correctly.
12        Q.    So, are you, as the chief of the
13    department, responsible for overseeing the quality of
14    care that Dr. Gupta provides to patients at
15    Eisenhower?
16            MS. LOWENSEN:  This is Joan.
17        Objection to the form.
18            MR. ADAMS:  Yeah.  I am going to
19        object.  That's something he could not
20        testify about.
21            MS. ZORK:  Hello?
22            MR. ADAMS:  Yeah, Lesley, it is
23        Larry.  I am going to object and instruct
24        the witness not to answer that question.
25            MS. ZORK:  Why?
```

1          MR. ADAMS:  Because the quality

2      assurance is something that regulation

3      precludes him from testifying about.

4          MS. ZORK:  I am not asking him to

5      give me any specifics.  I am asking if he

6      is the one responsible for overseeing the

7      quality of care.  It goes directly to the

8      issue of control.  I am not asking for any

9      specifics about his -- any quality

10     assurance reviews.

11         MR. ADAMS:  I'll let him answer that

12     question.

13     A.    Yes.  I oversee the quality of the care

14 that he delivers, and I reflect that in my

15 credentials review.

16     Q.    (By Ms. Zork)  Is there anyone outside of

17 your department, either at Sterling or at Humana,

18 that oversees the quality of Dr. Gupta's care at

19 Eisenhower?

20         MS. HANRAHAN:  Objection, foundation.

21     This is Cathy Hanrahan.

22         MR. ADAMS:  If you understand, you

23     can answer.

24     A.    I understand.  I don't believe so.  I am

25 not aware of anyone else overseeing the quality of

1    his medical care.

2        Q.    (By Ms. Zork)  I have become aware during

3    this case at Eisenhower there is a tumor board that

4    convenes on a regular basis to discuss oncology

5    patients, and that that was in existence in 1998.  Am

6    I correct about that?

7        A.    Yes, you are.

8        Q.    How long has there been a tumor board in

9    operation at Eisenhower for that purpose?

10        A.    Our tumor board goes back well into the

11    '70s or '80s. I don't know the exact year.

12        Q.    In October of 1998, you were the chief of

13    oncology at that time; is that correct?

14        A.    Yes.

15        Q.    Can you describe for me who -- how the

16    tumor board operated in 1998?

17        A.    Yeah.  The tumor board was, I will say it,

18    as a surgically based tumor conference.  The surgeons

19    would -- usually are the ones who perform surgery,

20    and when they discover a cancer, they submit that

21    patient to the tumor board to review at a conference,

22    usually after -- obviously after the cancer diagnosis

23    has been made.  Sometimes before the treatment has

24    actually started, and sometimes after the treatment

25    has started.  The cases come to the tumor board's

1    attention for review by all of us who take care of

2    patients.  It is actually a requirement to have a

3    tumor board at our hospital in order to take care of

4    patients.  And generally the conference meets and

5    goes over the case, and some recommendations are made

6    from various consultants that attend the meeting.

7    The recommendations from the tumor board are given

8    serious consideration and weight by the actual

9    treating physician.

10        Q.    Is there any method of follow-up on a

11   patient that's put in the tumor board by the tumor

12   board?

13        A.    Yeah.  The tumor registry does follow up

14   and indicates, as do all tumor registries, what

15   treatment decisions were made, and then continues to

16   follow that patient for life.

17        Q.    What is the method for continuing to

18   follow patients for life?

19        A.    Yeah.  The patient, through the tumor

20   registry, a minimum of once a year, a mail-out is

21   sent to the patients or the patient's family to ask

22   the status, whether the patient still has cancer, if

23   that cancer is active or inactive and whether the

24   patient is alive or not and died from that cancer or

25   not.  Once that patient has succumbed, has passed

22

```
 1    away, then the patient is no longer followed in the
 2    registry.
 3         Q.    So, is Veronica Pollard in the tumor
 4    registry that is operated by the tumor board at
 5    Eisenhower?
 6         A.    Yes.
 7         Q.    And how is that data maintained?  Is it in
 8    a computer?  Anyway, do you understand what I am
 9    asking?
10         A.    Yes, I do.  Yes, we do have a computer
11    program that maintains, maintains all of our tumor
12    registry patients.  It's a military based computer
13    program shared by all military cancer institutions.
14         Q.    Who puts the information into the data --
15    into the registry?
16         A.    Our tumor registrar is her title.
17         Q.    Have you accessed the information on
18    Veronica Pollard prior to today's deposition?
19         A.    No, not from the tumor registry.
20         Q.    Okay.  Based upon that answer, I am going
21    to ask you, can you tell me what records you have and
22    documents you have reviewed that relate to Veronica
23    Pollard for your anticipated testimony in today's
24    deposition?
25              MR. ADAMS:  For today's deposition he
```

```
 1          could indicate what he's looked at, yes.

 2          A.    Yeah, I reviewed her record as part --

 3     could you repeat the question?

 4          Q.    (By Ms. Zork)  I'm sorry.  Could you

 5     please identify for me everything that you have

 6     reviewed today, documents and records that you have

 7     reviewed in preparation for your deposition.  And

 8     going back as far as you need to in terms of when you

 9     first found out about this litigation.

10          MR. ADAMS:  Well, Lesley, he cannot

11          testify about any quality assurance.  He

12          can testify what he reviewed today in

13          preparation for this deposition, the

14          documents that I brought down.

15          MS. ZORK:  Well, if he is going to be

16          relying -- anything that he is relying on

17          that either refreshes his memory about

18          this, I think I am entitled to know what it

19          is he has reviewed.  Now, I am not asking

20          that he provide any specifics of what he

21          reviewed that may have been contained in

22          any quality assurance or peer review

23          meeting.  So, I am entitled --

24          MR. ADAMS:  What he reviewed today.

25          He can answer that.
```

1    Q.    (By Ms. Zork)  I'm not asking what he

2    reviewed today.  I'm not limiting it to today.

3    A.    Yeah.

4    Q.    Anything that you are going to be relying

5    upon that refreshed your memory, anything that you

6    reviewed in connection with this.  I'm not asking

7    that the doctor disclose any -- anything that's

8    contained in quality assurance documents.

9         MR. ADAMS:  And he understands that

10        and will not be relaying any information in

11        that regard.

12    A.    I have reviewed Dr. Gupta's letter that he

13    submitted to Mrs. Pollard at her request as a letter

14    of introduction to her visit that was going to be

15    coming up at her next duty station.

16    Q.    (By Ms. Zork)  I'm sorry.  Can you be more

17    specific about -- can you identify the date of the

18    letter and to whom it was addressed?

19    A.    Yeah.  Dr. Gupta wrote a letter on

20    December 16th, 1998, and it was addressed to no one,

21    no specific person.  It was a summary letter of

22    her -- of her medical status, much as a patient

23    statement would be written.

24    Q.    Okay.  What else have you reviewed?

25    A.    That's all I have reviewed.

