```
           IN THE UNITED STATES DISTRICT COURT FOR
           THE DISTRICT OF MARYLAND, NORTHERN DIVISION
                                  *
VERONICA POLLARD, et al.,
                                  *
     Plaintiffs,
v.                                *      CIVIL NO.: WDQ-02-764

THE UNITED STATES OF              *
AMERICA, et al.,
                                  *
     Defendants.
*    *    *    *    *    *    *    *    *    *    *    *    *
```

MEMORANDUM OPINION AND ORDER

Roosevelt and Veronica Pollard have sued the United States of America ("USA"), Dr. Raj R. Gupta, Sterling Medical Corporation ("Sterling"), and Humana Military Healthcare, Inc. ("Humana") for negligence and wrongful death. Pending are Mr. Pollard's motion for leave to file a second amended complaint and to compel discovery, and the USA, Humana, and Dr. Gupta's motions for summary judgment. For the reasons discussed below, Mr. Pollard's motion for leave to file a second amended complaint will be granted, but his motion to compel discovery will be denied; the USA's motion for summary judgment will be denied, but the claims against it will be dismissed; Humana's motion for summary judgment will be denied, and Dr. Gupta's motion for summary judgment will be denied.

BACKGROUND

Veronica Pollard was the civilian wife of Roosevelt Pollard, an active member of the armed forces. Veronica Pollard Dep. 15.

1

In 1998, Mr. Pollard was stationed in Kuwait, and his wife and children lived in military housing in Augusta, Georgia. Proposed Second Am. Compl. ¶ 12. In October 1998, Mrs. Pollard, 43 years old at the time, found a small lump in her right breast. Veronica Pollard Dep. 23, 25. Two days later, Mrs. Pollard saw a physician at the Dwight D. Eisenhower Military Hospital ("Military Hospital") in Augusta, Georgia. *Id.* at 24. Mrs. Pollard informed the physician that her sister had died from breast cancer at age 29, and that her mother had been diagnosed with breast cancer. *Id.*

The physician performed a biopsy of the lump and determined that it was cancerous. *Id.* at 25. On November 12, 1998, Mrs. Pollard underwent a lumpectomy to remove the cancerous nodule and 17 nearby lymph nodes. *Id.* at 26-27. Cancer was not found in any of the lymph nodes. *Id.* at 27. The physician who performed the lumpectomy recommended that Mrs. Pollard receive chemotherapy and radiation treatment, and referred her to an oncologist. *Id.* at 29.

Mrs. Pollard contacted Dr. Gupta, an oncologist at the Military Hospital, in mid-November 1998, but was told that he had not received her medical information, so she should make an appointment for the beginning of December. *Id.* When Mrs. Pollard arrived for her first appointment with Dr. Gupta in early December, she was informed that he was still awaiting her test

results and she re-scheduled her appointment for mid-December. *Id.* at 80.

At her mid-December appointment with Dr. Gupta, Mrs. Pollard informed him that she was planning to move to England with her family in January 1999 because her husband was being stationed there. *Id.* at 32. Dr. Gupta's receptionist told Mrs. Pollard that before her move to England, Dr. Gupta would need to be sure that there was a place there capable of handling her care. *Id.* Dr. Gupta spoke with a military medical care manager in England, and Dr. Gupta's receptionist related to Mrs. Pollard that a medical center in Leeds could administer her radiation and chemotherapy. *Id.*

Dr. Gupta gave Mrs. Pollard a good prognosis and told her that he would contact an oncologist in England to establish her treatment plan. *Id.* Dr. Gupta made no specific recommendations to Mrs. Pollard about her treatment options, but gave her permission to relocate to England with her husband. *Id.* at 33-34. Dr. Gupta also forwarded Mrs. Pollard's medical records and a letter addressed "To whom it may concern," which explained that:

> Mrs. Pollard's adjuvant therapy is somewhat debatable. The size of the tumor was very small and has medullary features which are of favorable prognosis. The fact that she is pre-menopausal and that her receptors were negative, makes me favor recommending adjuvant chemotherapy with adriamycin and cytoxan for 4 cycles. I also recommend radiation therapy to her right breast. In addition, I recommend the use of tamoxifen for prevention of breast cancer in this high risk

patient.
Pl.'s Opp'n to Humana's Mot. for Summ. J. Ex. 3 (letter from Dr. Gupta to Whom it may concern).

