IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| VERONICA POLLARD, et al., | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| v. | ) CA No. S-02-CV-764 |
| | ) Judge Quarles |
| THE UNITED STATES OF | ) |
| AMERICA | ) |
| | ) |
| Defendant | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR RECONSIDERATION, OR IN THE ALTERNATIVE MOTION TO VACATE**

## I.  THE GOVERNMENT NEVER PROPERLY RAISED THE ISSUE OF DR. ADAMS'S NEGLIGENCE IN ITS MOTION FOR SUMMARY JUDGMENT.

In the government's Motion for Summary Judgment, it lists two grounds as a basis for summary judgment: "1. The treating oncologist in the United States, Dr. Raj Gupta is an independent contractor for whom the United States is not liable; 2. Any treatment rendered oversees is not covered by the Federal Tort Claims Act inasmuch as there is no waiver of sovereign immunity for torts committed in a foreign country."[1]  These were the only two issues before this Court, and Plaintiffs opposed the Motion within this scope.  The government never raised as a legal or factual issue the merits of plaintiffs' allegations against Dr. Adams.

In its supporting Memorandum the government made a blanket assertion that the surgical and pathological services it provided to Mrs. Pollard did not violate the standard of

---

[1]See Defendant The United States of America's Motion for Summary Judgment, at Exhibit 1.

care.[2]  Plaintiffs' counsel interpreted these statements as gratuitous argument by the government's counsel in support of the government's defense at trial, not argument or evidence that went to either of the issues that were raised in the government's motion.  Moreover, plaintiffs viewed these broad assertions is this manner because, in truth, there is overwhelming expert testimony in the record that Dr. Adams breached the standard of care, and accordingly, any assertion that the "undisputed material facts" exonerated the pathologists, could not responsibly or ethically have been raised.  In further support of this interpretation, the government never referenced any of the expert testimony to substantiate its conclusion, and never argued that plaintiffs have failed to support their allegations that there was a breach of the standard of care by the pathologists at Eisenhower.  In fact, the government acknowledges the plaintiffs' allegations that the pathology services were delayed.[3]  The government also failed to provide plaintiffs or the Court with a clear enumeration of what they believed the *undisputed* facts were, as is the standard when moving for summary judgment.

In opposing the government's Motion for Summary Judgment, the plaintiffs addressed the issue of the pathologist's negligence in an effort to clarify the scope of the pending Motion.  The government had confusingly raised what was in effect a *partial* Motion for Summary Judgment on the issues of Dr. Gupta and liability for treatment overseas.  Plaintiffs wanted the Court to understand that even if the government prevailed in their Motion for Summary Judgment with respect to Dr. Gupta, that plaintiffs still had a valid *prima facie* case

---

[2]See government's Memorandum in Support of its Motion for Summary Judgment  at p. 3, 8.

[3]See id. at p. 9, fn 4.

against the government for the actions of its pathologists and surgeons.  In doing so, plaintiffs

reiterated to the Court the allegations that had been pled from the outset and supported by

affidavit and expert testimony.  These are not "bare allegations" as this Court perceived, but are

substantiated by expert testimony and affidavits that were in the record before the Court at the

time the government's Motion was being considered, as well as additional expert testimony

obtained during discovery that is part of the record as a whole.

       If plaintiffs' counsel made any mistake, it was a clerical one of omitting direct

references to the already existing record.  As a result, this Court viewed plaintiffs' assertions as

bare allegations without any evidentiary support.  That, however, is a misunderstanding that

needs to be clarified before this Court can properly rule on the government's Motion.

       The Court apparently viewed the government's Motion as also encompassing the

issue of the negligence of the government's <u>undisputed</u> employees, specifically Dr. Adams.   The

Court dismissed the claims against the government for want of jurisdiction because it

erroneously believed that plaintiffs had not proffered any evidence to support their allegations

against the government's pathologists and surgeons.  However, since the pathologist's status as

an employee of the government is undisputed, and jurisdiction is proper with respect to these

allegations, plaintiffs respectfully request the opportunity to direct the Court's attention to the

abundant evidence in the record to substantiate the claims against Dr. Adams, and respectfully

request that the claims against the United States be reinstated on this basis.

