1

1       IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MARYLAND
2

3    VERONICA POLLARD, et al.,  )
                            )
4          Plaintiff,      )
                            )  CIVIL ACTION
5          vs.             )
                            )  FILE NO. S-02-CV-764
6    THE UNITED STATES OF        )
     AMERICA,                )
7                           )
           Defendant.      )
8

9              DEPOSITION OF

10          DR. STEPHEN D. ADAMS

11

12              March 31, 2003

13                12:00 p.m.

14

15    Dwight David Eisenhower Army Medical Center
                    11C-36
16               Augusta, Georgia

17

18       Regina W. Hollis, CCR-B2306, RPR

19

20

21

22

23

24

25

2

1                APPEARANCES OF COUNSEL

2

3   On behalf of the plaintiff

4     LESLIE ZORK, Esq.
      Klores & Associates
5     Suite 300
      915 15th Street NW
6     Washington, DC  20005

7
    On behalf of the Defendant:
8   The Unites States of America:

9     LARRY D. ADAMS, Esq.
      Assistant United States Attorney
10    6625 United States Courthouse
      101 West Lombard Street
11    Baltimore, Maryland  21201

12
    On behalf of Dr. Gupta and Sterling Medical
13  Corporation:

14    JOAN CERNIGLIA-LOWENSEN, Esq.
      Morgan, Shelsby, Carlo, Downs & Everton
15    4 North Park Drive
      Suite 404
16    Hunt Valley, Maryland  21030-1876

17  On behalf of Humana Military Health System:

18    CATHERINE A. HANRAHAN, Esq.
        (Via telephone)
19    Wilson, Elser, Mokowitz, Edelman & Dicker
      1341 G Street NW, Fifth Floor
20    Washington, DC 20005-3105

21

22
                  - - -
23

24

25

3

1          (Reporter disclosure made pursuant to

2      Article 8.B. of the Rules and Regulations

3      of the Board of Court Reporting of the

4      Judicial Council of Georgia.)

5          DR. STEPHEN D. ADAMS,

6  having been first duly sworn, was examined and

7  testified as follows:

8              EXAMINATION

9  BY MS. ZORK:

10     Q.   Good afternoon, Dr. Adams.  We met briefly

11  off the record.  On the record, my name is Leslie

12  Zork, and I represent Ms. Pollard in this action

13  that's been filed in the District Court in Maryland.

14  Would you please state your full name for the record.

15     A.   Stephen Drake Adams.

16     Q.   And give me your residential address.

17     A.   It's 2398 William Few Parkway.  That's in

18  Evans, Georgia, 30809.

19     Q.   And give me your -- where do you work

20  right now?  Where are you working?

21     A.   I do locum tenens work.  So, I work in

22  different hospitals.

23     Q.   You say you do --

24     A.   It's locum tenens.  Basically fill in for

25  other physicians.

4

1     Q.   What type of work are you doing?

2     A.   Pathology.

3     Q.   And what hospitals are you working at?

4     A.   I am working at University Hospital,

5   Doctors Hospital.  Like I said, I go to different

6   hospitals.  Athens, out in Athens at St. Mary's

7   Hospital.

8     Q.   Is there a certain radius of hospitals

9   that you work at?

10     A.   No.  It's just as a need comes up, I will

11   -- the people will contact me, and if I can -- to see

12   if I can do the job.

13     Q.   Is your practice limited to Georgia

14   hospitals or do you go outside of that?

15     A.   I go outside of that.

16     Q.   So, tell me how many different hospitals,

17   for instance, in the last year you have worked in?

18     A.   Okay.  Like I say, University, Doctors,

19   St. Mary's, Charleston Naval Hospital, and

20   Eisenhower, here at Eisenhower.

21     Q.   Are you with an agency of some sort?

22     A.   Well, I work through different agencies.

23     Q.   Like, what agencies do you work through?

24     A.   Well, at Eisenhower it was Daniel and

25   Yeager.  In Charleston it was Daniel and Yeager and J

5

1   & C Nationwide.

2       Q.   Are these agencies that place pathology

3   physicians or --

4       A.   They place all type, all specialties.

5       Q.   How long have you been doing – working

6   through an agency or through agencies?

7       A.   Well, I got out of the military in

8   September of 2001, and so I have been doing this

9   part-time work since then.

10      Q.   Have you applied anywhere for a permanent

11  position?

12      A.   I'm working both at University and Doctors

13  Hospital.  It's a permanent position, permanent

14  part-time.

15      Q.   For people who aren't local, what is

16  University Hospital?  Where is that located?

17      A.   It's located in downtown Augusta.

18      Q.   And the Doctors Hospital, where is that?

19      A.   It's located in Augusta.  I don't know the

20  exact address.  It is right off I-20 and Wheeler

21  Road.

22      Q.   What hours do you work?

23      A.   I work three days a week at University

24  Hospital and one day a week at Doctors Hospital.

25      Q.   Who is your employer when you work at

6

1    University Hospital and Doctors Hospital?

2        A.    Ameripath.

3        Q.    Can you tell me what Ameripath is?

4        A.    Ameripath is a corporation that owns

5    numerous pathology laboratories across the country.

6        Q.    And where is that based?

7        A.    In Orlando, Florida.

8        Q.    Who is your boss?

9        A.    Well, at Doctors Hospital it is Dr.

10    O'Quinn, and at University Hospital it's Dr. Sharma,

11    S-H-A-R-M-A.

12        Q.    And who pays you?

13        A.    Ameripath.

14        Q.    So, there is a contract?  The University

15    Hospital and Doctors Hospital, do they have a

16    contract with Ameripath to place you there?

17        A.    Well, the pathology practices in both of

18    those hospitals are owned by Ameripath, and I don't

19    know what the contractual arrangements are between

20    the hospitals and Ameripath are.

21        Q.    And the other hospitals where you work at

22    times, Athens, St. Mary's, Charleston Naval -- well,

23    Athens and St. Mary's, are those also Ameripath?

24        A.    No.  That's St. Mary's hospital is in

25    Athens.  It is a single hospital.  I was just working

7

1   directly for the pathologist there at that hospital.

2       Q.    And I think you said in an earlier answer

3   that you are working part-time as a pathologist?

4       A.    That's correct.

5       Q.    Do you have any other kind of employment

6   as well?

7       A.    No.

8       Q.    I don't have a copy of your CV.  So, can

9   you tell me -- give me a thumbnail sketch of your

10   educational background starting with college and

11   going through medical school and your training, any

12   residency trainings that you have had.

13       A.    Okay.  I went to college at the University

14   of Colorado, Boulder, graduated in 1982, and then

15   went to medical school at Chicago College of

16   Osteopathic Medicine, graduating in 1989.  I did a

17   rotating internship at Tripler Army Medical Center in

18   Honolulu in '89 and '90, and then did a residency in

19   pathology from '90 to '94 at Tripler Army Medical

20   Center.  That's it as far as training.

21       Q.    Are you board certified in pathology?

22       A.    Yes, I am.

23       Q.    When were you board certified?

24       A.    In November 1994.

25       Q.    And did you pass your boards on the first

8

1   attempt?

2      A.   Yes.

3      Q.   Tell me where you've worked since

4   completing your residency.

5      A.   I worked from '94 to '97 at the 121st

6   General Hospital in Seoul, South Korea, and from '97

7   to 2001, I worked here at Eisenhower.

8      Q.   When did you join the military?

9      A.   When I started -- well, when I started

10   medical school.  They have a scholarship program.

11   So, I signed a contract with the military when I

12   started medical school, and then actually went on to

13   active duty in June of '89.

14      Q.   So, from June of 1989 through September of

15   2002, were you active?

16      A.   Until September of 2001.

17      Q.   September 2001?

18      A.   Yes.

19      Q.   Did I understand correctly that you left

20   Eisenhower?  When did you leave Eisenhower?

21      A.   In September of 2001.

22      Q.   Okay.  In October, November of 1998, how

23   long had you been at Eisenhower?

24      A.   About a year, little bit over a year.

25      Q.   Can you describe your practice in

9

1    pathology from 1994 do 1997 when you were stationed

2    in Seoul?

3        A.    Uh-huh.  I was a chief of surgical

4    pathology.  I was a medical director of the blood

5    bank, and I was a consultant in clinical pathology at

6    Sam Sung Hospital.

7        Q.    What type of -- what type of service or

8    medical services were provided at the hospital in

9    Seoul?

10       A.    It was general, a small general hospital.

11   So, they had, you know, general surgery service,

12   obstetric service.  They had dermatologists.  So, it

13   was a pretty broad practice.

14       Q.    During your – did you have any -- have

15   you had any specialized training in breast pathology?

16       A.    No.

17       Q.    What was your -- what frequency were you

18   called upon to examine pathology samples and between

19   -- well, when you were in Seoul, that related to the

20   diagnosis of breast cancer?

21       A.    I don't know a specific number.  It wasn't

22   -- I mean, it is not an unusual type of diagnosis or

23   a case that we would see.  Like I say, there were

24   three general surgeons there.  So, they were – and

25   they had a fairly active practice.

10

1      Q.    Were the surgeons who practiced there, did

2   they practice solely on dependents or people that

3   were in the military --

4      A.    Right.

5      Q.    -- or the practice include other --

6      A.    No, solely active duty military and their

7   dependents.  Also their department of defense

8   civilians since it was an overseas location, embassy

9   employees and that type of thing.

10      Q.    So, if you can give me an estimate, just

11   some general estimate of the number of cases in a

12   year where women would be admitted with -- to either

13   rule out breast cancer or have diagnostic studies

14   done in the pathology lab?

15      A.    Right.  Well, again, I don't -- I would

16   think probably around 20 cases a year, but again, I

17   don't have a concrete number.

18      Q.    How many pathologists were in the

19   department in Seoul?

20      A.    Two for the most part.  One of the years

21   there were three.

22      Q.    Who were they?

23      A.    Okay.  There was Joseph Smith, and the

24   other one that was there for the year, I don't

25   remember his name.

11

1    Q.   You said you worked as a surgical -- a

2  consultant in the surgical pathology lab for Sam Sung

3  Hospital?

4    A.   Yes.

5    Q.   What is that hospital?

6    A.   It's a large teaching hospital in Seoul.

7  It's about a 2,000 bed hospital.

8    Q.   What did you do there?

9    A.   Basically I went there once a week and

10  looked at cases with a pathologist there.

11    Q.   What types of cases?

12    A.   Just a wide variety of interesting cases.

13  They saw about 25,000 surgical specimens a year.

14    Q.   So, would you look -- what would be the

15  purpose of -- were you actually employed working

16  there, or you said you would look at cases once a

17  week with the pathologist?

18    A.   Right.

19    Q.   What type of cases?  You said interesting

20  cases?

21    A.   Right, interesting or difficult or unusual

22  cases.

23    Q.   Can you give me an example?  What would be

24  interesting, an interesting case?

25    A.   An unusual type of cancer, an unusual type

12

1  of lymphoma.  Primarily they were malignant cases.

2      Q.    And who was the pathologist that you would

3  work with?

4      A.    Dr. Rhee.

5      Q.    How do you --

6      A.    Rhee, R-H-E-E.

7      Q.    Is Dr. Rhee Korean?

8      A.    Yes.

9      Q.    Did he have an area of expertise or

10  recognized --

11      A.    He is pretty well recognized worldwide as

12  a hematic pathologist.

13      Q.    Over the course of your experience, have

14  you developed an interest in one area of pathology

15  over another?

16      A.    Well, surgical pathology, but I really --

17  I really like seeing a broad variety of cases.

18      Q.    What do you mean?  What is meant by

19  surgical pathology?  What's encompassed within that?

20      A.    Basically the specimens that are taken or

21  biopsied from patients either in surgery or at

22  outpatients in the clinic.  So, anything, skin

23  biopsies, breast biopsies, biopsies from the stomach

24  or the colon.  Basically any tissue that is taken --

25      Q.    Any tissue?

13

1    A.    -- for diagnostic purposes.

2    Q.    Okay.  What would be the other categories

3    of pathology, recognized categories?

4    A.    There is cytopathology, which is more

5    looking at cellular specimens that are taken for

6    diagnostic purposes.

7    Q.    Would evaluating specimens for breast

8    cancer or breast cancer specimens, would that fit

9    within cytopathology?

10    A.    It is both cytopathology and surgical

11    pathology, depending on the type specimen that's

12    taken.  And then probably the other area of pathology

13    is clinical pathology, which deals with more the

14    laboratory, the chemistry laboratory, blood banking,

15    microbiology, that type of thing.

16    Q.    Your consultancy, your consulting work in

17    Seoul with Dr. Rhee, was that something that you did

18    for educational purposes or was that something that

19    you did to help with the workload?

20    A.    It was just for my own -- out of my own

21    interest and to be able to see a wider variety of

22    cases.

23    Q.    Were you on staff there? Did you sign off

24    on reports?

