1

```
1        IN THE UNITED STATES DISTRICT COURT

2            DISTRICT OF MARYLAND

3

4    VERONICA POLLARD,      :

5    et al.,

6        Plaintiffs    : Civil Action

7        vs.            No. S-02-CV-764

8    UNITED STATES OF AMERICA,:

9    et al.,

10        Defendants    :

11            ------------------

12

13        Deposition of ARTHUR H. McTIGHE, M.D., was

14    taken on Monday, June 30, 2003, at 915 15th

15    Street, N.W., Washington, D.C., commencing at

16    1:25 p.m. before Carol T. Lucic, Notary Public.

17            ------------------

18

19

20

21    REPORTED BY:  Carol T. Lucic
```

2

1    APPEARANCES:

2         LESLEY S. ZORK, ESQUIRE

3             On behalf of the Plaintiffs

4         LARRY D. ADAMS, ESQUIRE

5             On behalf of the Defendant

6             United States of America

7        (via telephone)

8         JOAN CERNIGLIA-LOWENSEN, ESQUIRE

9             On behalf of the Defendant

10            Raj Gupta, M.D.

11       (via telephone)

12        CATHERINE A. HANRAHAN, ESQUIRE

13            On behalf of the Defendant

14            Humana Military Healthcare

15            Systems, Inc.

16

17

18

19

20

21

3

1          I N D E X   O F   W I T N E S S E S

2     WITNESS                         PAGE

3     ARTHUR H. McTIGHE, M.D.

4     By Mr. Adams                    4, 71

5     By Ms. Cerniglia-Lowensen             48

6     By Ms. Hanrahan                 68

7

8          I N D E X   O F   E X H I B I T S

9     EXHIBIT                         PAGE

10      No. 1    Curriculum vitae          4

11

12

13

14

15

16

17

18

19

20

21              (Exhibit attached.)

4

1    (Whereupon curriculum vitae was marked as

2    Deposition Exhibit No. 1.)

3    Thereupon --

4        ARTHUR H. McTIGHE, M.D.,

5    a Witness, called for oral examination by

6    counsel for the Defendants, having declared and

7    affirmed under the penalties of perjury to tell

8    the truth, was examined and testified as

9    follows:

10        EXAMINATION BY MR. ADAMS:

11    Q.   Dr. McTighe, my name is Larry Adams.  I'm

12    with the U.S. Attorney's Office in Baltimore,

13    and I represent the United States in this case.

14    On the phone is Joan Cerniglia-Lowensen.  She

15    represents the oncologist in this case, Dr. Raj

16    Gupta, and also Cathy Hanrahan is also on the

17    telephone.  She represents Humana.

18        I take it you're familiar with some of the

19    players in this case in the materials that

20    you've read; is that correct?

21    A.   Yes.

5

1    Q.   I see from your CV that you've testified

2    or been involved in a number of cases as an

3    expert witness over the years; is that correct?

4    A.   That's correct.  I don't know that that's

5    in my CV, but, yes, I have been involved in some

6    cases before.

7    Q.   So you're familiar with this process of

8    asking questions and responding and occasionally

9    your attorney may object.  You're familiar with

10   that process; correct?

11   A.   Yes.

12   Q.   As you know, in order to save time, absent

13   very unusual circumstances even if your attorney

14   notes an objection, we would like you to go

15   ahead and answer the question, and then we'll

16   sort that out with the judge later if it was an

17   inappropriate question or not.  Do you

18   understand that?

19   A.   Yes.

20   Q.   Let me show you what has been marked as

21   Defendant's 1, which is a copy of your CV.  This

6

1    particular CV, which I believe is undated, was

2    supplied by plaintiff's counsel previously.  Is

3    this a reasonably up-to-date copy of your CV?

4    A.   This is not the latest edition of my CV.

5    My house number changed.  My address number

6    changed to 103 Fay Lane rather than 67.  The

7    neighborhood was renumbered, and so it's 103.  I

8    think otherwise this appears to be correct.

9    Q.   Let me go through some of the details

10   here.

11        According to this you graduated from

12   University of Pittsburgh School of Medicine in

13   1969.

14   A.   Yes.

15   Q.   Where did you do your undergraduate work?

16   A.   Also at the University of Pittsburgh.

17   Q.   What year did you graduate with an

18   undergraduate degree?

19   A.   What year?

20   Q.   Yes.

21   A.   I finished college in 1965.  I attended

7

1    college for three years, and at the end of my

2    second year of medical school I received a

3    baccalaureate degree.  So my B.S. is dated 1967

4    while my M.D. is dated 1969, which is a little

5    confusing sometimes.

6    Q.    What was your major in college?

7    A.    Chemistry.

8    Q.    According to this you did your internship

9    at Presbyterian University Hospital in

10   Pittsburgh from '69 to '70; is that correct?

11   A.    Yes, sir.

12   Q.    I see that you worked for the Public

13   Health Service subsequent from 1970 to 1972 in

14   research and experimental pathology here in

15   Rockville, Maryland; is that correct?

16   A.    Yes.

17   Q.    What were your particular areas of

18   interest with regard to experimental pathology

19   or research pathology?

20   A.    I was with the Bureau of Radiological

21   Health, which I think is now part of the Food

8

1    and Drug Administration, and we studied the

2    pathology of radiation, cancers, and other

3    radiation-induced diseases.  In part I did that

4    in collaboration with people at the National

5    Cancer Institute.

6    Q.   I see after you finished there in '72 you

7    spent two years as a fellow in laboratory

8    medicine at Yale New Haven Hospital; is that

9    correct?

10    A.   Yes.

11    Q.   Were there particular areas of interest or

12    specialty that you followed while you were at

13    Yale New Haven?

14    A.   I completed my pathology training at Yale

15    New Haven.

16    Q.   In the expert's designation and in your

17    board certifications you indicate that you first

18    received your board certification in anatomic

19    and clinical pathology in '75; is that correct?

20    A.   Yes.

21    Q.   And you passed that on the first try?

9

1    A.   Yes.

2    Q.   Then subsequently you received in 1978 a

3    board certification in medical microbiology; is

4    that correct?

5    A.   Yes.

6    Q.   And then in 1985 you received your board

7    certification in dermatopathology?

8    A.   Yes.

9    Q.   I'm not sure what that specialty is.  What

10   is it?

11   A.   That's the pathology of skin diseases,

12   skin lesions.

13   Q.   According to this CV the last board

14   certification you received was in cytopathology

15   in 1997; is that correct?

16   A.   Yes.

17   Q.   You've already mentioned the initial board

18   certification you passed on the first attempt.

19   Is that true for the other three that we've

20   spoken about?

21   A.   Yes.

10

1    Q.    And you're currently licensed in both

2    Maryland and Pennsylvania?

3    A.    Yes.

4    Q.    Any other licenses?

5    A.    No.

6    Q.    As I understand it, right now you're still

7    working for Evangelical Community Hospital in

8    Lewisburg, Pennsylvania; is that correct?

9    A.    Yes.

10    Q.    And you have been there since 1991?

11    A.    Correct.

12    Q.    It looks like you wear at least two

13    different hats currently.  I see that ever since

14    you went there you were director of the

15    laboratories at Evangelical Community Hospital;

16    is that correct?

17    A.    Yes.

18    Q.    We're talking about the pathology lab?

19    A.    Yes.

20    Q.    But since June of 2000 you have been the

21    vice-president for medical affairs; is that

11

1    correct?

