IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| VERONICA POLLARD, et al., | : | |
| Plaintiffs, | : | |
| v. | : | CIVIL NO. WDQ 02-CV-764 |
| United States of America, et al. | : | |
| Defendants. | : | |

...oOo...

**DEFENDANT UNITED STATES' OPPOSITION TO PLAINTIFFS' MOTION FOR RECONSIDERATION OR, IN THE ALTERNATIVE MOTION TO VACATE THIS COURT'S JUNE 30, 2004 ORDER DISMISSING CLAIMS AGAINST THE DEFENDANT UNITED STATES OF AMERICA**

Defendant, United States of America, by Thomas M. DiBiagio, United States Attorney for the District of Maryland, and Larry D. Adams, Assistant United States Attorney for said District, submits the following Opposition to the Plaintiff's Motion for Reconsideration or, in the alternative, Motion to Vacate the Court's June, 30, 2004 Order Dismissing Claims ("Motion for Reconsideration") against the Defendant United States of America.

## I. INTRODUCTION

The Plaintiffs filed a motion for reconsideration after the United States was dismissed from the case on June 30, 2003. They are attempting to keep the United States as a defendant by reasserting allegations of negligence by the Army pathologist, Dr. Stephen Adams, who first examined Mrs. Pollard's tumor when it was removed from her breast in October 1998. This argument will not withstand scrutiny logically, chronologically or scientifically; it is simply the last gasp of the Plaintiffs to keep the original defendant in the case.

At the time the United States motion for summary judgment was filed on December 29, 2002, the plaintiffs had raised the issue of negligence by stating that "Mr. Pollard also asserts that the physician who "under reported and misread the pathology specimens" was negligent and because he was an employee of the USA, the claims against the USA should survive. Pl.s' Opp'n to USA" Mot. for Summ. J. at 8. The Court in reaching its decision stated that: "Mr. Pollard however proffered no evidence in support of this assertion. A nonmoving parties bare allegations are insufficient to overcome a for motion for summary judgment." Court's Mem at 15.

Plaintiff's motion for reconsideration seeks to address that deficiency despite the fact that under Rule 59 a motion following summary judgment should not be considered unless the moving party can justify why the evidence was not presented during the summary judgment proceedings. See RGI, Inc. Unified Indus., Inc. 963 F. 2d 658, 662 (4th Cir. 1992).

## II. BACKGROUND

The United States filed a motion for summary judgment on the basis, *inter alia*, that the evidence showed that Dr. Gupta, the treating oncologist, functioned as an independent contractor with respect to relevant care given cancer patient Veronica Pollard. Therefore, any potential liability on his part were not attributable to the United States. The Court agreed with this argument and dismissed the claims against the United States. Belatedly, the plaintiffs now concede that Dr. Gupta is indeed an independent contract after vigorously contending otherwise.

The United States also asserted that the surgery and pathology services provided by Eisenhower Army Medical Center ("Army") personnel to Veronica Pollard did not violate any standard of care or cause her cancer. Moreover, since Plaintiffs cannot show that the pathology report adversely affected Dr. Gupta's decision making process this argument will not sustain a

2

reversal by the Court and bring the United States back into the case. This is true because it is axiomatic that only disputes that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Furthermore, a factual dispute is "genuine" for summary judgment purposes only when there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. That is not the situation which obtains here.

In their previous opposition, Plaintiffs asserted that the Army medical personnel at Eisenhower exercised sufficient supervision and control over Dr. Gupta in the day-to-day performance of his duties to establish that Dr. Gupta was an employee of the United States. Pls' Mem. in Opp. at 6-7. In addition, the Plaintiffs alleged that liability is shared by Dr. Stephen Adams, the pathologist at Eisenhower, who "under-reported" and "misread the pathology specimen" and "delayed" obtaining important studies. Pls'. Mem. in Opp 8-9. The problem with this argument is that it is a perfect example of exaggeration and hindsight used to keep the United States in the case when all else has failed. The pathology report show a carcinoma; that is about all that it was needed for Dr. Gupta to prescribe treatment. The fact that Plaintiffs' experts seek to make an issue of the description of the carcinoma does not make it an element of causation in this case.

Absent any indication by Dr. Gupta that he was mislead by the pathology reports the Plaintiffs cannot show that anything done by Dr. Adams constituted a breach of the standard of care or was implicated in the causation of Mrs. Pollard's breast cancer. Therefore, this Court lacks subject matter jurisdiction with respect to the United States and its judgment should be affirmed dismissing the United States from this action.

