# EXHIBIT 1

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

VERONICA POLLARD, et al. *

 Plaintiffs *
      * Civil Action
v.   *
      * No. S-02-764
UNITED STATES OF AMERICA *
      *
 Defendant *
  * * * * * * * * *

Pursuant to Notice, the deposition of RAJ R. GUPTA, M.D. was taken on Friday, March 21st, 2003, commencing at 1:07 p.m., at the law offices of Morgan, Shelsby, Carlo, Downs & Everton, 4 North Park Drive, Suite 404, Hunt Valley, Maryland 21030-1876, before Sharon A. Beaty, Notary Public.

Reported by: Sharon A. Beaty, CSR

## Page 2

APPEARANCES:
ON BEHALF OF THE PLAINTIFFS:
 BRUCE J. KLORES, ESQUIRE
 LESLEY ZORK, ESQUIRE
 Bruce J. Klores & Associates, P.C.
 915 15th Street N.W., 3rd Floor
 Washington, D.C. 20005
 Telephone: 202-628-8100
 Fax: 202-628-1240

ON BEHALF OF DEFENDANT
 UNITED STATES OF AMERICA:
 LARRY D. ADAMS, ESQUIRE
 U.S. Department of Justice
 United States Courthouse
 101 West Lombard Street
 Baltimore, Maryland 21201-2692
 Telephone: 410-209-4801
 Fax: 410-962-2310

ON BEHALF OF DEFENDANT HUMANA MILITARY
 HEALTH CARE SYSTEMS, INC.:
 CATHERINE A. HANRAHAN, ESQUIRE
 Wilson, Elser, Moskowitz,
  Edelman & Dicker, LLP
 The Colorado Building, Suite 500
 1341 G Street N.W., 5th Floor
 Washington, D.C. 20005
 Telephone: 202-626-7660
 Fax: 202-628-3606

## Page 3

APPEARANCES, continued:
ON BEHALF OF THE DEPONENT:
 JOAN CERNIGLIA-LOWENSEN, ESQUIRE
 Morgan, Shelsby, Carlo, Downs & Everton
 4 North Park Drive, Suite 404
 Hunt Valley, Maryland 21030-1876
 Telephone: 410-584-2800
 Fax: 410-584-2020

## Page 4

   INDEX   PAGE
WITNESS:
 Raj R. Gupta, M.D.
EXAMINATION:
 By Mr. Klores  6
EXHIBITS: (Attached.)
1 Shared Decision Making  88
2 Areas of Controversy in the  147
 Adjuvant Systemic Therapy of
 Endocrine - Nonresponsive Breast
 Cancer

3 NIH Consensus Development  147
 Conference: Adjuvant Therapy for
 Breast Cancer

4 Breast Cancer: Detection of Small  147
 Tumors Creates New Controversies

5 Adjuvant Therapy for Breast Cancer:  147
 Practice Patterns of Community
 Physicians

6 Adjuvant Therapy for All Patients  147
 With Breast Cancer

7 Prognosis and Treatment of Patients  147
 With Breast Tumors of One
 Centimeter or Less and Negative
 Axillary Lymph Nodes

8 Determining Which Breast Cancer  147
 Patients Can Skip Chemo

9 Preferred Chemotherapy Regimens for  147
 Recurrent or Metastatic Breast

DEPOSITION OF RAJ K. GUPTA, M.D.
CONDUCTED ON FRIDAY, MARCH 21, 2003

7 (Pages 25 to 28)

---

25

1  that's the time --
2      Q   That's when she should have been told,
3  right?
4      A   Right.
5      Q   And then she would have elected her
6  definitive treatment to be a lumpectomy with
7  radiation, right?
8          MS. HANRAHAN: Objection to the form.
9          MS. CERNIGLIA-LOWENSEN: Do you
10 understand the question?
11     A   Can you repeat that?
12     Q   Yes. After the biopsy she elected,
13 rather than to have a mastectomy she elected to
14 have a lumpectomy with radiation?
15     A   Looking at the medical records, yes.
16     Q   And as of December 16th she had had both
17 the excisional biopsy and the lumpectomy but she
18 had not started her radiation therapy, right?
19     A   Correct.
20     Q   And you knew that?
21     A   Yes.
22     Q   And did you know when Mrs. Pollard was

