### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| VERONICA POLLARD, *et al.*, :<br>:<br>Plaintiffs :<br>:<br>v. :<br>:<br>UNITED STATES OF AMERICA, *et al.*, :<br>:<br>Defendants : | C.A. No.: S-02-764 WDQ |

### DEFENDANT HUMANA MILITARY HEALTHCARE SERVICES, INC.'S
### MOTION IN LIMINE TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERTS ON
### MEDICAL CAUSATION AND DEATH

Defendant Humana Military Healthcare Services, Inc., ("HMHS") by counsel WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP, respectfully moves this Court *in limine* for an Order excluding the testimony of Plaintiffs' expert witnesses on the issues of medical causation and death and as reasons therefor states as follows:

1. Plaintiffs allege defendant Raj Gupta, M.D. was acting as HMHS's agent or employee when he provided medical care to plaintiff Veronica Pollard.

2. Plaintiffs specifically claim that the delay in administration of radiation therapy to Mrs. Pollard and the lack of any chemotherapy caused Mrs. Pollard's cancer to recur and metastasize and ultimately caused her death from breast cancer.

3. Plaintiffs will proffer expert testimony to support their theory.

3. Studies of scientific peer reviewed literature addressing women with breast cancer with prognostic factors similar to those of Mrs. Pollard at the time of her diagnosis conclude that women who are treated by lumpectomy only have a survival rate of more than 50%.

190266.1

4. The scientific studies, and hence the basis for plaintiffs' experts' opinions on medical causation and death, provide no basis for the testimony of plaintiffs' experts that, more likely than not, the failure to timely administer radiation therapy and the failure to administer chemotherapy proximately caused Mrs. Pollard's recurrence, metastasis, and death.

4. In fact, one of plaintiffs' experts, Dr. Sokol, admitted in his deposition testimony that the medical studies show the rate of survival for women with breast cancer of similar staging and other prognostic factors as Mrs. Pollard to have a survival rate of more than 50% with lumpectomy alone.

5. Plaintiffs' experts therefore should be barred from testifying that the failure to timely administer radiation therapy and any chemotherapy to Mrs. Pollard resulted in her recurrence, metastasis, and death because their testimony is not based on proven scientific fact.

WHEREFORE, Defendant Humana Military Healthcare Services, Inc. respectfully requests that this Court enter an Order barring the causation testimony of plaintiffs' experts.

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER, LLP


By:   *Catherine A. Hanrahan*
      Catherine A. Hanrahan, #06711
      The Colorado Building
      1341 G Street, NW
      Suite 500
      Washington, DC  20005
      (202) 626-7668
      fax (202) 628-3606

190266.1

2

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true copy of the foregoing Defendant Humana Military Healthcare Services, Inc.'s Motion *in Limine*, Memorandum of Points and Authorities, Exhibits and Proposed Order were mailed, postage pre-paid, this 23rd day of December, 2004 to:

> Bruce J. Klores, Esquire
> Lesley S. Zork, Esquire
> Bruce J. Klores & Associates, PC.
> 915 15th Street, NW
> Washington, DC  20005
>
> Peter R. Masciola, Esquire
> 601 Indiana Avenue, NW
> Suite 603
> Washington, DC  20004
> *Counsel for Plaintiffs*
>
> Joan Cerniglia-Lowensen, Esquire
> Morgan, Shelsby, Carlo, Downs & Everton
> 4 North Oak Drive
> Suite 404
> Hunt Valley, MD  21030
> *Attorneys for Dr. Gupta and Sterling Medical Corporation*
>
>
> Larry Adams, Esquire
> Assistant United States Attorney
> United States Attorney's Office
> 6625 U.S. Court House
> 101 W. Lombard Street
> Baltimore, MD  21201
> *Attorneys for the United States of America*

