IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ROOSEVELT POLLARD, | : | |
| Plaintiff, | : | |
| v. | : | CIVIL NO. WDQ 02-CV-764 |
| UNITED STATES OF AMERICA, | : | |
| Defendant. | : | |

...oOo...

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

Defendant, United States of America, by Rod J. Rosenstein, United States Attorney for the District of Maryland, and Larry D. Adams, Assistant United States Attorney for said District, submits the following Memorandum of Law in support of its Motion for Summary Judgment.

**I.  STATEMENT OF THE CASE**

The plaintiffs filed suit against the United States on March 11, 2002 under the Federal Tort Claims Act ("FTCA").  Paper No. 1.  In July 2002, the United States sought to dismiss plaintiffs' allegations for lack of subject matter jurisdiction under the independent contractor and foreign country exceptions to the FTCA's waiver of sovereign immunity since most of plaintiffs' claims were based on the alleged negligent care of Dr. Gupta and doctors who treated Mrs. Pollard in England.  Paper No. 8. Plaintiffs then amended their complaint on October 7, 2002, to assert separate causes of action against Dr. Gupta, Sterling Medical Corporation (Dr. Gupta's immediate employer), and Humana Military Healthcare (the general contractor).  Paper No. 16.  Thereafter, the district court denied the United States' motion to dismiss.  Paper No. 18.  In December 2003, the United States filed a motion for summary judgment, arguing again that plaintiffs' claims against the

United States should be dismissed under the independent contractor and foreign country exceptions. Paper No. 61. Plaintiffs responded in February 2004 that Dr. Gupta was a United States employee rather than an independent contractor. Paper No. 80. They further argued that even if Dr. Gupta was an independent contractor, the claims against the United States should not be dismissed for lack of jurisdiction in their entirety because they had also alleged that Dr. Adams, a United States employee, was negligent.   Id. Plaintiff's response did not provide any citations to the record to support their allegations against Dr. Adams.

On June 30, 2004, the district court dismissed all of the claims against the United States for lack of jurisdiction. Paper No. 91. Specifically, the district court found that Dr. Gupta's alleged negligence could not subject the United States to liability under the FTCA since he was an independent contractor. As to the claims based on Dr. Adams' alleged negligence, the district court held that plaintiffs had "proffered no evidence" in support of these allegations. Pollard v. U.S, No. 05-1304, slip op. at 6 (4th Cir. Feb. 2, 2006)(per curiam). Instead of entering summary judgment, however, the district court dismissed these claims for lack of jurisdiction as well, holding that "[w]hen a court concludes that the United States is not liable for a party's actions pursuant to the FTCA, the proper practice is to dismiss the suit for want of jurisdiction" under Federal Rule of Civil Procedure 12(b)(1), rather than to grant summary judgment. Id. at 7-8.

The private case against Dr. Gupta, Sterling Medical and Humana Military Healthcare went to trial on February 7, 2005. The case was tried before a jury. On February 16, the jury rendered its decision on special verdict form. Exh. 1. The first question put to the jury was: Do you find that Dr. Gupta failed to comply with the standard of care in his treatment of Mrs. Pollard? Id. The jury answered affirmatively that Dr. Gupta had failed to comply with the standard of care. Id. The jury

was then directed to answer question 2: Do you find that Dr. Gupta's failure to comply with the standard of care was a proximate cause of Mrs. Pollard's damages and death? Id. The jury answered that Dr. Gupta's failure was not the proximate cause of her death. Id. Consequently, Dr. Gupta was not held liable. This result was not challenged and the private case is fully concluded.

As regards the FTCA case against the United States, the court of appeals reversed and remanded the case back to this court for a decision whether to dismiss the claims premised on the pathology reports prepared by Dr. Adams, a government physician. In so holding, the court of appeals noted that the district court incorrectly disposed of the claims under Rule12(b)(1) when it should have applied a summary judgment standard:

> The district court clearly erred in dismissing for lack of jurisdiction the claims against the United States insofar as they were premised upon allegations that Dr. Adams was negligent. The district court appeared to believe that whenever a claim brought against the United States under the FTCA fails, for whatever reason, the appropriate course is to dismiss for lack of jurisdiction. . . . To the extent that this was the district court's understanding, it was mistaken. . . [W}here the claims fail, not because they do not come within the scope of the FTCA's waiver of sovereign immunity, but simply because of lack of proof, the proper course is to enter judgment for the United States.

