IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ROOSEVELT POLLARD, ET AL., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) CIVIL NO. WDQ 02-CV-764 |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFFS' OPPOSITION TO THE UNITED
STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT**

COME NOW THE PLAINTIFFS, by and through their counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure, and hereby oppose Defendant Unites States of America's motion for summary judgment. In support of this opposition, Plaintiffs submit the attached Opposition and supporting documents.

Respectfully submitted,

BRUCE J. KLORES & ASSOCIATES, P.C.

By:____/s/_____
Bruce J. Klores
Scott M. Perry
1735 20th Street, N.W.
Washington, D.C. 20009
(202) 628-8100
Co-counsel for Plaintiffs

and

LAW OFFICES OF PETER MASCIOLA

_____/s/_____
Peter R. Masciola
601 Pennsylvania Avenue, N. W. #900
Washington, D.C. 20004
202-628-5680
Co-counsel for Plaintiffs

## **INTRODUCTION**

The Government has moved for summary judgment claiming that there are no genuine issues of material fact in dispute regarding the negligence of Stephen Adams, M.D., the government pathologist who misreported both the size and characteristics of Mrs. Pollard's breast cancer tumor and who delayed, by over two months, obtaining crucial studies to aid Mrs. Pollard's oncologist, Dr. Raj Gupta, and all of Mrs. Pollard's downstream health care providers who relied upon Dr. Adams' faulty findings, in determining her plan of care. As a direct result of Dr. Adams' negligence – which is virtually undisputed by the Government – Mrs. Pollard never received the chemotherapy that would have saved her life. The Government could not be more wrong in claiming that there are no genuine issues of material facts in dispute.

The Government's broad-brush motion ignores the central issues and relies on inapplicable "facts" in claiming that there are no genuine issues of material fact at issue. But as the evidence demonstrates, the relevant facts are in dispute. That evidence demonstrates that had Dr. Adams accurately and timely reported the pathology results to Dr. Gupta, the standard of care would have required that Dr. Gupta unequivocally recommend that Mrs. Pollard immediately begin chemotherapy in the United States and not be allowed to leave for England.

Had she been so advised by Dr. Gupta, Mrs. Pollard would have followed this order, would have immediately obtained chemotherapy in the United States, and to a reasonable degree of medical probability, would be alive today. Similarly, Mrs. Pollard's downstream health care providers, including David Dodwell, M.D., her U.K. oncologist, also relied on Dr. Adams' faulty findings; preventing them from recommended the life-saving treatment that she needed.

This evidence comes not only from Plaintiffs' fact and expert witnesses, but also from Dr. Gupta's *own expert* oncologist, Marc Lippman, M.D., who emphatically testified that if Dr.

2

Adams had measured the tumor correctly, and had accurately recognized the particular type of breast cancer it was, that would have represented "dramatically altered circumstances" for Dr. Gupta and the standard of care would require commencement of immediate chemotherapy. Likewise, Dr. Gupta, himself, testified that the standard of care for a tumor greater than one centimeter – as Mrs. Pollard's tumor turned out to be – is to order chemotherapy.[1] Similarly, Dr. Dodwell testified that by the time the U.K. pathologist recognized Dr. Adams' errors, it was too late to recommend chemotherapy to Mrs. Pollard.

The Government's argument, boiled down for relevance, is that Dr. Gupta's recommendation to Mrs. Pollard would have been the same even if Dr. Adams had timely and accurately reported his findings. This is flatly wrong, and most important for purposes of this motion, is a strongly disputed fact. Moreover, the motion ignores the fact that Mrs. Pollard's downstream healthcare providers also relied upon Dr. Adams' faulty findings to Mrs. Pollard's detriment. Thus, proximate cause is disputed and this motion should be denied.

## STATEMENT OF MATERIAL FACTS IN DIPSUTE

While there are many genuine issues of material fact in dispute between the parties, the genuine issues pertinent to the Government's motion – which preclude entry of summary judgment – are as follows:

1. Dr. Adams, the government's pathologist, did not timely send on the specimens of the breast cancer tumor to have DNA and hormonal studies performed. Dep. of Arthur McTighe, M.D. at 40-42, Exh. 1.

