1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

------------------------------x

VERONICA POLLARD, et al,

       Plaintiffs,

  vs.                  Case No. S-02-764

UNITED STATES OF AMERICA,

       Defendant.
------------------------------x

**ORIGINAL**

PAGE 1 TO 144

The Videoconference Deposition of

MARC LIPPMAN, M.D.,

Taken at 2900 State Street,

Ann Arbor, Michigan,

Commencing at 3:40 p.m.,

Wednesday, October 1, 2003,

Before Renee J. Ogden, RPR, CSR-3455.



51

1  Q.  But in this case, would it -- you listed it as
2      something that you would have factored into your
3      decision not to give treatment to Mrs. Pollard.
4  A.  Well, I'm looking at every -- of course, as a
5      treating physician I will look at every fact that I
6      can obtain for a patient. The most important issues
7      determining prognosis are tumor size and lymph node
8      status overwhelmingly. Other features are less
9      important but could be the tipping point in the
10     decision-making process. So, of course, I would
11     look at them. I wouldn't ignore any fact about a
12     patient.
13 Q.  I'm not suggesting that you would, Doctor. I'm only
14     asking you if that was a factor that you considered
15     in addition to the others, to the size of the lymph
16     node status, as tending to show a more favorable
17     prognosis?
18 A.  It would be a tiny point in favor of my feeling a
19     bit more comfortable about the decision not to give
20     her chemotherapy with a half a centimeter tumor.
21 Q.  Okay. Let me just ask this: In your opinion, why
22     would you not -- why would you not have given

61

1 literature, in fact, all that I can think of that
2 applies to a patient like this or one who may
3 deviate from her in a small way.
4 Q. Okay. If in October of 1998, if the pathologic
5 information that was available to you described a
6 tumor of 1.1 centimeters in size, node negative, and
7 a tumor that was a Grade III poorly differentiated
8 tumor that didn't really have any significant
9 medullary component to it, would your advice to and
10 recommendation to Mrs. Pollard have changed in any
11 way?
12 A. They sure would.
13 Q. Okay. What would they have been?
14 A. I would have been encouraging her rather strongly to
15 take chemotherapy.
16 Q. And why?
17 A. Because now her prognosis is substantially worse.
18 Therefore, I believe that chemotherapy, the benefits
19 would significantly outweigh the harm. I would,
20 under those rather dramatically altered
21 circumstances, have felt that chemotherapy was
22 indicated. Furthermore, in that setting, unlike the

62

1    previous one, there would have been literature
2    because there was literature for tumors greater than
3    a centimeter but less than two centimeters proving a
4    survival benefit for chemotherapy, so I would have
5    given it to her under those circumstances --
6    recommended it under those circumstances.
7  Q. Can you tell me what your recommendation would have
8    been, what -- how you would have explained the
9    benefits and the survival benefits to Mrs. Pollard
10   in 1998 if you understood that the tumor was 11
11   millimeters in size and was a Grade III tumor?
12 A. Grade III, poorly differentiated, ER negative, 1.1
13   centimeters.  Now her chances of long-term survival,
14   her natural history, is down to 75 to 80 percent.
15   That's significantly deteriorated.  Furthermore, the
16   same relative benefit of adjuvant chemotherapy now
17   is worth about 6 or 7 percent in terms of absolute
18   survival benefit.  Whereas the toxicity, the risk of
19   harm hasn't increased, that's exactly the same.  Now
20   the relative benefit is much more apparent as
21   compared to the harm.
22              I would explain all that to her.  It would

110

1  then?

2  A.  I honestly don't know what he knew precisely at that

3      time. I don't recall, I don't know. I know that on

4      December 16 he had enough information from somewhere

5      to make an equivocal recommendation, as a matter of

6      fact. He comes down in favor of chemotherapy, but

7      it's something he favors and he very, very, very

8      appropriately points out that the question of

9      adjuvant therapy is debateable and though it may

10     subsequently have been shown to be erroneous, he

11     cites the pathologic information that was required

12     on his part to make the recommendations that he did.

13     Furthermore, I don't believe it is the duty of an

14     oncologist to verify whether or not a pathologist

15     has read a sample correctly or not. He is entitled

16     to rely on a pathologist.

17 Q.  Okay. I would like you to --

18 A.  By the way, that is only six weeks after her

19     surgery. Her surgery was November 12th; correct?

20 Q.  Her definitive surgery, the lumpectomy and the lymph

21     node dissection was --

22 A.  November 12th I believe, 1998; correct?