**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

ROOSEVELT POLLARD,                    :

         Plaintiff,                    :

         v.                    :         CIVIL NO. WDQ 02-CV-764

UNITED STATES OF AMERICA,             :

         Defendant.                    :
                   ...oOo...

**DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO**
**UNITED STATES'S OF AMERICA MOTION FOR SUMMARY JUDGMENT**

Defendant, United States of America, by Rod J. Rosenstein, United States Attorney for the

District of Maryland, and Larry D. Adams, Assistant United States Attorney for said District, submits

the following reply to Plaintiff's Opposition to United States of America's Motion for Summary

Judgment ("Pl.'s Opp.").

**I.  INTRODUCTION**

_____Having failed to prevail before a jury in his claim that Mrs. Pollard's treating oncologists

failed to properly treat her breast cancer, Plaintiff now seeks to overcome the Defendant's motion

for summary judgment by ignoring many facts and overstating other testimony.  Plaintiff states as

a given that the first treating pathologist, Dr. Stephen Adams, incorrectly diagnosed the tumor which

was removed from Mrs. Pollard in 1998.  Furthermore, the alleged misdiagnosis of the tumor lead

the treating oncologists, Dr. Gupta and Dr. Dodwell, not to aggressively treat Mrs. Pollard with

chemotherapy.  Pl.'s Opp. at 5-6. Plaintiff carefully ignores the testimony of the second treating

pathologist, Dr Quinn, who basically endorses Dr. Adams' report.  Therefore, Plaintiff' attempt to

pile one conjecture on another in order to try to create a genuine of material fact which would

prevent this Court from properly granting summary judgment for the United States is a house of cards. Plaintiff's attempt to obtain a second bite of the apple is unavailing because the evidence of record supports the United States' Motion for Summary Judgment.

## II. PROCEDURAL  HISTORY  OF THE CASE

It is helpful to recap the procedural posture of this case. On June 30, 2004, this Court dismissed all of the claims against the United States for lack of jurisdiction. Docket Paper No. 91. This Court found that Dr. Gupta's alleged negligence could not subject the United States to liability under the Federal Tort Claims Act ("FTCA") because he was an independent contractor. As to the claims based on Dr. Adams' alleged negligence, this Court held that plaintiff had "proffered no evidence" in support of these allegations. Pollard v. U.S., No. 05-1304, slip op. at 6 (4th Cir. Feb. 2, 2006)(per curiam). Instead of entering summary judgment, however, the district court dismissed these claims for lack of jurisdiction as well, holding that "[w]hen a court concludes that the United States is not liable for a party's actions pursuant to the FTCA, the proper practice is to dismiss the suite for want of jurisdiction" under Federal Rule of Civil Procedure 12(b)(1), rather than to grant summary judgment. Id. at 7-8.

The case against Dr. Gupta, Sterling Medical and Humana Military Healthcare underwent a jury trial on February 7, 2005.  On February 16, the jury rendered its decision on special verdict form.  The first question put to the jury  was whether  Dr. Gupta failed to comply with the standard of care in his treatment of Mrs. Pollard.  The jury answered affirmatively that Dr. Gupta had failed to comply with the standard of care.  The jury was asked to answer  whether Dr. Gupta's failure to comply with the standard of care was a proximate cause of Mrs. Pollard's damages and death.  The jury found that his failure to comply with the standard of care was not the proximate cause of her

2

death. Id. Consequently, Dr. Gupta was not held liable.

As regards the FTCA case against the United States, the Court of Appeals reversed and remanded the case back to this court for a decision whether to dismiss the claims premised on the pathology reports prepared by Dr. Adams, a government employee. The appellate court noted that the district court incorrectly disposed of the claims under Rule12(b)(1) when it should have applied a summary judgment standard. Pollard v. United States, No.05-1304, slip op. at 7-8   The United States, as the moving party, first had to show that plaintiff lacked evidence in support of his case:

> Before the burden ever shifts to the non-movant to come forward with record evidence establishing a genuine issue of material fact, the movant must first carry the initial burden of "pointing out the district court" those portions of the record "that there is an absence of evidence to support the nonmoving party's case."

