## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Baltimore Division

| | | |
|---|---|---|
| **ROOSEVELT POLLARD, as** | ) | |
| **Surviving spouse, and as Personal** | ) | |
| **Representative of the Estate of** | ) | |
| **VERONICA POLLARD, deceased** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **C.A. WDQ-02-CV-764** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### PLAINTIFF'S PROPOSED FINDINGS
### OF FACT AND CONCLUSIONS OF LAW
### (Thursday, April 12, 2007)

This Federal Tort Claims Act action was tried to the Court, sitting without a jury, from April 23, 2007 through April 27, 2007. Plaintiff filed a two count second amended complaint. Count I set forth a wrongful death claim grounded on medical negligence pursuant to Georgia's wrongful death statute, O.C.G.A. §§ 51-4-1 and 51-4-2. Count II set forth a separate survival action also based on medical negligence. The Court has considered the record evidence submitted by the parties, made determinations as to its relevancy and materiality, assessed the credibility of the witnesses, both written and oral, and ascertained for its purposes the probative significance of the documentary and visual evidence, pursuant to Fed. R. Civ. P. 52(a), the Court finds the following facts to have been proven by a preponderance of the evidence, and applying the applicable law to such fact findings, makes the following conclusions of law.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A.     **JURISDICTION AND VENUE**

1.     This is a health care negligence case brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §2671 (2007) <u>et seq.</u> ("FTCA").  (Ref. ¶ Req. for Admissions.)

2.     The plaintiff is Sergeant Roosevelt Pollard, as surviving spouse and Personal Representative of the Estate of Veronica Pollard, his deceased wife. The case involves tort claims by the Sgt. Pollard based on medical care that was furnished by the United States of America, through employees acting within the course and scope of their employment, at a hospital known as Dwight D. Eisenhower Medical Center ("DDEMC") at Ft. Gordon, Georgia, to Veronica Pollard, a civilian military dependent spouse, in the Fall of 1998.  At that time, Sgt. Pollard was active duty in the United States Army, stationed in Ft. Gordon. (Ref. ¶ Req. for Admissions.)

3.     The remedy against the United States of America under the FTCA is exclusive with regard to claims based upon torts of federal employees acting within the scope of their employment.  28 U.S.C. §2679 <u>et</u>. <u>seq</u>.  To invoke the litigation provisions of the FTCA, the claimants must bring their action against the United States of America, specifically naming it as defendant.  (Ref. ¶ Req. for Admissions.)

4.     The defendant in this case is the United States of America.  The Department of Defense and the Department of the Army are agencies of the United States of America.  The United States of America, through its agencies,

the Department of Defense and the Department of the Army, at all times material hereto, owned, operated and controlled DDEMC. (Ref. ¶ Req. for Admissions.)

5.     In 1998, and at all times relevant to this lawsuit, Capt. Stephen Adams, M.D., was an employee of the United States of America for the purposes of and subject to the FTCA. Capt. Stephen Adams was acting within the scope of his employment as a pathologist with the United States of America pursuant to 28 U.S.C. §2679 in October, November and December 1998, and at all times relevant to this lawsuit, when he provided the medical care that is at issue. (Ref. ¶ Req. for Admissions.)

6.     On or about October 2, 2000, the Department of the Army received by certified mail, return receipt requested, two separate SF 95 forms constituting the administrative claims of Sgt. Pollard and Mrs. Pollard. The *ad damnum* clauses in the SF-95 forms each set forth a separate claim in the amount of $10 million for each of the Pollards. Plaintiff therefore timely and properly presented his claims under the FTCA with the appropriate federal agency arising out of the medical and health care received by Mrs. Pollard at DDEMC at Ft. Gordon, Georgia.

7.     The Pollards filed their complaint and amended complaint in a timely manner and within the relevant administrative deadlines and statutes of limitation.

8.     This lawsuit was timely filed in this Court on March 11, 2002. Plaintiff has complied with all jurisdictional and procedure prerequisites with regard to the filing and pursuance of this litigation. (Ref. ¶ Req. for Admissions.)

9.      The United States District Court for the District of Maryland has jurisdiction in this case under the provisions of 28 U.S.C. §1346(b).  (Ref. ¶ Req. for Admissions.)

10.      Venue in this case is proper in the United States District Court for the District of Maryland pursuant to 28 U.S.C. §1402(b), because at the time of filing the complaint, the Pollards resided in this judicial district, more specifically in Odenton, Maryland.  Under the FTCA, venue is proper either where the medical care took place, or where the plaintiff resides.  Defendant has not challenged jurisdiction or venue.  The claims of the Plaintiff against the United States of America are properly before this Court.  (Ref. ¶ Req. for Admissions.)

11.      The suit initially joined the United States of America as a party defendant.  The Court dismissed the Government on June 30, 2004.  The dismissal was reversed by the Fourth Circuit Court of Appeals in <u>Pollard v. United States</u>, 166 Fed. Appx. 674 (4th Cir. 2006), and remanded to this Court. After remand, the defendant United States of America moved for summary judgment.  Sgt. Pollard opposed this Motion.  The Court denied this Motion on November 2, 2006, and set this matter for trial on the merits.

12.      The United States of America has answered Plaintiff's second amended complaint, has entered an appearance in this case, and has defended the litigation.

**B.      <u>PLAINTIFFS' BACKGROUND</u>**

13.    Sgt. Pollard was born and raised in Brooklyn, New York.    He graduated from East New York High School in 1983.    (Ref. ¶ Req. for Admissions.)

14.    Sgt. Pollard was married to Veronica Pollard ("Mrs. Pollard") between June 22, 1992, and December 29, 2003.  (Ref. ¶ Req. for Admissions.)

15.    Mrs. Pollard was born on April 19, 1955.  Mrs. Pollard graduated from high school in 1972.

16.    Mrs. Pollard died of metastatic breast cancer on December 29, 2003, at age 48.

17.    Sgt. Pollard and Mrs. Pollard had one child together, their son Benjamin, who was born August 8, 1997.

18.    Mrs. Pollard has three other children:  James Phelps (born August 22, 1972), Shantrece Brown (born August 4, 1975), and Lynn Pollard (born December 7, 1984).  Roosevelt Pollard legally adopted Lynn Pollard.