```
 1         Q.    You have not looked at Mrs. Pollard's
 2    medical records from Eisenhower, from her treatment
 3    at Eisenhower?
 4              MR. ADAMS:  He hasn't reviewed --
 5         well, let me pose an objection.
 6              MS. ZORK:  Let the witness answer.
 7              MR. ADAMS:  Let me pose an objection,
 8         and then we'll go from there.  With regard
 9         to the specifics of any quality assurance,
10         he cannot testify.  So, if you are going
11         back in time, I am going to instruct him
12         not to answer the question in that regard.
13              MS. ZORK:  Well, you are instructing
14         the witness not to answer whether or not he
15         has reviewed Mrs. Pollard's medical record?
16              MR. ADAMS:  Well, that he can answer,
17         yes.
18         Q.    (By Ms. Zork) That was my question.  Have
19    you reviewed Veronica Pollard's medical records from
20    her treatment at Eisenhower?
21         A.    Yes, I previously reviewed her medical
22    records.
23         Q.    Do you have any independent recollection
24    of Veronica Pollard from 1998?
25         A.    No, I never saw her.
```

1      Q.    Do you recall having been consulted by Dr.

2   Gupta or anyone else at Eisenhower about Mrs. Pollard

3   while she was receiving treatment in 1998?

4      A.    He never consulted me regarding her

5   medical care, no.

6      Q.    Have you reviewed the minutes from the

7   tumor board that was convened on October 26, 1998,

8   during which it appears from the notes that

9   Mrs. Pollard's case was discussed?

10      A.    I have not reviewed that, no.

11      Q.    I have been provided with a printout of

12   what would appear to be minutes and notes from the

13   tumor board with a sign-in sheet that's attached, and

14   it is dated October 26, 1998.  And under

15   hematology/oncology clinic, your name is listed with

16   your signature on that sheet.  Are you familiar with

17   the sign-in sheet for the tumor board?

18      A.    Yes.

19      Q.    Does your signature on that sheet indicate

20   that you were in attendance at the tumor board on

21   October 26, 1998?

22      A.    Yes.

23      Q.    There is also on the same signature page

24   Dr. Gupta's name appears, and his signature is -- he

25   signed in on that sheet as well.  Would that be

1    unusual for there to be two oncologists from the

2    department at the tumor board?

3        A.    No, that's not unusual.

4        Q.    There is also -- there is a third

5    oncologist listed who didn't sign in, but it was

6    Diana Willadsen.  Are you familiar with a Dr.

7    Willadsen?

8        A.    Yes, I am.

9        Q.    Was she in the oncology department in

10    1998?

11        A.    Yes, most likely, and thus it is possible

12    that my previous statement where I said Dr. Coleman

13    was the third position was probably inaccurate.  I

14    think it was right about the time when Dr. Willadsen

15    was leaving and Dr. Coleman was coming on board.  We

16    do have a fairly high turnover in oncologists in

17    terms of that position.

18        Q.    So, you do remember a Dr. Willadsen being

19    a member of the department at about that time?

20        A.    Yes.

21        Q.    Okay.  Whose responsibility would it be in

22    1998 to bring to everyone's attention on the tumor

23    board that there was a patient who needed to be

24    considered?

25        A.    Right.  Our tumor registrar sends out a

1    list of the patients that are to be presented at the

2    upcoming tumor board.  She sends that list out by --

3    through our e-mail system.

4        Q.    Whose responsibility is it to notify the

5    registrar about a patient?

6        A.    The surgeons tell the registrar about a

7    patient that they would like to have presented.  That

8    is one method.  And a second is that the registrar

9    herself can go through the pathology results for the

10   previous week and see if there are any new cancer

11   diagnoses.

12       Q.    So, both of those methods were in practice

13   in 1998 at Eisenhower?

14       A.    Yes.

15       Q.    Can you tell me what the -- I believe you

16   said you testified earlier that all patients -- let

17   me before I ask that question.  Dr. Fink, it is

18   eleven O'clock by my clock.  Do you need to go

19   somewhere now?

20       A.    I don't think so.  I think they will page

21   me when they need me.

22       Q.    All right.  You just let me know when you

23   have to go.

24       A.    Okay.

25       Q.    It is my understanding from what you said

1    earlier that all new oncology patients at Eisenhower,

2    there was a tumor board convened on all such

3    patients; is that correct?

4         A.    I would hesitate a little bit to say all.

5    Clearly most are presented through the tumor board.

6    Probably not all.  There is not a requirement to

7    present every new cancer case through our tumor

8    board.  We certainly use the tumor board for the more

9    interesting and more difficult cases.  Some of the

10   much more straight forward cases may not be presented

11   at the tumor board.

12        Q.    Okay.  I thought that's what I understood

13   what you said earlier.  Would breast cancer patients

14   be routinely referred to the tumor board?

15        A.    Yes, they would.

16        Q.    What was the purpose of the tumor board in

17   reviewing patients who were diagnosed with breast

18   cancer?

19        A.    The main purpose of that tumor board is to

20   have all the consultants involved, physicians, all

21   speaking at once about the same patient, rather than

22   having the patient move from one clinic to the other

23   and possibly lose some specifics by having the

24   pathologist, the radiologist, the surgeon, the

25   radiation doctor and the medical doctor all present

1     at the same time.  It's a more collaborative, more

2     complete way of treating a cancer patient who

3     requires a multidisciplinary approach.

4          Q.    Now, Mrs. Pollard had had -- are you

5     familiar with the timeline of diagnosis and treatment

6     of Mrs. Pollard's breast cancer between October 2nd

7     and December 15 of 1998?

8          A.    Can you repeat the question?

9          Q.    Are you familiar with the timeline of

10    Mrs. Pollard's treatment from the time she was

11    diagnosed with breast cancer in 1998 until December

12    15 when she last saw Dr. Gupta?

13         A.    Yes, I am.

14         Q.    How are you familiar with that?

15         A.    I've heard -- I've previously reviewed her

16    record.

17         Q.    So, you understand that Mrs. Pollard had a

18    fine needle aspiration of a palpable lump in her

19    breast on October the 2nd of 1998?

20         A.    Ma'am, my instructions have been to not

21    discuss the medical aspects of her --

22              MR. ADAMS:  That question you can

23              probably answer because I think, Lesley,

24              you are laying the foundation for the facts

25              that have come out in the litigation; is

1          that correct?  We are not going to the

2          specifics of his review, but just the basic

3          facts.  And in that regard, we will allow

4          him to testify.

5          A.    And I'm sorry.  Could you repeat the

6   question for me in that regard?

7          Q.    (By Ms. Zork)  Are you aware that

8   Mrs. Pollard had a fine needle aspiration on October

9   2nd of a palpable lump in her breast that was the

10  first indication that she had breast cancer?

11         A.    I haven't reviewed her record in some

12  time, but I am aware that she had a biopsy of that

13  type.

14         MS. ZORK:  Larry, let me ask you

15         this.  Dr. Fink, would appear, was present

16         at the tumor board when Mrs. Pollard's case

17         was discussed in October of 1998.  Do you

18         have -- the minutes from that, you know, do

19         you have them available so that I can ask

20         Dr. Fink about that?

21         MR. ADAMS:  Well, I brought down

22         volume 1.  I haven't looked for that.

23         Q.    (By Ms. Zork)  Let me ask you this, Dr.

24  Fink.  Do you have any recollection of being present

25  at the tumor board on October 26th when

1    Mrs. Pollard's case was discussed?

2        A.    No, I don't.

3        Q.    There are some handwritten notes on the --

4    that appear to reflect what was actually discussed at

5    the tumor board.  Who --

6            MR. ADAMS:  Lesley, on your copy, do

7        you have like the DDE Bates stamp so we can

8        refer to that page?

9            MS. ZORK:  You had put it in -- it

10        was put in a folder together with a big box

11        of documents that you provided us through a

12        deposition one day.

13            MR. ADAMS:  He doesn't have the

14        document in front of him.  Maybe we can get

15        it faxed down here if that would expedite

16        things.

17            MS. ZORK:  Okay.  Maybe then I will

18        wait on that and --

19            MR. ADAMS:  The fax number would be

20        706-787-9441.  And make it to the attention

21        of Paul Elkin.  He's one of the JAG

22        attorneys here.

23        Q.    (By Ms. Zork)  Dr. Fink, I am going to

24    wait until you have an opportunity to look at the

25    note because it doesn't make sense for me -- I am not

1   going to get my question answered unless you have it

2   right in front of you.  Let me back up a little bit.

3   In 1998, was there an Exceptional Family Member

4   Program at Eisenhower, Fort Gordon?

5        A.    Yes.

6        Q.    And were you familiar with the Exceptional

7   Family Member Program with respect to how it applied

8   to medical criteria at that time?

9        A.    Yes.

10        Q.    Was there a physician who was or a medical

11   doctor who was in charge of the Exceptional Family

12   Member Program in 1998?

13              MR. ADAMS:  Objection.  Foundation.

14        Do you understand the question?

15        A.    Not really.  Was there a physician as part

16   of the EFMP?

17        Q.    (By Ms. Zork)  Yes.

18              MR. ADAMS:  Do you want to ask it

19        again or do you want him to answer on his

20        understanding?

21        Q.    (By Ms. Zork)  Go ahead and answer based

22   upon your understanding.

23        A.    In 1998 I was not familiar with a

24   physician as part of the EFM program, no.  I was only

25   aware of the program.

1      Q.    What is your understanding as to what the

2    medical criteria were for family members to be

3    considered exceptional family members within that

4    program?

5      A.    Any family member who had more than a need

6    for general medical care could be eligible for the

7    EFMP program.  So, it could be almost any type of

8    medical problem.  It's primary purpose, my

9    understanding, was to give additional assistance in

10   whatever capacity needed for those families that had

11   members who had additional medical needs.

12     Q.    As a physician at Eisenhower, have you

13   ever filled out exceptional family member forms on

14   patients that you have seen?

15     A.    I am not that familiar with the forms.

16   The usual way I refer a patient is through the

17   consult system.

18     Q.    Can you explain that to me?

19     A.    We can enter a consult to EFMP through our

20   medical -- through our medical consult system, and

21   that can be done through a standard form, consult

22   form, or through an electronic consult form.

23     Q.    What information would be contained in the

24   consult form that you are referring to?

25     A.    The consult would just include the

1    patient's medical information and a request to be

2    enrolled in the EFMP program to perform whatever the

3    patient may need in terms of additional, additional

4    considerations.

5         Q.    Are you familiar with any requirements

6    that family members be -- that there was an

7    obligation on the part of physicians who identified a

8    family member with an exceptional need under the

9    criteria, was there a requirement to such a consult?

10             MR. ADAMS:  Objection as to the form.

11        If you understand, you may answer.

12        A.    Yeah, I understand.  The intention of the

13   EFMP program is for all patients who are eligible for

14   EFMP to be referred to EFMP. That is the intention.