Upon arriving in England in mid-January 1999, Mrs. Pollard contacted the military medical manager to arrange her care. *Id.* at 35. Because it took a couple of weeks to complete the process necessary to enroll Mrs. Pollard in the military medical system in England, she was not able to see an oncologist there until February 1999. *Id.*

Dr. Dodwell, Mrs. Pollard's oncologist in England, told her that he had discussed her care with Dr. Gupta and concluded that she should receive radiation but not chemotherapy. *Id.* at 36-37. Because there was a waiting list for receiving radiation therapy in England, Mrs. Pollard did not begin her radiation treatments until April 23, 1999. Dodwell Dep. 36.

In the spring of 2000, doctors in England discovered that Mrs. Pollard had cancer in her right breast again, as well as a cancerous nodule on her sternum. Veronica Pollard Dep. 42. Because the military lacked appropriate facilities to treat Mrs. Pollard's cancer in England, she was transferred to the Walter Reed medical center in Washington, DC. *Id.* at 46.

Upon arrival at Walter Reed, an oncologist discovered another cancerous nodule on Mrs. Pollard's collarbone. *Id.* The oncologist immediately sent her for four cycles of chemotherapy,

which were administered from June through August 2000.  *Id.*

In August 2000, when Mrs. Pollard returned to her oncologist, he informed her that she needed a mastectomy of the right breast because the cancer was spreading rapidly.  *Id.* at 50.  Mrs. Pollard underwent a mastectomy in September 2000.  *Id.*  Then in October 2000, Mrs. Pollard had a bone marrow transplant.  *Id.* at 55.

In January 2002, Mrs. Pollard consulted a surgeon to discuss possible reconstructive surgery.  *Id.* at 63-64.  In determining whether she could undergo surgery, Mrs. Pollard's doctors discovered that she had lung cancer.  *Id.* at 64.  Mrs. Pollard died of cancer on December 29, 2003.  Proposed Second Am. Compl. ¶ 4.

## ANALYSIS

A.  Motion for Leave to File Second Amended Complaint

In the first amended complaint, Mrs. Pollard charged the Defendants with medical malpractice, Mr. Pollard made a claim of negligent infliction of emotional distress, and both Plaintiffs alleged loss of consortium.  As a result of Mrs. Pollard's death, Mr. Pollard seeks to file a second amended complaint in his capacities as her surviving spouse and representative of her estate, in which he claims wrongful death and negligence.

Motions to amend are to be granted in the absence of undue delay, bad faith, dilatory motive, repeated failure to cure

deficiencies by amendments previously allowed, undue prejudice to the opposing party, or futility. *Ward Elecs. Serv., Inc. v. First Commercial Bank*, 819 F.2d 496, 497 (4th Cir. 1987) *(citing Foman v. Davis*, 371 U.S. 178, 182 (1962)). Because none of these concerns is implicated by Mr. Pollard's proposed amendments, his unopposed motion for leave to file the second amended complaint will be granted.

B.   Motions for Summary Judgment

   1.   Standard of Review

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to summary judgment as a matter of law. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court explained that, in considering a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask . . . whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most

favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), but the opponent must produce evidence upon which a reasonable fact finder could rely. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). The mere existence of a "scintilla" of evidence in support of the nonmoving party's case is not sufficient to preclude an order granting summary judgment. *Anderson*, 477 U.S. at 252.

    2.   Whether Dr. Gupta Fell Below the Standard of Care

Mr. Pollard asserts that Dr. Gupta fell below the standard of care by failing to administer radiation and chemotherapy to Mrs. Pollard in a timely manner after her lumpectomy operation, and by authorizing Mrs. Pollard's transfer to England before she completed chemotherapy and radiation treatments. Proposed Second Am. Compl. ¶ 21. Dr. Gupta argues that Mrs. Pollard terminated the doctor-patient relationship by moving to England, and that there is no evidence that the timely administration of chemotherapy would have prevented the recurrence of cancer. Dr. Gupta's Mot. for Summ. J. 3-8.

In diversity cases, the court must apply the law of the forum state, including its choice of law rules. *Rockstroh v. A.H. Robins Co., Inc.*, 602 F. Supp. 1259, 1262 (D. Md. 1985) (*citing Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). Maryland applies the doctrine of *lex loci delictus* in

tort actions, meaning that the substantive law of the state where the wrong occurred governs. *Id.* (*citing Hauch v. Connor*, 295 Md. 120 (1983)). Because Mrs. Pollard was allegedly injured in the state of Georgia, Georgia substantive law applies.

Georgia's wrongful death statutes give a right of action not available at common law and must be limited strictly to the meaning of the language employed and not extended beyond plain and explicit terms. *Dowling v. Lopez*, 211 Ga. App. 578, 579 (1993) (*citing Miles v. Ashland Chem. Co.*, 261 Ga. 726, 728 (1991)). The wrongful death statutes do not provide for recovery "where a defendant's wrongful act or negligence did not result in death." *Id.* at 579-80.