## II.  THERE IS OVERWHELMING EVIDENCE TO SUBSTANTIATE PLAINTIFFS' ALLEGATIONS OF DR. ADAM'S  NEGLIGENCE.

       Since the initial filing of their complaint, plaintiffs have proffered evidence on the

record in support of their allegations that the undisputed government employees, the pathologists

and surgeons who worked for the government, were negligent and deviated from the standard of

care in their treatment of Mrs. Pollard.  The initial complaint, which was filed on March 11,

2002, was accompanied by the affidavit of L.F. Smith, M.D., specifying the standard of care and

how the government pathologists, oncologists, and surgeons deviated from it.[4]  In Paragraph 3 of

Dr. Smith's affidavit he states, "it is my opinion that the medical treatment rendered to Veronica

Pollard by the surgeons, oncologist, **pathologists** and other medical doctors at D.D. Eisenhower

Army Medical Center . . . involved deviations from that degree of care and skill required by

physicians generally under like and similar circumstances, **by failing to obtain pathologic and**

**laboratory information regarding the characteristics of Ms. Pollard's cancer within a**

**reasonable period of time; by misidentifying the size and other characteristics of the cancer**

**on pathologic examination . . . ."**

Dr. Smith further spelled out the standard of care for the pathologists at

Eisenhower in Paragraph 4:

> Based on the circumstances shown in the above medical records,
> the **standard of care required** the surgeons, oncologist,
> **pathologists**, and other medical doctors . . . **to obtain accurate**
> **and reliable pathologic and receptor information regarding the**
> **characteristics of Mrs. Pollard's cancer, within two weeks of**
> **the surgery that was diagnostic of cancer.  The standard of**
> **care required the surgeons, oncologist, pathologist, and other**
> **medical doctors . . . to complete the pathologic studies and**
> **begin chemotherapy for adjuvant treatment of Mrs. Pollard's**
> **breast cancer within 4-6 weeks of her initial diagnosis of breast**
> **cancer**.

Id.  Dr. Smith went on to state in his affidavit that these failures to act in accordance with the

standard of care proximately caused Mrs. Pollard's cancer to spread and metastasize, ultimately

---

[4]See Affidavit of L.F. Smith, M.D., at Exhibit 2.

resulting in her death.  Id.  Dr. Smith's affidavit was also attached to Plaintiffs' First Amended

Complaint adding Dr. Gupta, Humana, and Sterling as defendants.  His expert opinion was

further detailed in his deposition, which was before this Court as Exhibit 10 to Plaintiffs'

Opposition to Defendant Gupta's Motion for Summary Judgment.   All of this evidence was in

the record before the Court when the government's Motion for Summary Judgment was being

considered.

      Dr. Smith's affidavit and deposition support a *prima facie* claim that the

pathologist was negligent and that his negligence contributed to Mrs. Pollard's injuries.  This

evidence alone raises a genuine issue of material fact, and it is sufficient to prevail over a motion

for summary judgment that encompasses this issue.  There is, however, additional powerful

evidence to substantiate the pathologist's negligence that the plaintiffs would now ask the Court

to consider.  Dr. Adams and Dr. Gupta, themselves, have testified that the delay in reporting and

obtaining the pathological findings was a breach of the standard of care.  When asked in his

deposition about whether a delay in sending out Mrs. Pollard's specimens was a breach of the

standard of care, Dr. Adams, the pathologist whose negligence is at issue, admitted that it was,

and that he had no good explanation for any delay:

> Q:    Okay.  In Ms. Pollard's case, when you had completed your
> findings, your examination of the tissue and the
> microscopic examination, who's responsibility was it to
> send the specimens on to have DNA and hormonal studies
> done?
>
> A:    Well, the pathologist in this case, me, since it is my case,
> chooses which is the best block to be sent and, you know,
> takes it to the secretary to make recuts and send the block
> off.
>
> Q:    And the standard is to do that once you have completed
> your examination and microscopic examination of the
> specimen?

A:    Once the case has been, yeah, usually finalized

Q:    What does that mean?

A:    That there is a report that's been signed –

Q:    Okay.