25    A.    No.  No, I didn't sign out any cases

14

1   there.

2       Q.   Did you participate in any studies that

3   were ongoing in that department?

4       A.   No.

5       Q.   Have you published at all in the field of

6   pathology?

7       A.   Yes.

8       Q.   Can you tell me --

9       A.   I did a study on teratogens in pediatric

10  -- in cases of pediatric meningitis.  It's a

11  chemistry test that can be performed on cerebral

12  spinal fluids to quickly tell if the patient has

13  meningitis without waiting for cultures.  I was

14  published in the American Journal -- American Journal

15  of Clinical Pathology.

16      Q.   Was this a test that you worked on

17  developing?

18      A.   No, we didn't work on developing it.  We

19  looked at -- basically it was designed -- without

20  getting into too much detail.  It was designed in the

21  '80s for a certain types of organisms that were

22  common causes of meningitis at that time.  And then

23  after the test was developed, there was a vaccine

24  developed for one of the major types of meningitis.

25  So, we looked at how the vaccine availability had

15

1    changed really the effectiveness of that test and

2    made it -- at the time it was kind of the standard of

3    care to do that test, but we show with our study that

4    with the advent of the vaccine, its usefulness had

5    really decreased.

6        Q.   Where were you when the study was done?

7        A.   That was at Tripler.

8        Q.   Any other publications?

9        A.   Yes.  I did a -- just a case report of a

10   renal mass, unusual renal mass.

11       Q.   Where was that?

12       A.   That was at Tripler, and that was

13   published in urology.

14       Q.   Any others?

15       A.   Yes.  A study on just another case report

16   on a lipoma, which is a type of benign fatty tumor

17   that grew as a response to a lumbar puncture in a

18   patient who had surgery and spinal anesthesia.

19       Q.   And where was -- where was that published?

20       A.   That was published in -- I don't remember

21   if it is American Journal of Anesthesia or just the

22   Journal of Anesthesia but it was --

23       Q.   And were you at Tripler when that was

24   published as well?

25       A.   No, I was in Korea.

16

1     Q.   Was that a case study that happened in

2   Korea?

3     A.   Yes.

4     Q.   Any others?

5     A.   No.

6     Q.   Are you currently participating in any

7   studies?

8     A.   No.

9     Q.   Any upcoming publications?

10    A.   No.

11    Q.   Okay.  Have you had your deposition taken

12  before?

13    A.   No.

14    Q.   Have you ever been named as a defendant in

15  a lawsuit?

16    A.   No.

17    Q.   I'm sure Mr. Adams has gone over this with

18  you in preparing you, but I am going to be asking you

19  a series of questions related to Ms. Pollard's care

20  in 1998 here at Eisenhower.  If at any time you don't

21  understand my question, please let me know, and I

22  will rephrase the question.  We are doing fine so

23  far, but make sure that I've asked my question even

24  if you think you know what it is going to be before

25  you give your answer so that the court reporter can

17

1    get the questions down and the answers down

2    completely. Okay?

3        A.    Okay.

4        Q.    Can you describe for me your training when

5    you -- during your residency in diagnosis of grading

6    of breast cancer?

7        A.    How specific would you like me to be?

8        Q.    Well, why don't you start off general, in

9    the general, you know, did you have a -- was it

10    something that was mixed in with your training or was

11    there -- did you -- was there a specific period of

12    time when you concentrated on that? Just give me

13    a --

14        A.    Okay. The residency training was

15    basically divided in half. Half was clinical

16    pathology and half was surgical pathology, anatomic

17    pathology. And the time spent doing anatomic

18    pathology, there was no specific training where we

19    did a month of breast pathology and a month of GI

20    pathology. It was all -- it is all dependent on the

21    cases that come in, and you just look at everything

22    that comes in. So, it's a mixture.

23        Q.    What were the -- what were the medical

24    references or the literature or the textbooks that

25    you referred to when you were -- when you were

18

1   learning about breast cancer?

2       A.   Okay.  Well, during my residency, probably

3   it was textbook Rosen's Pathology.  There is a Armed

4   Forces Institute of Pathology, Fascicle, which is an

5   atlas of mammary tumors.  There is a textbook by Dr.

6   Page that's kind of a classic textbook.

7       Q.   What's the name of that?

8       A.   I think it's Histopathology of the Breast,

9   but I -- we just always called it Page's book, so.

10      Q.   Well, when you are studying pathology and

11   you are getting specimens from the breast and from

12   the colon and from all different parts of the body,

13   how do you -- when you get a sample, you know, you

14   get a colon sample and a breast sample, how do you

15   approach your -- the --

16      A.   The diagnosis?

17      Q.   The diagnosis, yes.

18      A.   Well, are you talking about as far as in

19   training how we were trained or how do I approach it?

20      Q.   Tell me how you were trained and then if

21   it's changed, you can --

22      A.   I mean, it starts with the gross

23   examination where you actually get the tissue sample

24   and look at the tissue sample before any processing.

25   Now it's pretty much standard of care to put ink

19

1   around the outside of all the breast biopsies, and

2   that will mark the boundary of the excision of the

3   biopsy so you can tell under the microscope where the

4   true edge of the lesion or where the true edge of the

5   biopsy is.

6       Q.   So, that would be something that the

7   surgeon would do?

8       A.   No, we do that as a pathologist.

9       Q.   Can you explain that to me again?

10      A.   Okay.  Basically, say we get a biopsy and

11  it's usually round or oval shaped piece of tissue.

12  And we take ink and put ink around the outside of the

13  tissue.

14      Q.   Before you -- before you --

15      A.   Before cutting it or doing anything.  And

16  that way, once it's cut, you always have a marker of

17  where the edge of it is because you can lose

18  orientation once it's all in a lot of little pieces.

19  And then once you have done that, you section through

20  the specimen looking for any abnormalities, look for

21  masses, look for cysts, areas of hemorrhage,

22  necrosis.

23      Q.   Now, are these all things that you do as

24  part of the gross examination?

25      A.   Yes.  And measure the size of the tumor,

20

1    and then in doing all this, we make a detailed

2    description or a description of what we see and

3    select parts of the tissue that we think need to be

4    processed and looked at under the microscope.  And

5    that's where a lot of the learning process is, is

6    learning what areas, what's really abnormal that you

7    need to take a look at.

8        Q.   What do you look for in determining, in

9    trying to decide what to look at under the

10   microscope?  What are you looking for with your eyes?

11       A.   Specifically in the breast, looking

12   anything that's a mass, anything that you can see

13   that -- or anything that you can feel that's hard or

14   firm or has a mass appearance, cysts, areas of

15   hemorrhage.  Sometimes there is areas that are not a

16   true mass but they are firmer or more fibrotic than

17   other areas of the tissue.

18       Q.   And then what?

19       A.   That's basically it.  And usually what --

20   with the smaller breast biopsies, we usually put all

21   the tissue through.  You still look at it and

22   describe it, but you are not selecting certain areas.

23   You're just putting all the tissue in to look at

24   histologically.

25       Q.   When you say are you putting through all

21

1    the tissue to look at histologically, does that mean

2    that you cut through the entire -- you take slices of

3    the entire specimen?

4        A.    No.  What we do is, you take the specimen

5    and we call it serially sectioning or just making

6    thin slices with a knife, usually about four

7    millimeters thick, and then each of those will go

8    into a cassette and be processed.  And then from each

9    of those we will make a slide.  But like I said, it's

10   usually they are four to five millimeters thick

11   slices of tissue, and each tissue section is only

12   five or six microns.  So, you are not looking at all

13   the tissue but you are getting a good sample.  You

14   are trying to get a good sampling of the tissue.

15       Q.    Okay.  So, then in -- so, then when you

16   sample the tissue to look at under the microscope,

17   what's your approach in looking at the specimen under

18   the microscope?  What are you looking for with breast

19   tissue?

20       A.    Well, first, take a scanning overview and

21   look at the architecture of the breast tissue to see

22   if it's -- kind of always comes down to is it normal

23   or abnormal at each level that you are looking at.

24   So, you look at the architecture of the breast and

25   see if it is normal or abnormal.  If it is normal,

22

1    obviously, that's -- you know, you don't look -- I

2    mean, there is nothing further to do, but if it's

3    abnormal, then you try and determine what the

4    abnormality is, whether it's a benign process or a

5    malignant process. And then if you determine it's a

6    malignant process, determining whether it's an

7    invasive type of tumor or in situ or carcinoma in

8    situ. And then once you determine that it is

9    malignant, then trying to classify the malignancy or

10    if you determine it's benign, trying to classify

11    exactly what the process is that's going on.

12        Q.   When you see something abnormal in breast

13    tissue, what are the determining factors that guide

14    you in making a decision as to whether it's benign or

15    malignant?

16        A.   Okay. Well, there's criteria for

17    malignancy. There's architectural patterns. You

18    look at basically two things. You look at the

19    architecture and you look at the cytology. And both

20    of them can point you in the direction of malignancy.

21    You can have tumors that have cells that are fairly

22    normal looking, that if you are just looking at the

23    cells themselves, they don't look bad. But if you

24    look at the architecture of the tumor, it has a

25    pattern that's recognized as a malignant pattern.

23

1    So, you can call it a malignancy based on the

2    architecture.  Usually it's a combination of both,

3    but the cytologic features you look for are increase

4    in the size of the cells, irregularities of the

5    nuclei, darkening of the nuclei, areas of necrosis,

6    look at how -- once you determine that it is a

7    malignancy, you look at the, again, the architecture

8    of the tumor to see if it -- how closely it is

9    replicating normal breast.  If it is making --

10   basically if it is making tubes or duct structures

11   that you see in a normal breast, and that helps to

12   tell you how well differentiated the tumor is.

13        Q.   And what are the characteristics of an

14   invasive versus an in situ -- is that what you said?

15        A.   Right, in situ or basically an in situ

16   carcinoma is a cancer cytologically that, you know,

17   it has malignant cells, but it hasn't invaded into

18   the tissue.  And until it invades into the tissue, it

19   doesn't have the potential to metastasize.  So, you

20   look for, again, there's architectural and cytologic

21   features of carcinoma in situ to make the diagnosis

22   of carcinoma in situ.  And then you look very closely

23   to make sure there are no signs of invasion or

24   infiltration of the normal tissue of the breast.

25        Q.   So, what does it look like when it's

24

1    invaded the normal tissue versus just a

2    self-contained tumor?

3        A.    Usually with a carcinoma in situ, usually

4    what you have are the normal structures that are

5    dilated or enlarged and being filled with the

6    malignant cells that are proliferating.  And then

7    there's usually very little reaction in the tissue

8    surrounding the duct.  The duct is just being

9    enlarged, but it's not -- the tissue around it is

10   just being pushed away.  There is no reaction.  And

11   once you have invasion, obviously you look for -- you

12   have to see cells that are actually outside the duct

13   that are invading the tissue of the breast.  And then

14   there is a reaction called desmoplastic reaction of

15   the tissue of the breast to the cells that are

16   malignant cells as they are invading.  So, you start

17   to see that with an invasive carcinoma.  That's

18   really the main determining factors.

19       Q.    In 1998, according to the records that we

20   have received from Eisenhower, your name is on a

21   report of a fine needle aspiration I think was done

22   on October 1st, and then on a second report of an

23   excisional biopsy that was done on October the 15th

24   of 1998; is that correct, or at least the --

25       A.    Yes, that's correct.

25

1       Q.    You just referred to something.  Can I

2  take a look?

3       A.    This is just the pathology report for the

4  --

5       Q.    In preparation of your deposition today,

6  what have you reviewed?  What records have you

7  reviewed?

8       A.    Well, I was -- I received this complete

9  record of -- and I did look through it.  And I have

10  reviewed obviously my report, and I reviewed the

11  slides from the excisional biopsy.  I haven't had a

12  chance to review the slides from the cytology or from

13  the fine needle aspiration.

14       Q.    How many slides were there that you

15  reviewed from the excisional biopsy?

16       A.    Four slides.

17       Q.    This surgical pathology report, where did

18  that that you just handed me, and we can have it

19  marked in a minute, but where did this come from?

20       A.    It was with the slides.

21       Q.    So, this came in the same envelope?

22       A.    In a package, yes.

23       Q.    Why don't we go ahead and have this --

24           MR. ADAMS:  It's the same report as in

25  here.

26

1        MS. ZORK:  I know, but this one is nice

2   and clear and legible.

3        MR. ADAMS:  I tell you what, let's get it

4   copied.  Leave the original here.

5      A.   None of them are original because

6   everything is computer based here.  So, we sign it in

7   the computer.

8        MR. ADAMS: I don't have a problem with her

9   getting a copy.  I just want to make sure it stays

10  with the slides as a source of --

11       MS. ZORK:  Okay.  So, you don't want me to

12  mark this one?

13       MR. ADAMS: Well, I'm just saying, let's

14  make a photocopy of that one, and then you can mark

15  it.