2    A.   Yes.  I've also been the vice-president

3    for medical affairs, so I have two

4    responsibilities now.

5    Q.   You mean at a previous time you were the

6    vice-president of medical affairs, not just

7    since 2000?

8    A.   No.  What I mean to say is that I'm still

9    the director of laboratories, I'm still the

10   chief pathologist at Evangelical Hospital for

11   the past 12 years, and then in the past three

12   years I've taken on the additional role of

13   vice-president for medical affairs.

14   Q.   What are the duties as the vice-president

15   for medical affairs?

16   A.   The vice-president for medical affairs is

17   sort of the chief quality assurance officer of

18   the institution.  My principal duties involve

19   the quality of medical care, so the quality

20   assurance department reports to me, utilization

21   review, infection control, patient safety.

12

1    Those are the issues that come under my

2    jurisdiction.  I serve as a liaison to the

3    medical staff from administration to the medical

4    staff and vice versa.

5    Q.    What do you mean by that, you serve as

6    liaison between the medical staff and the

7    administration?

8    A.    The goal of achieving high quality medical

9    care is something in which the medical staff has

10    an interest.  It's something that the hospital

11    has an interest in, and the two groups have to

12    work together for the common goal.  So in that

13    sense I interface with both administration and

14    the medical staff.

15    Q.    You also list what appears to be a current

16    position as director of laboratories at Sunbury

17    Community College.  Is that still the case?

18    A.    Sunbury Community Hospital, yes, sir.

19    Q.    I'm sorry.  Community Hospital.

20        I take it that's a town in close proximity

21    to Lewisburg, Pennsylvania?

13

1    A.   Yes.

2    Q.   About how far away is it?

3    A.   Ten miles.

4    Q.   Previous to that as I understand it you

5    worked principally in Baltimore at Maryland

6    General Hospital, Franklin Square Hospital, and

7    also for the Public Health Service in Baltimore.

8    Although these periods are somewhat overlapping

9    -- I take that back.  I guess they're

10    consecutive.

11        I take it that after you left your

12    fellowship in Rockville for the Public Health

13    Service you came to Baltimore and worked three

14    years, '74 to '77, for the Public Health Service

15    in Baltimore?

16    A.   Yes.

17    Q.   Was that the Wyman Park facility?

18    A.   Yes.

19    Q.   I think that has been closed or at least

20    changed in its mission since that time.

21    A.   I think that's right.  After I left I

14

1    think it became a community-based hospital, and

2    it may now be part of the Johns Hopkins medical

3    institutions.

4    Q.   But at the time you were there it in fact

5    had a true public health service component.  I

6    think merchant seamen were among the patients

7    that went there, things of that nature; is that

8    correct?

9    A.   Yes.

10   Q.   What were your duties while you were at

11   Wyman Park in the U.S. Public Health Service in

12   Baltimore from '74 to '77?

13   A.   I was a pathologist.

14   Q.   Were you a staff pathologist or the chief

15   of pathology or --

16   A.   I think I came as a staff pathologist and

17   I left as the deputy director -- I think that's

18   right -- or deputy chief.  I don't recall the

19   name.

20   Q.   It looks like in '77 you left the Public

21   Health Service and started working for Franklin

15

1    Square Hospital and stayed there for

2    approximately two years; is that correct?

3    A.   Yes.

4    Q.   What were your duties at Franklin Square

5    Hospital?

6    A.   I was a general pathologist, anatomical

7    and clinical pathology.

8    Q.   Did you have a supervisory position while

9    you were there?

10   A.   Yes.

11   Q.   What was your supervisory position?

12   A.   I was the director of pathology there.

13   Q.   From the start or when you finished?

14   A.   I think from the start.

15   Q.   When you left in '79, then you spent --

16   A.   12 years I think at Maryland General.

17   Q.   -- 12 years at Maryland General as the

18   vice chief of pathology; is that correct?

19   A.   Yes.

20   Q.   I notice in your CV you have a list of

21   publications that basically run from 1978

16

1    through I believe it was '83.  I take it that

2    there have not been any publications since 1983

3    that you have been involved with?

4    A.    That is correct.

5    Q.    As I was looking at this list it seems

6    like during that period of time you had a

7    specialty in Neisseria gonorrhoeae; is that

8    correct?

9    A.    Well, in microbiology.  We had a very busy

10    microbiology practice at Maryland General

11    Hospital.  Maryland General Hospital was a

12    teaching hospital; I think it still is, but then

13    we had a number of residents in a number of

14    different disciplines.  I think many of these

15    publications deal with Neisseria gonorrhoeae.

16    Others deal with Staph aureus and others deal

17    with Bacteroides fragilis.

18    Q.    And that was an area that you tended to

19    specialize in during this period of time.  Is

20    that a fair statement?

21    A.    Yes.  I became certified in medical

17

1    microbiology in 1978, which was the year before

2    I went to Maryland General, and I had a keen

3    interest in those areas, and we had a lot of

4    infectious diseases at Maryland General

5    Hospital.

6    Q.    Do any of these publications relate to the

7    topic for which you have been called as an

8    expert today in the Pollard case?

9    A.    No.

10   Q.    So there is nothing you can point to here

11   that would be directly related?

12   A.    No.

13   Q.    Have you published anything or given any

14   talks that would relate to the topic which

15   you're called to talk about today?

16   A.    No.

17   Q.    One of the other things on your CV that I

18   wanted -- a couple of things that I wanted to

19   talk about.  I see that you were a coowner of

20   three private laboratories in Baltimore from '81

21   to '91.  I guess these were the three different

18

1    entities, Baltimore Biomedical Lab, Physicians'

2    Service Lab, and Baltimore Diagnostics Lab.

3    That is correct; right?

4    A.    Yes.

5    Q.    I've detailed it as you have it written

6    here.

7        When you finished with your interest in

8    those labs, did you sell your interest or what

9    happened to terminate your relationship to these

10    labs?

11    A.    The labs essentially went out of

12    existence.  The first lab that we established,

13    which was called Baltimore Diagnostics Lab, was

14    a lab that we established at Maryland General to

15    serve the needs of physicians in their offices.

16    We purchased Physicians' Service Lab in the late

17    1980s or in the mid-1980s, I think, from Russell

18    Fisher, who had owned it up until that point,

19    and then in the late '80s we sold Physicians'

20    Service Lab to SmithKline Laboratories.

21        SmithKline is now part of Quest, and

19

1    SmithKline took over most of the Physicians'

2    Service Lab, but preferred to have us do the

3    anatomic pathology, and we created a separate

4    lab which was called -- what was the third of

5    those?

6    Q.   Baltimore Diagnostics.

7    A.   This was a while ago, and I forget which

8    was which.  Pardon me.  I believe that Baltimore

9    Diagnostics Lab was the first of those labs, and

10    Baltimore Biomedical Lab was the last of those

11    labs.

12       In any case this was a lab in which we did

13    the anatomic pathology work that came into

14    SmithKline.  When I left to go to Lewisburg, my

15    partner in the laboratory decided that he wanted

16    to leave that business, and I think someone else

17    took it over.  I think I turned over my interest

18    to my former partner, and then he may have sold

19    out to someone else.

20    Q.   When you say "turned over," you mean there

21    wasn't a monetary exchange?

20

1 A. No.  The lab really had no assets.  All of

2 its work it got from SmithKline.  It didn't have

3 any clients of its own.

4 Q. You also list that you were a member of

5 the Pennsylvania State House of Representatives.