### III. STATEMENT OF FACTS

Veronica Pollard was a civilian dependent wife of an active duty serviceman who have

served 20 years as an active duty soldier before retiring. Pls.' Opp. Gupta Mot. Summ. J. at 1.  She had family history significant for cancer because her mother, her sister at age 29, and an aunt died from cancer.  Def.'s Mot Dismiss, Ex. 1 at 20.  In late September 1998 Ms. Pollard noted the appearance of a lump in the lower outer quadrant of her right breast of two days duration. Id. at 12.

On October 2, 1998, she presented to Army physicians and a mammogram was ordered which was reported as normal; a fine-needle aspiration was then done.  The pathology report of this biopsy revealed, "Atypical cells are present.  Cannot rule out malignancy." Id. at 14.

Ms. Pollard then had a breast biopsy on October 14, 1998, which revealed "infiltrating carcinoma with medullary features."  Ms. Pollard was preliminarily staged  T1bNMNX. Id.  On November 10, 1998, Ms. Pollard underwent a bone scan, which was reported as negative. Id. at 17.  On November 12, 1998, Army surgeons performed a lumpectomy and an axillary node dissection.  The results showed no residual tumor and all 17 nodes were negative. Id. at 18.

Following these results, the treating oncologist, Dr. Gupta was consulted, and changed the stage of her cancer to T1NOMO. Id. at 17. Dr. Gupta's plan was to see the results of the estrogen and progesterone receptors.  If they were positive, then he would treat her with Tamoxifen.  If they were negative, he recommended chemotherapy using Adriamycin and Cytoxan for four cycles.  He then would plan on giving radiation to the right breast for local control and would do this after chemotherapy, if she consented to the chemotherapy.  Dr. Gupta also recommended, partly because of the family history, that he would consider using Tamoxifen even if the receptors were negative. Id. at 20-21.  Finally, Dr. Gupta in a note dated Dec 14, 1998, reveals that he "leans toward offering adj[uvant]. chemo[therapy]  (some oncologists may feel that adj. chemo is not indicated for this patient). Def.'s Mot Dismiss, Ex. 8.  He would also recommend  XRT [radiation] to breast and

Tamoxifen ...for 5 years for prevention of new breast cancer. Id. He also noted that [Mrs. Pollard] plans to move to England and he will give her pertinent records." Id.

Because Dr. Gupta understood from his patient that the family was going to be transferred overseas to the United Kingdom in late January 1999, he wrote a letter that the estrogen and progesterone receptors were negative and states that the tumor was very small, 0.5-cm, and "medullary features, which are of favorable prognosis." Def.'s Mot Dismiss, Ex. 3 at 11.[1]

As has been previously discussed, Mrs. Pollard was referred to Dr. David Dodwell, clinical oncologist at Cookridge Hospital, Leeds, United Kingdom, on February 3, 1999 shortly after arriving in at her husband's duty station. It is significant to note that the time between December 15, 1998 and February 1999 was spent by the family was on leave; they were visiting and staying with relatives. Crucial to case and fatal to Plaintiffs' various theories of liability, Mrs. Pollard did not seek any medical treatment for her cancer during this six week period (December 15, 1998 to January 31, 1999).

Dr. Dodwell saw Ms. Pollard on February 19, 1999, and noted that because of the negative estrogen receptors, Ms. Pollard would not gain anything by the use of Tamoxifen. He further notes that, "The prognosis should really be good and the only thing that might make one consider the use of chemotherapy is her young age. However, despite this, I have not recommended that she have adjuvant chemotherapy and on discussion she is very content with this." Id. at 9.

Ms. Pollard underwent radiation therapy, which concluded on May 21, 1999. Def.'s Mot

---

[1] This letter dated December 16, 1998 is addressed to "Whom It May Concern." The natural inference is that this letter was written by Gupta in anticipation of Mrs. Pollard voluntarily accompanying her husband to his next duty assignment. We know that SSG Pollard had orders for the UK at this time. Ex 1. Dep. SSG Pollard.

Dismiss, Ex. 2 at 13. But on February 16, 2000, Ms. Pollard noted pain in her right upper breast region. Chest wall examination revealed that the fourth, fifth, and sixth ribs were very tender. There was nodularity, and she was again referred to Dr. Dodwell.

Ultimately after an initial diagnosis of costochondritis, Ms. Pollard was seen again on May 16, 2000, and an excisional biopsy was performed on May 22, 2000. Id. at 11. This revealed that the right breast had a focal atypical ductal hyperplasia consistent with carcinoma *in situ*. Id. at 13. Biopsy of the chest wall revealed infiltrating, poorly differentiated adenocarcinoma. Id.