26

1  supposed to be arriving in England on December
2  16th?
3      A   Within about two weeks from that date.
4      Q   And how did you know that?
5      A   Because my note says that.
6      Q   What does it say?
7      A   My note says patient plans to move to
8  England next week, we will give her pertinent
9  records, and this is on December 15th.
10     Q   And when you say pertinent records,
11 which records would those be?
12     A   Those would be the pathology report,
13 would be my consultation note, would be the special
14 studies of her receptor studies, would be her
15 mammogram, mainly these.
16     Q   When in your view should the radiation
17 have started?
18     A   It depends from case to case. Normally
19 if everything is going okay, meaning there is no
20 complication in healing, then it starts somewhere
21 about four to six weeks after the surgery when the
22 wound has all healed. It also depends on whether

27

1  the patient is going to get adjuvant chemotherapy.
2  If patient gets chemotherapy, then radiation is
3  given normally after the chemotherapy is completed,
4  which could be as late as six months after the
5  surgery.
6      Q   Well, let me ask it to you this way.
7  Let's assume that Mrs. Pollard wasn't going
8  anywhere.
9      A   Okay.
10     Q   What would happen to her at Dwight
11 Eisenhower? Your record indicates, should have
12 some indication of the condition of her breast
13 after the November operation, right? Did you
14 actually see her on December 16th?
15         MS. HANRAHAN: Objection to the form.
16 I'm not sure which question is pending.
17         MS. CERNIGLIA-LOWENSEN: Yeah.
18     Q   Did you see her in the office on
19 December 16th?
20     A   December 15th, yes.
21     Q   Okay. Was her wound healing well at
22 that time?

28

1      A   I do not recall that. I do not have a
2  note about her physical exam.
3      Q   Well, let's assume that she was healing
4  normally on, after the lumpectomy on November 12th.
5  What would the plan have been had she stayed at
6  Fort Gordon?
7      A   The first, the first decision would be
8  whether or not she was going to undergo adjuvant
9  chemotherapy, and if she was going to undergo
10 chemotherapy, then radiation would be given after
11 the chemo is completed.
12     Q   Well, your record speaks to whether
13 chemotherapy was indicated, doesn't it?
14     A   My record makes a recommendation.
15     Q   Okay. So your recommendation was that
16 there was, that chemotherapy should be started,
17 right?
18     A   Right.
19     Q   And take me from there. She's in the
20 office with you on December 15th, she's not going
21 anywhere, you sit her down and you tell her this is
22 what I recommend that you have done.

---

45

1  object because I don't understand the question.
2  Maybe the doctor does.
3        MS. HANRAHAN: I don't either.
4        MS. CERNIGLIA-LOWENSEN: Because you
5  said facts and you talked about risks and benefits.
6  I'm sorry, I just got lost, Bruce. If you could
7  ask it differently.
8        MR. KLORES: No problem.
9     Q  You're faced with Mrs. Pollard, you have
10 the information -- just backing up a second, as I
11 understand it, you would not have been in a
12 position to make any recommendations concerning
13 chemotherapy, based upon your prior testimony, on
14 December 1st, right?
15       MR. ADAMS: Objection.
16    A  I'm sorry, can you repeat that?
17    Q  You said earlier that you would not have
18 made a decision concerning whether to recommend
19 chemotherapy or not until you had these estrogen
20 and DNA studies back, right?
21    A  Right, I already had that -- no, I'm
22 sorry, I did not have that information at that

46

1  time.
2     Q  So on December 1st you could not make
3  any, you could not make, in your practice, you
4  would not have made any recommendations concerning
5  chemotherapy, right?
6     A  Can I elaborate on that?
7     Q  Sure.
8     A  My note from December 1st outlines these
9  different scenes if her receptors would be negative
10 or positive, and my note says if she was receptor
11 positive I would recommend adjuvant tamoxifen and
12 if she was receptor negative I would recommend
13 chemotherapy and I would also recommend radiation
14 to her breast.
15    Q  But that's my point, you could not have
16 made a recommendation as to which route she should
17 take until these studies came back to you, right?
18    A  Right.
19    Q  So if you had everything in front of you
20 on December 1st, you would have made the
21 recommendation on December 1st that we've already
22 talked about, four weeks of chemotherapy followed

47

1  by radiation, right?
2     A  Right.
3     Q  When you -- tell me how you would
4  describe to her the type of breast cancer that she
5  had.
6     A  I would tell her --
7     Q  Tell us slowly.
8     A  I would tell her that her breast cancer
9  is in an early stage, the tumor is very small, and
10 the smaller the tumor the more favorable it is, the
11 lower the risk of spreading or recurrence. Her
12 lymph nodes were all negative and that's a good
13 prognostic indicator. Most of the tumors of this
14 size, that is point five centimeter, are detected
15 by screening mammography and not, and not present
16 as a palpable tumor. In her case it is somewhat
17 unusual in that regard. We know that tumors that
18 are this small have a very good prognosis and many
19 times we do not recommend any adjuvant
20 chemotherapy. Since there is something unusual
21 about her case I would explain to her that I favor
22 giving her chemotherapy.