>> *Catherine A. Hanrahan*
>> Catherine A. Hanrahan

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| VERONICA POLLARD, *et al.*, : | |
| : | |
| Plaintiffs : | |
| : | |
| v.  : | C.A. No.:  S-02-764 WDQ |
| : | |
| UNITED STATES OF AMERICA, *et al.,* : | |
| : | |
| Defendants : | |

### DEFENDANT HUMANA MILITARY HEALTHCARE SERVICES, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERTS ON ISSUE OF MEDICAL CAUSATION AND DEATH

Defendant, Humana Military Healthcare Services, Inc., ("HMHS") by counsel WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP, hereby files the following Memorandum of Points and Authorities in support of its Motion *in Limine* to exclude testimony of Plaintiffs' experts regarding causation and death.

### I.     FACTS

#### A.     Background

Plaintiff Roosevelt Pollard, Jr., who is a Sergeant in the U.S. Army, was married to Veronica Pollard.  Mrs. Pollard found a lump in her breast in the fall of 1998.  She obtained treatment from a number of physicians at the Dwight D. Eisenhower Army Medical Center at Fort Gordon, Georgia. Dr. Sees, a surgeon in the Army, performed a biopsy on October 14, 1998.  A pathologist in the Army identified the tissue as malignant.  Dr. Sees performed a subsequent lumpectomy and lymph node dissection on November 12, 1998.  On November 17, 1998, Dr. Sees

190266.1

referred Mrs. Pollard to the Treatment Center's oncology department. Mrs. Pollard was appointed to consult with Defendant Dr. Gupta on December 1, 1998.

Mrs. Pollard saw Dr. Gupta on December 1, 1998, and was advised on that date that all test results were not available. She was re-appointed for a consult with Dr. Gupta on December 15, 1998. The Pollards were at the time preparing to relocate to England, pursuant to Sergeant Pollard's assignment to England many months before, and advised Dr. Gupta of that fact. At the consultation with Dr. Gupta on December 15, 1998, Dr. Gupta had a conversation with someone in England (later identified as Helen Hodgkins) who advised therapy for breast cancer was available upon the Pollards' arrival in England.

Mrs. Pollard consulted Dr. Corrin in England in January 1999, and was referred to an oncologist, Dr. Dodwell. She saw Dr. Dodwell on February 16, 1999, and thereafter began a treatment regimen of radiation therapy under Dr. Dodwell's supervision that concluded in late spring 1999.

In the spring of 2000, Mrs. Pollard had a local recurrence and metastasis of her breast cancer and returned to the United States for further treatment at Walter Reed Medical Center. Mrs. Pollard passed away in December 2003.

Plaintiffs' Second Amended Complaint seeks compensatory damages against the United States of America ("USA"), Sterling Medical Corporation ("Sterling"), Raj Gupta, M.D. and HMHS. Defendant USA is not a party to this action by virtue of this Court's decision awarding summary judgment on June 30, 2004. [A Motion for Reconsideration filed by the plaintiffs is pending]. The Second Amended Complaint has two counts – wrongful death and negligence as to all Defendants.

Plaintiffs assert that the failure to ensure timely radiation therapy for Mrs. Pollard and the failure to ensure Mrs. Pollard received chemotherapy caused her cancer to recur, metastasize, and caused her death. Plaintiffs designated four oncologists to testify to this effect.

As discussed below, medical studies of women who have similar prognostic factors as Mrs. Pollard have a chance of survival of greater than 50% with treatment of lumpectomy alone, without any radiation or chemotherapy. As a result, any expert testimony that the failure to obtain timely radiation and chemotherapy caused Mrs. Pollard's recurrence, metastasis, and death should be barred as unsupported by scientific fact.

As the opinions of plaintiffs' experts fail to meet the threshold requirements set by the Supreme Court and the Federal Rules of Evidence as reliable testimony, the testimony should be excluded by this Court as not scientifically valid.