Pollard, No.05-1304, slip op. at 7-8

The court of appeals also determined, however, that summary judgement could not be entered for the United States based solely on the district court's determination that plaintiffs had proffered no evidence in support of their assertion that Dr. Adams was negligent. Rather, the United States as the moving party first had to show that plaintiff lacked evidence in support of his case:

> Before the burden ever shifts to the non-movant to come forward with record evidence establishing a genuine issue of material fact, the movant must first carry the initial burden of "pointing out the district court" those portions of the record "that there is an absence of evidence to support the nonmoving party's case."

Id. at 9 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

Because the Fourth Circuit held the United States never met its burden, the burden of producing evidence to the contrary never shifted to the plaintiffs. The court of appeals concluded by remanding the case back to the district court with instructions to adjudicate summary judgment "with respect to the claims premised upon Dr. Adams' conduct with such supplemental briefing as the district court deems necessary." Id. at 11.

## II. STATEMENT OF FACTS

The United sates has now moved for summary judgment and submit this memorandum of law in support thereof. There is no genuine issue of material fact in dispute and the United States is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

Veronica Pollard was a civilian dependent wife of an active duty serviceman who served 20 years as an active duty soldier before retiring. She had family history significant for cancer because her mother, her sister at age 29, and an aunt died from cancer. Exh. 2 at 20. In late September 1998 Mrs. Pollard noted the appearance of a lump in the lower outer quadrant of her right breast of two days duration. Id. at 12. On October 2,1998, she presented to Army physicians and a mammogram was ordered which was reported as normal: a fine-needle aspiration was then done. The pathology report of this biopsy revealed, "Atypical cells are present. Cannot rule out malignancy." Id. at 14.

Mrs. Pollard then had a breast biopsy on October 14, 1998, which revealed "infiltrating carcinoma with medullary features." Mrs. Pollard was preliminarily staged T1bNxMx.[1] Id. at 16.

---

[1] According the National Cancer Institute website, the TNM system is one of the most commonly used staging systems for cancer. T represents the extent of the tumor, N the extent of the spread to the lymph nodes and M the presence of metastasis. T1, T2, T3, T4 represents the size and/or extent of the tumor. For instance, T1a is smaller than T1a, which is smaller than T2 etc.). X means the condition cannot yet be evaluated. N0 means no cancer found in lymph nodes. M0 means cancer has not spread to other parts of the body.
http://www.cancer.gov/cancertopics/factsheet/Detection/staging

On November 10, 1998, Mrs. Pollard underwent a bone scan, which was reported as negative. Id. at 17. On November 12, 1998, Army surgeons performed a lumpectomy and an axillary node dissection. The results showed no residual tumor and all 17 nodes were negative. Id. at 18.

Following these results, the treating oncologist, Dr. Gupta was consulted, and changed the stage of her cancer to T1N0M0 (i.e., small tumor found on scale of 1 to 4, no cancer in lymph nodes, no cancer in other parts of the body). Id. at 17. Dr. Gupta's plan was to see the results of the estrogen and progesterone receptors. If they were positive, then he would treat her with Tamoxifen. If they were negative, he recommended chemotherapy using Adriamycin and Cytoxan for four cycles. He then would plan on giving radiation to the right breast for local control and would do this after chemotherapy, if she consented to the chemotherapy. Dr. Gupta also recommended, partly because of the family history, that he would consider using Tamoxifen even if the receptors were negative. Id. at 20-21. Finally, Dr. Gupta in a note dated December 14, 1998, stated that he "leans toward offering adj[uvant]. chemo[therapy] (some oncologists may feel that adj. chemo is not indicated for this patient). Exh. 3. He would also recommend "XRT [radiation] to breast and Tamoxifen ...for 5 years for prevention of new breast cancer." Id. He also noted that [Mrs. Pollard] "plans to move to England and he will give her pertinent records." Id.

Because Dr. Gupta understood from his patient that the family was going to be transferred overseas to England late January 1999, he wrote a letter that the estrogen and progesterone receptors were negative and stated that the tumor was very small, 0.5-cm, and "medullary features, which are of favorable prognosis." Exh. 4 at 11.[2]

---

[2] This letter dated December 16, 1998, is addressed to "Whom It May Concern." The letter was written by Dr. Gupta in anticipation of Mrs. Pollard voluntarily accompanying her husband to his next duty assignment.