2. Dr. Adams did not accurately measure the size of Mrs. Pollard's tumor. *Id.* at 37.

---

[1] Indeed, if there is any genuine issue of material fact that is not in dispute, it is that the standard of care for a greater than 1 centimeter tumor requires the ordering of chemotherapy.

3

3. Dr. Adams did not accurately describe the characteristics of Mrs. Pollard's tumor; he undersized it by *half*. *Id.* at 33-35 & 39.

4. Dr. Adams mischaracterized the tumor as being a carcinoma with medullary features, a more benign cancer than she had. *Id.* at 35-36.

5. Dr. Adams improperly measured the tumor as being 0.5 centimeters, when it was actually 1.1 centimeters. *Id.* at 37; Dep. of David Dodwell, M.D., at 42-43, Exh. 2.

6. Dr. Adams did not timely obtain the estrogen receptors, progesterone receptors, and Her 2 Neu results. McTighe Dep. at 40-42, Exh. 1.

7. Dr. Adams' report was incorrect, misleading and did not contain the correct information to enable Dr. Gupta and Mrs. Pollard's other health care providers to review the report and to understand immediately that chemotherapy was an urgent matter. *Id.* at 33-38; Dodwell Dep. at 42-43, Exh. 2.

8. Dr. Adams' mischaracterization of the tumor improperly led Dr. Gupta to conclude that Mrs. Pollard's cancer had a relatively favorable prognosis, leading him to communicate the same to Mrs. Pollard and to subsequent physicians. McTighe Dep. at 35, Exh. 1; Dep. of Raj Gupta, M.D., at 47, Exh. 3.

9. At no time during his care of Mrs. Pollard did Dr. Gupta have an accurate and complete pathology report, a fact that was not told to Mrs. Pollard. Gupta Dep. at 50, Exh. 3.

10. If Dr. Gupta had accurate pathology results when he first saw Mrs. Pollard on December 1, 1998, he should have immediately ordered chemotherapy in order to comply with the standard of care. *Id.* at 49; Dep. of Marc Lippman, M.D. (Oct. 1, 2003) at 61-62, Exh. 4.

11. If Dr. Gupta had accurate pathology results when he next saw Mrs. Pollard on

4

December 16, 1998, he would have immediately ordered chemotherapy. *Id.*; Gupta Dep. at 49, Exh. 3.

12. Literature existed at the time demonstrating that the survival benefit increases when chemotherapy is given for tumors greater than one centimeter, and, thus, chemotherapy was required by the standard of care. Lippman Dep. at 62, Exh. 4.

13. If Dr. Gupta had accurate pathology results, he would not have written the misleading letter on December 16, 1998, entitled "To Whom It May Concern," which stated the efficacy of chemotherapy "is somewhat debatable," giving Mrs. Pollard's U.K. doctors the mistaken factual predicate allowing them to join in his equivocality regarding the efficacy of chemotherapy. *Id.*

14. If Dr. Gupta had accurate pathology results, he would not have written the misleading letter on December 16, 1998, entitled "To Whom It May Concern," which incorrectly described the tumor as "very small" and with "medullary features which are of a favorable prognosis." *Id.*; McTighe Dep. at 35-35, Exh. 1.

15. If Dr. Gupta had accurate pathology results, he would not have allowed Mrs. Pollard to leave the United States without strongly recommending chemotherapy. Gupta Dep. at 49, Exh. 3; Lippman Dep. at 61-62, Exh. 4.

16. If Dr. Gupta had strongly recommended chemotherapy when he saw Mrs. Pollard on two occasions in December 1998 in the United States, Mrs. Pollard would have undergone chemotherapy. De Bene Esse Dep. of Veronica Pollard, at 38, Exh. 5; Lippman Dep. at 62-63, Exh. 4.

17. If Dr. Alan had accurately and timely reported the pathology results to Dr. Gupta,

5

Mrs. Pollard would have undergone timely chemotherapy and would be alive today. Dep. of Leroy Smith, M.D., at 54-55, Exh. 6.

18.   By the time that Dr. Dodwell was made aware of Dr. Adams' errors, it was too late for Mrs. Pollard to obtain the benefits of the chemotherapy. Dodwell Dep. at 43-44, Exh. 2.