Id. at 9 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

By remanding the case back to the district court with instructions to adjudicate summary judgment "with respect to the claims premised upon Dr. Adams' conduct with such supplemental briefing as the district court deems necessary." Id. at 11.  This briefing demonstrates that the effort to find the United States liable because of the alleged negligence of the first of the treating pathologists is not supported by the considerable evidence of record. The United States is helped immeasurably in this regard by the de bene esse testimony of the second treating pathologist, Dr. Cecily Quinn.

### III.  STATEMENT OF FACTS

Veronica Pollard was a civilian dependent wife of an active duty serviceman who served 20 years as an active duty soldier before retiring.   Veronica Pollard knew about cancer.  Her family history included her mother, her sister and an aunt, all who died from cancer.  Def.'s Mot. Summ.

J., Exh. 2 at 20.  In late September 1998 Mrs. Pollard noted the appearance of a lump in the lower outer quadrant of her right breast of two days duration.  Id. at 12.  On October 2,1998, she presented to Army physicians and a mammogram was ordered which was reported as normal: a fine-needle aspiration was then done.  The pathology report of this biopsy revealed, "Atypical cells are present. Cannot rule out malignancy."  Id. at 14.

Mrs. Pollard then had a breast biopsy on October 14, 1998, which revealed "infiltrating carcinoma with medullary features."  Mrs. Pollard was preliminarily staged  T1bNxMx.[1]  Id. at 16. On November 10, 1998, Mrs. Pollard underwent a bone scan, which was reported as negative.  Id. at 17.  On November 12, 1998, Army surgeons performed a lumpectomy and an axillary node dissection.  The results showed no residual tumor and all 17 nodes were negative. Id. at 18.[2]

Following these results, the treating oncologist, Dr. Gupta was consulted, and changed the stage of her cancer to T1N0M0 (i.e., small tumor found on scale of 1 to 4, no cancer in lymph nodes, no cancer in other parts of the body).  Id. at 17. Dr. Gupta's plan was to see the results of the estrogen and progesterone receptors.  If they were positive, then he would treat her with Tamoxifen.  If they were negative, he recommended chemotherapy using Adriamycin and Cytoxan for four cycles.  He then would plan on giving radiation to the right breast for local control and would do this after chemotherapy, if she consented to the chemotherapy.  Dr. Gupta also recommended, partly because

---

[1]  According to the National Cancer Institute website, the TNM system is one of the most commonly used staging systems for cancer. http://www.cancer.gov/cancertopics/factsheet/Detection/staging See Pl.'s Mot. Summ. J at 4, ft 1.

[2]  It is very significant that the lymph nodes were not involved.  According to Plaintiff's argument, it is tumor size and lymph node status which determine prognosis and chemotherapy. Pl.'s Opp. 12-13.  The fact that the lymph nodes were clear is completely overlooked by Plaintiff.

4

of the family history, that he would consider using Tamoxifen even if the receptors were negative. Id. at 20-21.  Finally, Dr. Gupta in a note dated December 14, 1998, stated that he "leans toward offering adj[uvant]. chemo[therapy]  (some oncologists may feel that adj. chemo is not indicated for this patient). Id. Exh. 3.  He would also recommend "XRT [radiation] to breast and Tamoxifen...for 5 years for prevention of new breast cancer."  Id.  He also noted that [Mrs. Pollard] "plans to move to England and he will give her pertinent records."  Id.

Because Dr. Gupta understood from his patient that the family was going to be transferred overseas to England late January 1999, he wrote letter dated December 16, 1998, addressed to "Whom It May Concern."  The letter was written by Dr. Gupta in anticipation of Mrs. Pollard voluntarily accompanying her husband to his next duty assignment letter that the estrogen and progesterone receptors were negative and stated, in pertinent part,  that the tumor was very small, 0.5-cm, and "medullary features, which are of favorable prognosis."  Def.'s Mot. Summ. J. Exh. 4 at 11.