19.    Mrs. Pollard's beneficiaries include her husband, Roosevelt Pollard, and her four children, James Phelps, Shantrece Brown, Lynn Pollard, and Benjamin Pollard.

20.    Mrs. Pollard retired from the United States Army after approximately 15 years of service in February, 1995, with the rank of Sergeant.

21.    In 1996, Mrs. Pollard became employed as a Technical Instructor for GTE.

22.    In 1999, while in the United Kingdom, Mrs. Pollard was employed by Management Technologies, earning $33,280.00 per year.  In addition, she

received $17,428.00 a year in housing and *per diem* allowances.  Mrs. Pollard's total annual income while employed by Management Technologies was $50,708.00.

## C.    MEDICAL FACTS

23.    Mrs. Pollard felt a lump in her right breast in late September, 1998.

24.    Mrs. Pollard was African American with a strong family history of breast cancer.  Her sister died of breast cancer at age 29.  Her mother also died of breast cancer.

25.    In September, 1998, Sgt. Pollard was stationed in Kuwait with the United States Army.  Mrs. Pollard called Sgt. Pollard while he was in Kuwait and told him that she had found a lump in her breast.  As a result, the Red Cross arranged for Sgt. Pollard to travel to Ft. Gordon to be with his wife.

26.    After finding the lump, Mrs. Pollard went to see the doctors at DDEMC to have it examined.

27.    On October 2, 1998, Mrs. Pollard underwent a fine needle aspiration of the lump.

28.    Microscopic examination of the fine needle aspiration specimen revealed suspicious "atypical" cells.

29.    On October 14, 1998, Mrs. Pollard underwent an excisional biopsy of the lump.  Dr. David Sees, an Army surgeon, performed the excisional biopsy.

30.    Dr. Sees sent the removed tumor (the "Tumor") to Dr. Adams, an Army pathologist, on October 14, 1998.

31.    Dr. Adams measured the gross size of the Tumor as 0.5 centimeters at its greatest diameter.  Dr. Adams never measured the Tumor under the microscope.  Dr. Adams stated in a written report dated October 19, 1998 (the "Report"), that the greatest size of the cancer was 0.5 cm.

32.    The size of the cancerous Tumor was larger than 0.5 centimeters.  In fact, the actual size of the Tumor was at least 1 centimeter.  Thus, Dr. Adams should  have classified it as a T1-c tumor using the existing protocols, meaning a tumor greater than 1.0 cm.

33.    Dr. Adams also stated in his Report that the edges of the Tumor were "extremely close to the surgical resection margins."  In fact, the Tumor extended all the way out into the margins of the excised tissue.

34.    Dr. Adams' Report also described the Tumor as "infiltrating carcinoma with medullary features."  In October 1998, it was generally known by physicians specializing in breast cancer that breast tumors with medullary features had a good prognosis.

35.    Dr. Adams did not give any numerical histologic rating for the Tumor in his Report.

36.    As the pathologist who examined the Tumor, Dr. Adams was responsible for sending a tissue sample to a special outside laboratory -- IMPATH – for additional analysis.  It was his obligation to do this within a few days, at most, after the October 14, 1998 biopsy surgery.  The additional tests from IMPATH included an analysis of the estrogen receptor ("ER") and progesterone

receptor ("PR") markings of the cancer and were relevant to assist Mrs. Pollard and her doctors in making treatment choice(s) for her cancer as soon as possible.

37.    Dr. Adams did not send, nor arrange to send, a tissue sample from the Tumor to IMPATH for seven weeks, or December 4, 1998.  He had no explanation for this delay, but conceded it was his responsibility to arrange for this testing as soon as possible.

38.    The "tumor board" at DDEMC was a regular meeting of cancer physicians who would go over a patient's case and decide on treatment plans. Tumor boards are attended by breast cancer surgeons, pathologists, radiologists, and oncologists.  The tumor board met on October 26, 1998 for the first time about Mrs. Pollard.  The notes from that meeting indicate that tumor board physicians believed that Mrs. Pollard's tumor was only .5 cm, was extremely close to the margins, and that ER/PR tests were pending.  The plan was to proceed with a lumpectomy and lymph node dissection.

39.    Mrs. Pollard underwent a whole body bone scan on November 10, 1998, to determine whether there was any cancer in her bones.  Fortunately the scan was negative (no evidence of bone cancer).

40.    On November 12, 1998, Dr. Sees performed a lumpectomy to remove a wider margin of tissue in the area from which the Tumor had been removed.  He also dissected and removed 17 lymph nodes, to check if there was any evidence that cancer had spread from the tumor to the lymph nodes.

41.    The breast tissue and lymph nodes were sent to the pathology laboratory at DDEMC for additional microscopic examination.  Col. Moo Hwang,

M.D., a pathologist, did the analysis. Dr. Hwang found that there was "no residual malignancy" in any of the removed breast tissue. He also reported that all 17 removed lymph nodes were "negative for malignancy." The records indicate, and the parties agree that as of November 12, 1998, there was no evidence, either microscopically or grossly that Mrs. Pollard's cancer had spread, either through her vascular or lymphatic systems.

42.    Dr. Sees told Mrs. Pollard that while he would personally recommended chemotherapy, it was up to her oncologist, Dr. Gupta, to make that decision.

43.    Through no fault of her own Mrs. Pollard did not see the oncologist, Dr. Raj Gupta, at DDEMC until December 1, 1998. When Mrs. Pollard saw Dr. Gupta that day, he did not have all the pathology reports and studies from IMPATH that he was expecting and needed. Dr. Gupta told Mrs. Pollard that because the pathology analysis was incomplete, he could not yet discuss any treatment options with her, or make any recommendations. Instead, Dr. Gupta rescheduled Mrs. Pollard for an appointment on December 15, 1998, one day before the Pollards were scheduled to leave Ft. Gordon for England, where Sgt. Pollard had recently been reassigned by the Army.

44.    Notwithstanding the fact that Mrs. Pollard's cancer was firmly diagnosed on October 14, 1998, over two months passed before Dr. Gupta (or any oncologist) gave Mrs. Pollard any advice about what type of therapy she needed for her cancer.