15        Q.    (By Ms. Zork)  And the eligibility of the

16   patient for exceptional family member status is

17   determined by that patient's physician, attending

18   physician?

19             MR. ADAMS:  Objection as to the form.

20        If you understand.

21             MS. HANRAHAN:  Same objection.

22        Q.    (By Ms. Zork)  You can answer, Dr. Fink.

23        A.    I'm sorry.  You will have to repeat it.

24             (The record was read by the reporter.)

25        A.    Right.  Yeah, the medical condition is

1   usually well known to the physician as to whether it

2   requires more than average medical care, and thus the

3   referral can be made.

4        Q.   (By Ms. Zork)  Now, for patients who have

5   been diagnosed with breast cancer, is that a medical

6   condition that would be a well known condition to

7   qualify that patient for the Exceptional Family

8   Member Program?

9        A.   It would if the patient had ongoing needs

10  for that cancer, such as continued treatment for

11  follow-up by a physician higher than a general

12  physician.

13       Q.   So, a patient who would need chemotherapy

14  or radiation treatment following surgery for breast

15  cancer would be such a patient that would qualify for

16  exceptional family member status?

17       A.   Right.  If that therapy was ongoing and

18  that patient had needs through the EFMP program, then

19  that referral would be made.

20       Q.   Patients who have breast cancer, assuming

21  also once they've received their treatment, there is

22  an ongoing need for specialized follow-up for some

23  number of months or years following treatment; is

24  that correct?

25       A.   Yes.

1        Q.    The breast cancer patient would require

2    ongoing services for how long after the diagnosis and

3    treatment of cancer?

4            MR. ADAMS:  Objection.  You may

5            answer if you understand.

6        A.    There is no set time as to how long that

7    patient should be followed by an oncologist.

8        Q.    (By Ms. Zork)  What would you expect to be

9    the minimum as to the need for follow-up of those --

10    of a woman who had been treated for breast cancer?

11            MR. ADAMS:  Objection.  Go ahead.

12        A.    The minimum need is also not clear in any

13    form of standard.  Medical care by the oncologist is

14    certainly encouraged and is ideal.  There is no

15    absolute requirement, however.

16        Q.    (By Ms. Zork)  When you treat patients for

17    breast cancer, and for example the patient has

18    surgery, chemotherapy and radiation treatment, what

19    frequency do you recommend that the patient receive

20    follow-up care from an oncologist and/or surgeon?

21            MS. HANRAHAN:  Objection to the form.

22            MR. ADAMS:  Same objection.

23            MS. LOWENSEN:  Same objection.

24        Q.    (By Ms. Zork)  You can answer.

25        A.    Again, I don't think that the requirement

1    has got a specific answer.  The patient clearly

2    requires follow-up by a physician familiar with the

3    diagnosis and the treatment of this disease.  Medical

4    oncologist is certainly the most qualified, and

5    ideally the patient would be followed by an

6    oncologist on an ongoing basis.  In the absence of

7    that, the patient must be seen on a regular basis by

8    another physician.  It could be someone less

9    qualified, but quite familiar with the disease.  So,

10   a licensed physician, I think, is the minimum.

11        Q.    A licensed physician who is familiar with

12   management of patients with breast cancer?

13        A.    And familiar with the follow-up care of

14   that patient, yes.  Not so much the upfront

15   treatment.  I think the treatment must be done by the

16   oncologist, but the follow-up need not be.

17        Q.    It would be important, though, for

18   purposes of the Exceptional Family Member Program

19   that the family member be followed up by a physician

20   who understands what the appropriate follow-up is for

21   patients with breast cancer?

22             MR. ADAMS:  Objection.

23             MS. HANRAHAN:  Objection to the form.

24        This is Kathy Hanrahan.

25             MR. ADAMS:  This is Joan.

1      (Inaudible.)

2           THE COURT REPORTER:  I didn't hear

3      her.

4           MR. ADAMS:  Joan, she didn't hear

5      you.  Could you speak up?

6           MS. LOWENSEN:  Just a general

7      objection to join the other two.

8           MR. ADAMS:  Just a general objection

9      joining the other two.  If you understand,

10      you can answer.

11      A.    I didn't understand that.

12           MS. ZORK:  Can you please repeat the

13      question?

14           (The record was read by the

15      reporter.)

16           MR. ADAMS:  Same objection.

17      A.    No, I don't think the EFMP program

18      necessarily -- I don't think that's important

19      necessarily as far as the EFMP program is concerned.

20      Q.    (By Ms. Zork)  Why not?

21      A.    I think the oncologist would communicate

22      this better than the EFMP program would as to how to

23      educate the patient on her follow-up for her breast

24      cancer and who she must see and what her care should

25      be.  The EFMP program I think, my understanding of it

1    is, of course, they could certainly help that patient

2    at their request to go by the oncologist's

3    recommendations, especially if they were unable to

4    achieve that goal themselves.

5        Q.    With respect to, you know, soldiers and

6    their families who move from place to place in this

7    country and around the world, is it your

8    understanding that the Exceptional Family Member

9    Program is set up to make sure that the appropriate

10   medical personnel and treatment are available in the

11   place where they anticipate the family member is

12   going to be transferred?

13             MR. ADAMS:  Objection.

14             MS. HANRAHAN:  Same objection.  This

15        is Kathy Hanrahan.

16             MS. LOWENSEN:  Objection.

17             MR. ADAMS:  If you understand, you

18        may answer.

19        A.    That's not exactly my understanding of the

20   EFMP program.  I think that they are -- they are to

21   assist the patients and the exceptional family member

22   in accomplishing not only their medical needs but

23   also some of their non-medical needs, such as housing

24   and movement in a facilitated fashion to be sure that

25   their medical and even some of their non-medical

1    needs are taken care of within the scope of the

2    handicaps that they may have as an exceptional family

3    member.  But, indeed, the actual medical care

4    delivered to the patient is something that comes

5    between the patient and the recommendations of the

6    physician.

7        Q.    Now, I understand the actual medical care

8    would be directed by a physician and not by the

9    program.  Is it your understanding or is it not your

10    understanding that one component of the program is to

11    identify whether or not medical services are

12    available at a station where the Army would

13    anticipate sending a soldier and his family, whether

14    those services are available there to meet the needs

15    of the exceptional family member?  Do you understand

16    my question?

17        A.    Yes, I do, and I am thinking.  That is not

18    the way I have used that program before.  If I

19    thought that need was there, I could consult with the

20    EFMP program myself and ask them for their

21    assistance, I suppose.  But based on your question,

22    that is partially my understanding of their -- of

23    their functions.

24        Q.    Dr. Fink, how is it that you are --

25    understand what your responsibilities and duties are

1    with respect to the Exceptional Family Member

2    Program?

3         A.    Yeah.  I understand my duties to be that

4    should families have an extra need, that I would ask

5    the EFMP program to assist that patient with some of

6    those needs, be they medical or non-medical needs.

7    Generally, usually revolves around need for housing

8    or some other special features within their housing

9    to accommodate the patient's extra needs.  As far as

10   the patient leaving and getting -- going to a place

11   where that care is available, I have actually not

12   used the EFMP program for that purpose.  I have

13   usually found other very satisfying avenues to get

14   that information.

15        Q.    What avenues have you found for getting

16   that information?

17        A.    Either asking the patient themselves if

18   they know who they are going to be seeing, or if they

19   are aware of where they will be going and whether

20   they have checked into the care that's available

21   there.  That might be one avenue.  Another avenue

22   might be to call people that I know were in that

23   particular area.

24        Q.    And do what?

25        A.    Oh, and ask for and say I have got a

1    patient coming your way, could you accept this

2    patient.  So, if it happens to be in a place that I

3    know where they are going.  If I know a physician, an

4    oncologist in that area.  If I don't know, but I have

5    got assurances from the patient that they have things

6    arranged, then I feel comfortable with that.

7        Q.    So, my earlier question was a slightly

8    different issue, and that is, what do you base your

9    understanding of your duties with respect to the

10   Exceptional Family Member Program?  Where do you get

11   -- where have you gotten your understanding as to

12   what your responsibilities and duties are?

13       A.    I understand the EFMP program through some

14   experience earlier in my career.  The EFMP program

15   was part of taking care of patients and was help in

16   taking care of patients' needs outside of their

17   medical needs, generally speaking.  And then later it

18   became clear at some of our briefings that the EFMP

19   program is here, and that patients who have these

20   additional needs can and should be referred.

21       Q.    When did you take part in any briefing

22   program specifically about the Exceptional Family

23   Member Program?

24            MR. ADAMS:  Was that briefing?

25       A.    Yeah.  Yeah.  An occasional briefing has

44

1    occurred during my nine years here at Eisenhower.  I

2    can't give you the exact dates.  It came with some of

3    the preprescribed training programs that we have had

4    on a near annual or a couple of years basis.

5        Q.    Who provided the briefing?  Who gave you

6    the briefing about the program?

7        A.    Usually it was someone from the EFMP

8    program itself, someone who worked at the EFMP

9    program.

10       Q.    When I fax you over the tumor board

11   material, I would like to also fax you over a form

12   for you to look at.  Should we do that now or should

13   we wait until -- do you think?

14           MR. ADAMS:  Which form is that,

15       Lesley?

16           MS. ZORK:  Huh?

17           MR. ADAMS:  Which form is that?

18           MS. ZORK:  The form that Dr. Maltese

19       identified.

20           MR. ADAMS:  I actually brought those.

21       You mean the 5888s and 5862 and the 7246?

22           MS. ZORK:  Yes.

23           MR. ADAMS:  I have those three forms

24       here.  So, if you want to ask about those,

25       then we don't have to wait for the fax.

1           MS. ZORK:  Larry, can you show those

2       to Dr. Fink?

3           MR. ADAMS:  Yeah, he is looking at

4       them now.

5       Q.   (By Mr. Zork)  You have in front of you a

6   DA form 5862 entitled Army Exceptional Family Member

7   Program Summary?

8       A.   Yes.

9       Q.   Are you familiar with this form?

10      A.   No.

11      Q.   Have you ever filled out such a form?

12      A.   Not in my recent memory, no.

13      Q.   Have you ever seen this form at one of

14   your briefings about the Exceptional Family Member

15   Program?

16      A.   I don't recall.

17      Q.   The consult that you talked about that

18   you -- the consult for Exceptional Family Member

19   Program that you testified about earlier, you were

20   not referring to this form 5862?

21      A.   No, I wasn't.  We use a consultation form,

22   standard form 513, I believe, a general consult form

23   which we send to other consultants.

24      Q.   Are you familiar with DA form 7246?

25      A.   No.