The plaintiff in a wrongful death action, therefore, must show to a reasonable degree of medical certainty that the patient's death could have been prevented,[1] and that the physician's want of care or skill was the proximate cause[2] of the patient's death. *Id.* (*citing Maddox v. Houston County Hosp. Auth.*, 158 Ga. App. 283, 284 (1981)) (internal quotation marks omitted).

In wrongful death actions involving medical malpractice,

---

[1] *Id. (citing Goggin v. Goldman*, 209 Ga. App. 251, 252 (1993); *Parrott v. Chatham County Hosp. Auth.*, 145 Ga. App. 113, 115 (1978)).

[2] Proximate cause is "that which in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred." *Zwiren v. Thompson*, 276 Ga. 498, 500 (2003) (*quoting T.J. Morris Co. v. Dykes*, 197 Ga. App. 392, 395-96 (1990)) (internal quotation marks omitted).

expert testimony on proximate cause must "provide a causal connection that is more than mere chance or speculation." *Id.* at 501 (*citing Bowling v. Foster*, 254 Ga. App. 374 (2002); *Maddox*, 158 Ga. App. at 284). "Instead of speaking in terms of possibilities, the expert's testimony must show as an evidentiary threshold that the expert's opinion regarding causation is based, at the least, on the determination that there was a reasonable probability that the negligence caused the injury." *Id.* (*quoting Pilzer v. Jones*, 242 Ga. App. 198, 201 (2000)) (internal quotation marks omitted). The expert could also meet this threshold by stating that the only apparent cause of the plaintiff's injury was the defendant's action, or by presenting overwhelming testimony of experience that, in the absence of the alleged negligence, the patient's condition would have been prevented from worsening. *Id.* (*citing Lee v. Satilla Health Servs.*, 220 Ga. App. 885 (1996)).

Several expert witnesses testified and agreed that chemotherapy and/or radiation treatment must begin as soon as possible after a breast cancer patient has undergone a lumpectomy procedure. Smith Dep. 32; Fiorica Dep. 31-32; Pushkas Dep. 16; Sokol Dep. 35; Stark Dep. 54-55. Normally patients begin treatment between three and six weeks after breast cancer is diagnosed. Smith Dep. 32; Fiorica Dep. 31-32; Pushkas Dep. 16-17; Sokol Dep. 57; Stark Dep. 55.

Although there are no clinical studies to support the efficacy of this practice, the conventional wisdom is that:

> [t]here is no question that early treatment of breast cancer is essential because the longer you wait, the greater the risk, and the reason for that is that once you do a lumpectomy, then what happens is if there are micrometastases,[3] those metastases might basically be sort of in the resting phase . . . initially, but once the bulk of the tumor is removed, even though this was a small tumor, then these cells tend to reenter the cell cycle, and that is the optimum time to kill them with chemotherapy.

Smith Dep. 32-32; *see also* Stark Dep. 55 ("the surgery itself probably stimulates the metastases to begin to synthesize DNA and start to grow and . . . it would be optimal to begin [treatment] at a time when the metastases are most vulnerable to being killed").

Dr. Gupta argues that because the experts testified that adding chemotherapy to Mrs. Pollard's treatment would have only slightly decreased the odds that her cancer would recur, Mr. Pollard has failed to show that Dr. Gupta's actions were the proximate cause of the recurrence. Dr. Gupta's Mot. for Summ. J. 3-6.

In making this argument, Dr. Gupta ignores the overwhelming expert testimony that Mrs. Pollard's cancer would have been unlikely to recur had she received chemotherapy and/or radiation in a timely manner. The experts' testimony, based on their

---

[3] A micrometastases is a microscopic cancer tumor. Merriam-Webster Medical Dictionary (2003).

extensive professional experiences, is sufficient to show that Dr. Gupta's actions could have been the proximate cause of Mrs. Pollard's cancer recurrence.  *See Lee*, 220 Ga. App. at 888-889 (expert's testimony, based on his considerable experience, that physician's failure to provide timely treatment negatively affected the patient's prognosis sufficient to show proximate cause even though there were no scientific studies to support his position).

Dr. Gupta admits that he had a doctor-patient relationship with Mrs. Pollard before she relocated to England.  Dr. Gupta's Mot. for Summ. J. 7-8.  Because the experts testified that Dr. Gupta fell below the standard of care when Mrs. Pollard met with him before she left for England, his argument that there was no doctor-patient relationship once she moved abroad is irrelevant to the determination of whether he was negligent in treating her.