A:     — for diagnosis.

Q:    And in this case, on October 19, the report had been signed?

A:    That's correct.

Q:    And the standard would have been then to send the block of tissue on to the laboratory, Impath Laboratory in this case, to have DNA and hormonal testing done?

A:    That's correct.

Q:    That didn't happen in this case, did it?  . . . Well, assuming it wasn't sent out until December the 1st of 1998, do you have any explanation for the delay in this case in sending the tissues out for hormonal studies or DNA studies?

A:    No, I. don't. . . .

Q:    Do you agree that the receptor studies should have been sent on or about October 19 after you had completed and signed off on the report?

A:    Yes, I mean, that's how it should be done.  It should have been sent off."[5]

Dr. Gupta also testified in his deposition that the pathology studies should have been sent out and the results received in October of 1998.  When asked, "So what should have happened in this case is that as of October 25th at the latest, 1998, the in-house pathology report should have been completed and the extra studies done by the lab in New York, the DNA studies and the ER studies, would have been back at Eisenhower, Right," Dr. Gupta responded, "Right."[6]  Dr. Gupta testified that when he called the lab in early December, 1998, to find out whether receptor studies had been ordered, he was told "it actually should have been sent but it

---

[5]  Deposition of Stephen D. Adams, M.D. at p. 83-90.  <u>See</u> Exhibit 3.

[6] Deposition of Raj R. Gupta, M.D. at p. 36.  This deposition in its entirety is already on the record before this Court as Exhibit 3 to Plaintiffs' Opposition to Defendant Gupta's Motion for Summary Judgment.

was not sent and we'll send it now." Id. at p. 38.

   The government's pathologist's negligence is further substantiated by the expert testimony of Arthur H. McTighe, M.D., a board certified clinical pathologist, who was identified by plaintiffs and whom the government deposed at length.[7] At his deposition, Dr. McTighe testified, "I think that the report by Dr. Adams departs from the standard of care for a pathologist. It misstates some things. It misses some things. It has a diagnosis that I think was confusing, and some very important ancillary studies were not promptly performed."[8] "The diagnosis that [Dr. Adams] gave was carcinoma with medullary features, and I think that that diagnosis misled a lot of people." Id. at p. 34. When asked how this constituted a violation of the standard of care, Dr. McTighe explained that "medullary carcinoma has a relatively favorable prognosis, and it is a carcinoma that we report to clinicians and the clinicians and their patients take heart because that has a favorable prognosis. So to state a diagnosis in a way that suggests that the tumor may be medullary carcinoma is misleading." Id. at pp. 35-36.

   Dr. McTighe testified that Dr. Adams also breached the standard of care in the way he measured and reported the size of the tumor: "Dr. Adams said that tumor extended near, but not to the margin. I disagree with that. It extended to the margin. He also apparently measured the tumor in the gross, but not on the microscope slide. In the gross he stated that the tumor measured 0.5 cm in diameter. In the microscopic slide it's double that, and he didn't add that to the report." Id. at p. 35.

   Dr. McTighe criticized Dr. Adams for the delay in obtaining tumor marker

---

[7] See CV of Arthur H. McTighe, M.D. at Exhibit 4.

[8] Deposition of Arthur H. McTighe, M.D. at pp. 33-34. See Exhibit 5.

studies: "the estrogen receptors, progesterone receptors, Her 2 Neu, those are very important pieces of information in terms of prognosis, and they should be done automatically and immediately, not nearly two months later." Id. at p. 40.  In summing up these opinions, Dr. McTighe reiterated: "So the report was misleading, it contained wrong information, and it didn't contain enough information for the clinicians to review that report and understand immediately that chemotherapy was an urgent matter." Id. at p 41.

Dr. McTighe testified to a reasonable degree of probability that these failures by the pathology lab proximately caused the dissemination of the cancer in Mrs. Pollard's body:

. . . breast cancer is understood to be a disease that disseminates early.  So the critical thing is to diagnose early, which happened here, but also to treat early, which did not happen here.