16       MS. ZORK: Okay.  That's fine.

17       (Plaintiff's Exhibit 1 was marked for

18  identification.)

19     Q.   (By Ms. Zork)  Exhibit Number 1 is a copy

20  of the surgical pathology report, according to what

21  you said earlier, was taken from the package that had

22  the slides and from the resection -- the biopsy, I

23  mean?

24     A.   Well, the slides were here for me to

25  review today.  Today was the first time I had the

27

1    opportunity to review the slides.  And the slides and

2    the tissue blocks were all together in a plastic bag.

3        Q.    Okay.  And just so that I understand, the

4    only -- the slides and tissue blocks that are here

5    today and that you have looked at are those from the

6    excisional biopsy?

7        A.    That's correct.  The slides are also here

8    from the lumpectomy and dissection but I have not

9    reviewed those slides.

10        Q.    Did you participate in any way at the time

11    in looking at the specimens from the lumpectomy?

12        A.    Not that I recall, no.

13        Q.    And there is no indication on any of the

14    reports that you participated in any of that?

15        A.    No.

16        Q.    Is there anything else that you reviewed

17    in preparation for your deposition?

18        A.    Just reviewed the staging manual for

19    breast cancer.

20        Q.    The staging manual that you are referring

21    to, can you read into the record what that is?

22        A.    It's the American Journal, American Joint

23    Committee on Cancer Staging Handbook, 6th Edition.

24        Q.    What in particular did you refer to in

25    that handbook?

28

1      A.   The staging for breast cancer.

2      Q.   And why is it that you did that?

3      A.   Just to look at the -- at the staging and

4   that's --

5      Q.   Why did you feel the need to do that in

6   preparation for your deposition today?

7      A.   Because any time I have a cancer case,

8   that's one of the things I do.  And so in part of

9   reviewing the case, I did the same thing that I would

10   normally do in looking at a case.

11      Q.   Okay.  So, if I understand your last

12   answer, then in October of 1998, when you were the

13   pathologist that looked at the slides as part of your

14   process, you also consulted the staging handbook?

15      A.   That's correct.

16      Q.   And do you do that in every case of breast

17   -- when you are reviewing -- when you are looking at

18   slides in breast cancer cases?

19      A.   That's correct.

20      Q.   Are there any other handbooks or

21   references that you as a general practice would

22   consult during the course of examining breast

23   pathology?

24      A.   Other than I had already given you the

25   three references and this, that's primarily the

29

1   references I would use for breast cancer.

2      Q.   Can I take a look at the handbook?

3      A.   Yes.

4      Q.   So, in 1998, would you have consulted an

5   earlier --

6      A.   Earlier edition.

7      Q.   An earlier edition of this?

8      A.   Right.

9      Q.   Between 1998 and 2002, did any very

10  significant changes in the staging --

11         MR. ADAMS: 2003 or 2002?

12     A.   2003 sorry.  True.

13     Q.   Go 2002, that's when this 6th edition came

14  out.  Okay.  So, between 1998 and 2002, can you think

15  of any significant changes in the staging of breast

16  cancer?

17     A.   No, not specifically in the staging, but

18  there are other comments in there relating to

19  prognostic factors and things and many of those

20  things might have changed or been updated.  I would

21  have to look at -- at the previous editions, but

22  there have been updates in different tumor markers

23  and different studies on the prognosis of tumors.

24  And whenever those studies come out and become

25  available, then they are included in newer editions.

30

1    Q.    In October of 1998, how many pathologists

2    worked in the department at Eisenhower?

3    A.    Let's see.  I believe there were six.

4    Q.    Who was the head of the department?

5    A.    At that time I believe Dr. Nguyen was the

6    chief.

7         MR. ADAMS:  Do you know how that is

8    spelled?

9    A.    N-G-U-Y-E-N.

10    Q.    How was the practice divided up among the

11    pathologists in terms of all the different functions

12    that you do as pathologists?  Were there some people

13    that did the lab work, some people that did the

14    cytology and some people that primarily did the

15    surgical?

16    A.    Well, it was divided.  Most of the

17    sections in clinical pathology were assigned to one

18    of the pathologists.  So, there was a pathologist in

19    charge of the blood bank, a pathologist in charge of

20    microbiology, one in charge of hematology, one in

21    charge of chemistry, and then I was in charge of

22    surgical pathology and cytology.  But as far as

23    looking at the surgical pathology specimens, it was

24    not necessarily divided evenly but everybody

25    participated.

31

1      Q.   Being in charge of surgical pathology and

2    cytology, what were your duties in that role?

3      A.   Well, mostly administration, making sure

4    that the quality control is done correctly, that, you

5    know, taking care of any administrative problems that

6    might arise.

7      Q.   In 1998, did you work with, with

8    technologists or techs in the cytology lab or how did

9    you -- I guess I don't really know how to ask the

10   question properly, but did you work -- did you do all

11   your own processing of the samples and deciding what

12   to section or was that something that was done by a

13   technologist?

14     A.   Are you talking about cytology or are you

15   talking about surgical pathology specimen?

16     Q.   Well, I guess why -- when a breast sample

17   comes in to be looked at by the pathology department,

18   what was the technologist's role and what was your

19   role in processing that sample?

20     A.   Okay.  Well, for a sample that was

21   cytology, it was brought in and processed by the

22   technologist, and then we would read the slides.

23     Q.   So, when the sample is looked at by you,

24   it's already been cut down?

25     A.   No.  That's why I was trying to clarify.

32

1    Q.    Okay.  Okay.

2    A.    Between cytology specimens are different

3    than surgical pathology specimens.  If we get a piece

4    of tissue, then all the tissue is looked at by a

5    pathologist.  There is none looked at by a

6    technologist.

7    Q.    So, Ms. Pollard's -- when Ms. Pollard had

8    the excisional biopsy performed and the specimen was

9    sent down to the pathology lab to be looked at, who

10   looked at it first? Who had the first --

11   A.    I did.

12   Q.    All right.  So, you looked at the tissue

13   that came down?

14   A.    That's correct.

15   Q.    In Ms. Pollard's case, was the specimen

16   inked? Were the margins of the specimen inked?

17   A.    Yes.

18   Q.    When you refer to -- what did you refer to

19   when you --

20   A.    In page two of the report, 6429, under the

21   gross description, I described that the margins are

22   inked.

23   Q.    Okay.  So, that would be something that

24   you would have done?

25   A.    Yes.

33

1    Q.    Now, under the gross description, the

2    measurement of the tumor is .5 centimeters?

3    A.    That's correct.

4    Q.    Was the tumor -- did you ever measure the

5    tumor as it appeared on the slide?

6        MR. ADAMS:  You understand the question?

7    A.    Yes, I understand the question.  I don't

8    know if I did or not.

9    Q.    Is there any indication anywhere in the

10    report that the tumor was also measured once the

11    specimen had been sectioned and put on a slide?

12    A.    No.

13    Q.    And looking at slides today in preparation

14    for your deposition, did you measure the tumor that

15    appears on the slide?

16    A.    No, I did not.  And I don't have the

17    original -- these are not the original slides either.

18    Q.    Okay.

19    A.    These are recut slides.

20    Q.    Where are the original slides?

21    A.    I don't know.

22        MS. ZORK: I thought we had original

23    slides.

24        MR. ADAMS: Had the slides that are here.

25    A.    We have the slides they gave to me.

34

1          MR. ADAMS: He looked at them, and that's

2    what he told me.  Some that are original tumor are

3    not the original slides.

4          Q.    (By Ms. Zork)  How can you tell they're

5    not the original slides just --

6          A.    They are labeled.  If it is a recut, it is

7    labeled as a recut.

8          Q.    On the recuts, did you -- did you measure

9    the size of the tumor on the recuts?

10          A.    No, I didn't.

11          Q.    Are you able to do that if you look

12    through the microscope now?

13          A.    I don't have a ruler to make a

14    measurement.  The microscope does not have a ruler

15    that --

16          Q.    Okay.  Where is the laboratory?

17          A.    I can go and get one.

18          Q.    All right.  If you wouldn't mind doing

19    that.

20          MR. ADAMS: You want to do that now?

21          MS. ZORK:  Why don't we go ahead and do

22    that now so that he can --

23          (A recess was taken.)

24          Q.    (By Ms. Zork)  Dr. Adams came back with

25    the ruler.  If you wouldn't mind taking a look and

35

1    identify for the record what it is that you are

2    looking at.

3         MR. ADAMS: We are looking into the

4    microscope, Catherine.

5         MS. HANRAHAN:  Okay.

6    A.   I mean, how much -- you want me to

7    describe just the slide I am looking at?

8    Q.   Well, the identifying information on the

9    slide so that if we wanted to look at it again at a

10   later point, we would know which slide you are

11   referring to.

12   A.   This is a recut of slide A2, case number

13   6429.

14   Q.   And what is it that you are looking at?

15   A.   I'm looking at the extent of the invasive

16   component of the tumor.  When you measure a tumor,

17   the measurement is of the invasive component.  So, it

18   is not always what looks like tumor when you hold up

19   a slide.

20   Q.   So, the invasive component, there may be

21   some normal tissue in the same field?

22   A.   That's correct.

23   Q.   Okay.  So, you measure where the invasive

24   cells, how far they spread?

25   A.   That's correct.  And on this slide, it

36

1  measures approximately eight millimeters invasive

2  component.

3      Q.    You are looking at another slide.  Can you

4  identify, give us the identifying information from

5  that slide?

6      A.    Yes.  This is slide number A4.  Again, it

7  is a recut on case number 6429.  Again, on this slide

8  it looks about between seven and eight millimeters.

9  And those are the only two slides of the tumor that

10  we have available here.

11      Q.    Now, in measuring -- in the pathology

12  report in measuring the tumor, is the standard of

13  care to measure the tumor just by gross or is the

14  standard of care to measure the tumor as it appears

15  on the slide?

16      A.    Well, the standard of care is to use all

17  your means available because it's very dependent on

18  each case.  And what I mean by that, there are some

19  tumors larger than you would be able to fit on a

20  slide where the section you are taking is not truly

21  the size of the tumor.  So, a measurement from the

22  slide is not -- is not going to be accurate.  There

23  is also some changes in the size of the tissue that

24  occurs on -- that can occur when it is cut and

25  stripped, you know, placed on the slide.  So, you can

37

1   have some variation there.  Normally, if you have a

2   tumor, the most accurate measurement is taken grossly

3   from the tumor.  Like I said, there can be some

4   variation because what you feel is a tumor or a lump

5   basically in the tissue, when you look at it under

6   the slide, it might not all be invasive cancer.

7   There might be a lot of fibrosis or intraductal

8   cancer that's making up that mass and only a small

9   portion of invasive cancer.  So, it is only the

10  invasive cancer that's important with the measurement

11  as far as prognosis.

12      Q.   In this case, when you looked at the

13  slides that we just looked at, A2 and A4, is the

14  entire area of the tumor, does it appear on those two

15  slides?

16      A.   I believe -- I don't see on here, and like

17  I said, I don't have all of the slides from this

18  case.  There are seven slides from this case.  And

19  there are, let me see, four slides there.

20      Q.   So, in looking at the report --

21      A.   When you look at the bottom of page two in

22  the gross description at the end.

23      Q.   Uh-huh.

24      A.   There is kind of a code, ESB1-7.  And what

25  that means is that the entire specimen has been

38

1    submitted for histologic exam and was placed in

2    slides and slides 1 through 7.

3        Q.    And for today's purposes, you've been

4    provided 4 out of the 7 slides?

5        A.    That's correct.

6        Q.    Are there tissue samples -- are there

7    seven different tissue samples in that bag that

8    relate to the --

9            MR. ADAMS: For the record, just enumerate

10   what he has in the bag there.

11           THE WITNESS:  You want me to say what is

12   in the bag?

13           MR. ADAMS: I think so.  Make it clear.

14       A.    What I have in this bag are called the

15   tissue blocks.  It's the tissue samples that we

16   submit that's been imbedded in paraffin so that it

17   can be cut and made into slides.  On that case, there

18   are seven blocks of tissue.

19       Q.    And can you tell based upon the markings

20   -- well, let me ask it a different way.  So, the

21   entire sample that was submitted to pathology is

22   contained in those seven tumor blocks?

23       A.    That's correct.

24       Q.    When you selected out two recuts to look

25   at, A2 and A4, in order to measure the size of the

39

1   tumor, why did you select A2 and A4 as opposed to A1

2   and A3?

3       A.   A1 and A3 don't contain any tumor.

4       Q.   So, there was some area of the sample that

5   just had normal tissue?

6       A.   Right, because the mass was only a half a

7   centimeter and the amount of tissue they submitted

8   was 3 by 2 and a half by 1.8 centimeters.

9       Q.   How many of the blocks contain -- can you

10  identify for the record which of the blocks contain

11  tumor?