6 Was that correct at one time?

7 A. No, I was never a member of the

8 Pennsylvania -- I was a member of a work group.

9 That continues on to the next line.

10 Pennsylvania State House of Representatives work

11 group on HIV and AIDS policy.  That's what I was

12 a member of.

13 Q. So you weren't elected to any office.

14 A. No.  I was never a member of the House.  I

15 was a member of a work group that the House

16 convened on the subject of HIV and AIDS.

17 Q. And that started in 1999 and continues?

18 A. It started in 1999.  I think that we did

19 meet into the year 2000 or 2001, but it is not

20 in existence at this point.  The issues that it

21 was charged with exploring have been resolved.

21

1    Q.    You also list on your other experience

2    inspector, College of American Pathologists

3    laboratory accreditation program, but there are

4    no dates or time periods involved there.

5         When did you start doing that and are you

6    still doing it?

7    A.    I'm still doing it, and I think I started

8    doing it about 20 years ago.

9    Q.    So I take it that from time to time you're

10   part of a team that will go and inspect a

11   pathology lab or a lab at a hospital?

12   A.    Yes.

13   Q.    When was the last time that you did that?

14   A.    Last year.

15   Q.    Which hospital did you inspect?

16   A.    I haven't thought about this in a long

17   time. I think I last inspected Soliders and

18   Sailors Memorial Hospital, which is located in

19   Wellsboro, Pennsylvania.

20   Q.    I take it that you have worked previously

21   for Klores & Associates on some medical

22

1    malpractice cases.  Do you recall that?

2    A.    Yes.

3    Q.    As I understand it, you may have been

4    involved in a case where the plaintiff was

5    Porsha Blakeney?

6    A.    Yes.

7    Q.    And perhaps there were at least two

8    medical defendants, Cecilia Holden and Felipe

9    Rodriguez.

10        Do you recall your involvement in that

11    case?

12    A.    Yes, I do.

13    Q.    For what pertinent expertise were you

14    called in that case?

15    A.    Well, I do remember the name.  I haven't

16    thought about this in a couple of years, and I

17    don't specifically remember my involvement in

18    that case.

19    Q.    Of course, you have been retained by the

20    Klores firm in this case.  What is your hourly

21    rate for reviewing records and for depositions

23

1    and for trial testimony?

2    A.    I charge for my time, and that's $250 an

3    hour.

4    Q.    Regardless of whether it's preparation or

5    deposition or trial it's the same rate?

6    A.    Yes.

7    Q.    Any flat fee for deposition or trial time?

8    A.    No.  My fee is for my time.

9    Q.    Do you have any idea how you came to be

10    contacted by Klores & Associates on the first

11    occasion, the case involving Porsha Blakeney?

12    A.    I do not know.

13    Q.    I see that you have had some other

14    involvement with medical malpractice cases.  Do

15    you recall being involved with a case where the

16    plaintiff was Jawaher Al-Sheikh?

17    A.    Yes.

18    Q.    As I understand, the plaintiff's attorney

19    was Christopher Mitchell --

20    A.    Yes.

21    Q.    -- of Stein, Mitchell and Mezines in

24

1    Washington.  Do you recall that?

2    A.    Yes.

3    Q.    Did that precede your involvement with the

4    Porsha Blakeney case?

5    A.    I don't know.  I don't know the time

6    course.  I remember both cases in terms of the

7    name of the plaintiff, but I don't recall their

8    time relationship.

9    Q.    I see there was another case you were

10    involved in where the plaintiff was Henry

11    Buniski and the defendant was Susan Ferlipher I

12    believe it is.  I'm not sure who the plaintiff's

13    attorney was based on my information.  This was

14    a failure to properly diagnose or treat vaginal

15    cancer.  Do you recall that case?

16    A.    I don't recall that case at all.  I don't

17    remember any of those names.

18    Q.    It looks like the defense attorney was

19    James Wharton of Annapolis.  Does that refresh

20    your memory in any respect?

21    A.    No.

25

1      MS. ZORK:  Did you say Henry Buniski,

2   vaginal cancer?

3      MR. ADAMS:  Let me make sure I have it

4   written correctly.  You're right to question

5   that.  I take that back.  Actually it's a

6   wrongful death.  I stand corrected.  It's a

7   wrongful death action.

8   Q.   The next case that I'm looking at, the

9   vaginal cancer, is a Lauren Cattanch.  James

10  Gleason was the plaintiff's counsel.

11  A.   Yes.

12  Q.   He's located in Rockville.

13  A.   Yes.

14  Q.   Do you recall your involvement with that

15  case and what opinion you rendered in that case?

16  A.   Yes, I do remember the case.  It concerns

17  failure to diagnose a cancer of the female

18  genital tract.

19  Q.   Do you recall the outcome of that case?

20  A.   I don't think there has been an outcome.

21  I think that's still in the process.

26

1     Q.    So is that something that you were

2     involved with fairly recently?

3     A.    I don't think particularly recently.  I

4     would think a year or two ago.

5     Q.    One other case that research has revealed

6     is Breanna Jones versus Michael Lee Arnold.  Do

7     you recall that case?

8     A.    No, I don't.

9     Q.    If I have this correct, it may have been a

10     failure to monitor fetal heart rate, perinatal

11     asphyxia due to performing C section, brain

12     damage.  Does that refresh your memory?

13     A.    In all of these cases I would have been

14     concerned with the pathologic aspects of the

15     case, and I don't remember the specifics.  I do

16     remember the name.  I think that was a while ago

17     as well.

18     Q.    I also have a case where Julia Lodowski

19     out of Baltimore was the plaintiff's counsel in

20     a case.  It's Anne O'Donnell Shugars versus

21     Richard Chasen.  Does that seem like a case you

27

1    have been involved with recently?

2    A.   I do remember O'Donnell as the name of a

3    plaintiff.

4    Q.   Do you recall anything else about that

5    case?

6    A.   No, I do not.

7    Q.   In the past five years how many cases on

8    average have you taken a year as a medical

9    expert, if you recall?

10   A.   I would guesstimate maybe five a year.

11   Q.   I assume that when you give those five

12   cases in a given year, that, of course, you're

13   called upon to render an opinion to the counsel

14   that has contacted you.

15       Do those cases on an average also go into

16   deposition?  Are you normally deposed in the

17   course of the litigation of that case?

18   A.   It depends on the state.  In Pennsylvania

19   experts write letters; they are not deposed, but

20   in the other jurisdictions I think if I thought

21   there was any merit to the case, then I would

28

1   have been deposed.

2   Q.   Are most of your cases in this area, the

3   Maryland, D.C. area, or are they in Pennsylvania

4   in the past five years?

5   A.   They are in both areas.  I think more in

6   Maryland, D.C. than in Pennsylvania.

7   Q.   In the past five years can you estimate

8   how many times a year you're called to give a

9   deposition?

10   A.   Well, when I answered five as a

11   guesstimate, I was thinking of depositions.

12   Q.   I see. So in fact the times that you may

13   be called to write a letter in Pennsylvania

14   might increase the number of cases in which

15   you're involved by several cases.  Is that a

16   fair statement?

17   A.   No.  I was including letters as well.  I

18   was making a distinction from seeing a slide.  I

19   mean from time to time an attorney has asked me

20   to look at a slide and I've thought that it was

21   a fairly obvious matter and I couldn't offer any

29

1    opinions that would be supportive.  So I presume

2    in that instance the attorney would -- I never

3    wrote reports.  I was never deposed.  I was just

4    simply sent slides from time to time and asked

5    is there any merit to this.