Follow-up noted recurrent carcinoma and a CT scan of her abdomen/chest showed no lymph node enlargement, but there was an 8-mm nodule of the posterior segment of her right upper lobe. Id. at 18-19. Ms. Pollard was transferred to Walter Reed Army Medical Center (WRAMC).[2] Def.'s Mot Dismiss, Ex. 5. At WRAMC Dr. Peoples reviewed the slides, came to similar conclusions, and ordered a biopsy of the left breast mass. On June 12, 2000, WRAMC physicians performed a fine needle aspiration of her right supraclavicular note. Id. at 3-5 This showed metastatic disease and the lesion of the left breast showed poorly differentiated carcinoma with angiolymphatic invasion. Ms. Pollard was started on chemotherapy at that time. The record indicates that four cycles of Adriamycin and Cytoxin were ordered. Id. at 12. On September 11, 2000, a CT of the chest and abdomen and pelvis was performed in preparation for a bone marrow transplant.

Mrs. Pollard has continued to receive treatment at WRAMC through November 2003 . Id.

---

[2] It is important to note that Plaintiffs are not making any allegations of negligence concerning the care received at WRAMC. Furthermore the move back to the United States was made under the auspices of the Exceptional Family Member Program. Army Reg. 608-75. Although Mrs. Pollard's cancer would have qualified her for this program in October 1998, there is no record that SSG. Pollard took action to register her. In fact, the testimony is that he called the nurse-liaison in the UK to make sure appropriate treatment facilities for his wife were available at his new duty station. Infra at 11. Ex. 3, Dep. Helen Hodgkins.

at 16. At that time she was discharged with a poor prognosis and died shortly thereafter.

### III. LEGAL STANDARD

Under Fed.R.Civ.P. 56(c), summary judgment is proper against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, 477 U.S. 242 (1986); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

Where the moving party will not have the burden of proof on an issue at trial, it merely has the burden of pointing out the parts of the record indicating that the non-moving party will not be able to carry its burden of proof at trial. It need not affirmatively negate the non-moving party's case. Celotex, supra, 477 U.S. at 324-325. The plaintiff's burden in opposing a motion for summary judgment is the evidentiary standard which they must satisfy at trial. Anderson, 477 U.S. at 255. He must show more than that there is a scintilla of evidence to support his case; he must show that a reasonable finder of fact could reach a verdict in his favor based on that evidence. Anderson, 477 U.S. at 252.

The party moving for summary judgment carries the initial burden of production to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Logan v. Commercial Union Ins. Co., 96 F.3d 971, 978 (7th Cir.1996) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, (1986) (citation and internal quotation omitted)). The moving party may discharge this burden by " 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. Once

the moving party satisfies this burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The nonmovant must do more, however, than demonstrate some factual disagreement between the parties; the issue must be 'material.' " Logan, 96 F.3d at 978. "Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute ." Id. (citation omitted). In determining whether the nonmovant has identified a "material" issue of fact for trial, courts are guided by the applicable substantive law; "[o]nly disputes that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." McGinn v. Burlington Northern R.R. Co., 102 F.3d 295, 298 (7th Cir.1996) (citation omitted). Furthermore, a factual dispute is "genuine" for summary judgment purposes only when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, (1986). Hence, a "metaphysical doubt" regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and "the nonmovant fails to demonstrate a genuine issue for trial 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party....' " Logan, 96 F.3d at 978 (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, (1986)).

In the present case, the evidence proffered by the Plaintiffs on the issue of causation – an issue on which the Plaintiff have the burden of proof at trial is insufficient, therefore the United States is entitled to summary judgment because nothing done by Dr. Adams constituted a material breach of the standard of care, is implicated in the causation of Mrs. Pollards' breast cancer or adversely influenced the treatment rendered by her oncologist, Dr. Gupta.