48

1     Q  What were the unusual things?
2     A  One was that the tumor was palpable and
3  was very small, other thing was that her grade was
4  not grade 1 or it was not a well-differentiated
5  tumor.
6     Q  Uh-huh.
7     A  That's it.
8     Q  You mentioned that the tumor was .5
9  centimeters; is that right?
10    A  Correct.
11    Q  And you would have received that
12 information from Dr. Adams, the pathologist, that's
13 who you were relying upon?
14    A  Yes.
15    Q  So your understanding in December, on
16 December 1st is that the tumor was less than one
17 centimeter?
18    A  It was .5 centimeter, yes.
19    Q  Now, have you seen the records where the
20 tumor was looked at by the pathologists in England?
21    A  No.
22    Q  I assume if the tumor was greater than

### Page 133

1  Q  Were they known to you before this time?
2  A  No.
3  Q  So who -- they called you or wrote to
4  you?
5  A  First contact was by call.
6  Q  And what did they say?
7  A  They said they have an opportunity for
8  oncology, for this practice, and if I would be
9  interested.
10  Q  And what was the practice, staff
11  hematologist/oncologist at Dwight Eisenhower?
12  A  Yes.
13  Q  And you signed a contract with Sterling?
14  A  Yes.
15  Q  Did you also sign any contracts with the
16  military or the United States government?
17  A  I applied for the hospital privileges
18  but I don't remember ever signing any contract.
19  Q  Okay. So who do you understand your
20  employer to be, if any, from 1990 onwards?
21  A  I have several employers, Sterling
22  Medical Corporation, Humana Corporation and

### Page 134

1  government of USA.
2  Q  The government of the USA; that's what
3  you said, right?
4  A  Right.
5  Q  On your report of December 16th you
6  write that her ER and PR were negative, right?
7  A  Right.
8  Q  And what does that mean with respect to
9  the efficacy of chemotherapy?
10  A  That means those are the receptors,
11  estrogen and progesterone receptors that were
12  negative, it means that use of any anti-hormonal
13  treatment would not be effective. As in regards to
14  chemo, I don't think it means whether or not chemo
15  would be less or more effective.
16  Q  Well, it's, the fact that the ER and PR
17  are negative mean that she is less likely to
18  benefit from tamoxifen, which is another type of
19  adjuvant therapy, right?
20  A  Right.
21  Q  And the studies being negative would be
22  one additional reason to recommend chemotherapy,

### Page 135

1  right?
2  A  Right.
3  Q  Your recommendation for tamoxifen then
4  was based upon what?
5  A  My recommendation for tamoxifen was
6  strictly for preventive use. She had a strong
7  family history of breast cancer and she was, she
8  was at a high risk of developing a new breast
9  cancer, and tamoxifen was to help prevent or lower
10  the risk of a new breast cancer.
11  Q  Was there any scientific support in 1998
12  that tamoxifen would increase survival in the
13  literature in a patient such as Mrs. Pollard?
14  A  There is scientific evidence back in
15  1998 that tamoxifen would be helpful in lowering
16  the development of new breast cancers.
17  Q  And when would the tamoxifen start?
18  After the chemotherapy was over?
19  A  Normally, yes.
20  Q  Have you brought any other documents
21  with you today in response to the notice of
22  deposition that you haven't already identified?

### Page 136

1  (Documents tendered.)
2  Q  Just your medical, your board
3  certification in medical oncology and internal
4  medicine, your license to practice in Georgia. All
5  right. And that stack of records that you have,
6  and this article, the NIH consensus of January
7  31st, 2002?
8  MS. CERNIGLIA-LOWENSEN: What the doctor
9  has in front of him, these records, and you're
10  welcome to look through them, I mailed you all a
11  packet. That is the records that he sent to me
12  initially before I got the records from Larry. I
13  suspect most of them, if not all of them, are
14  copies of what you already have, but you're welcome
15  to look through them.
16  MR. KLORES: Okay. Thank you.
17  Q  Yeah, you know, that's a good point
18  here. You received a letter from somebody in
19  England, right? Do you remember that? In this
20  case, I don't mean in life.
21  A  I was wondering. No, I don't remember.
22  Q  Okay. So the form that you were talking