## II.  ARGUMENT

### A.  APPLICABLE LAW

This Court has diversity jurisdiction over this matter and the substantive law of Georgia applies to this case. *See* Memorandum Order and Opinion dated June 30, 2004, at 7. Courts sitting in diversity jurisdiction apply federal procedural law, including the Federal Rules of Evidence. *See Hottle v. Beech Aircraft Corp.*, 47 F.3d 106, 109 (4th Cir. 1995). The preclusion of the testimony of plaintiffs' experts must therefore be tested under federal law.

The Court's review of contested expert testimony is governed by Federal Rules of Evidence ("FRE") 104 and 702. FRE 104(a) states that preliminary questions as to the qualification of a person to be a witness shall by determined by the Court. FRE 702 provides that trial judges act as

gatekeepers to "ensure that any and all scientific testimony" is relevant and reliable. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

"Courts must recognize that due to the difficulty of evaluating their testimony, expert witnesses have the potential to be both powerful and quite misleading." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citations and quotations omitted). To determine the admissibility of expert testimony, the trial court must conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592 n. 10; *Cooper*, 259 F.3d at 199; *Newman v. Motorola, Inc.*, 218 F.Supp.2d 769, 772 (D. Md. 2002).

The U.S. Supreme Court in *Daubert* identified several factors that a court may consider in its determination of the reliability of an expert's testimony. *See Daubert*, 509 U.S. at 592-94. Those factors include:

1) whether a theory or technique can be or has been tested;

2) whether it has been subjected to peer review and publication;

3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and

4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*See id.* at 592-594; *Cooper*, 259 F.3d at 199.

The *Daubert* factors are not definitive or exhaustive; rather, their use to determine the reliability of testimony varies "depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Cooper*, 259 F.3d at 200-201 (citing *Kumho Tire Co. v.*

*Carmichael*, 526 U.S. 137, 150, 119 S.Ct. 11167, 143 L.Ed.2d 238 (1999)).  "[T]he objective of *Daubert's* gatekeeping requirement is to make certain that an expert employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *See Cooper,* 259 F.3d at 200 (quoting *Kumho Tire Co.*, 526 U.S. at 152).

    **B.**    **MEDICAL STUDIES OF STAGE I and II BREAST CANCER SHOW CHANCES OF SURVIVAL DO NOT DROP BELOW 50% IN TREATMENT BY LUMPECTOMY ONLY**

Peer reviewed studies of recurrence and chances of survival in breast cancer patients demonstrate that patients with breast cancer at a stage as Mrs. Pollard's, treated by lumpectomy alone, have a recurrence and survival rate of over 50%.

The significant prognostic factors used to assess the risk of breast cancer death and recurrence are the size of the tumor; whether the cancer metastasized at the time of its discovery; whether the cancer spread to the patient's lymph nodes; and whether the tumor reacted to hormones, or in other words is estrogen or progesterone positive or negative.

In this case, the undisputed facts are that Mrs. Pollard's tumor was hormone negative, with no spread to the lymph nodes.  Additionally, for the sake of this motion, HMHS will posit that the size of Mrs. Pollard's tumor was 1.1 cm at the time of its discovery.  Her cancer was also considered invasive, but it had not metastasized.  Mrs. Pollard therefore had Stage I breast cancer.

Studies of breast cancer patients with similar prognostic factors have shown that patients who receive a lumpectomy, or partial removal of the breast only to remove the tumor, which is the surgical procedure elected by Mrs. Pollard, without any other treatment have a recurrence and survival rate of over 50%.

One major study followed over 1500 women with Stage I or Stage II invasive breast cancer over a dozen years.[1] The study participants had tumors of 4 centimeters or less, no metastasis, but invasive breast cancer. Some women had lymph nodes that were positive for cancer, others had lymph nodes negative for cancer. The participants were treated with one of three treatments: 1) total mastectomy (complete removal of the breast), 2) lumpectomy (partial removal of breast) followed by breast irradiation, or 3) lumpectomy without irradiation. The study reviewed the rates of survival and recurrence for the study participants at 5, 8, and 12-year intervals. The studies are attached hereto as Exhibits.