Mrs. Pollard was referred to Dr. David Dodwell, clinical oncologist at Cookridge Hospital, Leeds, England, on February 3, 1999 shortly after arriving in at her husband's duty station. It is significant to note that the time between December 15, 1998 and February 1999 was spent by the family was on leave; they were visiting and staying with relatives. Crucial to case and fatal to Plaintiffs' various theories of liability, Mrs. Pollard did not seek any medical treatment for her cancer during this six week period (December 15, 1998 to January 31, 1999).

Dr. Dodwell saw Mrs. Pollard on February 19, 1999, and noted that because of the negative estrogen receptors, Mrs. Pollard would not gain anything by the use of Tamoxifen. He further noted that, "The prognosis should really be good and the only thing that might make one consider the use of chemotherapy is her young age. However, despite this, I have not recommended that she have adjuvant chemotherapy and on discussion she is very content with this." Id. at 9.

Mrs. Pollard underwent radiation therapy, which concluded on May 21, 1999. Exh. 2 at 13. But on February 16, 2000, Mrs. Pollard noted pain in her right upper breast region. Chest wall examination revealed that the fourth, fifth, and sixth ribs were very tender. There was nodularity, and she was again referred to Dr. Dodwell.

Ultimately after an initial diagnosis of costochondritis (inflammation of the junctions where the upper ribs join with the cartilage that holds them to the breastbone or sternum which causes localized chest pain), Mrs. Pollard was seen again on May 16, 2000, and an excisional biopsy was performed on May 22, 2000. Id. at 11. This revealed that the right breast had a focal atypical ductal hyperplasia consistent with carcinoma *in situ*. Id. at 13. Biopsy of the chest wall revealed infiltrating, poorly differentiated adenocarcinoma. Id. A follow-up noted recurrent carcinoma and a CT scan of her abdomen/chest showed no lymph node enlargement, but there was an 8-mm nodule

of the posterior segment of her right upper lobe.  Id. at 18-19.  Mrs. Pollard was transferred to Walter Reed Army Medical Center (WRAMC).[3]  Exh. 6.

At WRAMC Dr. Peoples reviewed the slides, came to similar conclusions, and ordered a biopsy of the left breast mass.  On June 12, 2000, WRAMC physicians performed a fine needle aspiration of her right supraclavicular note. Id. at 3-5  This showed metastatic disease and the lesion of the left breast showed poorly differentiated carcinoma with angiolymphatic invasion. Mrs. Pollard was started on chemotherapy at that time.  The record indicates that four cycles of Adriamycin and Cytoxin were ordered.  Id. at 12.  On September 11, 2000, a CT of the chest and abdomen and pelvis was performed in preparation for a bone marrow transplant.  Treatment of various kinds continued which were not successful. Mrs. Pollard died three and a half years later on December 29, 2003.

## III. LEGAL STANDARD

Under Fed.R.Civ.P. 56© summary judgment is proper against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, 477 U.S. 242 (1986); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

Where the moving party will not have the burden of proof on an issue at trial, it merely has the burden of pointing out the parts of the record indicating that the non-moving party will not be able to carry its burden of proof at trial.  It need not affirmatively negate the non-moving party's case. Celotex,  477 U.S. at 324-325.  The plaintiff's burden in opposing a motion for summary judgment

---

[3] It is important to note that Plaintiff did not make any allegations of negligence concerning the care received at WRAMC.

is the evidentiary standard which they must satisfy at trial. <u>Anderson</u>, 477 U.S. at 255. The Plaintiff must show more than that there is a scintilla of evidence to support his case; he must show that a reasonable finder of fact could reach a verdict in his favor based on that evidence. <u>Anderson</u>, 477 U.S. at 252.

The party moving for summary judgment carries the initial burden of production to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, (1986) The moving party may discharge this burden by " 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325.