## ARGUMENT

### I. THE GOVERNMENT HAS NOT MET ITS BURDEN OF DEMONSTRATING AN ABSENCE OF DISPUTED MATERIAL FACTS AS REQUIRED TO SHIFT THE BURDEN TO PLAINTIFF

This case is before this Court after being reversed and remanded by the Fourth Circuit Court of Appeals. *Pollard v. United States,* 2006 U.S. App. LEXIS 2605 (Feb. 2, 2006). The Fourth Circuit reversed the dismissal of this action as to the Government for the claims that derive from the negligence of its employee, Dr. Adams. In so holding, the Fourth Circuit found that in moving for summary judgment on this claim, "the United States failed to meet its burden as the moving party" to demonstrate an absence of genuine issues of material fact as to the negligence of Dr. Adams. *See id.* at \*\*10.

In ruling against the United States, the Fourth Circuit noted that summary judgment motions are determined under a burden-shifting scheme whereby the movant must first "'point[] out to the district court' those portions of the record that show 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* at \*\*9-10 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)). Where the movant fails to establish an absence of genuine issues of material fact that are in dispute, summary judgment must be denied even if the non-movant puts forth no evidence. *See Pollard,* 2006 U.S. App. LEXIS 2605 at \*\*10. The Fourth Circuit found that the Government failed to sustain its burden.

6

The Government has now moved for summary judgment a second time on the Plaintiffs' claims against the Government. When it moved for summary judgment the first time, it failed to substantiate its motion with facts demonstrating an absence of genuine issues of material fact. While this time the Government has set forth some additional facts, they are hardly undisputed facts as demonstrated in Plaintiffs' statement of material facts in dispute. Rather, the facts that the Government relies upon are strongly disputed and do not lead the Government's conclusion that proximate cause is lacking as a matter of law. Thus, the Government has, again, failed to meet its burden and on that basis alone the Court should deny the Government's motion.

Even if the Court were to find that the Government has set forth sufficient facts to consider the motion, genuine issues of material facts exist demonstrating that Dr. Adams breached the standard of care and that his breaches proximately caused Mrs. Pollard's death. Thus, the motion should be denied.

## II. HAD DR. ADAMS TIMELY, ACCURATELY AND COMPLETELY REPORTED THE PATHOLOGY FINDINGS, MRS. POLLARD WOULD HAVE BEEN GIVEN CHEMOTHERAPY IMMEDIATELY IN THE UNITED STATES AND WOULD HAVE SURVIVED

For purposes of this motion, Plaintiffs' case against Dr. Adams can be reduced to a simple point: if Dr. Adams, and hence the Government, had properly reported the size of Mrs. Pollard's tumor, had accurately described the tumor's characteristics, and had timely obtained the laboratory results, the standard of care would have required that Dr. Gupta and the other downstream health care providers order chemotherapy immediately and, if done, Mrs. Pollard would be alive today.

In this area of medicine, the patient's plan of care is wholly dependent on the pathologist's findings, and the oncologist has a right to rely on the pathologist's findings in

7

determining the patient's plan of care. Lippman Dep. at 110, Exh. 4.[2] Indeed, Dr. Adams has acknowledged that his findings formed the basis for all of Mrs. Pollard's future treatment. Steven Adams, M.D. Dep. at 41, Exh. 7. Thus, the pathology findings form the foundation for the patient's plan of care, and that plan of care is built upon that foundation. And much like a structure built with a faulty foundation will crumble, a plan of care built upon a foundation of faulty pathology findings will fail. That is precisely what happened in this case.

Dr. Gupta admitted relying on Dr. Adams' incomplete and inaccurate pathology report to develop his plan of care. Gupta Dep. at 49-50, Exh. 3. As a result, he did not strongly recommend that Mrs. Pollard undergo chemotherapy. Def's Exh. 3 (Gupta's handwritten note). Rather, based on his reliance on Dr. Adams' pathology report as to the size and characteristics of the tumor, he determined that the benefits of chemotherapy for Mrs. Pollard were, at best, equivocal, and, according to him, he communicated that equivocation to the patient and to subsequent physicians who relied upon it. Def's Exh. 4, at 11 (Gupta writes "Mrs. Pollard's adjuvant therapy is somewhat debatable" based on the pathology findings.). Had he received accurate and timely pathology findings, Dr. Gupta's equivocation as to the efficacy of chemotherapy would not have existed; the standard of care clearly called for chemotherapy in December 1998 according to both Dr. Gupta's own oncology expert and the existent literature. Lippman Dep. at 61-62, Exh. 4. As a result, a proximate cause of Mrs. Pollard's death is Dr. Adams' inaccurate and untimely pathology report.