Mrs. Pollard was referred to Dr. David Dodwell, clinical oncologist at Cookridge Hospital, Leeds, England, on February 3, 1999 shortly after arriving  in at her husband's duty station.   It is significant to note that the time between December 15, 1998 and February 1999 was spent by  the family was on leave; they were visiting and staying with relatives.  Crucial to case and fatal to Plaintiffs' various theories of liability, Mrs. Pollard did not seek any medical treatment for her cancer during this six week period (December 15, 1998  to January 31, 1999).

Dr. Dodwell saw Mrs. Pollard on February 19, 1999, and noted that because of the negative estrogen receptors, Mrs. Pollard would not gain anything by the use of Tamoxifen.  He further noted that, "The prognosis should really be good and the only thing that might make one consider the use

5

of chemotherapy is her young age. However, despite this, I have not recommended that she have adjuvant chemotherapy and on discussion she is very content with this." Def.'s Mot. Summ. J., Exh. 4 at 9.

Mrs. Pollard underwent a second diagnostic work-up in England. Her pathology slides were obtained from the United States and reviewed by Dr. Cecily Quinn. Dr. Quinn confirmed what Dr. Adams had observed. Her oncologist, Dr. Dodwell saw Mrs. Pollard on February 19, 1999, and noted that because of the negative estrogen receptors, Mrs. Pollard would not gain anything by the use of Tamoxifen. He further noted that, "The prognosis should really be good and the only thing that might make one consider the use of chemotherapy is her young age. However, despite this, I have not recommended that she have adjuvant chemotherapy and on discussion she is very content with this." Id. at 9. In other words, she had another chance to undergo chemotherapy that was recommended or taken.

It should also be noted that when Mrs. Pollard was diagnosed with cancer and returned to the United States she underwent chemotherapy in June 12, 2000 at Walter Read Army Medical Center. Def.'s Mot Summ J. Exh. 6 at 12. Consequently, for Plaintiff to insist that she had to begin chemotherapy while in the United States in 1998 in order to derive an benefit from such treatment is not supported by the record. Ultimately the treatment was unsuccessful and she died on December 29, 2003 just as the cancer had taken her mother, sister and aunt.

## IV. LEGAL STANDARD

The party moving for summary judgment carries the initial burden of production to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of

material fact."Celotex Corp. v. Catrett, 477 U.S. 317, 323, (1986)  The moving party may discharge

this burden by " 'showing'--that is, pointing out to the district court--that there is an absence of

evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party satisfies this burden, the nonmovant must "set forth specific facts

showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The nonmovant must do more,

however, than demonstrate some factual disagreement between the parties; the issue must be

"material." Cray Communications, Inc. v. Novatel Computer Sys., Inc., 33 F.3d 390, 393-94 (4th

Cir. 1994). Irrelevant or unnecessary facts do not preclude summary judgment even when they are

in dispute.  In determining whether the nonmovant has identified a "material" issue of fact for trial,

courts are guided by the applicable substantive law; therefore only disputes that could affect the

outcome of the suit under governing law will properly preclude the entry of summary judgment.

Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir.1994)  Furthermore, a factual dispute is "genuine" for

summary judgment purposes only when there is "sufficient evidence favoring the nonmoving party

for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249,

(1986). Hence, a "metaphysical doubt" regarding the existence of a genuine fact issue is not enough

to stave off summary judgment, and "the nonmovant fails to demonstrate a genuine issue for trial

'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving

party....." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587,  (1986)).

Despite objection from the Plaintiff, the Defendant still contends that doctrine of collateral

estoppel applies.  It is Mrs. Pollard's unwillingness to undergo chemotherapy that lead the jury to

conclude that Dr. Gupta's violation of the standard of care was not the proximate cause of her

injuries and death.  The jury's decision on the issue of proximate cause was necessary to a final

judgment and the Plaintiff had a fully opportunity to litigate the issue. The Plaintiff would have the Court believe that pathologist's report was so far off the mark that it would have totally altered Dr. Gupta's approach to his patient.    Because Mrs. Pollard had a second oncologist and pathologist review her records and specimens, the Court need not engage in speculation.  Those second opinions given in England resulted in the same course of treatment. That is because the second opinions of Dr. Quinn and Dr. Dodwell are like a second pathway merging into the first which Dr. Gupta and Dr. Adams started.  Therefore, the somewhat elastic criteria for the doctrine of collateral estoppel has been met.  See  Virginia Hosp. Ass'n. v. Baliles, 830 F. 2d 1308, 1311-12 (4th Cir. 1987), aff'd on other grounds, 496 U.S. 498 (1990).