45.    IMPATH, in a report dated December 8, 1998, found that the Tumor was estrogen and progesterone receptor negative.  This meant that Mrs. Pollard was not a candidate for hormone-based cancer treatments, one of the mainstays of post-operative medical management of breast cancer.

46.    When Mrs. Pollard saw Dr. Gupta again on December 15, 1998, Dr. Gupta told her that the Tumor was very small, based on Dr. Adam's 0.5 cm. measurement.  This, of course, was wrong.

47.    In December 1998, it was generally accepted among oncologists in the United States that chemotherapy should be strongly recommended for an African American woman like Mrs. Pollard who was pre-menopausal, with a strong family history of breast cancer, with a tumor of 1.0 cm. or more, even with no lymph node invasion.  Indeed, the standard of care required a reasonably prudent oncologist under these circumstances to strongly recommend chemotherapy and radiation therapy for Mrs. Pollard to start as soon as possible. The purpose of adjuvant chemotherapy is to eradicate any cancer cells that may have been microscopically released into the blood stream but were undetected before they have a chance to multiply and spread.

48.    Because of Dr. Adams' errors, Dr. Gupta concluded that the benefits of chemotherapy were debatable and did not strongly recommend that Mrs. Pollard immediately begin adjuvant chemotherapy for her cancer.  Instead, in mid-December 1998, Dr. Gupta cleared Mrs. Pollard to go to England, and wrote a "to whom it may concern" letter, dated December 16, 1998, to whatever oncologist would treat her abroad stating that chemotherapy for her was

"somewhat debatable," noting that size of the Tumor was only 0.5 cm.  Dr. Gupta admitted at trial that he was leaving the decision about chemotherapy up to Mrs. Pollard's United Kingdom oncologist, and recognized that at .5 cm. many oncologists would not recommend chemotherapy.

49.    The Pollards left Ft. Gordon in mid-December 1998, bound for England.  At no point prior to the Pollards' departure did any physician advise the Pollards that Mrs. Pollard should definitely start prompt chemotherapy.   At no point were the Pollards advised by any physician that chemotherapy had critical importance as adjuvant treatment for Mrs. Pollard's breast cancer.  At no point prior were the Pollards advised by any physician that chemotherapy for Mrs. Pollard's cancer should be started as soon as possible after the lumpectomy on November 12, 1998.  Had Mrs. Pollard been told these things, she would not have left Ft. Gordon for England in December 1998.  Instead, she would have stayed at Ft. Gordon and undergone chemotherapy.  In early to mid-January, 1999, after a few weeks of vacation, the Pollards arrived in England, and Sgt. Pollard reported for duty.

50.    Mrs. Pollard never received any chemotherapy treatment for her cancer once she reached England.  She received only radiation, beginning in April 1999.

51.    In April 1999, a pathologist in England examined re-cut slides from the Tumor and found that it was, in fact, 1.1 cm. in size.

52.    In 1999 Mrs. Pollard was gainfully employed in her field of specialty, electronics, at a salary of $50,700.00 per year.

53.    In May, 2000, a biopsy of tissue from Mrs. Pollard's right breast revealed re-current cancer.

54.    Mrs. Pollard returned to Washington, D.C. in June 2000, where at Walter Reed Army Hospital she was diagnosed with recurring breast cancer.   The cancer in June 2000 grew from the untreated microscopic cancer left behind in 1998.

55.    Mrs. Pollard received her first chemotherapy for cancer in June, 2000.

56.    Thereafter, she underwent a right mastectomy and suffered through many surgeries because of the recurrent cancer.

57.    For approximately three years, Mrs. Pollard endured one debilitating cancer treatment after another.  She fought courageously to extend her life to help her family, and in particular her seven year old son, Benjamin.  Those treatments failed, however, and Mrs. Pollard died on December 29, 2003, with her family at her side.

58.    If Mrs. Pollard's cancer had not re-occurred and metastasized, she would not have required all of the cancer treatments she received starting in June, 2000, and continuing to her death.  If Mrs. Pollard had received chemotherapy beginning in late 1998, she more likely than not would have been cured of her cancer, and she would be alive today.

D.    **LIABILITY**

59.    Plaintiff has the burden of proving by a preponderance of the evidence that Veronica Pollard suffered metastatic breast cancer and died as the proximate result of Dr. Stephen Adams' failure to exercise the degree and care and skill required of a physician under the laws of the State of Georgia, where all of the medical care and treatment at issue was provided.  Under the Federal Tort Claims Act, the Government's liability is determined "in accordance with the law of the place where the negligent act or omission occurred."  The Court, as fact finder, must determine whether Dr. Adams was negligent, and if so, whether his negligence caused or contributed to Veronica Pollard's injuries and death.

60.    There are three essential elements for imposing liability in this medical negligence case: (1) the existence of a duty inherent in a doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and, (3) the breach of the duty being the proximate cause of the injury sustained.  T6-112;  [Cite to be provided][1]

61.    Dr. Adams owed no duty to Mrs. Pollard unless and until a doctor-patient relationship was formed.  The relationship between a patient and her physician, once formed, is one of trust and confidence.  T6-115; Bryson v. Aven, 124 S.E. 553 (Ga. Ct. App. 1924); Saffold v. Scarborough, 86 S.E.2d 649 (Ga. Ct. App. 1955);  Stephen W. Brown & Co. Assoc. v. Gowers, 278 S.E.2d 653 (Ga. Ct. App. 1981).

---

[1]    Beginning in this section of his proposed findings of fact and conclusions of law, Plaintiff has relied on the Court's February 15, 2005, jury instructions from the previous trial in this case. Any citations to this portion of the trial transcript follows the following format:  "T6-___."

62.     The Court finds that a doctor-patient relationship existed between Dr. Adams and Veronica Pollard beginning on October 14, 1998.

**STANDARD OF CARE**

63.     Ordinary negligence means the absence of, or the failure to use, that degree of care that is used by ordinarily careful persons under the same or similar circumstances.  Negligence may consist of doing something which should not have been done, or not doing something that should have been done.  T6-113-114; Ferguson v. Gurley, 125 S.E.2d 218 (Ga. Ct. App. 1962); Georgia Pattern Jury Instruction 60.010 Torts; Ordinary Negligence (Ordinary Diligence).