```
 1          Q.    And are you familiar with DA form --
 2          A.    5888-R, no, I am not.
 3                MS. ZORK:  I'm still here.  Larry, I
 4          am assuming just based upon some of the
 5          objections that you have raised during the
 6          course of this deposition that Dr. Fink
 7          will not be commenting on issues relating
 8          to the standard of care in this case?
 9                MR. ADAMS:  That's correct.
10                MS. ZORK:  And he is not going to be
11          commenting on in any way the care that was
12          provided at Eisenhower, either as a factual
13          witness or as an expert?
14                MR. ADAMS:  That's correct.
15          Q.    (By Ms. Zork)  Dr. Fink, as chief of the
16    department, do you have ongoing -- do you have
17    regular departmental meetings where patient care
18    issues are discussed?
19          A.    Yes.
20          Q.    And is Dr. Gupta required to attend those
21    departmental meetings?
22          A.    Yes.
23          Q.    Are you responsible for the patient
24    assignment for Dr. Gupta?
25          A.    Yes.
```

1     Q.    Are there specific hours that Dr. Gupta is

2   required to work a week on your schedule that you set

3   up?

4     A.    Yes, he does.  He works a regular duty

5   hour day.

6     Q.    Okay.  In other words, he doesn't set his

7   own schedule.  His schedule has been set for him by

8   the department?

9     A.    Right.

10          MS. ZORK:  Larry, based on Dr.

11       Fink's, based on earlier answers, his lack

12       of familiarity between specifics -- I mean,

13       about the specifics of any contract between

14       the Department of Defense and Humana and

15       Humana and Sterling and Sterling and Dr.

16       Gupta, that he would not be the person to

17       address those questions to.

18          MR. ADAMS:  Well, I mean, obviously

19       he has that supervisory role pursuant to

20       the contract, and I have the material that

21       Catherine sent us here and faxed into his

22       office on Friday.

23          MS. ZORK:  But he said he doesn't

24       have -- he was not -- well, let me let you

25       finish.