Because a reasonable jury could find that Dr. Gupta was negligent and that his negligence was the proximate cause of Mrs. Pollard's death, Dr. Gupta's motion for summary judgment will be denied.[4]

3.   Whether the USA can be Held Liable for Dr. Gupta's Actions

---

[4] Mr. Pollard filed a motion to strike Dr. Gupta's Reply or for leave to file a Surreply.  Because the Court found it unnecessary to rely on Dr. Gupta's Reply in denying his motion for summary judgment, Mr. Pollard's motion to strike or for leave to file a Surreply will be denied as moot.

Mr. Pollard asserts that as Dr. Gupta's employer, the USA controlled his actions, rendering the USA liable for his alleged negligence. Pl.'s Opp'n to USA's Mot. for Summ. J. ¶ 1.

The Federal Tort Claims Act ("FTCA") makes the United States liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b) (2004). The FTCA, "by its own terms, applies only to the acts of federal employees and explicitly excludes the possibility of federal government liability for the acts of independent government contractors." *Berkman v. United States*, 957 F.2d 108, 111 (4th Cir. 1992) (citing 28 U.S.C. § 1346(b)); *see also Logue v. United States*, 412 U.S. 521, 526-28 (1973).

The FTCA, as a waiver of sovereign immunity, is strictly construed, and all ambiguities are resolved in favor of the sovereign. *Robb v. United States*, 80 F.3d 884, 887 (4th Cir. 1996) (*citing United States v. Nordic Village, Inc.*, 503 U.S. 30, 33 (1992); *Williams v. United States*, 50 F.3d 299, 305 (4th Cir. 1995)). The independent contractor exception to the waiver of sovereign immunity has thus been broadly construed. *Id. (citing Lurch v. United States*, 719 F.2d 333, 338 (10th Cir. 1983)).

In determining whether an individual is an employee or an independent contractor under the FTCA, the court must consider

whether the United States has the authority to control the detailed physical performance of the contractor.  *Logue*, 412 U.S. at 527-28.  In making this assessment, the court must examine the control exerted over the primary activity that is contracted for and not the peripheral, administrative tasks relating to such activity.  *Id.* at 889 (*citing Wood v. Standard Products Co.*, 671 F.2d 825, 832 (4th Cir. 1982)).  The terms of the contract between the United States and the individual performing work on its behalf are critical to making this assessment.  *Wood*, 671 F.2d at 829.

Dr. Gupta's relationship with the USA was created by a series of contracts.  In 1996, the United States Department of Defense entered into a contract with Humana, by which Humana was required to solicit input from government personnel as to the requirements of the government facilities it would be servicing, and then "select . . . providers without any further involvement of the Government in the selection process, except for the privileging of the providers by [government personnel] after the selection has been made."  Humana's Mot. for Summ. J. Ex. 8 (contract between United States and Humana).  Selected providers were required to comply with federal law and to participate in quality assessment and improvement activities.  *Id.*

Humana then entered into a contract with Sterling, by which Sterling was required to contract with healthcare providers to

provide services to facilities that Humana administered under its contract with United States.  Humana's Mot. for Summ. J. Ex. 10 at § 1.3 (contact between Humana and Sterling).  The contract stated that the providers would be subject to clinical quality and utilization management activities conducted by Humana and the United States.  *Id.* at § 4.  Sterling was required to pay all applicable taxes, unemployment compensation, and workman's compensation for the providers, and to purchase professional liability insurance for them.  *Id.* at §§ 6-7.

Sterling entered into an agreement with Dr. Gupta, which required Dr. Gupta to provide oncology services at the Dwight D. Eisenhower Army Medical Center five days a week.  Humana's Mot. for Summ. J. Ex. 9 at § 1.  The contract stated that "Physician and Sterling Medical agree that Physician is an independent contractor, and not an employee of Sterling Medical.  Physician shall be responsible for his/her own acts and conduct in performance of services hereunder."  *Id.* at § 5.

The court enforces the plain language of a contract in its ordinary sense.  *See Bowers Hydraulic Dredging Co. v. United States*, 211 U.S. 176, 187 (1908).  The plain language of Dr. Gupta's contract provides that he is an independent contractor.

Moreover, Dr. Gupta's relationship with the USA is "not consonant with a traditional employer-employee relationship." *Lurch*, 719 F.2d at 338.  The USA's ability to control Dr. Gupta's

14

performance was limited to requiring compliance with federal law and overseeing quality standards. The government may "fix specific and precise conditions to implement federal objectives" without converting an individual's actions "into federal governmental acts." *United States v. Orleans*, 425 U.S. 807, 816 (1976).