\*   \*   \*

. . . the surgeons realized that there was something here that had to be worked up quickly, and they scheduled Miss Pollard for surgery a short time after she discovered this lesion herself.  **The specimen went to pathology, and that's when the chain of events that resulted in this improper care started**.

So the clinical physicians made a diagnosis of "suspicious for cancer" and started the train on its track, but then when it got to pathology, it veered off and went on a different course that ultimately I think is the reason that Miss Pollard has the disseminated disease that in fact she has.

So what you need to do is not only diagnose early, but treat early because patients like this have thousands of ticking time bombs out in their body, collections of cells in small blood vessels, two cells, four cells, eight cells, sitting out in lymphatics and blood vessels scattered all through the body.  Some of those probably are the result of the surgery itself.  When you take the cancer out, you disturb the lymphatics and the vascularity, so there is the possibility that that can disseminate the tumor.

Also the tumor may enter the circulation while it's still growing in situ in the woman's breast.  But those early

8

> micrometastases, those ticking time bombs are just a few cells, and
> they're amenable to treatment with chemotherapy.  The only way
> you're going to get at those very small groups of cells is with
> chemotherapy, and that has to be done early.

Id. at pp. 44-46.

Finally, Dr. McTighe testified that the pathologist's negligence, in addition to Dr.

Gupta's negligence, was a proximate cause of Mrs. Pollard's disseminated disease:

> I think that the pathology report wasn't rendered in a away that
> made it readily understandable and to convey the urgency that it
> needed to convey.  Dr. Gupta also didn't see this patient until two
> months later until December, and then he didn't put in motion a
> program of chemotherapy that could be relied upon for the patient.
> So I think in terms of causation, in terms of what happened to Miss
> Pollard, I do think that what Dr. Gupta did also is part of why Miss
> Pollard has the disseminated disease."

Id. at p. 47.

The government was fully aware, when it filed its Motion for Summary

Judgment, of the testimony and conclusions of Dr. Smith and Dr. McTighe in support of

plaintiffs' allegations that the government's pathologist was negligent.  The government has

proffered no legal basis for disregarding this testimony.

### III.  IT IS PROPER FOR THE THIS COURT TO RECONSIDER ITS ORDER PURSUANT TO F.R.C.P.  59(e) and 60(b)(1)

#### A.    This Court May Alter Or Amend Its Order Pursuant To Federal Rule Of Civil Procedure 59(e).

The Court may grant a Rule 59(e) motion for reconsideration under three limited

circumstances: "(1) an intervening change in the controlling law has occurred, (2) evidence not

previously available has become available, or (3) it is necessary to correct a clear error of law or

prevent manifest injustice."  Turner v. Knight, 217 F.Supp.2d 680 (D.Md. S.Div. 2002);

9

<u>Superior Bank v. Tandem Mortgage Co.</u>, 2000 WL 33380140 (D. Md.).

In this case, reconsideration is necessary to correct a clear error of law and to prevent manifest injustice. The disparity between the issues that were raised in the Government's Motion for Summary Judgment and the arguments that were advanced in the Government's Memorandum, at best, created a serious ambiguity about what issues had been raised for Summary Judgment.   It is clear from its ruling that the Court believed that the plaintiffs had made unsubstantiated allegations that were not supported by anything in the record.  As explained above, plaintiffs' failure to directly cite the record to substantiate the claims against Dr. Adams in opposing Summary Judgment, was because plaintiffs did not perceive that the issue had been raised by the government for Summary Judgment purposes.  That perception changed with the Court's ruling.

It would be manifestly unjust to preclude the plaintiffs from the opportunity to proceed with their claim against the government, a responsible party, because of a failure to provide citations to the record on an issue that plaintiffs genuinely believed had not been raised by the government's Motion for Summary Judgment.   It would also be a manifest injustice to allow the government to escape liability and to benefit from the ambiguity it created that led to this mistake.  The government has known for over two years that plaintiffs have expert testimony in the form of affidavits and depositions providing evidence to support the allegations against its employees, which is why the government never challenged the sufficiency of plaintiffs' *prima facie* allegations against the pathologist in this case.  It would be grossly unfair to allow the government a windfall of outright dismissal on an issue they did not, and could not, have properly raised, based on the abundance of evidence supporting plaintiffs' claims against the

pathologist.