12      A.   Well, I can't say for sure grossly just

13  looking at it.  I can say that I looked at slides A2

14  -- slides from block A2 and block A4, and they had

15  tumor.

16      Q.   Would it be fair to say then A3 would also

17  have tumor since it comes in between 2 and 4?

18      A.   I have slide A3 here.  Again, looking at

19  6429, A3, it looks like there is a small focus of

20  tumor on this slide.

21      Q.   Smaller than on A4 and A2?

22      A.   Yeah.  Probably about -- it's less than a

23  millimeter in size, and I don't have a micrometer to

24  make an accurate measurement but less than a

25  millimeter.

40

1      Q.    Let me ask you this:  When you are looking

2   at A3, are you looking at part of the same tumor or

3   are you looking at perhaps another focal area of

4   cancer?

5      A.    Of cancer?

6      Q.    Yeah.

7      A.    Well, there was only one mass that was at

8   least grossly visible.  Something less than a

9   millimeter obviously would not be grossly visible.

10      Q.    I guess what I am asking you, is the

11   little area of malignancy that you identified that's

12   less than one millimeter, can you tell that it's part

13   of the greater or is it off by itself somewhere? Can

14   you tell based upon the slide?

15      A.    You can't really tell based upon the

16   slide.

17      Q.    Your report says that the neoplasm extends

18   extremely close to surgical resection margins.  Are

19   there some areas you look at where there really is no

20   -- there is no normal tissue on some of the margins

21   when you look at the -- at the samples at this time?

22      A.    I will take another look.

23      Q.    I guess what I'm asking --  well, I'll ask

24   another follow-up question.

25          MR. ADAMS: What is the question that's on

41

1    the table now?

2          MS. ZORK: He describes it being extremely

3    close. I want to know if when he looks at the

4    slides, whether there are some slides that show no

5    margin.

6      A.   No. Looking at -- I looked at both --

7    well, A2, A3 and A4. A2 is closest to the margin,

8    but there is no tumor at an inked margin.

9      Q.   So, when you use the word extremely close,

10   what does that mean?

11     A.   It means that, like I said, there is no --

12   we inked the tumor so we know what the margin is, and

13   to say that a tumor is at the margin, you need to see

14   ink on tumor basically. And I don't see any areas

15   where there is ink on tumor. There is areas where

16   it's -- there is just a small band of tissue around

17   there that contains tumor, but there is -- or that

18   does not contain tumor, but it's extremely close. I

19   mean, it's --

20     Q.   As a pathologist, are you comfortable

21   telling the surgeon that he's excised completely

22   around the tumor?

23         MR. ADAMS: Objection. You may answer if

24   you can.

25     A.   Could you repeat that question again.

42

1    Q.   (By Ms. Zork)  As a pathologist, are you

2    comfortable telling the surgeon who's done the biopsy

3    that he has excised the tumor completely based upon

4    what you see on these slides?

5        MR. ADAMS: Same objection.  Do you

6    understand the question?  I had an objection there

7    but you can still answer.  But if you don't quite

8    understand or want clarification, you can ask for

9    that.

10    A.   In this case, no, I mean, I wouldn't feel

11    comfortable saying that the margin is completely

12    clear.  Again, these are recut slides.  I don't have

13    the original, but looking at these, again, it's

14    extremely close.  I think there's an understanding --

15    well, never mind.

16    Q.   (By Ms. Zork)  No.  No, that's important.

17    What is the understanding between surgeons and

18    pathologists when they obtain a report, such as the

19    report that you've written in this case, describing

20    the neoplasm extending extremely close to the

21    surgical resection margin?

22    A.   Well, what I was going to say, I guess not

23    in answer to that question, was --

24        MR. ADAMS: Well, you need to answer that.

25    That's the question on the table.

43

1    Q.    Tell me what you were going to say then.

2        MR. ADAMS: No.  No.

3        MS. ZORK: Yes.

4        MR. ADAMS: If you want to rephrase the

5    question, that's fine, but one question at a time

6    because now it gets confusing as to what we are

7    talking about.

8    Q.    (By Ms. Zork)  Okay.  Well, answer my

9    question, then we will go back to what you were going

10   to say.

11   A.    Repeat your question.

12   Q.    My question is, what is the surgeon

13   reading your report to understand from the

14   description -- what do you expect them to understand

15   when you describe the neoplasm extends extremely

16   close to the surgical resection margins?

17   A.    I expect them to understand exactly what

18   it says, that the tumor is extremely close to the

19   margin.

20   Q.    And what clinical significance does that

21   have?  What is your understanding of the clinical

22   significance that has to a surgeon in a case like

23   this?

24   A.    My understanding is that the clinical

25   significance is that the surgeon knows that -- again,

44

1    we are looking at a sample of the tissue.  Even

2    though I put all the tissue in, like I said, you are

3    looking -- you have a four millimeter slice of

4    tissue, and we are looking on one slide, a five

5    micron slice of that.  So, you could make another,

6    you know, who knows, maybe 500 slides from that piece

7    of tissue to look at all the tissue.  And on one of

8    those, if it's that close, you might find something.

9    But it's my understanding in answer to your question

10   of what the surgeon understands is that it's

11   extremely close to the margin and --

12       Q.   Therefore, what?

13       A.   Well, for breast biopsies, I believe -- I

14   didn't research it, but I believe that the standard

15   is to try and get at least a half a centimeter and

16   preferably a centimeter margin around a tumor.

17       Q.   And so what is the margin around the tumor

18   that you described as being extremely close?

19       A.   Probably just with estimation -- like I

20   said, I don't have a micrometer, but probably ten

21   microns.

22       Q.   So, that's a tenth of a millimeter?

23       A.   About the size of a couple of cells.

24       Q.   As the pathologist, looking at breast

25   tissue where there's been identified carcinoma, you

45

1    understand that what you report forms the basis for

2    future treatment for a woman with breast cancer?

3        A.    That's correct.

4        Q.    And it's the standard of care in reporting

5    about what you see, when you are looking at breast

6    cancer, to make the report back as clear and concise

7    in the areas that are of most important clinical

8    significance to the surgeon and oncologist who will

9    be handling the patients or treating the patient for

10   breast cancer?

11       A.    That's correct.

12       Q.    Is there a uniform understanding among

13   oncologists and surgeons as to what extremely close

14   to the margin means?

15           MR. ADAMS: Objection.

16           MS. HANRAHAN: Objection.

17           MR. ADAMS: You may answer.

18       A.    Again, you see, there's -- you are correct

19   in that it's a standard of care to report the margin

20   in cancer, in a breast cancer case.  Clearly, if the

21   margin is, you know, a one centimeter margin or two

22   centimeter margin, it's easy to quantify.  If a

23   margin is involved, it's easy to say the margin is

24   involved.  In saying that it extends extremely close

25   to the margin, I am trying to convey -- I could be

46

1    semantically correct and say that the margin is

2    clear, there are no tumor cells at the margin.  But I

3    don't think that that would provide the information

4    that would help the patient.  So, that is why I say

5    that it is extremely close to the margin.  And,

6    again, these slides in most cases, you know, we don't

7    just put out a report without any conversation with

8    the surgeon, and many, many times the surgeons come

9    and look at the cases with us.

10       Q.   In this case, did you have any

11   conversations with the surgeon after you looked at

12   the slides and wrote your report?

13       A.   I mean, I'm sure that I did, but I

14   couldn't -- I don't have any record.  Like I said, in

15   most cases, there is.

16       Q.   Are there standards that in pathology for

17   reporting in breast cancer cases, the way that the

18   report should -- the format that the report should

19   follow and the language that should be used in the

20   report?

21       A.   Now there are.  In 1998 there were not.

22       Q.   What did you -- were there guidelines?

23   What did you look to in 1998 as a standard for what

24   should be included in a report in a breast cancer

25   case?

47

1       A.   As I said earlier, that's why I usually

2   refer to the staging manual with every case because

3   that's the best information that we can give to

4   provide prognostic information to the clinicians who

5   are going to treat the patient.  So, to provide

6   information that can be used to accurately stage the

7   patient.

8       Q.   The information that has the greatest

9   importance for prognosis in management of the breast

10   cancer patient, that would be the size of the tumor?

11      A.   That's --

12      Q.   That would be one of the factors?

13      A.   That's correct.  That's one of the

14   factors.

15      Q.   A description of, it's an excisional

16   biopsy or lumpectomy, whether the margins are clear,

17   that would be an important information, piece of

18   information?

19      A.   It's important information.  It's not

20   necessarily prognostic information in a diagnostic

21   biopsy rather than a therapeutic lumpectomy.  They

22   are two different procedures.

23      Q.   Well, okay.  The other important aspect of

24   the information that you provide for prognosis and

25   treatment is grading of the tumor?

48

1    A.    That's correct.

2    Q.    And if I understand, the grading system in

3    1998 and that exists still, is grading tumors 1

4    through 3?

5    A.    That's correct.

6    Q.    Grade 1 tumors have the best

7    prognosticating features?

8    A.    That's right.

9    Q.    And grade 3 have the worse?

10    A.    Have the worst.

11    Q.    Also grade 3, they are also described or

12    sometimes referred to as poorly differentiated?

13    A.    Poorly differentiated or high grade.

14    Q.    And that's what Ms. Pollard had?

15    A.    That's correct.

16    Q.    In the final diagnosis, you don't provide

17    a grade or don't see where you provided a grade

18    anywhere in your report of the tumor?

19    A.    If you look in the comment, it says this

20    is a poorly differentiated neoplasm, and then it says

21    in the second line, the high grade cytologic

22    features.  So, it describes the high grade nature of

23    the cytology, and it says in a separate line that it

24    is a poorly differentiated cancer.

25    Q.    Okay.  In your final diagnosis you don't

49

1  write poorly differentiated tumor, do you?

2     A.   No.

3     Q.   You write infiltrating carcinoma with

4  medullary features?

5     A.   Medullary features.

6     Q.   Medullary features.  Now, a cancer with

7  medullary features is a poorly differentiated cancer

8  that has good prognosticating features, right?

9     A.   No.

10    Q.   Okay.  Explain why you say no.

11    A.   Okay.  There are different types of breast

12  cancer.  The most common being infiltrating ductal

13  carcinoma or mammary carcinoma of no special type.

14  There is a lot of different terminology, but it is

15  just garden variety breast cancer.  And then there

16  are special types of breast cancer, and medullary

17  carcinoma is one of those types.  But the significant

18  prognosis, the improved prognosis with medullary

19  carcinoma is only with a pure medullary carcinoma,

20  not with what is called an atypical medullary

21  carcinoma or infiltrating carcinoma with medullary

22  features.  It does not carry a better prognosis.

23    Q.   What was the purpose of using infiltrating

24  carcinoma with medullary features in your final

25  diagnosis?

50

1      A.   It's a description of what the neoplasm

2   looks like.  It's --

3      Q.   Would you more -- your audience for your

4   report is the oncologist and the surgeon who will be

5   treating this patient; is that correct?

6      A.   That's correct.

7      Q.   The grading system is understood by

8   oncologists and surgeons throughout this country;

9   isn't that correct?

10      A.   That's correct.  It's pretty much

11   standard.

12      Q.   And a grade 3 tumor is understood by

13   oncologists and surgeons as a tumor with poor

14   prognosticating features?

15         MS. HANRAHAN: Objection to the form.

16      Q.   (By Ms. Zork)  Is that correct?

17      A.   No.

18      Q.   Okay.

19      A.   Again, that's why I don't think you will

20   find in a report somebody that says this is a grade 3

21   tumor because there are -- there are many grading

22   systems and grading schemes used for cancers, and

23   breast cancer included.  So, you will see qualifiers

24   versus what type of grading scheme you are using, and

25   then also the descriptive of well differentiated,

51

1   moderately differentiated or poorly differentiated or

2   low grade, high grade, something like that.  Rarely

3   will you just see a numerical grade because there's a

4   lot of confusion, which is --

5        Q.   Well, everyone understands the meaning,

6   oncologists and surgeons who are going to be treating

7   the patient, what a poorly differentiated neoplasm

8   is; is that correct?

9        MR. ADAMS: Objection.

10       A.   Right.

11       Q.   (By Ms. Zork)  That's uniformly understood

12   that that's -- that those types of tumors have,

13   neoplasms have poor prognosticating features, which

14   is significant information in terms of management of

15   this patient, right?

16       A.   Again, it depends on the context that it's

17   being used.

18       Q.   Okay.  Well, tell me when it wouldn't be

19   of concern to an oncologist if they saw that?

20       MS. HANRAHAN: Objection to the form.

21       MR. ADAMS: Same objection.

22       A.   If it was a pure medullary carcinoma, it

23   would have a better prognosis, even though it's very

24   poorly differentiated.

25       Q.   (By Ms. Zork) In 1998 or were you familiar

52

1   with the Elston score?

2       A.   Yes.

3       Q.   Is that something that you use in

4   reporting breast tumors?