6    Q.    But I take it in those cases you would

7    examine the slides and perhaps have a telephone

8    conversation or a conversation with the attorney

9    that sent it to you and give them your oral

10   opinion, and that would be the end of it except

11   for receiving your fee; is that correct?

12   A.    Yes.

13   Q.    So what I want to make sure I understand

14   because perhaps I didn't ask the question

15   clearly is how many cases of both where you're

16   simply consulted on an oral basis, where you do

17   the letter in Pennsylvania, where you're deposed

18   as you might be in Maryland or D.C. -- is that

19   five to ten cases per year that we're talking

20   about in the past five years that you have been

21   involved with?

30

1     A.   I suppose, but I'm just approximating

2     these numbers because I don't think in these

3     terms.  I don't keep any sort of mental register

4     of what cases I've seen, how many they are.

5     Q.   I understand that.  What I'm asking for is

6     an average based on your recollection, and I

7     think you've answered that question.

8     A.   Well, if you accept a guesstimate as a

9     recollection, then yes.

10    Q.   All right.  In preparation for today's

11    testimony what documents, records have you

12    examined?

13    A.   I've examined a file of medical records, a

14    notebook of medical records -- these are

15    original medical records -- and they include

16    records from the Eisenhower Army Medical Center;

17    from Great Britain from Harrogate; also from

18    Great Britain, the Cookridge Hospital, Yorkshire

19    Regional Center for Cancer Management; also from

20    the Lakenheath Royal Air Force facility; and

21    also from the Walter Reed Army Medical Center.

31

1    Q.   Aside from the medical records what else

2    have you examined?

3    A.   I have also examined an AFIP report, the

4    specimen of 2000, which includes two breast

5    biopsies.  That was sent to the AFIP, so I've

6    separately looked at that.

7    Q.   What else?

8    A.   I've also seen some records from the tumor

9    board, and then I've had depositions from Dr.

10    Huang, from Dr. Gupta, from Dr. Sees, from Dr.

11    Adams, and from Mr. and Mrs. Pollard.

12    Q.   Is there anything else that you have

13    looked at?

14    A.   I've looked at slides.

15    Q.   Did you bring the slides with you today?

16    A.   Yes, I did.

17    Q.   Where are those?

18    MS. ZORK:  I think what he has are the

19    originals that you sent me.  I originally sent

20    him three cuts, and those are located with

21    another expert.

32

1          MR. ADAMS:  So he has the originals today?

2          MS. ZORK:  He has the originals today, and

3      we can return them to you.

4      Q.    Anything else?

5      A.    I did see a recut of a case that wasn't in

6      the original slides.  The original slides were

7      of two procedures, but not all three.  I also

8      reviewed on an earlier occasion slides, and

9      these are from the breast biopsy that was done

10      in the year 2000.  They're identified with the

11      number S001861 Slides A-1, A-2, and B.  So those

12      I saw at an earlier time when I looked at recut

13      slides, and at the time of the recuts I reviewed

14      recuts of S98-6429.  There are seven slides that

15      are identified as A-1 through A-7.  They were

16      from the Eisenhower Medical Center.  I also

17      reviewed slides S98-7005.  There are slides A-1

18      through A-6 and then B-1 through B-4.

19      Q.    I notice you have a report there that

20      you've prepared; is that correct?

21      A.    Yes.  These are my factual notes.  There

33

1    are no opinions.  It's not a report exactly.

2    These are just notes that I took as I reviewed

3    the record and as I reviewed the depositions.

4    Q.   But these are notes that you're relying

5    upon to give your testimony today; correct?

6    A.   Yes.

7        MR. ADAMS:  I would ask counsel to have a

8    copy of that.

9        MS. ZORK:  Sure.

10   Q.   Based on your review of the material that

11   we've outlined have you reached a medical

12   opinion as regards the pathology that was

13   conducted in this case?

14   A.   Yes.

15   Q.   What opinions have you reached?

16   A.   The initial biopsy that was reviewed by

17   Dr. Adams was collected in a timely fashion.  It

18   was obtained only a short time after the patient

19   noticed this lesion by self breast examination,

20   but after that a number of problems occurred.

21       I think that the report by Dr. Adams

34

1   departs from the standard of care for a

2   pathologist.  It misstates some things.  It

3   misses some things.  It has a diagnosis that I

4   think was confusing, and some very important

5   ancillary studies were not promptly performed.

6   Q.   Well, let's go into each of those details.

7   You say that there were some misstatements in

8   Dr. Adams' report.

9   A.   Yes.

10  Q.   What are you referring to?

11  A.   Well, the diagnosis that he gave was

12  carcinoma with medullary features, and I think

13  that that diagnosis misled a lot of people.

14  What does that mean?  What does carcinoma with

15  medullary features mean?  There is a medullary

16  carcinoma that pathologists recognize.  There is

17  another entity that people call atypical

18  medullary carcinoma.

19     Atypical medullary carcinoma does not have

20  a behavior that is any different than ordinary

21  infiltrating adenocarcinoma.  It's a condition

35

1    that is a noncondition.  It may masquerade a bit

2    as medullary carcinoma because it shares some

3    features with medullary carcinoma, but when

4    pathologists and clinicians see atypical

5    medullary carcinoma, they know that that is not

6    medullary carcinoma.  They know that medullary

7    carcinoma is medullary carcinoma if that's the

8    diagnosis, but what does carcinoma with

9    medullary features -- what does that mean?

10       I think that it may have been used to

11   indicate that it was atypical medullary

12   carcinoma, but I think the way it was stated it

13   was confusing.

14   Q.   Let me ask you this:  How does that

15   violate any particular guideline or medical

16   directive?

17   A.   Because the medullary carcinoma has a

18   relatively favorable prognosis, and it is a

19   carcinoma that we report to clinicians and the

20   clinicians and their patients take heart because

21   that has a favorable prognosis.  So to state a

36

1    diagnosis in a way that suggests that the tumor

2    may be medullary carcinoma is misleading.

3    Q.   But I ask you again what particular

4    guideline or medical directive does that

5    violate?

6    A.   I don't think I understand your question.

7    Q.   Is there any particular authority,

8    treatise, textbook, medical directive which you

9    are using as a guideline that you can say this

10   particular passage shows that you shouldn't use

11   the term medullary features or atypical

12   medullary?

13   A.   There is a consensus conference on breast

14   cancer that was convened by the College of

15   American Pathologists I believe in the year

16   2000, and that's reported in the Archives of

17   Pathology. This issue is discussed there, and

18   the issue of atypical medullary carcinoma versus

19   medullary carcinoma also is discussed in Paul

20   Peter Rosen's textbook on breast cancer. That's

21   a text that many of us use.

37

1          The AJCC, the American Joint Cancer

2    Committee, also has standards for staging of

3    cancer, for reporting of cancer, the features in

4    the pathology report that ought to be mentioned

5    to be of use in properly staging and treating

6    patients with cancer.

7          So those are the sources that I rely on.

8    Q.   What other opinions do you have with

9    regard to the report that Dr. Adams fashioned?

10   A.   Dr. Adams said that the tumor extended

11   near, but not to the margin.  I disagree with

12   that.  It extended to the margin.  He also

13   apparently measured the tumor in the gross, but

14   not on the microscopic slide.  In the gross he

15   stated that the tumor measured 0.5 cm. in

16   diameter.  In the microscopic slide it's double

17   that, and he didn't add that to the report.