## IV.  ARGUMENT

### A.  Army Healthcare Providers Were not Negligent in Treatment of Mrs. Pollard

There is no question that the Army healthcare providers performed the necessary surgery and obtained appropriate and adequate pathologic and laboratory information regarding the characteristics of Ms. Pollard's cancer within a reasonable period of time (e.g, from October through December 1998)

Specifically, when Mrs. Pollard made the initial complaint of soreness of her right breast, Army physicians took rapid action. First, a mammogram was taken which was negative. Second, a fine needle aspiration was done which showed some atypical cells. Third, an excisional biopsy was immediately ordered. Pathology did a complete work-up of the tissue, and it was determined that Ms. Pollard had an "infiltrating carcinoma with medullary features." Fourth, a bone scan was done which was negative. Fifth, a lumpectomy and axillary node dissection was performed. Again, pathology was consulted, and it was shown that there was no residual tumor and that all 17 nodes were negative. Finally, tests were done to check for estrogen and progesterone receptors, both of which were negative. Plaintiffs indicate that these studies should have been done more quickly. However, they were available for Dr. Gupta by mid-December 1998, well within the time that Dr. Gupta states adjuvant chemotherapy should have begun. Exhibit 1, Dr. Gupta Dep. at 26-27. The entire process lasted from October to mid-December 1998, from the time of her initial complaint through her surgery until the her departure from Georgia.

Once the lump had been excised and the pathology reports forwarded to Dr. Gupta the direct involvement of Dr. Adams and other Army healthcare providers with Mrs. Pollard's subsequent

treatment ended. The remaining healthcare decisions in the United States were between her and Dr. Gupta.

### B. Because the Pathology Report Did Not Effect the Treatment The United States Must be Dismissed As a Defendant in This Case

In this case, plaintiffs' claims of medical malpractice can only relate to oncology care provided by Dr. Gupta while Mrs. Pollard in the United States or to her subsequent treatment by British doctors while she was stationed overseas. See Amended Complaint. Plaintiffs now concede that Dr. Gupta was an independent contractor. Pursuant to the contract, Dr. Gupta, as a professional oncologist, was paid to examine patients, prescribe treatment, provide consultation, make reports of clinical findings, and perform related services. Dr. Gupta was also required to maintain his own medical liability insurance, including a certificate of insurance evidencing an acceptable amount of coverage. The essential controlling fact is that pathology reported carcinoma in the patient. Based on the pathology, the surgical findings and other criteria, Dr. Gupta recommended that chemotherapy be administered. It was Dr. Gupta's care and advice upon which the patient relied or ignored. The pivot on which liability rest is that relationship and no other.

Plaintiffs' basis for reconsideration is that there is evidence to substantiate the plaintiffs's allegations of Dr. Adams' negligence. This alleged failure is premised on the "failing to obtain pathologic and laboratory information regarding the characteristic of Ms. Pollard's cancer withing a reasonable period of time, by misidentifying the size and other charger of the cancer n pathologic examination   Pls.' Mot. for Reconsid. at 4, Affidavit of L.F. Smith.

Plaintiff's further quotes Dr. Smith affidavit that the standard of care requires the surgeons oncologist, pathologist and other medical doctors to complete the pathologic studies and begin

chemotherapy for adjuvant treatment of Mrs. Pollard's breast cancer within 4-6 weeks of her initial diagnosis of breast cancer. Id.

This is contradicted contention by Dr. Gupta's own statement as when radiation should be started:

> It depends on the case. Normally if everything is going okay, meaning there is no complication in healing, then it start somewhere about four to six weeks after the surgery when the wound has all healed. It also depends on whether the patient is gong to get adjuvant chemotherapy. If the patient gets chemotherapy then radiation is given normally after the chemotherapy is completed, which could be as late as six months after the surgery. Ex. 1, Dr. Gupta Dep. at 26-27.

When Dr. Gupta last saw Mrs. Pollard in December 15, 1998 it had been a little more than four weeks since her last surgical procedure which was on November 12, 1998. At that time the surgeons had performed a lumpectomy and an axillary node dissection. The results showed no residual tumor and all 17 nodes were negative.

Also Plaintiff's takes Dr. Adams to task for a delay in sending out Mrs. Pollards' specimens for DNA and hormonal studies. Pls.' Mot. for Reconsider. at 6. However, while Dr. Gupta agreed that the specimens should have been sent out earlier, nowhere in his deposition does say that receiving the studies in December made any difference in his diagnosis. In fact, when confronted with this line of questioning by plaintiffs' counsel. He said that

> My notes from December 1st outlines these different scenes if her receptor would be negative or positive, an my note says if she was receptor positive I would recommend adjuvant tamoxifen and if she was receptor negative I would recommend chemotherapy and I would also recommend radiation to her breast. Ex. 1, Dr. Gupta Dep at 46.