The results after 12 years show that 58% of the women treated with lumpectomy alone were alive. In other words, the overall survival rate never drops below 58% for women with lumpectomy alone.[2] At 8 years, the survival rate was 61% in patients treated with lumpectomy alone.[3] These

---

[1] The results from the study occurred in three different New England Journal of Medicine articles:
   B. Fisher, et al., *Five-year results of a randomized clinical trial comparing total mastectomy and segmental mastectomy with or without radiation in the treatment of breast cancer*, 312 N.Engl. J. Med. 665-73 (1985) (attached hereto as Exhibit 1).
   B. Fisher, *et al.*, *Eight-year results of a randomized clinical trial comparing total mastectomy and lumpectomy with or without irradiation in the treatment of breast cancer*, 320 N.Engl. J. Med. 822-28 (1989) (attached hereto as Exhibit 2).
   B. Fisher, *et al., Reanalysis and results after 12 years of follow-up in a randomized clinical trial comparing total mastectomy and lumpectomy with or without radiation in the treatment of breast cancer*, 333 N.Engl. J. Med. 1456-1467 (1995) (attached hereto as Exhibit 3).
A fourth article reviewing the study confirms that the participants in the study had invasive cancer:
   E. Fisher, *et al.*, *Ipsilateral Breast Tumor Recurrence and Survival Following Lumpectomy and Survival Following Lumpectomy and Irradiation: Pathological Findings From NSABP Protocol B-06*, 8 Seminars in Surgical Oncology 161-66 (1992). (attached hereto as Exhibit 4).

[2] *See* Ex. 1 (1995 article) at 1458. The women in the study are broken into three divisions or "cohorts," as it was discovered that earlier portions of the study included falsified statistics from one reporting hospital. "Cohort C" in Exhibit 1 represents the statistics in 1995 without the falsified data. *See* Ex. 1 at 1457.

[3] *See* Ex. 2 (1989 article) at 823, Figure 1.

statistics do not support the opinions of plaintiffs' experts that the failure to timely administer radiation and to administer chemotherapy resulted in Mrs. Pollard's recurrence of and death from breast cancer.

One of plaintiffs' experts, Dr. Sokol, admitted at his deposition that had Mrs. Pollard received no treatment following the surgical removal of the tumor from her breast, the known studies would have placed her with a survivability rate of 60%. Dr. Sokol testified that medical studies showed breast cancer patients who receive no chemotherapy and no radiation following surgical removal of a tumor have a recurrence rate of 40%, or a likelihood of remaining cancer free of 60%. *See* Ex. X at 65. Dr. Sokol was asked:

> Q. So in the context that you are familiar with in legal/medical expert standards, when asked whether Mrs. Pollard would have reoccurred had she chosen no further therapy, isn't it correct that within a reasonable degree of medical probability the answer would have been she most likely would not have . . . given those studies?
> …
> A. It depends. If you are saying are these or are these patients more likely than not on a statistical basis, no, you can't argue with the statistics.

Ex. X at 65-66 (objections of counsel omitted). See Ex. 5 (testimony of Dr. Sokol).

The medical literature does not support the causation opinions of plaintiffs' experts.

### C. AS THE MEDICAL LITERATURE DOES NOT SUPPORT THE CAUSATION OPINIONS OF PLAINTIFFS' EXPERTS, THEIR TESTIMONY MUST BE EXCLUDED

A number of federal courts in Maryland have refused to permit testimony of medical experts as to causation when medical studies did not support the testimony. In *Newman v. Motorola*, 218 F.Supp.2d 769 (D.Md. 2002), the Court held an expert's testimony that cell phone usage caused a plaintiff's cancer was inadmissible due to a lack of medical studies to support the testimony. *See*

*Newman*, 218 F.Supp.2d at 773-74, 783.  The Court observed the causation opinions proffered by plaintiff's experts did not pass the *Daubert* test because their theories had not "gained general acceptance in the scientific community, as demonstrated by the numerous national and international scientific and governmental published reports finding no sufficient proof that use of handheld cellular phones causes human brain cancer."  *Newman*, 218 F.Supp.2d at 783.