Once the moving party satisfies this burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The nonmovant must do more, however, than demonstrate some factual disagreement between the parties; the issue must be "material." <u>Cray Communications, Inc. v. Novatel Computer Sys., Inc.</u>, 33 F.3d 390, 393-94 (4th Cir. 1994). Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. In determining whether the nonmovant has identified a "material" issue of fact for trial, courts are guided by the applicable substantive law; therefore only disputes that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. <u>Shaw v. Stroud</u>, 13 F.3d 791, 798 (4th Cir.1994) Furthermore, a factual dispute is "genuine" for summary judgment purposes only when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249, (1986). Hence, a "metaphysical doubt" regarding the existence of a genuine fact issue is not enough

to stave off summary judgment, and "the nonmovant fails to demonstrate a genuine issue for trial 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party...." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, (1986)).

This is case also in which the doctrine of "collateral estoppel" applies.  The doctrine, sometimes known as "issue preclusion" prevents the relitigation of issues already decided in an earlier action.  See, e.g., In re McNallen, 62 F. 3d 619, 623 (4th Cir. 1995); Dionne v. Mayor and City Council of Baltimore, 40 F. 3d 677, 682 (4th Cir. 1994).  Here, the issues raised and decided at trial are the same as the issues raised in this action.  Specifically, the issue of proximate cause of Mrs. Pollard's death was decided by the jury.  Morever, the decision on the issue of proximate cause was necessary to a final judgment and the plaintiff had a fully opportunity to litigate the issue.  Therefore, the criteria for collateral estoppel has been met.  See  Virginia Hosp. Ass'n. v. Baliles, 830 F. 2d 1308, 1311-12 (4th Cir. 1987), *aff'd on other grounds*, 496 U.S. 498 (1990).

In the present case, the evidence proffered by the Plaintiff on the issue of causation – an issue on which the Plaintiff had the burden of proof at the jury trial was insufficient to obtain a judgment for the plaintiff, therefore the United States is entitled to summary judgment.  Nothing done by Dr. Adams which constituted an alleged  breach of the standard of care, is implicated in the causation of Mrs. Pollard's breast cancer or adversely influenced the treatment rendered by her oncologist, Dr. Gupta.  As the sole trier of fact in this FTCA case, the Court has at its disposal the finding of the jury that found Dr. Gupta breached the standard of care but still found he was not liable as to causation for Mrs. Pollard's death and damages.  There is no need for speculation as what a reasonable jury would find; we have the actual result.  The Court can be guided by its recollection of the trial as well as the court record.

## IV. ARGUMENT

When Mrs. Pollard made the initial complaint of soreness of her right breast, Army physicians took rapid action. First, a mammogram was taken which was negative. Second, a fine needle aspiration was done which showed some atypical cells. Third, an excisional biopsy was immediately ordered. Pathology did a complete work-up of the tissue, and it was determined that Mrs. Pollard had an "infiltrating carcinoma with medullary features." Fourth, a bone scan was done which was negative. Fifth, a lumpectomy and axillary node dissection was performed. Again, pathology was consulted, and it was shown that there was no residual tumor and that all 17 nodes were negative. Finally, tests were done to check for estrogen and progesterone receptors, both of which were negative.

Plaintiff argues that these studies should have been done more quickly. However, they were available for Dr. Gupta, the independent contractor, by mid-December 1998, well within the time that Dr. Gupta stated adjuvant chemotherapy should have begun. Exh.7, Dr. Gupta Dep. at 26-27. The entire process lasted only from October to mid-December 1998, from the time of her initial complaint through her surgery until the her departure from Georgia.

Once the lump had been excised and the pathology reports forwarded to Dr. Gupta, Dr. Adams had no other involvement with Mrs. Pollard's treatment. All remaining healthcare decisions in the United States were between Mrs. Pollard and her treating oncologist, Dr. Gupta. Dr. Gupta testified at trial that when he first saw Mrs. Pollard on December 1, 1998 he explained to her that the receptor studies were not available. Exh. 10 at 18. If the receptors were positive he would have recommended tamoxifen; if the receptors came back negative then he would have recommended chemotherapy. Id. He testified that he explained on December 1 that there were side effects. He

advised her to discuss these side effects with family and friends. Since he was given to understand that chemotherapy had been used in her family, she would come better prepared next time to discuss whether she elected chemotherapy.[4] Exh. 10 at 18-19. He also explained that he recommended five years of radiation. If she underwent chemotherapy the radiation would commence afterwards. If she elected not to undergo chemotherapy, then he would have recommended only radiation and tamoxifen for five years. Exh. 10 at 19. Later in his testimony, Dr. Gupta was asked if he was concerned when the English oncologist did not recommend chemotherapy. Id at 45. Dr. Gupta testified that he was not concerned because the risk/benefit ratio is "very much equal here." Id. at 45. It was a "close call either way" if chemotherapy was not recommended. Id. Since the benefit is "perhaps 2%" increased chance of survival, it is the patient's call. Id. 45-46.