---

[2] Dr. Lippman, Dr. Gupta's expert oncologist, was clear on this issue: "[I] don't believe it is the duty of an oncologist to verify whether or not a pathologist has read a sample correctly or not. He is entitled to rely on a pathologist." *Id.*

8

### A. Dr. Gupta *Never* Had Accurate Pathology Data With Which To Determine Mrs. Pollard's Plan Of Care

The Government does not seriously dispute in its motion that Dr. Adams departed from the standard of care in failing to timely prepare Mrs. Pollard's pathology report and in failing to accurately report the size and characteristics of the tumor removed from Mrs. Pollard's breast on October 14, 1998.[3] Rather, the government asserts that because the pathology report results "were available for Dr. Gupta . . . by mid-December 1998," his recommendation to Mrs. Pollard would not have changed and, thus, proximate cause is lacking. Def's Br. at 10. Missing entirely from the Government's brief, however, are two crucial facts: First, at no time while Mrs. Pollard was under Dr. Gupta's care did he have an *accurate and complete* pathology report. Gupta Dep. at 50, Exh. 3. Second, the record evidence demonstrates that if Dr. Gupta had been provided an accurate pathology report prior to when he first saw Mrs. Pollard on December 1, 1998, he would have ordered that she undergo chemotherapy immediately. *Id.* at 49; Lippman Dep. at 61-62, Exh. 4. With these facts, Dr. Gupta's recommendation to Mrs. Pollard would have changed; he would have strongly advised chemotherapy.

The report that Dr. Adams provided to Dr. Gupta, and on which he relied upon to determine a plan of care for Mrs. Pollard both *underreported* the size of the tumor *by half* and incorrectly noted the characteristics of the tumor. McTighe Dep. at 33-39, Exh. 1. Thus, it is simply incorrect to suggest that Dr. Gupta had all of the information that he needed to determine Mrs. Pollard's plan of care in December 1998. Rather, Dr. Adams' mistakes were not discovered until his results were reviewed by the U.K. pathologist in April 1999, far beyond the time when chemotherapy could have saved Mrs. Pollard's life. Dodwell Dep. at 44-45, Exh. 2.

---

[3] To the extent that it does dispute these facts, then they are genuine issues of material fact, precluding summary judgment.

9

As a result, the inaccurate report that Dr. Gupta relied upon on December 16, 1998 (he had only an incomplete report to rely on during the December 1, 1998 visit) led him to conclude that Mrs. Pollard's prognosis was more favorable than it actually was, and that immediate chemotherapy was not necessary.

Simply put, Dr. Gupta *never* had an accurate and complete pathology report to provide him with the crucial information needed to create a proper plan of care for Mrs. Pollard, which plan – according to the undisputed standard of care testified to by both Plaintiffs' and Dr. Gupta's experts – would have included life-saving chemotherapy.

> **B.     The Evidence Of Both Plaintiffs' And Dr. Gupta's Standard Of Care Witnesses Establishes That A 1.1 Centimeter Tumor With The Characteristics Of Mrs. Pollard's Tumor Requires Chemotherapy And The Failure Of Dr. Gupta To Recommend Chemotherapy Based On Dr. Adams' Faulty Report Was A Proximate Cause Of Mrs. Pollard's Death**

Plaintiffs' pathology expert is Arthur H. McTighe, M.D., who is Chief of Pathology at Union Memorial Hospital here in Baltimore. Before the Government was dismissed, Dr. McTighe testified at his deposition that Dr. Adams' pathology report departed from the standard of care in numerous ways; namely, that Dr. Adams incorrectly measured the size of the tumor as 0.5 centimeters instead of 1.1 centimeters and that he misstated crucial information with regard to the characteristics of the tumor such as Dr. Adams' finding of "carcinoma with medullary features."[4] McTighe Dep., at 34-37, Exh. 1. Dr. McTighe further opined that these mistakes were crucial because they mistakenly gave Dr. Gupta the impression of a relatively favorable prognosis, which obviated the need for chemotherapy, especially given the purported -- although wrong -- size of the tumor. *Id.* Dr. McTighe also testified that Dr. Adams departed from the standard of care by failing to timely perform crucial studies that were necessary to develop a plan

---

[4] The Government states that Dr. McTighe did not find fault at trial with Dr. Adams' work. Gov't Br. At 14. This is, of course, because the Government was no longer a party to this case at trial and he did not testify on this issue.