As the sole trier of fact in this Federal Tort Claims Act case, the Court has at its disposal the findings of the jury, and the viva voce testimony of the witnesses which found Dr. Gupta breached the standard of care but still found he was not liable as to causation for Mrs. Pollard's death and damages. 28 U.S.C. Section 2402.  The Court can be guided by its recollection of the trial testimony.

## V.  ARGUMENT

When Mrs. Pollard made the initial complaint of soreness of her right breast, Army physicians acted quickly.  A mammogram was taken which was negative.  A fine needle aspiration was done which showed some atypical cells.  An excisional biopsy was immediately ordered. Pathology did a complete work-up of the tissue, and it was determined that Mrs. Pollard had an "infiltrating carcinoma with medullary features."  A bone scan was done which was negative.  Fifth, a lumpectomy and axillary node dissection was performed.  Again, pathology was consulted, and it was shown that there was no residual tumor  and that all 17 lymph nodes were negative.  Finally, tests were done to check for estrogen and progesterone receptors, both of which were negative.

8

Def.'s Mot. Summ. J. 4-5.

Plaintiff argues Mrs. Pollard never received the chemotherapy that would have definitely saved her life. [3]  Pl.'s Opp. 2  Plaintiff maintains that standard of care would have required that Dr. Gupta "unequivocally" recommend Mrs. Pollard immediately begin chemotherapy in the United States and not be allowed to leave for England.  Id.  As part of this argument, Plaintiff alleges downstream health care providers were also adversely impacted in their recommendations because they also relied on Dr. Adams faulty findings.  Id.  However, this argument is simply not supported by the evidence. The Plaintiff ignores the new work up done by the English physicians.

The pathology reports were available for Dr. Gupta by mid-December 1998, well within the time that Dr. Gupta stated adjuvant chemotherapy should have begun.  Def.'s Mot. Summ. J, Exh.7, Dr. Gupta Dep. at 26-27.  From the time of her initial complaint through her surgery until her departure from Georgia the process lasted 2.5 months from October through mid December 1998.

Dr. Gupta testified at trial that when he first saw Mrs. Pollard on December 1, 1998, he explained to her that the receptor studies were not available at that time.  Def.'s Mot. Summ. J., Exh. 10 at 18.  He also testified that if the receptors were positive he would have  recommended Tamoxifen; if the receptors came back negative then he would have recommended chemotherapy.  Id.  He also testified that he explained on December 1, 1998, that there were side effects if chemotherapy was undertaken.  She was advised to discuss these side effects with her family and friends. Since Dr. Gupta was given to understand that chemotherapy had been used in her family, his advice and the patient's experience would allow her upon her return visit to come better prepared

---

[3]  Plaintiff states that the government conceded Dr. Adams' negligence. Pl.'s Opp. 2. That is simply not correct as shown herein.

to discuss whether she elected to undergo chemotherapy.[4]  Def.'s Mot. Summ. J., Exh. 10 at 18-19. He also explained that he recommended five years of radiation.  If she underwent chemotherapy the radiation would commence afterwards.  If she elected not to undergo chemotherapy, then he would have recommended only radiation and Tamoxifen for five years.  Def.'s Mot. Summ. J., 10 at 19. Ultimately, the receptor studies were positive, thus tending <u>against</u> chemotherapy.

Dr. Gupta was also asked if he was concerned when the English oncologist, Dr. Dodwell, did not recommend chemotherapy.  <u>Id</u>. at 45.  Dr. Gupta testified that he was not concerned because the risk/benefit ratio is "very much equal here."  <u>Id</u>. at 45.   It was a "close call either way" if chemotherapy was not recommended.  <u>Id</u>.  Since the benefit is "perhaps 2%" increased chance of survival, it is the patient's call.  <u>Id</u>. 45-46.   This two percent difference is markedly different from the Plaintiff's stark contention that a timely and accurate report would have resulted in Mrs. Pollard's receiving chemotherapy and such treatment would have saved her life.  Pl.'s Opp. at 10 and 20.  The sounder conclusion is that it is impossible to know.