64.     A practicing physician must exercise a reasonable degree of care and skill as is ordinarily employed under similar conditions and like surrounding circumstances.  Any injury resulting from a want of that care or skill is an act for which a recovery may be had.  T6-115; O.C.G.A. § 51-1-27; Simpson v. Dickson, 306 S.E.2d 404 (Ga. Ct. App. 1983); Bulloch Co. Hosp. Auth. v. Fowler, 183 S.E.2d 586 (Ga. Ct. App. 1971), overruled on other grounds, Gilson v. Mitchell, 205 S.E.2d 421 (Ga. Ct. App. 1974); Hopper v. McCord, 153 S.E.2d 646 (Ga. Ct. App. 1967); Mills v. Emory University, Inc., 150 S.E.2d 276 (Ga. Ct. App. 1966); Word v. Henderson, 142 S.E.2d 244 (Ga. Ct. App. 1965);  Howell v. Jackson, 16 S.E.2d 45 (Ga. Ct. App. 1941); Hinkle v. Smith, 77 S.E. 650 (Ga. Ct. App. 1913). Thus, in this case, the Government was negligent if Dr. Adams failed to use the degree of care or skill ordinarily employed by a pathologist generally under same or similar surrounding circumstances.  If the injury to Plaintiffs resulted from Dr.

Adams' failure to meet the standard of care, then the Government may liable for the resulting injuries.

65.    The Plaintiff must prove that the Government was negligent in one or more ways alleged in order to recover.  It is not necessary for the Plaintiff to prove that the Government was negligent in every way that Plaintiff claims.  T6-114; Georgia Pattern Jury Instruction 60.060 Torts; Negligence; One Act Sufficient.

66.    A defendant is not negligent based only on an assessment of a patient's condition that only later, in hindsight, proves to be incorrect, as long as the initial assessment was made in accordance with reasonable standards of medical care.  In other words, the concept of negligence does not include hindsight.  T6-116-117.

67.    Although there is a presumption in these cases that the services were performed in an ordinarily skillful manner, a plaintiff overcomes this presumption with evidence that the doctor did not treat the patient in an ordinarily skillful manner.  Expert testimony is usually required to overcome the presumption, and the burden is on the plaintiff to show a lack of due care and skill by a preponderance of the evidence.  T6-116; Beach v. Lipham, 578 S.E.2d 402 (Ga. 2003).

68.    The Court finds that the Government, through Dr. Adams, departed from the standard of care in the following ways:  (a) he incorrectly measured the gross size of the Tumor as only 0.5 cm; (b) he failed to measure the size of the Tumor under the microscope; (c) he failed to measure the size of the Tumor as

greater than 1.0 centimeters; (d) he failed to state in the Report that the Tumor was greater than 1.0 cm; (e) he failed to report the Tumor as a T1-c tumor; (f) he did not provide a sufficient histologic grade for Mrs. Pollard's cancer; (g) he gave the false impression that the cancer may be a medullary or less aggressive cancer than the type of cancer Mrs. Pollard actually had.

69.     The Court also finds that Dr. Adams departed from the standard of care by: (a) not sending a sample of the Tumor to IMPATH for additional studies, including estrogen receptor and progesterone receptor analysis, within a few days after the October 14, 1998, cancer diagnosis; (b) not obtaining results from IMPATH by the end of October 1998; and (c) and not sending a sample of the Tumor to IMPATH until sometime after Mrs. Pollard's first visit with Dr. Gupta on December 1, 1998.   The Court notes that essentially all treatment decisions for women newly diagnosed with breast cancer start with, and are reliant upon the pathologic evaluation and staging of the cancer.   As has been clearly shown in this case, the medical clinicians/oncologists will look to the pathology report to determine if a woman should have chemotherapy, radiation therapy or is a candidate for Tamoxifen.   Absent an accurate pathologic evaluation of the cancer, the patient's subsequent physicians will be deprived of critical information required for the patient's well-being.

70.     In making these findings, the Court relied principally on the testimony of Plaintiff's expert pathologist, Arthur McTighe, M.D.  Dr. McTighe is the Director of Pathology at Union Memorial Hospital in Baltimore.  He is licensed in Maryland.  Dr. McTighe completed his pathology training at Yale and

has been board certified in pathology, anatomic and clinical pathology, medical microbiology, dermapathology and cytopathology.  He has been board certified since 1975.  Dr McTighe was the Vice Chair of Pathology for twelve years at Maryland General Hospital, and he is an Inspector for the College of American Pathologists' accreditation programs.  Dr. McTighe testified that he had reviewed medical records from DDEMC, from a variety of hospitals in Great Britain, that he examined the Armed Forces Institute of Pathology report, the specimens from 2000, including two breast biopsies, all of the tumor records, as well as all pertinent depositions.  In his career, Dr. McTighe has reviewed thousands of breast cancer slides.  He has been asked for and given his opinion to dozens, if not hundreds, of oncologists about the management of breast cancer patients in the same or similar clinical setting and circumstances that were presented to Dr. Adams in this case.  The Court found Dr. McTighe to be credible and reliable.

71.    Dr. McTighe testified that Dr. Adams breached the standard of care by erroneously measuring the Tumor at 0.5 centimeters, based only on his gross examination of the Tumor.  In fact, the Tumor on the slide was at least double that size.  Dr. McTighe also confirmed that the standard of care required Dr. Adams to measure the Tumor under his microscope, but he never did.  Had he done so, Dr. Adams would more likely than not have seen that the Tumor was greater than 1.0 cm., and he would have classified it as a T1-c tumor, and not a T1-b tumor.

72.    Dr. McTighe also stated that Dr. Adams breached the standard of care by incorrectly reporting that the Tumor extended only "extremely close" to

the margins. In fact, the Tumor extended all the way into the Tumor's margins. Thus, even assuming that the Tumor was less than 1.0 cm. on either gross or microscopic examination, the standard of care required Dr. Adams to report it as a T1-c tumor (>1.0 cm.).