```
 1              MR. ADAMS:  Well, I mean, I don't

 2         think he negotiated the contract, if that's

 3         what you are suggesting.  But insofar as

 4         how it was practically, you covered part of

 5         that in your questions.  To the extent that

 6         --

 7              MS. ZORK:  No.  In his role with

 8         respect to Dr. Gupta, but is Dr. Fink the

 9         person to address the contracts and the

10         terms of the contracts with Humana and the

11         Department of Defense, Humana and Sterling?

12              MR. ADAMS:  I am not -- I mean,

13         that's at some level that's not here.

14         Humana/Sterling officials I suppose would

15         be testifying about that.  So, I am not --

16         in the absence of knowing what kind of

17         question you are shooting for, it is hard

18         to make a complete judgment.  Are you still

19         there, Lesley?

20              MS. ZORK:  I am.  I am just trying

21         for purposes of the 30(b)(6) designation, I

22         asked that you produce a witness that can

23         discuss the terms of the contract and

24         negotiation of the contract between the

25         United States Army and Humana Military that
```

```
 1         was in effect from 1998 to the present.

 2         And I'm assuming, based upon Dr. Fink's

 3         earlier answer, that he is not the

 4         appropriate witness to answer those

 5         questions.  He doesn't have that knowledge.

 6              MR. ADAMS:  Well, as I suggested, he

 7         may not about the negotiation per se, but

 8         insofar as the contract covers Dr. Gupta

 9         being in the oncology department, he may

10         have an answer that they wouldn't have at

11         the level of negotiation pursuant to the

12         terms of the contract.  You see what I am

13         saying?

14              MS. ZORK:  Okay.

15    Q.    Let me ask you this.  Dr. Fink, have you

16    ever looked at or reviewed in your capacity as Chief

17    of the Department of Oncology the terms of the

18    contract between the United States Army and Humana

19    Military?

20    A.    To a very limited degree, and I am only

21    familiar with the -- I am familiar with his job

22    requirements.

23    Q.    So, you are familiar with the job

24    requirements with respect to whom?

25    A.    With respect to Dr. Gupta, with respect to
```

50

 1    the physician whom we -- and with whom we hire Dr.

 2    Gupta.

 3        Q.    Okay.  So, you know how Dr. Gupta fits in

 4    your department and what your role is with respect to

 5    Dr. Gupta, correct?

 6        A.    Yes.

 7        Q.    You are not familiar with what Humana's

 8    obligations are to provide medical services under

 9    their contract with the United States; is that

10    correct?

11            MS. HANRAHAN:  Objection to the form.

12            This is Cathy Hanrahan.  You can answer,

13            Doctor.

14        A.    No, I am not that familiar with Humana's

15    responsibility in terms of -- other than hiring him

16    for the position.

17            MR. ADAMS:  And for the record, I

18            would suggest that's a question best put to

19            Humana.

20            MS. ZORK:  Well, there are two

21            parties to the contract.  There is what the

22            Department of Defense intends and what

23            Humana intends.  So, you know.  So, with

24            respect to on your end, Larry, I am trying

25            to -- are you going to be offering up some

1 other witness who will be able to address

2 what the U. S. Army expects or considers

3 are the duties and responsibilities of

4 Humana pursuant to the contract?

5   MR. ADAMS:  No.

6   MS. ZORK:  I mean, that's what I have

7 asked you to produce.

8   MR. ADAMS:  Well, I'll consult with

9 the agency counsel here, but, I mean, this

10 whole issue about -- I mean, yeah, the

11 terms of the contract, the contract within

12 the four corners of the contract, we have

13 what it is.  And frankly I thought the

14 intent of your 30(b)(6) was to get to the

15 practical level of Dr. Gupta, the defendant

16 in this case, and his relationship to this

17 oncology department.

18   MS. ZORK:  I mean, that certainly is

19 one aspect.  The other aspect which is, you

20 know, Cathy on behalf of her client intends

21 to argue that Humana is not responsible for

22 any of the actions of Dr. Gupta by virtue

23 of their contract with Sterling.

24   MR. ADAMS:  I don't want to get into

25 a legal argument, but, I mean, my initial

```
 1          thought is that Humana has its arguments.