Mr. Pollard also asserts that the physician who "under-reported and misread the pathology specimens" was negligent and because he was an employee of the USA, the claims against the USA should survive. Pl.'s Opp'n to USA's Mot. for Summ. J. 8. Mr. Pollard, however, proffered no evidence in support of this assertion. A nonmoving party's bare allegations are insufficient to overcome a motion for summary judgment.

When a court concludes that the United States is not liable for a party's actions pursuant to the FTCA, the proper practice is to dismiss the suit for want of jurisdiction under Federal Rule of Civil Procedure 12(b)(1), rather than to grant summary judgment. *Williams*, 50 F.3d at 304. Accordingly, the USA's motion for summary judgment will be denied, but Mr. Pollard's claims against the USA will be dismissed.

4.   Whether Humana can be Held Liable for Dr. Gupta's Actions

Mr. Pollard argues that Dr. Gupta is an employee of Humana, rendering Humana vicariously liable for his alleged negligence.

Under Georgia law, to determine whether an individual is an employee or agent of a principal, the court must determine:

> whether the employer, under the contract, whether oral or written, has the right to direct the time, the manner, the methods, and the means of the execution of the work, as contra-distinguished from the right to insist upon the contractor producing results according to the contract, or whether the contractor in the performance of the work contracted for is free from any control by the employer of the time, manner, and method in the performance of the work. . . . The right to control the manner and method means the right to tell the employee how he shall go about doing the job in every detail, including what tools he shall use and what procedures he shall follow.

*RBF Holding Co. v. Williamson*, 260 Ga. 526 (1990) *(quoting State v. Goolsby*, 191 Ga. App. 161, 163 (1989)) (internal quotation marks omitted) (alteration in original).[5]

The right to control the person's time means that the employer has assumed the right to control the person's actual hours of work.  *Cooper*, 2004 Ga. App. LEXIS 462, at *7 (*citing Williamson v. Coastal Physician Servs. of the Southeast*, 251 Ga.

---

[5] Georgia has two statutes governing the liability of principals. Official Code of Georgia Annotated § 51-2-2 provides that "[e]very person shall be liable for torts committed by . . . his servant by his command or in the prosecution and within the scope of his business." Section 51-2-5 holds an employer liable for the acts of an employee if the employer "retains the right to direct or control the manner of executing the work or interferes and assumes control so as to create the relation of master and servant or so that an injury results which is traceable to his interference."  It is unclear which statute Mr. Pollard relied on in his opposition to Humana's motion for summary judgment, but the same test is used to determine liability under both statutes.  *See Cooper v. Binion*, 2004 Ga. App. LEXIS 462, *3 (2004).

App. 667, 668 (2001)). When an entity requires a person to work certain hours or arranges the person's schedule, this factor shows that the person is an employee and may alone preclude summary judgment. *Id.* (*citing Hollingsworth v. Ga. Osteopathic Hosp.*, 145 Ga. App. 870, 871-72 (1978)).

The contract between Humana and Sterling states that "[t]he location(s) of where the services are to be performed, the hours of operation and additional matters will be incorporated by reference into this contract." Humana's Mot. for Summ. J. Ex. 10 at § 1.2 (contract between Humana and Sterling). The hours of operation are provided in the "Statement of Work," which is also incorporated by reference into the contract. *Id.* at Attachment A. The "Statement of Work" provides that "[n]ormal duty hours of performance are [7:30 a.m.] through [4:30 p.m.] Monday through Friday." Humana's Mot. for Summ. J. Ex. 11 at Attachment C ¶ 1.6 (oncology statement of work).

A reasonable fact finder could determine that Humana assumed control over Dr. Gupta's work schedule, rendering it liable for his alleged negligence. Therefore, whether Dr. Gupta was Humana's employee is a question of material fact to be submitted to a jury.

C.   Motion to Compel Discovery

Mr. Pollard has filed a motion to compel the USA to produce

17

a witness to testify as to:

> The terms of the contract and negotiation of the contract between the U.S. Army and Humana Military in effect in 1998-present, including all aspects of the contract related to provision of health care services to members of the military and their families, indemnification, insurance, control of healthcare, assignment of the contract. The . . . designee should be prepared to address the intent of the USA in negotiating and entering the contract with Humana Military.

Pl.'s Mot. to Compel Discovery 1.

Mr. Pollard sought this information because the USA's motion for summary judgment relied, in part, on an agency argument. *Id.* at 1-2. Because this information was not necessary in determining whether the USA could be held liable for Dr. Gupta's actions, Mr. Pollard's motion to compel discovery will be denied as moot.


   June 30, 2004                                 /s/
Date                                       William D. Quarles, Jr.
                                             United States District Judge