It is clearly within the Court's discretion now to take notice of the evidence that has been a part of the record from the inception of the case, and to alter its June 30, 2004 Order by denying the dismissal of the claims against the United States of America based on the actions of its undisputed employees at Eisenhower Army Medical Center.

> **B.     In The Alternative, This Court May Vacate The Dismissal Of The Claims Against The United States Of America, Pursuant To Federal Rule Of Civil Procedure 60(b)(1).**

Rule 60(b)(1) states that "on motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons:  (1) mistake, inadvertence, surprise, or excusable neglect."  The plaintiffs' counsel's omission of direct citations to the record is precisely the inadvertent and excusable mistake this rule encompasses.

There is no clear standard for determining when a mistake is excusable. However, in Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd. Partnership, 507 U.S. 380, 387-389 (1993), the Supreme Court laid out some factors to be considered in such a determination, including: "(1) the danger of prejudice to the party opposing the modification, (2) the length of delay and its potential impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the movant, and (4) whether the movant acted in good faith."  This analysis has been followed in motions filed pursuant to Rule 60(b)(1).  See Chapman v. Maytag Corp., 2000 WL 748113 (S.D. Ind.).  These factors balance strongly in favor of plaintiffs.

First, the danger of prejudice to the government is minimal because there are no

factual or legal grounds for the government to have prevailed on summary judgment on the allegations of negligence against its pathologist; the facts of the case did not merit dismissal on this issue in the first place.  In fact, it is plaintiffs who would be unduly prejudiced by the dismissal of this case because the statute of limitations has expired and they cannot refile their claim against the government.  Further, the government contributed to this Court's misperception of the evidence on the record by failing to properly raise the issue in its Motion before the Court. The government could not have expected to win on an issue that was without merit and that they only raised in passing.  Moreover, to the extent the issue was raised, the government failed to cite to anything on the record that would substantiate its bald assertion that no duty of care was breached.

          The second factor also balances in favor of the plaintiffs because this Motion is filed within the ten-day time period prescribed by Rule 59(e).  Plaintiffs did not wait the year allotted to them under Rule 60(b). Plaintiffs are only asking the Court to reconsider its ruling on a discreet issue as to one of the defendants.  There will be no delay in the proceedings against any of the defendants if the government is brought back into the case.  Trial date has been set and discovery, for the most part, is completed.

          With regard to the third factor, as set forth above, any mistake by plaintiffs in failing to cite to the record in support of plaintiffs case against the pathologist, was a consequence of the government's failure to properly raise the issue in its Motion for Summary Judgment.  Lastly, the plaintiffs have certainly acted in good faith and were not trying mislead or confuse the Court.  Plaintiffs' counsel acted diligently in compiling the evidence on this issue, and have substantiated their assertions, starting with the filing of the initial Complaint.

Plaintiffs' counsel is not asking for a second bite at the apple, or to conduct additional discovery to provide to the court with the evidence necessary to substantiate its claims. The evidence has already been taken, and is before the Court. Accordingly, plaintiffs' request permission to correct the mistake, and respectfully ask the Court to consider the evidence substantiating plaintiffs' claims against the pathologist, and to vacate the dismissal of the claims against the government.

<u>CONCLUSION</u>

Wherefore, the plaintiffs respectfully request that this Court reconsider paragraph 8 of its June 30, 2004 Order, and in light of the overwhelming evidence on and off the record relating to this issue, ask the Court to amend or in the alternative vacate its ruling and reinstate the claims against the government relating to the negligence of its undisputed employees.

Respectfully submitted,

BRUCE J. KLORES & ASSOCIATES, P.C.

By:_____/s/_____
       Lesley S. Zork
       Bruce J. Klores
       915 15th Street, NW
       Washington, D.C. 20005
       (202) 628-8100
       Co-counsel for Plaintiffs

       and

LAW OFFICES OF PETER MASCIOLA


_____/s/_____
Peter R. Masciola
601 Pennsylvania Avenue, N. W. #900
Washington, D.C. 20004
202-628-5680
Co-counsel for Plaintiffs