5       A.   It's something that I use now in all my

6   reports.  It's something I used then in determining

7   the grade of the tumor, but it wasn't necessarily

8   standard of care at that time to include that in your

9   report.

10      Q.   Tell me what the Elston scores are tied

11  to.

12      A.   There are three things that the Elston

13  score looks at.  It looks at the nuclear features,

14  whether the nuclei are fairly normal or very

15  pleomorphic or somewhere in between.  And you are

16  giving a score of 1 to 3 based upon how much

17  abnormality there is in the nucleus, and then it

18  looks at tubular formation, whether the tumor is

19  forming tubes that replicate the normal breast tissue

20  at one end of the spectrum.  And the other end of the

21  spectrum it is just sheets of cells that don't form

22  any tubals at all.  Not being the most poorly

23  differentiated, and then it looks at the mitotic

24  count.  And you look at the number of mitoses per ten

25  high power fields, and it depends on the type of

53

1    microscope you are looking at.  But there are certain

2    ranges for the mitotic count making it a 1, 2 or 3 or

3    well or poorly differentiated tumor.

4        Q.    The more poorly differentiated, higher the

5    score?

6        A.    The more points.

7        Q.    And what's the most points you can get for

8    a bad tumor?

9        A.    9.  You could have a 3, 3, 3, would be a

10   9.

11       Q.    And applying the Elston score to

12   Ms. Pollard's tumor, what is it?

13          MR. ADAMS: Objection.  Can you answer that

14   question?

15          THE WITNESS:  I would have to go and -- I

16   could sit here, and I could grade the tumor from what

17   I have.

18       Q.    (By Ms. Zork)  Looking at the report, can

19   you discern from the report, based upon the report,

20   what her Elston score would have been?

21       A.    It would have been at least a 7.

22       Q.    And that's based upon what that you see in

23   the report, what features that you see in the report?

24       A.    That it's a poorly differentiated tumor,

25   and when you look at the Elston score, between 3 and

54

1   4 is a well differentiated; 5, 6 moderately

2   differentiated; 7 or greater is a poorly

3   differentiated.

4        Q.   Did you by describing the tumor as

5   infiltrating carcinoma with medullary features, did

6   you mean to convey the same -- the same prognostic

7   information as would have been conveyed by describing

8   it as a poorly differentiated neoplasm?

9        MR. ADAMS: Objection.

10       MS. HANRAHAN: Same objection.

11       A.   I am not sure I understand the question.

12   One is a diagnosis and one is a prognostic or a

13   description.

14       Q.   (By Ms. Zork)  Okay.  In the description,

15   you are conveying information that the oncologists

16   use in determining what the treatment should be and

17   what the prognosis is for this patient?

18       A.   That's correct.

19       MS. LOWENSEN: Object to the form.

20       Q.   (By Ms. Zork)  By describing in your final

21   diagnosis the tumor as an infiltrating carcinoma with

22   medullary features, what prognostic information is

23   contained by that description or is conveyed by that

24   description?

25       A.   That it's a carcinoma of the breast.

55

1    Q.    Is it a -- is it good, moderate or poor?

2    A.    Based --

3    Q.    Prognosticating features, does it have

4    good, poor or moderate?

5    A.    Again, from the diagnosis line, it doesn't

6    provide that information.  The standard of care for

7    reporting is not necessarily to put all the

8    information in the diagnosis line that will be of

9    prognostic significance.

10   Q.    So, standard of care is to put some of the

11   diagnostic information in the --

12   A.    No, you put the -- I'm sorry to interrupt.

13   Q.    Let me ask the question.  Is it within the

14   standard of care to put some of the diagnostic and

15   prognostic information in the final diagnosis and

16   other information that's critical for prognosis and

17   treatment somewhere else in the report as well?

18       MR. ADAMS: Objection as to the form.

19   Q.    (By Ms. Zork)  Somewhere else in the

20   report?

21       MS. HANRAHAN: Same objection.

22   A.    Again, what you are asking is -- no.  As

23   far as -- let me take that back.  I mean, it's

24   standard of care to provide diagnostic and prognostic

25   information in the pathology report.  Where it occurs

56

1   is not necessarily I don't think dictated in a

2   standard of care.  If you look at the College of

3   American Pathologists guidelines, which are the

4   accepted or becoming the accepted guidelines for what

5   should be reported on a cancer, some of the protocols

6   of what needs to be reported are three and four pages

7   long.  And the information -- that information is to

8   be in a report.  Now, if you bury -- if you put a

9   diagnosis line that's three pages long it becomes --

10   you know, to me, it becomes very difficult to convey

11   exactly what you are trying to convey.  To me, what

12   the diagnosis line is to provide a diagnosis, and

13   then the other information of use for prognosis and

14   treatment of the patient is provided in the comment.

15       Q.   Why wouldn't poorly differentiated

16   neoplasm be a diagnosis?  Why couldn't that be a

17   diagnosis?

18       A.   Poorly differentiated neoplasm doesn't --

19   that would imply -- again, if that was the diagnosis,

20   that would imply that it could be a different type of

21   cancer or not even a cancer at all.  It could be a

22   sarcoma or lymphoma.  It's a descriptive term.

23   That's a descriptive terminology.  It's not a

24   diagnostic terminology.

25       Q.   How about a poorly differentiated

57

1   carcinoma?

2          MR. ADAMS: Objection.

3      Q.    (By Ms. Zork)  Would that be a diagnosis,

4   an appropriate diagnosis in Ms. Pollard's case?

5          MR. ADAMS: Same objection.

6      A.    Again, there are a lot of different

7   terminology that you can use in diagnosis.  Again,

8   just saying a poorly differentiated carcinoma is not

9   -- again, it doesn't convey that it's a cancer of the

10  breast.  Whereas infiltrating carcinoma with

11  medullary features, while it's – it is among the

12  terminology used in diagnosing breast cancers.  Like

13  I said, now the terminology now is more an atypical

14  medullary carcinoma to describe this type of a tumor.

15  But to say a poorly differentiated carcinoma, then

16  the -- again, it doesn't convey --

17     Q.    In the record that you have reviewed, can

18  you take a look at the folder of records that you

19  reviewed?

20     A.    Yes.

21          MR. ADAMS: Let's take a couple of minutes.

22          (A recess was taken.)

23     Q.    (By Ms. Zork)  Look at the records that

24  you reviewed.  It's pages number 92 and 93.  Looks

25  like the order is switched.  Looks like the 93 would

58

1    be the first page of your report and page 92 be the

2    second page of the report.  Where does -- this looks

3    like a computer printed report.  Where did this --

4    who did this report go to? Can you tell? Who was the

5    recipient of that report?

6        A.   We don't send -- at least at this time we

7    didn't send out hard copies of reports.  It's a

8    completely computerized system.

9        Q.   So, how does the next, the treating

10   doctor, the surgeon or the oncologist, how are they

11   notified that the report has been completed or that

12   the path --

13       A.   The report, when we sign off on the

14   report, there's a que sent to the physician.  You

15   send it that he has laboratory tests ready for his

16   review.

17       Q.   Okay.  And how do you -- can you tell

18   based upon this report that we are looking at, pages

19   93 and 92, who the intended recipients of the report

20   would be, who it would go to?  Who would get that

21   message?

22       A.   The ordering physician was Ricardo Young.

23       Q.   And so the ordering physician then would

24   be the doctor who, the physician who got the -- who

25   would get the first notice that the report was

59

1    complete?

2        A.    That's correct.  That's the way the

3    computer system was set up, was whoever was the

4    ordering physician would get the notification that it

5    was completed.

6        Q.    With this study that you did, looks like

7    it was done on October 15?

8        A.    Yes.

9        Q.    Well, let' see.

10       A.    Excision on the 15th.

11       Q.    I think the operation was done on the

12   14th?

13       A.    That's correct.

14       Q.    What does accessioned mean?  What is that?

15       A.    That's when it was signed into the

16   laboratory.

17       Q.    Where was --

18       A.    Put in the computer.

19       Q.    Where was the specimen between -- where is

20   the specimen maintained during that -- between that

21   time on the 14th when it's removed from the breast

22   and the 15th when it was accessioned?

23       A.    Well, I mean, from looking at this report,

24   there is no way of knowing.

25       Q.    Do you remember?  What would be the

60

1    procedure?  If surgery was done on one day but the

2    pathologist wasn't going to look at the specimen

3    until the following day, how would that specimen be

4    processed and stored?

5        A.    Well, again, this specimen is a cytology

6    specimen.  No.  I am sorry.  This is a tissue

7    specimen.  Usually the specimen, again, is collected

8    in the operating room, taken from the patient and

9    placed in a container.  The surgeon sometimes will

10   have the specimen sent down for what we call frozen

11   section or intraoperative diagnosis.  He'll send the

12   tissue fresh, and we will look at it fresh while the

13   patient's in the operating room.  And in this case,

14   the specimen was not sent fresh.  So, it's placed in

15   formalin in the operating room, and then it's brought

16   from the operating room to the lab for processing.

17   And as far as what happened between 12 O'clock when

18   it was taken on the 15th, it's not -- and it depends

19   on how often the courier brings specimens down from

20   the operating room.

21       Q.    When you completed your report -- do you

22   write your report as you are doing your -- making

23   your observations?

24       A.    We dictate the report, yes.

25       Q.    As you are making your observations?

61

1      A.   Yes.

2      Q.   Or do you take down notes as to what you

3   observed and then later go and dictate all your

4   reports at the end of the day?

5      A.   Well, again, as far as looking at the

6   gross specimen, we dictate that as we are looking at

7   the specimen.

8      Q.   And what about when you are looking at the

9   microscopic specimens?

10     A.   The same.

11     Q.   How many slides would you -- if you were

12   working a normal day, how many different cases would

13   you look at in a day?

14     A.   There's a wide variation but between --

15   usually between here 30 to 60 cases.

16     Q.   A day?

17     A.   A day.  On the days -- like I said, we all

18   shared surgical pathology duty.  So, you weren't

19   doing it day in, day out.  It was on your day, that's

20   about how many you would see.

21     Q.   So, absent the need for an immediate

22   frozen section to be looked at, would the surgical

23   pathology specimens be looked at on certain days of

24   the week but not others?

25     A.   No, it's looked at every day.

62

1      Q.    How much time would you have spent looking

2    at the surgical specimen and the microscopic slides

3    before you would complete your report?

4      A.    Again, it varies.  It can vary greatly

5    depending on the case.

6      Q.    In this case, can you give me your best

7    estimate as to how much time you would have spent or

8    if you remember how much time you spent?

9      A.    I mean, I don't remember, and I don't know

10   if some of the recuts that we have here are recuts

11   that I ordered.  Generally, what we will do is when

12   we get a case and we get the slides, we will look at

13   the slides.  And obviously some we just will dictate

14   as we are looking at them and sign out the case.

15   Other cases that might be more complex or more

16   complicated, we will look at them longer, get more

17   slides made, show them to colleagues, get special

18   stains done.  So, in this case, I couldn't say how

19   much time was spent looking at it.  I know it was

20   signed out on the 19th of October.

21     Q.    When you say it was signed out, who was it

22   signed out to?

23     A.    Meaning that I signed it.  I signed the

24   final diagnosis on the 19th of October.

25     Q.    What significance does that have in light

63

1  of the fact it was accessioned on the 15th?

2      A.    The significance being you ask me how long

3  I looked at the case.  It came on the 15th, and I

4  signed it on the 19th.

5      Q.    Right.

6      A.    So, for those four days, I had the slides

7  to look at.  I don't know how much actual time I

8  spent looking at those slides.

9      Q.    When were the slides actually looked at on

10  the 15th or 19th?

11      A.    Again, I would have to look at a calendar.

12  We only -- we are five days a week.  If they are

13  accessioned one day, the slides are available the

14  next day by about noon.  So, the slides would have

15  been available on the 16th, if the 16th was a

16  weekday.  If not, it would have been the following

17  Monday.

18      Q.    But you said that you actually looked at

19  the specimen yourself.  Would it be a two-step

20  process where you look at it yourself and then

21  someone would prepare the slides?

22      A.    That's correct.

23      Q.    All right.  So, the specimen would come

24  in, you would examine it, and then you would give it

25  on to the technologist to make the slides?

64

1      A.    Right, and cut it into pieces to be put in

2   a block, and the technologists put it in a block and

3   make the slides.  And we get the slides the following

4   day.

5      Q.    When you completed your report, would this

6   be the kind of case in which you would in addition to

7   flagging the referring doctor, would you call the

8   doctor and tell him what you found?

9      A.    Yes.

10     Q.    So, that would have been your practice in

11  1998 to have done that?

12     A.    Yes.  And like I said, most of the time

13  the surgeons here were pretty active about looking at

14  cases.  So, they were down in the laboratory, you

15  know, few times a day to look at cases.  But that was

16  the practice to notify them.

17     Q.    I have looked at the specimen and there is

18  cancer and breast cancer here?