18         He also doesn't give the histologic

19   grading in a fashion that is suggested in a

20   number of these sources.  There is a grading of

21   breast cancers that pathologists use that

38

1     involves determination of the percentage of the

2     tumor that is composed of tubules.  Tubules are

3     hollow, differentiated structures, and if that

4     percentage is more than 75%, then that is scored

5     as a 1.  If it's between 10 and 75 percent,

6     that's scored as a 2.  If it's less than 10%,

7     it's scored as a 3.  In Miss Pollard's tumor

8     it's a zero, so that would be scored as a 3.

9          The next feature that we use in histologic

10    grading is the nuclear morphology.  If the

11    nuclei are relatively uniform, we give that a 1;

12    if there is some variation, we give that a 2;

13    and if there is a lot of variation in nuclear

14    size, shape, and morphology, we give that a 3.

15    Miss Pollard's tumor would get a 3 by that

16    criteria.

17          Then we also count the number of mitoses

18    in ten high-powered fields.  Those are broken

19    down into three grades, I, II, and III just as

20    the others are, and when you take those three

21    numbers and add them together, the minimum

39

1    possible number that you could arrive at would

2    be a 3.  The maximum possible number that you

3    could generate would be a 9.

4        Miss Pollard's tumor is a 9, and tumors

5    that give a score of either 8 or 9 by the method

6    I've described are Grade III.  So that should

7    have been in the description.  It was not.

8        That has been a standard of pathology for

9    many years.  Bloom and Richardson popularized

10   this grading system.  It was further endorsed by

11   Fisher and by Elston, and it more recently

12   carries the name of Nottingham.  So the

13   Nottingham grade is basically what I've

14   described, although you may see those other

15   names associated with the grading system.

16   Q.   Let me stop you right there.  I think

17   you've indicated these features being described

18   by Bloom, Richardson, Fisher, Elston, and

19   Nottingham as how a particular grading system is

20   characterized.

21       Are these in a particular text, the Paul

40

1    Peter Rosen text or some other text that you're

2    referring to, the Joint Cancer Committee?  Which

3    one of these are part of a treatise, part of a

4    text?

5    A.   They are in all of those works.

6    Q.   This particular grading system?

7    A.   Yes.

8    Q.   You're saying that was the case in 1998

9    when this exam was done --

10   A.   Yes.

11   Q.   Let me finish.

12        -- by Dr. Adams and by the other

13   healthcare providers at Eisenhower Hospital?

14   A.   Yes.

15   Q.   Where else would you criticize the work

16   that Dr. Adams did?

17   A.   The tumor markers, the estrogen receptors,

18   progesterone receptors, Her 2 Neu, those are

19   very important pieces of information in terms of

20   prognosis, and they should be done automatically

21   and immediately, not nearly two months later.

41

1    So I think that those are the issues as I see

2    them.

3        So the report was misleading, it contained

4    wrong information, and it didn't contain enough

5    information in order for the clinicians to

6    review that report and understand immediately

7    that chemotherapy was an urgent matter.

8    Q.   I think I understand your answer with

9    regard to enough information, but where was it

10    wrong information?

11        MS. ZORK:  He said the size and the

12    margins.  He already answered.

13    Q.   You can answer it again.  Where was it

14    wrong information?

15    A.   The size and the margins.  The size was

16    measured in the gross, but not in the

17    microscopic.  You take the greater of those two

18    because the maximum tumor diameter is the

19    important number for the prognosis and the

20    grading in the TNM system.  Then also the tumor

21    doesn't go close, near the margin; it goes to

42

1    the margin.  So those are just incorrect.

2         The other things I would view as sloppy

3    and misleading.  Not ordering the receptors

4    until sometime later when others realized that

5    it has not been ordered, that's sloppy.

6    Something fell through the cracks.  Then the

7    whole way in which the report is constructed is

8    a misleading report, and it doesn't have the

9    information correctly stated or clearly stated.

10   Q.   Are there any other criticisms you have of

11   any of the pathology reports?

12   A.   Yes.  These criticisms that we have been

13   talking about so far concern S98-6429.  The

14   other specimen is S98-7003, and this is the

15   specimen that was described by Dr. Huang.  This

16   is the lumpectomy specimen.

17        In the lumpectomy specimen there is an

18   area of atypical intraductal hyperplasia that in

19   view of the other pathology that this lady has I

20   would view as ductal carcinoma in situ, and that

21   was not recognized in the pathology report as

43

1    given by Dr. Huang.

2    Q.    Anything else?

3    A.    No.

4    Q.    Based on your review of the documentation

5    and the slides and the criticisms that you have

6    made, can you state to a reasonable degree of

7    medical probability what these failures in the

8    pathology, if they are those, what they caused

9    with regard to the subsequent treatment of Miss

10    Pollard?

11    A.    Yes.

12    Q.    What is that?

13    A.    Well, breast cancer used to be thought of

14    as a locally aggressive disease.  The philosophy

15    that Dr. Halstead from Hopkins espoused 100

16    years ago was that it was a locally aggressive

17    disease that you could operate around.  You

18    could do a bigger and better mastectomy and get

19    out all of the disease.

20        Since the advent of the work by Dr. Fisher

21    breast cancer is understood to be a disease that

44

1    disseminates early, that the treatment to the

2    breast helps with local control and local

3    recurrence, but to cure a patient you really

4    need to get at the disease that disseminates

5    early. So the critical thing is to diagnose

6    early, which happened here, but also to treat

7    early, which did not happen here.

8    Q. Let me stop you there. So if I understand

9    your testimony, you're saying despite the

10   sloppiness and the mistakes that were made in

11   the pathology reports in your opinion,

12   nevertheless the correct diagnosis was made

13   early?

14   A. No.

15   Q. What are you saying?

16   A. I'm saying that a diagnosis was made, that

17   the surgeons realized that there was something

18   here that had to be worked up quickly, and they

19   scheduled Miss Pollard for surgery a short time

20   after she discovered this lesion herself. The

21   specimen went to pathology, and that's when the

45

1    chain of events that resulted in this improper

2    care started.

3        So the clinical physicians made a

4    diagnosis of suspicious for cancer and started

5    the train on its track, but then when it got to

6    pathology, it veered off and went on a different

7    course that ultimately I think is the reason

8    that Miss Pollard has the disseminated disease

9    that in fact she has.

10        So what you need to do is not only

11    diagnose early, but treat early because patients

12    like this have thousands of ticking time bombs

13    out in their body, collections of cells in small

14    blood vessels, two cells, four cells, eight

15    cells sitting out in lymphatics and blood

16    vessels scattered all through the body. Some of

17    those probably are the result of the surgery

18    itself. When you take the cancer out, you

19    disturb the lymphatics and the vascularity, so

20    there is the possibility that that can

21    disseminate the tumor.

46

1          Also the tumor may enter the circulation

2     while it's still growing in situ in the woman's

3     breast.  But those early micrometastases, those

4     ticking time bombs are just a few cells, and

5     they're amenable to treatment with chemotherapy.

6     The only way you're going to get at those very

7     small groups of cells is with chemotherapy, and

8     that has to be done early.

9     Q.   Doctor, do I take it you're going to

10    render an opinion today with regard to the work

11    of the oncologist, Dr. Gupta?

12    A.    Well, I'm not an oncologist, and I have

13    never personally treated a lady with breast

14    cancer in the way that Dr. Gupta did.  On the

15    other hand, though, I think that the concepts

16    that I've discussed with you are concepts that

17    are part of the general knowledge base of all

18    physicians.

19    Q.    I understand that, but that wasn't really

20    my question.