Dr Gupta went to explain that he " would [have told] her that her breast cancer is in an early stage, the tumor is very small, and the smaller the tumor the more favorable it is, the lower the risk

11

of spreading or recurrence. Her lymph nodes were all negative and that's a good prognostic indicator. Most of the tumors of this size, that is point five centimeter, are detected by screening mammography and not, and not present as a palpable tumor. In her case it is somewhat unusual in that regard. We know that tumors that are this small have a very good prognosis and many times we do not recommend any adjuvant chemotherapy. Since there is something unusual about her case I would explain to her I favor giver her chemotherapy. Id. at 47

The fact of that matter is despite Dr. Gupta's recommendation, Mrs. Pollard did not have chemotherapy. Whether Dr. Gupta should have insisted she start it immediately or by January 1, 1999 (Id. at 74-75) or wait until she got to the United Kingdom, nevertheless, it was up to Mrs. Pollard to decide whether she wanted chemotherapy. These are issues beyond the scope of this brief. But the relevant point is that the pathology information was in the hands of the treating oncologist and was sufficient for him to recommend chemotherapy. Nowhere in Dr. Gupta's testimony has he alleged that the information provided him was lacking or untimely.

In sum, since Mrs. Pollard did not undergo chemotherapy despite Dr. Gupta's recommendation, the entire issue surrounding the pathology is a red herring upon which Plaintiffs' are attempting to salvage a defendant for their case when all else has failed.

Finally, we should point to the opinions of two other pathologist in this case. First the treating pathologist in the UK, Dr. Cecily Quinn has testified that although the language she used in her report as a British trained pathologist is slightly different from Dr. Adams' language, the reports are not different. Ex. 2, Dr. Quinn Dep at 11-13. Specifically, she testified that cytology description of high grade tumor is not dissimilar from her description. With regard to the medullary features, both she and Dr. Adams described the specimen as "suggestive of medullary but overall

12

did not fulfill this criteria." Id. The inescapable conclusion is that another treating pathologist found no fault with Dr. Adams report.

Also when the defendant's expert pathologist, Dr. David Page, was asked if patients with a high grade tumors would stand to benefit the most for adjuvant treatment he testified that.."Yeah, It is my belief and understanding that high grade tumors are more likely to benefit . However, I need to say those decisions are very much between clinicians and patients, and that most clinicians believe that any young woman benefits from chemotherapy. So even the low grade cases of women, certainly in the age group under 40, if not under 45, are usually encouraged to take chemotherapy". Ex. 3, Dr. Page Dep. at 39-40.

In summary, Veronica Pollard chose to move to the United Kingdom with her husband, and consented to the course of treatment by British physicians which did not include chemotherapy. Whether or not the British physicians were within the standard of care for Veronica Pollard's treatment is, of course, irrelevant to the issue of the United States' liability and has already been decided in this case. Mrs. Pollard could have chosen to stay in the United States and continued to receive care through the dependent health care programs provided by the military. At the time of her family's move it was reasonable for her to conclude that the timely excision of the lump from her breast, followed by radiation treatment in the UK would lead to a full recovery. However, relevant to the issue presently before the Court, he report authored by Army pathologist after a breast biopsy on October 14, 1998 found "infiltrating carcinoma with medullary features." This report, when coupled with the receptor studies, which Dr. Gupta reviewed in December lead him to recommend a course of adjuvant chemotherapy to his patient. That recommendation was not followed, but to place the blame on the shoulders of the Army pathologist would be a misreading of the evidence and

13

miscarriage of justice.

## V. CONCLUSION

For the foregoing reasons, Defendant, United States of America, respectfully requests that the Court affirm summary judgment on its behalf and deny the Plaintiffs' Motion for Reconsideration.

                        Respectfully submitted,

                        Thomas M. DiBiagio
                        United States Attorney

By:_____/S/_____
            Larry D. Adams
            Assistant United States Attorney
            6625 United States Courthouse
            101 West Lombard Street
            Baltimore, Maryland 21201-2692
            410-209-4800

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was electronically filed this 29th day of December 21, 2003 and sent to:

Lesley Zork, Esquire
Bruce J. Klores, and Associates, P.C.
915 15th Street, N.W.
Washington, D.C. 20005

Joan Cerniglia-Lowensen, Esq.
Morgan, Shelsby, Carlo, Downs & Everton
4 North Park Drive, #404
Hunt Valley, Md.  21030
Attorney for Dr. Raj Gupta

Catherine A. Harahan, Esq.
Wilson, Elser, Moskowitz, Edelman and Dicker
1341 G Street, N.W.   5th Floor
Washington, D.C. 20005-3105
Attorney for Humana Military Healthcare, Inc.


_____/s/_____
Larry D. Adams
Assistant United States Attorney