An expert's testimony proved "too great an analytical gap between the data and the opinion proffered" and was excluded in *Gross v. King David Bistro, Inc.*, 83 F.Supp.2d 597, 600 (D. Md. 2000).  The expert asserted that contaminated food caused the plaintiff's fibromyalgia.  The court reviewed medical studies submitted by plaintiff that purportedly supported the expert's opinion.  The trial court found the expert's opinion was "far removed from the underlying studies . . . [which] only support the conclusion that the pathogenesis of fibromyalgia remains in doubt," and prohibited the testimony of the expert.  *See id.* at 599-600.

The testimony of Plaintiffs' own expert, Dr. Sokol, affirms that the studies of breast cancer patients with tumors similar to Mrs. Pollard's have a survival rate of more than 50% when treated by lumpectomy alone.  There is therefore no basis in scientific fact for the testimony of plaintiffs' experts that any delay in treatment or the failure to provide chemotherapy caused Mrs. Pollard to have a recurrence metastasize.

The testimony of plaintiffs' experts as to causation should therefore be stricken by this Court as not supported in or accepted by the scientific community.

## IV. CONCLUSION

As the medical literature demonstrates that a lumpectomy alone provided Mrs. Pollard with more than a 50% chance of survival, and Dr. Sokol agreed with this literature in his sworn deposition testimony, plaintiffs' experts should be barred from testifying at trial that any delay in radiation therapy or failure to administer chemotherapy caused Mrs. Pollard's recurrence, metastasis, and ultimate death from breast cancer.

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER, LLP

By: *Catherine A. Hanrahan*
Catherine A. Hanrahan, #06711
The Colorado Building
1341 G Street, NW, Suite 500
Washington, DC  20005
(202) 626-7668
(202) 628-3606

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| VERONICA POLLARD, *et al.*, : | |
| : | |
| Plaintiffs : | |
| : | |
| v. : | C.A. No.: S-02-764 WDQ |
| : | |
| UNITED STATES OF AMERICA, *et al.,* : | |
| : | |
| Defendants : | |

### **ORDER**

Upon consideration of defendant Humana Military Healthcare Services, Inc.'s Motion *in Limine*, any Opposition thereto, and Reply, and the record herein, it is this _____ day of _____, 2004, hereby

ORDERED that the Motion is GRANTED, and it is further

ORDERED that Plaintiffs' experts are precluded from rendering testimony that the failure to render chemotherapy and timely radiation therapy caused recurrence, metastasis and death from breast cancer.

 

 

William D. Quarles, Jr., Judge

190266.1

cc: Bruce J. Klores, Esquire
Lesley S. Zork, Esquire
Bruce J. Klores & Associates, PC.
915 15th Street, NW
Washington, DC 20005

Peter R. Masciola, Esquire
601 Indiana Avenue, NW
Suite 603
Washington, DC 20004
*Counsel for Plaintiffs*

Larry Adams, Esquire
Assistant United States Attorney
United States Attorney's Office
6625 U.S. Court House
101 W. Lombard Street
Baltimore, MD 21201
*Attorney for United States of America*

Joan Cerniglia-Lowensen, Esquire
Morgan, Shelsby, Carlo, Downs & Everton
4 North Oak Drive
Suite 404
Hunt Valley, MD 21030
*Attorneys for Dr. Gupta and Sterling Medical Corporation*

Catherine A. Hanrahan, Esquire
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
1341 G Street, N.W., Suite 500
Washington, DC 20005
*Attorneys for Humana Military Healthcare Services, Inc.*

2

190266.1