      Later at trial, Dr. Gupta was asked how soon chemotherapy should be undertaken if elected. Id. at 82-95  Despite the suggestion made by plaintiff's counsel that four to six weeks after the " definitive surgery" was the appropriate time period, Dr Gupta maintained that under nationally recognized standards it more like "84 days, 12 weeks after definitive surgery." Id. at 86. Even when further pressed on this issue, Dr. Gupta stated that Mrs. Pollard had time extending into January 1999 and perhaps later to begin chemotherapy if she so elected. Id. at 88-89. Moreover, she left him to believe that she was leaving for England shortly after Christmas 1998, where she would continue treatment. Id. at 90-91.  Ultimately, she did not leave this country until late January.

      In this case, plaintiff's claims of medical malpractice revolve around the oncology care provided by Dr. Gupta.  On remand the controlling fact is that pathology reported carcinoma in the

---

[4] At trial the plaintiff's expert pathologist acknowledged that chemotherapy has side effects, including loss of hair and "gastrointestinal disorders." Exh. 11 at 29-30.

11

patient. Based on the pathology, the surgical findings and other criteria, Dr. Gupta recommended that chemotherapy be administered. It was Dr. Gupta's care and advice which the patient ignored. Mrs. Pollard's decision not to undergo chemotherapy is precisely what the jury relied upon when it absolved Dr. Gupta of liability, despite finding he failed to comply with the standard of care.

Plaintiff argues that there is evidence to substantiate the plaintiffs's allegations of Dr. Adams' negligence. This alleged shortcoming is premised on the "failing to obtain pathologic and laboratory information regarding the characteristic of Mrs. Pollard's cancer within a reasonable period of time, by misidentifying the size and other characteristics of the cancer in the pathologic examination." Exh. 6 at 11, affidavit of L.F. Smith. Plaintiff's further quotes Dr. Smith's affidavit that the standard of care requires the surgeon, oncologist, pathologist and other medical doctors to complete the pathologic studies and begin chemotherapy for adjuvant treatment of Mrs. Pollard's breast cancer within 4-6 weeks of her initial diagnosis of breast cancer. Id.

However, there is no evidence that Dr. Gupta would have started radiation earlier. In fact he testified that:

> It depends on the case. Normally if everything is going okay, meaning there is no complication in healing, then it started somewhere about four to six weeks after the surgery when the wound has all healed. It also depends on whether the patient is going to get adjuvant chemotherapy. If the patient gets chemotherapy then radiation is given normally after the chemotherapy is completed, which could be as late as six months after the surgery. Exh. 7, Dr. Gupta Dep. at 26-27.

When Dr. Gupta last saw Mrs. Pollard in December 15, 1998 it had been a little more than four weeks since her last surgical procedure which was on November 12, 1998. At that time the surgeons had performed a lumpectomy and an axillary node dissection. The results showed no residual tumor and all 17 nodes were negative. In other words, the prognosis was very favorable.

Next, Plaintiff takes Dr. Adams to task for a delay in sending out Mrs. Pollards' specimens for DNA and hormonal studies. Pls.' Mot. for Recons. at 6. However, while Dr. Gupta agreed that the specimens should have been sent out earlier, there is no evidence that receiving the studies by December 1 would have made any difference in his diagnosis. In fact, when confronted with this line of questioning by plaintiff's counsel at trial, he said that

> My notes from December 1st outlines these different scenes if her receptor would be negative or positive, and my note says if she was receptor positive I would recommend adjuvant tamoxifen and if she was receptor negative I would recommend chemotherapy and I would also recommend radiation to her breast. Exh. 7, Dr. Gupta Dep at 46.