10

of care for Mrs. Pollard. *Id.* at 34. As Dr. McTighe explained, the ancillary studies – including the estrogen receptors and progesterone receptors – should be done "automatically and immediately, not nearly two months later." *Id.* at 40. This is because – as is undisputed in this case – the sooner one obtains chemotherapy the more likely it will benefit the patient. Smith Dep. at 32-33, Exh. 6.

In addition to providing standard of care testimony, Dr. McTighe provided the crucial causation testimony that is at dispute in this case and which precludes the entry of summary judgment. Namely, Dr. McTighe testified that the "critical thing is to diagnose early, which happened here, but also to treat early, *which did not happen here.*" *Id.* at 44 (emphasis added). As Dr. McTighe succinctly stated:

> So the clinical physicians made a diagnosis suspicious of cancer and started the train on its track, but then when it got to pathology, it veered off and went on a different course that ultimately I think is the reason Miss Pollard has the disseminated disease that she now has.

*Id.* at 45.[5] Dr. McTighe stated that had Dr. Gupta received accurate pathology information from Dr. Adams, he would have been able to put into effect a plan to immediately attempt to save Mrs. Pollard's life because "with every day of delay her chance of disseminated disease increased." *Id.* at 50-51.

As to what a proper plan would include, this was definitively answered by Dr. Gupta's *own expert oncologist*, Dr. Lippman, who testified as follows:

> Q: Okay. If in October of 1998, if the pathologic information that was available to you described a tumor of 1.1 centimeters in size, node negative, and a tumor that was a Grade III poorly differentiated tumor that didn't really have any significant medullary component to it, would your advice and recommendation to Mrs. Pollard have changed in any way?

---

[5] Dr. McTighe's deposition was taken before Mrs. Pollard succumbed to cancer.

11

> A: *They sure would.*
>
> Q: Okay. What would they have been?
>
> A: *I would have been encouraging her rather strongly to take chemotherapy.*
>
> Q: And why?
>
> A: *Because now her prognosis is substantially worse. Therefore, I believe that chemotherapy, the benefits would strongly outweigh the harm. I would, under those rather dramatically altered circumstances, have felt that chemotherapy was indicated. Furthermore, in that setting, unlike the previous one [a 0.5 centimeter tumor], there would have been literature because there was literature for tumors greater than a centimeter but less than two centimeters proving a survival benefit for chemotherapy . . . .*

Lippman Dep., at 61-62, Exh. 4. Dr. Lippman went on to explain that these "dramatically altered circumstances" would result in a long-term survival rate for Mrs. Pollard that is now "significantly deteriorated." *Id.* at 62. Thus, Dr. Gupta's own expert established that the standard of care would have required him to embark upon an entirely different course, which would include chemotherapy had Dr. Adams accurately reported the size of the tumor and its medullary features to Dr. Gupta. Specifically, rather than the efficacy of chemotherapy being equivocal, the benefits of chemotherapy would have "strongly outweighed" the potential harm.

In fact, both Dr. Lippman and Dr. Gupta testified that the size of the tumor is *the overwhelming factor* in determining prognosis: "The *most important issues* in determining prognosis are the tumor size and lymph node status overwhelmingly." Lippman Dep. at 51, Exh. 4 (emphasis added). As to Dr. Gupta, he testified as follows:

> Q: Is tumor size an indication for chemotherapy by itself?
>
> A: *Yes. Most tumors, most of the time a tumor of more than one centimeter received some adjuvant treatment [chemotherapy].*

Gupta Dep. at 49-50, Exh. 3.

12

While Dr. Gupta, and his expert witness, themselves, defeat the Government's argument that summary judgment is appropriate, this evidence is not the only relevant evidence on this issue. Plaintiffs' causation case is further bolstered by one of his own expert oncologists, Leroy Smith, M.D., who made clear that "[t]here is no question that early treatment of breast cancer is essential because the longer you wait, the greater the risk . . . ." Smith Dep. at 32-33, Exh. 6. And Dr. Smith could not have been clearer that had Mrs. Pollard timely been given chemotherapy by Dr. Gupta, she would have survived:

> Q: Dr. Smith, is it your opinion to a reasonable degree of medical probability that Miss Pollard would have fallen into that percentage that would have survived with the chemotherapy?
>
> A: *Yes, it's my opinion.*

*Id.* at 55.