At trial, Dr. Gupta was asked  how soon chemotherapy should be undertaken if elected.  <u>Id</u>. at 82-95   Despite the suggestion made by plaintiff's counsel that four to six weeks after the "definitive surgery" was the appropriate time period, Dr. Gupta maintained that under nationally recognized standards it more like "84 days, 12 weeks after definitive surgery."  <u>Id</u>. at 86.  Even when further pressed on this issue, Dr. Gupta stated that Mrs. Pollard had time extending into January 1999 and perhaps later to begin chemotherapy if she so elected.  <u>Id</u>.  at 88-89.  Indeed, when she returned to the United States in 2000, almost two years later, she underwent chemotherapy at that late date.

---

[4]  At trial the plaintiff's expert pathologist acknowledged that chemotherapy has side effects, including loss of hair and "gastrointestinal disorders."  Def.'s Mot. Summ. J., Exh. 11 at 29-30.

Moreover, she lead Dr. Gupta to believe that she was leaving for England shortly after Christmas 1998, where she would continue treatment.  Id. at 90-91.  That is exactly what she did.

In this case, Plaintiff's claims of medical malpractice revolve around the oncology care provided by Dr. Gupta.  Plaintiff deliberately ignores the full range of treatment provided in England. At this stage of the litigation the controlling fact should be that pathology reported carcinoma in the patient.  Based on the pathology, the surgical findings and other criteria, Dr. Gupta recommended that chemotherapy be administered.  It was Dr. Gupta's care and advice which the patient ignored. Dr. Dodwell also discussed chemotherapy and did not recommend it.  Mrs. Pollard's decision not to undergo chemotherapy is precisely what the jury relied upon when it absolved Dr. Gupta of liability, despite finding he failed to comply with the standard of care.

Plaintiff argues that there is evidence to substantiate the Plaintiff's allegations of Dr. Adams' negligence.  This alleged shortcoming is premised on "failing to obtain pathologic and laboratory information regarding the characteristics of Mrs. Pollard's cancer within a reasonable period of time, by misidentifying the size and other characteristics of the cancer in the pathologic examination." Def.'s Mot. Summ. J., Exh. 6 at 11, affidavit of L.F. Smith.  Plaintiff's further quotes Dr. Smith's affidavit that the standard of care requires the surgeon, oncologist, pathologist and other medical doctors to complete the pathologic studies and begin chemotherapy for adjuvant treatment of Mrs. Pollard's breast cancer within 4-6 weeks of her initial diagnosis of breast cancer.  Id.

However, there is no evidence that Dr. Gupta would have started radiation earlier.  In fact he testified that:

> It depends on the case. Normally if everything is going okay, meaning there is no complication in healing, then it started somewhere about four to six weeks after the surgery when the wound has all healed.  It also depends on whether the patient is

11

      going to get adjuvant chemotherapy.  If the patient gets chemotherapy then radiation
      is given normally after the chemotherapy is completed, which could be as late as six
      months after the surgery.

Def.'s Mot. Summ. J., Exh. 7, Dr. Gupta Dep. at 26-27.

      When Dr. Gupta last saw Mrs. Pollard in December 15, 1998, it had been a little more than

four weeks since her last surgical procedure which was on November 12, 1998.  At that time the

surgeons had performed a lumpectomy and an axillary node dissection.  The results showed no

residual tumor and all 17 nodes were negative.  In other words, the prognosis was very favorable.

      To keep this case alive, Plaintiff criticizes Dr. Adams for a delay in sending out Mrs.