73.    Dr. McTighe also explained that Dr. Adams breached the standard of care by not including in his Report a histologic grade for the Tumor, and that by doing so he left out important information with important implications for treatment.

74.    Dr. McTighe also explained that the standard of care required Dr. Adams, as the pathologist who analyzed Mrs. Pollard's Tumor, to obtain as soon as possible information from IMPATH concerning the Tumor, such as tumor markers, and whether the Tumor was estrogen receptor or progesterone receptor positive or negative. Dr. Gupta testified that this information was needed to allow Mrs. Pollard and him to make appropriate treatment choices as soon as possible, because early detection and treatment of her breast cancer was essential to its cure. These tests needed to be done automatically and immediately after the October 14, 1998, cancer diagnosis, not two months later, as Dr. Adams allowed. As Dr. McTighe established, the IMPATH laboratory accepts samples only by overnight Federal Express, and communicates tests results immediately by telecopy. According to these normal practices, IMPATH would have reported its results back to Dr. Adams within three to four days after the October 14, 1998, biopsy, and Dr. Adams would then have been able to follow up with Mrs.

Pollard's other doctors.  Dr. Adams offered no explanation at trial as to why these studies took so long to obtain, other than to say that "these things happen."

75.    Dr. McTighe also made clear, based on his years of dealing with breast cancer patients, that the standard of care required not only early diagnosis of Mrs. Pollard's cancer, but also early treatment.  This is because Mrs. Pollard's breast cancer, having been diagnosed at an early stage, had, at worst, only micrometastasized while she was in Georgia. Micrometastasized tumors are the most amenable to successful chemotherapy and radiation treatment.  Dr. Adam's malpractice caused Mrs. Pollard not to see an oncologist until December, 1998, and thereafter caused her never to receive the chemotherapy that would have cured her of the cancer.  It is undisputed that timing is of the essence in breast cancer treatment.  The earlier the treatment, the better the outcome.

## PROXIMATE CAUSATION

76.    Dr. Adams' negligence, alone, is insufficient to warrant a verdict in Plaintiff's favor.  Plaintiff must also prove that Mrs. Pollard's injuries and death were proximately caused by the Government's negligence.  T6-112-113.

77.    A proximate cause is a cause that, in the natural and continuous sequence, is unbroken by other causes, produces an event, and without which the event would not have occurred.  A proximate cause is that which is nearest in the order of responsible causes, as distinguished from a remote cause, that which stands last in causation, not necessarily in time or place, but in causal relation. T6-120; Georgia Pattern Jury Instruction 60.200 Torts; Proximate Cause; Definition.

78. In a negligence case, a defendant is liable when he commits a negligent act that puts in motion forces that result in the injury, when those forces are the natural and probable result of the act that the defendant committed, and that reasonably should have been foreseen by the defendant. Negligence consists of not foreseeing and guarding against that which is probable and likely to happen, not against that which is only remotely and slightly possible. If the chain reaction that resulted from the defendant's alleged negligence is the natural, probable and foreseeable result, then the plaintiff may recover. T6-114; <u>Stern v. Wyatt</u>, 231 S.E.2d 519, 520 (Ga Ct. App. 1976); <u>Stapleton v. Amerson</u>, 100 S.E.2d 628, 629 (Ga. Ct. App. 1957); Georgia Pattern Jury Instruction 60.202 Torts; Proximate Cause; Foreseeability; Natural and Probable Consequence; Intervening Cause Rules (Chain Reaction Situation).

79. A defendant may be liable for negligence even if he did not anticipate or contemplate the consequences that ensued, or the precise injuries sustained by the plaintiff. It is sufficient if, by exercise of reasonable care, a defendant might have foreseen that some injury would result from his actions. In other words, in this case, Plaintiff need not prove that the Dr. Adams might or should have seen the likelihood of Mrs. Pollard's particular injury or harm, or the extent of the harm, or the manner in which it occurred, but only that he should have anticipated that an injury or harm might result from his conduct. T6-120; O.C.G.A. § 51-12-9; <u>Stern v. Wyatt</u>, 231 S.E.2d 519 (Ga. Ct. App. 1976); <u>Lewis v. Harry White Ford</u>, 199 S.E.2d 599 (Ga. Ct. App. 1973); <u>Hospital Authority of Hall County & City of Gainesville v. Adams</u>, 140 S.E.2d 139 (Ga. Ct. App.

1965); <u>Atlanta Gas Light Co. v. Mills</u>, 51 S.E.2d 705 (Ga. Ct. App. 1949);

<u>Mathis v. Mathis</u>, 155 S.E. 88 (Ga. Ct. App. 1930); <u>Emory University v. Lee</u>, 104

S.E.2d 234 (Ga. Ct. App. 1958).

80.    In order for Plaintiff to show that the Dr. Adams' negligence was

the proximate cause of the Plaintiff's injuries, Plaintiff must present expert

testimony.  An expert's opinion on the issue of whether the defendant's alleged

negligence caused the plaintiff's injury cannot be based on speculation or

possibility.  It must be based on reasonable medical probability or reasonable

medical certainty.  T6-116; <u>Zwiren v. Thompson</u>, 578 S.E.2d 862, 867 (Ga.

2003).

81.    The Court finds that as a result of Dr. Adams' negligence, Mrs.

Pollard never received the chemotherapy and radiation treatment that she needed

as soon as possible after the November 12, 1998, lumpectomy.

82.    As Dr. McTighe testified, the direct and proximate result of Dr.

Adams' failures to appropriately measure the Tumor, report on its characteristics,

and properly arrange for the necessary tests at IMPATH, was that Mrs. Pollard

never received the adjuvant chemotherapy and radiation that she needed

beginning in late 1998.

83.    The Court also credits the testimony of Plaintiff's second expert,

James V. Fiorica, M.D.  Dr. Fiorica is board certified in obstetrics, gynecology,

and gynecologic oncology.  Dr. Fiorica completed a GYN Oncology Fellowship

as well as a Breast Fellowship.  He is in active clinical practice, specializing in

breast and other forms of female cancer in South Florida.  Dr. Fiorica was

thoroughly familiar with the medical records of this case, and the medical literature which applied to the circumstances of Veronica Pollard's medical treatment.