 2               MS. ZORK:  It is not a legal

 3          argument.  I am trying to just let you know

 4          why it is important that I have -- that the

 5          United States produce a witness who can

 6          discuss that aspect of the contract.  I am

 7          not arguing.

 8               MR. ADAMS:  And the aspect that you

 9          are specifically referring to is?

10               MS. ZORK:  Terms of the contract.

11               MR. ADAMS:  Terms of the contract.

12               MS. ZORK:  Number 8, number 8 on my

13          30(b)(6) designation notice.  The terms of

14          the contract and negotiation of the

15          contract between the U. S. Army and Humana

16          Military Health Care Services.

17               MR. ADAMS:  Well, I submit that I am

18          not sure what you want there.  The terms of

19          the contract are the terms of the contract,

20          and beyond that I don't quite understand.

21          But that -- I mean, do you have anymore

22          questions for Dr. Fink?

23               MS. ZORK:  Yeah, I do.  In order for

24          me to know where the scope of my -- my

25          continued scope of the deposition, I need
```

1          to know whether or not you produced him on

2          that issue, and that's all I am trying to

3          ascertain.

4                MR. ADAMS:  Right.  We thought that

5          would be sufficient.  So, why don't we move

6          on to another topic for Dr. Fink. If he

7          cannot answer in the fashion that you need,

8          then we will have to think about this in

9          another context.

10     Q.    (By Ms. Zork)  Dr. Fink, under your

11   understanding of your role with respect to Dr. Gupta

12   as chief of the department, is it within your

13   authority -- would it be within your authority to

14   institute disciplinary action against Dr. Gupta if

15   circumstances warranted it in your opinion?

16                MR. ADAMS:  Objection to the form.

17          You may answer, if you understand.

18     A.    Yes, I can initiate disciplinary action

19   through recommendations.

20     Q.    (By Ms. Zork)  And is it your

21   understanding that at Eisenhower you would have the

22   authority to fire Dr. Gupta if you believed

23   circumstances warranted that?

24                MR. ADAMS:  Objection as to the form.

25          You understand?

1      A.    Did you say fire?

2      Q.    (By Ms. Zork) Yes.

3      A.    No, I don't have that authority.

4      Q.    Who would be -- if you believed that Dr.

5    Gupta should be fired, what would be the procedure

6    that you would have to follow?

7      A.    I would go to the contracting office and

8    tell them of my complaint and file it in writing.

9    And then an action would subsequently take place

10   through this government office, which would go

11   through the contractor, Humana, who would then take

12   the action as necessary.  And they would have to

13   perform that to my satisfaction.

14     Q.    When you say they would have to perform

15   that to your satisfaction, can you explain who that

16   is and what they would have to do?

17     A.    So, the government office is, I believe --

18   well, the contract office, who handles these

19   contracts, would have to put forward through my

20   request whatever action it is that I request, and

21   then the hiring company would then have to take

22   action on my recommendation and would have to satisfy

23   me that that action was completed.

24     Q.    And with respect to Dr. Gupta, who would

25   you be -- under what contract would you be dealing

1    with, with him?

2        A.    The contract that he has through Sterling,

3    through Humana, would be the contract in question,

4    and I would call that into question and say he is not

5    fulfilling whatever role I believe he should be

6    fulfilling based on that contract, which is to

7    perform at the standard of care in medical oncology.

8        Q.    What is your understanding, if you have

9    one, as to what Sterling's role is as a contractor in

10    relationship to Humana Military?

11        A.    Yeah, my only understanding is that they

12    are a subcontractor for Humana to carry out the

13    hiring action.

14        Q.    It is your understanding that it's Humana

15    who is ultimately responsible for the hiring or the

16    supplying of civilian doctors as needed at

17    Eisenhower?

18            MS. HANRAHAN:  This is Cathy

19    Hanrahan.  Objection to the form.

20        A.    That is my understanding that Humana has

21    that responsibility.

22        Q.    (By Ms. Zork)  Does Humana Military Health

23    Care Services, do they have an office located at

24    Eisenhower or Fort Gordon?

25        A.    I don't believe so.  I am not 100 percent

1   sure.

2       Q.    The contract office that you referred to,

3   what is that office and where is that located?

4       A.    I believe it's -- I believe it's part of

5   our utilization management, if I am not mistaken, and

6   they have an office that handles the civilian

7   contracts.

8       Q.    Now, let me just back up.  I believe you

9   testified earlier that radiation therapy for cancer

10  patients is done outside of Eisenhower at a place in

11  Augusta?

12      A.    Yes.

13      Q.    And that the place where the radiation

14  treatments are administered, that is not a -- that is

15  not a government facility, is it?

16      A.    Correct, it is not.

17      Q.    So, does anyone at Eisenhower have any

18  authority to direct how services are provided at the

19  radiation therapy treatment center?

20            MR. ADAMS:  Objection.  If you know.

21      A.    We facilitate the referral, but we don't

22  authorize the visits.  The authorization is conducted

23  through our Tricare office.

24      Q.    (By Ms. Zork)  Is that contract a contract

25  that was negotiated directly between Eisenhower

1     Medical Center and the radiation treatment facility?

2          A.     No.

3          Q.     Was that a contract that was negotiated

4     through Humana or do you know?

5          A.     No.  I don't think there is a contract in

6     terms of our radiation agreement.

7          Q.     So, it is just simply patients who need

8     radiation treatment are given a referral, and the

9     treatment is paid for by Tricare?

10          A.     That's correct.

11               MR. ADAMS:  I think we need to stop

12          now because the doctor got buzzed.  I

13          assume he has to go to his appointment.

14          Why don't we take a break.  Did you fax off

15          that form?

16               MS. ZORK:  I will go do that right

17          now.

18               MR. ADAMS:  That way the doctor can

19          take the phone call and we can resume.

20               MS. ZORK:  Okay.

21               (A recess was taken.)

22          Q.     (By Ms. Zork) Dr. Fink, do you know how

23     Dr. Gupta's salary is or how he is paid for his

24     services at Eisenhower?

25          A.     I believe he is a salaried physician.

58

1      Q.    And who pays his salary?

2      A.    I believe Sterling.

3      Q.    Sorry?

4      A.    I believe Sterling.

5      Q.    What do you base your belief that it is

6  Sterling?  What do you base that on?

7      A.    Since they are the contracting company

8  that hired him.

9      Q.    Where does Sterling get their money from

10  to pay Dr. Gupta?

11      A.    Through the Humana contract.

12      Q.    Does Dr. Gupta -- I guess, implicit in

13  your answer, Dr. Gupta is on a salary.  His salary is

14  not determined by the number of patients that he sees

15  in a month?

16      A.    That is my understanding.

17      Q.    Well, when you say that's your

18  understanding --

19      A.    Well, I know that they -- I know that he

20  submits his encounters to Sterling so they are

21  enumerated and accounted for by Sterling.  However, I

22  don't believe that his salary is based on the number

23  of patient visits.

24      Q.    So, when you say encounters, there is some

25  method by which Dr. Gupta keeps track of the number

1    of patients that he sees and the type of treatment he

2    provides?

3         A.    Yes.  I believe he completes what we call

4    a super bill and does submit that to Sterling.

5         Q.    The patients Dr. Gupta sees at Eisenhower,

6    there is no billing paperwork that goes along with

7    the appointments; is that correct?

8         A.    Yeah, I believe he -- I believe he

9    completes the patient encounter form, including the

10   level of the visit he had with the patient, and that

11   information is then sent forward to Sterling.

12        Q.    When a patient is referred for an oncology

13   consult and is assigned to see Dr. Gupta, does that

14   patient have to go through the Tricare office to get

15   authorization to see Dr. Gupta?

16        A.    No.

17        Q.    In comparison, if a patient is going to

18   receive radiation treatment in Augusta, the center

19   that you described earlier, would a patient in that

20   situation have to have approval and Tricare

21   authorization to receive the treatment?

22        A.    Well, for that facility to be reimbursed,

23   yes, they would.

24        Q.    Are you familiar with whether or not Dr.

25   Gupta or what the requirement is for Dr. Gupta to

1    have liability insurance?

2         A.    Specifically, no, but he requires

3    malpractice insurance in order to practice at

4    Eisenhower, is my understanding, or actually my

5    assumption.

6         Q.    Okay.  Is that something that -- is that a

7    part of the credentialing file that you are required

8    to review?

9         A.    As far as his need for malpractice

10   insurance coverage, no, that's not.

11        Q.    The verification of the coverage and the

12   amount of the coverage?

13        A.    No, that part I am not familiar with.

14        Q.    The contract between Humana Military

15   Services and Eisenhower Army Medical Center, are you

16   familiar with the provisions of that contract with

17   respect to professional liability coverage?

18        A.    No, I am sorry, I am not.

19        Q.    You don't know the amount of coverage

20   Humana Military is responsible for under the

21   contract?

22             MS. HANRAHAN:  Objection.

23             MR. ADAMS:  Objection.  If you know.

24        A.    I don't know.

25        Q.    (By Ms. Zork) The credentialing process

1    that you're involved with on a regular basis with

2    respect to Dr. Gupta, what aspects of that are you

3    required to address?

4         A.    I am required to address, as I previous

5    said, his privileges to practice oncology, to

6    prescribe chemotherapy, and things such as that, that

7    relate to delivery of medical oncology care.

8         Q.    I'm sorry.  Go ahead.

9         A.    And then in addition, to be sure that he

10   is using resources correctly, such as drug

11   utilization, blood utilization, things of that

12   aspect.

13        Q.    Can you just, if it is possible, just

14   explain to me a little bit more, you know, the

15   concept of whether or not he is using resources

16   properly to me, a practical example?

17             MR. ADAMS:  I am going to pose an

18        objection here because I think we are

19        skirting awfully close to the quality

20        assurance issue.  Can you rephrase the

21        question perhaps?

22        Q.    (By Ms. Zork) Well, I am not asking you

23   for a specific example of Gupta.  I'm asking you for

24   an example as to what you would be evaluating when

25   you are evaluating whether or not a physician in your

1   department is using --

2        A.    Yes.  In general, if I have heard during

3   the evaluation period or have personal knowledge of

4   his misuse of drugs, such as incorrectly prescribing

5   a drug or inappropriately giving a transfusion for a

6   patient who didn't need it or not giving one if a

7   patient did need it, that type of thing, that is

8   included in my evaluation.

9        Q.    The evaluation of Dr. Gupta for

10  credentialing purposes, is it any different by virtue

11  of the fact that he has been provided to you by

12  Sterling?  Is it any different than the evaluation

13  that you provide other oncologists that are in your

14  department who are military doctors?

15       A.    No difference.

16       Q.    And the supervision you provide for Dr.

17  Gupta, is it any different than the supervision that

18  you provide for the other members in your department?

19       A.    No difference.

20       Q.    Have you gotten your fax?

21            MR. ADAMS:  Yeah.

22       Q.    So, do you have in front of you the

23  printout of the October 26, 1998, tumor board

24  meeting?

25       A.    Yes.

1        Q.    Can you read it?  Is it legible through

2    the fax?

3        A.    Yes.

4        Q.    On the first page that has typewritten, is

5    that really -- would those be the schedule of

6    patients that were going to be discussed that day?

7    Is that what that means?

8        A.    Yes.

9        Q.    And there are handwritten notes on this

10    first page as well.  Who would have written those

11    notes?

12        A.    The tumor registrar.

13        Q.    In Mrs. Pollard's case, if you look at the

14    sign-in sheet for October 26, is that your signature?

15        A.    Yes.

16        Q.    Next to your name.  As you look at this,

17    does this refresh your recollection at all about

18    whether or not you were present when Mrs. Pollard's

19    case was discussed?

20        A.    No.

21        Q.    Okay.  What would be the format?  How

22    would a patient such as Mrs. Pollard's case be

23    presented?  Who would be the -- who would go first?

24        A.    Usually the surgeon would present the case

25    as it is presented to him or her, and then discuss

1   the findings, the initial findings, and then go to --

2   after that go to some of the radiology findings, if

3   there are any.  And then after that go to any of the

4   pathological findings, and then discuss the surgical

5   management, if there was any further.  And then open

6   it up to the floor for comments on further treatment.

7       Q.    At this stage, at the tumor board, what

8   record, what medical records would you expect to have

9   available to the participants?

10      A.    The x-rays would be present if there was,

11  for example, a mammogram, if there were any other --

12  on this case it would probably just be a mammogram

13  that might have been available.  And then the most

14  important would be the pathological specimen, which

15  would be reviewed by the pathologist.

16      Q.    If there is information at the tumor board

17  that is missing, that would be clinically specific

18  information missing from the record, what is the

19  practice of the tumor board?

20      A.    The tumor board practice is to not discuss

21  that further unless a second tumor board is called

22  for, for whatever extenuating circumstances.  For

23  example, a surprise finding.  In this particular

24  case, there were some, I think, recommendations made,

25  from the notes here, given certain parameters, for

1   example, of the ER/PR status, as to how the treatment

2   might go.  That information doesn't look like it was

3   available at the time of the tumor board.

4        Q.    Assuming that, as the tumor board notation

5   says, that the excisional biopsy was performed on

6   October 14, 1998, would you have expected the ER/PR

7   result to have been completed based upon your

8   understanding of how things work at Eisenhower?

9        A.    Ideally the ER/PR status would have been

10  available at the time of the tumor board, but the

11  tumor board was still functional and could give a

12  functional recommendation without that information.

13       Q.    What were the recommendations of the tumor

14  board on October 26?

15       A.    Let's see.  Certainly to -- since she had

16  only had a lumpectomy, to undergo radiation.  The

17  ER/PR status was pending, and they said that if

18  negative, can have chemo.

19       Q.    On the 26th, where do you see that?

20       A.    I am actually -- well, I am actually

21  looking at --

22       Q.    I am sorry.  Let's make sure we are both

23  looking at the same thing at the same time.  Okay.  I

24  am asking questions about on October 26 of 1998,

25  which is the tumor board where you were present.