19     A.    Right.

20     Q.    Is Dr. Sees one of the surgeons that would

21  come down to the lab to look at the specimens

22  himself?  Do you remember Dr. Sees?

23     A.    To be honest with you I don't remember Dr.

24  Sees.

25     Q.    Okay.  Do you remember Dr. Young?

65

1    A.   No, I don't.

2    Q.   Is Dr. Young, Ricardo Young, a surgeon?

3    A.   I don't know.  I don't remember.

4    Q.   Okay.

5    A.   The name is not familiar to me.

6    Q.   You have looked through all of the records

7    that you have in front of you?

8    A.   I mean, I glanced through them, yes.

9    Q.   Have you seen in the records where Dr.

10   Gupta, in reviewing your report, referred to the

11   cancer as cancer with medullary features with good

12   prognosticating -- with good prognosticating factors?

13        MS. LOWENSEN: Objection to form.

14        MR. ADAMS: Objection.

15   A.   I don't remember seeing that.

16   Q.   Let me see if I can find that.  Did you

17   mean to convey in your report that Ms. Pollard's

18   breast tumor had good prognosticating features?

19        MR. ADAMS: Objection.

20        MS. LOWENSEN: Same objection.

21   A.   No, I did not and I --

22   Q.   (By Ms. Zork)  Do you know who Raj Gupta

23   is?

24   A.   Yes, I do.

25   Q.   He's the oncologist that Ms. Pollard was

66

1  referred to for evaluation for adjuvant treatment?

2     A.   Yes, that's what I understand.  I mean, I

3  know who Dr. Gupta is.

4     Q.   Did you see -- have you seen this letter

5  that Dr. Gupta wrote, "To whom it may concern?"

6        MR. ADAMS: He's reading it.

7     A.   Okay.  Now, I have seen it.

8     Q.   (By Ms. Zork)  Had you seen that letter

9  before?

10    A.   No, I don't remember that.

11    Q.   Do you see where Dr. Gupta writes

12  Ms. Pollard's adjuvant therapy is somewhat debatable.

13  The size of the tumor was very small and has

14  medullary features, which are of a favorable

15  prognosis?

16    A.   I saw where it says that, yes.

17    Q.   And did you mean to convey that in your

18  report?

19        MR. ADAMS: Objection.

20        MS. LOWENSEN:  Objection to form.

21    A.   Again, the terminology I used in the

22  report is accepted terminology for diagnosis of

23  breast cancer.  There are a lot of classifications of

24  breast cancer that are -- that are given.  As a

25  pathologist, I am not always aware of all the

67

1   treatment options that are available to patients.

2   That's beyond my scope of practice, but I am trying

3   to provide the most information that I can provide

4   for the case.

5       Q.   Did you see the letter from the oncologist

6   in England?

7       MR. ADAMS: For the record, we are

8   referring to a note from Dr. D-O-D-W-E-L-L, dated,

9   what appears to be, February 18th, '99.

10      Q.   (By Ms. Zork)  Their understanding, ductal

11  carcinoma with medullary features, no negative.  Is

12  there -- do you see anything in the report that --

13      MR. ADAMS: First of all, let's identify

14  it.  Have you seen it before?

15      Q.   (By Ms. Zork)  Have you seen this report

16  before?

17      A.   I think I did see this in the this booklet

18  you gave me.

19      MR. ADAMS: Okay.  The question.

20      Q.   The question is, is there anything in the

21  oncologist's report from England that identifies that

22  he's aware that this is a poorly differentiated tumor

23  with poor prognosticating features?

24      MR. ADAMS: I'm going to object, but you

25  can answer.

68

1    A.    Again, you're -- I mean, you are picking

2    out the poorly differentiated as a poor prognostic

3    indicator, but there are prognostic -- there are

4    multiple prognostic indicators that are used by the

5    oncologist.  Again, that's not my practice.  But I

6    provide information that tries to give them

7    information about those prognostic factors; size, the

8    grade of the tumor, the stage of the tumor, that type

9    of information. So --

10    Q.    Am I correct --

11        MR. ADAMS: I don't think he finished.

12    Q.    Were you finished?  I am sorry.  I thought

13    he was finished.

14        MR. ADAMS: I know, but --

15        MS. ZORK:  You thought he wasn't.  I

16    thought he was.  Let's see if he is.

17    A.    What I was saying is there are multiple

18    factors that are provided for prognosis; the margins,

19    the size of the tumor, the grade of the tumor, the

20    stage of the tumor, the histologic, architecture of

21    tumor, all that type of information is provided.

22    Q.    But there is no information in this report

23    or in your report about the grade of the tumor or

24    that information is not out there readily --

25    A.    I disagree.

69

1      Q.   All right.  Do you see any indication in

2   the oncologist's letter that he understood that this

3   was a grade 3 carcinoma?

4        MR. ADAMS: Objection.  Requires

5   speculation on his part.

6        MS. HANRAHAN: Same objection.

7        MS. LOWENSEN: Objection.

8      A.   I don't know what he -- again, if he was

9   -- I don't know.  There is no way of my knowing.

10     Q.   (By Ms. Zork)  Well, let me just ask you

11   this question: A medullary carcinoma is considered to

12   have good prognosticating features, is that -- am I

13   correct about that?

14        MR. ADAMS: Objection.  Asked and answered,

15   but you can answer it again.

16     A.   Again, a pure medullary carcinoma has been

17   shown in the literature to have a better prognosis.

18   There had been mixed with atypical medullary or

19   infiltrating carcinoma with medullary features, there

20   has been shown some difference in prognostic -- in

21   prognosis but they haven't been statistically

22   significant.

23     Q.   Having medullary features as opposed to

24   being a pure medullary carcinoma, does the reasonable

25   oncologist understand that pure medullary has good

70

1   prognosticating features but a tumor with medullary

2   features has poor prognosticating?

3        MR. ADAMS: Objection.

4        MS. HANRAHAN: Objection to the form.

5        MS. LOWENSEN: Objection.

6     A.   I am not an oncologist, and I am not

7   familiar with all the literature on prognosis and

8   treatment of patients. I provide information to help

9   them treat the patients, and --

10     Q.   (By Ms. Zork) How does the -- how does

11   describing the tumor as having medullary features

12   assist the oncologist in the treatment of this

13   patient?

14        MS. HANRAHAN: Objection to form.

15        MS. LOWENSEN: Same objection.

16     Q.   (By Ms. Zork) What is conveyed for

17   purposes of treatment from your perspective as a

18   pathologist in your understanding of oncology, breast

19   oncology?

20     A.   Again, as a pathologist, it conveys that

21   it's a cancer and it has medullary features.

22     Q.   Does it convey that it's a good cancer or

23   a bad cancer?

24        MR. ADAMS: Objection.

25     A.   I don't think there is a good cancer.

71

1          MS. HANRAHAN: Objection.

2     Q.    You understand what I am saying.  There

3   are cancers that are worse than others.  Is this a --

4   does it convey that this is a cancer where there is a

5   worse prognosis or a better prognosis?

6          MS. HANRAHAN: Objection.

7          MR. ADAMS: Same objection.

8     A.    Again, a lot of the prognostic information

9   I give is not in the diagnosis.

10    Q.    (By Ms. Zork)  I know, but my question is

11  with respect to describing the tumor as having

12  medullary features, what does that convey to the

13  oncologist in terms of where this cancer fits on the

14  prognosis scale?

15    A.    Because it's an accepted classification of

16  a tumor, and so they can look and determine that that

17  type of tumor, does it have a better prognosis, who

18  has studied tumors of that classification to see how

19  they should be treated and how they react, that's the

20  whole purpose of classifying tumors.  Not necessarily

21  to give prognostic information because that changes.

22  New treatments, new therapies, mordalities are

23  developed.  And as a pathologist, I don't keep up on

24  that.  I keep up on what is needed to properly

25  classify the tumor and provide information that can

72

1    be used to treat and provide a prognosis for the

2    patient.  A diagnosis or tumor classification does

3    not necessarily provide prognostic information.  It

4    tells them this is what kind of tumor it is so that

5    they know how to treat it.  It doesn't --

6        Q.   Is there a treatment -- is there a

7    different treatment for a poorly differentiated tumor

8    with medullary features?

9           MS. HANRAHAN: Objection.

10       A.   I don't know.

11          MS. HANRAHAN: Lack of foundation.

12       A.   I don't know.

13       Q.   The specimens were sent over to England.

14   Some of the slides were sent over to England.  Have

15   you seen the pathology report from the pathologist in

16   England who looked at the slides?

17       A.   No, I have not.

18       Q.   Is there any kind of tracking system

19   maintained in the department here at Eisenhower when

20   slides are sent, are requested and sent to other

21   health care providers or to lawyers' offices?  Does

22   somebody keep track of that?

23       A.   Yes.

24       Q.   Where is that information stored?

25       A.   When I was here, there's a

73

1    transcriptionist's office where the -- if there was a

2    request for slides to be sent, there were forms that

3    were submitted to have the slides sent and those are

4    kept in a file.

5        Q.    Have you seen those forms in this case?

6        A.    No, I have not.

7        Q.    Were the specimens that we looked at here

8    today, and all of those tissue blocks, were those all

9    maintained and kept here at Eisenhower?

10       A.    Yes.

11       Q.    So they -- this transcription office,

12   would they have maintained the record of who's

13   requested slides and who's been sent slides in Ms.

14   Pollard's case?

15       A.    I don't know.  I mean, that is the

16   procedure.  Whether they did or not, I don't know,

17   but that is the procedure.

18       Q.    If you would take a look at what I have in

19   my records is a report from the Leeds Teaching

20   Hospital by Cecily Quinn.  A report dated April 21,

21   1999.

22       A.    Okay.

23           MR. ADAMS: Are you going to make that an

24   exhibit?

25           (Plaintiff's Exhibit 2 was marked for

74

1       identification.)

2       Q.    (By Ms. Zork)  Do you know, according to

3   the report, Dr. Quinn received two H&E slides?  What

4   does H&E mean?

5       A.    Hematoxylin and eosin, it's a stain that's

6   used for the tissue.

7       Q.    Do you know which two slides she looked

8   at?

9       A.    No, I do not.

10      Q.    Do you know -- so, you don't have any way

11  of knowing if they were different slides than you

12  have looked at today or recuts of the same slides

13  that you looked at?

14      A.    Well, again, these are what I have of the

15  tumor, are recut slides.

16      Q.    Where would the originals normally be

17  kept?

18      A.    They are normally kept in the department.

19      Q.    With --

20      A.    Filed.

21      Q.    With the tissue blocks?

22      A.    Well, they are kept in different files

23  but, yeah, all in the laboratory.

24      Q.    And did you specifically request the

25  originals?

75

1        MR. ADAMS: When?

2    Q.  (By Ms. Zork) To look at, at any time

3  before today?

4        MR. ADAMS: He didn't.

5    A.  No.  No.

6        MR. ADAMS: He didn't request them.

7    Q.  (By Ms. Zork)  So, you don't know whether

8  the -- would the recuts be with the originals?

9    A.  Like I said, this is kind of a mixture of

10  originals and recuts.  All the slides are kept

11  together on a certain case.  And there is no -- you

12  know, like I said, we get recuts on a lot of cases as

13  we are looking at the specimen.

14    Q.  So, but there should be -- if someone took

15  the originals to look at or if the originals were

16  sent some place to be looked at, there should be a

17  record that the actual originals were sent as opposed

18  to recuts were sent?

19    A.  Yes.  Though at least at that time the

20  policy was not to send original slides.

21    Q.  Okay.  So, the policy --

22    A.  Unless there was no tissue available to

23  make recuts.

24    Q.  So, the policy would be not to send the

25  original to make recuts?

76

1      A.    To make recuts and send that, unless there

2   was some, you know, special reason to send it.  If

3   the recuts -- occasionally recuts will not show what

4   you want.  Whoever you are sending it off to will not

5   show what you want them to see.  So you will send an

6   original requesting that it be returned.

7      Q.    What would be the reason to have sent only

8   two slides to England?

9          MR. ADAMS: Objection.

10     Q.    Who would have made that determination?

11  If there is a request to the department to have the

12  slides sent to another physician to be looked at, who

13  would make the decision which of the slides to send?

14     A.    Again, I don't -- it depends on the case.

15     Q.    Okay.  Well, in a case such as this, where

16  the --

17     A.    It might be that he requested those

18  slides.  It might be that -- it could -- I have no

19  way of knowing.

20     Q.    Would you -- okay.

21     A.    I mean, I could speculate, but I have no

22  way of knowing.

23     Q.    When a request for slides comes in, is

24  that something that's handled by -- who is that

25  handled by in the laboratory?

77

1    A.    Again, they come in through the

2    transcription area, and it depends.  They might just

3    handle it themselves.