21          Are you going to render an opinion today

47

1    with regard to Dr. Gupta?  I take it your answer

2    is no.

3         MS. ZORK:  His answer is his answer.

4         MR. ADAMS:  I want it to be clarified.

5    That's all.  He can clarify it.

6         MS. ZORK:  He can clarify.  He did answer.

7         MR. ADAMS:  He can answer again.

8    A.    I thought I had answered that.  A number

9    of problems occurred in this case.  I think that

10   the pathology report wasn't rendered in a way

11   that made it readily understandable and to

12   convey the urgency that it needed to convey.

13   Dr. Gupta also didn't see this patient until two

14   months later, until December, and then he didn't

15   put in motion a program of chemotherapy that

16   could be relied upon for the patient.

17        So I think that in terms of causation, in

18   terms of what happened to Miss Pollard, I do

19   think that what Dr. Gupta did also is part of

20   why Miss Pollard has the disseminated disease.

21        MR. ADAMS:  I don't have any other

48

1    questions right now.  Joan, do you want to ask

2    some questions?

3        MS. CERNIGLIA-LOWENSEN:  Yes.  Doctor, I

4    have a few.

5        EXAMINATION BY MS. CERNIGLIA-LOWENSEN:

6    Q.    Doctor, I represent Dr. Gupta.  My name is

7    Joan Cerniglia-Lowensen.  If at any time I ask

8    you a question that's unclear or if you don't

9    hear me, if you would let me know that, I will

10   be happy to rephrase it.  Is that agreeable,

11   sir?

12   A.    Yes, ma'am.

13   Q.    Doctor, have you ever encountered Dr.

14   Gupta either professionally or personally during

15   your career?

16   A.    Not as far as I know.

17   Q.    Doctor, do you have any training at all as

18   an oncologist?

19   A.    As a medical oncologist?

20   Q.    Yes, sir.

21   A.    No.

49

1    Q.   Have you at any time in your career or in

2    your training been responsible for ordering

3    actual cancer treatment for somebody?  And by

4    that I mean chemotherapy, radiation therapy,

5    anything like that.

6    A.   I have not personally ordered those

7    treatments, but I think I'm generally familiar

8    with what is done through my reading of the

9    literature and my education.

10    Q.   Did you review the letter and the medical

11    chart of Dr. Gupta?

12    A.   Yes, ma'am.

13    Q.   The recommendations that Dr. Gupta made in

14    his documentation, do you believe that those

15    recommendations were appropriate or do you have

16    an opinion one way or another?

17    A.   Can you be more specific?

18    Q.   Certainly.  Do you agree with the

19    recommendations made by Dr. Gupta concerning

20    that Miss Pollard required radiation therapy and

21    that she was going to require chemotherapy?

50

1    A.    Yes, I do agree that she requires both of

2    those, and so Dr. Gupta -- you're referring to a

3    plan that Dr. Gupta put together?

4    Q.    Correct.

5    A.    Yes.  I think that that plan is perfectly

6    fine, but the problem is formulating a plan is

7    one thing.  Devising a way of carrying it out is

8    quite another and also communicating to the

9    patient the urgency with which this should be

10   pursued; be on the lookout for this, make sure

11   you take care of that, that sort of advice, that

12   was never given to the patient.

13      So if this plan that exists in the record

14   existed, that's the first step, but then it

15   needs to be implemented.

16   Q.    Doctor, do you have an opinion one way or

17   another -- and if do you not, tell me that also

18   -- when Mrs. Pollard was required to begin the

19   plan as laid out by Dr. Gupta?

20   A.    I think that she should have begun that

21   plan as soon as possible, and with every day of

51

1    delay her chance of disseminated disease

2    increased. These ticking time bombs that I

3    referred to, these small emboli of tumors

4    sitting out there -- there are thousands of

5    those sitting out there -- those are much more

6    amenable to therapy when therapy is given early.

7    Sometimes therapy is even given before the

8    lumpectomy. Chemotherapy can be given right

9    after the biopsy diagnosis before the lumpectomy

10    is performed, and that gets out these tumor

11    deposits that have been released by the surgery

12    itself and also the tumor deposits that have

13    gotten there through the growth of the tumor

14    even before surgery. You can give chemo at that

15    point, and it will zap these tiny emboli of

16    tumor that have very few cells in them early on.

17        So that can occur before the lumpectomy,

18    and then the radiation can be the last of the

19    treatments, but all of those treatments,

20    radiation included, should be done as quickly as

21    possible.

52

1    Q.    Doctor, do you know factually when the

2    referral was made to Dr. Gupta?

3    A.    Yes.  I think that's in the record.

4    Q.    Feel free to refer to anything that you

5    have in front of you.

6    A.    Yes.  Thank you.  I think Dr. Sees

7    requested a consult from Dr. Gupta on the 17th

8    of November 1998.

9    Q.    Do you have any criticism of -- and if you

10    don't, tell me that also -- how long of a gap in

11    time there was between the 17th and when Dr.

12    Gupta first saw Miss Pollard?

13    A.    A couple of weeks went by.  I think Dr.

14    Gupta saw her on or about the 1st of December

15    for the first time.

16    Q.    Is that an okay period of time or do you

17    have an opinion whether that length of time

18    deviates from standard of care?

19    A.    I don't understand why that had to be two

20    weeks.  That could have been quicker.  Then when

21    Dr. Gupta saw her at that point, the receptor

53

1    information that eventually came back from Mpath

2    after the specimen was eventually sent to Mpath,

3    that information was not available.

4         So although Dr. Gupta formulated a plan,

5    he wasn't in a position to carry out that plan

6    until December 16.

7    Q.   If we can back up sort of to the November

8    17 referral, do you have any idea how the

9    referral actually occurred in this case?  When

10   you say 11/17, is that the day that Dr. Sees

11   told Mrs. Pollard or wrote down that he wanted a

12   referral to Dr. Gupta?

13   A.   As I understand it, this process occurs

14   through the computer at the Eisenhower Medical

15   Center, and on that date Dr. Sees initiated the

16   request for a consult.

17   Q.   Do you know any of the factual information

18   as to why it may have occurred two weeks later

19   and not a week later?

20   A.   I do not know that.

21   Q.   Then you said about the receptor

54

1    information.  Was that information that Dr.

2    Gupta required prior to making his final

3    recommendations?

4    A.   Yes.

5    Q.   Why is that, sir?

6    A.   Because depending upon the receptors on

7    whether they're positive or negative, that

8    impacts on the prognosis, on the aggressiveness

9    of the tumor, and also on the treatment.  If the

10   lesion is negative for estrogen receptors and

11   progesterone receptors, then the drug Tamoxifen

12   can't really be used for that cancer.  Because

13   Tamoxifen is an estrogen antagonist, it just

14   doesn't work for cancers that are ER negative

15   and PR negative.

16       Also if the tumor is negative for these

17   receptors, then it needs to get other kinds of

18   chemotherapy other than Tamoxifen, and tumors

19   that are negative for those receptors are more

20   aggressive and have a worse behavior than those

21   which are positive for these receptors, so that

55

1    also impacts on the treatment.

2    Q.   Doctor, whose responsibility was it to

3    make certain that these receptor studies were

4    done?

5    A.   I think that's primarily the pathologist's

6    responsibility.

7    Q.   When you say "primarily," when Dr. Gupta

8    saw Miss Pollard for the first occasion, did he

9    have any responsibility prior to that first

10   visit regarding the receptor studies?