Dr. Gupta further explained that he " would [have told] her that her breast cancer is in an early stage, the tumor is very small, and the smaller the tumor the more favorable it is, the lower the risk of spreading or recurrence. Her lymph nodes were all negative and that's a good prognostic indicator. Most of the tumors of this size, that is point five centimeter, are detected by screening mammography and not, and not present as a palpable tumor. In her case, it is somewhat unusual in that regard. We know that tumors that are this small have a very good prognosis and many times we do not recommend any adjuvant chemotherapy. Since there is something unusual about her case I would explain to her I favor giving her chemotherapy." Id. at 47

The fact of that matter is despite Dr. Gupta's recommendation, Mrs. Pollard chose not to have chemotherapy. Whether Dr. Gupta should have insisted she start it immediately or by January 1, 1999 (Id. at 74-75) or wait until she arrived in England, nevertheless, it was up to Mrs. Pollard to decide whether she wanted chemotherapy. But the relevant point is that the pathology information was in the hands of the treating oncologist and was sufficient for him to recommend chemotherapy. No evidence supports the proposition that the information provided to Dr. Gupta was lacking or

untimely.

Furthermore, the opinions of two other pathologist in this case should be noted. First, the treating pathologist in England, Dr. Cecily Quinn, testified that although the language she used in her report as a British trained pathologist is slightly different from Dr. Adams' language, the reports are not different. Exh. 8, Dr. Quinn Dep. at 11-13. Specifically, she testified that Dr. Adams' cytology description of "high grade tumor" is "not dissimilar" from her own description. Id. With regard to the medullary features, both she and Dr. Adams described the specimen as "suggestive of medullary but overall did not fulfill this criteria." Id. The inescapable conclusion is that another treating pathologist, not an expert at trial, found no fault with Dr. Adams' report.

Also when the defendant's expert pathologist, Dr. David Page, was asked if patients with a high grade tumor would stand to benefit the most for adjuvant treatment he testified that "Yeah, It is my belief and understanding that high grade tumors are more likely to benefit . However, I need to say those decisions are very much between clinicians and patients, and that most clinicians believe that any young woman benefits from chemotherapy.  So even the low grade cases of women, certainly in the age group under 40, if not under 45, are usually encouraged to take chemotherapy." Ex. 9, Dr. Page Dep. at 39-40.  This testimony was further buttressed by the statements of Dr. McTighe, Plaintiff's expert at trial, that the treating oncologist was entitled to rely on the information provided by Dr. Adams "in order to address the subsequent clinical course of the patient." Exh. 11 at 53-54. Nowhere in his trial testimony did Dr. McTighe find fault with the work of Dr. Adams. In fact, his testimony confirmed the description of the tumor given by Dr. Adams. "This tumor is a high grade, poorly differentiated tumor and that is described in the original biopsy report by Dr. Adams." Exh. 11 at 49.   Indeed, Dr. McTighe went so far as to state that the description of the

tumor as high grade was "immediately available" and Dr. Gupta did not need the report on the receptors to indicate that chemotherapy must be considered by the oncologist. Id. at 52.

In summary, Veronica Pollard chose to move to England with her husband, and consented to the course of treatment by British physicians which did not include chemotherapy. Whether or not the British physicians acted within the standard of care for Mrs. Pollard's treatment is, of course, irrelevant to the issue of the United States' liability and has already been decided in this case. Mrs. Pollard could have chosen to stay in the United States and continued to receive care, including chemotherapy, through the dependent health care programs provided by the military. At the time of her family's move she was aware of Dr. Gupta's recommendation for chemotherapy. Dr. Gupta's advice was based on the report authored by Army pathologist after a breast biopsy on October 14, 1998 that found "infiltrating carcinoma with medullary features." This report, when coupled with the receptor studies, which Dr. Gupta reviewed in December lead him to recommend a course of adjuvant chemotherapy to his patient. That recommendation was not followed. There is no evidence legally sufficient to establish that any action by the Army pathologist would have caused a different result.

## V. **CONCLUSION**

For the foregoing reasons, the United States of America, respectfully requests that the Court grant summary judgment on its behalf.

                                            Respectfully submitted,

                                            Rod J. Rosenstein
                                            United States Attorney

By:_____/s/_____
                Larry D. Adams
                Assistant United States Attorney
                36 South Charles Street, 4th Floor
                Baltimore, Maryland 21201
                410-209-4800

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing was electronically filed this 8th day of June, 2006 and also sent by first class mail to:

> Bruce J. Klores, Esq.
> Bruce J. Klores, and Associates, P.C.
> 915 15th Street, N.W.
> Washington, D.C. 20005
>
> .

_____/s/_____
Larry D. Adams
Assistant United States Attorney