In short, Plaintiffs' expert witnesses have opined that Dr. Adams breached the standard of care by improperly measuring the size of the tumor, in describing its characteristics, and in failing to timely obtain crucial laboratory studies. They have further opined that his breaches of the standard of care proximately caused Mrs. Pollard's death because Dr. Gupta relied on the incorrect report in making his recommendation, if at all, to Mrs. Pollard that chemotherapy was a "close call" and not urgent in her situation. And had Dr. Gupta known the tumor was 1.1 centimeters in diameter rather than the wrongly reported 0.5 centimeters, it is undisputed that the standard of care called for chemotherapy. Indeed, Dr. Gupta has testified that tumors that are greater than one centimeter – as Mrs. Pollard's was – receive chemotherapy.

Likewise, Dr. Lippman, Dr. Gupta's own expert oncologist, testified that a greater than one centimeter tumor would have represented "dramatically altered circumstances" for Mrs. Pollard and would have required chemotherapy. As to the Government's claim that Mrs. Pollard

13

chose to ignore Dr. Gupta's recommendation, that is a disputed fact as Mrs. Pollard unequivocally testified, prior to her death, that Dr. Gupta did not recommend chemotherapy and that had he recommended it, she would have accepted that recommendation. Pollard Dep., at 38, Exh. 5.

In short, Plaintiffs' expert witnesses, including his pathologist, Dr. McTighe, have specifically opined that Dr. Adams both breached the standard of care and that his breaches proximately caused Mrs. Pollard's death. Likewise, Mrs. Pollard's *de bene esse* deposition demonstrates that had Dr. Gupta recommended chemotherapy, as the standard of care required for a tumor of this size and characteristics, she would have chosen to undergo chemotherapy. Thus, there are certainly issues of material fact in dispute as to whether Dr. Adams' actions/omissions proximately caused Mrs. Pollard's death, which taken as a whole present a factually compelling case of medical malpractice.

### C. Dr. Adams' Negligence Affected The Plan Of Care Of All Of Mrs. Pollard's Downstream Health Care Providers Because They Also Relied Upon Dr. Adams' Faulty Findings And By The Time Dr. Adams' Errors Were Discovered It Was Too Late

The Government focuses its brief almost entirely on the actions of Dr. Gupta when arguing lack of proximate cause. As Plaintiffs have demonstrated, the issue of proximate cause based on Dr. Gupta's reliance upon Dr. Adams' incomplete and inaccurate pathology report is a genuine issue of material fact in dispute. But the Government ignores the fact that Dr. Adams' negligence affected not only Dr. Gupta's actions, but also the plan of care developed by all of the downstream health care providers who also relied upon Dr. Adams' findings. And no jury has made a determination on proximate cause as to that issue.

There were numerous providers downstream from Dr. Gupta who relied upon Dr. Adams' faulty and incomplete report in determining a plan of care for Mrs. Pollard. Dodwell Dep. at 44, Exh. 2. Indeed, Dr. Adams acknowledged this fact:

> Q: As the pathologist, looking at breast tissue where there's been identified carcinoma, you understand that what you report forms the basis for future treatment for a woman with breast cancer?
>
> A:   That's correct.

Steven Adams, M.D. Deposition at 41, Exh. 7.

When Dr. Adams breached the standard of care by relaying faulty findings, it was those same faulty findings that Dr. Gupta relied on that Dr. Dodwell also relied upon. It was only when Dr. Dodwell asked a fellow U.K. pathologist to look at the specimens that Dr. Adams' errors realized. And at that point, Dr. Dodwell testified that it was too late because the crucial time had passed to obtain the benefits of chemotherapy that Mrs. Pollard needed. Dodwell Dep. at 43-44, Exh. 2.

Simply put, it was because of Dr. Adams' breach of the standard of care that Mrs. Pollard's treating physicians could not properly advise her in her medical decisiomaking.