Pollards' specimens for DNA and hormonal studies.  Pl.'s Opp. at 6.  However, while Dr. Gupta

agreed that the specimens should have been sent out earlier, there is no evidence that receiving the

studies by December 1, 1998, (i.e., the first meeting with Dr. Gupta) would have made any difference

in his diagnosis or recommendations.  In fact, when confronted with this line of questioning by

Plaintiff's counsel at trial, Dr. Gupta said:

      My notes from December 1st outlines these different scenes if her receptor would be
      negative or positive, and my note says if she was receptor positive I would
      recommend adjuvant tamoxifen and if she was receptor negative I would recommend
      chemotherapy and I would also recommend radiation to her breast.

Def.'s Mot. Summ J., Exh. 7, Dr. Gupta Dep at 46.

      Dr. Gupta further explained that he " would [have told] her that her breast cancer is in an

early stage, the tumor is very small, and the smaller the tumor the more favorable it is, the lower the

risk of spreading or recurrence.  Her lymph nodes were all negative and that's a good prognostic

indicator.  Most of the tumors of this size, that is point five centimeter [0.5], are detected by

screening mammography and not, and not present as a palpable tumor.  In her case, it is somewhat

unusual in that regard.  We know that tumors that are this small have a very good prognosis and many times we do not recommend any adjuvant chemotherapy.  Since there is something unusual about her case I would explain to her I favor giving her chemotherapy." Id. at 47

 The fact of that matter is despite Dr. Gupta's recommendation,  Mrs. Pollard chose not to have chemotherapy.  Whether Dr. Gupta should have insisted she start it immediately or by January 1, 1999 (Id. at 74-75) or wait until she arrived in England, nevertheless, it was Mrs. Pollard decision to make.  But the relevant point is that the pathology information was in the hands of the treating oncologist and was sufficient for him to recommend chemotherapy.  Despite the conjectures that Plaintiff now posits, there is insufficient evidence to support the contention that the information provided to Dr. Gupta was lacking or untimely.

Plaintiff argues that  Dr. Gupta also testified that the standard of care for a tumor greater than one centimeter is to order chemotherapy.  Pl.'s 3.  Specifically, Plaintiff contends that if Dr. Gupta had accurate pathology results he would not have, "written the letter on December 16, 1998 entitled to "Whom it May Concern" which stated the efficacy of chemotherapy is somewhat debatable giving ... UK doctors the mistaken factual predicate allowing them to join in his equivocality regarding the efficacy of chemotherapy."  Pl.'s Opp. 8.  But this argument is too clever by half,  because Dr. Dodwell obtained his own pathology report.  Dr. Dodwell ordered the slides from America.  They were read by Dr. Cecily Quinn.  In order for the Plaintiff to succeed in discrediting Dr. Adams the Plaintiff would also have to discredit Dr. Quinn.  Plaintiff did not attempt and cannot find fault with Dr. Quinn because she came to the same conclusion as Dr. Adams.

Despite this failure in the evidence, Plaintiff maintains that,  "By the time that Dr. Dodwell was made aware of Dr. Adams errors it was too late for Mrs. Pollard to obtain the benefit of the

chemotherapy."  Pl.'s Opp. at 6.  (Of course, this argument about the efficacy of chemotherapy is contradicted by the fact that she underwent Chemotherapy in 2000 when the cancer resurfaced.)

Dr. Quinn testified that, although the language she used in her report as a British trained pathologist is slightly different from Dr. Adams' language, the reports are not different.  Def.'s Mot. Summ. J., Exh. 8,  Dr. Quinn Dep. at 11-13.  Specifically, she testified that Dr. Adams' cytology description of "high grade tumor" is "not dissimilar" from her own description. Id.  With regard to the medullary features, both she and Dr. Adams described the specimen as "suggestive of medullary but overall did not fulfill this criteria."  Id.

Regarding the size of the tumor upon which Plaintiff bases so much of his argument, we have the following question put to Dr. Quinn and by Plaintiff's counsel:

> Question:  Okay. Now, in the next second page of your letter , you indicate the tumor measured 11 mm.  And I believe that the report that you had from Dr. Adams indicated that his measurement .5 cm.  Do you have any understanding of why the difference in the measurement between your measurement and the report you received from Dr. Adams in Georgia?

Exh. 1, Quinn De Bene Esse Dep. at 7-8.