84.     Dr. Fiorica testified, and the Court agrees, that if the United States, through Dr. Adams, had adhered to the standard of care, then the oncologists or other health care providers at DDEMC would have strongly recommended to Mrs. Pollard no later than late October 1998, that she commence chemotherapy for her newly discovered breast cancer as soon as possible after her lumpectomy surgery. Mrs. Pollard would have received a strong recommendation for immediate chemotherapy for three principal reasons. First, she was an appropriate, if not ideal, patient who would benefit from chemotherapy. She was a young, African American woman with estrogen and progesterone receptor negativity. Second, the type of cancer that Mrs. Pollard had, known as a high grade tumor, was the type that responds best to chemotherapy. Third, there was only a microscopic amount of cancer in Mrs. Pollard's body as of November 12, 1998.

85.     The Court further finds, based on Dr. Fiorica's and Mrs. Pollard's testimony, that if she had received a strong recommendation for immediate chemotherapy, Mrs. Pollard, like the vast majority of Dr. Fiorica's patients would have followed that advice and would not have moved to England with her husband in 1998, but rather she would have stayed at Ft. Gordon to receive chemotherapy treatment, followed by radiation therapy.

86.     In order to cure Mrs. Pollard of her cancer, the Court finds that it was essential that chemotherapy, followed by radiation therapy begin as soon as

possible after the November 12, 1998, lumpectomy, and no later than mid-December 1998.    Pathology reports following the excisional biopsy and lumpectomy showed that, by November 1998, Mrs. Pollard's cancer could only have been microscopic.  The second pathology report on the Tumor (April 1999) showed that, as of October 1998, the cancer had not invaded Mrs. Pollard's vascular system.  The November 10 bone scan showed that there was no cancer in Mrs. Pollard's bones.  The pathologist found who examined the breast tissue removed during the lumpectomy found that it contained no cancer cells.  Similarly, the dissected lymph nodes showed no evidence of malignancy.  Thus, as of November 12, 1998, the cancer that existed somewhere in Mrs. Pollard's body was only microscopic, and in only a tiny amount.  It was, at that point, most vulnerable to the curative effects of chemotherapy and radiation.  If Mrs. Pollard's doctors had commenced those therapies by mid-December 1998, then it is more likely than not that chemotherapy and radiation therapy would have killed all of the microscopic cancer cells in Mrs. Pollard's body, that Mrs. Pollard would have been cured of her cancer several months later in 1999, and she would be alive today.  The Court notes that on June 9, 2000, Mrs. Pollard's Army doctors documented that she was responding to chemotherapy.  According to Drs. Fiorica and McTighe, this response is evidence that Mrs. Pollard's cancer was sensitive to chemotherapy and that it would have been eradicated if aggressively treated in late 1998 when Mrs. Pollard's cancer burden or volume was at its lowest.  The reason the chemotherapy was ultimately unsuccessful was that by June, 2000,

sixteen months had passed since the excisional biopsy. Sixteen months of unchecked and untreated cancer growth.

87. The Government has asserted contributory negligence as an affirmative defense. The doctrine of contributory negligence is grounded in the notion that every plaintiff has a duty to use ordinary care for his or her own safety. On this issue, the Government has the burden of proof. T6-113.

88. If Mrs. Pollard failed to use ordinary care – and was contributorily negligent -- and if that failure was the sole proximate cause of Plaintiff's injuries, then Plaintiffs cannot recover from the Government. T6-113.

89. Likewise, if the Government was negligent, but Mrs. Pollard's negligence not only contributed to their injury and damages, but was equal to or even greater than that of the Government, then Plaintiff cannot recover. T6-113.

90. Finally, if Government was negligent so as to be liable to the Plaintiff, and Mrs. Pollard was also contributorily negligent, but Mrs. Pollard's negligence was less than the Government's negligence, then Mrs. Pollard's negligence does not prevent Plaintiff's recovery of damages, but would require a reduction of the amount of damages otherwise awarded to him in proportion to the negligence of Mrs. Pollard as compared with that of Dr. Adams. T6-113-114.

91. Notwithstanding the above, in the medical negligence context, a patient has a right to rely on what she is told by her medical doctors about her condition, and the patient is not contributorily negligent by so relying. T6-115; Stephen W. Brown Radiology Assoc. v. Gowers, 278 S.E.2d 653 (Ga. Ct. App. 1981); Leagan v. Levine, 279 S.E.2d 741 (Ga. Ct. App. 1981).

92.    The Government has argued that Mrs. Pollard failed to use ordinary care once she learned of her cancer, and that her failure was the sole proximate cause of her injuries.  The Court has heard the testimony of Mrs. Pollard, through her deposition and her videotaped *de bene esse* deposition taken prior to her death.  The Court concludes that as to the negligence of Dr. Adams, the Government has no defense of contributory negligence as a matter of fact, or law.

## DAMAGES

93.    Under Georgia law, an injured plaintiff is entitled to recover damages for all harm -- past, present, and prospective – that are proximately or legally caused by the defendant's negligence.   Damages may be awarded for any injury or condition which the plaintiff may have suffered if it is established by a preponderance of the evidence that such injury or condition was proximately caused by the tort.

94.    Damages are given in order to compensate the plaintiff for injuries caused by a defendant's negligence.  When one party is required to pay damages to another, the law seeks to ensure that the damages awarded are fair to both parties.  A prevailing plaintiff is entitled to a reasonable and just sum.  T6-120-121; Georgia Pattern Jury Instruction 66.000 Tort Damages; Preliminary Instructions

### Mrs. Pollard's Pain and Suffering

95.    Pain and suffering is a legal item of damages in a case such as this. It is measured by the enlightened conscience of a fair and impartial finder of fact

based on how much and how long Mrs. Pollard suffered.  T6-124; Georgia Pattern Jury Instruction 66.501 Tort Damages; Pain and Suffering; Generally.