```
 1          A.    Okay.  Tumor board I was present.

 2               MR. ADAMS:  We believe the 26 has fax

 3          number 2, page number 2 at upper right-hand

 4          corner.  I mean, I guess you don't have it,

 5          Lesley.  We have it here as number 2.

 6          A.    Okay.  And on that date said present at

 7     next tumor board after surgery.

 8          Q.    (By Ms. Zork)  Okay.  In the handwritten

 9     -- I mean, in the typewritten portion about

10     Mrs. Pollard there is also some handwritten notes in

11     that section where it says, "plan lumpectomy and

12     lymph node dissection, patient's decision."  What

13     does that mean?

14          A.    I am looking for that.  I don't quite see

15     that comment.

16          Q.    Okay.  I'm sorry.  Do you have the

17     typewritten notes from October 26, 1998, in front of

18     you?

19          A.    The typewritten notes I have, have her

20     name and a 41-year-old female with a history of

21     fibrocystic disease.  Patient had FNA on 2 October

22     '98.  Is that what you are referring to?

23          Q.    Yes.

24          A.    An excisional biopsy performed 14 October

25     with a positive histology of infiltrating carcinoma
```

1    with medullary features.  And then handwritten it

2    says prior --

3         Q.    No.  Plan.

4         A.    Plan lumpectomy and lymph nodes --

5         Q.    Dissection, I believe?

6         A.    Lymph node dissection, right.

7         Q.    Okay.  Would that be the plan that was

8    discussed by the tumor board?

9              MR. ADAMS:  Objection.  If you know.

10         A.    With her notes there, it sounds like that

11    was the plan discussed.

12         Q.    (By Ms. Zork) Okay.  It says, "patient's

13    decision."  Do you know what that would mean?

14         A.    Yeah.  The patients are told that a

15    complete mastectomy is the equivalent of a lumpectomy

16    followed by radiation, and that the patient may -- is

17    usually presented that data and made to decide

18    whether she would like to preserve the breast by only

19    having the lumpectomy followed by the radiation.

20         Q.    Can you read the rest of the note?  Says,

21    ".5 centimeter palpable, extremely close to margin,

22    ER/PR pending."

23         A.    Yes.

24         Q.    On October 26 of 1998, in light of the

25    fact that the biopsy was done on October 14, would

68

1    you have expected the ER/PR results to have been

2    available for the tumor board?

3            MR. ADAMS:  Objection.  Asked and

4        answered.

5            MS. ZORK:  There was some confusion

6        to which --

7            MR. ADAMS:  Yeah.  I am permitting

8        him to answer.

9    A.    The ER/PR status, would I have expected it

10    to be positive, to be --

11    Q.    (By Ms. Zork) No. Have expected to have

12    that information by that time, meaning October 26, in

13    light of the fact that the biopsy was done on October

14    14?

15    A.    Not necessarily, and nor would it bear on

16    the plan as stated.

17    Q.    Why would you not necessarily expect to

18    have that information available on October 26?

19    A.    I would expect to have that information at

20    the time adjuvant therapy was being planned and not

21    necessarily at the time of initial surgical therapy

22    planning.

23    Q.    Was it the practice at Eisenhower to wait

24    until after all of the surgical treatment was

25    completed before ER/PR testing was requested?

1      A.    No, it wasn't.  The practice was to submit

2    all tissue specimens for ER/PR testing at the time of

3    diagnosis.  The logistics of carrying that out were

4    variable in terms of how quickly the results would

5    come back.

6      Q.    What would the variables be?

7      A.    Variables might be regarding personnel

8    down in the pathology laboratory as to who was

9    handling the tissue, as to what the efficiency of

10    those people were in terms of getting it out sooner

11    or later.

12      Q.    From your perspective, were there problems

13    in 1998 in the pathology department with specimens

14    sent for further studies on patients who had a

15    diagnosis of cancer?

16          MR. ADAMS:  Objection.  You may

17      answer.

18      A.    No, there weren't any specific problems.

19    There was an occasional delay that would require an

20    extra step or two, but it never had any detrimental

21    effect that I am aware of.

22      Q.    (By Ms. Zork)  If at the October 26 tumor

23    board meeting it was noted that ER/PR studies had not

24    been requested, would it have been the practice of

25    the tumor board to note that and to -- someone's

1    responsibility on the tumor board to follow up to see

2    that those studies were performed?

3             MR. ADAMS:  Objection.

4       A.    No.  It was still the responsibility of

5    the ordering physician, i.e., the surgeon who

6    performed the biopsy, to insure that all the proper

7    handling and studies were back on the tissue.

8       Q.    (By Ms. Zork) So, even though the

9    pathologist who may have done the pathologic

10   evaluation was present at the tumor board meeting,

11   the responsibility for seeing that the appropriate

12   follow-up testing of the specimen was done would fall

13   back on the surgeon?

14      A.    That's correct.

15      Q.    Is that something that is understood among

16   the physicians at Eisenhower?

17      A.    Yeah.

18      Q.    That practice and treatment of oncology?

19      A.    Yes.  I think we all as a group recognize

20   that ER/PR testing is required for all tissue

21   specimens, and there are almost no exceptions to that

22   rule.  And thus almost all surgeons are very well

23   aware of that as part of the standard of care.

24      Q.    I am looking at the notes for the tumor

25   board from November 30th of 1998.  On the sign-in

1    sheet your name does not appear.  Does that mean that

2    you were not present?

3         A.    That's correct.

4         Q.    Would you have been present, then the

5    practice would have been you would have signed in?

6         A.    Right.

7         Q.    I am looking at some notes here.  Do you

8    have any specific knowledge in this case as to why

9    ER/PR studies were not requested in Mrs. Pollard's

10   case until December 4 of 1998?

11        A.    No, I don't know the reason.

12        Q.    Would that be the normal practice at

13   Eisenhower if a patient has an excisional biopsy and

14   breast cancer is removed from the breast on October

15   14, would it be usual or unusual for there to be a

16   delay of six or seven weeks in requesting ER/PR

17   studies?

18             MR. ADAMS:  Objection.

19        A.    Somewhat unusual.

20        Q.    (By Ms. Zork)  Somewhat unusual?

21        A.    Uh-huh.

22        Q.    What would the normal practice be in your

23   experience?

24        A.    Normally it is done on the initial biopsy,

25   and it is sent fairly routinely.  On the occasion

1    where that fails to occur, then a reminder takes

2    place either through one of the consulting

3    physicians, such as the surgeon, or the oncologist

4    who may be familiar, to please expedite that

5    evaluation.  So, there is usually some prompting of

6    the pathology department by one of the clinicians if

7    there does seem to be that data missing.

8        Q.    Dr. Fink, have you reviewed any medical

9    literature in connection with your deposition today?

10       A.    Well, I read a lot of literature about

11   breast cancer, which does have some -- which all

12   connects with this type of case.

13       Q.    But, I mean, specifically for purposes of

14   this case, have you consulted any medical literature?

15       A.    No.

16       Q.    Other than your conversations with

17   Mr. Adams, have you discussed this case with anyone

18   else at Eisenhower?

19       A.    No.

20       Q.    Dr. Gupta testified in a deposition

21   earlier this year that he had some conversations with

22   you about this case.  Do you recall those, any

23   conversation with Dr. Gupta about Mrs. Pollard or

24   about this case?

25       A.    Yes.

1      Q.     What do you recall?

2      A.     He asked about whether, in general terms,

3    whether a patient who was going overseas should be

4    referred to the EFMP program.

5      Q.     And I take it whether a patient who is

6    going overseas who's recently been diagnosed with

7    breast cancer?

8      A.     Correct.

9      Q.     And what did you tell him?

10      A.     The best that I can recall was that the

11    EFMP program was probably not necessary for her to

12    get the care that she needed, or something like that,

13    or this person.  Again, we referred to this person

14    but not so much as her name.  But a person with

15    breast cancer who is going overseas, that such a

16    person as long as you felt comfortable that the care

17    was going to be taken care of, that they were going

18    to a place that had adequate facilities, that the

19    EFMP program would not be necessary for her to get

20    the optimal care.

21      Q.     Now, in the context in which Dr. Gupta

22    asked you the question, this is after the pendency of

23    this lawsuit?

24          MR. ADAMS:  Objection.  If you know.

25      A.     I believe so, yes.

74

1     Q.   (By Ms. Zork) Dr. Gupta didn't approach

2   you with that question at the time he was seeing

3   Mrs. Pollard in 1998?

4     A.   Right.  It was after that.

5     Q.   That's after Mrs. Pollard had already

6   left?

7     A.   After she had already left.

8     Q.   Your answer to Dr. Gupta's question that

9   as long as you felt comfortable that the care was

10   adequate that it would not be necessary to refer a

11   patient to the Exceptional Family Member Program, is

12   that based upon a written policy as to when referrals

13   are appropriate?

14     A.   No.  That was based more on the practical

15   use of that program.

16     Q.   So, your understanding that it's within

17   the discretion of the treating physician as to

18   whether or not a patient, such as Mrs. Pollard, who

19   is actively being treated for breast cancer and going

20   overseas, is it your understanding it's discretionary

21   as to whether or not physicians refer the patient to

22   the Exceptional Family Member Program?

23        MR. ADAMS:  Objection.

24        MS. LOWENSEN:  Objection to the form.

25        MS. HANRAHAN:  Same objection.

1        Q.    (By Ms. Zork)  You can answer.

2        A.    I am not familiar with the discretion.

3        Q.    You are not familiar with whether or not

4    it is discretionary?

5        A.    That's correct.  My understanding is that

6    it's -- that it is recommended and encouraged to

7    refer such patients to EFMP, and many patients

8    actually enroll on their own without the physician

9    referral or physician initiated referral.

10       Q.    How do you know that?

11       A.    Quite often patients come and say that

12   they would like you to refer them to EFMP, or they

13   need a referral to EFMP in order to get housing or

14   something along those lines.  Quite often it is

15   brought to the physician's attention that way.

16       Q.    The briefings that you attended where you

17   were briefed about the Exceptional Family Member

18   Program, were the other members of your department,

19   would those be briefings that they would have

20   attended as well?

21       A.    Yes.

22       Q.    So, was it a requirement in your

23   department that the oncologists, including Dr. Gupta,

24   attend those type of briefings?

25       A.    Yes, it is.

1      Q.    I did just want to ask you on the -- if

2  you can look again at the sign-in sheet from the

3  November 28 -- I'm sorry.  November 30th, 1998, tumor

4  board.  It's just a list of the hematology/oncology

5  names that are listed there.

6      A.    Okay.

7      Q.    There is a Dr. Willadsen is on that list,

8  Dr. Thompson and Dr. Dodge?

9      A.    They are not -- Yeini Thompson is a Ph.D.

10  who works in our research department, and Jeri Dodge

11  was her assistant, not a physician.

12      Q.    What type of research are they involved in

13  within the department?

14      A.    We have national research studies going on

15  in the treatment of various cancers, and they help us

16  manage those trials, mostly administratively.

17      Q.    Can you tell me, is there a residency

18  program in hematology -- I mean, a fellowship in

19  hematology and oncology at Eisenhower?

20      A.    No.

21      Q.    Do you have any residents that rotate

22  through your department?

23      A.    Yes.  We have internal medicine residents

24  that rotate.

25      Q.    What school or program are they affiliated

1    with?

2         A.    With Eisenhower's internal medicine

3    residency program.

4         Q.    And do you use internal medicine

5    residents?  Do they also rotate through the

6    outpatient clinic?

7         A.    Yes, they do.

8         Q.    With respect to the patients who are seen

9    by internal medicine residents in the

10   hematology/oncology clinic, are they seen under the

11   supervision of the attending oncologist?

12        A.    Yes.

13        Q.    To your knowledge, did internal medicine

14   residents work with Dr. Gupta?

15        A.    Yes, they did.

16        Q.    The conversation that we just talked about

17   with Dr. Gupta in which he asked about the

18   Exceptional Family Member Program, do you have any --

19   do you recall any other conversations or anything

20   else about that conversation with Dr. Gupta?

21             MR. ADAMS:  Objection.

22        A.    No, I don't.

23        Q.    (By Ms. Zork) Have you done any

24   independent -- independently looked into whether or

25   not Mrs. Pollard was enrolled in the Exceptional

1   Family Member Program based upon her treatment at

2   Eisenhower?

3       A.    No, I haven't.

4       Q.    Have you had any discussions with anyone

5   in the Exceptional Family Member Program about

6   Mrs. Pollard?

7       A.    No, I haven't.

8       Q.    Are you familiar with the exceptional

9   family member regulations?

10          MR. ADAMS:  Objection.  If you

11          understand, you can answer.

12      A.    No.  The only part I am familiar with is

13  the briefing received, the brief briefing received

14  from EFMP.

15      Q.    (By Ms. Zork) I'm sorry.  I didn't hear

16  that.

17      A.    I am only familiar with the briefing we

18  received in our training.

19          MS. ZORK:  I think those are all the

20          questions I have, Dr. Fink.

21          MR. ADAMS:  Give me a second.

22          MS. HANRAHAN:  Larry, this is Cathy.

23      I have a question or two.

24          MR. ADAMS:  Cathy, why don't you go

25          ahead.