4    Q.    Who makes actual recuts?

5    A.    The technologists.  Often times in a case

6    that -- where there is a lot of slides and lot of

7    blocks, rather than recutting all of them, they will

8    just recut the ones that have, again, the tumor in it

9    or --

10    Q.    The specimen that the pathologist is

11    describing, does it -- does she appear to be

12    describing the same specimens as what you have looked

13    at?

14    A.    Everything looked pretty -- I mean, as far

15    as her description of the histology, it looked

16    similar to what I see.

17    Q.    And she has measured the tumor as 11

18    millimeters?

19    A.    Uh-huh.

20    Q.    Could that be a function of the cut that

21    she got?

22    A.    It could be.  It is possible.

23    Q.    So that --

24    A.    It could be variation of measuring

25    technique.

78

1    Q.    How many different -- what are the

2    different techniques for measuring where you could

3    come up -- with measuring exactly the same tumor, you

4    come up with two different measurements?  What would

5    be the technique?

6        A.    Again, you are talking millimeters, and

7    when you measure it, again you are measuring the

8    infiltrating component of the tumor, and there could

9    be a variation.  Again, just how it's measured.

10   Whether you are going from the edge of what looks

11   like tumor, whether you are going to the edge of the

12   infiltrating component of the tumor.  There might be

13   a millimeter or two millimeter difference in that.

14       Q.    What would be the standard for what you

15   should include in the measurement?

16       A.    The infiltrating component of the tumor.

17       Q.    On your report that I think I have a copy

18   of in my records at page 13?

19            MR. ADAMS: You are speaking of Exhibit 1

20   or something else?

21       Q.    In my report, my copy of the report in my

22   records, let me see if it's the same as what's

23   Plaintiff's Exhibit 1.  No.  The copy of the report

24   in my records is the second page of it.  It's

25   preliminary -- says preliminary AGCC staging of this

79

1    tumor is stage 1.  Final staging is deferred pending

2    tumor board discussion.

3         MR. ADAMS: I think he needs to see that

4    for him to talk about it.

5        Q.   I think we can find it.

6        A.   I mean, I am not looking at the same

7    thing, but --

8        Q.   Is that in yours as well, in your copy of

9    the report?

10       A.   Yes, it is.

11       Q.   Okay.  Were you -- did you participate in

12   the tumor board?

13       A.   I don't remember if I specifically did the

14   tumor board on this case or not.

15       Q.   Well, just as a general matter, did you

16   participate in tumor board?

17       A.   Yes, I did most of the tumor boards.

18       Q.   And based upon this note, would this have

19   been a case that would have been presented to the

20   tumor board?

21       A.   Yes.

22       Q.   Who would have been present at the tumor

23   board, meaning what physical -- if you know

24   specifically, tell me, because, you know, based if

25   you know who was always there.  But if you don't

80

1    know, tell me physicians from what specialties.

2        A.    Physicians from pathology, radiology,

3    general surgery, radiation oncology, and oncology

4    were generally there, a representative, at least one

5    representative from each of those was present at all

6    the tumor boards.  Occasionally, someone from ENT or

7    ear, nose and throat or thoracic surgery, that type

8    of thing.

9        Q.    For breast cancer case, you wouldn't have

10    those?

11        A.    Well, the cases aren't necessarily divided

12    up.  We have a breast cancer tumor board and a lung

13    -- you know.

14        Q.    I guess what I am saying, you wouldn't

15    have an ENT doctor come to the tumor board to discuss

16    the breast cancer cases or just might be there?

17        A.    Like I said, we didn't divide it out.

18        Q.    Okay.

19        A.    So, we might discuss a breast case, ENT

20    case and an orthopedic case in the same day, in the

21    same tumor board.

22        Q.    What is the purpose of the tumor board?

23        A.    The purpose of the tumor board is to,

24    again, get physicians from all the different

25    specialties involved in treating the patient, and

81

1    come up with a staging of the patient based on

2    clinical information, radiology information,

3    pathology information, and then have a discussion of

4    how the patient should be treated.

5        Q.    So, you participated in those discussions?

6        A.    Yes.

7        Q.    And what was your -- what was your role?

8        A.    As a pathologist, our role, we would bring

9    all the slides of the relevant cases to the tumor

10   board and show those slides, and discuss the

11   pertinent findings in those slides.

12       Q.    How often do the tumor boards meet?

13       A.    At that time I believe it was about every

14   other week.  There was a general tumor board, and

15   then there was a pulmonary tumor board once a week.

16       Q.    And what cases were selected for the tumor

17   board?

18       A.    All malignant cases.

19       Q.    And do you have any recollection of this

20   case being presented to the tumor board?

21       A.    I don't have a specific recollection, no.

22       Q.    Would there be a consensus and a plan

23   drawn up at the tumor board?

24       A.    Not necessarily.  Some of the cases that

25   -- again, I think it was a discussion in presenting

82

1   all the findings and getting an accurate staging of

2   the patient. I don't know if there was always a

3   conclusion at the end of the discussion on patients

4   of what the treatment was going to be.

5       Q.   Would there be one person in charge of

6   presenting the patient and taking the treatment plan

7   and implementing it?

8       A.   No, because it was -- again, it is a

9   multispecialty conference.

10      Q.   I understand. But as a practical matter,

11  when you were done meeting and there had been -- and

12  there had been a consensus of what the stage of the

13  tumor was and what the treatment options were, who

14  would -- who would be the -- among the health care

15  providers, who would be the one to convey that to the

16  patient and get the patient's treatment initiated?

17      A.   Again, it depended on the case.

18      Q.   Okay.

19      A.   Some cases have to go to oncology. Some

20  have to go to radiation oncology. Some may go back

21  to the surgeon. Some don't get any further

22  treatment.

23      Q.   Who would be considered as among the

24  physicians at the tumor board, who would be

25  considered the primary physician among you to

83

1    coordinate --

2        MR. ADAMS: Objection.

3    Q.    -- to make sure that all these treatments

4    were implemented?

5        MR. ADAMS: Objection.

6    A.    Again, it would be usually whoever --

7    whoever's patient that it was.

8    Q.    The surgeon?

9    A.    It might have been the surgeon.

10   Q.    In a case such as this where the patient

11   had had an excisional biopsy and --

12   A.    Right.

13   Q.    -- finding of cancer?

14   A.    The surgeon, that's correct.

15   Q.    In a patient such as Ms. Pollard, where

16   there had been a fine needle aspiration excisional

17   biopsy, what information would you need to have

18   before the tumor board would convene to discuss her

19   staging?  Do you understand my question?

20   A.    No, I don't.

21   Q.    Would there have to be any further

22   follow-up treatment or information, diagnostic

23   information obtained before Ms. Pollard's case could

24   be presented to the tumor board as of the date when

25   you completed your report?  I mean, the tumor board

84

1    wouldn't meet without a pathology report, would they?

2        A.    No.

3        Q.    Okay.  Is there any additional information

4    once you have done your report that you would wait to

5    obtain before the tumor board would meet?

6        A.    Not necessarily.

7        Q.    Okay.  In Ms. Pollard's case, when you had

8    completed your findings, your examination of the

9    tissue and the microscopic examination, who's

10   responsibility was it to send the specimens on to

11   have DNA and hormonal studies done?

12       A.    Well, the pathologist in this case, me,

13   since it is my case, chooses which is the best block

14   to be sent and, you know, takes it to the secretary

15   to make recuts and send the block off.

16       Q.    And the standard is to do that once you

17   have completed your examination and microscopic

18   examination of the specimen?

19       A.    Once the case has been, yeah, usually

20   finalized.

21       Q.    What does that mean?

22       A.    That there is a report that's been

23   signed --

24       Q.    Okay.

25       A.    -- for diagnosis.

85

1     Q.    And in this case, on October 19, the

2   report had been signed?

3     A.    That's correct.

4     Q.    And the standard would have been then to

5   send the block of tissue on to the laboratory, Impath

6   Laboratory in this case, to have DNA and hormonal

7   testing done?

8     A.    That's correct.

9     Q.    That didn't happen in this case, did it?

10     A.    I saw when the results came back.  So, I

11   don't know what the delay was in the case, no.

12     Q.    But the specimen was not sent out in this

13   case until December of 1998?

14     A.    I don't know when it was sent out.

15     Q.    Have you looked at the records?

16     A.    Yes, I have looked through the records,

17   but, again, I don't know when the specimen was sent

18   out.

19     Q.    Well, assuming it wasn't sent out until

20   December the 1st of 1998, do you have any explanation

21   for the delay in this case in sending the tissues out

22   for hormonal studies or DNA studies?

23     A.    No, I don't.

24     Q.    Would the tumor board typically wait to

25   meet until the DNA studies and the hormonal studies

86

1    had been done?

2        A.    No.

3        Q.    What is the importance of the information

4    with respect to prognosis and treatment of a breast

5    cancer patient of the DNA and the hormonal studies,

6    your understanding as a pathologist?

7        A.    My understanding as a pathologist, the

8    ones that we normally get are the estrogen and

9    progesterone receptors, and those are important for

10    whether the patient will be given adjuvant tamoxifen

11    therapy.  There are HER-2/neu receptor and Ki67.  The

12    Ki67 is a marker of proliferation.  So, if it's

13    positive, it tells you that -- or if a lot of the

14    cells are positive, it tells you that it's an

15    actively growing tumor.

16        Q.    And in Ms. Pollard's case, what did those

17    markers tell you about her tumor?

18        A.    Again, from what I remember, was that her

19    ER and PR, estrogen and progesterone receptors were

20    negative.  That the Ki67, I don't remember the

21    percentage that was positive, but it was a fairly

22    high percentage that was positive.  And the HER-2/neu

23    was negative.

24        Q.    And is HER-2/neu negative, is that a good

25    prognosticating factor, a bad prognosticating factor?

87

1    A.    Well, HER-2/neu positive is a bad

2    prognostic indicator.

3    Q.    Negative is what, nothing, neither?

4    A.    I guess relatively good than having a

5    positive.  But like I said before, there is no one

6    indicator that -- you know, it's a whole slew of

7    information that's used.

8    Q.    Now, the hormone receptor negative, that

9    in and of itself is a poor prognostic indicator,

10   isn't it, in a woman who's premenopausal?

11   A.    From what I understand.  Again, that's

12   getting out of my expertise, as far as which group of

13   patients, if that's a poor indicator and whether that

14   is negated by, you know, given tamoxifen, I am not

15   sure.  Again, it is providing information.  And

16   that's --

17   Q.    It's not just providing information.  It

18   is providing important information in determining --

19   A.    That's correct.

20   Q.    -- the treatment?

21   A.    That's correct.  I am not involved in

22   determining the treatment.

23   Q.    But you are -- your role is to get that

24   information in a timely manner, and as accurately as

25   you can in order for the oncologist to know what

88

1    treatment options are available for the patient?

2        A.    That's correct.

3        Q.    I understand you said at some later time

4    there was standards or guidelines set up for

5    reporting of breast pathology.  Were there no

6    guidelines within your department for how the

7    pathology should be reported in cases involving

8    breast cancer in 1998 when you were here?

9        A.    There were not written guidelines.  When I

10    talked about the guidelines that are available now,

11    that's, again, from the College of American

12    Pathologists.  And it is not just in breast cancer,

13    it's in cancer from every part of the body.

14        Q.    I understand.  But are there specific

15    guidelines for reporting in breast cancer that are

16    different from the way you would report in other

17    types of cancer?

18        A.    Yes.  Yes.

19        Q.    You said that there were no written

20    guidelines here at Eisenhower in 1998.  How were you

21    trained or who trained you or what was your training

22    in how to report in breast cancer cases?

23        A.    Well, in all my years of training, through

24    my residency, in practice of pathology up until that

25    point, that was my training.  I was always taught to

89

1    use, to give the information that's required to make

2    a decision on treating the patient. Not no check the

3    box formats or anything like that, but --

4        Q.    Do you agree that the receptor studies

5    should have been sent on or about October 19 after

6    you had completed and signed off on the report?

7        A.    Yes, I mean, that's how it should be done.

8    It should have been sent off.

9        Q.    As a pathologist, what is your

10    understanding as to the time line, or if you have

11    one, for treating patients with adjuvant chemotherapy

12    and radiation with respect to when the diagnosis is

13    made?

14        MR. ADAMS: Objection.

15        MS. HANRAHAN: Objection, lack of

16    foundation.

17        MS. LOWENSEN: Objection.

18        A.    I don't know.

19        Q.    (By Ms. Zork) How were specimens -- I

20    think I understood you to say that you would select

21    what you thought would be the appropriate specimen to

22    send on for receptor studies?

23        A.    That's correct.

24        Q.    What would be the criteria for deciding

25    what's the best block of tissue to send?

page

90

1    A.    The block of tissue that has the tumor.

2    Q.    Okay.  Well, several of these blocks have

3    portions of the tumor in it; is that correct?

4    A.    That's correct.

5    Q.    Okay.  So, it could be any one of the

6    blocks that has a tumor in it?