11   A.   I think that Dr. Gupta participated in a

12   tumor board at which Miss Pollard's tumor was

13   first discussed, and he was present at a tumor

14   board that occurred on October 26 of 1998.

15   Q.   Was Miss Pollard Dr. Gupta's patient at

16   that point in time?

17   A.   Well, she would have gone to somebody in

18   the oncology service.  I don't know how it's

19   decided which one of the medical oncologists

20   takes care of a cancer patient.  That's not

21   clear to me.

56

1    Q.    I guess I kind of got lost in your answer

2    there.

3         Can you tell me by the mere fact that Dr.

4    Gupta was present at the tumor board meeting of

5    October 26 – is that what you said?

6    A.    Yes.

7    Q.    What responsibility, if any, would he have

8    concerning Miss Pollard by the fact that he was

9    there?

10   A.    The oncology/hematology service at the

11   Eisenhower Hospital is a small service.  It has

12   only got three physicians in it.  Two of the

13   three of them are there.  I think that when they

14   understand that there is a new breast cancer

15   patient who is coming along who is in the

16   system, that they do owe her appropriate

17   followup as quickly as possible.

18        So I think the fact that she has presented

19   there should alert them that here is a patient

20   who is going to be entering the system.  We need

21   to expedite getting her into the system.

57

1    Q.   Did Dr. Gupta have a doctor-patient

2    relationship with Miss Pollard on October 26?

3    A.   No.

4    Q.   I'm sorry?

5    A.   No.

6    Q.   Doctor, tell me if you do not have

7    opinions regarding this, but I need to ask.

8        Do you have an opinion what Miss Pollard's

9    chances of a five-year survival were in November

10   of 1999 had chemotherapy been initiated?

11   MS. ZORK:  You mean '98.

12   MS. CERNIGLIA-LOWENSEN:  Yes; wrong year.

13   A.   I cannot give you a specific number.  I

14   can tell you, though, that each day that the

15   cancer goes untreated is another day that makes

16   it more likely the patient is going to have a

17   bad outcome.

18   Q.   Along that same line then, Doctor, do you

19   have an opinion to a reasonable degree of

20   medical probability as to what point in time had

21   chemotherapy and radiation been initiated in the

58

1   method that you've described, when it would have

2   been less than 50% likely that Miss Pollard

3   would have survived?

4   A.   I can't give you a number for when that

5   happened.  Again, I would just simply say that

6   breast cancer is a disease that disseminates

7   early.  It probably started to disseminate even

8   before the very first biopsy.  The biopsy

9   probably contributed to the dissemination of the

10  tumor.  The sooner you interrupt that process

11  with chemo, the better it is for the patient.

12  Q.   Doctor, is an oncologist entitled to rely

13  on the measurements provided by a pathologist

14  when we're talking about a breast tumor?

15  A.   Yes.  The oncologist does not

16  independently measure the diameter of a tumor.

17  Often oncologists review histologic slides of

18  tumors.  Sometimes at tumor boards actual slides

19  are shown, but I think that the oncologist

20  doesn't depart from the standard of care if he

21  or she relies on the information provided by the

59

1    pathologist.

2    Q.    Doctor, you told Mr. Adams that there was

3    a difference in terms of the sizing of gross

4    measurement as compared to the microscopic

5    measurement, and I just can't picture that. Can

6    you describe for me what you mean?

7    A.    Yes, ma'am. When a pathologist looks at a

8    gross tissue specimen, the characteristics that

9    separate a cancer from the surrounding

10    noncancerous tissue are often not clear. You

11    can tell perhaps that the center of a cancer is

12    a cancer. The word "cancer," of course, comes

13    from the word for crab in the Greek language,

14    and that's because the cancer infiltrates out

15    into the adjacent tissue. That's particularly

16    true for breast cancer.

17        So under the microscope the extent of the

18    tumor may be far greater than is apparent with

19    the naked eye. So what Dr. Adams did in this

20    case was to give it a naked eye guesstimate, and

21    when he had the slide in his hand that he can

60

1    measure accurately, he just didn't do that.  If

2    he did that, he didn't report it.  So that's how

3    there are two different numbers here.

4        The greater of those numbers is the number

5    that's used because it's the greatest diameter

6    that goes into the T classification, and that

7    generally is more accurate under the microscope.

8    Q.   Would the measurement microscopically in

9    this case have changed the staging in any way?

10   A.   Yes.

11   Q.   In what way, sir?

12   A.   This patient moves from one T category to

13   another.

14   Q.   From what T to what T?

15   A.   If the lesion is up to 0.5, then she is a

16   T1-A.  If the lesion is between .51 and up to

17   1.0, then she is a T1-B.  If the lesion is

18   greater than 1 cm., 1.0 cm. up to 2 cm., then

19   she's a T1-C.  If the lesion is greater than 2

20   cm., then she goes into the next category of T2.

21   Q.   Did you do the measurements, sir?

61

1    A.   Yes.

2    Q.   What measurement did you get

3    microscopically?

4    A.   The measurement that I obtained was just a

5    tad over 10 millimeters, so I would put her

6    tumor in the T1-C category, not in the T1-A

7    category where it was by the report of Dr.

8    Adams.

9    Q.   With your experience in dealing with

10   breast cancer is there a different protocol or a

11   different appropriate treatment for a patient

12   that is T1-A as compared to T1-C?

13   A.   I don't know the answer to that question

14   specifically.  Again, I would just say that the

15   bigger the cancer, the longer it has been there,

16   the more access it has had to lymphatics and

17   blood vessels, the greater the degree of spread.

18   So the larger the lesion, the more aggressive

19   the physician would be.

20        This was viewed as a very small lesion, as

21   a 0.5 cm. lesion.  In the record in many places

62

1    it's described as very small, and I think that

2    may have factored into her care as well, but

3    specifically is there a different protocol for

4    lesions that are T1-C than T1-A, I don't know

5    the answer to that question.

6    Q.   Doctor, you told Mr. Adams that there was

7    in your opinion some confusion on the

8    terminology that was utilized regarding the

9    cancer with medullary features, and you talked

10   about a medullary carcinoma and then the

11   atypical medullary carcinoma, and I believe you

12   said the medullary carcinoma had a better

13   prognosis; is that correct?

14   A.   Yes, ma'am.

15   Q.   Have you in your time as a pathologist

16   dealt with patients who have had a medullary

17   carcinoma?

18   A.   Yes, ma'am.

19   Q.   Assume hypothetically that a patient

20   presents with a similar size tumor as Miss

21   Pollard, but the pathology is described as a

63

1    medullary carcinoma.

2         What is the appropriate treatment in your

3    experience in that situation?

4    A.   I don't know how the treatment would

5    differ.  It may be that the protocols are

6    different, but I just don't know that.

7    Q.   When you say with medullary carcinoma the

8    prognosis is better, is the growth or the

9    metastasis or spread, whatever word is

10   appropriate, slower with medullary carcinoma?

11   A.   When I say that the prognosis is better, I

12   mean that the recurrence rate is less and the

13   rate of distant metastases is less so that the

14   cure is greater.

15   Q.   Doctor, did you do any type of MEDLINE

16   search or research prior to your deposition

17   today or any time during your review of the

18   medical records in this case?

19   A.   Not specifically for this case, no.

20   Q.   Well, since you have been referred this

21   particular case have you come across any

64

1    articles in your normal course of reading that

2    you've read it and thought that's relevant to

3    this Pollard case?

4    A.    I don't believe that that has occurred.  I

5    do read the literature and I do read papers that

6    concern breast cancer, but I don't recall having

7    that sort of light bulb type moment that you

8    described.

9    Q.    What journals or textbooks do you

10   regularly review, Doctor?

11   A.    The New England Journal of Medicine, the

12   Journal of the American Medical Association, and

13   Archives of Pathology.  I subscribe to all three

14   of those personally.  Then I generally review

15   Human Pathology and sometimes Modern Pathology.

16   I think those are the journals that I review or

17   read.

18   Q.    Doctor, are there any textbooks that you

19   think are particularly good on breast cancer?

20   A.    Well, I think that the Rosen book that I

21   referred to before, Paul Peter Rosen -- that

65

1    book is in its second edition -- that's a book

2    that pathologists refer to.  There is a surgical

3    pathology text by Dr. Rosai.  This is a

4    two-volume text, and in the back of that

5    textbook there are protocols for the information

6    to be put into a report, and some of the

7    information concerning the AJCC staging is in

8    that book as well.  So that's a book that

9    pathologists use on a regular basis.  The AJCC

10    manual itself, that's a manual that pathologists

11    use in trying to decide what information

12    clinicians need in order to treat patients

13    appropriately.  That's a book that pathologists

14    consult.  There is a breast pathology book by

15    Dr. Tavasoli.  I believe that is

16    T A V A S O L I.  I may have left out a letter

17    or two, but it's something like that.  That's a

18    book that people refer to as well.

19        So I think that there are a number of

20    textbooks and other treatises that pathologists

21    refer to as they encounter breast cancer cases.

66

1    Q.    Doctor, in your practice approximately how

2    many pathology slides or pathology specimens

3    would you estimate you read on a monthly basis?

4    A.    I think I would answer that question

5    differently for the 30 years before the year

6    2000 and since the year 2000.

7    Q.    Since the year 2000 approximately how

8    many, sir?

9    A.    How many per what time period?

10    Q.    Per month or however you can do it.  If

11    you can't do it on a monthly basis, that's fine.

12    A.    Well, I would think on an annual basis now

13    I may see 1,000 cases, and some of those are

14    cases I look at as the primary pathologist.  In

15    other cases I'm asked my opinion about a case.

16    Q.    Of those approximate 1,000 cases on an

17    annual basis that you might read, how many of

18    those would deal with breast cancer, sir?

19    A.    I would think that that number is probably

20    somewhere between 50 and 100.  Generally cancers

21    are shown around by one pathologist to another,

67

1      so a number of pathologists may look at a cancer

2      just simply -- a newly diagnosed cancer

3      generally is signed out by more than one person,

4      and breast cancer is a common disease.  So I

5      would guess something in that order, 50 to 100.

6      Q.    Of those 50 to 100, on how many of those

7      cases would you be the primary pathologist?

8      A.    You're talking about since the year 2000?

9      Q.    Yes, sir.

10     A.    I suppose 25 perhaps.  I'm giving you a

11     guesstimate.  I don't really think in these

12     terms, but based on what is common in the

13     workload I would guess something in that order.

14     Q.    Thank you, sir.

15     A.    I would add that in the 30 years before

16     the year 2000 I think I would double all of

17     those numbers.  Since the year 2000 about half

18     of my time is spent in administrative work, but

19     in the 30 years before that those numbers I

20     think would double.

21          MR. CERNIGLIA-LOWENSEN:  Doctor, I think

68

1    that's all the questions I have for you right

2    now.  Thank you very much.

3         EXAMINATION BY MS. HANRAHAN:

4    Q.   Good afternoon, Doctor.  This is Cathy

5    Hanrahan.  Can you hear me?

6    A.   Yes, ma'am.  Good afternoon.

7    Q.   I represent an entity known as Humana

8    Military Healthcare Systems.

9         Do you have any independent opinions with

10   respect to that entity or have you identified

11   all of the opinions that you hold?

12   A.   I don't know how Humana Healthcare fits

13   into this.  I don't know who works for Humana.

14   I don't really understand that.

15   Q.   I understand that.  I think there are a

16   lot of us in that same boat.

17        So your opinions that you've rendered are

18   just your general opinions as to the healthcare

19   providers and you have identified here this

20   afternoon all of the opinions that you hold?

21        MS. ZORK:  I'm going to object.  With

69

1    respect to the specific healthcare providers

2    that he has been asked about, he has answered

3    those questions.

4         MS. HANRAHAN:  Well, are there additional

5    healthcare providers that he's rendering

6    opinions with respect to?

7         MS. ZORK:  Just the folks at Eisenhower

8    before Mrs. Pollard was transferred.

9         MS. HANRAHAN:  I'm just trying to make

10   certain that there isn't anything out there that

11   impacts Humana.  I just want to make certain

12   that he has identified those opinions.  If there

13   are additional healthcare providers -- I know he

14   has identified Dr. Adams, Dr. Huang, and Dr.

15   Gupta.

16   Q.   Doctor, are there additional healthcare

17   providers you intend to render opinions about?

18   A.   Dr. Sees, the surgeon.  I think that this

19   case had areas of overlapping responsibility in

20   that the receptors not coming back, Dr. Sees

21   could have brought that to the attention of Dr.

70

1    Adams rather than Dr. Gupta bringing it to his

2    attention. So I think that this was just

3    handled in kind of a disorganized and almost

4    sloppy way.

5    Q.   Are those all of the opinions that you

6    have?

7    A.   Yes, ma'am.

8    Q.   With respect to implementing any care for

9    a patient who has been diagnosed with any type

10   of cancer, you have never been in a position

11   where you've communicated to a patient the

12   implementation of therapy, how it was to be

13   done, or the significance of that therapy, have

14   you?

15   A.   Not as the primary physician.

16   Q.   When you say not as the primary physician,

17   what role, if any, have you been in a patient

18   meeting where the implementation of the care has

19   been communicated to the patient?

20   A.   You're talking about after medical school?

21   Q.   Yes.

71

1     A.    I don't think that I've ever been involved

2     in a meeting at which the implementation of a

3     treatment protocol was specifically discussed

4     with the patient himself or herself.

5     Q.    When is the last time you were the primary

6     healthcare provider in a meeting with a patient

7     discussing medical treatment modalities?

8         MS. ZORK:  Do you mean in breast cancer?

9         MS. HANRAHAN:  Any cancer.

10        MS. ZORK:  Okay.

11    A.    A long, long time ago back when I was in

12    training.

13    Q.    Medical school?

14    A.    Yes.

15        MS. HANRAHAN:  I don't have any further

16    questions.  Thank you.

17        MR. ADAMS:  I have one followup question.

18            EXAMINATION BY MR. ADAMS:

19    Q.    Doctor, during the course of your

20    preparation did you talk with either Mrs.

21    Pollard or her husband?

72

1    A.   No.

2         MR. ADAMS:  I have no further questions.

3         MS. CERNIGLIA-LOWENSEN:  Nothing here.

4         (Whereupon at 2:45 p.m. the deposition was

5    concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

73

1        CERTIFICATE FOR READING AND SIGNING

2

3        I hereby certify that I have read and

4    examined the within transcript and the same is a

5    true and accurate record of the testimony given

6    by me.

7        Any additions or corrections that I

8    feel are necessary I have listed on the separate

9    ERRATA SHEET enclosed, indicating the page and

10     line number of each correction.

11

12

13

14

15

16

17

18    ----------        -----------------------

19    DATE             ARTHUR H. McTIGHE, M.D.

20

21