### III. THE GOVERNMENT'S MOTION IS BUILT UPON *DISPUTED* FACTS

As Plaintiffs have demonstrated above, there are genuine issues of material fact in dispute; a sufficient reason to deny summary judgment. A close look at the facts relied upon by the Government, however, provides an even stronger basis to deny the motion because the "undisputed" evidence that the United States cites is premised *entirely on* either Dr. Gupta's testimony where he was asked to assume that the pathology report that he based his decision upon *was accurate and complete* or upon facts that are clearly disputed in the record.

15

### A. The Government's Facts Are Based Upon Dr. Gupta's Reading Of The Incorrect And Incomplete Pathology Report Prepared By Dr. Adams

It is now known that Dr. Adams' pathology findings were incomplete and inaccurate. Yet, in supporting its motion, the Government relies chiefly upon Dr. Gupta's testimony where he was assuming that the pathology findings on which he relied are correct. Thus, as demonstrated below, these are not undisputed facts and they do not support the Government's position:

- The Government cites Dr. Gupta's trial testimony in which he testified that a recommendation of chemotherapy was a "close call" in Mrs. Pollard's case, implying that the standard of care did not require him to recommend chemotherapy. Def's Exh. 10 at 45. The problem with the Government's reliance on this testimony is that Dr. Gupta was opining that it was a "close call" whether to recommend chemotherapy to Mrs. Pollard based on a tumor he believed to be *0.5 centimeters* in size, and *after* the Government had been dismissed as a defendant. Dr. Gupta was not being asked whether chemotherapy was a "close call" for a 1.1 centimeter tumor as the evidence shows in the present case. In fact, when he was asked at deposition what his recommendation would have been for tumor the size of Mrs. Pollard's, Dr. Gupta responded that he would order chemotherapy. Gupta Dep. at 49, Exh. 3.

- The Government notes that Dr. Gupta wrote a letter in late January 1999 in which he noted that the tumor was "very small." Govt's Br. at 5. But Dr. Gupta was relying on Dr. Adams' incorrect measurement of the tumor, given that the evidence in this trial will show that the real size was *twice* Dr. Adams' measurement. McTighe Dep. at 37, Exh. 1.

- The Government states that Dr. Dodwell, Mrs. Pollard's U.K. oncologist, concurred that chemotherapy was not necessary for Mrs. Pollard. Govt's Br. at 6. But when Dr. Dodwell wrote the letter on which the Government is relying, he was also relying on Dr. Adams'

16

inaccurate measurement of the tumor as 0.5 centimeters. Govt's Exh. 4, at 9. And when asked during deposition if his recommendation would have been different had he known the actual size of the tumor, Dr. Dodwell noted that the benefits of chemotherapy by the time he learned of the actual size would be greatly diminished because too much time had passed. Dodwell Dep. at 43-44, Exh. 2. And, of course, all of this time passed because of the oncologists' reliance on Dr. Adams' incorrect and incomplete pathology report.

- The Government claims that when Dr. Gupta last saw Mrs. Pollard on December 16, 1998, her "prognosis was very favorable." Govt's Br. at 12. But, again, this is based on Dr. Gupta's reliance on Dr. Alan's incorrect and incomplete pathology report. As the Government's own expert oncologist, Dr. Lippman, testified, with a 1.1 centimeter tumor, Mrs. Pollard's prognosis is not very favorable, but rather "substantially worse." Lippman Dep. at 61-62, Exh. 4.

All of these "undisputed facts" that the Government relies upon only hold true when based on the inaccurate and incomplete pathology report.

### B. Whether Dr. Gupta Recommended Chemotherapy To Mrs. Pollard Is Disputed

After relying on Dr. Gupta's testimony – which is not proper for the reasons explained above – the Government then opines that proximate cause is lacking because Mrs. Pollard chose not to undergo chemotherapy. But the record establishes that Mrs. Pollard was never advised to undergo chemotherapy, and that had she been so advised she would have undergone chemotherapy:

- The Government claims that Mrs. Pollard's failure to obtain medical treatment for her cancer during the six-week period of December 15, 1998 to January 31, 1999 is "crucial to case" [sic]. Govt's Br. at 6. Implicit in this statement is that Mrs. Pollard was supposed to obtain

17

medical treatment during this time. Mrs. Pollard testified, however, that she was not told that it was crucial to obtain treatment during this time. Pollard Dep. at 38, Exh. 5.

- The Government argues that "Mrs. Pollard's decision not to undergo chemotherapy is precisely what the jury relied upon when it absolved Dr. Gupta of liability . . . ." It, of course, cites no record evidence for this "fact" because it is nothing more than counsel's speculation (who was not present at trial). It is not an undisputed fact and the Fourth Circuit has made clear that the jury's finding on that issue has no bearing on the case against Dr. Adams.

- The Government concludes its "undisputed" facts by again claiming that Plaintiffs' claim fails as to proximate cause because "Mrs. Pollard chose not to have chemotherapy." Govt's Br. at 13. But the record could not be clearer that Mrs. Pollard testified that had chemotherapy been recommended to her by Dr. Gupta, she would have undergone chemotherapy. Pollard Dep. at 38, Exh. 5.

Moreover, this disputed fact has nothing to do with the decisions made by Mrs. Pollard's downstream health care providers who also relied upon Dr. Adams' faulty findings to determine her plan of care.

## IV. PLAINTIFFS ARE NOT COLLATERALLY ESTOPPED FROM PROVING PROXIMATE CAUSE

The Government sets forth one additional argument in support of its motion for summary judgment, claiming that Plaintiffs are collaterally estopped from establishing proximate cause because the jury did not find proximate cause against Dr. Gupta in the first trial. Plaintiffs are at a loss to understand how the Government can set forth this argument in light of the Fourth Circuit's holding to the contrary. Although lengthy, Plaintiffs are compelled to quote the Fourth Circuit's language in full as it disposes of this issue:

> The United States also argues that summary judgment should be entered in its favor because any error committed by the district court was harmless in light of the jury's subsequent finding that Dr. Gupta's negligence did not cause Mrs. Pollard's injuries. *We reject this argument.* The fact that the jury found that Dr. Gupta's negligence did not cause Mrs. Pollard's injuries *says nothing whatsoever about whether Dr. Adams' negligence,* if there be any, caused Mrs. Pollard's injuries.

*Pollard v. United States,* 2006 U.S. App. LEXIS 2605, **11 n.1 (4th Cir. Feb. 2, 2006) (emphasis added).

The Fourth Circuit's decision on this issue is the law of the case. *See United States v. Aramony,* 166 F.3d 655, 661 (4th Cir. 1998) (holding that the law of the case doctrine "'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'") (quoting *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 815-16 (1988)). Pursuant to the law of the case doctrine, once an appellate court establishes the law of the case, "it must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal." *Aramony,* 166 F.3d at 661 (quoting *Sejman v. Warner-Lambert Co.,* 845 F.2d 66, 69 (4th Cir. 1988)).[6]

As the Fourth Circuit has explicitly recognized, the jury's finding as to whether Dr. Gupta's actions/omissions proximately caused Mrs. Pollard's death is irrelevant, and does not collaterally estop Plaintiffs from proving that Dr. Adams' actions/omissions proximately caused Mrs. Pollard's death. Thus, this argument must be rejected as a matter of law.

## CONCLUSION

The Government has failed to sustain its burden of demonstrating an absence of material facts in dispute. Even if the Court were to find that the Government has sustained its burden, Plaintiffs have demonstrated that there are genuine issues of material fact in dispute. Indeed, the

---

[6] None of the rare exceptions to the law of the case doctrine apply here.

crucial facts of this case are in dispute. Namely, the parties dispute the accuracy and timeliness of the government pathologist's report; they dispute whether a timely and accurate report would have resulted in Mrs. Pollard's receiving chemotherapy; and they dispute whether that chemotherapy would have saved Mrs. Pollard's life.

WHEREFORE, Plaintiffs respectfully requests that this Court deny the Defendant United States of America's motion for summary judgment and set this case for trial.

Respectfully submitted,

BRUCE J. KLORES & ASSOCIATES, P.C.

By:____/s/_____
Bruce J. Klores
Scott M. Perry
1735 20th Street, N.W.
Washington, D.C. 20009
(202) 628-8100
Co-counsel for Plaintiffs

and

LAW OFFICES OF PETER MASCIOLA

_____/s/_____
Peter R. Masciola
601 Pennsylvania Avenue, N. W. #900
Washington, D.C. 20004
202-628-5680
Co-counsel for Plaintiffs

1606/Opp.SJ.doc