In  response, Dr. Quinn explained how she measured the slides, how the measuring might be different and the use of recut slides:

> Answer: My understanding from reading Dr. Adams' report is that the tumor was measured in the gross specimen and not microscopically. I measured , I didn't  have the gross specimen so I didn't obviously measure it on the gross specimen.  So I measured the tumour on the slide and sometimes tumours can appear a little smaller on the gross tumour or indeed a little larger for different reasons.  Sometimes you can see a well-defined lesion and then perhaps the tumour can spread out a little more into the tissue, so that is one possibility that it was bigger microscopically than grossly.  Also, as we discussed earlier I may have examined recuts and sometimes the tumour can be slightly bigger on a recut than it is on the original because one is cutting through a block of tissue.

Exh. 1, Quinn De Bene Esse Dep. at 8.

In further elaborating on the size issue, Dr. Quinn explained that size can vary:

Answer: I think it is fair to say that tumours can vary from one section to another in size. It is well documented that as you cut through a block, a tumour may be larger or smaller, so I think it is reasonable to include that in the assessment of the size difference.

Exh.1, Quinn De Bene Dep. at 9.

The upshot of this testimony is that another treating pathologist, not an expert at trial, found no fault with Dr. Adams' report. No fault was found with the size issue or the grade of the tumor. If this testimony were otherwise, the Court can rest assured Plaintiff would have used it to his advantage in his opposition

Furthermore, when the defendant's expert pathologist, Dr. David Page, was asked if patients with a high grade tumor would stand to benefit the most for adjuvant treatment he testified that "Yeah, It is my belief and understanding that high grade tumors are more likely to benefit . However, I need to say those decisions are very much between clinicians and patients, and that most clinicians believe that any young woman benefits from chemotherapy. So even the low grade cases of women, certainly in the age group under 40, if not under 45, are usually encouraged to take chemotherapy." Def.'s Mot. Summ J., Exh. 9, Dr. Page Dep. at 39-40.

This testimony was further buttressed by the statements of Dr. McTighe, Plaintiff's expert at trial, that the treating oncologist was entitled to rely on the information provided by Dr. Adams "in order to address the subsequent clinical course of the patient." Def.'s Mot Summ. J., Exh. 11 at 53-54. Nowhere in his trial testimony did Dr. McTighe find fault with the work of Dr. Adams. Rather, his testimony endorsed the description of the tumor given by Dr. Adams, to wit: "This tumor

is a high grade, poorly differentiated tumor and that is described in the original biopsy report by Dr. Adams." Def.'s Mot. Summ. J., Exh. 11 at 49.   Indeed, Dr. McTighe stated that the description of the tumor as high  grade was "immediately available" and Dr. Gupta did not need the report on the receptors to indicate that chemotherapy must be considered by the oncologist.  Id. at 52.  This endorsement of Dr. Adams completely undercuts Plaintiff's current arguments.

In summary, Veronica Pollard chose to move to England with her husband, and consented to the course of treatment by English physicians which did not include chemotherapy.   Both the American and English oncologists had their respective pathologists review the pathology slides. The American oncologist recommended chemotherapy, the English oncologist discussed the matter but was not strong in recommending such a course of treatment.   For her own reasons, despite a family history of cancer, she chose not to undergo chemotherapy. The English pathologist measured the tumor on the slide as 11 millimeters, that did not trigger the English oncologist to prescribe chemotherapy that Plaintiff argues was required.

## VI.  CONCLUSION

For the foregoing reasons, the United States of America,  respectfully requests that the Court grant summary judgment on its behalf.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

By:_____/s/_____
        Larry D. Adams
        Assistant United States Attorney
        36 South Charles Street, 4th Floor
        Baltimore, Maryland 21201
        410-209-4800

16

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing was electronically filed this 18th

day of October, 2006 to:

> Bruce J. Klores, Esq.
> Scott Perry, Esq.
> Bruce J. Klores, and Associates, P.C.
> 915 15th Street, N.W.
> Washington, D.C. 20005
>
> .

> _____/s/_____
> Larry D. Adams
> Assistant United States Attorney