96.    Unlike tort cases that do not involve a physical injury, Plaintiff's damages for Mrs. Pollard's pain and suffering may include damages for mental, as well as physical, suffering.  Anxiety, shock, and worry are examples of what is included under mental pain and suffering.  T6-124; Nationwide Mutual Fire v. Lam, 546 S.E.2d 283 (Ga. Ct. App. 2001); Lee v. State Farm Mutual, 533 S.E.2d 82 (Ga. 2000); OB-GYN Associates of Albany v. Littleton, 386 S.E.2d 146 (Ga. 1989); Gibson's Prod. Co. of Albany, Inc. v. Mansfield, 196 S.E.2d 353 (Ga. Ct. App. 1973); Southern Railway Co. v. Jackson, 91 S.E. 28 (Ga. 1916); Chapman v. Western Union Telegraph Co., 15 S.E. 901 (Ga. 1892); Georgia Pattern Jury Instruction 66.502 Tort Damages; Pain and Suffering; Mental Pain and Suffering.

97.    The Court has had an opportunity to view videotapes of Mrs. Pollard at various stages of her battle against her metastatic breast cancer.  The Court has watched how Mrs. Pollard interacted with her youngest child, Benjamin, and her husband.  It is clear that Mrs. Pollard suffered extreme physical and emotional pain and distress.  The Court heard evidence from Mrs. Pollard, her husband, and plaintiffs' expert, James Fiorica, M.D., describing the various surgeries Mrs. Pollard underwent, and the pain associated with these procedures. The Court has reviewed Mrs. Pollard's medical records which describe how she lost her energy and appetite, and even her voice, battling cancer for over three years.  Mrs. Pollard was treated on numerous occasions for nausea, vomiting, diarrhea and depression.  She, however, never gave up in her battle, and never

complained.    Had Mrs. Pollard been treated with timely chemotherapy and radiation she would have been cured by May, 1999, and would never have suffered the damages noted herein and contained in her medical records.

98.    The Court finds that an appropriate award for Mrs. Pollard's pain and suffering is **$3,000,000.00**.

### "Full Value" of Mrs. Pollard's Life

99.    Georgia law states that Plaintiff is entitled to recover the "full value" of Veronica Pollard's life.   The full value of Mrs. Pollard's life is determined by the evidence, without deduction for necessary or other personal expenses of the deceased if that person had lived.   T6-123; Pollard v. Boatright, 57 196 S.E. 215 (Ga. Ct. App. 1938); City of Macon v. Smith, 160 S.E.2d 622 (Ga. Ct. App. 1968); Rhodes v. Baker, 156 S.E.2d 545 (Ga. Ct. App. 1967); Elsberry v. Lewis, 231 S.E.2d 789 (Ga. Ct. App. 1976); Georgia Pattern Jury Instruction 66.304 Tort Damages; Life Expectancy; Full Value of Life.

100.    The "full value" of Mrs. Pollard's life is comprised of two categories of damages:   (a) items having a proven monetary value, such her lost potential lifetime earnings and lost household services, reduced to present cash value, and (b) intangible items whose value cannot be precisely quantified, such her loss of the society, advice, example, and counsel to her husband and children, as determined by the enlightened conscience of the Court, as factfinder.   T6-123; Childs v. United States of America, 923 F. Supp. 1570, 1582 (S.D. Ga. 1996) (quoting Consolidated Freightways Corp. v. Futrell, 410 S.E. 2d 751 (Ga. Ct.

App. 1991)).  An award for loss of the intangible items is not reduced to present value.  City of Macon v. Smith, 160 S.E. 2d 622 (Ga. Ct. App. 1968).

### Monetary Losses – Past Wages

101.    The first item of monetary loss is Mrs. Pollard's lost past wages, computed from the time of her injury to her death.  The amount recoverable as lost wages is the value of the earnings that, as shown by the evidence with reasonable certainty, Mrs. Pollard, in fact, lost as a result of the injury.  Her earnings at the time of the injury, what she earned following the injury, the amount customarily paid in the locality for the kind of work she did, and similar matters, are relevant to determining her lost past earnings.  T6-121; Georgia Pattern Jury Instruction 66.100 Tort Damages; Earnings, Past; Loss of.

102.    The evidence shows that Mrs. Pollard would have been able to work from mid-April, 2000, to the time of her death at the end of 2003 had the standard of care been met.  This is because Mrs. Pollard would certainly have completed her chemotherapy and radiation therapy by mid-April, 2000.  Utilizing Mrs. Pollard's 1999 annual wage of $50,708.00 in England, the Court finds that Mrs. Pollard's wage loss from April, 2000 until the date of her death is **$167,600.00**.

### Monetary Losses – Future Earnings

103.    Because Mrs. Pollard's earning capacity was permanently destroyed, then lost future earnings, just like lost past earnings, are also recoverable.  Future earnings are determined by the evidence of what Mrs. Pollard

would have earned in the future, had she lived.  T6-121; Georgia Pattern Jury Instruction 66.201 Tort Damages; Earnings; Loss of Future Earnings.

104.    In considering lost future earnings, the Court remained mindful of the fact that old age generally reduces the capacity to labor and earn money.  At the same time, the Court recognized that Mrs. Pollard's ability to earn money could have, depending on the evidence, increased during some later periods of her life.  T6-121-122.

105.    Mrs. Pollard's life expectancy is another factor that the Court must consider in calculating lost future earnings.  Indeed, the Court must calculate Mrs. Pollard's lost future earnings by considering both her earning capacity and life expectancy, and applying them to her life.    T6-122; Georgia Pattern Jury Instruction 66.202 Tort Damages; Earnings; Life Expectancy Georgia Pattern Jury Instruction 66.203 Tort Damages; Earnings; Average Annual Earnings.

106.    The Court may determine Mrs. Pollard's life expectancy two ways.  First, it may be determined based on her age, without any direct evidence on the subject other than her personal health, habits, surroundings, and method of living.  T6-122; Georgia Pattern Jury Instruction 66.301 Tort Damages; Life Expectancy; Generally.

107.    Alternatively, Mrs. Pollard's life expectancy may be determined based on a mortality table.    According to the mortality table introduced by Plaintiffs, Mrs. Pollard had a life expectancy of 79 years when she dies.  The life expectancy in the mortality table, however, is merely a guide.  T6-122.

108.    After determining the gross amount of Mrs. Pollard's lost future earnings, the Court must reduce the amount to its present cash value.  In doing so, the Court must use a discount rate of interest of 5% per annum. T6-122; Georgia Pattern Jury Instruction 66.204 Tort Damages; Earnings; Present Cash Value.

109.    The Court finds that as a result of Mrs. Pollard's death, Plaintiff suffered a significant loss of future earnings.

110.    The evidence shows that Mrs. Pollard stopped working due to her cancer on March 14, 2000, five days from her 45th birthday.  A normal work life expectancy for her would have been another 16.3 years.  However, the evidence shows that Mrs. Pollard had no plans to retire until age 65.  Thus, the Court finds Mrs. Pollard had a 20 year work life remaining as of March 2000.

111.    The evidence showed that Mrs. Pollard left the United States Army in February, 1995 as a Sergeant.  In 1996, she became employed as a Technical Instructor for GTE.  In 1999, after moving to England, Mrs. Pollard became employed at Management Technologies, and earned a salary of $33,280.00 per year.  Additionally, she received $17,428.00 a year in housing and *per diem* allowances.  Hence, the Court finds that her income when she was forced to stop working in March 2000 was $50,708.

112.    The Court heard the testimony of Plaintiff's economist, Richard Lurito, Ph.D., and credits his testimony as to the amount of Mrs. Pollard's lost earning capacity.  As Dr. Lurito explained, Mrs. Pollard's $50,708 annual income would likely have risen at an annual rate of 6.76% beginning in 2000.  This increase is based on a 4.87% inflation rate, and a 1.89% productivity increase.

However, in order to be conservative, Dr. Lurito utilized only a 3.5% annual wage increase in his calculations, and the Court adopts that rate if increase. Likewise, in his present value calculations, Dr. Lurito utilized the conservative 5% discount rate that is mandated by Georgia law.

113.    Based on the foregoing, the Court finds that the present value of Plaintiff's lost future wage claim is **$1,096,683.00**.

**Monetary Losses – Household Services**

114.    The economic value of the household services that Mrs. Pollard performed for, and on behalf of, her husband and children is another element of Plaintiff's monetary losses. The economic value of Mrs. Pollard's services is not dependent upon direct or express evidence of the value of the person's services by the hour, week or month. This may be determined from the individual facts and circumstances of this case, and estimated in the light of common observations and experience. O.C.G.A. § 51-4-1(1); O.C.G.A. § 51-12-13; Pollard v. Boatwright, 196 S.E. 215 (Ga. Ct. App. 1938); Southwestern Railroad v. Paulk, supra; Elsberry v. Lewis, 231 S.E.2d 789 (Ga. Ct. App. 1976); Boswell v. Barnhard, 23 S.E. 414 (Ga. 1895); Atlantic C.C. R.R. v. Dougherty, 157 S.E.2d 880 (Ga. Ct. App. 1967); Standard Oil Co. v. Regan, 84 S.E. 69 (Ga. Ct. App. 1915); Metropolitan St. R. Co. v. Johnson, 18 S.E. 816 (Ga. 1893); Georgia Railroad Co. v. Tice, 52 S.E. 916 (Ga. 1905); City of Macon v. Smith, 160 S.E.2d 622 (Ga. Ct. App. 1968); Rhodes v. Baker, 156 S.E.2d 545 (Ga. Ct. App. 1967).

115.    The Court has heard testimony from Sgt. Pollard that Mrs. Pollard spent approximately 56 hours a week providing a full range of household services

to her husband and two minor children prior to April, 2000, when she was no longer able to provide these services.

116.    The Court finds, based on Dr. Lurito's testimony, that it is entirely reasonable to utilize a household services replacement rate of $10.50 per hour, and to utilize a 4% annual cost escalation factor.  The Court also finds that the same 5% discount rate must be applied under Georgia law, and again utilizing Dr. Lurito's analysis, concludes that the present value of these lost services until Mr. and Mrs. Pollard reached their joint life expectancy, is **$523,181**.

### **Intangible Losses – Loss of Life, Relationships, Providing Society, Advice, and Companionship**

117.    The second category of the "full value" of Veronica Pollard's life is the value of "intangible elements" of her life.  Plaintiff's intangible damages also include the value that Mrs. Pollard she placed on being alive, and her enjoyment of life and living.  They also include the value that Mrs. Pollard placed on her relationships with her husband and children, as well as the society, advice, counsel, and companionship that she shared with them and her friends.  City of Macon v. Smith, 160 S.E. 2d 622, 630-31 (Ga. Ct. App. 1968).

118.    The Court finds that an appropriate award for loss of "the full value of Mrs. Pollard's life," is **$5,000,000**.

119.    Based on the foregoing findings of fact and conclusions of law, the Court will, by separate order, enter judgment for the Plaintiff as follows:

  a. Veronica Pollard's physical pain, suffering and

mental anguish                                                $3,000,000

    b.   The Full Value of Veronica Pollard's life, including:

          i.   Economic damages (lost income, potential
              lifetime earnings, and services);                $1,787,464

         ii.   Non-economic damages (loss of her guidance,
              example, comfort, care, counsel and support)    <u>$5,000,000</u>

                                    **TOTAL**   **$9,787,464**


Date:  April 12, 2007                Respectfully submitted,

                                BRUCE J. KLORES & ASSOCIATES, P.C.


                                By:_____/s/_____
                                Bruce J. Klores
                                Thomas W. Mitchell
                                1735 20th Street, NW
                                Washington, D.C. 20007
                                (202) 628-8100
                                Co-counsel for Plaintiffs

                                    and

                                LAW OFFICES OF PETER MASCIOLA

                                _____/s/_____
                                Peter R. Masciola
                                601 Pennsylvania Avenue, N.W. #900
                                Washington, D.C. 20004
                                202-628-5680
                                Co-counsel for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served by telecopy and first class mail postage prepaid to the following person this 12th day of April, 2007:

Larry D. Adams
Assistant United States Attorney
6625 United States Courthouse
101 West Lombard Street
Baltimore, Maryland 21201


_____/s/_____
Thomas W. Mitchell


1606\findings.twm.1