```
 1                    CROSS-EXAMINATION

 2   BY MS. HANRAHAN:

 3        Q.    Dr. Fink, this is Cathy Hanrahan.  I just

 4   have a couple of questions for you with respect to

 5   the oncology department at Eisenhower and how it

 6   operated in 1998.  Is it correct that all oncologists

 7   within the department could see CHAMPUS eligible

 8   patients?

 9        A.    Yes, they could.

10        Q.    And on occasion, you had the opportunity

11   to see CHAMPUS eligible patients?

12        A.    Yes, I did.

13             MS. HANRAHAN:  That's all I have.

14             MR. ADAMS:  Let me go now.

15                    CROSS-EXAMINATION

16   BY MR. ADAMS:

17        Q.    Dr. Fink, do you have day-to-day control

18   or supervision over Dr. Gupta's delivery of medical

19   care to the patients you assign to him?

20        A.    I hear of the patients he is going to be

21   seeing each day, but I don't directly supervise nor

22   control his practice of those patients.

23        Q.    If you have a problem with one of your

24   uniformed oncologists that may require disciplinary

25   action, how do you proceed?
```

 1          A.    Yeah.  That works through military

 2    channels, and I would go through my department

 3    chairman to bring that forward.

 4          Q.    And do you perform an officer evaluation

 5    for your uniformed medical care providers?

 6              MS. ZORK:  I'm sorry.  I can barely

 7          --

 8          Q.    (By Mr. Adams)  Do you make an officer

 9    rating for your active duty oncologists?

10              MS. ZORK:  I still didn't hear you,

11          Larry.

12          Q.    (By Mr. Adams)  Let me repeat it again.

13    Do you provide an officer evaluating, what is called

14    an OER, for your active duty medical oncologists?

15          A.    Yes.  I perform an evaluation report for

16    my military physicians that I rate.

17          Q.    And do you do that for Dr. Gupta?

18          A.    No, we don't have an equivalent evaluation

19    form.

20          Q.    And with regard to Dr. Gupta's

21    compensation, is it your understanding -- well, what

22    is your understanding of how that is covered or where

23    it is covered in the scheme of things?

24          A.    My understanding is his salary is based

25    upon the quantity of work he has previously

1    performed, for which the new contract was created,

2    and he has some degree of expectation to keep up that

3    degree of workload, which is accounted for by his

4    submission of the bills to the company Sterling.

5              MR. ADAMS:  I don't have any other

6         questions.

7              MS. LOWENSEN:  This is Joan.  I have

8         no questions.

9              MR. ADAMS:  Okay.  He decides to

10        waive.

11             THE WITNESS:  The answer to one

12        question was who was the physician in 1998.

13        I answered Dr. Coleman.  I would like to

14        change that answer to Dr. Willadsen.

15             MS. ZORK:  That's fine.  I think it's

16        already been changed.

17             (Deposition concluded at 12:40 p.m.)

18             (It was stipulated and agreed by and

19    between counsel for the respective parties and the

20    witness that the signature of the witness to the

21    deposition be waived.)

22

23

24

25

82

1                    INDEX TO EXAMINATIONS

2

3          Examination                              Page

4

5   Direct Examination by Ms. Zork                  3

6   Cross-Examination by Ms. Hanrahan               79

7   Cross-Examination by Mr. Adams                  79

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

83

```
 1                    C E R T I F I C A T E

 2

 3

 4    STATE OF GEORGIA:

 5    COUNTY OF COLUMBIA:

 6            I hereby certify that the foregoing

 7        transcript was taken down, as stated in

 8        the caption, and the questions and answers

 9        thereto were reduced to typewriting under

10        my direction; that the foregoing pages 1

11        through 85 represent a true, complete, and

12        correct transcript of the evidence given

13        upon said hearing, and I further certify

14        that I am not of kin or counsel to the

15        parties in the case; am not in the regular

16        employ of counsel for any of said parties;

17        nor am I in anywise interested in the result

18        of said case.

19            This, the 5th day of December, 2003.

20

21

22

                REGINA W. HOLLIS, CCR B-2306, RPR
23              My commission expires on the
                20th day of May, 2006.
24

25
```

84

```
 1              COURT REPORTER DISCLOSURE

 2    DEPOSITION OF: KENNETH I. FINK, M.D.

 3         Pursuant to Article 8.B. of the Rules and
      Regulations of the Board of Court Reporting of the
 4    Judicial Council of Georgia which states: "Each court
      reporter shall tender a disclosure form at the time
 5    of the taking of the deposition stating the
      arrangements made for the reporting services of the
 6    certified court reporter, by the certified court
      reporter, the court reporter's employer, or the
 7    referral source for the deposition, with any party to
      the litigation, counsel to the parties or other
 8    entity.  Such form shall be attached to the
      deposition transcript," I make the following
 9    disclosure:
           I am a Georgia Certified Court Reporter.  I am
10    here as a representative of Brown Reporting, Inc.
           Brown Reporting was contacted by the offices of
11    Bruce J. Klores & Associates to provide court
      reporting services for the deposition.  Brown
12    Reporting will not be taking this deposition under
      any contract that is prohibited by O.C.G.A.
13    15-14-37(a) and (b).
           Brown Reporting has no contract/agreement to
14    provide reporting services with any party to the
      case, any counsel in the case, or any reporter or
15    reporting agency from whom a referral might have been
      made to cover this deposition.  Brown Reporting will
16    charge its usual and customary rates to all parties
      in the case, and a financial discount will not be
17    given to any party to this litigation.

18

      /s/ Regina W. Hollis, CCR B-2306, RPR   11/24/03
19

20    Signature of Attorneys present:

21    /s/ Attorney Name          Disc Date

22    /s/ Attorney Name          Disc Date

23    /s/ Attorney Name          Disc Date

24    /s/ Attorney Name          Disc Date
      Return this form after review and/or signatures to
25    the court reporter for inclusion in the record.
      Please use reverse side for additional signatures.
```