7    A.    That has viable tumor.  Again, not

8    specifically in this case, but in some cases you have

9    a lot of tumor that's necrotic or you just want to

10   send a good representative section of what you want

11   to test.  You don't want to send them something that

12   doesn't represent what you have because then the

13   results will not mean anything.

14   Q.    Is there a record kept of what is sent to

15   be analyzed?

16   A.    There is a record made of any slide that

17   we get recuts on of which blocks are cut and that

18   type of thing.  Now, as far as sending out for the

19   receptor studies, I don't know if there is a record

20   of specifically which block was cut and sent for

21   receptor study, other than the record that is kept on

22   all recuts.

23   Q.    So, it would just be -- it wouldn't be

24   like a whole block that was sent.  I thought I

25   understood you to say you send the block to them.

91

1    A.    Right, block and the recut usually.

2    Q.    And then do they send it back?

3    A.    Then they send the block back.

4    Q.    Once you have made the selection, who's

5    responsible for sending it out, sending it on?

6    A.    The transcriptionist or the department

7    secretary.

8    Q.    And is that usually done by FedEx or how

9    is it -- Impath, isn't it in New York?

10    A.    It's in New York. And so specifically I

11    don't know, you know, which company, you know,

12    transported with.

13    Q.    Typically when the results have been

14    completed, do they come back to your department?

15    A.    Yes.

16    Q.    And then you distribute it on to the

17    referring physician?

18    A.    Then it's placed in an addendum in the

19    report.

20    Q.    Okay.

21    A.    If you look at this, page two, there is an

22    addendum made of the results.

23    Q.    Okay. But do you flag the doctor that

24    this additional information has come in, the

25    referring doctor?

92

1      A.   Any time the report is changed, and then

2   we have to sign it out again or basically electronic

3   signature.  And any time it's changed, then it -- the

4   ordering physician is sent a flag that the report is

5   changed.

6      Q.   How long does it take for you to get the

7   results typically from the time they are sent out to

8   the --

9      A.   Usually within a week, to a week and a

10  half.  I mean, from when we send it out to get the

11  report back and dictated and put in the record and

12  have it signed out.

13     Q.   Do they typically fax you the report as

14  soon as the --

15     A.   Sometimes they will.  It's not consistent.

16     Q.   Were there -- were there other instances

17  within the department in 1998 of specimens not being

18  sent on to the laboratory in New York for receptor

19  study?

20        MR. ADAMS: Objection.

21     A.   I don't know.

22     Q.   You don't know that being a problem within

23  the department that was brought to your attention by

24  oncologists or anyone else?

25     A.   No.  No.

93

1    Q.    Other than having spoken to Mr. Adams,

2    have you talked to anyone else about this case?

3    A.    Anyone else meaning?

4    Q.    Anyone.

5    A.    Well, sure.  Yes, I have.

6    Q.    Who have you talked to?

7    A.    I have talked to my wife.

8    Q.    Is your wife a physician?

9    A.    Yes, she is.

10   Q.    What's her area of specialty?

11   A.    Obstetrics.

12   Q.    And what were your conversations with your

13   wife about with respect to this case?

14   A.    Well, not necessarily in respect to this

15   case.  Just in respect to having to do the deposition

16   and that type of thing.

17   Q.    Anyone else?

18   A.    No.

19   Q.    Did you talk to anyone else in your

20   department?

21   A.    No.

22   Q.    Anyone else that you worked with at that

23   time?

24   A.    Well, again, when I came in, I haven't

25   been here probably for a year.  So, I went and talked

94

1   to a couple of the people that I worked with.  And

2   one of them was, you know, trying to help me find the

3   slides to look at today.  So, we talked as far as

4   that goes about my doing a deposition, but no

5   specifics of the case.

6       Q.   Do you have an understanding as to what

7   the allegations are in this case?

8       A.   Not really, no.

9       Q.   Have you looked at a copy of the complaint

10  that was filed?

11      A.   I don't think I was provided a copy of the

12  complaint.

13      Q.   Have you read any of the depositions that

14  have been given in this case?

15      A.   No.

16      Q.   Do you know Dr. Gupta, Raj Gupta?

17      A.   Yes, I know who he is.

18      Q.   Have you spoken to Dr. Gupta at all about

19  this case?

20      A.   Again, I don't remember if I -- I mean, if

21  I had presented this case at the tumor board, then we

22  probably discussed it then, but I don't have any

23  recollection for sure of that.

24          MR. ADAMS: Asking in preparation for this

25  deposition, did he speak recently.  That's what you

95

1  are asking, right?

2     Q.   (By Ms. Zork)  Either way.  But I think

3  you answered the question.  You haven't -- you don't

4  have any recollection of having spoken to Dr. Gupta?

5     A.   No.  And I haven't -- concerning the

6  deposition, I haven't spoken with him at all.

7     Q.   How long ago did you understand that you

8  would need to be deposed in this case?

9     A.   I think it was around the first of March.

10     Q.   Were you aware of this case before then?

11     A.   No.

12        MS. ZORK:  I think I'm done.  Let me just

13  quickly review my notes. I think that's all I have.

14                EXAMINATION

15  BY MR. ADAMS:

16     Q.   Dr. Adams, the addendum that Ms. Zork

17  pointed your attention to, the one that came back

18  from Impath?

19     A.   Yes.

20     Q.   Would you read the findings that seem to

21  be there and explain their significance where it says

22  antibody/tests ER by IHC?

23     A.   Oh, okay.  ER by IHC means estrogen

24  receptors by immunohistochemistry less than five

25  percent positive as staining/intensity, meaning less

96

1    than five percent of the tumor cells stained with

2    that receptor.

3        Q.    What is the significance, if any, of less

4    than five percent stain positive?

5        A.    The significance is that it's -- it is a

6    poor -- again, that it -- taken by itself, it's not a

7    good prognostic indicator.

8        Q.    So, in the next section, prognostic

9    groupings unfavorable, is that sort of a translation

10   of that particular laboratory finding?

11       A.    That's correct.  That's correct.

12       Q.    What significance, if any, did this

13   addendum mean for you as far as treating Ms. Pollard

14   in your role as pathology?

15       A.    In my role as pathologist it doesn't.  It

16   doesn't change what I do.

17           MR. ADAMS: I don't have any further

18   questions.  Do you have any follow-up?

19       I forgot to mention this prior to beginning of

20   the deposition, but you have the right to read the

21   deposition the court reporter has prepared.  And if

22   there have been mistakes made, to file an addendum so

23   corrections can be made to the transcript.  And

24   although this has gone fairly slowly, I think in this

25   case, probably I would like you to review it and then

97

1    make the changes.  You cannot change your testimony

2    per se, but, for instance, spellings and perhaps

3    grammatical corrections, things of that nature can be

4    corrected.  And so be in the next couple of weeks

5    send it to you, and you can send it back in a certain

6    time frame.

7         (Deposition concluded at 2:00 p.m.)

8         (Pursuant to Rule 30(e) of the

9    Federal Rules of Civil Procedure and/or

10    O.C.G.A. 9-11-30(e), the deponent and/or a

11    party having requested the right to review

12    the deposition, making corrections and/or

13    changes and signing, for that purpose the

14    errata pages have been annexed hereto.)

15

16

17

18

19

20

21

22

23

24

25

98

1              INDEX TO EXAMINATIONS

2

3          Examination                Page

4

5    Examination by Ms. Zork              3

6    Examination by Mr. Adams             95

7

8                  - - -

9

10              INDEX TO EXHIBITS

11

12   Plaintiff's
        Exhibit        Description    Page
13

14      1    Surgical Pathology Report  26

15      2    Letter, Histopathology    73

16

17     (Original Exhibits 1 and 2 have been attached to
    the original transcript.)
18

19

20

21

22

23

24

25

99

1              C E R T I F I C A T E

2

3

4    STATE OF GEORGIA:

5    COUNTY OF COLUMBIA:

6          I hereby certify that the foregoing

7       transcript was taken down, as stated in

8       the caption, and the questions and answers

9       thereto were reduced to typewriting under

10      my direction; that the foregoing pages 1

11      through 104 represent a true, complete, and

12      correct transcript of the evidence given

13      upon said hearing, and I further certify

14      that I am not of kin or counsel to the

15      parties in the case; am not in the regular

16      employ of counsel for any of said parties;

17      nor am I in anywise interested in the result

18      of said case.

19          This, the 28th day of April, 2003.

20

21

22          REGINA W. HOLLIS, B-2306, RPR
            My commission expires on the
23          20th day of May, 2006.

24

25

100

1          COURT REPORTER DISCLOSURE

2    DEPOSITION OF: DR. STEPHEN D. ADAMS

3        Pursuant to Article 8.B. of the Rules and
     Regulations of the Board of Court Reporting of the
4    Judicial Council of Georgia which states: "Each court
     reporter shall tender a disclosure form at the time
5    of the taking of the deposition stating the
     arrangements made for the reporting services of the
6    certified court reporter, by the certified court
     reporter, the court reporter's employer, or the
7    referral source for the deposition, with any party to
     the litigation, counsel to the parties or other
8    entity.  Such form shall be attached to the
     deposition transcript," I make the following
9    disclosure:
         I am a Georgia Certified Court Reporter.  I am
10   here as a representative of Brown Reporting, Inc.
         Brown Reporting was contacted by the offices of
11   Klores & Associates
     to provide court reporting services for the
12   deposition.  Brown Reporting will not be taking this
     deposition under any contract that is prohibited by
13   O.C.G.A. 15-14-37(a) and (b).
         Brown Reporting has no contract/agreement to
14   provide reporting services with any party to the
     case, any counsel in the case, or any reporter or
15   reporting agency from whom a referral might have been
     made to cover this deposition.  Brown Reporting will
16   charge its usual and customary rates to all parties
     in the case, and a financial discount will not be
17   given to any party to this litigation.

18
     /s/ Regina W. Hollis, B-2306, RPR
19

20

21

22

23

24

25

101

1      DEPOSITION OF DR. STEPHEN D. ADAMS/GH

2      I do hereby certify that I have read all
questions propounded to me and all answers given
3   by me on the 31st day of March, 2003, taken before
Regina W. Hollis, and that:

4
       1)  There are no changes noted.
5      2)  The following changes are noted:

6      Pursuant to Rule 30(e) of the Federal Rules of
Civil Procedure and/or the Official Code of Georgia
7   Annotated 9-11-30(e), both of which read in part:
Any changes in form or substance which you desire to
8   make shall be entered upon the deposition...with a
statement of the reasons given...for making them.
9   Accordingly, to assist you in effecting corrections,
please use the form below:

10

11   Page No.      Line No.      should read:

12

13   Page No.      Line No.      should read:

14

15   Page No.      Line No.      should read:

16

17   Page No.      Line No.      should read:

18

19   Page No.      Line No.      should read:

20

21   Page No.      Line No.      should read:

22

23   Page No.      Line No.      should read:

24
       Page No.      Line No.      should read:
25

102

1       DEPOSITION OF DR. STEPHEN D. ADAMS/GH

2    Page No.      Line No.      should read:

3

4    Page No.      Line No.      should read:

5

6    Page No.      Line No.      should read:

7

8    Page No.      Line No.      should read:

9

10   Page No.      Line No.      should read:

11

12   Page No.      Line No.      should read:

13

14   Page No.      Line No.      should read:

15

16   Page No.      Line No.      should read:

17

18   Page No.      Line No.      should read:

19

20   Page No.      Line No.      should read:

21

22   Page No.      Line No.      should read:

23

24   Page No.      Line No.      should read:

25

103

1        DEPOSITION OF DR. STEPHEN D. ADAMS/GH

2     Page No.      Line No.      should read:

3

4     Page No.      Line No.      should read:

5

6     Page No.      Line No.      should read:

7

8     Page No.      Line No.      should read:

9

10    Page No.      Line No.      should read:

11

12    Page No.      Line No.      should read:

13

14    Page No.      Line No.      should read:

15

16    Page No.      Line No.      should read:

17

18    Page No.      Line No.      should read:

19

20    Page No.      Line No.      should read:

21

22    Page No.      Line No.      should read:

23

24    Page No.      Line No.      should read:

25

104

1         DEPOSITION OF DR. STEPHEN D. ADAMS/GH

2    Page No.      Line No.      should read:

3

4    Page No.      Line No.      should read:

5

6    Page No.      Line No.      should read:

7

8    Page No.      Line No.      should read:

9

10   Page No.      Line No.      should read:

11

12   Page No.      Line No.      should read:

13

14   Page No.      Line No.      should read:

15

16   Page No.      Line No.      should read:

17

18

     If supplemental or additional pages are necessary,
19   please furnish same in typewriting annexed to this
     deposition.

20

21

          DR. STEPHEN D. ADAMS
22

     Sworn to and subscribed before me,
23   this the      day of         , 20   .

24

     Notary Public
25   My commission expires: